**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIPELINE HEALTH SYSTEM, LLC., *et al.*,[1] | ) | Case No. 22-90291 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF RUSSELL A. PERRY, CHIEF
TRANSFORMATION OFFICER OF PIPELINE HEALTH SYSTEM, LLC,
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Russell A. Perry, hereby declare under penalty of perjury:

1. I am the Chief Transformation Officer ("CTO") of Pipeline Health System, LLC ("PHS" and, together with its affiliated debtors and debtors in possession, the "Debtors" or "Pipeline"). I am also a Senior Managing Director of Ankura Consulting Group, LLC ("Ankura"). Pursuant to an agreement with the Debtors, Ankura agreed to provide personnel to the Debtors to assist with certain functions. I was appointed CTO of PHS on August 24, 2022.

2. I hold a bachelor's degree in agribusiness, an MBA degree from Texas A&M University, and am a CFA® charterholder. I have more than fifteen years of restructuring and bankruptcy-related experience, with a focus on the U.S. healthcare market. During that time, I have advised and assisted distressed companies across various complex financial, operational, and strategic situations, including serving in interim management, Chief Restructuring Officer, Strategic Restructuring Advisor, and Independent Manager positions. My experience includes financial statement analysis, financial projection development, liquidity and cash management,

---

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at http://dm.epiq11.com/PipelineHealth. The Debtors' service address is 898 N. Pacific Coast Highway, Suite 700, El Segundo, California 90245.

M&A support, stakeholder negotiations, balance sheet recapitalization and restructuring, postpetition financing and sourcing, and bankruptcy preparation and administration.

3.       I have played a key role in many successful chapter 11 restructurings, including *In re Trident Holding Co., LLC*, No. 19-10384 (SHL) (Bankr. S.D.N.Y. Feb. 10, 2019); *In re Virginia United Methodist Homes of Williamsburg, Inc.*, No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 1, 2013); *In re Franciscan Cmtys. St. Mary of the Woods*, No. 1:11-bk-19865 (JPS) (Bankr. N.D. Ohio Nov. 21, 2011); *In re the Clare at Water Tower*, No. 11-46151 (TAB) (Bankr. N.D. Ill. Nov. 14, 2011); *In re Forum Health*, No. 9-40795 (KW) (Bankr. N.D. Ohio Mar. 16, 2009); *In re SQLC Senior Living Ctr. at Corpus Christi Inc.*, No. 2:19-bk-20063 (DRJ) (Bankr. S.D. Tex. Feb. 8, 2019); *In re Fairview Village* No. 1:11-bk-04392 (TAB) (Bankr. N.D. Ill. Feb. 4, 2011); and *In re Tarrant County Senior Living Ctr., Inc. d/b/a The Stayton at Museum Way*, No. 19-33756 (SGJ) (Bankr. N.D. Tex. Nov. 5, 2019).  I also served as the Assistant Chief Restructuring Officer of Gulf Coast Health Care, LLC in the chapter 11 cases styled as *In re Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del. Dec. 17, 2021), and as Strategic Restructuring Advisor, in interim management and as independent manager in other confidential, out-of-court matters.

4.       Since April 2021, I and the Ankura team have worked closely with the Debtors and their management on various financial and operational turnaround projects.[2]  As a result of my role and experience with the Debtors, my review of relevant documents, and my discussions with other individuals who manage the Debtors' day-to-day business operations and affairs, I am generally familiar with the Debtors' business, financial affairs, and books and records.  I submit

---

[2]     Ankura was originally retained from April to July 2021 in a limited capacity focused on the Illinois Facilities and then re-engaged in May 2022.

this declaration (this "<u>Declaration</u>") to assist the Court and parties in interest in understanding the circumstances that compelled Pipeline's commencement of these chapter 11 cases and to provide support for Pipeline's voluntary chapter 11 petitions and related First Day Motions (as defined herein) filed on the date hereof (the "<u>Petition Date</u>").[3]

5.    Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, information obtained from the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## Introduction

6.    Pipeline is an independent, community-focused healthcare network that offers a wide range of medical services to the communities it serves, including maternity care, cancer treatment, behavioral health, rehabilitation, general surgery, and hospice care.  Headquartered in El Segundo, California, Pipeline's operations include seven "safety net" hospitals, three health clinics, and three medical group centers across California, Texas, and Illinois, with approximately 310 physicians and over 1,150 beds to serve patients, and a company-wide workforce of over 4,200.  Pipeline's healthcare facilities, which have served their respective communities for decades, include seven emergency departments, six general surgery departments, six orthopedic surgery departments, and five intensive or critical care departments.  In the twelve-month span

---

[3]    The factual statements set forth in the First Day Motions are incorporated herein by reference.

ending August 2022, Pipeline delivered more than 2,200 babies, performed more than 19,000 surgeries, provided emergency medical care in more than 179,000 visits, and provided other medical care in more than 328,000 office visits and 29,000 hospital admissions.

7.      As a community hospital enterprise, most of the Pipeline's patients rely on Medicare, Medicaid, or other government programs for healthcare coverage.   In 2020, approximately two-thirds of Pipeline's patients relied on government programs for healthcare coverage.   Pipeline thus relies significantly on government reimbursement payments and other governmental funding to fund operations.   As a result, any decrease or delay in the amount or frequency of such payments and funding has a direct, adverse impact on Pipeline's financial condition.   In addition, Pipeline's healthcare mission—to provide quality patient care in generally underserved communities—is cost intensive.   Realizing this mission requires Pipeline to make significant capital expenditures to keep its healthcare facilities in good working order and to dedicate significant operating liquidity to facility staffing costs.   Pipeline has, however, recently experienced a number of material funding delays in connection with governmental health coverage programs, which has placed the Debtors under significant financial strain.

8.      Pipeline, like many other hospital operators, has faced significant headwinds since 2020, largely because of changing health trends related to the global COVID-19 pandemic. In Pipeline's case, these headwinds have been compounded by various operational challenges. Most acutely, in the wake of the COVID-19 pandemic, Pipeline's costs for nurses and other contract labor and medical supplies skyrocketed.   The Debtors are also burdened by aging facilities which require extensive capital expenditures to maintain.   In addition, the Debtors' underlying business has suffered from certain burdensome legacy contractual arrangements related to labor, services, goods, or technology services.   Finally, as an operator of safety-net hospitals, Pipeline

has historically relied on governmental reimbursement payments and other government funding. Recent delays and cuts to governmental funding sources have contributed to the significant strain on the Debtors' finances.

9.      These factors have adversely impacted Pipeline's liquidity and overall financial condition.  This is particularly true with respect to Pipeline's Illinois operations (collectively, the "Illinois Facilities").  The Illinois Facilities have required significant working capital and have posted large financial losses since they were acquired.  In the twelve-month period ending in August 2022, the Illinois Facilities posted a net loss of approximately $69.7 million on a consolidated basis.

10.     Due to the financial state of the Illinois Facilities, Pipeline's California- and Texas-based healthcare operations have effectively subsidized the Illinois Facilities to avoid operational disruptions thereof.  This subsidization, however, has destabilized Pipeline's overall healthcare network.  Adequately addressing Pipeline's financial difficulties with a goal to reach profitability again while maintaining a high level of patient care requires further financial investment and a sale of the Illinois Facilities.

11.     Before commencing these chapter 11 cases, the Debtors negotiated a sale of the Illinois Facilities to Ramco Healthcare Holdings, LLC ("Ramco") who, in turn, planned to lease the premises to Michigan-based AUM Global Healthcare Management LLC doing business as Resilience Health ("Resilience" and, together with Ramco, the "Illinois Buyers") to continue operations.  On July 19, 2022, certain entities of Pipeline and Ramco entered into a real estate asset purchase agreement (the "Chicago APA") whereby Ramco agreed to purchase the Illinois Facilities' underlying real estate for $92 million, subject to standard closing conditions, including a financing contingency (such potential sale, the "Illinois Sale").  In addition to the real estate

purchase, Resilience agreed to take the equity interests in the entities operating the Illinois Facilities pursuant to a membership-interest purchase agreement in exchange for the assumption of liabilities.  On June 7, 2022, the Illinois Health Facilities and Services Review Board approved the Illinois Sale.  Had the Illinois Sale closed, it would have materially increased the Debtors' liquidity—bringing in $92 million and relieving Pipeline's Texas and California operations from continued subsidization of significant Illinois operating losses.  The Illinois Sale was initially set to close on August 30, 2022.

12.    To provide liquidity and bridge to closing of the sale, on August 11, 2022, Pipeline entered into certain amendments to the Main Facility (as defined herein) with the lenders thereunder (the "Term Loan Lenders") that provided for an additional $30 million of committed funding (the "Bridge Financing Facility").  In the weeks following execution of the real estate purchase agreement, however, the Illinois Buyers indicated they were not able to close by the August 30 deadline, and on August 30, 2022, the Illinois Buyers terminated the Chicago APA. Since then, the Debtors and the Illinois Buyer and their respective advisors have continued to engage in discussions and negotiations regarding the Illinois Buyer's acquisition of the Illinois Facilities.  The Debtors' cash position has continued to deteriorate following the failure to consummate the Illinois Sale.

