**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PIPELINE HEALTH SYSTEM, LLC, *et al.*,[1] | ) | Case No. 22-90291 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR
ENTRY OF AN ORDER (I) APPROVING THE SALE OF
CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES RELATED THERETO; (III) DISMISSING CERTAIN
OF THE DEBTORS' CHAPTER 11 CASES; AND (IV) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than November 29, 2022, at 3:30 p.m. (prevailing Central Time).**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on November 29, 2022 at 3:30 p.m. (prevailing Central time) at 515 Rusk Street, 4th Floor, Courtroom 404, Houston, TX, 77002.**
>
> **You may participate in the hearing either in person or by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's home page. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/PipelineHealth. The Debtors' service address is 898 N. Pacific Coast Highway, Suite 700, El Segundo, California 90245.

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Pipeline") state as follows in support of this motion:[2]

**Preliminary Statement**

1.      As set forth in the First Day Declaration, a primary driver of the Debtors' chapter 11 filing was the liquidity challenge facing the Debtors' two Illinois hospitals, Weiss Memorial Hospital and West Suburban Medical Center (together with their related facilities and properties, the "Illinois Assets").  Recognizing the challenges of continuing to operate the Illinois Assets as part of the Pipeline network, prior to the Petition Date,[3] the Debtors negotiated a proposed sale of the Illinois Assets and related operations to Ramco Healthcare Holdings, LLC ("Ramco") and AUM Global Healthcare, LLC d/b/a Resilience Health ("Resilience," and together with Ramco, the "Buyers").  Pipeline and the Buyers ultimately agreed to a proposed sale whereby the Debtors would sell the underlying real property and membership interests in the operating entities of the Illinois Assets to the Buyers.  On June 7, 2022, the Illinois Health Facilities and Services Review Board (the "IHFSRB") approved the proposed sale.  The sale, however, did not close before the targeted closing date of August 30, 2022.

2.      In the following weeks leading up to the Petition Date, the Debtors continued to engage in negotiations with the Buyers regarding paths to close the sale either out of court or in court.  Following Pipeline's chapter 11 filing on October 2, 2022, Pipeline immediately pivoted to negotiating with the Buyers on closing the existing sale transaction under section 363 of the Bankruptcy Code.  Pursuant to the Debtors' bidding procedures with respect to the Illinois Assets,

---

[2]     The facts and circumstances supporting this motion are set forth in the *Declaration of Russell A. Perry, Chief Transformation Officer of Pipeline Health System, LLC, in Support of the Debtors' Chapter 11 Petitions* [Docket No. 23] (the "First Day Declaration"), incorporated by reference herein.

[3]     Capitalized terms used but not immediately defined herein have the meaning ascribed to them in the First Day Declaration or as defined later in the Motion.

the Debtors' investment banker, Jefferies LLC, simultaneously conducted a postpetition marketing process to solicit interest from alternative purchasers who might be able to present a value-maximizing alternative to a transaction with the Buyers.  The Buyers submitted an offer[4] and several other potential purchasers submitted bids around the time of the November 7, 2022, bid deadline.[5]  The Debtors determined at that time that none of the submitted bids presented a going-concern solution for the Illinois Assets and engaged in negotiations with each of the potential purchasers to determine whether any of the bids were actionable.  Following weeks of hard-fought negotiations with the Buyers, the Debtors and the Buyers were able to agree on the scope of a transaction on substantially similar terms to those agreed to by the parties and approved by the IHFSRB prior to the Petition Date (the "Illinois Sale") but with a bifurcated closing whereby the parties would close first on the sale of the Illinois operations and thereafter on the sale of the Illinois real estate properties, subject to satisfaction of the conditions precedent and other terms of the applicable transaction documents.  The Debtors and the Buyers are prepared to close on the first part of the Illinois Sale—the Membership Interest Sale—on December 2, 2022.

3. The Debtors believe that the Illinois Sale represents the ***only available*** path to allow the hospitals comprising part of the Illinois Assets to remain open and continue providing critical

---

[4] The Buyers maintain that their offer was *not* submitted as a bid under the Bidding Procedures Order so that (i) the offer could not be used as a stalking horse bid that did not provide Buyers with stalking horse protections and (ii) no investment banker success fee would be potentially triggered by submission of the offer.  The Buyers recognize, however, that the Debtors must evaluate the Buyers' offer against any bid submitted by other potential purchasers pursuant to the Bidding Procedures Order (as defined herein).  References to the Buyers' offer as a Qualified Bid (as defined in the Bidding Procedures (as defined herein)) for purposes of this Motion or the Debtors' evaluation process should not be construed as a modification of the parameters of Buyers' offer as submitted.

[5] Pursuant to the *Order (I)Approving the Bidding Procedures, (II) Establishing Related Dates and Deadlines, (III) Approving the Form and Manner of Notice Thereof, and (IV) Granting Related Relief* entered at Docket No. 140 (the "Bidding Procedures Order" and the procedures approved thereby, the "Bidding Procedures"), the original bid deadline for the Illinois Assets was October 31, 2022.  Following consultation with the DIP Lenders and the Official Committee and consistent with the Bidding Procedures Order, the Debtors determined to extend the bid deadline to November 7.

services to the communities in which they operate. Due to the structure of the Membership Interest Sale and the assumption of certain liabilities by the Buyers under the sale, consummating the Illinois Sale also means that a substantial majority of claims of general unsecured creditors that could otherwise be subject to discharge pursuant to the Debtors' plan process will be unaffected by the bankruptcy. Finally, the Illinois Sale will provide immediate significant value to the Debtors' estates in the form of (i) the ability of the Debtors to pass through certain contractual costs through a transition services agreement, and (ii) improved liquidity as a result of the transfer of substantial administrative claims to the Buyers, the elimination of costs associated with operating the Illinois facilities, and the $1 million in monthly rent payments commencing 30 days after close of the Membership Interest Sale until closing of the Real Estate Sale.

4. For these reasons the Debtors, in a reasonable exercise of their business judgment, in consultation with the Consultation Parties and in accordance with the Bidding Procedures, have determined that the Illinois Sale is the only Qualified Bid and that it is the highest or otherwise best offer and have accordingly determined not to conduct an Auction with respect to the Illinois Assets (each as defined in the Bidding Procedures).

5. The Illinois Sale consists of two interrelated sale transactions—the Membership Interest Sale and the Real Estate Sale. The key terms are as follows:

- ***The Membership Interest Sale.*** Upon closing of the Membership Interest Sale, Illinois Parent shall convey the OpCo Membership Interests to Resilience pursuant to the MIPA for nominal consideration with Resilience taking over operations of the Illinois Assets and assuming certain related liabilities.

    o <u>Excluded Liabilities</u>: Section 2.3 of the MIPA provides that the Seller Parties shall retain or assume certain "Excluded Liabilities," and Resilience and the OpCos shall not be liable for such Excluded Liabilities, including without limitation:

4

- Certain known or unknown prepetition professional liability claims (*i.e.*, medical malpractice claims).[6]

- Liabilities relating to certain multi-facility (*i.e.*, involving facilities in addition to Illinois) contracts relating to operations of non-Illinois Debtors listed on Schedule 2.2(f) to the MIPA.

o Upon the closing of the Membership Interest Sale, the existing leases between the PropCos and the OpCos will be amended as follows (the amended leases, the "Resilience OpCo-PropCo Leases"):

- The OpCos' rent obligations under the Resilience OpCo-PropCo Leases will be abated for the first 30 days following the close of the Membership Interest Sale. During this 30-day period, Ramco will work to finalize terms for financing necessary to complete the Real Property Sale.

- Following the expiration of 30 days after close of the Membership Interest Sale, the OpCos shall owe a total of $1 million in monthly base rent to the PropCos under the Resilience OpCo-PropCo Leases.

o Illinois Parent will transfer an approximately $1.9 million payroll credit to the Buyers.

- ***The Real Estate Sale.*** Following the close of the Membership Interest Sale, subject to satisfaction of all closing conditions under the REPA, upon closing of the Real Estate Sale, the PropCos shall convey the Illinois Real Property to Ramco pursuant to the REPA for the Purchase Price comprising:

o $25 million in cash, which amount consists of the sum of:

- $5 million in equity proceeds from Ramco (which amount includes a previously provided $3 million cash deposit); and

- $20 million in proceeds from the FCB Loan; and

o $67 million in the form of seller financing pursuant to the Ramco Seller Note.

o The $3 million deposit previously paid by Ramco in connection with the Proposed Prepetition Transaction will be credited against the Purchase Price upon closing of the Real Estate Sale.

---

[6] *See* MIPA at Sec. 2.3(g) (identifying "Excluded Claims" as Excluded Liabilities). Under the MIPA, "Excluded Claim*s*" means any known or unknown professional liability claims arising from incidents that occurred prior to the Petition Date entitled to coverage (subject to any deductibles or retentions) under any of the Seller Parties' professional liability insurance policies set forth on Schedule 3.16 to the MIPA, including without limitation those professional liability claims set forth on Schedule 3.12 thereto, which shall be assumed by the Seller Parties (other than the OpCos) and otherwise addressed as contemplated in the MIPA.

5

o   Upon the maturity and cash settlement of the Ramco Seller Note for at least $30 million, the PropCos will transfer $30 million in cash to Resilience to satisfy certain agreed credits.