13.    In the intervening time, the Debtors negotiated with their prepetition Term Loan Lenders to draw upon substantially all of the $30 million commitment for additional funding under the Bridge Financing Facility to fund operations.  The collective $30 million in critical pre-filing liquidity enabled the Debtors to finalize preparations for chapter 11 and avoid a value-destructive crash filing.

14.     In parallel, the Debtors also explored additional financing options, canvassing the market and engaging in DIP financing negotiations with the Term Loan Lenders.  As explained in the *Declaration of Jeffrey Finger in Support of the Debtors' DIP Financing Motion* (the "DIP Declaration") filed contemporaneously herewith, the Debtors' market check ultimately did not receive any actionable proposals.[4]  The one proposal was offered by the ABL Lender (as defined herein), which would allow the Debtors to continue to access funding under the ABL Facility (as defined herein).  I and the Debtors do not believe such proposal would provide sufficient additional liquidity to justify entering a debtor-in-possession agreement with the ABL Lender at this time.  Instead, following hard-fought, arm's-length negotiations with the Term Loan Lenders, the Debtors secured commitments for an approximately $110 million superpriority senior secured debtor-in-possession financing facility (the "DIP Facility").  The DIP Facility will provide $40 million in new cash for the Debtors and approximately $70 million to roll up certain prepetition debt of the Term Loan Lenders, including the Bridge Financing Facility, as further described in the DIP Motion.  This money will provide the Debtors with necessary liquidity to continue operations to fund the costs of the chapter 11 process while they work to implement a comprehensive operational and balance-sheet solution.  The engagement with, and support from, the Term Loan Lenders with respect to prepetition liquidity, postpetition financing, and timing of these cases has been a critical element of the Debtors' efforts to preserve both value and hospital services for patients.

---

[4]     The Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion") contemporaneously with this First Day Declaration.

15.     Pipeline commenced these chapter 11 cases with a view toward realizing a comprehensive operational and balance sheet solution to enable Pipeline's healthcare network to continue providing vital medical care to the communities it serves.  The Debtors' contemplated solution has several components.

16.     *First*, the Debtors' have filed contemporaneously herewith a value-maximizing chapter 11 plan (as may be amended, modified, or supplemented, the "Plan")[5] that sets forth the terms of a restructuring transaction that will enable the Debtors to emerge from chapter 11 quickly with a manageable go-forward balance sheet and greater operational flexibility, unburdened by costly legacy contracts.  Pursuant to the Plan, the Term Loan Lenders will either receive reorganized equity or the Debtors' assets through a credit bid.  The Debtors are seeking an expeditious chapter 11 process that appropriately balances Pipeline's financial and operational restructuring goals, the health and safety of the Debtors' patients, and notice and due process considerations.  Accordingly, the Debtors have also filed the Scheduling Motion asking the Court to approve a proposed case schedule that the Debtors believe strikes a balance among these various considerations, as well as the milestones under the DIP Facility.

17.     *Second*, the Debtors' contemplated restructuring solution includes an active, open marketing process for a value-maximizing sale for some or all of the Debtors' assets.  To that end, on the Petition Date, the Debtors have filed a motion asking the Court to approve the *Debtors' Motion for Entry of an Order (I) Approving the Bidding Procedures, (II) Establishing Related Dates and Deadlines, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* (the "Bidding Procedures") for such a sale and certain related dates and deadlines.

---

[5]     The Plan remains subject to continuing negotiations with, among other parties, the Term Loan Lenders and proposed DIP Lenders (as defined in the DIP Motion).

The Bidding Procedures will allow the Debtors flexibility to market assets in California, Texas, and Illinois to potential buyers.  Consummating the Illinois Sale separately on an expedited basis would quickly unlock the value of those assets for Pipeline and unburden its remaining operations, while also allowing for the integration of the Illinois Facilities into a healthcare network that can properly support them.  To that end, the Debtors are continuing to engage in negotiations with the Illinois Buyers to pursue a path to closing the Illinois Sale inside of chapter 11 as well as engaging with other potential buyers.

18.     As such, the Debtors are continuing to engage in negotiations with Ramco to pursue a path to closing the Illinois Sale inside of chapter 11.  To that end, the Debtors are prepared to quickly file a private sale motion with respect to the Illinois Sale or, in the alternative, engage in discussions with Ramco regarding the potential to serve as a stalking horse purchaser.

19.     **Third**, the Debtors have filed the First Day Motions that ask the Court to approve, among other things, the Debtors' entry into the DIP Facility (and related documents) and consensual use of cash collateral, the Debtors' payment of certain prepetition obligations, and certain procedural relief.  As explained below, I believe that the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as well as potential harm to patients at the Debtors' healthcare facilities.  The relief requested in the First Day Motions would allow Pipeline to smoothly transition into chapter 11 and provide additional runway so that the Debtors could pursue a comprehensive solution.

20.     To further familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into four sections as follows:

- **Part I** provides a general overview of the Debtors' organizational history, key assets, business operations, and revenue;

- **Part II** provides an overview of the Debtors' prepetition organizational and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases and Pipeline's contemplated path forward through these chapter 11 cases; and

- **Part IV** sets forth the evidentiary basis for the relief requested in the First Day Motions.

**I.     The Company's History and Business Operations.**

**A.     Corporate History.**

21.     Pipeline can trace its roots back to January 2009, when a group of investors, including Nick Orzano and Mark Bell (the "Founders") purchased the Memorial Hospital of Gardena and East Los Angeles Doctors Hospital in California, both of which were underperforming financially under Avanti Healthcare Holdings, LLC ("Avanti"). After finding success with their initial investment, the group later acquired Community Hospital of Huntington Park in 2010. In 2010, a California law went into effect that provided additional funding to safety net hospitals, which provided a much-needed boost to Avanti's finances. In 2011, Avanti acquired the Community Hospital of Huntington Park, completing Avanti's acquisition of the four Debtor hospitals in California.

22.     In December 2018, the Founders formed PHS along with related entities of the Term Loan Lenders (the "Sponsors"). In January 2019, Pipeline closed on its purchase of three hospital facilities in the greater Chicago area from Tenet Healthcare Corporation. In March 2018, Pipeline acquired a majority interest in the entity holding what is now known as White Rock

Medical Center in Dallas, Texas. In December 2019, the Founders bought out the other equity holders of Avanti and consolidated Avanti's four facilities in Los Angeles under the Pipeline banner. Contemporaneously with Pipeline's acquisition of the Avanti and Chicago real estate in December 2019, Sponsors acquired additional equity of PHS such that the Sponsors, collectively, held more than 70% of the equity of PHS.

### B. Key Assets and Operations.

23.    The Debtors are a diversified multi-specialty healthcare network that delivers physician and patient-oriented services to underserved communities. Their hospitals are often the only available medical care in the area, making Pipeline a vital partner to each community. The Debtors own their facilities in Illinois and are parties to the Property Financings (as defined below) for its operations in California and Dallas. Together, the Debtors have more than 1,150 hospital beds available to the communities they serve. Each of the hospitals have an emergency department and offer a combination of services in specialties that may include cardiology, critical care, imaging and radiology, orthopedics (including orthopedic surgery), pulmonary care, general surgery, rehabilitation, and women's health.

#### 1.  *Weiss Memorial Hospital in Chicago, Illinois*



*Weiss Memorial Hospital (left), and Chicago Center for Orthopedics (right)*

24.    Founded in 1952, Weiss Memorial Hospital is a Joint Commission-accredited teaching hospital associated with the University of Illinois that operates on the north side of

Chicago.  It is also home to medical providers associated with UChicago Medicine.  The facility hosts approximately 236 hospital beds, includes state-of-the-art diagnostic and treatment options, and has an affiliated multidisciplinary clinic to provide internal medicine, geriatric medicine, and wound care.  The hospital's most recent achievements include opening its Outpatient Center for Behavioral Health in 2019, attaining Level Three Geriatric Emergency Department Accreditation from the American College of Emergency Physicians in 2021, and becoming the first hospital in Chicago to implement new 3-D, artificial intelligence-based cardiac technology in 2022.  The Weiss Memorial Hospital also houses the Jacob M. Arvey Community Health Center, an internal-medicine focused teaching facility where residents work under the direct supervision and guidance of experienced Weiss doctors.  Adjacent to and associated with the Weiss Memorial Hospital is the Chicago Health Medical Group, which provides multidisciplinary care including family medicine, endocrinology, and oncology.  In April 2022, Weiss Memorial Hospital announced the opening of the Chicago Center for Orthopedics to provide full-service orthopedic surgery. Approximately 60% of its revenue was generated from government health insurance programs and 40% from third-party insurers in 2020.

2.   *West Suburban Medical Center in Oak Park, Illinois*



*West Suburban Medical Center (left) and Chicago Health Medical Group, Bldg. A (right), both acquired in 2019*

25.   West Suburban Medical Center has operated in the Oak Park neighborhood of Chicago since 1914.  West Suburban Medical Center offers a full range of medical and surgical

specialties and comprehensive services.  Its services also include outreach programs and support groups for the community coordinated by West Suburban Medical Center.  The center has been recognized as one of the nation's top maternity centers by *Newsweek* for two years in a row and has upheld its accreditation in cancer treatment by the Commission on Cancer for more than 20 years.  The facilities associated with the West Suburban Medical Center include three River Forest Medical Campus buildings and the Chicago Health Medical Group.  Approximately 57% of its revenue was generated from government health insurance programs and 43% from third-party insurers in 2020.