6.      Approval of the Illinois Sale is a pivotal step in the Debtors' path to emergence from chapter 11 with a strengthened balance sheet.  Critically, the Illinois Sale allows a new operator to replace the Debtors and continue to operate the Illinois Assets, which employ a total of approximately 1,400 people and support over 450 hospital beds.  Because the Illinois Sale is on substantially similar terms, and on the same key terms, to the sale approved by the IHFSRB prior to the Petition Date, the Illinois Sale can be closed substantially faster than any other potential transaction as to the Illinois Assets.  Pipeline will also immediately realize significant liquidity and operational benefits due to the Buyers' immediately taking over operations post-closing, thereby relieving Pipeline of the need to continue funding the Illinois Assets, which posted a net loss of approximately $69.7 million in the twelve-month period ending August 2022, and increasing Pipeline's operational flexibility with respect to its Texas and California operations.

7.      In short, the Illinois Sale provides immediate benefits to both the Debtors' estates and the communities the Debtors serve.  The Illinois Sale will provide the Debtors with immediate liquidity and operational benefits, preserve approximately 1,400 jobs and more than 450 hospital beds, and allow the Illinois Assets to continue operating under new ownership.  For these reasons, the Illinois Sale should be approved.

### Relief Requested

8.      The Debtors seek entry of an order, substantially in the attached form (the "Order"), (a) authorizing and approving the applicable Debtors' entry into (x) that certain Membership Interest Purchase Agreement attached to the Order as Exhibit 1 (as amended, modified, or supplemented from time to time, the "MIPA," the membership interests to be sold

thereby, the "OpCo Membership Interests,"[7] and the transaction contemplated thereby, the "Membership Interest Sale") by and between Debtor SRC Hospital Investments II, LLC ("Illinois Parent"), as seller, and AUM Global Healthcare Management, LLC d/b/a/ Resilience Health ("Resilience") as buyer, and (y) that certain Real Estate Purchase Agreement attached to the Order as Exhibit 2-A and Exhibit 2-B (as amended, modified, or supplemented from time to time, the "REPA"; the real property to be sold pursuant to the REPA, the "Illinois Real Property";[8] the transaction contemplated by the REPA, the "Real Estate Sale"; the REPA together with the MIPA and the related transaction documents contemplated under the REPA and the MIPA, including the documents attached to the Order as Exhibits 3-A, 3-B, and 3-C (the "Lease Amendments"), collectively, the "Illinois Sale Documents"; and the operations and assets to be sold pursuant to the Illinois Sale Documents, the "Illinois Operations" and "Illinois Assets," respectively; and the transactions contemplated by the Illinois Sale Documents, collectively, the "Illinois Sale") by and among Debtors West Suburban Property Holdings, LLC, River Forest Property Holdings, LLC, Weiss Property Holdings, LLC, and Weiss MOB Property Holdings, LLC (collectively, the "PropCos," and together with Illinois Parent, the "Sellers"), as sellers, and Ramco Healthcare Holdings, LLC ("Ramco," and together with Resilience, the "Buyers"), as buyer; (b) authorizing and approving the consummation of the Illinois Sale, including the sale of certain of the Debtors' property free and clear of liens, claims, encumbrances, and interests on the terms set forth in the Illinois Sale Documents, and directing the Buyers to perform their obligations under the Illinois Sale Documents and in connection with the consummation of the Illinois Sale;

---

[7]    The following Debtors are each an "OpCo" and collectively are the "OpCos":  (a) Pipeline – West Suburban Medical Center, LLC; (b) Pipeline – Weiss Memorial Hospital, LLC; (c) Pipeline – Lakefront Medical Associates, LLC; (d) Pipeline – Midwest Pharmacies, LLC; and (e) Pipeline – Weiss Medical Specialists, LLC.

[8]    The Illinois Real Property consists of certain land and improvements more specifically described in the REPA.

7

(c) authorizing and approving the applicable Debtors' entry into those certain Lease Amendments, by and among the PropCos and certain of the OpCos; (d) approving the assumption and assignment of certain executory contracts and unexpired leases in connection with the Illinois Sale; (e) dismissing certain of the Debtors' chapter 11 cases; (f) authorizing and approving the Debtors' transfer of patient records, including the "Patient Matrix" maintained in these chapter 11 cases, associated with the Illinois Operations (the "Illinois Patient Records") to Resilience upon the consummation of the Membership Interest Sale; and (g) granting related relief.

## Jurisdiction and Venue

9. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this motion.

10. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11. The bases for the relief requested herein are sections 105, 363(b), 363(f), 365(b), 365(f), and 1112 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 1017, 2002, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1, 4002-1(e), and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

12. Pipeline is an independent, community-focused healthcare network that offers a wide range of medical services to the communities it serves, including maternity care, cancer treatment, behavioral health, rehabilitation, general surgery, and hospice care. Headquartered in El Segundo, California, Pipeline's operations include seven acute care hospitals across California, Texas, and Illinois, with approximately 310 physicians and over 1,150 beds to serve patients, and

8

a company-wide workforce of over 4,200.  Pipeline's hospitals, which have served their respective communities for decades, include seven emergency departments, six general surgery departments, six orthopedic surgery departments, and five intensive or critical care departments, and provide medical care to approximately 135,000 patients annually.

13.     On October 2, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors and their businesses, including facts and circumstances giving rise to these chapter 11 cases is set forth in the First Day Declaration.

14.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 3, 2022, the Court entered an order [Docket No. 48] authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). On October 12, 2022, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed a patient care ombudsman [Docket No. 156] (the "PCO"). On October 13, 2022, the U.S. Trustee appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code [Docket No. 164] (the "Committee").  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

### The Illinois Assets

15.     On January 28, 2019, the Debtors acquired the Illinois Operations and related assets and liabilities, including the Illinois Real Property.  The Illinois Real Property is owned by the PropCos, and 100 percent of the equity interests in the PropCos is owned by Illinois Parent.  Illinois Parent also owns 100 percent of the OpCo Membership Interests, comprising the membership interests in the OpCo Debtors, which collectively carry on the Illinois Operations.  Pursuant to

certain OpCo-PropCo Leases,[9] the PropCos lease the Illinois Real Property to certain of the OpCos.

### The Sale Process

16.     As set forth in greater detail in the First Day Declaration, the Illinois Assets have driven persistent losses for the Debtors due, among other things, to their aging equipment and buildings; burdensome legacy contractual arrangements related to labor, services, goods, and technology services; and, since early 2020, the global COVID-19 pandemic, which, among other things, has caused expenses related to nurses and other contract labor and medical supplies to skyrocket.  In the twelve-month period ending in August 2022, the Illinois Assets posted a net loss of approximately $69.7 million on a consolidated basis.  This drain on the Debtors' liquidity affects the rest of the Debtors' operations in Texas and California as funding and supplies are siphoned off to cover the operational and liquidity needs of the Illinois Assets.

17.     With patient care as the Debtors' top priority, it became increasingly difficult for the Debtors' Texas and California operations to continue to subsidize the losses of the Illinois Assets.  Accordingly, on July 19, 2022, the PropCos and Ramco entered into a real estate asset purchase agreement (the "Prepetition Agreement"), whereby Ramco agreed to purchase the Illinois Real Property for $92 million subject to standard closing conditions (such potential transaction, the "Proposed Prepetition Transaction").  The sale documents further contemplated that Ramco would lease the premises to Resilience.  In addition to the real estate purchase,

---

[9]     As used herein, "OpCo-PropCo Leases" refers to the following, each as amended, supplemented, or modified from time to time:  (i) that certain *Office Lease* dated May 26, 2005, by and between Weiss MOB Property Holdings, LLC, as landlord, and Pipeline - Lakefront Medical Associates, LLC, as tenant; (ii) that certain *Mater Lease* dated as of January 28, 2019, by and among Weiss Property Holdings, LLC, as landlord, and Pipeline - Weiss Memorial Hospital, LLC, as tenant; and (iii) that certain *Master Lese* dated as of January 28, 2019, by and among West Suburban Property Holdings, LLC and River Forest Property Holdings, LLC, collectively, as landlord, and Pipeline -West Suburban Medical Center, LLC, as tenant.

Resilience was to acquire the equity interests in the entities operating the Illinois Assets pursuant to a membership interest purchase agreement.

18.     On June 7, 2022, the IHFSRB approved the Illinois Sale.  Following such approval, the Proposed Prepetition Transaction was initially set to close on August 30, 2022, but in the weeks following execution of the Prepetition Agreement, Ramco and Resilience indicated they were not able to close by the deadline, and on August 30, 2022, Ramco and Resilience terminated the Prepetition Agreement.

19.     Following termination of the Prepetition Agreement and the filing of these chapter 11 cases, the Debtors launched a postpetition marketing process (the "Postpetition Marketing Process") in accordance with the bidding procedures approved by this Court, which are designed, among other things, to facilitate a value-maximizing sale of the Illinois Assets.  Over the course of the Postpetition Marketing Process, the Debtors, along with Jefferies, had contact with a total of 37 strategic, financial, and other entities with investment experience in the healthcare space to solicit interest in purchasing the Illinois Assets on a going concern basis.  8 of these parties signed non-disclosure agreements and were granted access to a virtual dataroom containing, among other things, a confidential investment memorandum and confidential information regarding the Debtors' businesses, finances, organizational structure, and material agreements.  In parallel with the Postpetition Marketing Process, in light of the extensive prepetition negotiations and the Buyers' ability to close the Illinois Sale on a significantly faster timeline than any alternative purchase could achieve, the Debtors continued negotiations with Ramco and Resilience in parallel to the Postpetition Marketing Process.

20.     Although three parties other than the Buyers submitted formal bids for the Illinois Assets, the Debtors determined, in an exercise of their business judgment, that none of the bids

met the requirements to constitute Qualified Bids (as defined in the Bidding Procedures).  The Debtors were, however, following extensive negotiations, able to reach an agreement with the Buyers that, in the business judgment of the Debtors in consultation with their advisors, represented a value maximizing path forward.  Accordingly, on November 22, 2022, the Debtors and Buyers signed definitive documentation with respect to the Illinois Sale.  Recognizing the unique opportunity to execute a going-concern sale of the Illinois Assets with an expedited closing timeline, the Debtors, in a reasonable exercise of their business judgment, determined to cancel the auction and file this motion to approve the Illinois Sale on the terms set forth herein.