*3.   White Rock Medical Center in Dallas, Texas*

26. Located in Dallas, Texas, White Rock Medical Center provides inpatient, outpatient, emergency, and telehealth services to thousands of people in the Dallas area each year.  White Rock Medical Center specializes in bariatrics, cardiology, orthopedics, and gynecology.   The White Rock Medical Center received a certificate of distinction in the management of chest pain in January 2022 and is accredited by the American Association of



*White Rock Medical Center*

Cardiovascular and Pulmonary Rehabilitation.  Additionally, the hospital has an affiliated clinic, the White Rock Medical Group, which offers primary care for adults, including sick visits, preventative care, and checkups.   Approximately 58% of its revenue was generated from government health insurance programs and 42% from third-party insurers in 2020.

### 4. *Coast Plaza Hospital in Norwalk, California*

27.     Coast Plaza Hospital has serviced the community of Norwalk, California for over 60 years.  The facility hosts 117 hospital beds and services over 15,000 annual emergency room visits.  Services at Coast Plaza Hospital include intensive care, critical care and progressive care, as well as in-house diagnostics and laboratory services.  In addition, the hospital is affiliated with the Coast Plaza Multi-Specialty Clinic, to provide care for non-urgent injuries


*Coastal Plaza Hospital*

and illnesses.  The hospital offers educational opportunities to the community, including classes on healthy eating and weight management.  Approximately 87% of its revenue was generated from government health insurance programs and 13% from third-party insurers in 2020.

### 5. *Community Hospital of Huntington Park in Huntington Park, California*

28.     Community Hospital of Huntington Park is the only local hospital serving the


*Community Hospital of Huntington Park*

densely populated underserved neighborhoods of Huntington Park, Maywood, Vernon, and Bell Gardens in Southern California, with 72.6% of households in the surround area earning less than $75,000 annually.   Approximately 93% of its revenue was generated from government health insurance programs and 7% from third-party insurers in 2020.  The hospital prides itself on its ability to offer services including cardiology, critical care, orthopedics, surgical services, and radiology, in addition to its emergency department,

to the community.  The hospital hosts patient education and community health programs, and works with several established nursing schools in their clinical rotations to further serve its community.

###### 6.  *East Los Angeles Doctors Hospital in Los Angeles, California*

29.     East Los Angeles Doctors Hospital has more than 215 physicians and accommodates more than 16,000 emergency room visits annually.  The hospital hosts a



multispecialty clinic in addition to its other services including cardiology, obstetrics and gynecology, surgical services, and emergency care.  The hospital is dedicated to caring for its underserved community and employs a diverse group of first- or second-

*East Los Angeles Doctors Hospital*

generation immigrant physicians.  Additionally, the hospital provides care for non-urgent medical ailment at its Multi-Specialty Clinic.  Approximately 93% of its revenue was generated from government health insurance programs and 7% from third-party insurers in 2020.

###### 7.  *Memorial Hospital of Gardena in Gardena, California*

30.     Serving southern California for more than 70 years, Memorial Hospital of Gardena is an accredited Primary Stroke Center and has a specialty Geriatric Emergency Department to serve the unique needs of its older community.  It is the only hospital in the Gardena area and accommodates almost 50,000 emergency room visits annually.



*Memorial Hospital of Gardena*

The five-mile radius around the hospital is 71% non-white and the hospital prides itself on a medical staff that speaks languages including Spanish, Hindi, Arabic, and Korean fluently. The Multi-Specialty Clinic affiliated with the hospital also offers care for less severe and less time-sensitive illnesses and injuries. The Memorial Hospital of Gardena generates approximately 90% of its revenue from government health insurance programs and 10% from third-party insurers.

### C. Revenue.

31.     Pipeline generates revenue from patients, third-party payors (including health insurance and government programs), and others. In general, patients are responsible for deductibles related to third-party payors, which vary in amount. The communities the hospitals serve rely heavily on government assistance for medical care, as opposed to private insurance carriers with higher fees. As a capital and liquidity-intensive business with high overhead costs, any bureaucratic or political delays of funding has negative consequences. In addition to traditional payor agreements with managed care providers, the Debtors have agreements with various insurance plans to provide medical services to subscribing participants under which the company receives monthly capitation payments based on the number of participants. All capitation contracts have a single performance obligation that constitutes a stand-ready obligation to provide certain healthcare services to subscribing patients for the duration of the contract.

32.     In the twelve-month period ending in August 2022, the Debtors' total net operating revenue was approximately $683.96 million, which includes approximately $96.85 million from Medicaid supplemental programs and approximately $25.67 million from the Disproportionate Share Hospital Program, after accounting for adjustments, denials, and bad debt. In that same period, the Debtors' EBIDAR loss was approximately $77.26 million and net loss was approximately $271.55 million. Over the same time, the Debtors' operating expenses were

approximately $761.22 million, approximately $419.73 million (more than 55% of operating expenses) of which were attributable to labor costs.

33.     Looking at Pipeline's operations geographically, over the same time frame, on a consolidated basis, the Debtors' operations in California provided EBIDAR of approximately $2.64 million while the EBIDAR losses in Texas and Illinois were approximately $6.55 million and $51.02 million, respectively, prior to accounting for corporate expenses.  In that same period, however, the overall net losses of the Debtors' consolidated operations in each of California, Texas, and Illinois were $125.33 million, $15.96 million, and $68.74 million, respectively.

34.     The California Hospital Quality Assurance Fee Program provides supplemental payments to certain hospitals, including those owned and operated by the Debtors.  To participate in the program, participating hospitals are required to pay fee assessments that are matched by the government and then distributed to qualifying hospitals.   The amount of revenue the Debtors receive from this program is dependent upon the aggregate amount of fees collected by the state.

35.     Both Illinois and Texas have instituted provider taxes on certain patient-service revenues at qualifying hospitals to increase federal funding and funding from other sources to support increased payments to providers of Medicaid Services.  As qualifying hospitals, the Debtors' facilities in Illinois and Texas partake in and benefit from these programs.

36.     The Debtors also provide charity care to patients whose income level is below 300% of the federal poverty level.  Over the twelve-month period ending in August 2022, the Debtors wrote off approximately $39.04 million in revenue on account of charity care. The Debtors also provide care to uninsured patients, offering them discounts from standard charges.  This work is both necessary and a point of pride for the Debtors.

## II.   The Company's Organizational Structure and Prepetition Capital Structure.

### A.   Organizational Structure.

37.     Pipeline is headquartered in California, with the ultimate parent entity being PHS, a Delaware limited liability company.  Each Debtor entity (other than four) are limited liability companies with a single member.  Two Debtor entities are limited partnerships and two are nonprofit corporations.  Each of Gardena Hospital, L.P. and ELADH, L.P. are limited partnerships organized under the laws of Texas.  Pipeline Chicago Graduate Education Foundation, a federal 501(c)(3) entity, is a Delaware corporation.  City Hospital Physician Group, Inc. is a Texas corporation.  A comprehensive organizational chart is attached hereto as **Exhibit B**.

### B.   Prepetition Capital Structure.

38.     Twenty-four (24) of the Debtors are jointly-obligated parties on outstanding secured debt consisting of amounts due under the ABL Facility (as defined herein) and the Term Loan.  As of the Petition Date, the Debtors have approximately $603.85 million in aggregate outstanding principal amount of prepetition debt obligations, $357.33 million of which relates to funded debt.

| Prepetition Obligations | Approximate Outstanding Principal Amount |
|---|---|
| *Term Loan Facility* | $297.66 million |
| *Term Loan – Bridge Facility* | $30.67 million |
| *ABL Facility* | $29.01 million |
| *Equipment Leases* | $7.90 million |
| *Texas Property Financing* | $21.27 million |
| *California Property Financing* | $217.45 million |
| Total | $603.85 million |

39.     ***ABL Facility.***  Certain Debtors are obligated under that certain revolving line of credit (as amended, restated, amended and restated, modified, or supplemented in accordance with the terms thereof, the "<u>ABL Facility</u>") issued by Credit Suisse AG, Cayman Islands Branch

(the "ABL Lender").   On December 30, 2019, certain Debtor entities entered as borrowers or guarantors into the Credit and Guaranty Agreement with ABL Lender for a $55 million revolving commitment, with Credit Suisse AG, New York acting as administrative agent (the "ABL Agent") thereunder.   As further described in the Cash Management Motion (as defined herein), the ABL Lender owns a certain deposit account that is integrated into Pipeline's cash management system by disbursing funds into Pipeline's main concentration account.   The ABL Lender and Pipeline are also party to certain deposit account control agreements that permit the ABL Lender to sweep certain of Pipeline's operational accounts on a daily basis.

40.      After informing the ABL Agent that the Debtors anticipated being unable to meet certain obligations at the end of March 31, 2022, the seventh amendment to the ABL Facility was agreed to by the same parties on April 28, 2022, which changed the interest rate on the facility from LIBOR-based to SOFR-based.   As of September 26, 2022, approximately $29.01 million of the principal amount remains outstanding under the ABL Facility.