### The Illinois Sale

21.     The Illinois Sale Documents are the product of extensive, arm's length negotiations over the months before and after the Petition Date.  The Illinois Sale will be effectuated in two parts:  First, Illinois Parent will sell the OpCo Membership Interests to Resilience pursuant to the MIPA (the "Membership Interest Sale").  Second, the PropCos will sell the Illinois Real Property to Ramco pursuant to the REPA (the "Real Estate Sale").  The Membership Interest Sale is to close as soon as practicable after the Court enters the Order; the Real Estate Sale is to close at some time thereafter once all closing conditions are met, namely after Ramco finalizes terms for requisite financing to effectuate the purchase of the Illinois Real Property.  In the intervening period between close of the Membership Interest Sale and close of the Real Estate Sale, the Resilience-owned will lease the Illinois Real Property from the PropCos pursuant to the Resilience OpCo-PropCo Leases.

22.     ***The MIPA.***  Pursuant to the MIPA, Illinois Parent will convey the OpCo Membership Interests to Resilience in exchange for nominal consideration and the assumption of the majority of the liabilities associated with the OpCos.  Illinois Parent is also the parent of the PropCos, so the consideration for the overall Illinois Sale, including the Purchase Price and the assumption of certain liabilities of its subsidiaries, ultimately redounds to the benefit of Illinois

Parent.  The MIPA also contemplates that certain Excluded Liabilities (as defined in the MIPA) of the OpCos will not be transferred to the Buyer pursuant to the Illinois Sale but will be assumed by the Illinois Parent following the Illinois Sale.  Such Excluded Liabilities include prepetition medical malpractice claims and certain multi-facility (*i.e.*, involving facilities in addition to Illinois) contracts relating to operations of non-Illinois Debtors listed on Schedule 2.2(f) to the MIPA.  In addition, the MIPA contemplates that, upon close of the Membership Interest Sale, Illinois Parent will transfer a credit of approximately $1.9 million equal to the prorated amount of six day's worth of payroll for the OpCo's December 16, 2022, payroll run.  Finally, the indemnification provisions under the MIPA shall be suspended pending close of the Real Estate Sale.

23.     In connection with the MIPA, the Debtors also seek entry into that certain Transition Services Agreement (the "TSA") to be dated as of the closing of the Membership Interest Sale, by and between Pipeline Health System, LLC and AUM Global Healthcare Management, LLC, which TSA sets forth the terms and conditions governing the parties' actions in the period during which operations of the Illinois Assets are fully transferred from the Sellers to the Buyers.

24.     Additionally, upon consummation of the Membership Interest Sale, the membership interests of the OpCos, along with all of their respective assets and liabilities (other than as set forth in the MIPA), will no longer be a part of the Debtors' estates, and there will be no assets or liabilities to be administered in the chapter 11 cases of the OpCos.  Alleged post-closing costs, if any, may be brought forth against the Debtors' remaining estates and under no circumstances will be the responsibility of the OpCos.  Accordingly, the Debtors request that the

13

Court dismiss the OpCos' chapter 11 cases immediately prior to consummation of the Illinois Sale.[10]

25.      ***The Resilience Opco-PropCo Leases.***  Contemporaneously with consummation of the MIPA, the PropCos and certain of the OpCos will enter into the Resilience Opco-Propco Leases.  Pursuant to the Resilience Opco-Propco Leases, each Resilience-owned OpCo shall pay rent to each landlord PropCo in the amount of $333,333.33 per month, for a total base rent of $1 million (the "Base Rent").  The Resilience-owned OpCos' obligation to pay the Base Rent shall be abated for the first 30 days following close of the Membership Interest Sale.  During this 30-day abatement period, Ramco will work to finalize terms for financing necessary to complete the Real Property Sale, as set forth in greater detail below.

26.      ***The REPA.***  Pursuant to the REPA, attached to the Order as Exhibit 2-A and Exhibit 2-B, the PropCos will convey the Illinois Real Property to Ramco free and clear of all liens, claims, encumbrances, and other liabilities, subject to certain exceptions, in exchange for a purchase price of $92 million (the "Purchase Price"), which will net out to approximately $51.8 million after accounting for certain credits.   The Purchase Price will consist of (a) $25 million in cash comprising the sum of (i) $5 million in equity from Ramco (which includes a previously provided $3 million cash deposit) and (ii) $20 million in proceeds from that certain senior priority loan agreement (the "FCB Loan Agreement" and such loan the "FCB Loan") to be entered into by and among Ramco, as borrower, and First Credit Bank, as lender, and secured by a first priority lien on the Illinois Real Property; and (b) a $67 million promissory note issued by

---

[10]    By this Motion, the Debtors also request that the Court dismiss the chapter 11 case of Debtor Pipeline Chicago Graduate Education Foundation (the "Foundation"). The Foundation is a Delaware non-stock corporation. OpCo Debtor Pipeline – Weiss Memorial Hospital, LLC is the sole member (as that term is used in the Delaware General Corporation Law), and Section 8.10 of the MIPA provides that Seller shall take all necessary steps to effectively transfer control of the Foundation to Resilience or its designee, effective as of the MIPA Closing Date.

Ramco in favor of the PropCos and secured by a second lien on the Illinois Real Property and a first lien on OpCo assets, including accounts receivable (the "Ramco Seller Note").  In connection therewith, the Debtors seek authority to enter into that certain Intercreditor Agreement (the "Intercreditor Agreement," and together with the FCB Loan Agreement, the Ramco Seller Note, and related agreements and documents, the "Loan Documents"), setting forth the relative payment and lien priorities and other rights and remedies of the Sellers and First Credit Bank with respect to, among other things, the collateral securing the FCB Loan Agreement and the Ramco Seller Note.

27.    In addition, at both the closing of the Real Estate Sale and upon the maturity and cash settlement of the Ramco Seller Note for at least $30 million, the Debtors will transfer to Resilience, by wire transfer of immediately available funds, $30 million in credits (the "Closing Credits"), comprising (a) a cash credit in the amount of $18 million, which the Sellers and Buyers acknowledge is an agreed-upon adjustment to address certain pre-closing changes to accounts receivable, accounts payable, and costs associated with purchasing certain insurance coverage, and (b) a cash credit in the amount of $12 million, which Resilience will use in cooperation with Ramco for the benefit of the Weiss Memorial Hospital campus.  The $12 million cash credit will be issued to honor certain written and oral commitments made in connection with the parties' obtaining approval of the Proposed Prepetition Transaction from the IHFSRB.  The Debtors' agreeing to fund the Closing Credits was necessary to consummating the Illinois Sale on the terms described herein, and the availability of the Closing Credits to the Buyers will be critical to the Buyers' ability to maintain the standards of patient care and safety at the Illinois Assets.  Accordingly, the Debtors submit that providing the Closing Credits as set forth in the MIPA is necessary, proper, and a sound exercise of their business judgment.

28.     The privileges and obligations of the PropCos under the Resilience Opco-Propco Leases, as amended, will be assumed and assigned to Ramco pursuant to the REPA.

29.     ***Transaction Expenses.***   By this Motion, the Debtors seek to pay the fees and expenses incurred by Duane Morris LLP, transactional counsel to the Debtors, and Arent Fox Schiff LLP, regulatory counsel to the Debtors, incurred in connection with the Illinois Sale as well as certain fees and expenses of consultants utilized by the Debtors in connection with the Illinois Sale (such fees and expenses, the "Transaction Expenses") upon closing of the Real Estate Sale. The Transaction Expenses were negotiated in connection with the Prepetition Agreement and the Proposed Prepetition Transaction, and the incurrence thereof was reasonable and necessary to close the value-maximizing Illinois Sale.  Accordingly, the Court should authorize the Debtors to pay the Transaction Expenses pursuant to section 363 of the Bankruptcy Code as a sound exercise of the Debtors' business judgment.

30.     Consummating the Illinois Sale on the terms set forth herein is a sound exercise of the Debtors' business judgment for at least five reasons. ***First***, and most importantly, the Illinois Sale will minimize disruptions to patient care.  In addition to the fact that it can be closed on the most expeditious possible timeline, the Illinois Sale contemplates transferring the operations of the Illinois Assets to Resilience, which is owned and operated by seasoned healthcare executives capable of running the Illinois Assets with the same expertise that characterizes the Debtors' current operations.  Consummating the Illinois Sale on the terms set forth herein is therefore the best way to save approximately 1,400 jobs, maintain the availability of over 450 hospital beds, and minimize disruption to the operations of the Illinois Assets, which are vital to the communities in which they operate. ***Second***, the Debtors believe that the Purchase Price is the highest and best offer available in the market for the Illinois Assets.  The Illinois Assets have posted consistent