41.      ***Term Loan.***   Certain Debtors are obligated under that certain term loan facility (as amended, restated, amended and restated, modified, or supplemented in accordance with the terms thereof, the "Main Facility") issued by the Term Loan Lenders, with Alter Domus Products Corp. as administrative agent thereunder.   On January 28, 2019, certain Pipeline entities entered, as borrowers, into the Main Facility with the Term Loan Lenders.   The Main Facility has an interest rate of 10.0% (cash) or 12.5% (PIK), matures on January 28, 2025, and is secured by substantially all assets of the obligors, subject to intercompany arrangements.   As of the date hereof, approximately $297.6 million of the principal amount of the Main Facility remains outstanding.

42.      In late July, it became apparent that a delay in the Illinois Sale beyond mid-August would place Pipeline in a challenging liquidity position.   Management and advisors calculated the

liquidity shortfall under a number of scenarios and concluded that at least $30 million of funding would be required to continue providing critical patient care and to allow additional time for the sale to close.  Accordingly, the Debtors and Term Loan Lenders agreed to amend the Main Facility such that the Debtors received a commitment of $30 million in additional funding (the "Bridge Facility" and, together with the Main Facility, the "Term Loan").  The Term Loan is secured by substantially all assets of the obligors, subject to intercompany arrangements.  As of the date hereof, $30.67 million of the Bridge Facility remains outstanding.

43.    ***Equity Interests.***  Pipeline comprises the thirty-three Debtors in these chapter 11 cases.  Debtor entity PHS is the ultimate parent of the other thirty-two.  Pipeline, in turn, is majority-owned by sponsors DFP Opco LLC, who holds approximately 34.4% of its equity and Deerfield PH Holdings IV, LP, who holds approximately 36.2% of its equity.  Pipeline Hospital Holdings, LLC holds approximately 29.4% of Pipeline's equity.

44.    ***Property Financing.***  While Pipeline owns the real estate and buildings for its operations in Illinois, Pipeline has entered into agreements for the use of real property that allow it to operate in its California and Texas markets respectively.  With respect to the operations in California, on July 6, 2021, certain Pipeline entities entered as lessees in a sale-leaseback arrangement under that certain master lease agreement, dated July 6, 2021 (the "California Property Financing") with certain affiliates of Medical Properties Trust, Inc., a real estate trust focused on developing net-leased hospital facilities.  The California Property Financing purported to lease back such real estate so that the Debtors could continue its operations for a term of 20 years, subject to extensions.  Entry into the California Property Financing arrangement was intended to pay off debt, lower interest rates, and providing capital support for the organization with a focus on repairing aging building infrastructure.  With respect to the operations in Texas,

on March 1, 2018, certain Debtor entities entered into a lease arrangement under that certain lease with GMR East Dallas Hospital, LLC (the "Texas Property Financing" and, together with the California Property Financing, the "Property Financing") in connection with the building and land in connection with the White Rock Medical Center and providing for annual minimum rent of $1.43 million.  The Texas Property Financing is set to expire on February 28, 2038 after two consecutive 10-year terms.

## III.    Circumstances Leading to Chapter 11 Filing.

### A.    Challenges Facing Debtors' Business.

45.    The Debtors' main challenges leading to these chapter 11 cases are four-fold.  *First*, in light of the Debtors' reliance on funding from government sources, recent delays, and underpayments in such funding have placed significant strain on Pipeline's finances.  *Second*, the Debtors' underlying business has suffered from certain burdensome legacy contractual arrangements related to labor, services, goods, or technology services that have increased costs for Pipeline.  In addition, the Debtors' aging facilities require extensive capital expenditures in order to maintain or improve them.  *Third*, in the wake of the COVID-19 pandemic which caused a tightening in the healthcare labor market and disrupted supply chains, Pipeline's costs have ballooned for labor as well as for supplies, medications, and medical devices.  *Fourth*, preexisting cash flow problems at the Chicago facilities have only worsened, putting a strain on the Debtors' operations nationwide.  These challenges together placed Pipeline in a position where it no longer had adequate liquidity to continue operations absent the liquidity available under the DIP Facility.

46.    ***Government Funding Issues.***    Pipeline's ongoing problems with delays or withheld amounts of government funding sources have totaled approximately $24 million to date. Pipeline has faced financial hardships in connection with, (a) on the federal side, (i) a lack of full coverage under the CARES Act and (ii) increased recoupment by Medicare and, (b) on the state

side, delays in receiving (i) certain grants and supplemental funding from the state of Illinois, (ii) payment of funding under CHIRP (as defined herein) by the state of Texas, and (iii) the pending approval of the Hospital Quality Assurance Fee Program VII administered by the Department of Health Care Services for the state of California.

47.     To aid medical providers during the pandemic, the federal government created the COVID-19 Accelerated and Advance Payments Program ("CAAP Program")[6] to provide funding to Medicare Part A providers, which includes the Debtors' hospitals.  The repayment terms for the CAAP Program were established by the Continuing Appropriations Act, 2021 and Other Extensions Act,[7] enacted on October 1, 2020, under which the Centers for Medicare and Medicaid Services ("CMS") began to automatically recoup 25% of Medicare payments otherwise owed to the medical provider for eleven months after the payment issuance, after which it would recoup 50% for another six months.  Finally, if a balance remained after 17 months, the CMS will issue demand letters requiring repayment of any outstanding balance, subject to an interest rate of 4%. As of the Petition Date, the Debtors' outstanding CAAP obligation is over $9.0 million.  Next, approximately $11 million to be distributed through the Illinois state government as allocated by the CARES Act[8] has yet to be received by the Debtors, and statewide delays[9] in the roll out of the Comprehensive Hospital Increase Reimbursement Program ("CHIRP")[10] in Texas resulted in

---

[6]     S.3750, 116th Cong. § 2 (2020).

[7]     H.R. 8337, 116th Cong. (P.L. 116-159) (2020).

[8]     20 Ill. Comp. Stat. 605/605-1047 (2021).

[9]     *See, e.g.*, *A Crisis Within a Pandemic:  Withholding Hospital Funds Hurts Patients*, Texas Hospital Association (2022), available at https://www.tha.org/Portals/0/files/Issues/MedicareMedicaid/2022-Crisis-Within-Pandemic.pdf

[10]    1 Tex. Admin Code § 353.1206 (2021).

$7-8 million of delayed funding for the Debtors.  In addition, private insurer Blue Cross Blue Shield of Illinois recently retracted $5 million of payments.  Lastly, $11 million in additional funding from the recently passed Illinois HB1950[11] could be provided to the Debtors if the Chicago hospitals received a safety net designation.

48.     ***Burdensome Legacy Arrangements and Facility Improvements.***  The Debtors' hospitals are subject to legacy contracts for labor, goods, services, and/or technology.  Given the Debtors' current operations, many of these contracts are burdensome and require restructuring.  Further, on average, the Debtors' facilities are 53 years old and require extensive capital investment to maintain.

49.     ***Cost of Labor and Goods.***  The strain on Pipeline's operations was further exacerbated by the pandemic.  Disruptions in supply chains resulted in increased prices for basic supplies necessary for the operation of the Debtors' business,[12] which were not fully offset by government stimulus.  The resulting fallout of the pandemic is still affecting the Debtors' business today.  The hospitals fast-paced environment as well as regulatory minimum staffing ratios create a consistent demand for labor across the Debtors' facilities.  Lack of a stable qualified workforce could have jeopardized patient safety and hampered the Debtors' ability to provide patient care so the Debtors were forced to rely upon more expensive contract labor as well as respond to market increases in wages.  For instance, the Debtors' labor, including contract labor, annualized through

---

[11]    30 Ill. Comp. Stat. 105/5.935 (2022).

[12]    *See, e.g.*, K. Goldschmidt, K. Stasko, *The Downstream Effects of the COVID-19 Pandemic: The Supply Chain Failure, a Wicked Problem*, Journal of Pediatric Nursing (Jul-Aug 2022); Umesh N. Khot *Navigating Healthcare Supply Shortages During the COVID-19 Pandemic*, American Heart Association, Circulation: Cardiovascular Quality and Outcomes, Vol. 13, Issue 6 (June 2020)

the first eight months of 2022 increased $52 million annually as compared to pre-COVID levels.[13] Periodic lockdowns, staffing shortages, the increased prevalence of virtual medical appointments, and further delay of certain medical tests and procedures continues to exert downward pressure on the Debtor's business.

50.     ***The Illinois Facilities***.  The challenges facing Pipeline have been particularly acute at the Illinois Facilities.  The Illinois Facilities have required significant working capital and have posted large financial losses since they were acquired.  As noted above, the Illinois Facilities posted a net loss of approximately $69.74 million on a consolidated basis.  In turn, the losses at the Illinois Facility have required Pipeline's California- and Texas- to effectively subsidize the Illinois operations.

**B.      Proactive Approach to Addressing Financial Issues.**

51.     In response to growing liquidity issues, Pipeline implemented several performance and operational improvement strategies beginning in 2020.  The Debtors' initiatives to combat financial issues included significant reductions in corporate overhead, reduction on the reliance of external IT resource support, contract labor management and stabilization, analysis of labor practice standards and productivity, and general expense management across all markets.  Lastly, Pipeline reassessed its business development strategies by, among other things, refocusing its branding towards densely populated areas.