16

losses since the Debtors acquired them, which limits the universe of potential buyers.  Moreover, both the Postpetition Marketing Process and the Debtors' efforts to market the Illinois Assets in the weeks leading up to the Petition Date failed to yield any actionable offer to purchase the Illinois Assets, let alone an offer to purchase the Illinois Assets for an amount greater than the Purchase Price.  *Third*, consummating the Illinois Sale on the terms set forth herein frees the Debtors of a loss-generating asset.  As discussed above, in the twelve-month period ending August 2022, the Illinois Assets posted a net loss of approximately $69.7 million on a consolidated basis.  The losses generated by the Illinois Assets have forced the Debtors to reallocate funds that would otherwise be directed to the Debtors' California and Texas operations to the Illinois Assets.  This drain on the Debtors' liquidity has consistently threatened the Debtors' ability to deliver the highest quality care to patients throughout the Debtors' network of facilities.  The sale of the OpCos will result in the elimination of these operating expenses, the transfer of certain administrative claims to the Buyers, the Buyers' assumption of substantial liabilities, and, following 30 days after close of the Membership Interest Sale in the event the Real Estate Sale has not closed, $1 million in monthly rent payments, all of which will substantially strengthen the Debtors' liquidity position.  *Fourth*, the Illinois Sale can be closed on a far faster timeline than any other potential transaction given that the substance of the Illinois Sale was already approved prepetition when the Debtors were seeking to consummate the Proposed Prepetition Transaction.  Even if another potential buyer emerged and took the time and effort to execute definitive deal documents, a sale to any buyer other than the Buyers or on any terms other than those contemplated by the Illinois Sale Documents, which contemplate substantially similar terms, and the same key terms, as the Proposed Prepetition Transaction, would require the Debtors to begin the regulatory approval process from scratch, substantially delaying the closing of the transaction and prolonging the

17

liquidity drain associated with the Debtors' operation of the Illinois Assets.  The Illinois Sale therefore offers the Debtors the unique ability to avoid a new protracted regulatory approval process that will delay consummation of the sale and risk hampering the Debtors' ability to maintain ordinary course operations at the Illinois Assets.  ***Fifth***, the two-part structure of the Illinois Sale reconciles timing considerations particular to the Membership Interest Sale and the Real Estate Sale, affording Ramco additional time to finalize terms for requisite financing to close the Real Estate Sale while also compensating the PropCos for delay in closing the Real Estate Sale with the secured $1 million monthly Base Rent payment payable under the Resilience OpCo-PropCo Leases.

31.     For the foregoing reasons, entering into the Illinois Sale Documents and consummating the Illinois Sale on the terms set forth herein is fair, reasonable, and the most value maximizing path forward for the Debtors and represents a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court approve the Illinois Sale on the terms set forth herein.

## Key Provisions of the MIPA

32.     The following chart summarizes the key terms and conditions of the MIPA:

| Summary Description of the MIPA[11] | |
|---|---|
| **Seller** | SRC Hospital Investments II, LLC |
| **Buyer** | AUM Global Healthcare, LLC |
| **The Assets** | All of the issued and outstanding membership interests of the following entities (the "Acquired Entities"):<br><br>(i)     Pipeline – West Suburban Medical Center, LLC |

---

[11]   Any description of the terms of the MIPA contained herein is a summary provided for convenience purposes only. In the event of any inconsistency between the summary set forth herein and the MIPA, the MIPA shall control. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the MIPA.

| **Summary Description of the MIPA**[11] | |
|---|---|
| | (ii) Pipeline – Weiss Memorial Hospital, LLC; |
| | (iii) Pipeline – Lakefront Medical Associates, LLC; |
| | (iv) Pipeline Midwest Pharmacies, LLC; and |
| | (v) Pipeline – Weiss Medical Specialists, LLC. |
| **Excluded Assets** | Certain Excluded Assets of the Acquired Entities shall be retained by, or transferred to, the Seller prior to closing, and not included as part of Buyer's acquisition of the Acquired Entities, including cash and cash equivalents of the Acquired Entities, certain amounts related to the Closing Credits to be transferred to Buyer, certain intercompany receivables, state tax credits, certain contracts that are not exclusively related to the businesses being purchased by Buyer, certain intellectual property and information technology equipment of the Seller not exclusively related to the businesses being purchased by Buyer, and corporate organizational and other records that Seller is required by Law to retain.<br><br>MIPA § 2.2. |
| **Purchase Price** | $1.00.<br><br>MIPA § 2.4. |
| **Excluded Liabilities** | Seller Parties (other than the Subsidiaries) shall retain or assume, as applicable, and Buyer shall not be liable for, the following liabilities relating to the Hospital Facilities:<br><br>a) Any intercompany payables owing from the Subsidiaries to any other Seller Parties;<br><br>b) Any Indebtedness of the Seller Parties, including without limitation: (i) any Claims or liabilities arising under the ABL Credit Agreement, (ii) any Claims or liabilities arising under the Term Loan Credit Agreement, and (iii) any Claims or liabilities arising under the DIP Credit Agreement;<br><br>c) Any Claims of Seller Parties (other than the Subsidiaries) against the Subsidiaries, including without limitation any and all Claims of such Seller Parties under chapter 5 of the Bankruptcy Code;<br><br>d) Any and all fees and expenses related to the Debtors' restructuring, including without limitation: (i) fees and expenses of professionals employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code, (ii) compensation and reimbursement awarded pursuant to section 503(b)(4) of the Bankruptcy Code, (iii) Restructuring Expenses (as that term is defined in the proposed chapter 11 plan filed at Docket No. 21 in the Chapter 11 Cases), (iv) Other Restructuring Disbursements (as set forth in line item 19 in the budget attached to the interim order approving post-petition financing filed at Docket No. 86 in the Chapter 11 Cases), and (v) fees owing to the Office of the United States Trustee, including fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717; |

19

| Summary Description of the MIPA[11] | |
|---|---|
| | e)  Any liability or claim relating to the Excluded Assets; [12] <br><br> f)  The Deferred Payroll Tax Liability; and <br><br> g)  The Excluded Claims (*i.e.*, prepetition medical malpractice claims).[13] <br><br> MIPA § 2.3. |
| **Closing Credits to Buyer** | a)  At the Closing, Seller shall transfer to Buyer, by wire transfer of immediately available funds, the following amounts (collectively, the "Closing Credits"): <br><br>     i.   The Estimated Employee Payroll Credit. <br><br> b)  On or after the maturity date of the Ramco Note, the principal balance due under the Ramco Note shall be reduced by an amount equal to the Cares Act Deposit. Interest will accrue on the full principal balance of the Ramco Note (or such reduced amount after any payments by Ramco Healthcare Holdings, LLC during the term of the Ramco Note) through the maturity date and before the credit for the Cares Act Deposit is applied. <br><br> c)  At such time after the RPPA Closing when Ramco Healthcare Holdings, LLC delivers a lump-sum payment of at least Thirty Million and No/100 Dollars ($30,000,000) on the Ramco Note, Seller shall cause the Chicago PropCos to immediately transfer to Buyer, by wire transfer of immediately available funds, the following amounts: <br><br>     i.   An amount equal to Eighteen Million and No/100 Dollars ($18,000,000.00), which Seller and Buyer each acknowledge is an additional agreed-upon adjustment to address pre-Closing changes to Accounts Receivable, accounts payable, and costs associated with purchasing the Retroactive Insurance Coverage; ***plus*** <br><br>     ii.  An amount equal to Twelve Million and No/100 Dollars ($12,000,000.00), which Buyer, in cooperation with Real Estate Buyer, shall use for the benefit of Weiss Memorial Hospital to honor the written and oral commitments made in connection with obtaining the Certificates of Exemption from IHFSRB. <br><br> MIPA § 2.5. |
| **Seller Closing Actions** | <u>Actions of Seller at Closing</u>.  At the Closing or within such other timeframes as specified below and unless otherwise waived in writing by Buyer, Seller shall deliver or cause to be delivered to Buyer the following: |

---

[12]   Such liabilities include without limitation liabilities relating to certain multi-facility (*i.e.*, involving facilities in addition to Illinois) contracts relating to operations of non-Illinois Debtors listed on Schedule 2.2(f) to the MIPA

[13]   Under the MIPA, "Excluded Claims" is defined as any known or unknown professional liability claims arising from incidents that occurred prior to the Petition Date entitled to coverage (subject to any deductibles or retentions) under any of the Seller Parties' professional liability insurance policies set forth on Schedule 3.16 to the MIPA, including without limitation those professional liability claims set forth on Schedule 3.12 thereto, which shall be assumed by the Seller Parties (other than the OpCos) and otherwise addressed as contemplated in the MIPA.

20

| | |
|---|---|
| **Summary Description of the MIPA[11]** | |

a) Limited liability company interest transfer powers evidencing the transfer of the Membership Interests from the Seller to Buyer, duly executed by the Seller;

b) Copies of resolutions duly adopted by the governing body of Seller authorizing and approving Seller's execution and delivery of this Agreement and consummation of the Transaction;

c) Certificate of good standing of Seller from the State of Delaware, dated as of the most recent practicable date prior to the Closing Date;

d) The Transition Services Agreement between Pipeline Health System and Buyer in a form to be negotiated by the parties and attached hereto as Exhibit A and incorporating such additional terms on transition services as mutually agreed upon prior to Closing (the "Transition Services Agreement") executed by Pipeline Health System;

e) Assignment and assumption agreements (the "Retention Bonus Assignments") for the assignment to, and assumption by, Buyer or Buyer's designee of those certain retention bonus letter agreements (the "Retention Bonus Agreements") by and between Pipeline Health System or the Subsidiaries, on the one hand, and those executives and employees of the Seller Parties listed on Schedule 2.7(e), on the other hand;

f) An assignment and assumption agreement (the "Material Contract Assignment") for the assignment to, and assumption by, Buyer or Buyer's designee of those certain Material Contracts to which Seller and other Affiliates of Seller that are not the Subsidiaries are a party, and which are listed on Schedule 2.7(f);

g) Written evidence of Credit Suisse AG, New York Branch's (i) consent to the sale of the Membership Interests free and clear of all Claims and Encumbrances arising under the ABL Credit Agreement pursuant to the Sale Order and (ii) release/termination of any Encumbrances on the assets of the Subsidiaries arising under the ABL Credit Agreement; provided that, the Parties agree this deliverable may be satisfied if the Sale Order includes factual findings regarding such consent and ordering such release/termination (all in form and substance reasonably acceptable to Buyer);

h) Written evidence of Alter Domus Products Corp.'s (i) consent to the sale of the Membership Interests free and clear of all Claims and Encumbrances arising under the Term Loan Credit Agreement pursuant to the Sale Order and (ii) release/termination of any Encumbrances on the assets of the Subsidiaries arising under the Term Loan Credit Agreement; provided that, the Parties agree this deliverable may be satisfied if the Sale Order includes factual findings regarding such consent and ordering such release/termination (all in form and substance reasonably acceptable to Buyer);

i) Evidence reasonably satisfactory to Buyer that Seller has paid the Deferred Payroll Tax Liability to the appropriate Governmental Authorities;

j) The Restrictive Covenant Agreement, in the form attached hereto as Exhibit B, executed by Seller and binding on Seller and Seller's Affiliates;

k) (i) An aged trial balance, list of all Uncleared Checks, Income Statement with General Ledger to support same, balance sheet with general ledger to support aged accounts payable, aged Accounts Receivable identifying payor and detailed