52.     On April 27, 2021, Pipeline initially retained Ankura to provide certain financial advising services related to the Illinois Facilities.  This initial engagement concluded in July 2021,

---

[13]   *See*, *Massive Growth in Expenses and Rising Inflation Fuel Continued Financial Challenges for America's Hospitals and Health Systems*, American Hospital Association (April 2022).   Available at https://www.aha.org/system/files/media/file/2022/04/2022-Hospital-Expenses-Increase-Report-Final-Final.pdf.

and on May 2, 2022, Ankura and Pipeline signed an amended engagement letter related to the review of the company's liquidity position and business plan. On August 24, 2022, Ankura and Pipeline executed an amendment to their engagement letter, which provided for, among other things, my appointment and services as CTO and a pivot to restructuring-oriented services.

53.     Pipeline retained Kirkland & Ellis LLP in connection with legal restructuring advice. On September 19, 2022, Pipeline retained Jefferies LLC to provide advice on strategic transaction alternatives with respect to a potential sale process.

### C.     Attempted Sale of Illinois Facilities.

54.     On January 28, 2019, Pipeline consummated its acquisition of the assets and liabilities of three hospitals, Weiss Memorial Hospital (together with its related facilities, "Weiss Hospital"), Westlake Hospital, and West Suburban Medical Center ("West Suburban"), located in the greater Chicago area. The purchase price was approximately $5 million, though the hospitals were valued at $32 million. The significantly discounted purchase price accounted for the acute losses the hospitals were incurring. In the twelve-month period ending in June 2018, the three locations collectively had a net loss of approximately $12 million, which by the end of that year, grew to approximately $31 million.[14]

55.     The operational and liquidity problems in the Chicago-area facilities impacted Pipeline quickly thereafter and began to affect the rest of the Debtors' operations out-of-state as funding and supplies would be, at least in-effect, siphoned to cover the operational and liquidity needs of the Chicago branch.

---

[14]     Declaration of James Edwards in Support of First Day Relief, *In re Westlake Property Holdings, LLC,* No. 19-11756 (KBO) (Bankr. D. Del. August 6, 2019), ECF No. 6.

56.     With patient care as Pipeline's absolute top priority, it became increasingly difficult to continue operations at Weiss Hospital and West Suburban, as subsidizing losses there affected the entire network of medical care facilities.  In March 2022, Pipeline executed a letter of intent with Ramco for the Illinois Sale for $92 million in consideration.  The Illinois Health Facilities and Services Review Board approved the Illinois Sale in early June 2022.  However, due to certain financing issues of the potential buyer, the Illinois Sale did was not able to close in a timely manner in accordance with the purchase agreement, and discussions to continue to consummate the Illinois Sale have not led to closing the transaction.

**D.     The Path Forward.**

57.     During these chapter 11 cases, the Debtors will need to use the cash generated from their operations, as well as their current cash on hand to (a) satisfy payroll obligations, (b) honor all obligations under their customer contracts, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business.  Such cash, however, is likely insufficient to meet the Debtors' liquidity needs.   Accordingly, before the Petition Date, Pipeline's contingency planning included discussions with, among others, the Sponsors, Term Loan Lenders and the ABL Lenders, to finance the chapter 11 process.  After much negotiation, the parties have agreed to certain debtor in possession financing (the "DIP Financing") as further described in the DIP Motion filed contemporaneously herewith.  The DIP Financing will provide crucial financial runway for Pipeline to operate and ultimately reorganize or effectuate a sale.

58.     Over the last several weeks, the Debtor advisors and I have had a substantial number of discussions and meetings with the Debtors' management team and other advisors regarding the need for financing.  Based on those discussions and meetings, I am generally familiar with the Debtors' current liquidity, the ABL Facility, the prepetition Main Facility, and the Bridge

Facility, and I understand the Debtors' cash needs during these chapter 11 cases. I am also generally familiar with the cash flow forecasts. I understand that these forecasts consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on business operations and fees and expenses associated with the chapter 11 filing. Based on those discussions and meetings, my experience in the restructuring industry, and my familiarity with the Debtors, I believe the Debtors require immediate access to the DIP Financing to fund the costs of administering the chapter 11 cases and the Debtors' near term working capital needs and ongoing business operations.

59.     Without immediate postpetition financing and access to cash collateral, the Debtors will lack the necessary funding to meet working capital and business operating needs to ensure a reorganization of the Debtors and to administer these chapter 11 cases, causing immediate and irreparable harm to the value of the Debtors' estates and all stakeholders, including, most importantly, the Debtors' patients. As of the Petition Date, the Debtors had approximately $17.76 million in cash on hand. This includes approximately $6.80 million of operating cash on hand, including an estimate of approximately $2.50 million of outstanding checks that will be voided as of the petition date, approximately $7.00 million of cash held in trust, and approximately $3.96 million of cash held in collection accounts historically swept by the ABL Lender. On average, the Debtors require approximately $14.50 million per week in operating capital to maintain ordinary course operations. Accordingly, the Debtors analyzed how much postpetition financing would be required to operate the Debtors' business and pay administrative costs during the chapter 11 process. Based on this analysis, the Debtors determined that they would require incremental new money liquidity of approximately $40 million to operate postpetition and satisfy costs and expenses.

60.     Based on my experience, I believe that a seamless transition into chapter 11 and the ability to continue operations uninterrupted is imperative for the Debtors to maintain patient care and preserve the loyalty and goodwill of their patients, suppliers, and employees and maximize value.  Absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course, pay employees, and procure goods and services that are vital to ongoing business operations, employees, vendors and suppliers may refuse to do business with the Debtors, which may risk compromising the Debtors' core mission of providing high quality care to patients in the communities in which they operate.  I believe that commencing these chapter 11 cases with adequate financing through the Debtors' access to the DIP Financing and cash collateral should communicate to such stakeholders that the Debtors will be able to continue meeting the needs of their patients and managing their businesses in a manner as close to the ordinary course as possible.

61.     Accordingly, I believe that the Debtors have an immediate need for the liquidity that would be provided by the DIP Financing.

62.     Contemporaneously herewith, Pipeline has filed the Plan and a motion to approve the Bidding Procedures.  Together, these motions preserve optionality for the Debtors to best maximize the value of the estates.  The Plan includes a toggle feature that allows for the implementation of a credit bid or other sale, either through the Plan or a section 363 sale.  The Plan allows for an equitization of the claims of the Term Loan Lenders, or alternatively, a sale of the assets and liabilities of Pipeline's operations in California and Texas, for which the Debtors will seek approval, using the proceeds to fund the Plan.  The Debtors will market test such proposed sale, along with marketing the Illinois Facilities, pursuant to the Bidding Procedures.  To note, the Bidding Procedures are flexible enough to permit Pipeline to consider bids on a location-basis or an asset-by-asset basis.  While the Bidding Procedures provide a longer runway for the California-

and Texas- based assets, Pipeline will explore the potential sale of the Illinois Facilities on a faster timeline as those assets present greater liquidity strains on Pipeline and have had a significant prepetition marketing process.  If a restructuring is consummated pursuant to the Plan, the Plan will permit restructuring that facilitates a manageable go-forward balance sheet with flexible options, and allows the Debtors to modify their contracts at sustainable, economical rates.

63.     In my opinion, it is critical that the Debtors proceed promptly through confirmation and emergence to minimize disruption to patient care and preserve value for the benefit of the Debtors' estates.  Community health needs cannot be put on hold, and the Debtors' must be able to serve whomever walks in their doors at any time.  A swift emergence from chapter 11 will mitigate uncertainty among employees, patients, and vendors, minimize disruptions to Pipeline's supply chain and business, and curtail professional fees and administrative costs.

**IV.    First Day Motions.**

64.     Contemporaneously herewith, the Debtors have filed the first day motions as set forth in **Exhibit A** attached hereto (collectively and, with the DIP Motion, the "First Day Motions").

65.     I have reviewed and am familiar with the content of each of the First Day Motions and have consulted with the Debtors' advisors to ensure that I understand each First Day Motion and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

66.     Based on my knowledge, and after reasonable inquiry, I believe that the approval of the relief requested in the First Day Motions, including the DIP Motion, is (a) necessary to enable the Debtors to transition into, and operate efficiently and successfully in, chapter 11 with minimal disruption or loss of productivity and value, (b) critical to the Debtors' achieving a

successful restructuring; and (c) in the best interest of the Debtors' estates and their stakeholders. I believe that, if the Court does not grant the relief requested by the Debtors in the First Day Motions, the Debtors' business and their estates will suffer immediate and irreparable harm. Accordingly, for the reasons set forth herein and in the First Day Motions, the Court should grant the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 3, 2022                       _/s/ Russell A. Perry_ _____
                                             Russell A. Perry
                                             Chief Transformation Officer
                                             Pipeline Health System, LLC

**<u>Exhibit A</u>**

**Description of First Day Motions**

(*See attached*)

**First Day Motions**[15]

1.      Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions include the following:

*Procedural Motions*

A.      **Joint Administration Motion.**  *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

B.      **Schedules and Statements Extension.**  *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports, and (II) Granting Related Relief* (the "Schedules and Statements Extension Motion");

C.      **Scheduling Motion.**  *Debtors' Emergency Motion for Entry of an Order Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Disclosure Statement and Plan Confirmation* (the "Scheduling Motion");

D.      **Creditor Matrix Motion.**  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief* (the "Creditor Matrix Motion");

E.      **Patient Information Procedures Motion.**  *Debtors' Emergency Motion for Entry of an Order Authorizing the Implementation of Procedures to Protect Confidential Patient Information* (the "Patient Information Procedures Motion");

*Operational Motions*

F.      **Cash Management Motion.**  *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform*

---

[15]   Capitalized terms used but not defined in this **Exhibit A** have the correlative meaning ascribed to such term as in the corresponding First Day Motion, as applicable.

*Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief* (the "Cash Management Motion");

G. **Wages Motion.** *Debtors' Emergency Motion For Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "Wages Motion");

H. **Insurance Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (C) Continue To Pay Brokerage Fees, and (II) Granting Related Relief* (the "Insurance Motion");

I. **Critical Claims Motion.** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Patient Care and Safety Vendors and (B) Lien Claimants; and (II) Granting Related Relief* (the "Critical Claims Motion");

J. **Taxes and Fees Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees, and (II) Granting Related Relief* (the "Tax Motion"); and

K. **Utilities Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Approving the Proposed Adequate Assurance Deposit for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Proposed Adequate Assurance Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "Utilities Motion").

## **Procedural Motions**

### A.   **Joint Administration Motion.**

2.      Pursuant to the Joint Administration Motion, the Debtors seek entry of an order, (a) directing procedural consolidation and joint administration of these chapter 11 cases, and (b) granting related relief.  Specifically, the Debtors request that one file and one docket be maintained for all of the jointly administered cases under the case of Pipeline Health Systems, LLC.

3.      Joint administration for procedural purposes only is appropriate in the Debtors' cases.  Given the integrated nature of the Debtors' operations, joint administration will provide significant administrative convenience without harming the substantive rights of any party in

interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  Joint administration will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases efficiently and with greater ease, as all filings will be available on one docket rather than across 33 dockets.

4.      I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

      **B.**     **Schedules and Statements Extension Motion.**

5.      The Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs by 25 days, for a total of 39 days from the Petition Date, through and including November 10, 2022, and (b) granting related relief.

6.      The Debtors submit that ample cause exists to grant the relief requested therein.  To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each of the 33 Debtor entities.  Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their advisors at a time when such resources would be best used to stabilize the Debtors' business operations at the outset of these cases.  Additionally, because this information is voluminous and located in numerous places throughout the Debtors' organization, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

7.     I believe that the relief requested in the Schedules and Statements Extension Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**C.     Scheduling Motion.**

8.     The Debtors seek entry of an order (a) scheduling certain hearings and dates in connection with the (i) *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Pipeline Health System, LLC and Its Debtor Affiliates* and (ii) Plan, each filed contemporaneously herewith, and (b) granting related relief.

9.     The Scheduling Motion requests authority to proceed on the timeline set forth therein, which will allow the Debtors in move these chapter 11 cases to an expeditious manner. The Debtors seek confirmation of the Plan on Tuesday, December 20, 2022 or as soon thereafter as the Court is available.  It is critical that the Debtors obtain confirmation and emerge from these chapter 11 cases as soon as reasonably practicable because of the nature of their business, specifically maintaining healthcare services for their thousands of patients.  The Debtors believe that consummation of the Plan will ensure continued operations of their healthcare facilities, employment of their physicians, and safety of their patients.  Any delay in consummation of the Plan puts the well-being of the Debtors' patients at risk and increases the likelihood of irreparable harm to the Debtors' businesses.  Thus, the Debtors have a critical and unique need for an expedited chapter 11 proceeding.  The Debtors therefore submit that confirming the Plan on this schedule is in the best interests of the Debtors, their estates, and all stakeholders, and should be approved.

10.     I believe that the relief requested in the Scheduling Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**D.      Creditor Matrix Motion.**

11.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order (a) authorizing the Debtors to redact certain personally identifiable information, (b) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases, and (c) granting related relief.  I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**E.      Patient Information Procedures Motion.**

12.      Pursuant to the Patient Information Procedures Motion, the Debtors request that this Court enact procedures to protect confidential information of current and former patients of the Debtors.  Specifically, the Debtors request that Epiq Corporate Restructuring, LLC, the proposed claims agent in these chapter 11 cases be allowed to prepare, pursuant to section 521(a)(1)(A) and Bankruptcy Rule 1007(a)(1), a separate creditor matrix of the Patients and, pursuant to section 521(a)(1)(B)(i) and Bankruptcy Rule 1007(b)(1)(A), separate schedules of claims that may be asserted by and against the Patients.  The Debtors request that the Claims Agent not be required to file the Patient Matrix or the Patient Schedules with this Court but that the Claims Agent be allowed to file a redacted version of the Patient Schedules that redacts the names and addresses of the Patients; provided, however, that the Patient Matrix and the Patient Schedules may be reviewed by (a) this Court, (b) the U.S. Trustee, (c) any applicable state regulatory agency (through the respective state attorney general), and (d) any other party in interest that obtains, after notice and a hearing, authorization from this Court.

13.      The Debtors believe that the requirements to maintain patient confidentiality under HIPAA conflict with the requirements to disclose information under the Bankruptcy Code, specifically the duty to file a list of all creditors under section 521(a)(1)(A) and the duty to file

schedules of all assets and liabilities under section 521(a)(1)(B)(i). The Debtors therefore request that such patient information be protected pursuant to section 107(c), which allows a bankruptcy court, for cause, to protect an individual if disclosure would create an undue risk of unlawful injury. *See also* Fed. R. Bankr. P. 9018 (allowing a bankruptcy court to protect governmental matters that are made confidential by statute or regulation). The Debtors believe that the relief requested herein balances the need to maintain confidential patient information under HIPAA with the need for disclosure under the Bankruptcy Code.

14.     I believe that the relief requested in the Patient Information Procedures Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

## **Operational Motions**

### F.     **Cash Management Motion.**

15.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to (i) continue to operate their cash management system and maintain their existing bank accounts, including honoring certain prepetition obligations related thereto, (ii) continue intercompany transactions and funding consistent with their historical practices, and (iii) maintain existing business forms and books and records in the ordinary course of business, and (b) granting related relief.

16.     In the ordinary course of business, Pipeline maintains a sophisticated cash management system to facilitate the timely and efficient collection, management, and disbursement of funds. The Cash Management System includes a total of 94 Debtor bank accounts. The Bank Accounts are maintained by 26 Debtor entities at three different financial institutions.

17.     The Debtors use the Cash Management System to collect, transfer, and distribute funds and to facilitate cash monitoring, forecasting, and reporting for the entire enterprise.  The Cash Management System is typical for a healthcare organizations of similar size and is designed to manage the Debtors' cash flow in a cost-effective and efficient manner.  Pipeline's treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with certain intercompany transactions.  Pipeline's treasury and accounting departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

18.     Given the economic and operational scale and complexity of the Debtors' healthcare enterprise, any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' operations to the detriment of their estates and stakeholders, including patients at the Debtors' hospitals.  To minimize the disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue utilizing their existing Cash Management System during the course of these chapter 11 cases.

19.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**G.     Wages Motion.**

20.     Pursuant to the Wages Motion, the Debtors seek entry of an order, (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course, including paying certain prepetition obligations related thereto, and (b) granting related relief.

21.     As of the Petition Date, the Debtors employ approximately 4,200 Employees, including approximately 3,000 full-time Employees, 1,200 part time Employees, and 175

Independent Physicians and Group Physicians.  Approximately 1,440 of the Debtors' Employees participate in the 401(k) Plan.

22.      The Employees perform functions critical to the Debtors' ordinary-course hospital operations and the orderly administration of these chapter 11 cases.  In many instances, the Employees are distinctly familiar with the Debtors' hospitals, processes, and systems and possess specialized knowledge, skills, or experience that cannot be easily replaced.

23.      The vast majority of the Employees rely on compensation funded by the Debtors to pay their daily living expenses and to support their families.  These workers will be exposed to significant financial hardship if the Debtors are not permitted to continue paying these amounts in the ordinary course.  Similarly, the vast majority of Employees rely on health and other benefits provided by the Debtors to meet their and their families' health and other life needs.  These Employees will be exposed to significant financial hardship if the Debtors are not permitted to continue paying their compensation and providing them with health and other benefit programs during these chapter 11 cases.  Consequently, the relief requested is necessary and appropriate.