21

| Summary Description of the MIPA[11] | |
|---|---|
| | claims, each of which shall be part of the Financial Statements and delivered to Buyer at least three (3) business days prior to the Closing Date and updated again on the Closing Date; |
| | l)  Evidence of the purchase and binding of the D&O Tail Policy reasonably satisfactory to Buyer; |
| | m)  The Drug Enforcement Administration ("DEA") Power of Attorney (the "DEA POA") for use of the Hospital Facilities' DEA Controlled Substance Registration in the form attached hereto as Exhibit C and executed by Seller; |
| | n)  Payment to Buyer of the Closing Credits, as adjusted; |
| | o)  An assumption agreement whereby the Seller Parties (other than the Subsidiaries) assume any and all liabilities relating to the Excluded Liabilities, including without limitation the Excluded Claims, and agree to address such Excluded Liabilities in a chapter 11 plan in the form attached hereto as Exhibit D and executed by the Buyer and Seller Parties (other than the Subsidiaries); |
| | p)  A certified copy of the Sale Order entered by the Bankruptcy Court; |
| | q)  Amendments to the amended and restated master leases for the Chicago Real Property in the forms attached hereto as Exhibit F (the "Lease Amendments"), executed by the Chicago PropCos; and |
| | r)  Such other agreements, instruments and documents as Buyer reasonably deems necessary to consummate the transactions under this Agreement. |
| | MIPA § 2.7. |
| **Buyer Closing Actions** | <u>Actions of Buyer at Closing.</u>  At the Closing and unless otherwise waived in writing by Seller, Buyer shall deliver or cause to be delivered to Seller the following: |
| | a)  The Purchase Price by wire transfer of immediately available funds; |
| | b)  Copies of resolutions duly adopted by the Board of Managers of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and consummation of the Transaction; |
| | c)  The Transition Services Agreement executed by Buyer; |
| | d)  The Retention Bonus Assignments executed by Buyer; |
| | e)  The Material Contract Assignment executed by Buyer; |
| | f)  Evidence of the purchase and binding of the Retroactive Insurance Coverage, reasonably satisfactory to Seller; |
| | g)  The Restrictive Covenant Agreement executed by Buyer; |
| | h)  The DEA POA executed by Buyer; |
| | i)  The Lease Amendments, executed by the Buyer on behalf of the Subsidiaries; and |

| **Summary Description of the MIPA**[11] | |
|---|---|
| | j)  Such other agreements, instruments and documents as Seller reasonably deems necessary to consummate the transactions under this Agreement.<br><br>MIPA § 2.8. |
| **Conditions Precedent to Obligations of Buyer** | Notwithstanding anything herein to the contrary, the obligations of Buyer to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Buyer on or prior to the Closing:<br><br>6.1  Representations and Warranties; Covenants.   The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth herein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date.  All of the covenants in this Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth therein).  Buyer shall have received a certificate signed on behalf of Seller by a duly authorized officer of Seller to such effect.<br><br>6.2  Pre-Closing Confirmation.  Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that the Parties have obtained the Certificates of Exemption approval from the IHFSRB.<br><br>6.3  Actions and Proceedings.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the Transaction.  On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Hospital Facilities, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Hospital Facilities, (b) enjoining or otherwise preventing the consummation of this Agreement or the Transaction, which Action, in the reasonable opinion of Buyer, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the Transaction.<br><br>6.4  Entry of Sale Order.  The Bankruptcy Court shall have entered the Sale Order.<br><br>6.5  Closing Deliveries.  Seller shall have executed and delivered, or caused to have been executed and delivered, to Buyer the documents and items described in Section 2.7.<br><br>MIPA §§ 6.1–6.5. |

| **Summary Description of the MIPA[11]** | |
|---|---|
| **Conditions Precedent to Obligations of Seller** | Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Seller on or prior to the Closing: |

7.1    Representations and Warranties; Covenants.    The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date.  All of the covenants in this Agreement to be complied with or performed by Buyer on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein).  Seller shall have received a certificate signed on behalf of Buyer by a duly authorized officer of Buyer to such effect.

7.2    Pre-Closing Confirmations.  Seller shall have obtained documentation or other evidence reasonably satisfactory to Seller that the Parties have obtained the Certificates of Exemption approval from the IHFSRB.

7.3    Actions and Proceedings.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the Transaction.  On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Hospital Facilities, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Hospital Facilities, (b) enjoining or otherwise preventing the consummation of this Agreement or the Transaction, which Action, in the reasonable opinion of Seller, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Seller or Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the Transaction.

7.4    Insolvency.  Buyer shall not (a) be in receivership or dissolution, (b) have made any assignment for the benefit of creditors, (c) have admitted in writing its inability to pay its debts as they mature, (d) have been adjudicated a bankrupt or (e) have filed a petition in voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy Law or any other similar Law.

7.5    Closing Deliveries.  Buyer shall have executed and delivered, or caused to have been executed and delivered, to Seller the documents and items described in Section 2.8.

MIPA §§ 7.1–7.5.

24

| Summary Description of the MIPA[11] | |
|---|---|
| **Indemnification by Buyer** | Subject to the limitations set forth in Section 9.3, from and after the Closing, Buyer shall defend, indemnify and hold harmless Seller (and its respective Affiliates, and their respective officers, directors, employees, counsel, agents, successors and assigns) (collectively, the "<u>Seller Indemnified Parties</u>") from and against any and all Losses to the extent arising out of or resulting from:<br><br>a)  any breach of or inaccuracy in any representation or warranty made by Buyer contained in this Agreement or in any certificate executed and delivered pursuant hereto;<br><br>b)  any breach of or failure by Buyer to perform any covenant or obligation of Buyer contained in this Agreement;<br><br>c)  any Third Party Claim arising solely from the operation of the Hospital Facilities and the Subsidiaries after the Closing Date;<br><br>d)  Buyer's use of the Pipeline Trademarks and Logos as described in Section 8.6;<br><br>e)  the failure of Buyer to pay when due after the Closing Date any premiums or other charges relating to the Employee Benefit Plans of the Subsidiaries or the failure to fund payroll and payroll taxes in accordance with Section 8.3; or<br><br>f)  any fraud, willful misconduct or criminal acts of Buyer or its Affiliates.<br><br>MIPA § 9.1. |
| **Indemnification by Seller** | Subject to the limitations set forth in Section 9.3, from and after the Closing, Seller shall defend, indemnify and hold harmless Buyer and the Subsidiaries (and their respective Affiliates, and their respective officers, directors, employees, counsel, agents, successors and assigns) (collectively, the "<u>Buyer Indemnified Parties</u>" and collectively with the Seller Indemnified Parties, the "<u>Indemnified Parties</u>") from and against any and all Losses to the extent arising out of or resulting from:<br><br>a)  any breach of or inaccuracy in any representation or warranty made by Seller contained in this Agreement or in any certificate executed and delivered pursuant hereto;<br><br>b)  any breach of or failure by Seller to perform any covenant or obligation of Seller contained in this Agreement;<br><br>c)  any Excluded Liability other than the Excluded Claims;<br><br>d)  any Excluded Asset;<br><br>e)  the matters disclosed on Schedule 9.2(e);<br><br>f)  the Excluded Claims; and<br><br>g)  any fraud, willful misconduct or criminal acts of Seller or its Affiliates.<br><br>MIPA § 9.2. |

| Summary Description of the MIPA[11] | |
|---|---|
| **Other Material Terms** | At the Closing Buyer and Seller shall enter into a Transition Services Agreement by which Seller shall provide certain information technology services and support to Buyer for a specified period following the Closing.  MIPA, <u>Exhibit A</u>.<br><br>For a period of twelve (12) months after the Closing, Seller agrees to cooperate with and provide reasonable assistance to Buyer in facilitating the change of ownership ("<u>CHOW</u>") filings related to the assignment and assumption of the Hospital Facilities' Medicare and Medicaid provider agreements by Buyer and the billing of services rendered by Buyer at the Hospital Facilities under such existing provider agreements during the period following the Closing and until such CHOW filings are approved with issuance of "tie-in" notices (the "<u>CHOW Period</u>") in a manner consistent with applicable Medicare and Medicaid rules and regulations.  Buyer shall have sole responsibility for preparing and coordinating the filing of the CHOW filings, subject to Seller providing reasonable assistance with such filings. Buyer shall retain sole responsibility and liability for the billing of such services provided by Buyer at the Hospital Facilities during the CHOW Period and Seller shall promptly remit to Buyer any payments received by Seller for such services.<br><br>MIPA § 8.7(b).<br><br>At Closing, the Parties will enter into the Restrictive Covenant Agreements. MIPA §8.8, <u>Exhibit B</u>. |

## <u>Key Provisions of the Rental Agreements</u>

33.	The following chart summarizes the key terms and conditions of the OpCo-PropCo Leases:

| Summary Description of the Resilience OpCo-PropCo Leases[14] | |
|---|---|
| **Lessors** | Weiss MOB Property Holdings, LLC - 6th Amend. to Combined Medical Office Lease<br><br>Weiss Property Holdings, LLC - 2nd Amend. to A/R Weiss Hospital Master Lease<br><br>Wes Suburban Property Holdings, LLC; River Forest Property Holdings, LLC - 3rd Amendment to A/R West Sub/River Forest Master Lease |
| **Lessees** | Pipeline - Lakefront Medical Associates, LLC - 6th Amend. to Combined Medical Office Lease<br><br>Pipeline - Weiss Memorial Hospital, LLC - 2nd Amend. to A/R Weiss Hospital Master Lease<br><br>Pipeline - West Suburban Medical Center, LLC  - 3rd Amendment to A/R West Sub/River Forest Master Lease |

---

[14]	Any description of the terms of the Resilience OpCo-PropCo Leases contained herein is a summary provided for convenience purposes only.  In the event of any inconsistency between the summary set forth herein and the Rental Agreements, the Rental Agreements shall control.  Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Rental Agreements.