24.      In the twelve months before the Petition Date, the Debtors incurred a monthly average of approximately $24.6 million in Wages obligations, $600,000 in Capitation Obligations, $40,000 in Reimbursable Expenses obligations, $6.84 million in Withholding and Deduction Obligations, $83,000 in Exponent HR subscription fee obligations, $27,000 in ADP subscription fee obligations, $31,000 in Kronos subscription fee obligations, $447,000 in Non-Insider Incentive Obligations, $899,000 in Health and Welfare Program obligations, $758,000 in Health Benefit Program Obligations, $607,000 in Medical Insurance Program obligations, $87,000 in Dental Plan obligations, $48,000 in Vision Plan obligations, $4,000 for HSA and FSA program obligations, $12,000 in Wellness Program obligations, $141,000 in Basic Life and AD&D Insurance Program

obligations, $100 in 401(k) Fee obligations, $156,000 in Miscellaneous Employee Benefit obligations, $6.7 million on account of the Withholding and Deduction Obligations, $3.5 million of which arises out of deferred Social Security payroll taxes under the Coronavirus Aid, Relief, and Economic Security Act.

25.     As of the Petition Date, the Debtors estimate that they owe approximately $10.23 million on account of accrued but unpaid Wages, $4.96 million on account of the Affiliated Physician Obligations, $90,000 on account of Reimbursable Expenses, $49,000 in HRI System Fees to Exponent HR, $75,500 in HRI System Fees to ADP, $191,000 in HRI System Fees to Kronos, $168,210 in Non-Insider Severance Obligations to a total of four Employees, $286,000 on account of the Non-Insider Incentive Programs, $5.87 million on account of the Health and Welfare Programs, $5.66 million in the aggregate on account of the Health Benefit Programs, $5.43 million on account of the Medical Insurance Program, including claim reimbursement payments and administrative fees owed to Anthem and Health Net, $130,500 on account of the Dental Plan, $72,000 on account of the Vision Plan, $6,000 on account of the HSA and FSA programs, $18,000 on account of the Wellness Program, $211,500 to New York Life on account of the Basic Life and AD&D Insurance Program, $2.1 million under the Workers' Compensation Program related to approximately eighty-five open claims, $300 in accrued and unpaid 401(k) fees, $27.97 million in obligations on account of the PTO Benefits, $312,000 in unpaid obligations on account of the Miscellaneous Employee Benefits, and $21,000 on account of the Benefits Brokerage Fees.

26.     The Debtors have paid approximately $14,000 quarterly for its Benefits Brokerage Fees and pay the Disinterested Managers an average annual retainer of $600,000.

27.     Of the Employees owed Wages as of the Petition Date, eight are owed prepetition accrued Wages that exceed the priority cap set forth in section 507 of the Bankruptcy Code.  These Employees, six of whom are non-insiders and two of whom are insiders, include five physicians, one charge nurse, the Chief Executive Officer of the Debtors, and the Chief Operating Officer of the Debtors.

28.     Pursuant to the Wages Motion, the Debtors seek authority to pay and honor certain prepetition claims and continue to honor obligations on a postpetition basis relating to, among other things:   Wages; Reimbursable Expenses; Employee Payroll Taxes; Withholding and Deduction Obligations; Health and Welfare Programs; Basic Life and AD&D Insurance Programs; Workers' Compensation Programs; PTO Benefits, and certain other benefits that the Debtors have historically provided in the ordinary course.  The Debtors' timely payment of workforce-related obligations is necessary for the Debtors to maintain ordinary-course operations, continue providing quality patient care, and avoid personal financial hardship to the Employees.

29.     I believe that the relief requested in the Wages Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**H.     Insurance Motion.**

30.     Pursuant to the Insurance Motion, the Debtors seek entry of an order, (a) authorizing the Debtors to (i) continue their prepetition insurance coverage and satisfy prepetition obligations related thereto, (ii) renew, amend, supplement, extend, or purchase insurance coverage on a postpetition basis in the ordinary course, and (iii) pay prepetition obligations on account of and continue to pay Brokerage Fees on a postpetition basis in the ordinary course, and (b) granting related relief.

31.     In the ordinary course of business, the Debtors maintain 33 insurance policies with 33 third-party insurance carriers.  The Insurance Policies, provide coverage for, among other things, losses related to the Debtors' real and personal property, professional and general liability, crime liability, cyber liability, directors and officers' liability, pollution liability, automobile liability, storage tank liability, workers' compensation, and employer and employment practices liability.  In addition, certain of the Insurance Policies provide layers of excess liability coverage.  As of the Petition Date, the Debtors do not believe there are any accrued but unpaid amounts due under the insurance policies, premium financing agreements, and but seek authority to continue paying the insurance policies nonetheless out of an abundance of caution.

32.     In the ordinary course of business, the Debtors directly pay all Premiums.  For these Insurance Policies, the Debtors pay the Premiums through monthly installment payments over the course of the policy period.  Those Insurance Policies without installment payments are financed by the Premium Financing Agreements and are further described therein.  Each of the Insurance Policies is either one year or 18 months in length and renews at various times throughout the year.

33.     The Premium Financing Agreements are all between PF Lender and the Debtors. Pursuant to the Premium Financing Agreements, the PF Lender has agreed to pay the insurance premiums due under the Insurance Policies in exchange for payments from the Debtors, as set forth more fully below.  The PF Lender is secured by all sums due under the Premium Financing Agreements and any unearned premiums or other sums that may become payable thereunder.  The aggregate annual premium for the Insurance Policies financed under the Premium Financing Agreements is approximately $7.2 million plus applicable taxes and surcharges with an annual interest rate of 4.19 percent.  Pursuant to the Premium Financing Agreements, the Debtors pay the

financing premiums through monthly installments, which began on May 1, 2022, for the insurance coverage provided for the Debtors under the Premium Financing Agreements.

34.     Certain of the Insurance Policies require the Debtors to pay Deductibles.  Generally, if a claim is made under an Insurance Policy with a Deductible, the Debtors are obligated to pay any defense costs or successful or settled claims up to the amount of the Deductible.  Carriers are directly responsible for any claim under the applicable Insurance Policy to the extent such claim is in excess of the Deductible is the carrier's responsibility.  The Deductibles may range up to $10 million, subject to certain limitations.  Alternatively, certain of the Insurance Policies use SIRs instead of Deductibles.  If a claim is made under these policies, the Debtors must make payments in the first instance up to the limit of the SIR and, once the Debtors have made such payments, the carrier is obligated to cover remaining costs.  The amount of the SIRs range from $250,000 to $2.5 million.

35.     To preserve the value of the Debtors' business operations, properties, and assets, it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance policies.  In many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and the operating guidelines issued by the U.S. Trustee.  It is particularly important to maintain comprehensive insurance in the current economic environment as the commercial healthcare industry continues to adjust to the impacts of the global COVID-19 pandemic.  The relief requested in the Insurance Motion is to ensure uninterrupted coverage under the Insurance Policies.  Therefore, the Debtors seek authorization to maintain the existing Insurance Policies and brokerage accounts, pay prepetition obligations (if any) related

thereto upon entry of the order, and renew, amend, supplement, extend, or purchase new Insurance Policies on a postpetition basis in the ordinary course of business consistent with past practice.

36.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**I.     Critical Claims Motion.**

37.     Pursuant to the Critical Claims Motion, the Debtors seek entry of an interim order and a final order (a) authorizing, but not directing, the Debtors to pay, in the ordinary course, certain prepetition claims of (i) patient care and safety vendors and (ii) lien claimants; and (b) granting related relief.

38.     As hospital operators and healthcare providers, the Debtors operate in one of the most heavily regulated and closely scrutinized industries in the country.  The Debtors' ability to succeed in the healthcare space relies, among other things, on their business relationships with the Patient Care and Safety Vendors.  In some cases, local, state, and federal law requires the Debtors to maintain contracts with certain Patient Care and Safety Vendors, including those needed to comply with regulations applicable to hospital pharmacies and laboratories.  The Patient Care and Safety Vendors distinguish themselves from other vendors that are critical to the Debtors' business in that the Patient Care and Safety Vendors have a direct, profound impact on the Debtors' ability to fulfill their mandate as medical service providers and meet regulatory requirements.  For example, the Debtors are required to maintain a blood bank for the benefit of the patients.  The extensive, comprehensive regulations and requirements to which the Debtors are subject can only be fulfilled through uninterrupted access to essential goods and services.  It is absolutely vital to the well being of the Debtors' current and future patients that the Debtors maintain their business relationships with the Patient Care and Safety Vendors.

39.     Without the ability to continue payment of Patient Care and Safety Vendors' claims, the Debtors' risk harming not only the going-concern value of their business, but the safety of their doctors and staff, and quality medical care for their patients.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Patient Care and Safety Claims.  Out of an abundance of caution, the Debtors seek authority to pay up to $250,000 on an interim basis, after reasonable consultation with the DIP Lenders, on account of the Patient Care and Safety Claims, without prejudice to the Debtors' ability to seek additional relief.

40.     The Debtors regularly hire Lien Claimants to make improvements and repairs to their properties and certain equipment used in the operation of the hospitals.  Such properties and equipment include the Debtors' medical facilities themselves, as well as highly technical and specialized medical equipment, the operation of which is an integral component of the Debtors' ongoing businesses.  Simply put, countless aspects of the Debtors' operations depend on continuing business relationships with, and services provided by, their Lien Claimants.  Failure to timely pay amounts owed to the Lien Claimants could result in, among other things, Lien Claimants asserting liens against certain of the Debtors' assets under applicable state law, which could disrupt the Debtors' ordinary course operations and delivery of quality patient care.