26

| Summary Description of the Resilience OpCo-PropCo Leases[14] | |
|---|---|
| Rent Terms | Notwithstanding anything in the A/R Master Lease to the contrary regarding any abatements of Base Rent, Additional Rent, and all other monetary obligations of Tenant payable to Landlord under the A/R Master Lease during the Abatement Period, commencing on that date which is thirty (30) days from the date hereof, and continuing until the date on which Buyer, or its successors or assigns, completes the acquisition of the Purchased Assets pursuant to the Purchase Agreement (the "Rent Payment Period"), Tenant shall pay Base Rent to the Landlord in the amount of $333,333.33 per month, such amount being payable on the first day of each month, without any demand, abatement or offset.  For the avoidance of doubt, Base Rent shall be abated until the date that is thirty (30) days from the date hereof. <br><br> Further, all payments required to be paid by Tenant under (i) Section 4.2 of the Original A/R Master Lease, or (ii) elsewhere in the A/R Master Lease shall no longer be abated and shall be paid by Tenant during the Rent Payment Period. <br><br> 3rd Amendment to A/R West Sub/River Forest Master Lease §§ 2(a), (b).[15] |

## Key Provisions of the REPA

34.     The following chart summarizes the key terms and conditions of the REPA:

| Summary Description of the REPA[16] | |
|---|---|
| Sellers | West Suburban Property Holdings, LLC, River Forest Property Holdings, LLC, Weiss Property Holdings, LLC, and Weiss MOB Property Holdings, LLC |
| Buyer | Ramco Healthcare Holdings, LLC |
| The Purchased Assets | Subject to the terms and conditions of this Agreement, at the Closing and effective as of the Effective Time, Sellers shall sell, assign, transfer and deliver to Buyer, and Buyer shall acquire, all of Sellers' right, title and interest to all of the assets owned, exclusively used or held for use by Sellers as follows: <br><br> a)   all interests in the Owned Real Property set forth in Exhibit A; <br><br> b)   all of the Tenant Leases described in Schedule 2.1(b); <br><br> c)   all of the Lessor Leases described in Schedule 2.1(c), together with all guarantees of any of such Lessor Leases and all security deposits delivered by tenants thereunder, whether in cash or letter of credit or pursuant to a guaranty agreement; <br><br> d)   all Personal Property listed in Schedule 2.1(d); <br><br> e)   all Intangible Property; and |

---

[15]   Analogous terms in other Resilience OpCo-PropCo Leases are substantially the same.

[16]   Any description of the terms of the REPA contained herein is a summary provided for convenience purposes only.  In the event of any inconsistency between the summary set forth herein and the REPA, the REPA shall control.  Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the REPA.

| | |
|---|---|
| **Summary Description of the REPA[16]** | |
| | f) all Service Contracts set forth in Schedule 2.1(f). <br><br> REPA § 2.1. |
| **Purchase Price** | $92,000,000 comprising: <br><br> a) $5 million in equity proceeds from Ramco; <br><br> b) $20 million in the form of the Senior Priority Loan; and <br><br> c) $67 million in the form of the Second Lien Note. <br><br> REPA § 2.2. |
| **Closing Payment** | At the Closing, Buyer will pay to Sellers an amount equal to (i) the Purchase Price, (ii) less (A) the Deposit (without interest) in the amount of $3,000,000.00, and (B) an amount equal to the Buyer Subordinated Note in the amount of $67,000,000.00 (which is to be delivered to Sellers as provided in Section 2.5 hereof), and (iii) as further adjusted pursuant to the terms hereof, which amount shall be payable in immediately available funds by wire transfer to the account of Sellers as set forth in wiring instructions provided by Sellers to Buyer.  For the avoidance of doubt, the Parties acknowledge that at Closing, Sellers are to receive additional gross proceeds in immediately available funds, before any adjustments, in the amount of $22,000,000.00, which amount shall be in the form of additional cash contributions from Buyer in the amount of $2,000,000.00 and proceeds from the Buyer Senior Financing (i.e. $92,000,000.00 Purchase Price, less $3,000,000.00 Deposit (previously disbursed to Sellers and applied to the Purchase Price), less $67,000,000.00 Buyer Subordinated Note, equals $22,000,000.00 in additional cash from Buyer in the amount of $2,000,000.00 and proceeds from Buyer Senior Financing, which $22,000,000.00 shall be the amount of the gross proceeds (before any adjustments) paid to Sellers at Closing). <br><br> REPA § 2.2(c). |
| **Bifurcated Closing** | Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated under this Agreement (the "Closing") shall take place electronically on or before that date that is thirty (30) days from the date of the MIPA Closing or such other date as the Parties may mutually agree upon in writing (the "Closing Date"); provided that by notice given to Sellers not less than five (5) days before the end of the initial Closing Date, Buyer may extend the Closing Date in order to close on the Buyer Senior Financing, but in no event may Buyer extend the Closing Date beyond June 30, 2023. <br><br> REPA § 2.3. |
| **Conditions Precedent to Obligations of Buyers** | Notwithstanding anything herein to the contrary, the obligations of Buyer to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Buyer on or prior to the Closing: <br><br> 6.1   Representations and Warranties; Covenants.   The representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth herein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified |

| Summary Description of the REPA[16] | |
|---|---|
| | date, as of such specified date. All of the covenants in this Agreement to be complied with or performed by Sellers on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth therein).<br><br>6.2   Pre-Closing Confirmations.  Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that the IHFSRB has issued the IHFSRB Approval.<br><br>6.3   Actions and Proceedings.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement. On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Owned Real Property, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Owned Real Property, (b) enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby, which Action, in the reasonable opinion of Buyer, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the transactions contemplated by this Agreement.<br><br>6.4   Reserved.<br><br>6.5   Closing Deliveries.  Sellers shall have executed and delivered, or caused to have been executed and delivered, to Buyer the documents and items described in Section 2.4.<br><br>6.6   [Superseded].<br><br>6.7   Entry of Sale Order.  The Bankruptcy Court shall have entered the Sale Order.<br><br>REPA §§ 6.1–6.7. |
| **Conditions Precedent to Obligations of Sellers** | Notwithstanding anything herein to the contrary, the obligations of Sellers to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Sellers on or prior to the Closing:<br><br>7.1   Representations and Warranties.  The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date.  All of the covenants in this Agreement to be complied with or performed by Buyer on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects |

29

| Summary Description of the REPA[16] |
|---|

| | | |
|---|---|---|
| | | (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein). |
| | 7.2 | Pre-Closing Confirmations.  Sellers shall have obtained documentation or other evidence reasonably satisfactory to Sellers that the IHFSRB has issued the IHFSRB Approval. |
| | 7.3 | Actions and Proceedings.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement. On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Owned Real Property, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Owned Real Property, (b) enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby, which Action, in the reasonable opinion of Sellers, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Sellers or Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the transactions contemplated by this Agreement. |
| | 7.4 | Insolvency of Buyer.  Buyer shall not (a) be in receivership or dissolution, (b) have made any assignment for the benefit of creditors, (c) have admitted in writing its inability to pay its debts as they mature, (d) have been adjudicated a bankrupt or (e) have filed a petition in voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy Law or any other similar Law. |
| | 7.5 | Closing Deliveries.  Buyer shall have executed and delivered, or caused to have been executed and delivered, to Sellers the documents and items described in Section 2.5. |
| REPA §§ 7.1–7.5. | | |

## Basis for Relief

I.    **The Illinois Sale Should Be Approved Under Section 363(b) of the Bankruptcy Code as an Exercise of the Debtors' Sound Business Judgment.**

35.    Under section 363(b)(1) of the Bankruptcy Code, a debtor in possession may "use, sell, or lease" estate property "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1).  It is well established in this jurisdiction that a debtor may sell estate property outside the ordinary course of business under this provision if there is a good

30

business reason for doing so.  *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011);

*In re State Park Bldg. Grp., Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

36.    "Great judicial deference is given to the [debtor in possession's] exercise of

business judgment" regarding the sale of estate property.  *State Park Bldg. Grp.*, 331 B.R. at 254.

Once a debtor articulates a good business reason for the sale of estate property outside the ordinary

course of business, it is presumed that the debtor's decision to move forward with the sale was

made "on an informed basis, in good faith, and in the honest belief that the [transaction] was in the

best interests of the [debtor] company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y.

1990); *see Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("As

long as [the sale of estate property] appears to enhance [the] debtor's estate, court approval of a

[debtor in possession's] decision to [sell the property] should only be withheld if the [debtor's]

judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy

Code.") (internal quotation marks and citation omitted).