41.     To continue benefitting from the Lien Claimants' goods and services, the Debtors request authority to pay prepetition Lien Claims as they become due and payable and to continue paying the Lien Claims in the ordinary course of business.  For the avoidance of doubt, the Debtors seek authority to pay only those amounts of Lien Claims that the Debtors determine, after reasonable consultation with the DIP Lenders, to be necessary or appropriate to (a) continue providing safe, reliable, and compliant healthcare services, (b) obtain release of critical or valuable goods, (c) maintain reliable, efficient, and smooth distribution systems, and (d) induce the Lien

Claimants to continue performing or otherwise supporting the Debtors' operations on a postpetition basis.

42.     I believe that the relief requested in the Critical Claims Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**J.      Taxes Motion.**

43.     Pursuant to the Taxes Motion, the Debtors seek entry of an order (a) authorizing the Debtors to remit and pay or use tax credits to offset prepetition Taxes and Fees and postpetition Taxes and Fees as they become due and owing, including obligations arising on account of an Audit or Assessment, and (b) granting related relief.

44.     In the ordinary course of business, the Debtors collect, withhold, and incur taxes and fees related to sales and use, property, income, franchise, annual reporting fees, audits, and business and regulatory fees.  The Debtors remit the Taxes and Fees to various federal, state, and local governments and authorities on a monthly, quarterly, semi-annual, or annual basis.

45.     The Debtors seek authority to make payments where (a) the Taxes and Fees have accrued or were incurred prepetition but (i) were not paid prepetition or (ii) were paid in an amount less than actually owed, (b) the Debtors made payments prepetition that were lost or the Authorities did not receive the prepetition payments in full, which may give rise to interest and other penalties, (c) the Taxes and Fees were incurred for prepetition periods and become due and payable after the Petition Date, (d) the Taxes and Fees accrued or are incurred postpetition, and (e) the Taxes and Fees are for so-called "straddle" periods.

46.     Each Debtor typically pays their respective Taxes and Fees.  Occasionally, another Debtor entity located in the same state will pay the Taxes and Fees on behalf of the Debtor entity responsible for such Taxes and Fees.  Taxes and Fees are paid either through checks or electronic

transfers regardless of whether the individual Debtor pays the amounts outstanding directly to the Authority or Pipeline pays the amounts outstanding to the Authority on the Debtor's behalf.  In certain instances, the Debtors will receive tax credits for overpayments or refunds related to paid Taxes or Fees.  The Debtors use these credits to offset against future Taxes or Fees or have such amounts refunded.

47.     The Debtors estimate that approximately $16.7 million in Taxes and Fees have accrued as of the Petition Date and will become due and owing after the Petition Date either in the ordinary course, in connection with Audits or in connection with resolutions or statutory "amnesty" provisions.

48.     In the ordinary course of business, the Debtors incur and pay state and local sales and use taxes by purchasing inventory, supplies, or other regularly used goods.  In Illinois and Texas, the Sales and Use Taxes are paid in arrears on a monthly basis, and, in California, they are paid as they are incurred.  As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $5.2 million in Sales and Use Taxes that have not been remitted to the relevant Authorities.  The Debtors request authority to pay prepetition Sales and Use Taxes as they become due and owing and to continue paying their Sales and Use Taxes obligations on a postpetition basis in the ordinary course of business.

49.     The Debtors own and operate commercial property in Illinois and lease property in California and Texas under triple net leases.  The time and manner that real property taxes accrue and are paid are based on applicable non-bankruptcy law.  Obligations related to Real Property Taxes are satisfied in the following ways:

> a.     In Illinois, the Debtors directly own their properties and those entities pay Real Property Taxes to relevant authorities directly as these Real Property Taxes become due and owing; and

       b.     In California and Texas, the Debtors (as tenants) receive invoices for Real Property Taxes from third party landlords and are then obligated to pay Real Property Taxes directly to the Authorities.

50.     Importantly, state and local laws in jurisdictions in which the Debtors operate generally provide that certain Authorities may assert a lien on property for unpaid Real Property Taxes.  Such a lien could affect the rights of third parties if left unsatisfied, including the rights of mortgagees and lessees of the Debtors' real property.  It is essential to the Debtors' go forward operations that they are authorized to pay all of their Real Property Taxes in the ordinary course. The Debtors estimate that they have accrued approximately $6.4 million in Real Property Taxes as of the Petition Date.  Accordingly, the Debtors request authority to pay prepetition Real Property Taxes as they become due and owing and to continue paying their Real Property Tax obligations on a postpetition basis in the ordinary course of business.

51.     The Debtors are required to make payments for amounts due to certain states and localities that require the Debtors to pay income or corporate taxes, including gross receipts taxes. Generally, Income and Other Taxes are calculated as a percentage of net income (*i.e.*, the difference between gross receipts and expenses after accounting for additional write-offs).  The Debtors own and operate property in Illinois, California, and Texas.  As a result, many Authorities calculate Income and Other Taxes for a particular Debtor based on the proportion of the applicable Debtor's taxable income derived from operations in the applicable jurisdiction.

52.     The Debtors are required to pay the Income and Other Taxes on a quarterly or annual basis.  As of the Petition Date, the Debtors estimate that they have accrued approximately $4.1 million in Income and Other Taxes.  The Debtors request authority to pay prepetition Income and Other Taxes as they become due and owing and to continue paying their Income and Other Tax obligations on a postpetition basis in the ordinary course of business.

53.     The Debtors incur and remit annual reporting, permitting, and licensing fees in connection with chartering or operating in those states.  As of the Petition Date, the Debtors estimate that they have accrued approximately $400,000 in Fees.  The Debtors request authority to pay prepetition Fees as they become due and owing and to continue paying their Fee Obligations on a postpetition basis in the ordinary course of business.

54.     The Debtors are required to pay state franchise taxes in Texas, independent of income taxes, in order to continue conducting their business pursuant to applicable law.  State and local Authorities in California, Illinois, and Delaware also impose taxes on the Debtors for, among other things, operating licenses and additional business privileges, including healthcare credit programs.  Failure to pay Franchise and Privilege Taxes as they become due in the ordinary course could cause the Debtors to lose their ability to conduct business in the applicable jurisdictions.  The Debtors pay their Franchise and Privilege Taxes on an annual basis, depending on the jurisdiction.  As of the Petition Date, the Debtors estimate that they have accrued approximately $600,000 on account of prepetition Franchise and Privilege Taxes.  The Debtors request authority to pay prepetition Franchise and Privilege Taxes and to continue paying the Franchise and Privilege Taxes on a postpetition basis in the ordinary course of business.

55.     The Debtors may currently be involved in ongoing audit investigations and may be subject to further investigations on account of tax returns and/or tax obligations in prior years.  Additionally, the Debtors may be assessed additional Taxes and Fees for prepetition amounts paid notwithstanding whether an Audit has occurred.  Further, the Debtors routinely review their books and records and perform other related activities in connection with their Taxes and Fees in the ordinary course of business, which could give rise to additional liabilities that are not associated with an Audit or Assessment.  As of the Petition Date, the Debtors do not believe there are any

outstanding amounts owed in Taxes and Fees on account of the Assessments, which includes amounts that are being disputed in the appropriate judicial or administrative proceeding. The Debtors seek authority to pay undisputed prepetition Assessments and continue to negotiate settlements or resolutions with the applicable Authority regarding any disputed Assessments on a postpetition basis in the ordinary course of business.

56.     I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**K.     Utilities Motion.**

57.     Pursuant to the Utilities Motion, and in light of the severe consequences to the Debtors, their medical operations, and their patients should the Utility Providers interrupt their services, the Debtors seek entry of an order (a) determining that the Adequate Assurance Deposit provide the Utility Providers with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, (c) approving the Adequate Assurance Procedures for resolving any dispute in connection with the Adequate Assurance Deposit, and (d) granting related relief

58.     On average, the Debtors spend approximately $1.2 million per month on utilities. As of the Petition Date, the Debtors estimate that approximately $1.2 million on account of their Utility Services will become due and owing in the next twenty-one days.

59.     The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner. Cash on hand and cash generated in the ordinary course of business as well as anticipated access to cash collateral available and debtor in possession financing will provide the Debtors with sufficient liquidity to pay the Utility Providers for Utility Services in accordance with past practice. As the Adequate Assurance Deposit, the

Debtors propose to deposit $455,324.59 into the Adequate Assurance Account within five business days after the Order is entered.

60.     The Adequate Assurance Deposit is equal to approximately one half of the Debtors' average monthly cost of Utility Services, calculated based on the historical average of payments made to the Utility Providers over the twelve-month period prior to the Petition Date, excluding certain amounts and subject to certain adjustments.   Specifically, the Debtors believe that they have paid approximately $658,074.18 in Prepetition Deposits to certain Utility Providers as of the Petition Date.   Any Utility Provider holding a Prepetition Deposit will have that amount factored into the applicable proposed Adequate Assurance amount, given that such party has already been provided with protection.  The Adequate Assurance Account will be held in the Wells Fargo bank account ending in 2783 for the duration of the Debtors' chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Providers in accordance with the Adequate Assurance Procedures.  The Proposed Adequate Assurance demonstrates the Debtors' ability to pay for future Utility Services in accordance with past practice and constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

61.     I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

**Exhibit B**

Organizational Chart