37.    The Illinois Sale is a sound exercise of the Debtors' business judgment.  The

Debtors are satisfied that the Purchase Price is the highest and best value that the Debtors can

reasonably expect to receive for the Illinois Assets.  The Illinois Sale will substantially improve

the Debtors' liquidity position by relieving the Debtors of loss-generating assets that the Debtors'

Texas and California operations have long had to subsidize, transferring substantial liabilities and

administrative claims to the Buyers, and providing for $1 million in monthly rental payments

following the expiration of 30 days after close of the Membership Interest Sale in the event the

Real Estate Sale has not closed.  The Buyers will also be able to consummate the Illinois Sale on

a shorter timeline than any other potential buyer offering to purchase the Illinois Assets on any

other terms.  As discussed above, the IHFSRB has already approved the key terms of the Illinois

Sale. Pursuing an alternative transaction would entail preparing, submitting, and waiting for the IHFSRB response to an entirely new regulatory application. Even if such alternative transaction were approved, the review process would delay the consummation of any sale by months, all to the detriment of patients, the Debtors, and other stakeholders in these chapter 11 cases. Finally, the Debtors are able to consummate the Illinois Sale with minimal disruption to patient care given the expertise the Buyers possess in the healthcare industry.

38.    Payment of the Transaction Expenses is likewise justified under section 363(b) of the Bankruptcy Code. The Transaction Expenses were incurred before and after the Petition Date in connection with the performance of legal and consulting work that was indispensable to consummation of the Illinois Sale. The Transaction Expenses are also reasonable and customary given the nature and complexity of the work conducted by the recipients thereof. Failure to pay the Transaction Expenses as contemplated in the Illinois Sale Documents risks damaging relationships with key professionals whose ongoing services may be indispensable to consummation of the Illinois Sale following entry of the Order. Payment of the Transaction Expenses is therefore in the best interests of the Debtors, their creditors, and other parties in interest.

39.    Accordingly, the Debtors' entering into the Illinois Sale and paying the Transaction Expenses are sound exercises of the Debtors' business judgment and should be approved under section 363(b) of the Bankruptcy Code.

**II.    The Illinois Sale Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.**

40.    Section 363(f) of the Bankruptcy Code permits a debtor in possession to sell estate property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a

lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. 11 U.S.C. § 363(f).

41.      Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any one of the requirements specified therein will suffice to warrant Pipeline's sale of the Illinois Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges, or encumbrances). *See, e.g.*, *In re C-Power Prods., Inc.*, 230 B.R. 800, 803-04 (Bankr. N.D. Tex. 1998).

42.      The MIPA contemplates that Illinois Parent shall convey the OpCo Membership Interests to Resilience free of all liens, claims, encumbrances, and other liabilities, subject to certain exceptions, and the REPA provides that the PropCos shall convey the Illinois Real Property to Ramco free of all liens, claims, encumbrances, and other liabilities, subject to certain exceptions. To the extent the Illinois Assets to be transferred pursuant to the Illinois Sale are subject to liens, the holders of such liens have either consented to or are anticipated to consent to the Illinois Sale because it will provide the most efficient, value-maximizing approach to realizing proceeds for, among other things, the repayment of amounts due to such parties. In particular:

     a.   Credit Suisse AG, New York Branch, as agent, consents to the sale of the Illinois Assets free and clear of all Claims and Liens arising under the ABL Credit Agreement pursuant to this Order and consents to the release/termination of any Liens on the Illinois Assets and the assets of the OpCos arising under the ABL Credit Agreement;

     b.   Alter Domus Products Corp., as agent, consents to the sale of the Illinois Assets free and clear of all Claims and Liens arising under the Term Loan Credit Agreement pursuant to this Order and consents to the release/termination of any Liens on the Illinois Assets and the assets of the OpCos arising under the Term Loan Credit Agreement; and

     c.   Acquiom Agency Services LLC, as agent, consents to the sale of the Illinois Assets free and clear of all Claims and Liens arising under the DIP Credit Agreement pursuant to this Order and consents to the release/termination of any Liens on the Illinois Assets and the assets of the OpCos arising under the DIP Credit Agreement.

Any and all liens on the transferred Illinois Assets that are not assumed by the Buyers or otherwise preserved under the Illinois Sale Documents will attach to the proceeds of the Illinois Sale with the same force, effect, and priority as such liens currently have on these assets, subject to the rights and defenses, if any, of the Debtors and of any party in interest to object thereto.  Any other entity that does not object to the Illinois Sale should be deemed to have consented.

43.    Accordingly, the Illinois Sale satisfies (or will satisfy) section 363(f) of the Bankruptcy Code, and the Court should approve the conveyance of the Illinois Real Property and the OpCo Membership Interests free of all liens claims, encumbrances, and other liabilities, other than as set forth in the Illinois Sale Documents.

### III.    The Buyers are Good Faith Purchasers and are Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.

44.    Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under [section 363(b) and (c) of the Bankruptcy Code] of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith."  While the Bankruptcy Code and the Bankruptcy Rules do not define the term "good faith," the Fifth Circuit has held that a "good faith purchaser" protected by this provision is "one who purchases the assets for value, in good faith, and without notice of adverse claims."  *In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014).[17]  By providing good faith purchasers with a final order and removing the risks of endless litigation over ownership, section 363(m) of the Bankruptcy Code allows purchasers "to offer fair value for estate property[,]" which "greatly benefits both the debtor and

---

[17]    Good faith will not be found, however, where there has been "fraud, collusion between the purchaser and other bidders or the [debtor in possession,] or an attempt to take grossly unfair advantage of other bidders." *TMT Procurement*, 764 F.3d at 521.

its creditors." *In re Energytec, Inc.*, 739 F.3d 215, 219 (5th Cir. 2013) (internal quotations omitted).

45.     The Illinois Sale Documents are the product of good faith, arm's-length negotiations between sophisticated, well-represented parties, and the $92 million aggregate purchase price is fair and reasonable. Accordingly, the Buyers are "good faith purchasers" of the Illinois Assets and are entitled to the full protection of section 363(m) of the Bankruptcy Code in connection with the Illinois Sale.

**IV.     Consummation of the Illinois Sale Is Appropriate Under Bankruptcy Rule 6004(f).**

46.     Bankruptcy Rule 6004(f) and Bankruptcy Local Rule 6004-11(b)(iv)(D) authorize a debtor in possession to sell estate property outside of the ordinary course of business by private sale or public auction. Courts generally afford debtors in possession broad discretion to determine the manner in which estate property is sold. *See, e.g.*, *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998); *In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del. 1981). Sales outside of an auction are appropriate where the debtor demonstrates that the proposed sale is permissible under section 363(b) of the Bankruptcy Code; *i.e.*, where the debtor articulates a good business reason for the sale. *See In re Cypresswood Land Partners, I,* 409 B.R. 396, 436 (Bankr. S.D. Tex. 2009). Additionally, courts have held that a debtor has broad discretion to determine the manner in which its assets are sold. *See Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) (finding that section 363 "clearly indicates that the manner of sale is within the discretion of the trustee"); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (noting that a trustee has ample authority to conduct a sale of estate property through a private or public sale).

47.     Here, there are sound business reasons for the Illinois Sale, and the Illinois Sale is the best available option to maximize the value of the Illinois Assets to the Debtors' estates. As

set forth in paragraphs 19 and 20 above, the Debtors and their advisors conducted a comprehensive Postpetition Marketing Process in addition to the marketing process in the weeks leading up to the Petition Date.  Not a single actionable bid for the entirety of the Illinois Assets arose other than the offer submitted by the Buyers.  Given that this market check did not produce a single actionable going-concern bid other than the Buyers, holding an auction for the Illinois Assets at this juncture would likely fail to yield more value for the Debtors' estates and would needlessly delay consummation of the Illinois Sale.  Accordingly, pursuant to section XVII of the Bidding Procedures, the Debtors elected to cancel the Illinois-Only Auction (as defined in the Bidding Procedures) and announce the Buyers as the Winning Bidders (as defined in the Bidding Procedures).  For these reasons, selling the Illinois Assets without an auction is appropriate under Bankruptcy Rule 6004(f).

## V.      Dismissing the OpCos' Chapter 11 Cases is Appropriate Under the Circumstances.

### A.      Dismissal of the OpCos' Chapter 11 Cases is Warranted Under Section 1112(b) of the Bankruptcy Code.

48.      Pursuant to section 1112(b) of the Bankruptcy Code, a court shall "convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estates, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b) (emphasis added).  A determination of "cause" under section 1112(b) is made by courts on a case-by-case basis. *See In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984).  The legislative history of section 1112(b) of the Bankruptcy Code and relevant case authority indicate that a court has wide discretion to use its equitable powers in dismissing a debtor's case. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 405 (1977) (stating that the court has "wide discretion" to dismiss the case if in the best interests of creditors); S. Rep. No.

36

989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5903 (same); *see also In re Woodbrook Assocs.*, 19 F.3d 312, 316 (7th Cir. 1994) ("A bankruptcy court has broad discretion under 11 U.S.C. § 1112(b) to dismiss a chapter 11 case for cause."); *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 728 (5th Cir. 1991) (stating that a determination of whether cause exists under section 1112(b) of the Bankruptcy Code "rests in the sound discretion" of the bankruptcy court). In addition, "[w]hen a bankruptcy judge is asked to dismiss or convert a case under section 1112(b), he or she should consider which option best protects the interests of all the creditors." *In re Brauer*, 80 B.R. 903, 911 (N.D. Ill. 1987) (internal citation omitted). The Court is "not required to articulate expressly why dismissal [is] preferable to conversion." *Id.* at 912.

49. Section 1112(b) of the Bankruptcy Code provides a nonexclusive list of sixteen grounds for dismissal of a chapter 11 case. 11 U.S.C. §§ 1112(b)(4)(A)–(P). *See also In re Frieouf*, 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that the list in section 1112(b) of the Bankruptcy Code is non-exhaustive). Among other grounds, section 1112(b)(4)(M) of the Bankruptcy Code provides that dismissal is appropriate where a party in interest shows that there is an inability to effectuate a chapter 11 plan. The inability to effectuate a plan arises when, among other things, the "core" for a workable chapter 11 plan "does not exist." *In re Preferred Door Co.*, 990 F.2d 547, 549 (10th Cir. 1993); *In re Original IFPC Shareholders, Inc.*, 317 B.R. 738, 743–49 (Bankr. N.D. Ill. 2004) (noting that issues to be evaluated when determining a debtor's inability to effectuate a plan include the existence of a viable business enterprise).

50. Once a court determines that cause exists to dismiss a chapter 11 case, the court must also evaluate whether dismissal is in the best interests of the estate and its creditors. *See In re Superior Siding & Window, Inc.*, 14 F.3d 240, 243 (4th Cir. 1994); *In re Mazzocone*, 183 B.R. 402, 411 (Bankr. E.D. Pa. 1995) aff'd, 200 B.R. 568 (E.D. Pa. 1996); *In re Warner*,

37

83 B.R. 807, 809 (Bankr. M.D. Fla. 1988). A dismissal of a chapter 11 case meets this test where a debtor has nothing left to reorganize and the debtor's assets are fixed and liquidated. *See IFPC Shareholders*, 317 B.R. at 753–54 (dismissing case where conversion to chapter 7 "would not serve any substantial purpose"); *In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (dismissing chapter 11 case in part where there was "simply nothing to reorganize" and no reason to continue the reorganization).

51.     The OpCos' chapter 11 cases, immediately prior to consummation of the Membership Interest Sale, meet the standard for dismissal pursuant to section 1112(b) of the Bankruptcy Code. First, following consummation of the Membership Interest Sale, the OpCos' chapter 11 cases will no longer have any entities, assets, or liabilities therein, as those will be transferred to the Buyers pursuant to the terms of the Illinois Sale. Accordingly, from a practical perspective, there would be no assets to distribute and no liabilities to address under a chapter 11 plan. Additionally, no parties-in-interest will be prejudiced by the dismissal of the OpCos' chapter 11 cases. The claims against the OpCos will be transferred to the Buyers, except as set forth in the MIPA, by virtue of the equity interests being transferred. Further, continuing the OpCos' chapter 11 cases will only be an administrative burden and expense, and therefore dismissal of such cases is in the best interests of the Debtors, their creditors, and other parties-in-interest. For the same reasons, dismissal, as opposed to conversion, is appropriate for the OpCos' chapter 11 cases. In sum, the Debtors believe they have met their burden of proof to show that cause exists to dismiss the OpCos' chapter 11 cases under section 1112(b) of the Bankruptcy Code.

**B.      The Order Dismissing the OpCos' Chapter 11 Cases Should Preserve the Finality of Applicable Orders Entered In These Chapter 11 Cases.**

52.     Although these chapter 11 cases are recent, the Debtors wish to preserve their rights with respect to the orders that have been or may be entered in the OpCos' chapter 11 cases,

38

including the order approving this Motion.   Unless the Court orders otherwise, the default provisions of section 349(b) of the Bankruptcy Code could unravel such orders.  To preserve the finality of the OpCos' chapter 11 processes, the dismissal of the OpCos' chapter 11 cases should not affect the finality and/or *res judicata* effect of any settlements, stipulations, or any orders entered by the Court during the OpCos' chapter 11 cases prior to the dismissal thereof. Furthermore, any motions, notices, objections, responses, adversary proceedings, contested matters, or other pleadings or filings that are or may be made during the course of the OpCos' chapter 11 cases that have not been decided prior to the dismissal of the OpCos' chapter 11 cases should be denied, dismissed, and/or overruled with prejudice.

53.	The Debtors and the OpCos submit that sufficient cause exists for the Court to use its authority pursuant to section 349(b) of the Bankruptcy Code to order that:  (a) all orders entered during the OpCos' chapter 11 cases shall remain binding and in full force and effect for purposes of *res judicata* and otherwise; (b) all settlements approved by the Court and stipulations filed with the Court shall remain binding and in full force and effect; (c) all judgments, findings of fact, and conclusions of law made by the Court in the OpCos' chapter 11 cases shall remain in full force and effect; (d) the assets of the OpCos or their estates shall be reinstated or revested in the OpCos upon dismissal; and (e) the effect of section 349 of the Bankruptcy Code shall otherwise be modified to implement the dismissal of the OpCos' chapter 11 cases.  By modifying the default provisions of section 349 of the Bankruptcy Code, the Court will leave uninterrupted the Debtors' remaining chapter 11 cases.

**VI.	The Debtors Should Be Authorized to Assume and Assign Certain Executory Contracts to the Buyers Pursuant to the Illinois Sale Documents and in Accordance With the Sale Order.**

54.	Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign its executory contracts and unexpired leases, subject to court approval, provided that the defaults

under such contracts and leases are cured and adequate assurance of future performance is provided.  A debtor's decision to assume, assume and assign, or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Grp. of Institutional Investors v. Chicago, Milqaukee, Sy. Paul & Pacific Ry. Co.*, 318 U.S. 523, 550–51 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting rest of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment).

55.     Here, the Court should approve the assumption and assignment of certain contracts (the "Assigned Contracts").[18]  ***First***, certain of the Debtors' contracts are important to effectively operate the Illinois Operations and continue to provide safe, high-quality medical care to its patients.  As such, the assignment of such agreements is essential to consummating the Real Estate Sale.  ***Second***, contract counterparties will have notice and opportunity to raise any issues including with respect to cure and adequate assurance of performance with the proposed assignee, so their respective rights, remedies, and defenses are preserved.  ***Third***, the Debtors submit that (a) the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied because all defaults associated with the Assigned Contracts required to be cured under section 365(b) of the Bankruptcy Code will be cured as part of the Real Estate Sale and (b) the requirements of the Assumption Procedures set forth in section IV of the Bidding Procedures Order are satisfied because the Debtors are filing contemporaneously herewith a proper Potential

---

[18]  For the avoidance of doubt, the Assumed Contracts shall include the PropCos' privileges and obligations under the Resilience Opco-PropCo Leases, as amended.

40

Assumption Notice and causing the same to be served upon all Contract Counterparties (each as defined in the Bidding Procedures Order) listed on Exhibit A attached thereto.

56.     Accordingly, the Debtors submit the assumption and assignment of the Assigned Contracts in connection with the Illinois Sale should be authorized.

## Emergency Consideration

57.     The Debtors request emergency consideration of this motion pursuant to Bankruptcy Local Rule 9013-1.  The Illinois Sale is the product of extensive arm's-length negotiations and is the best available option for the Debtors to unlock and maximize the Illinois Assets' value to their estates.  Emergency consideration of this motion is necessary to ensure the prompt consummation of the Illinois Sale, which is essential to Pipeline's shoring up and reinforcing its liquidity position, stabilizing its network-wide operations, and effecting an expeditious exit from chapter 11.  The facts and circumstances surrounding the Illinois Sale thus warrant emergency consideration of this motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

58.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion.

## Notice

59.     The Debtors will provide notice of this motion to:  (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Debtors' prepetition term loan lenders and their counsel; (d) the agent for the Debtors' prepetition term loan facility; (e) the Debtors' prepetition ABL lender; (f) the agent for the Debtors' postpetition financing facility and its counsel; (g) the United

States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) the state attorneys general for states in which the Debtors conduct business; (k) counsel to the Buyers; (l) individuals on the Patient Matrix with respect to the Illinois Assets; (m) the IHFSRB; (n) any person or entity that has asserted a claim or lien in respect of the Illinois Assets or is known to the Debtors to hold such a claim or lien; (o) counterparties to the Assigned Contracts; (p) the Illinois Department of Revenue; (q) the Cook County Treasurer's Office; and (r) any entity that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No other or further notice is needed in light of the nature of the relief requested.

WHEREFORE, the Debtors request that the Court enter the Order, substantially in the form attached hereto, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
November 22, 2022

*/s/ Veronica A. Polnick*

| | |
|---|---|
| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No.  24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Kristhy M. Peguero (TX Bar No. 24102776) | Steven N. Serajeddini, P.C. (admitted *pro hac vice*) |
| Veronica A. Polnick (TX Bar No. 24079148) | Zachary R. Manning (admitted *pro hac vice*) |
| Javier Gonzalez (TX Bar No. 24119697) | 601 Lexington Avenue |
| 1401 McKinney Street, Suite 1900 | New York, New York 10022 |
| Houston, Texas 77010 | Telephone:     (212) 446-4800 |
| Telephone:     (713) 752-4200 | Facsimile:     (212) 446-4900 |
| Facsimile:     (713) 752-4221 | Email:     steven.serajeddini@kirkland.com |
| Email:     mcavenaugh@jw.com | zach.manning@kirkland.com |
| kpeguero@jw.com | |
| vpolnick@jw.com | - and - |
| jgonzalez@jw.com | |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | Jaimie Fedell (admitted *pro hac vice*) |
| | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone:     (312) 862-2000 |
| | Facsimile:     (312) 862-2200 |
| | Email:     jaimie.fedell@kirkland.com |
| *Proposed Co-Counsel to the Debtors* | *Proposed Co-Counsel to the Debtors* |
| *and Debtors in Possession* | *and Debtors in Possession* |

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ *Veronica A. Polnick*
Veronica A. Polnick

**Certificate of Service**

I certify that on November 22, 2022, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Veronica A. Polnick*
Veronica A. Polnick