**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PIPELINE HEALTH SYSTEM, LLC, *et al.*,[1] | ) | Case No. 22-90291 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING THE SALE OF CERTAIN
OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES RELATED THERETO; (III) DISMISSING CERTAIN
OF THE DEBTORS' CHAPTER 11 CASES; AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing and approving the applicable Debtors' entry into (x) that certain Membership Interest Purchase Agreement attached hereto as **Exhibit 1** (as amended, modified, or supplemented from time to time, the "MIPA," the membership interests to be sold thereby, the "OpCo Membership Interests,"[3] and the transaction contemplated thereby, the "Membership Interest Sale") by and between Debtor SRC Hospital Investments II, LLC ("Illinois Parent"), as seller, and AUM Global Healthcare Management, LLC d/b/a/ Resilience Health ("Resilience") as buyer, and (y) that certain Real Estate Purchase Agreement attached hereto as **Exhibit 2-A** and **Exhibit 2-B** (as amended, modified, or

---

[1]   A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/PipelineHealth.  The Debtors' service address is 898 N. Pacific Coast Highway, Suite 700, El Segundo, California 90245.

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[3]   The following Debtors are each an "OpCo" and collectively are the "OpCos":  (a) Pipeline – West Suburban Medical Center, LLC; (b) Pipeline – Weiss Memorial Hospital, LLC; (c) Pipeline – Lakefront Medical Associates, LLC; (d) Pipeline – Midwest Pharmacies, LLC; and (e) Pipeline – Weiss Medical Specialists, LLC.

supplemented from time to time, the "REPA"; the real property to be sold pursuant to the REPA, the "Illinois Real Property";[4] the transaction contemplated by the REPA, the "Real Estate Sale"; the REPA together with the MIPA and the related transaction documents contemplated under the REPA and the MIPA, including the documents attached hereto as **Exhibits** **3-A**, **3-B**, and **3-C** (the "Lease Amendments"), collectively, the "Illinois Sale Documents"; and the operations and assets to be sold pursuant to the Illinois Sale Documents, the "Illinois Operations" and "Illinois Assets," respectively; and the transactions contemplated by the Illinois Sale Documents, collectively, the "Illinois Sale") by and among Debtors West Suburban Property Holdings, LLC, River Forest Property Holdings, LLC, Weiss Property Holdings, LLC, and Weiss MOB Property Holdings, LLC (collectively, the "PropCos," and together with Illinois Parent, the "Sellers"), as sellers, and Ramco Healthcare Holdings, LLC ("Ramco," and together with Resilience, the "Buyers"), as buyer; (b) authorizing and approving the consummation of the Illinois Sale, including the sale of certain of the Debtors' property free and clear of liens, claims, encumbrances, and interests on the terms set forth in the Illinois Sale Documents and this Order; (c) authorizing and approving the applicable Debtors' entry into those certain Lease Amendments, by and among the PropCos and certain of the OpCos; (d) approving the assumption and assignment of certain executory contracts and unexpired leases in connection with the Illinois Sale; (e) dismissing certain of the Debtors' chapter 11 cases; (f) authorizing and approving the Debtors' transfer of patient records, including the "Patient Matrix" maintained in these chapter 11 cases, associated with the Illinois Operations (the "Illinois Patient Records") to Resilience upon the consummation of the Membership Interest Sale; and (g) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having conducted a hearing on the Motion

---

[4]    The Illinois Real Property consists of certain land and improvements more specifically described in the REPA.

(the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, all relief related thereto, any objections thereto, and statements of counsel and the evidence presented at the Sale Hearing in support of the relief requested by the Debtors in the Motion; and this Court having found that, based on available evidence, the Illinois Sale constitutes the highest or otherwise best offer for the assets to be sold thereby; and that adequate and sufficient notice of the Illinois Sale Documents and all transactions contemplated thereunder and in this Order was provided; and that reasonable and adequate notice of the Motion having been provided to all persons required to be served in accordance with the Bankruptcy Code and the Bankruptcy Rules; and that all interested parties having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; and that jurisdiction exists for the Court to consider the Motion; and after due deliberation thereon; and upon the full evidentiary record; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it further appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and good and sufficient cause appearing therefor, THE COURT HEREBY FINDS AND DETERMINES AS FOLLOWS:[5]

A.    **Jurisdiction and Venue.**  This Court has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these chapter 11 cases and the Motion in this district and in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[5]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Bankruptcy Rule 7052.

B.      **Statutory Predicates.**  The statutory bases for the relief sought in the Motion are sections 105(a), 363, and 1112 of the Bankruptcy Code, Bankruptcy Rules 1017, 2002, and 6004, and Local Bankruptcy Local Rules 1075-1, 4002-1(e), and 9013-1.

C.      **Final Order.**   This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).   This Court expressly finds that there is no just reason for delay in the implementation of this Order and waives any stay such that this Order shall take effect immediately upon entry.

D.      **Notice.**  As evidenced by the certificates of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Illinois Sale Documents, the Illinois Sale, and the Sale Hearing has been provided to all parties in interest set forth on the creditor matrix related to the Debtors' operations in Illinois, including the Debtors' Illinois patients for the two-years prior to the Petition Date and the counterparties to the multi-facility contracts set forth on Schedule 2.2(f) to the MIPA, in accordance with sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, and 9008.  The notices described above were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Illinois Sale Documents, or Sale Hearing is or shall be required.  The disclosures made by the Debtors concerning the Motion, the Illinois Sale Documents, and the Sale Hearing were good, complete, and adequate.  The applicable requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice and disclosures.

E.      **Corporate Authority.**  The Debtors have full corporate power and authority to execute the Illinois Sale Documents and consummate the Illinois Sale.  No consents or approvals, other than those expressly provided for in the Illinois Sale Documents, are required for the Debtors to consummate the Illinois Sale.

F.	The Illinois Sale Documents were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia.  Neither the Debtors nor the Buyers are entering into the transactions contemplated by the Illinois Sale Documents fraudulently (as that term is understood in the context of statutory and common law fraudulent conveyance and fraudulent transfer claims or otherwise).

G.	The Debtors are the sole and lawful owner of the Illinois Assets.  Subject to section 363(f) of the Bankruptcy Code, the transfer of the Illinois Assets to the Buyers in accordance with the Illinois Sale Documents will be, as of the Applicable Closing Date,[6] a legal, valid, and effective transfer of the Illinois Assets, which transfer vests or will vest in the Buyers all right, title, and interest of the Debtors to the Illinois Assets free and clear of (i) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and encumbrances relating to, accruing, or arising at any time prior to the Applicable Closing Date (collectively, the "Liens"), and (ii) all debts arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter-ego, and matters of any kind and nature, whether arising prior to or subsequent to the commencement

---

[6]	"Applicable Closing Date" means (a) with respect to the Membership Interest Sale, the "Closing Date" under and as defined in the MIPA (the "MIPA Closing Date"); and (b) with respect to the Real Estate Sale, the "Closing Date" under and as defined in the REPA (the "REPA Closing Date").

of these cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to claims and Liens that (a) purport to give any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Buyers' respective interests in the Illinois Assets, or (b) in respect of taxes, restrictions, rights in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), the "Claims"), relating to, accruing, or arising any time prior to entry of this Order, in each case, with the exception of any such Liens or Claims that are expressly assumed by the Buyer or retained by the Sellers pursuant to the Illinois Sale Documents.

H.      **Sale in Best Interests of the Debtors' Estates.**  Good and sufficient reasons for approval of the Illinois Sale Documents and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for the Illinois Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, outside of a plan of reorganization, in that, among other things, the immediate consummation of the Illinois Sale to the Buyers is necessary and appropriate to maximize the value of the Debtors' estates.

I.      The Illinois Sale must be approved and consummated promptly to maximize the value of the Debtors' estates.  Time is of the essence in consummating the Illinois Sale.  Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Purchase

6

Price, the proposed Illinois Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

J.       The consummation of the Illinois Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Illinois Sale.

K.       **Good Faith of Buyers and Sellers.**  The Illinois Sale Documents were negotiated, proposed, and entered into by the Debtors and the Buyers without collusion, in good faith, and as the result of arm's-length bargaining positions and are substantively and procedurally fair to all parties.  The Buyers are not "insiders" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  Neither any of the Debtors nor the Buyers have engaged in any conduct that would cause or permit the Illinois Sale Documents to be avoided under section 363(n) of the Bankruptcy Code.  Specifically, the Buyers have not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among third parties.  The Buyers are purchasing the Illinois Assets, in accordance with the Illinois Sale Documents, in good faith, and are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code and are therefore entitled to all of the protections afforded by such provision and otherwise have proceeded in good faith in all respects in connection with the Debtors' chapter 11 cases.

L.       **Consideration.**  The consideration provided by the Buyers pursuant to the Illinois Sale Documents (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Illinois Assets, and (iii) constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Voidable Transactions Act (formerly the Uniform Fraudulent Transfer Act), Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code)

under the laws of the United States, any state, territory, possession, or the District of Columbia. No other person or entity or group of entities has offered to purchase the Illinois Assets for greater economic value to the Debtors' estates than that contemplated by the Illinois Sale. Approval of the Motion, the Illinois Sale Documents, and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

M.      **Free and Clear.**  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full, and therefore, the Debtors may sell the Illinois Assets free and clear of all Liens and Claims other than as expressly provided in the Illinois Sale Documents.  The Buyers would not have entered into the Illinois Sale Documents and would not consummate the transactions contemplated thereby if the transfer of the Illinois Assets to the Buyers pursuant to the Illinois Sale were not free and clear of all Liens and Claims other than as provided in the Illinois Sale Documents.  The Debtors may sell the Illinois Assets free and clear of all Liens and Claims (other than as expressly provided in the Illinois Sale Documents) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Each entity with a Lien in respect of the Illinois Assets to be transferred on the Applicable Closing Date:  (i) has, subject to the terms and conditions of this Order, consented to the Illinois Sale or is deemed to have consented to the Illinois Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien; (iii) is a holder of a Lien that is subject to a bona fide dispute; or (iv) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  In particular:

> a. Credit Suisse AG, New York Branch, as agent, consents to the sale of the Illinois Assets free and clear of all Claims and Liens arising under the ABL Credit Agreement pursuant to this Order and consents to the

release/termination of any Liens on the Illinois Assets and the assets of the OpCos arising under the ABL Credit Agreement;

b.  Alter Domus Products Corp., as agent, consents to the sale of the Illinois Assets free and clear of all Claims and Liens arising under the Term Loan Credit Agreement pursuant to this Order and consents to the release/termination of any Liens on the Illinois Assets and the assets of the OpCos arising under the Term Loan Credit Agreement; and

c.  Acquiom Agency Services LLC, as agent, consents to the sale of the Illinois Assets free and clear of all Claims and Liens arising under the DIP Credit Agreement pursuant to this Order and consents to the release/termination of any Liens on the Illinois Assets and the assets of the OpCos arising under the DIP Credit Agreement.

Those holders of Liens or Claims who did not object to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  All holders of Liens or Claims in respect of the Illinois Assets are adequately protected by having such Liens or Claims attach to the proceeds received by the Debtors that are ultimately attributable to the Illinois Assets against or in which such Liens or Claims are asserted, subject to the terms of such Liens or Claims, with the same validity, force, and effect, and in the same order of priority, that such Liens or Claims have against the Illinois Assets or their proceeds, if any, immediately prior to the entry of this Order, subject to any rights, claims, and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

N.      **Assumption and Assignment of Executory Contracts and Unexpired Leases**.

(i)      Schedules 2.7(e) and 2.7(f) of the MIPA list certain contracts or other agreements to which one or more Debtors is party (collectively, the "MIPA Contracts").  On the MIPA Closing Date, the applicable Debtors shall undertake to assume and assign the

9

Specified MIPA Contracts (as defined herein)[7] to Resilience in accordance with the terms and conditions of the Illinois Sale Documents.

(ii) On the REPA Closing Date, the applicable Debtors shall undertake to assume and assign the REPA Contracts (as defined herein)[8] to Ramco in accordance with the terms and conditions of the Illinois Sale Documents.

(iii) The assumption and assignment of the Specified MIPA Contracts and the REPA Contracts (together, the "Assigned Contracts") in accordance with the Illinois Sale Documents and this Order is in the best interests of the Debtors and their estates, creditors, and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. Buyers have provided adequate assurance of future performance under the Assigned Contracts.

O. **Dismissal.** Upon the consummation of the Membership Interest Sale, there will be no ongoing reorganizational purpose of the OpCos' chapter 11 cases justifying the administrative and financial burden of keeping such cases open thereafter. The dismissal of the OpCos' chapter 11 cases upon consummation of the Membership Interest Sale is therefore in the best interests of the Debtors, their estates, creditors, patients, and other parties in interest.

NOW, THEREFORE, IT IS ORDERED THAT:

1. Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing (the full record of which is incorporated herein by reference) or otherwise, and all

---

[7] "Specified MIPA Contracts" means a MIPA Contract that (1) is an "executory contract" or "unexpired lease" within the meaning of, and subject to, section 365 of the Bankruptcy Code; and (2) a Debtor other than an OpCo is party to.

[8] "REPA Contracts" means the contracts and leases described in section 2.1(b), section 2.1(c), and section 2.1(f) of the REPA.

reservations of rights included therein, if any, are hereby denied and overruled on the merits with prejudice.

2.      The Illinois Sale Documents and the Debtors' entry into the Illinois Sale Documents are approved in all respects.  The Debtors are authorized, but not directed, to take any and all actions necessary, appropriate, or desirable to (a) consummate each of the transactions described in the Illinois Sale Documents in accordance with the terms and conditions set forth therein and (b) otherwise implement and effectuate the terms of the Illinois Sale Documents, including, without limitation, the assumption and assignment of the Assigned Contracts; *provided that*, for the avoidance of doubt, the Debtors' performance under the Real Estate Sale shall be conditioned on satisfaction of the closing conditions set forth in the REPA, including delivery of (i) this Order as entered; (ii) executed copies of the Ramco Seller Note and related security documents; and (iii) the Intercreditor Agreement.

3.      Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, upon consummation of the Membership Interest Sale, all of Illinois Parent's right, title, and interest in and to, and possession of, the OpCo Membership Interests, shall be transferred to Resilience free and clear of the MIPA Excluded Liabilities (as defined herein),[9] with all Liens and Claims that constitute MIPA Excluded Liabilities to attach to the proceeds of the Membership Interest Sale in the order of their priority with the same force, effect, and validity that they had immediately prior to the entry of this Order, subject to any rights, claims, or defenses the Debtors may have with respect thereto.  Such transfer shall constitute a legal, valid, binding, and effective transfer of the OpCo Membership Interests.  Notwithstanding anything herein to the contrary, the MIPA Excluded Liabilities shall be assumed by Illinois Parent upon consummation of the

---

[9]     "MIPA Excluded Liabilities" means any "Excluded Liabilities" under and as defined in the MIPA.

Membership Interest Sale.  For the avoidance of doubt, and without limiting the generality of the foregoing, MIPA Excluded Liabilities include (a) any avoidance actions (including any actions arising under chapter 5 of the Bankruptcy Code) held by the Debtors (other than the OpCos) against the OpCos and (b) any intercompany payables owing from the OpCos to any other Debtors. The Debtors are authorized to assume and assign those certain Assigned Contracts to Resilience as contemplated under the MIPA free and clear of all Liens and Claims.  Notwithstanding anything herein to the contrary, the MIPA Excluded Assets (as defined herein) shall be retained by Illinois Parent or transferred to Illinois Parent upon the consummation of the Membership Interest Sale. "MIPA Excluded Assets" means any and all "Excluded Assets" under and as defined in the MIPA, including, for the avoidance of doubt, any MIPA Excluded Assets set forth in the schedules to the MIPA.

4.        Pursuant to sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, upon the consummation of the Real Estate Sale, all of the applicable Debtors' right, title, and interest in and to, and possession of, the Illinois Real Property, shall be transferred to Ramco free and clear of any and all Liens and Claims, except as otherwise set forth in the Illinois Sale Documents, with all such Liens and Claims to attach to the proceeds of the Real Estate Sale in the order of their priority, with the same force, effect, and validity that they had immediately prior to the entry of this Order, subject to any rights, claims, or defenses the Debtors may have with respect thereto.  Such transfer shall constitute a legal, valid, binding, and effective transfer of the Illinois Real Property.  The Debtors are authorized to assume and assign those certain Assigned Contracts to Ramco as contemplated under the REPA free and clear of all Liens and Claims, subject to satisfaction of all closing conditions set forth in the REPA.

5. A copy of this Order may be filed with the appropriate clerk and/or recorded with the appropriate recorder to cancel any Liens of record. Additionally, Buyers are authorized to execute and file any necessary termination statements with respect to Liens arising under the ABL Credit Agreement, the Term Loan Credit Agreement, or the DIP Credit Agreement.

6. Upon the occurrence of the Applicable Closing Date, any and all Seller Liens (as defined herein) (a) shall be legal, binding, and enforceable Liens on, and security interests in, any and all relevant property identified in the Illinois Sale Documents, (b) shall be deemed automatically attached and perfected, subject to such liens and security interests as may be permitted to be senior under the Intercreditor Agreement and related documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. "Seller Liens" means any Lien in favor of any Debtor (other than any OpCo) granted or otherwise provided for under the Illinois Sale Documents.

7. Upon consummation of the Membership Interest Sale and the occurrence of the MIPA Closing Date, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding MIPA Excluded Liabilities, shall be and hereby are forever barred, estopped, and permanently enjoined from asserting any Liens or Claims relating to such MIPA Excluded Liabilities against the Buyers, their successors or assigns, the OpCos, or their respective properties. Such injunction applies to, without limitation, each of the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Buyers, their successors or assigns, the OpCos, or their respective properties; (b) enforcing, attaching,

13

collecting, or recovering, in any manner, any judgment, award, decree, or order against the Buyers, their successors or assigns, the OpCos, or their respective properties; (c) creating, perfecting, or enforcing any Lien or Claim against the Buyers, their successors or assigns, the OpCos, or their respective properties; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Buyers, their successors or assigns, or the OpCos; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Illinois Assets or conduct any of the businesses operated with the Illinois Assets.  For the avoidance of doubt, to the extent that any of the MIPA Excluded Liabilities is guaranteed by one or more of the Debtors, such guarantee will survive the Illinois Sale and remain enforceable against such Debtor or Debtors to the extent provided by applicable law, as applicable.

8.     Upon consummation of the Real Estate Sale and the occurrence of the REPA Closing Date, all persons and entities, including, but not limited to, all debt holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Liens or Claims in respect of the Illinois Real Property arising before the consummation of the Real Estate Sale (other than Liens or Claims expressly assumed by Ramco pursuant to the REPA) are hereby forever barred, estopped, and permanently enjoined from asserting such Liens or Claims in respect of the Buyers, their successors or assigns, or their respective properties, including the Illinois Real Property.

9.     As of the Applicable Closing Date, Buyers or their respective designees shall be deemed to have acquired and assumed the Assigned Contracts pursuant to sections 363 and 365(f)

of the Bankruptcy Code.  The assignment of such Assigned Contracts shall not be a default thereunder and Buyers or their respective designees will be entitled to the protections afforded under section 363(m) of the Bankruptcy Code with respect thereto.

10.     This Order shall be binding in all respects upon the Debtors, their estates, all holders of equity interests in the Debtors, all holders of any Claim(s) against the Debtors, whether known or unknown, any holders of Liens on all or any portion of the Illinois Assets or Illinois Operations (including the assets of the OpCos), counterparties to the Assigned Contracts, Buyers and their designees, all successors and assigns of Buyers and their designees, any trustees, if any, subsequently appointed in the chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtors' cases, and all employee benefit plans in which the Debtors participate or previously participated.  This Order and the Illinois Sale Documents shall inure to the benefit of the Debtors, their estates, their creditors, Buyers and their designees, and their respective successors and assigns.  Nothing contained in any plan of reorganization or liquidation or order of any type or kind entered in the chapter 11 cases or any subsequent chapter 7 or chapter 11 cases for the Debtors or any related proceedings subsequent to the entry of this Order shall directly conflict with or derogate from the provisions of the Illinois Sale Documents or the terms of this Order.  For the avoidance of doubt, and without limiting the generality of the foregoing, the offset rights afforded to Buyers pursuant to Sections 9.3(g) and 11.19 of the MIPA shall not be impaired or otherwise limited by any such plan, order, or proceeding (regardless of whether such proceeding is (a) a result of any of these chapter 11 cases converting to chapter 7 or (b) a subsequent bankruptcy case filed by any of the Debtors other than the OpCos).

11.     This Order is and shall be binding upon all persons and entities that may be required by operation of law, the duties of their office, or contract to accept, file, register, or otherwise

record or release any documents or instruments, or that may be required to report or insure any title or state of title in or to any property; and each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Illinois Sale.

12.     The Buyers are deemed to be good faith purchasers of the Illinois Assets.  Pursuant to section 363(m) of the Bankruptcy Code, if this Order is reversed or modified on appeal, such reversal or modification shall not affect the validity of the Illinois Sale.  The consideration provided for the Illinois Assets under the Illinois Sale Documents is fair and reasonable, and the Illinois Sale is not subject to avoidance under section 363(n) of the Bankruptcy Code or otherwise.

13.     To the extent there are any inconsistencies between this Order and the Illinois Sale Documents, the terms of this Order shall control.

14.     Upon the consummation of the Membership Interest Sale, the Debtors are authorized to, and shall, transfer ownership, control, and possession of the Illinois Patient Records, as well as the "Patient Matrix" information for the Debtors' Illinois Operations, to Resilience. Such transfer shall be deemed to satisfy any applicable non-bankruptcy law relating to patient records, and none of the Debtors or Buyers shall have any liability on account of such transfer.

15.     Immediately prior to consummation of the Membership Interest Sale, the following chapter 11 cases shall be automatically dismissed and closed:  (a) *In re Pipeline – West Suburban Medical Center, LLC*, Case No. 22-90313 (MI); (b) *In re Pipeline – Weiss Memorial Hospital, LLC*, Case No. 22-90306 (MI); (c) *In re Pipeline – Lakefront Medical Associates, LLC*, Case No. 22-90300 (MI); (d) *In re Pipeline – Midwest Pharmacies, LLC*, Case No. 22-90302 (MI); (e) *In re*

*Pipeline – Weiss Medical Specialists, LLC*, Case No. 22-90304 (MI); and (f) *In re Pipeline Chicago Graduate Education Foundation*, Case No. 22-90318 (MI).[10]

16.     Notwithstanding entry of this Order or section 349 of the Bankruptcy Code, cause exists to modify the effects of section 349 of the Bankruptcy Code as set forth herein, and all stipulations, settlements, rulings, orders, and judgments of this Court made during the course of the OpCos' chapter 11 cases, including this Order, shall remain in full force and effect, shall be unaffected by the dismissal of the OpCos' chapter 11 cases, and are specifically preserved for purposes of finality of judgment and *res judicata*.

17.     Upon the dismissal of the OpCos' chapter 11 cases, effective immediately prior to the closing of the Membership Interest Sale, the assets of the OpCos or their estates (other than any MIPA Excluded Assets) shall be reinstated or revested in the OpCos pursuant to section 349 of the Bankruptcy Code; *provided* that the MIPA Excluded Assets shall be retained by Illinois Parent or transferred to Illinois Parent at such time.

18.     Any and all motions, notices, objections, responses, adversary proceedings, contested matters, or other pleadings or filings concerning the OpCos made during the course of the OpCos' chapter 11 cases that have not been decided prior to the date of the dismissal of the OpCos' chapter 11 cases as set forth herein immediately prior to the closing of the Membership Interest Sale, are denied, dismissed, and/or overruled with prejudice.

19.     The Transaction Expenses are approved in all respects subject to the closing of the Real Estate Sale, and the Debtors are authorized to pay all amounts constituting Transaction Expenses to the applicable persons or entities upon closing of the Real Estate Sale.

---

[10]   Debtor Pipeline Chicago Graduate Education Foundation (the "Foundation") is a Delaware non-stock corporation. OpCo Debtor Pipeline – Weiss Memorial Hospital, LLC is the sole member (as that term is used in the Delaware General Corporation Law), and Section 8.10 of the MIPA provides that Seller shall take all necessary steps to effectively transfer control of the Foundation to Resilience or its designee, effective as of the MIPA Closing Date.

17

20.     From and after the consummation of the Real Estate Sale, if First Credit Bank (or its authorized assignee or designee) is entitled to exercise remedies in respect of Ramco or its property due to an event of default under the REPA Financing Documents (as defined herein), then the automatic stay shall thereupon be modified to the extent necessary to permit the exercise of such remedies.[11]

21.     The proceeds of the Illinois Sale received by the Debtors, and the Debtors' use and disposition of the same, are and shall be subject to the applicable provisions of the final order entered by the Court at Docket No. 492 and the DIP Documents (as defined therein), unless otherwise agreed in writing by the DIP Lenders and the Debtors.

22.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

23.     Notice of the Motion as provided therein shall be deemed good and sufficient and satisfies the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules.

24.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

25.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

26.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Houston, Texas
Dated: _____, 2022

_____
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

---

[11]   "REPA Financing Documents" means the documents governing the Buyer Senior Financing (as defined in the REPA), as amended, supplemented, or otherwise modified from time to time.

## Exhibit 1

**Membership Interest Purchase Agreement**

*Execution Copy*

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

## BY AND BETWEEN

## AUM GLOBAL HEALTHCARE MANAGEMENT, LLC

### As Buyer

### AND

## SRC HOSPITAL INVESTMENTS II, LLC

### As Seller

**November 22, 2022**

15576184 v30

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS ......................................................................................................2
    1.1    Definitions................................................................................... 2

ARTICLE II TRANSACTIONS AT THE CLOSING ....................................................10
    2.1    Acquisition of Membership Interests....................................... 10
    2.2    Excluded Assets ........................................................................ 10
    2.3    Excluded Liabilities .................................................................. 11
    2.4    Purchase Price ........................................................................... 12
    2.5    Closing and Post-Closing Credits to Buyer ............................. 12
    2.6    Closing ...................................................................................... 13
    2.7    Actions of Seller at Closing ..................................................... 13
    2.8    Actions of Buyer at Closing..................................................... 15

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER.................................15
    3.1    Corporate Capacity, Authority and Consents .......................... 15
    3.2    Binding Agreement................................................................... 16
    3.3    Membership Interests; Title to Assets...................................... 16
    3.4    Subsidiaries .............................................................................. 17
    3.5    Debt.......................................................................................... 17
    3.6    Financial Statements ................................................................ 17
    3.7    Regulatory Compliance ........................................................... 17
    3.8    Compliance and Reporting ....................................................... 19
    3.9    Material Contracts.................................................................... 19
    3.10    Employee Benefit Plans ........................................................... 20
    3.11    Employee Relations ................................................................. 20
    3.12    Litigation and Proceedings ...................................................... 20
    3.13    Medical Staff Matters .............................................................. 21
    3.14    Tax Liabilities .......................................................................... 21
    3.15    Reimbursement Contracts......................................................... 21
    3.16    Insurance .................................................................................. 22
    3.17    Limitation on Representations and Warranties......................... 22

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER.................................23
    4.1    Corporate Capacity, Authority and Consents .......................... 23
    4.2    Binding Agreement................................................................... 23
    4.3    Litigation and Proceedings ...................................................... 23
    4.4    [Reserved]................................................................................. 23
    4.5    Independent Evaluation ........................................................... 24
    4.6    Regulatory Compliance ........................................................... 24
    4.7    Compliance Program ............................................................... 24
    4.8    Compliance and Reporting ....................................................... 24

ARTICLE V COVENANTS OF THE PARTIES PRIOR TO CLOSING .................................25

i

| | | |
|---|---|---|
| 5.1 | Access | 25 |
| 5.2 | Updates of Schedules | 25 |
| 5.3 | Operating Covenants | 25 |
| 5.4 | Negative Covenants | 26 |
| 5.5 | Sale Order | 26 |
| 5.6 | Third Party Consents | 27 |
| 5.7 | Reformation Efforts | 27 |
| 5.8 | Notice of Certain Events | 27 |
| 5.9 | Cerner Agreement | 27 |
| 5.10 | Insurance | 28 |

**ARTICLE VI CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER** .......................... 28

| | | |
|---|---|---|
| 6.1 | Representations and Warranties; Covenants | 28 |
| 6.2 | Pre-Closing Confirmations | 28 |
| 6.3 | Actions and Proceedings | 28 |
| 6.4 | Entry of Sale Order | 28 |
| 6.5 | Closing Deliveries | 28 |

**ARTICLE VII CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER** ...................... 29

| | | |
|---|---|---|
| 7.1 | Representations and Warranties; Covenants | 29 |
| 7.2 | Pre-Closing Confirmations | 29 |
| 7.3 | Actions and Proceedings | 29 |
| 7.4 | Insolvency | 29 |
| 7.5 | Closing Deliveries | 29 |

**ARTICLE VIII ADDITIONAL AGREEMENTS** ......................................................... 30

| | | |
|---|---|---|
| 8.1 | Termination Prior to Closing | 30 |
| 8.2 | Post-Closing Filings and Access to Information | 31 |
| 8.3 | Employee Benefit Plans | 32 |
| 8.4 | Medical Staff | 33 |
| 8.5 | Consents to Certain Assignments | 34 |
| 8.6 | Name Change; License for Use of Name | 34 |
| 8.7 | Refunds, Remittances and CHOW Period Billing | 34 |
| 8.8 | Restrictive Covenants | 35 |
| 8.9 | Waiver of Bulk Sales Law Compliance | 35 |
| 8.10 | Graduate Education Foundation | 35 |
| 8.11 | Non-Disparagement | 35 |
| 8.12 | Estimated Employee Payroll Credit Adjustment | 35 |
| 8.13 | Phase 1 Payments | 36 |

**ARTICLE IX INDEMNIFICATION** ......................................................................... 36

| | | |
|---|---|---|
| 9.1 | Indemnification by Buyer | 36 |
| 9.2 | Indemnification by Seller | 36 |
| 9.3 | Limitations | 37 |
| 9.4 | Third Party Claims | 38 |
| 9.5 | Direct Claims | 40 |
| 9.6 | Claims Made | 40 |

ii

DM3\8379252.24

9.7      Scope of Liability................................................................................... 40

ARTICLE X DISPUTE RESOLUTION ..........................................................................40
10.1     General................................................................................................... 40
10.2     Informal Negotiations ........................................................................... 40
10.3     Mediation .............................................................................................. 40
10.4     Arbitration............................................................................................. 41
10.5     Injunctive or Similar Relief .................................................................. 41
10.6     Survival ................................................................................................. 41

ARTICLE XI GENERAL PROVISIONS .......................................................................41
11.1     Additional Assurances .......................................................................... 41
11.2     Recitals.................................................................................................. 42
11.3     Consideration ........................................................................................ 42
11.4     Consents, Approvals and Discretion...................................................... 42
11.5     Legal Expenses ..................................................................................... 42
11.6     Choice of Law; Venue .......................................................................... 42
11.7     Benefit, Assignment and Third Party Beneficiaries ............................. 42
11.8     No Brokerage ........................................................................................ 42
11.9     Cost of Transaction ............................................................................... 43
11.10    Confidentiality ...................................................................................... 43
11.11    Public Announcements .......................................................................... 43
11.12    Waiver of Breach .................................................................................. 43
11.13    Notice 43
11.14    Severability ........................................................................................... 44
11.15    Interpretation......................................................................................... 45
11.16    Entire Agreement, Amendments and Counterparts ............................... 45
11.17    Personal Liability .................................................................................. 45
11.18    Disclosure Generally............................................................................. 45
11.19    Offset Rights ......................................................................................... 46
11.21    Time of Essence .................................................................................... 46
11.22    Waiver of Conflicts Regarding Representation; Non-Assertion of Attorney-
         Client Privilege ..................................................................................... 46

iii

**LIST OF EXHIBITS AND SCHEDULES**

## Exhibits

| | |
|---|---|
| Exhibit  A | Transition Services Agreement |
| Exhibit  B | Restrictive Covenant Agreement |
| Exhibit C | DEA Power of Attorney |
| Exhibit D | Excluded Liability Assumption Agreement |
| Exhibit E | Sale Order |
| Exhibit F | Amendments to Amended and Restated Master Leases for Chicago Real Property |

## Schedules

| | |
|---|---|
| Schedule 2.2(f) | Excluded Contracts |
| Schedule 2.2(l) | Other Excluded Assets |
| Schedule 2.7(e) | Executives and Employees of the Seller Parties |
| Schedule 3.1(b), (c) | Corporate Capacity, Authority and Consents |
| Schedule 3.4 | Subsidiaries |
| Schedule 3.5 | Debt |
| Schedule 3.6 | Financial Statements |
| Schedule 3.7(a) | Investigations |
| Schedule 3.7(b) | Compliance with Laws |
| Schedule 3.7(c) | Permits |
| Schedule 3.7(d) | Accredited Facilities |
| Schedule 3.8 | Compliance and Reporting |
| Schedule 3.9(a) | Material Contracts |
| Schedule 3.9(b) | Material Contracts Exceptions |
| Schedule 3.10(a) | Employee Benefit Plans |
| Schedule 3.10(b) | Employee Benefit Claims |

iv

DM3\8379252.24

Schedule 3.11        Employee Relations

Schedule 3.12        Litigation and Proceedings

Schedule 3.13        Medical Staff Matters

Schedule 3.14        Tax Liabilities

Schedule 3.15(b)     Medicare & Medicaid

Schedule 3.15(c)     Billing Practices

Schedule 3.15(d)     Cares Act Grants and Deposit

Schedule 3.16        Insurance

Schedule 4.6         Buyer Regulatory Compliance

Schedule 5.3(b)      Administrative Expenses

Schedule 5.6(b)      Required Consents

Schedule 9.2(e)      Indemnification by Seller

v

DM3\8379252.24

**MEMBERSHIP INTEREST PURCHASE AGREEMENT**

This Membership Interest Purchase Agreement (this "***Agreement***") is entered into as of November 22, 2022 (the "***Effective Date***") by and between **AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**, a Michigan limited liability company ("***Buyer***"), and **SRC HOSPITAL INVESTMENTS II, LLC**, a Delaware limited liability company ("***SRC II***" or "***Seller***").  Buyer and Seller are collectively referred to as the "***Parties***" and each individually as a "***Party***."

**BACKGROUND**

**WHEREAS**, SRC II is the sole owner, beneficially and of record, of all of the issued and outstanding membership interests (collectively, the "***Membership Interests***") of the following entities (each a "***Subsidiary***" and collectively, the "***Subsidiaries***"):  (i) **PIPELINE – WEST SUBURBAN MEDICAL CENTER, LLC**, a Delaware limited liability company ("***West Sub OpCo***"); (ii) **PIPELINE - WEISS MEMORIAL HOSPITAL, LLC**, a Delaware limited liability company ("***Weiss OpCo***"); (iii) **PIPELINE - LAKEFRONT MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company ("***Chicago Health Medical Group***"); (iv) **PIPELINE - MIDWEST PHARMACIES, LLC**, a Delaware limited liability company ("***Midwest Pharmacies***"); and (v) **PIPELINE - WEISS MEDICAL SPECIALISTS, LLC**, a Delaware limited liability company ("***Weiss Medical Specialists***");

**WHEREAS**, West Sub OpCo is the owner and licensed operator of West Suburban Medical Center, a 234-bed acute care hospital with its main campus located at 3 Erie Court, Oak Park, Illinois 60302 (the "***West Suburban Medical Center***");

**WHEREAS**, West Sub OpCo is the owner of: (i) the cancer center located at 7420 West Central Avenue, River Forest, Illinois 60305 (the "***River Forest Cancer Center***"); and (ii) the breast imaging center located at 420 Williams Street, River Forest, Illinois 60305 (the "***River Forest Breast Imaging Center***"; and together with the River Forest Cancer Center, the "***Hospital-Based Centers***");

**WHEREAS**, Weiss OpCo is the owner and licensed operator of Weiss Memorial Hospital, a 236-bed acute care hospital with its main campus located at 4646 N. Marine Drive, Chicago, Illinois 60640, a campus located at 4601 N. Clarendon Avenue, Chicago, Illinois 60640 and a campus located at 4602 N. Marine Drive, Chicago, Illinois 60640 (collectively, "***Weiss Memorial Hospital***");

**WHEREAS**, West Suburban Property Holdings, LLC ("***West Sub PropCo***") owns the real estate on which the West Suburban Medical Center and the Hospital-Based Centers operate (including the parking garage located at 305 N. Humphrey Ave., Oak Park, Illinois (the "***West Sub Parking Garage***")) (collectively, the "***West Sub Property***");

**WHEREAS**, River Forest Property Holdings, LLC ("***River Forest PropCo***") owns the real estate located at 7420 Central Avenue, 420 Williams Street and 7411 West Lake Street, each in River Forest, Illinois (collectively, the "***River Forest MOB Property***");

**WHEREAS**, Weiss Property Holdings, LLC ("***Weiss PropCo***") owns the real estate on which Weiss Memorial Hospital operates (including the parking garage located at 4652 N.

Clarendon Avenue, Chicago, Illinois 60640 (the "***Weiss Memorial Parking Garage***")) (collectively, "***Weiss Memorial Property***");

WHEREAS, Weiss MOB Property Holdings, LLC ("***Weiss MOB PropCo***") owns the real estate located at 4700 N. Marine Drive, Chicago, Illinois 60640 (the "***Weiss Memorial MOB Property***"; together with the West Sub Property, the River Forest MOB Property and the Weiss Memorial Property, collectively the "***Chicago Real Property***");

WHEREAS, Chicago Health Medical Group, Midwest Pharmacies and Weiss Medical Specialists operate their businesses in spaces leased from Weiss Property Holdings, LLC, each of which such leased premises is located on 4646 N. Marine Drive, Chicago, Illinois 60640;

WHEREAS, Ramco Healthcare Holdings, LLC ("***Real Estate Buyer***") has entered into that certain Real Estate Purchase Agreement dated July 19, 2022, which Real Estate Buyer terminated on August 30, 2022, but which was reinstated and amended pursuant to that certain Reinstatement and Amendment of Real Estate Purchase Agreement, dated as of the Effective Date (as the same may be amended, the "***Real Property Purchase Agreement***") with West Sub PropCo, River Forest PropCo, Weiss PropCo and Weiss MOB PropCo (collectively, the "***Chicago PropCos***") whereby Real Estate Buyer will acquire the Chicago Real Property;

WHEREAS, the transactions contemplated herein and under the Real Property Purchase Agreement are mutually dependent on each other and although the two transactions will close separately and at different times, constitute an integrated transaction (the "***Transaction***"); and

WHEREAS, on October 2, 2022 (the "***Petition Date***"), the Seller, Subsidiaries, West Sub PropCo, River Forest PropCo, Weiss PropCo, Weiss MOB PropCo, and certain of their Affiliates (collectively, the "***Debtors***") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), initiating chapter 11 bankruptcy cases which are currently pending in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") as Joint Case No. 22-90291 (MI) (the "***Chapter 11 Cases***").

WHEREAS, the Parties desire to set forth certain representations, warranties and covenants made by each to the other, on which they will rely as a condition to entering into this Agreement and to the closings contemplated hereunder, and to set forth certain additional agreements relating to the Transaction.

NOW, THEREFORE, in consideration of the promises, covenants, representations and warranties hereinafter set forth, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1    Definitions.** As used in this Agreement, the following terms have the following meanings (unless otherwise expressly provided herein):

"***ABL Credit Agreement***" means that Credit and Guaranty Agreement, dated as of December 30, 2019, as amended, restated, replaced, supplemented or otherwise modified from

time to time, by and among Gardena Hospital, L.P.; ELADH, L.P.; CHHP Management, LLC; CHHP Holdings II, LLC; CPH Hospital Management, LLC; the Subsidiaries; and Pipeline East Dallas, LLC, Avanti Hospitals, LLC; Avanti Hospital Holdings I, LLC; HealthPlus+ Holdings, LLC; Gardena Hospital Management, L.L.C. and ELADH Management, L.L.C., the lenders party thereto and Credit Suisse AG, New York Branch, in its capacity as administrative agent for itself and the other lenders.

"*Accounts Receivable*" means all accounts, notes, interest and other receivables of the Subsidiaries net of all adjustments, and all claims, rights, interests and proceeds related thereto, arising from the rendering of services to inpatients and outpatients at the Hospital Facilities, billed and unbilled, recorded and unrecorded (including any accounts previously written off or charged off as bad debts), for services provided by such Subsidiaries whether payable by private pay patients or Third Party Payors, or by any other source, including the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients at the Hospital Facilities relating to Medicare, Medicaid, TRICARE and other third party patient claims of such Subsidiaries due from beneficiaries or governmental Third Party Payors; provided, however, that Accounts Receivable shall not include any intercompany receivables of the Subsidiaries due from the Seller or Seller Parties (other than the Subsidiaries).

"*Actions*" means any pending or threatened claim, cause of action, demand, litigation, action, suit, arbitration, proceeding, or right in action, whether known or unknown, that may be alleged or brought by any Person, Governmental Authority or any administrative, arbitration, or governmental proceeding, investigation or inquiry.

"*Agreement*" means this Membership Interest Purchase Agreement between the Parties, as from time to time amended, modified or supplemented in accordance with its terms, including the Exhibits and Schedules attached hereto.

"*Affiliate*" means, with respect to a Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person.  The term "*control*" used in the preceding sentence shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the work activities, management and policies of a Person whether through ownership of membership interests or voting securities, the election or appointment of board members, by contract or otherwise.

"*CARES Act*" means Section 3719 of the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. No. 116-136)(H.R. 748).

"*CARES Act Deposit*" means an amount equal to one of the following: (a) one-half of the CARES Act Grants, if such amount is less than or equal to one-half of the CARES Act Offset Closing Amount; (b) one-half of the CARES Act Offset Closing Amount, if such amount is less than one-half of the CARES Act Grants; or (c) zero, if the CARES Act Grants are zero.

"*CARES Act Grants*" means funds received by the Seller Parties from CARES Act grants during the period from March 2, 2022, through and including the Closing Date.

3

DM3\8379252.24

"*CARES Act Offsets*" means the right of CMS to offset against or recoup certain patient accounts receivable as permitted under the Accelerated and Advance Payment Program for Medicare Part A and Part B providers and suppliers as expanded during the period of the COVID-19 public health emergency by the CARES Act.

"*CARES Act Offset Closing Amount*" means the total outstanding unpaid or unrecouped liability of the Seller Parties for CARES Act Offsets on the Closing Date.

"*Cerner Agreement*" means a support and services agreement that Buyer shall procure and execute with Cerner for Cerner's suite of products and services at a level that the Buyer shall approve in its sole discretion.

"*Claim*" shall have the meaning provided in section 101(5) of the Bankruptcy Code.

"*CMS*" means the Centers for Medicare and Medicaid Services.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Consent*" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"*Deferred Payroll Tax Liability*" means the portion of payroll taxes that the Seller Parties were entitled to defer for payment until December 31, 2022 under the CARES Act in the aggregate unpaid amount of $2,211,471.46.

"*DIP Credit Agreement*" means the definitive superpriority senior secured debtor-in-possession credit agreement, dated as of October 4, 2022, by and among the Debtors party thereto, the agent and the lenders thereto, as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms, including any ancillary loan documents contemplated therein.

"*D&O Tail Policy*" means a new 6-year Side A D&O tail policy covering the individual directors and officers of the Subsidiaries that Pipeline Health System will obtain by the Closing Date.

"*Employee Benefit Plans*" means, collectively, each "employee pension benefit plan" and "employee welfare benefit plan" as those terms are defined in Section 3(3) of ERISA (whether or not subject to ERISA), stock option or equity-based compensation, employee stock ownership, employment, deferred compensation, severance pay, vacation, bonus or other incentive agreement, arrangement, plan or policy, currently maintained by, sponsored in whole or in part by, or contributed to by the Seller Parties for the benefit of any current or former employees of the Hospital Facilities and their respective dependents, spouses, or other beneficiaries.

"*Employees*" means employees at the Hospital Facilities, including employees who are on leaves of absence and staff that may be employed by an Affiliate of Seller but are allocated to the Hospital Facilities for substantially all of the services they perform.

4

"*Encumbrances*" means any and all mortgages, liens, pledges, security interests, leases, subleases, levies, rights of way, easements, agreements, rights of first refusal, options, restrictions, covenants, reservations or similar matters of record, zoning ordinance restrictions, encroachments, liabilities, claims, assessments, obligations or encumbrances of any nature whatsoever, or any conditional sale contracts, title retention contracts or other agreements or arrangements to give or to refrain from giving any of the foregoing.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Estimated Employee Payroll Credit*" means the credit to be given to Buyer at Closing, calculated and potentially adjusted with post-Closing payments being made by Buyer or Seller as follows:

(a)   One day before the Closing Date, Seller will provide to Buyer an estimate of the costs of all employee wages, benefits, employment taxes, and expenses that will have accrued but remain unpaid through the Closing Date (such credit shall include accrued but unpaid retirement benefits but shall not include accrued but unused PTO).  The Estimated Employee Payroll Credit amount shall be part of Closing Credits as calculated and paid by Seller to Buyer at Closing. As soon as reasonably practicable, but not later than sixty (60) days after the Closing Date, Seller shall prepare and deliver to the Buyer a statement (the "*Employee Payroll Credit Statement*") setting forth the actual calculation and amount of the Employee Payroll Credit.  Within thirty (30) days after the Buyer's receipt of the Employee Payroll Credit Statement (the "Objection Period"), the Buyer shall either notify Seller in writing that the Employee Payroll Credit Statement is acceptable or object thereto in writing (the "Objection Notice"), setting forth a description of each disputed item in reasonable detail.  If the Buyer delivers a timely Objection Notice and Seller and the Buyer do not resolve such objections on a mutually agreeable basis within thirty (30) days after Seller's receipt of the Objection Notice, the remaining disputed items shall be resolved within an additional thirty (30) days by a mutually agreed upon independent accounting firm (the "Referral Firm").  The calculation of the Employee Payroll Credit (i) agreed to by the Parties, (ii) as determined by the Referral Firm or (iii) if the Buyer fails to deliver a timely Objection Notice within the Objection Period, as set forth in the Employee Payroll Credit Statement shall be final, conclusive and binding on the Parties (the "*Final Employee Payroll Credit*").  The fees, costs and expenses of the Referral Firm shall be paid by the Seller and Buyer in inverse proportion to their success on the merits in the resolution of the disputed items.

(b)  No later than five (5) Business Days after the date on which the Final Employee Payroll Credit is determined pursuant to subsection (a) above, if the Final Employee Payroll Credit is greater than the sum of the Estimated Employee Payroll Credit and $10,000, then Seller shall pay to the Buyer by wire transfer of immediately available funds, an aggregate amount, if any, equal to the difference of the Final Employee Payroll Credit and the Estimated Employee Payroll Credit. If the Final Employee Payroll Credit is less than the difference between the Estimated Employee Payroll Credit and $10,000, then Buyer shall pay to the Seller by wire transfer of immediately available funds, an aggregate amount, if any, equal to the difference between the Estimated Employee Payroll Credit and the Final Employee Payroll Credit.

"*Excluded Claims*" means any known or unknown professional liability claims arising from incidents that occurred prior to the Petition Date entitled to coverage (subject to any

5

deductibles or retentions) under any of the Seller Parties' professional liability insurance policies set forth on <u>Schedule 3.16</u>, including without limitation those professional liability claims set forth on <u>Schedule 3.12</u> hereto, which shall be assumed by the Seller Parties (other than the Subsidiaries) and otherwise addressed as contemplated herein.

"***Final Order***" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rule of Bankruptcy Procedure, may be filed with respect to such order will not preclude such order from being a Final Order.

"***GAAP***" means generally accepted accounting principles, consistently applied.

"***Governing Documents***" means, for the entity in question, that entity's Articles of Incorporation, Certificate of Formation, Certificate of Limited Partnership, other filings with the applicable Secretary of State, Bylaws, Partnership Agreement, Limited Liability Company Agreement or other similar documents for the governance of the entity.

"***Governmental Authority***" means any federal, state, local or municipal government; any governmental or quasi-governmental authority of any nature (including any government agency, branch, board, department, official, instrumentality or entity); any body exercising or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature; any entity that contracts with a governmental entity to administer or assist in the administration of a governmental program (including any Medicare or Medicaid administrative contractors and the Medicare Advantage Program); or any arbitrator with authority to bind a party at Law.

"***Government Reimbursement Programs***" shall mean any programs funded or administered by federal or state government, or contractor(s) thereof, for the purposes of paying for health care services.  Such programs shall include Medicare, Medicaid, TRICARE, programs administered by the U.S. Department of Labor Employment Standards Administration's Office of Workers' Compensation Programs (e.g., administration of claims pursuant to the Black Lung Benefits Act), and similar or successor programs with or for the benefit of designated federal or state residents.

"***Healthcare Laws***" means, collectively, any and all federal, state or local statutes, rules, regulations and administrative manuals, orders, guidelines and requirements of law of any Governmental Authority governing the licensure or regulation of healthcare providers, professionals, facilities, or payors or otherwise governing or regulating the provision of, or

6

payment for, healthcare services, the sale of controlled substances or other pharmaceuticals, medical devices or supplies and the like.  Without limiting the generality of the foregoing, Healthcare Laws include Illinois corporate practice of medicine laws, statutes and regulations, Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. § 1320a-7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute," Section 1877 of the Social Security Act, as amended, 42 U.S.C. § 1395nn and related regulations (Prohibition Against Certain Referrals), commonly referred to as "Stark Law," the federal False Claims Act, 31 U.S.C. § 3729 et seq., the Privacy Laws, and all applicable rules, regulations and licensing requirements of the Illinois Department of Public Health and other state and federal fraud and abuse laws.

"*HHS*" means the U.S. Department of Health and Human Services.

"*Hospital Facilities*" means West Suburban Medical Center, Weiss Memorial Hospital and the Hospital-Based Centers.

"*IHFSRB*" means the Illinois Health Facilities and Services Review Board.

"*Indebtedness*" means the aggregate amount, as of immediately prior to the Closing, of: (a) all indebtedness of the Seller Parties for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (b) all indebtedness of the Seller Parties evidenced by any note, bond, debenture or other similar instrument or debt security, (c) all liabilities of the Seller Parties for any drawn letters of credit, performance bonds, surety bonds and similar obligations, (d) all obligations and liabilities of the Seller Parties in respect of declared but unpaid dividends or distributions on the Membership Interests, (e) all guarantees made by the Seller Parties in connection with the foregoing and (f) all obligations of the type referred to in clauses (a) through (e) secured by any lien on any property or asset of the Seller Parties. Indebtedness will not include any guarantees made by the Seller Parties of the Subsidiaries' payment obligations under vendor, purchasing and supply agreements.

"*IRS*" means the Internal Revenue Service.

"*Knowledge of Buyer*" (and any similar expression, including, the expression "Buyer's Knowledge") means, as to a particular matter, the knowledge of the CEO, CFO, Chief Nursing Officer and Compliance Officer of Buyer, after due and reasonable inquiry, and all facts which such individuals should have known as a result of such due and reasonable inquiry, which shall include those facts as to which Buyer has received written notice from any Governmental Authority.

"*Knowledge of Seller*" (and any similar expression, including, the expression "Seller's Knowledge") means, as to a particular matter, the knowledge of the CEO, CFO, Chief Nursing Officer and Compliance Officer of each of West Suburban Medical Center and Weiss Memorial Hospital, after due and reasonable inquiry, and all facts which such individuals should have known as a result of such due and reasonable inquiry, which shall include those facts as to which Seller has received written notice from any Governmental Authority.

"*Law*" means any federal, state, local, foreign or other statute, law, ordinance, regulation, rule, code, injunction, judgment, ruling, decree or order of any Governmental Authority, including common law.

"*Losses*" means losses, damages, liabilities, deficiencies, claims, interest, awards, judgments, penalties, costs and expenses (including reasonable attorneys' fees, costs and other out-of-pocket expenses incurred in investigating or defending the foregoing), but excluding punitive, exemplary, treble, consequential, incidental, or other special damages, lost profits, or diminution in value, regardless of legal theory unless they are part of a Third Party Claim.

"*Material Adverse Change*" means a change, event or occurrence that is discovered or disclosed following the Effective Date, regardless of whether such change, event or occurrence actually occurred before or after the Effective Date, and that has, individually or in the aggregate, a material adverse effect on the financial condition, properties, assets, liabilities, business, or results of operations of the Hospital Facilities.  Notwithstanding the foregoing, a Material Adverse Change shall not include any change, event or occurrence resulting from: (i) any actual or proposed change in Law or accounting standards or the interpretation or implementation thereof; (ii) any change that is generally applicable to the healthcare industry or such industry in the State of Illinois; (iii) the entry into this Agreement or the announcement, pendency or consummation of the Transaction; (iv) any action taken by Seller or its Affiliates that is required to be taken by this Agreement; (v) any omission to act or action taken with the prior written consent of Buyer or its Affiliates; (vi) any change in general business, economic, geopolitical or financial market conditions, that does not disproportionately affect the Hospital Facilities relative to similarly situated Persons in the healthcare industry; (vii) any national or international political event or occurrence, including acts of war or terrorism, that does not disproportionately affect the Hospital Facilities relative to similarly situated Persons in the healthcare industry; (viii) any natural disaster or calamity that does not disproportionately affect the Hospital Facilities relative to similarly situated Persons in the healthcare industry in the Chicago market; and (ix) any seasonal fluctuations in the operations of the Hospital Facilities consistent with prior fiscal years. In addition, the mere fact that Seller and its Affiliates filed the Chapter 11 Cases in and of itself shall not constitute a Material Adverse Change.

"*Payment Program*" means any Government Reimbursement Programs and other managed care contracts, participation agreements or other billing arrangements with insurance providers or other third-party payers pursuant to which the Subsidiaries and/or any of the Hospital Facilities submit claims for reimbursement for health care services.

"*Permits*" means all licenses, permits, franchises, certificates, rights, registrations, approvals, authorizations, consents, provider numbers, waivers, exemptions, releases, variances, certificates of authority, accreditations, or orders issued by any Governmental Authority.

"*Person*" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

8

"***Phase 1 Payments***" means any additional "Phase 1" general distribution amounts that are paid to the Subsidiaries post-Closing relating to the request for reconsideration submitted to the Health Resources and Services Administration by Pipeline Health System for return of the approximately $2.1 million that was incorrectly credited to an entity affiliated with the prior owner of the Hospital Facilities, and which the Health Resources and Services Administration required Pipeline Health System to refund to HHS in October of 2021 on behalf of the Subsidiaries, and which Pipeline Health System contends was required to be refunded in error.

"***Pipeline Health System***" means Pipeline Health System, LLC, a Delaware limited liability company and a Debtor.

"***Privacy Laws***" means the Health Insurance Portability and Accountability Act of 1996, as amended ("***HIPAA***") and the applicable rules and regulations promulgated under HIPAA pursuant to 45 CFR Parts 160, 162, and 164 (subparts A, D and E) and the changes thereto imposed by the Health Information Technology for Economic Clinical Health Act, Division A, Title XIII § 1301 et. seq. of the American Recovery and Reinvestment Act of 2009, as amended from time to time, and other applicable state and federal Laws regarding patient or consumer privacy and the security, use, sale or disclosure of healthcare records.

"***Ramco Note***" means that certain promissory note in the aggregate principal amount of $67,000,000.00, dated as of the closing date of the RPPA Closing, made by Ramco Healthcare Holdings, LLC in favor of the Chicago PropCos.

"***Representatives***" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"***Retroactive Insurance Coverage***" means the general and professional liability insurance policies, with retroactive coverage to Jan 29, 2019, for the professional liability policy and retroactive coverage to April 1, 2021, for the general liability policy, that Buyer will obtain in connection with binding insurance coverage for the Subsidiaries effective as of the Closing Date.

"***RPPA Closing***" means the closing of the transactions contemplated by the Real Property Purchase Agreement and the execution and delivery of the Ramco Note to Seller in connection therewith.

"***Sale Order***" means the Final Order of the Bankruptcy Court approving the transactions contemplated under this Agreement and the Real Property Purchase Agreement, consistent with the terms and conditions herein and in the Real Property Purchase Agreement, with the subject assets being transferred free and clear of all Claims and Encumbrances (including the Excluded Claims) except as expressly permitted in this Agreement and Real Property Purchase Agreement (as applicable), which Final Order shall be substantially in the form attached hereto as Exhibit E, or as otherwise acceptable to Seller and Buyer.

"***Seller Parties***" means Seller, the Subsidiaries, and their Affiliates (excluding any equityholders of Pipeline Health System).

"***Term Loan Credit Agreement***" means that certain Amended and Restated Facility Agreement, dated as of December 30, 2019 (as amended, modified and restated from time to time),

DM3\8379252.24

by and among Pipeline Health System, as a Guarantor, Pipeline Health System Holdings, LLC, a Delaware limited liability company, and each of Pipeline Health System's subsidiaries (other than certain excluded subsidiaries), as Borrowers, the Lenders party thereto, and Alter Domus Products Corp. (formerly known as Cortland Products Corp.), a Delaware corporation, as agent for itself and the other Lenders.

"***Third Party Payor***" means any entity whether private or Governmental Authority-owned or operated (including the Government Reimbursement Programs, any entity authorized to provide health insurance (or property, casualty, or life insurance covering health benefits) in Illinois, any health maintenance organization, or any employer authorized under Law to self-insure its workers' compensation risk) that pays for or reimburses at least some of the health care expenses of its beneficiaries.

## ARTICLE II
## TRANSACTIONS AT THE CLOSING

**2.1**     **Acquisition of Membership Interests**.  Subject to the terms and conditions of this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, acquire, take and accept from the Seller, all of the Membership Interests, free and clear of all Claims and Encumbrances (other than restrictions on transfer under the Securities Act or applicable state securities Laws) (the "***Acquisition***").

**2.2**     **Excluded Assets**.  The following assets of the Seller Parties shall be retained by, or transferred to, the Seller and not included as part of Buyer's acquisition of the Membership Interests (collectively, the "***Excluded Assets***"):

(a)     all cash and cash equivalents of the Seller Parties, less any outstanding checks that have been issued by the Seller Parties but have not been deposited or negotiated on the Closing Date (the "***Uncleared Checks***");

(b)     all intercompany receivables of the Subsidiaries due from the Seller or Seller Parties (other than the Subsidiaries) (for the avoidance of doubt, the Accounts Receivable and utility deposits or deposits held by third parties (but not any deposits held by Seller or the Subsidiaries) are *not* Excluded Assets);

(c)     with respect to the CARES Act Grants, an amount equal to the greater of: (i) the difference between the CARES Act Grants received by the Seller Parties and one-half of the CARES Act Offset Closing Amount; or (ii) one-half of the CARES Act Grants received by the Seller Parties;

(d)     the Phase 1 Payments;

(e)     State of Illinois Tax Credits for investor-owned hospitals relating to the Hospital Facilities for the portion of tax years 2020, 2021 and 2022 during which Seller owned the Subsidiaries, which tax credits shall accrue to or shall otherwise be available for use by Seller or Pipeline Health System;

DM3\8379252.24

(f)     the commitments, contracts, leases and agreements of Seller or the Subsidiaries that (A) relate to the Excluded Liabilities or the Excluded Assets, (B) do not relate to the Hospital Facilities (except for real property leases to which the Subsidiaries are a party for space in any of the Chicago Real Property), or (C) are those multi-facility system contracts relating to the operations of Seller's Affiliates listed on Schedule 2.2(f), including, without limitation, the Employee Benefit Plans;

(g)     all United States and worldwide inventions, trade secrets, know-how, whether or not patentable, mask work rights, patents, patent applications, trademarks, service marks, trade names, trade dress, copyrights, and all applications, registrations and renewals in connection with any of the above including the names "Pipeline" and "Pipeline Health System", and any other trade names, trademarks, service marks, trade dress, logos, symbols (as well as all abbreviations, variations or derivations thereof), copyrights and applications therefor of Seller or its Affiliates or world-wide web addresses (including any world-wide web address containing "pipeline") not used exclusively at the Hospital Facilities, any promotional material, educational material, signage, stationery, supplies or other items of inventory bearing such names, marks, trade dress, logos, or symbols or abbreviations, variations or derivations thereof, and any URLs, sites, blogs or pages hosted on Pipeline system websites, including associated content embodied within the foregoing (collectively, the "***Excluded IP***");

(h)     computer software, programs and hardware or data processing equipment, data processing system manuals and licensed software materials which are proprietary to Seller and/or its Affiliates or used in connection with the operation of one or more of Seller's or their Affiliates' acute care hospitals other than the Hospital Facilities (the "***Excluded IT Equipment***"), provided that such Excluded IT Equipment shall not include any computer software, programs and hardware or data processing equipment, data processing system manuals and licensed software materials which are located at the Hospital Facilities);

(i)     all minute books and corporate organizational records relating to Seller and its Affiliates, other than the Subsidiaries, and all other books and records that the Seller is required by Law to retain in its possession;

(j)     all other records that Seller is required by Law to retain in its possession; provided that Seller shall, at Seller's expense and to the extent permitted by Law, make and provide copies of such records to Buyer;

(k)     the rights of Seller and its Affiliates under this Agreement; and

(l)     other specifically excluded assets set forth in Schedule 2.2(l).

**2.3     Excluded Liabilities**.  Seller Parties (other than the Subsidiaries) shall retain or assume, as applicable, and Buyer shall not be liable for, the following liabilities relating to the Hospital Facilities (collectively, the "***Excluded Liabilities***"):

(a)     Any intercompany payables owing from the Subsidiaries to any other Seller Parties;

11

(b)     Any Indebtedness of the Seller Parties, including without limitation: (i) any Claims or liabilities arising under the ABL Credit Agreement, (ii) any Claims or liabilities arising under the Term Loan Credit Agreement, and (iii) any Claims or liabilities arising under the DIP Credit Agreement;

(c)     Any Claims of Seller Parties (other than the Subsidiaries) against the Subsidiaries, including without limitation any and all Claims of such Seller Parties under chapter 5 of the Bankruptcy Code;

(d)     Any and all fees and expenses related to the Debtors' restructuring, including without limitation: (i) fees and expenses of professionals employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code, (ii) compensation and reimbursement awarded pursuant to section 503(b)(4) of the Bankruptcy Code, (iii) Restructuring Expenses (as that term is defined in the proposed chapter 11 plan filed at Docket No. 21 in the Chapter 11 Cases), (iv) Other Restructuring Disbursements (as set forth in line item 19 in the budget attached to the interim order approving post-petition financing filed at Docket No. 86 in the Chapter 11 Cases), and (v) fees owing to the Office of the United States Trustee, including fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717;

(e)     Any liability or claim relating to the Excluded Assets;

(f)     The Deferred Payroll Tax Liability; and

(g)     The Excluded Claims.

**2.4     Purchase Price**.  At the Closing, Buyer will pay to Seller, as the total consideration for the Membership Interests, One and No/100 Dollar ($1.00) ("**Purchase Price**").

**2.5     Closing and Post-Closing Credits to Buyer**.

(a)     At the Closing, Seller shall transfer to Buyer, by wire transfer of immediately available funds, the following amounts (collectively, the "**Closing Credits**"):

(i)     The Estimated Employee Payroll Credit.

(b)     On or after the maturity date of the Ramco Note, the principal balance due under the Ramco Note shall be reduced by an amount equal to the Cares Act Deposit. Interest will accrue on the full principal balance of the Ramco Note (or such reduced amount after any payments by Ramco Healthcare Holdings, LLC during the term of the Ramco Note) through the maturity date and before the credit for the Cares Act Deposit is applied.

(c)     At such time after the RPPA Closing when Ramco Healthcare Holdings, LLC delivers a lump-sum payment of at least Thirty Million and No/100 Dollars ($30,000,000) on the Ramco Note, Seller shall cause the Chicago PropCos to immediately transfer to Buyer, by wire transfer of immediately available funds, the following amounts:

12

(i) An amount equal to Eighteen Million and No/100 Dollars ($18,000,000.00), which Seller and Buyer each acknowledge is an additional agreed-upon adjustment to address pre-Closing changes to Accounts Receivable, accounts payable, and costs associated with purchasing the Retroactive Insurance Coverage; *plus*

(ii) An amount equal to Twelve Million and No/100 Dollars ($12,000,000.00), which Buyer, in cooperation with Real Estate Buyer, shall use for the benefit of Weiss Memorial Hospital to honor the written and oral commitments made in connection with obtaining the Certificates of Exemption from IHFSRB.

**2.6** **Closing**. Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated under this Agreement (the "*Closing*") shall take place at a mutually agreeable location on December 2, 2022, and which transactions shall be effective as of 12:01 a.m. on the day immediately following such date (the "*Closing Date*"). At Closing and in consideration of the payment of the Purchase Price, the Parties shall execute and deliver such documents, agreements, instruments and certificates as may be necessary or reasonably requested to consummate such transactions and to evidence the satisfaction of the conditions precedent to the obligations of the Parties hereunder (except to the extent waived in writing by the appropriate Party).

**2.7** **Actions of Seller at Closing**. At the Closing or within such other timeframes as specified below and unless otherwise waived in writing by Buyer, Seller shall deliver or cause to be delivered to Buyer the following:

(a) Limited liability company interest transfer powers evidencing the transfer of the Membership Interests from the Seller to Buyer, duly executed by the Seller;

(b) Copies of resolutions duly adopted by the governing body of Seller authorizing and approving Seller's execution and delivery of this Agreement and consummation of the Transaction;

(c) Certificate of good standing of Seller from the State of Delaware, dated as of the most recent practicable date prior to the Closing Date;

(d) The Transition Services Agreement between Pipeline Health System and Buyer in a form to be negotiated by the parties and attached hereto as Exhibit A and incorporating such additional terms on transition services as mutually agreed upon prior to Closing (the "*Transition Services Agreement*") executed by Pipeline Health System;

(e) Assignment and assumption agreements (the "*Retention Bonus Assignments*") for the assignment to, and assumption by, Buyer or Buyer's designee of those certain retention bonus letter agreements (the "*Retention Bonus Agreements*") by and between Pipeline Health System or the Subsidiaries, on the one hand, and those executives and employees of the Seller Parties listed on Schedule 2.7(e), on the other hand;

(f) An assignment and assumption agreement (the "*Material Contract Assignment*") for the assignment to, and assumption by, Buyer or Buyer's designee of those

DM3\8379252.24

certain Material Contracts to which Seller and other Affiliates of Seller that are not the Subsidiaries are a party, and which are listed on Schedule 2.7(f);

(g)     Written evidence of Credit Suisse AG, New York Branch's (i) consent to the sale of the Membership Interests free and clear of all Claims and Encumbrances arising under the ABL Credit Agreement pursuant to the Sale Order and (ii) release/termination of any Encumbrances on the assets of the Subsidiaries arising under the ABL Credit Agreement; provided that, the Parties agree this deliverable may be satisfied if the Sale Order includes factual findings regarding such consent and ordering such release/termination (all in form and substance reasonably acceptable to Buyer);

(h)     Written evidence of Alter Domus Products Corp.'s (i) consent to the sale of the Membership Interests free and clear of all Claims and Encumbrances arising under the Term Loan Credit Agreement pursuant to the Sale Order and (ii) release/termination of any Encumbrances on the assets of the Subsidiaries arising under the Term Loan Credit Agreement; provided that, the Parties agree this deliverable may be satisfied if the Sale Order includes factual findings regarding such consent and ordering such release/termination (all in form and substance reasonably acceptable to Buyer);

(i)     Evidence reasonably satisfactory to Buyer that Seller has paid the Deferred Payroll Tax Liability to the appropriate Governmental Authorities;

(j)     The Restrictive Covenant Agreement, in the form attached hereto as Exhibit B, executed by Seller and binding on Seller and Seller's Affiliates;

(k)     (i) An aged trial balance, list of all Uncleared Checks, Income Statement with General Ledger to support same, balance sheet with general ledger to support aged accounts payable, aged Accounts Receivable identifying payor and detailed claims, each of which shall be part of the Financial Statements and delivered to Buyer at least three (3) business days prior to the Closing Date and updated again on the Closing Date;

(l)     Evidence of the purchase and binding of the D&O Tail Policy reasonably satisfactory to Buyer;

(m)     The Drug Enforcement Administration ("*DEA*") Power of Attorney (the "*DEA POA*") for use of the Hospital Facilities' DEA Controlled Substance Registration in the form attached hereto as Exhibit C and executed by Seller;

(n)     Payment to Buyer of the Closing Credits, as adjusted;

(o)     An assumption agreement whereby the Seller Parties (other than the Subsidiaries) assume any and all liabilities relating to the Excluded Liabilities, including without limitation the Excluded Claims, and agree to address such Excluded Liabilities in a chapter 11 plan in the form attached hereto as Exhibit D and executed by the Buyer and Seller Parties (other than the Subsidiaries);

(p)     A certified copy of the Sale Order entered by the Bankruptcy Court;

<div align="center">14</div>

(q)     Amendments to the amended and restated master leases for the Chicago Real Property in the forms attached hereto as Exhibit F (the "***Lease Amendments***"), executed by the Chicago PropCos; and

(r)     Such other agreements, instruments and documents as Buyer reasonably deems necessary to consummate the transactions under this Agreement.

**2.8     Actions of Buyer at Closing**.  At the Closing and unless otherwise waived in writing by Seller, Buyer shall deliver or cause to be delivered to Seller the following:

(a)     The Purchase Price by wire transfer of immediately available funds;

(b)     Copies of resolutions duly adopted by the Board of Managers of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and consummation of the Transaction;

(c)     The Transition Services Agreement executed by Buyer;

(d)     The Retention Bonus Assignments executed by Buyer;

(e)     The Material Contract Assignment executed by Buyer;

(f)     Evidence of the purchase and binding of the Retroactive Insurance Coverage, reasonably satisfactory to Seller;

(g)     The Restrictive Covenant Agreement executed by Buyer;

(h)     The DEA POA executed by Buyer;

(i)     The Lease Amendments, executed by the Buyer on behalf of the Subsidiaries; and

(j)     Such other agreements, instruments and documents as Seller reasonably deems necessary to consummate the transactions under this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As of the Effective Date and as of the Closing Date, when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, Seller represents and warrants to Buyer the following:

**3.1     Corporate Capacity, Authority and Consents**.  Seller is duly organized and validly existing in good standing under the Laws of the state of its formation, registration or incorporation with the requisite corporate power and authority to enter into the transactions under this Agreement, to perform its obligations hereunder and to conduct its business as now being conducted.  The execution, delivery and performance of this Agreement and all other agreements

15

referenced herein to which Seller is or will become a party and the actions to be taken by Seller in connection with the consummation of the transactions contemplated herein:

(a)     are within the corporate powers of Seller, are not in contravention of applicable Law or the terms of Seller's Governing Documents and have been duly authorized by all appropriate corporate action;

(b)     except as otherwise expressly herein provided or as set forth on Schedule 3.1(b), do not require any approval or consent of, or filing with, any Governmental Authority; and

(c)     except as otherwise expressly provided herein or as set forth on Schedule 3.1(c), will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any material indenture, mortgage, contract, agreement or other instrument to which Seller or any of the Subsidiaries is a party or otherwise bound that could be reasonably expected to materially impair Seller's ability to fulfill its obligations under this Agreement; and

(d)     will not violate any Law to which Seller or the Hospital Facilities is subject.

**3.2     Binding Agreement**.  Subject to entry of the Sale Order, Seller has all necessary corporate power and authority to enter into this Agreement and to carry out its obligations hereunder.  This Agreement and all agreements to which Seller is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Seller, and are and will be enforceable against Seller in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3     Membership Interests; Title to Assets**.

(a)     Seller is the sole owner, beneficially and of record, of all of the Membership Interests, free and clear of any Encumbrances. All such Membership Interests have been duly authorized, are validly issued, fully paid, and nonassessable, and were not issued in violation of the preemptive rights of any Person or any agreement or Law by which Seller at the time of issuance was bound.  There are no outstanding subscriptions, options, warrants, rights (including preemptive rights), calls, convertible or exchangeable securities, appreciation rights, or other agreements or commitments of any character relating to the issued or unissued Membership Interests or obligating any of the Subsidiaries or Hospital Facilities to issue or redeem any of the foregoing securities of any kind.  None of the Subsidiaries or Hospital Facilities has any appreciation rights, equity incentive or option plan or similar rights or obligations outstanding. Except for the limited liability company agreement of the Seller, there are no voting trusts, voting agreements, proxies, equity-holder agreements, or other agreements that may affect the voting or transfer of the Membership Interests.  There are no declared dividends or distributions of any of the Subsidiaries or Hospital Facilities that remain unpaid.

(b)     Each of the respective Subsidiaries is the sole owner of, and has good, valid and marketable title to, or in the case of property held under a lease or license, an enforceable leasehold interest in, or right to use, all material tangible assets used in connection with the

16

DM3\8379252.24

respective operations of the Subsidiaries.  All such assets are free from any Encumbrances, except for permitted Encumbrances.  In addition, since January 1, 2022, none of the Subsidiaries' assets have been (i) sold or (ii) transferred to Seller or Seller's Affiliates.

**3.4**      **Subsidiaries**.  Except for the Subsidiaries and except as set forth on Schedule 3.4, Seller does not have any subsidiaries and does not own any interest, directly or indirectly, in any other Person. An organizational chart reflecting the pre-Closing ownership of the Subsidiaries and Hospital Facilities is set forth on Schedule 3.4.

**3.5**      **Debt**.  Except as set forth on Schedule 3.5, as of the Closing there is no Indebtedness on or affecting the Membership Interests, or the tangible and intangible assets owned or used by the Subsidiaries in the operation of the Hospital Facilities.

**3.6**      **Financial Statements**.  Attached on Schedule 3.6 are complete and accurate copies of the unaudited balance sheets and statements of income of Seller with respect to the operation of the Hospital Facilities for the year ended December 31, 2021 and unaudited balance sheets and statements of income of Seller with respect to the operation of the Hospital Facilities for the period ended September 30, 2022   (the "***Balance Sheet Date***") (collectively, the "***Financial Statements***").  Except as set forth on Schedule 3.6, the Financial Statements present fairly in all material respects the financial condition and results of operations of Seller, the Subsidiaries and the Hospital Facilities as of the dates and for the periods indicated therein in accordance with GAAP, except that the Financial Statements (i) that are not for a fiscal year-end do not reflect normal recurring year-end adjustments (ii) do not contain footnotes, (iii) are prepared without physical inventories, (iv) do not contain an unaudited statement of cash flow, (v) omit substantially all the disclosures required by GAAP, (vi) are not restated for subsequent events, (vii) may not reflect any adjustments for impairment of long-lived assets, or restructuring charges or the reclassification of assets held for sale on the applicable balance sheet, and (viii) balance sheets reflect the following liabilities in intercompany liabilities: (A) accruals in respect of Seller's self-insured employee health benefits, (B) liabilities payable in connection with workers' compensation claims, (C) liabilities payable pursuant to any employee welfare benefit plan (within the meaning of Section 3(1) of ERISA) maintained by Seller or any Affiliate of Seller on account of any of the Employees, (D) payroll and bonuses payable and vacation, holiday and similar accruals with respect to some but not all Employees.  Federal, state and local income or franchise taxes accruals are not reflected on the balance sheets or income statements.  Except as set forth on Schedule 3.6, to the Knowledge of Seller, there are no obligations or liabilities, whether absolute, accrued, contingent or otherwise, of Seller that are required in accordance with GAAP to be reflected or disclosed in the Financial Statements except for obligations or liabilities (a) reflected or disclosed in the Financial Statements and (b) incurred in the ordinary course of business since the Balance Sheet Date, none of which have had a Material Adverse Change.

**3.7**      **Regulatory Compliance**.

(a)      Except as set forth on Schedule 3.7(a), neither Seller, nor any of the Subsidiaries, with respect to the operation of the Hospital Facilities, have been charged with or given notice of, or are under any obligation to take remedial action under, are not subject to any subpoena, and to the Knowledge of Seller, are not under investigation with respect to, any applicable material Law (other than any Environmental Law).

DM3\8379252.24

(b)      Except as set forth on Schedule 3.7(b), to Seller's Knowledge, the operations, properties, and offices of Seller, the Subsidiaries, and the Hospital Facilities are currently conducted, held, owned and operated in material compliance with all Laws, including without limitation all Healthcare Laws, as well as all material requirements of each Governmental Authority having jurisdiction over Seller, the Subsidiaries, and the Hospital Facilities and their respective businesses. With respect to the Hospital Facilities, except as set forth on Schedule 3.7(b), neither Seller, nor any of the Subsidiaries, have  made or are in the process of making a voluntary self-disclosure under the Self-Referral Disclosure Protocol established by the Secretary of HHS pursuant to Section 6409 of the Patient Protection and Affordable Care Act, or under the self-disclosure protocol established and maintained by the HHS Office of the Inspector General, or any United States Attorney or other Governmental Authority.  Seller and the Subsidiaries and Hospital Facilities have screened all current Employees against the Exclusion Authorities and to Seller's Knowledge, Seller and the Subsidiaries currently are not engaging or employing any Person who has a conviction or other sanction that would prohibit such engagement under any Healthcare Laws.

(c)      To Seller's Knowledge, the Seller Parties hold all Permits necessary for the conduct of their respective business (as currently being operated), including the Permits set forth on Schedule 3.7(c), and, to Seller's Knowledge, all such Permits are, in all material respects, currently valid and in effect and in good standing. The Hospital Facilities are duly registered and licensed pursuant to the Laws of the State of Illinois. No written notice or written warning from any governmental or regulatory authority with respect to the suspension, restriction, revocation or termination of such Permits has been issued or given to any Subsidiary or the Hospital Facilities, nor does Seller have any Knowledge of the proposed or threatened issuance of any such notice or warning.

(d)      The facilities set forth on Schedule 3.7(d) ("*Accredited Facilities*") operated by Seller and the Subsidiaries are accredited by, and in good standing with, The Joint Commission or such other accrediting organization identified on Schedule 3.7(d) (the "*Accrediting Organizations*").  Seller has made available correct and complete copies of the most recent accreditation reports received from the Accrediting Organizations for the Accredited Facilities. To Seller's Knowledge, there are no deficiencies presently in existence which would preclude the Accredited Facilities' accreditation by the Accrediting Organizations.

(e)      The Subsidiaries and the Hospital Facilities each have adopted, maintained and implemented privacy and security policies, procedures and safeguards relating to the applicable requirements of the Privacy Laws.  The Subsidiaries and the Hospital Facilities each have appointed a designated security and privacy officer responsible for overseeing compliance with the Privacy Laws and such policies and procedures.  To the Seller's Knowledge, the Subsidiaries and the Hospital Facilities each are currently conducted in material compliance with the Privacy Laws. Neither Seller nor any Subsidiary has received any notice from any Governmental Authority or other Person alleging a violation of the Privacy Laws that is currently pending or has not been finalized or closed. To Seller's Knowledge, neither Seller nor any Subsidiary is currently required to make any disclosures or notifications to any Person (including a patient or any Governmental Authority) regarding a violation of the Privacy Laws.

18

**3.8**    **Compliance and Reporting**.  Seller, Subsidiaries, and the Hospital Facilities have adopted, maintained and implemented a compliance program, and related policies, procedures and manuals (collectively, the "***Compliance Program***").  Neither Seller nor any of the Subsidiaries, Hospital Facilities, or Employees (a) is a party to a Corporate Integrity Agreement or Certification of Compliance Agreement with the OIG; (b) has a reporting obligation pursuant to any settlement agreement entered into with any Governmental Authority; (c) is, to Seller's Knowledge, the subject of any Governmental Reimbursement Program investigation conducted by any federal or state enforcement agency; (d) to Seller's Knowledge, is a defendant in any unsealed qui tam/False Claims Act litigation; (e) except as set forth on Schedule 3.8, has been served with or received any open or pending search warrant, subpoena, civil investigation demand or contact letter from any federal or state enforcement agency related to participation in any Governmental Reimbursement Program in the past three (3) years; (f) to the Knowledge of Seller, has been the subject of an enforcement action by or resolution agreement with the U.S. Department of Health & Human Services, Office for Civil Rights or any other Governmental Authority related to HIPAA within the past three (3) years; (g) has had any civil monetary penalty assessed under Section 1128A of the Social Security Act or comparable state Laws and Orders, or (h) has been convicted of a criminal or civil offense under any Healthcare Laws.

**3.9**    **Material Contracts**.

(a)    Schedule 3.9(a) sets forth a complete and accurate list of the following commitments, contracts, leases and agreements, whether written or oral, of Seller, in each case relating to the Hospital Facilities (the "***Material Contracts***"), and Seller has delivered complete copies of such Material Contracts to Buyer, or has given the Representatives of Buyer access to complete copies of such Material Contracts (except for those multi-facility system contracts relating to the operations of Seller's Affiliates listed on Schedule 2.2(f)) or, in the case of any oral agreements, accurate summaries of such oral Material Contracts:

(i)    contracts involving the lease of equipment or personal property that require payments of greater than $100,000 on an annual basis;

(ii)    employment contracts or other contracts with individual employees;

(iii)    contracts with respect to patents, trademarks, trade names or service names;

(iv)    contracts applicable by their terms only to the Hospital Facilities relating to data processing programs or software used in connection with the operation of the Hospital Facilities;

(v)    contracts with physicians or other referral sources;

(vi)    Payment Program contracts;

(vii)    collective bargaining agreements;

(viii)    partnership or joint venture agreements;

19

DM3\8379252.24

(ix)    contracts containing a covenant not to compete or restrictive covenant which is binding upon Seller or the Subsidiaries with respect to the operation of the Hospital Facilities;

(x)    contracts involving the lease of real property that require payments of greater than $100,000 on an annual basis, and

(xi)    any other contracts, commitments, leases or agreements that involve payments, performance of services or provision of items in an amount exceeding $100,000 on an annual basis.

(b)    Except as set forth on Schedule 3.9(b), and excluding any breaches or defaults on account of the Chapter 11 Cases, Seller and the Subsidiaries have not been given notice of any breach or default of any of the Material Contracts, and, other than with respect to Seller's and certain of Seller's Subsidiaries being in compliance with certain payment terms of such Material Contracts, Seller has no Knowledge of any event, act or omission that has occurred or failed to occur which, with the giving of notice, the lapse of time or both would constitute a default under the Material Contracts by Seller, the Subsidiaries or, to Seller's Knowledge, the counterparties thereto.

3.10    **Employee Benefit Plans**.

(a)    Schedule 3.10(a) sets forth each Employee Benefit Plan maintained or participated in by Seller or any Seller Affiliate relating to the Employees that is currently in effect.

(b)    Except as disclosed in Schedule 3.10(b), there are no pending, or to Seller's Knowledge, threatened claims or disputes under the terms of, or in connection with, the Employee Benefit Plans of Seller or the Subsidiaries relating to the Hospital Facilities, other than claims for benefits which are payable in the ordinary course.

3.11    **Employee Relations**.    There is no pending or, to the Knowledge of Seller, threatened employee strike, work stoppage or labor dispute concerning the Employees.  Except as set forth on Schedule 3.11, there are no pending or, to the Knowledge of Seller, threatened fair employment claims, wage and hour claims, unemployment compensation claims or workers' compensation claims in respect of the Employees. Neither Seller nor any Seller Affiliate is a party to or bound by any collective bargaining agreement relating to the Employees. With respect to the Employees, during the last twelve (12) months, there has been no mass layoff, plant closing or shutdown that triggers application of the Worker Adjustment & Retraining Notification Act of 1988, as amended, or any similar Law. Except as set forth in Schedule 3.11, neither Seller nor any Seller Affiliate is a party to, or otherwise bound by, any consent decree with, or citation by, any governmental authority relating to employees or employment practices at the Hospital Facilities. Neither Seller nor any Seller Affiliate, or, to Seller's Knowledge, the officers thereof, has received any written notice of intent by any governmental authority responsible for the enforcement of labor or employment Laws to conduct an investigation relating to Seller or any Seller Affiliate that remains unresolved and, to Seller's Knowledge, no such investigation is in progress.

3.12    **Litigation and Proceedings**.  Except as set forth on Schedule 3.12 and except for the Chapter 11 Cases and those matters disclosed in Schedule 3.11, there are no Actions pending

20

DM3\8379252.24

or, to Seller's Knowledge, threatened against the Seller Parties, with respect to the Hospital Facilities, at law or in equity, or before or by any Governmental Authority.  There is no Action pending or, to the Knowledge of Seller, threatened, against the Seller Parties which seeks to prevent or delay consummation of the Transaction or would impair the ability of Seller to perform its obligations under this Agreement.

**3.13   Medical Staff Matters**.  Seller has provided to Buyer, with respect to the Hospital Facilities, the material forms generally used as of the Effective Date with respect to medical staff privileges and membership application, and true, correct and complete copies of the Medical Staff Bylaws, policies, rules and regulations of the Hospitals, as in effect as of the Effective Date as well as a list of all current members of such medical staff. Except as otherwise disclosed to Buyer on Schedule 3.13, to the extent the Hospital Facilities are permitted under applicable Law to disclose such matters, there are no pending or, to Seller's Knowledge, threatened challenges with respect to any medical staff member or any applicant thereto for which a medical staff member or applicant has requested a judicial review hearing which has not been scheduled or has been scheduled but has not been completed.

**3.14   Tax Liabilities**.  Except as set forth on Schedule 3.14, all material taxes, penalties, interest, and any other statutory additions which have become due prior to the Closing from Seller or the Subsidiaries relating to the Hospital Facilities have been paid when due or adequately provided for by the reserves shown in the Financial Statements and to the Knowledge of Seller there is no pending tax examination or audit of, nor any action, investigation or claim asserted or threatened against Seller or the Subsidiaries by any federal, state or local taxing authority in respect of the Hospital Facilities.

**3.15   Reimbursement Contracts**.

(a)   Neither the Illinois Department of Medicaid nor CMS (or predecessors thereof) has refused to enter into or has terminated any participation agreement pursuant to which any Seller Party was entitled to reimbursement for services or facilities provided to patients of the Hospital Facilities.  There is no pending or to Seller's Knowledge, threatened proceeding or any pending or, to Seller's Knowledge, threatened investigation, under the Medicare or Illinois Medicaid programs against Seller, the Subsidiaries, or the Hospital Facilities (excluding routine audit activity by such agencies).  To Seller's Knowledge, Seller, Subsidiaries and the Hospital Facilities are currently in compliance in all material respects with the conditions of participation in each Payment Program.

(b)   Schedule 3.15(b) describes the filing status of the Medicare and Illinois Medicaid cost reports of the Subsidiaries and the Hospital Facilities, including through which filing year such cost reports have been fully settled. Except as set forth on Schedule 3.15(b), the filed cost reports of the Hospital Facilities for Medicare payments have not been audited.  As of the Closing Date, there have not been any audits of any cost report of the Hospital Facilities for Medicaid payments.  Except as set forth on Schedule 3.15(b) and as described in the Financial Statements: (1) no written notice of any offsets against future reimbursement in any amount in excess of $25,000 has been received by Seller or the Subsidiaries or Hospital Facilities from the Medicare or Illinois Medicaid programs nor is there any basis therefor; (2) there are no pending appeals, adjustments, challenges, audits, litigation, notices of intent to reopen cost reports of the

DM3\8379252.24

Subsidiaries or Hospital Facilities with respect to the Medicare or Illinois Medicaid programs; and (3) there is no dispute between Seller, the Subsidiaries, or the Hospital Facilities and any governmental authority or the Medicare fiscal intermediary regarding such cost reports, other than with respect to adjustments thereto made in the ordinary course of business which do not involve amounts owed (or claimed to be owed) by Seller, the Subsidiaries, or the Hospital Facilities greater than $25,000 per adjustment or $100,000 in the aggregate.

(c)      Except as set forth on Schedule 3.15(c), to Seller's Knowledge, (i) the billing practices of Seller, Subsidiaries and the Hospital Facilities and any business owned and operated thereby, with respect to all Payment Programs, are currently in material compliance with all Laws and the applicable contractual requirements of each Payment Program, and (ii) neither Seller, the Subsidiaries, nor the Hospital Facilities has any bill or billing statement that is currently pending for payment or reimbursement that is in excess of amounts allowed by Law or the applicable contractual requirements of each Payment Program, except for customary offsets, refunds and patient credits incurred in the ordinary course of business consistent with Seller's past practice.

(d)      Schedule 3.15(d) sets forth a true and complete list of the Cares Act Grants, Cares Act Offset Closing Amount, and the Cares Act Deposit.

**3.16**   **Insurance**.  Schedule 3.16 sets forth a true and complete list of all current insurance or self-insurance policies of all risk properties, including professional liability, fire, commercial and general liability, product liability, errors and omissions, malpractice, workers' compensation, vehicular (often referred to as automobile liability), directors' and officers' liability, employment practices, fiduciary liability and any and all other forms of insurance maintained by or on behalf of Seller, the Subsidiaries, and the Hospital Facilities to provide insurance protection for the assets and business thereof. Seller will provide Buyer access to claims loss runs related to such insurance policies for the period commencing on January 29, 2019 through the Effective Date pursuant to a letter of authorization that Seller will file with its insurance carrier.

**3.17**   **Limitation on Representations and Warranties**.  Except for the representations and warranties contained in this Agreement (including the related portions of the Schedules attached hereto), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation and warranty as to the future revenue, potential reimbursement from Governmental Authorities, profitability or success of the Hospital Facilities, or any representation or warranty arising in Law, and Seller expressly disclaims any other representations, warranties, forecasts, projections, statements or information, whether made or furnished by Seller or any of its Affiliates or any of their respective Representatives or any other Person. To Seller's Knowledge, none of the representations and warranties made by Seller in this Article III contains any untrue statement of

22

DM3\8379252.24

a material fact or omits to state a material fact necessary to make such representation and warranty not misleading.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

As of the Effective Date and as of the Closing Date, when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, Buyer represents and warrants to Seller the following:

**4.1** **Corporate Capacity, Authority and Consents**. Buyer is duly organized and validly existing in good standing under the Laws of the state of its formation, registration or incorporation, and has the requisite corporate power and authority to enter into the transactions under this Agreement, to perform its obligations hereunder and to conduct its business as now being conducted. The execution, delivery and performance of this Agreement and all other agreements referenced herein to which Buyer is or will become a party and the actions to be taken by Buyer in connection with the consummation of the transactions contemplated herein:

(a) are within the corporate powers of Buyer, are not in contravention of applicable Law or the terms of Buyer's Governing Documents and have been duly authorized by all appropriate corporate action;

(b) do not require any approval or consent of, or filing with, any third party or any Governmental Authority;

(c) except as otherwise expressly provided herein, will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any material indenture, mortgage, contract, agreement or other instrument to which Buyer is a party or otherwise bound that could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement; and

(d) will not violate any Law to which Buyer is subject.

**4.2** **Binding Agreement**. This Agreement and all agreements to which Buyer is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Buyer, and are and will be enforceable against Buyer in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.3** **Litigation and Proceedings**. There are no Actions pending or, to Buyer's Knowledge, threatened against Buyer, or any governing Persons thereof, at law or in equity, or before or by any Governmental Authority, that if adversely determined could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement.

**4.4** **[Reserved]**.

23

DM3\8379252.24

**4.5**     **Independent Evaluation**. Buyer is an experienced, sophisticated, and knowledgeable investor and purchaser in the healthcare industry. Buyer has been advised by and, other than with respect to Seller's representations and warranties in ARTICLE III, Buyer has relied solely on, Buyer's own expertise and legal, tax, environmental, and other professional counsel concerning this Agreement, each of the other documents contemplated hereby and the transactions contemplated hereby and thereby, and not on any comments, statements, projections, or other material made or given by the Seller Parties or their Affiliates, or any representative, consultant, or advisor of the Seller Parties or any of their Affiliates. Buyer acknowledges and affirms that on or prior to Closing, Buyer shall have completed Buyer's independent investigation, verification, analysis, and evaluation of the Subsidiaries and the Hospital Facilities and made all such reviews and inspections as Buyer has deemed necessary or appropriate to consummate the transactions contemplated hereunder.

**4.6**     **Regulatory Compliance**.

(a)     Except as set forth on Schedule 4.6, neither Buyer, nor any of its Affiliates, have been charged with or given notice of, or are under any obligation to take remedial action under, are not subject to any subpoena, and to the Knowledge of Buyer, are not under investigation with respect to, any applicable material Law (other than any Environmental Law).

(b)     Neither Buyer, nor any of its Affiliates, have  made or are in the process of making a voluntary self-disclosure under the Self-Referral Disclosure Protocol established by the Secretary of HHS pursuant to Section 6409 of the Patient Protection and Affordable Care Act, or under the self-disclosure protocol established and maintained by the HHS Office of the Inspector General, or any United States Attorney or other Governmental Authority; provided, however, that this Section 4.6(b) shall not apply to any self-disclosure that Buyer or any of its Affiliates may be in the process of making on behalf of the Subsidiaries or Hospital Facilities.

**4.7**     **Compliance Program**. Buyer acknowledges and agrees that if it elects to use the Compliance Program and related materials, or any employment policies and procedures, or any other operating policies and procedures adopted by the Seller Parties for the operations of the Hospital Facilities post-Closing, then Seller shall have no liability for Buyer's post-Closing use of or reliance upon the Compliance Program or any of the materials described above.

**4.8**     **Compliance and Reporting**.  Buyer and its Affiliates (a) are not a party to a Corporate Integrity Agreement with the OIG; (b) do not have reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (c) are not, to Buyer's Knowledge, the subject of any Governmental Reimbursement Program investigation conducted by any federal or state enforcement agency; (d) are not a defendant in any unsealed qui tam/False Claims Act litigation; and (e) have not been served with or received any search warrant, subpoena, civil investigation demand or contact letter from any federal or state enforcement agency relating to participation in any Governmental Reimbursement Program in the past three (3) years.

24

DM3\8379252.24

## ARTICLE V
## COVENANTS OF THE PARTIES PRIOR TO CLOSING

**5.1**     **Access**.  From and after the Effective Date until the Closing (the "***Interim Period***"), Seller shall (a) provide Buyer and its Representatives reasonable access to and, as applicable, the right to inspect, the plants, properties, books and records, and Representatives of the Hospital Facilities and (b) furnish Buyer with such additional financial and operating data and other information as to the business and properties of the Hospital Facilities as reasonably requested, including copies of the updated Financial Statements following each calendar month during the Interim Period; provided, however, that such access shall be subject to prior reasonable approval by Seller and shall be coordinated through persons as may be designated in writing by Seller for such purpose.  Buyer's right of access and inspection shall be exercised during normal business hours and in such a manner as not to interfere unreasonably with the operations of the Hospital Facilities and to be in compliance with applicable Laws.  Notwithstanding the foregoing, all disclosures of information shall be consistent with wall agreements, joint defense agreements and any other nondisclosure agreements entered into between the Parties.

**5.2**     **Updates of Schedules**.  No later than seven (7) days following execution of this Agreement by both Parties, Seller and Buyer shall agree on a final set of all Schedules referenced as part of this Agreement. After such date, and no later than one (1) day prior to the Closing Date, the Parties shall supplement or update any and all Schedules with respect to any matter arising after the Effective Date which if existing as of the Effective Date would have been required to be set forth or described in such Schedules.

**5.3**     **Operating Covenants**.  During the Interim Period, except with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed) or as required by this Agreement, Seller shall:

(a)     carry on its businesses in respect of the Hospital Facilities and the Subsidiaries in the ordinary course of business consistent with past practice in all material respects, taking into account the Chapter 11 Cases;

(b)     timely pay all post-Petition Date ordinary course administrative expense payables within terms, which terms are specified on Schedule 5.3(b);

(c)     maintain the Hospital Facilities and all parts thereof in substantially the same operating condition in which the Hospital Facilities are currently maintained, ordinary wear and tear excepted;

(d)     keep in full force and effect current insurance policies, self-funded plans or trusts or other comparable insurance relating to or affecting the Hospital Facilities or Subsidiaries;

(e)     provide Buyer with weekly financial updates, including cash collections, accounts payable paid, and Accounts Receivable; and

(f)     use its commercially reasonable efforts to cause the Subsidiaries and Hospital Facilities to comply with all Laws applicable to the Hospital Facilities, keep in force all Permits necessary to the operation of the Hospital Facilities, maintain and preserve its business

25

DM3\8379252.24

organizations intact and retain the current Employees at the Hospital Facilities (excluding terminations of employment in the ordinary course), maintain its relationships with physicians, suppliers, customers and others having business relations with the Hospital Facilities, and take such actions as are reasonably necessary to cause the smooth, efficient and successful transition of the business operations of the Hospital Facilities and Subsidiaries to the control of Buyer as of the Closing.

**5.4     Negative Covenants**.  During the Interim Period, except as required by Law, Seller shall not, with respect to the Hospital Facilities and the Subsidiaries, without the prior written consent of Buyer (which, except as set forth below, shall not be unreasonably withheld, conditioned or delayed):

(a)     issue, sell or grant any equity securities or ownership interests of the Subsidiaries, or any options, warrants, calls, subscriptions or other rights, agreements or commitments obligating the Subsidiaries to issue, sell or grant any equity securities or ownership interests of the Subsidiaries, to any Person without the prior written consent of Buyer, which consent may be withheld in Buyer's sole discretion;

(b)     sell, assign, convey or otherwise transfer any of the Membership Interests to any Person without the prior written consent of Buyer, which consent may be withheld in Buyer's sole discretion.

(c)     remove or transfer any material portion of the assets of the Hospital Facilities (other than obsolete or damaged and consistent with past practices), or make any material changes to the business or operations of the Hospital Facilities;

(d)     enter into any written agreement with a governmental or private body, the provisions of which include payments in excess of One Hundred Thousand and No/100 Dollars ($100,000.00) in the aggregate during any 12-month period;

(e)     increase compensation payable or to become payable, make any bonus payment to, or otherwise enter into one or more bonus agreements with, any Employee, except in the ordinary course of business in accordance with existing personnel policies and consistent with prior practice or with respect to any retention bonuses which are to be paid in full prior to the Closing Date;

(f)     create, incur, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other Encumbrance affecting the Hospital Facilities other than Permitted Encumbrances; or

(g)     sell, assign, lease or otherwise transfer or dispose of any property, plant or equipment used in connection with the operation of the Hospital Facilities except in the ordinary course of business with comparable replacement thereof.

**5.5     Sale Order**.  Seller shall diligently pursue entry of the Sale Order in the Chapter 11 Cases.  The Debtors shall serve the motion for approval and entry of the Sale Order on that portion of the Debtors' creditor matrix in the Chapter 11 Cases related to the Debtors' operations in Illinois.

DM3\8379252.24

5.6     **Third Party Consents**.

(a)     During the Interim Period, each Party shall use its good faith, commercially reasonable efforts to take, or cause to be taken, all actions, and do, or cause to be done, and assist and cooperate with the other Parties in doing, all things necessary to consummate and make effective, as soon as reasonably possible, the Closing and the Transaction in accordance with the terms hereof.  Without limiting the generality of the foregoing, upon the terms and subject to the conditions set forth in this Agreement, each of the Parties agrees to use good faith, commercially reasonable efforts to take, or cause to be taken, all actions that are necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Closing, including the following: (i) obtain all required or advisable consents, approvals or waivers from third Persons, (ii) obtain all necessary actions or non-actions, waivers, consents, approvals, orders and authorizations from Governmental Authorities, and (iii) make all necessary registrations, declarations and filings with any Governmental Authority.

(b)     During the Interim Period, Seller shall use good faith, commercially reasonable efforts to provide or obtain, as applicable, those certain third-party notices and consents identified on Schedule 5.6(b) (the "***Required Consents***"), and Buyer will reasonably cooperate with respect thereto.

5.7     **Reformation Efforts**.  In the event that subsequent to the Effective Date all or part of this Agreement or the Transaction is successfully challenged by any Governmental Authorities, the Parties shall use good faith, commercially reasonable efforts to promptly analyze, revise, reform and, to the extent necessary, restructure this Agreement and the Transaction in order to fully comply with all applicable requirements of such Governmental Authorities in a manner that is equitable to both Parties in light of the intent of the Parties regarding the Transaction.

5.8     **Notice of Certain Events**.  During the Interim Period, each Party shall promptly notify the other Parties in writing of, and contemporaneously provide the other Parties with accurate and complete copies of any and all information and documents relating to, any event, transaction or circumstance that would reasonably be expected to cause any condition to Closing set forth in Article VI or Article VII not to be satisfied.  Any such notice should not be deemed to cure any breach of a representation, warranty or covenant for purposes of determining whether or not the conditions set forth in Article VI or Article VII have been satisfied (except with respect to updates or supplements to Schedules as provided in Section 5.2).

5.9     **Cerner Agreement**.  Buyer shall undertake commercially reasonable efforts to execute and deliver the Cerner Agreement by the Closing Date. If Buyer does not execute and deliver the Cerner Agreement within sixty (60) days after the Closing Date, then Buyer shall pay to Pipeline Health System an amount equal to one month of fees to be paid under the Transition Services Agreement, which Pipeline Health System will hold as a deposit to be applied against unpaid amounts due and owing under the Transition Services Agreement until such time as the Cerner Agreement is executed and delivered, at which point half of the deposit shall be applied immediately to any outstanding balance under the TSA.  After the Cerner Agreement is executed and delivered by Buyer and Cerner, the remaining half of such deposit shall continue be held by Pipeline Health System as a deposit to be applied against unpaid amounts due and owning under

27

the Transition Services Agreement. Notwithstanding the foregoing, Buyer shall be required to execute and deliver the Cerner Agreement no later than six (6) months after the Closing Date.

**5.10**     **Insurance**. Buyer shall obtain the Retroactive Insurance Coverage. Pipeline Health System shall obtain the D&O Tail Policy.

<div align="center">

**ARTICLE VI**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

</div>

Notwithstanding anything herein to the contrary, the obligations of Buyer to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Buyer on or prior to the Closing:

**6.1**     **Representations and Warranties; Covenants**.     The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth herein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date.  All of the covenants in this Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth therein).  Buyer shall have received a certificate signed on behalf of Seller by a duly authorized officer of Seller to such effect.

**6.2**     **Pre-Closing Confirmations**.  Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that the Parties have Obtained the Certificates of Exemption approval from the IHFSRB.

**6.3**     **Actions and Proceedings**.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the Transaction.  On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Hospital Facilities, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Hospital Facilities, (b) enjoining or otherwise preventing the consummation of this Agreement or the Transaction, which Action, in the reasonable opinion of Buyer, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the Transaction.

**6.4**     **Entry of Sale Order**.  The Bankruptcy Court shall have entered the Sale Order.

**6.5**     **Closing Deliveries**.  Seller shall have executed and delivered, or caused to have been executed and delivered, to Buyer the documents and items described in Section 2.7.

<div align="center">28</div>

DM3\8379252.24

## ARTICLE VII
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Seller on or prior to the Closing:

**7.1** **Representations and Warranties; Covenants**. The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date. All of the covenants in this Agreement to be complied with or performed by Buyer on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein). Seller shall have received a certificate signed on behalf of Buyer by a duly authorized officer of Buyer to such effect.

**7.2** **Pre-Closing Confirmations**. Seller shall have obtained documentation or other evidence reasonably satisfactory to Seller that the Parties have Obtained the Certificates of Exemption approval from the IHFSRB.

**7.3** **Actions and Proceedings**. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the Transaction. On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Hospital Facilities, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Hospital Facilities, (b) enjoining or otherwise preventing the consummation of this Agreement or the Transaction, which Action, in the reasonable opinion of Seller, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Seller or Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the Transaction.

**7.4** **Insolvency**. Buyer shall not (a) be in receivership or dissolution, (b) have made any assignment for the benefit of creditors, (c) have admitted in writing its inability to pay its debts as they mature, (d) have been adjudicated a bankrupt or (e) have filed a petition in voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy Law or any other similar Law.

**7.5** **Closing Deliveries**. Buyer shall have executed and delivered, or caused to have been executed and delivered, to Seller the documents and items described in Section 2.8.

29

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

**8.1** **Termination Prior to Closing**.

(a)     Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(i)     by the mutual written consent of Seller and Buyer;

(ii)     by Buyer: if Seller breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (A) would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 6.1, (B) cannot be or has not been cured within thirty (30) days following delivery of written notice of such breach or failure to perform and (C) has not been waived by Buyer;

(iii)     by Seller, if Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 7.1, (2) cannot be or has not been cured within thirty (30) days following delivery of written notice of such breach or failure to perform and (3) has not been waived by Seller;

(iv)     by Buyer, immediately upon the occurrence of any of the following events:

(A)     the Bankruptcy Court denies the motion to approve the Sale Order;

(B)     the Debtors pursue approval of an alternative transaction with respect to the Membership Interests, assets of the Subsidiaries, or assets that are subject to the Real Property Purchase Agreement;

(C)     the dismissal or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;'

(D)     the appointment of a chapter 11 trustee or an examiner with expanded powers pursuant to section 1106(b) of the Bankruptcy Code; or

(E)     A Governmental Authority issues a Final Order or similar ruling prohibiting the transactions contemplated herein or under the Real Property Purchase Agreement.

(v)     by either of Seller or Buyer for any other reason if the Closing has not occurred by the Closing Date (the "***Termination Date***").

30

The Party seeking to terminate this Agreement pursuant to this <u>Section 8.1(a)</u> (other than <u>Section 8.1(a)(i)</u>) shall give prompt written notice of such termination to the other Parties.

(b)       In the event of a termination of this Agreement pursuant to <u>Section 8.1(a)(i)</u>, <u>8.1(a)(iv)</u>, <u>or 8.1(a)(v)</u>, each Party shall pay the costs and expenses incurred by it in connection with this Agreement, and this Agreement shall forthwith become void whereupon each Party shall have no further obligations under this Agreement.

**8.2       <u>Post-Closing Filings and Access to Information</u>**.

(a)       After the Closing, each Party shall promptly deliver to the other Party upon reasonable notice copies of any post-closing filings, financial statements or reports that may be required to be prepared and delivered to any Governmental Authority as a result of the consummation of the Transaction.

(b)       The Parties acknowledge that subsequent to the Closing, Seller may need access to information or documents in the control or possession of Buyer for the purposes of concluding transactions herein contemplated, audits (including CARES ACT Grants compliance audits), compliance with Laws, and the prosecution or defense of third-party claims. Accordingly, Buyer shall for a period of seven (7) years after the Closing, and indefinitely with respect to any governmental or third party claims, maintain in accordance with retention requirements under Applicable Law and make reasonably available to Seller and its respective Representatives and/or Governmental Authorities, upon written request and at the expense of Seller, such documents and information as may be available relating to the Hospital Facilities for periods prior to the Closing Date to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws and the prosecution or defense of claims. Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

(c)       The Parties acknowledge that subsequent to the Closing Buyer may need access to information or documents in the control or possession of Seller for the purposes of concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of third-party claims. Accordingly, for a period of seven (7) years after the Closing, and indefinitely with respect to any governmental or third party claims, Seller shall maintain in accordance with retention requirements under Applicable Law and make reasonably available to Buyer and its Representatives and/or Governmental Authorities, upon written request and at the expense of Buyer, such documents and information as may be available relating to the Hospital Facilities to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws and the prosecution or defense of claims. Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

(d)       Upon reasonable notice and during normal business office hours, Seller will cooperate with Buyer regarding Buyer's preparation and filing of cost reports covering any period prior to Closing. Upon reasonable notice and during normal business office hours, Seller will cooperate with Buyer in connection with any cost report audits, appeals, disputes and/or other claim adjudication matters relative to governmental program reimbursement. Such cooperation

<div align="center">31</div>

shall include providing Buyer with files, data and statistics. If such assistance and cooperation to be provided by the Buyer to Seller involves a significant or substantial investment of time and resources, then Buyer shall pay a reasonable fee to Seller for such services to be mutually agreed upon by the parties in a commercially reasonable manner and Seller may refuse to provide such services that involve such substantial effort until the parties reach agreement on the fee that Buyer will pay to Seller.

8.3     **Employee Benefit Plans**.

(a)     Seller agrees to allow the Employees to continue to participate in the Seller Parties' medical and pharmacy benefit plans in place on the Closing Date, at Buyer's sole cost and expense and at no cost to the Seller, until the earlier of the date upon which Buyer or its Affiliates can implement its own medical and pharmacy benefit plans ("***Buyer New Medical Plans***") or March 31, 2023 (the "***Medical Benefit Termination Date***"); provided, however, that Buyer may extend the Medical Benefit Termination Date until April 30, 2023, by providing Seller no less than 30 days advance written notice. Buyer covenants and agrees to fully implement the Buyer New Medical Plans no later than the Medical Benefit Termination Date. Effective as of the Medical Benefit Termination Date, Seller and its Affiliates shall have the right to terminate or discontinue the participation of the Employees in the Seller Parties' medical and pharmacy benefit plans and to notify the Employees that they no longer will have the right to participate in such medical and pharmacy benefit plans effective as of the Medical Benefit Termination Date. For the avoidance of doubt: (i) Buyer shall be responsible for any and all premiums, costs and expenses for claims incurred following the Closing Date (including, but not limited to, run-out claims to the extent the claim was incurred following the Closing Date, and PCORI fees) relating to the continued participation of the Employees in the Seller Parties' medical and pharmacy benefit plans after the Closing Date (whether pursuant to active coverage or COBRA coverage); and (ii) Seller shall be responsible for any and all premiums, costs and expenses for all claims incurred on or prior to the Closing Date (including, but not limited to, run-out claims to the extent the claim was incurred on or prior to the Closing Date, and PCORI fees) related to the participation of the Employees in the Seller Parties' medical and pharmacy benefit plans on or prior to the Closing Date (whether pursuant to active coverage or COBRA coverage). With respect to COBRA coverage, Seller shall be responsible for any and all costs and expenses relating to the provision of COBRA coverage (subject to premium costs, co-insurance amounts and deductibles that are the responsibility of the Employees) for those former Employees who have elected COBRA coverage under Seller Parties' medical and pharmacy benefit plans on or prior to the Closing Date, and Buyer shall be responsible for any and all costs and expenses relating to the provision of COBRA coverage (subject to premium costs, co-insurance amounts and deductibles that are the responsibility of the Employees) for those Employees who elect COBRA coverage under Seller Parties' medical and pharmacy benefit plans after the Closing Date.

(b)     Buyer shall be obligated to arrange payment of all of the premiums, costs and expenses of the Seller Parties' medical, dental, and vision plans that will be continued for the Employees, as described in Section 8.3(a) above and Section 8.3(c) below, pursuant to the following procedure: Buyer will designate a bank account that will be used to fund the premiums, costs and expenses and will grant access to such bank account to Seller Parties' third-party administrator of employee benefit plans ("***Keenan***"). For the costs and expenses of the medical plan to be funded by Buyer, Keenan will provide a voucher for payment of the relevant benefit

32

DM3\8379252.24

plan on Monday of each week for the relevant claims expense, and Buyer shall fund the amount stated in each voucher into the designated bank account by Tuesday of the same week. Keenan will sweep the funds from the designated bank account on Wednesday of each week to satisfy the plan costs and expenses. The same procedure will be used for the pharmacy benefit plan, but such costs and expenses will be funded on a bi-weekly basis. Other benefit plan expenses, including Keenan's fees, stop loss costs and expenses and other costs will be invoiced and funded in a similar manner by Buyer on a monthly basis.

(c)     Notwithstanding the foregoing, Seller agrees to allow the Employees to continue to participate in the Seller Parties' Employee Benefit Plans in place on the Closing Date (but excluding Seller Parties' employee pension benefit plan(s)), at Buyer's sole cost and expense and at no cost to the Seller, until December 31, 2022.  Except as otherwise set forth in Section 8.3(a), Buyer will implement its own Employee Benefit Plans and will offer participation in such plans to the Employees beginning on January 1, 2023.

(d)     For purposes of the Employees' eligibility to participate, vesting, service credit and, with respect to severance, vacation and other paid time off benefits only, determining level of benefits, under the Buyer New Medical Plans and any other employee benefit plans sponsored by Buyer (other than any equity based plans), each Employee shall be credited with his or her years of service with the Subsidiaries before the Closing Date, to the same extent as such Employee was entitled, before the Closing Date, to credit for such service under any similar Employee Benefit Plan in which such Employee participated or was eligible to participate immediately prior to the Closing Date; provided, however, that the foregoing shall not apply to the extent that its application would result in a duplication of benefits. Notwithstanding the foregoing, Buyer agrees to comply with any continuity of care requirements when transitioning Employees to Buyer New Medical Plans.

(e)     The Buyer shall take such actions as are necessary to ensure that the Buyer New Medical Plans in which the Employees participate will recognize, for purposes of annual deductible, coinsurance and out-of-pocket limits under its medical, dental, vision and other employee benefit plans, as applicable, with respect to the plan year in which the Closing Date occurs, all deductible, coinsurance and out-of-pocket expenses paid by the Employees (or their covered dependents) in the plan year in which the Closing Date occurs.

(f)     No provision in this Section 8.3, whether express or implied, shall (i) create any third party beneficiary or other rights in any Employee or former employee of the Subsidiaries (including any beneficiary or dependent thereof), any other participant in any Employee Benefit Plan or any other Person; (ii) create any rights to continued employment with Buyer or the Subsidiaries or in any way limit the ability of the Buyer or the Subsidiaries to terminate the employment of any individual at any time and for any reason; or (iii) constitute or be deemed to constitute an amendment to any Employee Benefit Plan or employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by the Buyer or any of its Affiliates.

**8.4     Medical Staff**.  To ensure continuity of care in the community, Buyer agrees that the medical staff members of the Hospital Facilities who are in good standing as of the Closing Date shall maintain medical staff privileges at the Hospital Facilities as of the Closing.  After the

33

DM3\8379252.24

Closing, the medical staff will be subject to the Medical Staff Bylaws of the Hospital Facilities then in effect, as amended from time to time.

**8.5** **Consents to Certain Assignments**.

(a) Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or Law to which Seller is a party or by which it is bound, or in any way adversely affect the rights of Seller or, upon transfer, Buyer under such asset, permit, claim or right. Seller shall use its commercially reasonable efforts to obtain any third-party consents or waivers required to sell and transfer the Membership Interests to Buyer. Buyer agrees that Seller shall not have any liability to Buyer arising out of or relating to the failure to obtain any such consent that may be required in connection with the transactions contemplated by this Agreement or because of any circumstances resulting therefrom.

(b) If any such consent is not obtained prior to Closing and as a result thereof Buyer shall be prevented by such third party from receiving the rights and benefits of certain contracts and agreements in connection with the purchase of the Membership Interests, Seller and Buyer shall cooperate in any lawful and commercially reasonable arrangement, as Seller and Buyer shall agree, under which Buyer would, to the extent practicable, obtain the economic claims, rights and benefits of such contracts and agreements and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to Buyer; provided, that all reasonable out-of-pocket expenses of such cooperation and related actions shall be paid by Buyer except as otherwise provided in this Agreement.

**8.6** **Name Change; License for Use of Name**. Buyer acknowledges and agrees that it is not purchasing, acquiring or otherwise obtaining any right, title or interest in the names "Pipeline" and "Pipeline Health System", in any trade names, trademarks, logos, domain names or service marks related thereto or containing the words "Pipeline" or any part or variation of any of the foregoing or any similar trade names, trademarks, logos, domain names or service marks (the "*Pipeline Trademarks and Logos*"). For a period of sixty (60) days after the Closing Date, Buyer will be granted a royalty-free, limited and non-exclusive license to use the name "Pipeline" or "Pipeline Health System" solely for the purposes of providing Buyer with a transition period to replace all "Pipeline" signage and badges issued to Employees with Buyer's own trademarks and logos. For the avoidance of doubt, Buyer shall have no right to use the name "Pipeline" individually in any context or for any purpose, including marketing its products and services or in communicating with patients, vendors or potential patients and vendors. Within sixty (60) days after the Closing Date, Buyer shall also ensure that the Pipeline Trademarks and Logos cease to appear in all signage, stationery, websites and domain names and other material.

**8.7** **Refunds, Remittances and CHOW Period Billing**.

(a) After the Closing: (i) if Seller or any of its Affiliates receive any refund or other amount that relates to the operation of the Hospital Facilities and is properly due and owing to Buyer in accordance with the terms of this Agreement, Seller promptly shall remit, or shall

34

cause to be remitted, such amount to Buyer and (ii) if Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to Seller or any of its Affiliates in accordance with the terms of this Agreement, or if Buyer receives any refund or other amount that is due and owing to the prior owner of the Hospital Facilities, Buyer promptly shall remit, or shall cause to be remitted, such amount to Seller.  Seller shall cooperate with Buyer to execute appropriate Lock Box agreements and bank account sweep instructions to facilitate the transfer of Accounts Receivable to Buyer following the Closing as reasonably requested by Buyer and Buyer's lender and consistent with applicable Healthcare Laws.

(b)     For  a period of twelve (12) months after the Closing, Seller agrees to cooperate with and provide reasonable assistance to Buyer in facilitating the change of ownership ("*CHOW*") filings related to the assignment and assumption of the Hospital Facilities' Medicare and Medicaid provider agreements by Buyer and the billing of services rendered by Buyer at the Hospital Facilities under such existing provider agreements during the period following the Closing and until such CHOW filings are approved with issuance of "tie-in" notices (the "*CHOW Period*") in a manner consistent with applicable Medicare and Medicaid rules and regulations. Buyer shall have sole responsibility for preparing and coordinating the filing of the CHOW filings, subject to Seller providing reasonable assistance with such filings. Buyer shall retain sole responsibility and liability for the billing of such services provided by Buyer at the Hospital Facilities during the CHOW Period and Seller shall promptly remit to Buyer any payments received by Seller for such services.

**8.8     Restrictive Covenants**.  At Closing, the Parties shall enter into that restrictive covenant agreement substantially in the form attached hereto as Exhibit B the ("*Restrictive Covenant Agreement*").

**8.9     Waiver of Bulk Sales Law Compliance**.  Buyer hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in Illinois and all other similar laws applicable to bulk sales and transfers.

**8.10     Graduate Education Foundation**.   Seller shall take all necessary steps to effectively transfer control of the Pipeline Chicago Graduate Education Foundation to Buyer or Buyer's designee, effective as of the Closing Date.

**8.11     Non-Disparagement**. At any time after the Effective Date, neither party shall, and shall instruct its Affiliates and their respective directors, officers, agents, representatives, members, partners and senior management employees not to, disparage the other party or any of its respective Affiliates, any of their respective services, including the business conducted at the Hospital Facilities, or any of their respective directors, officers, employees, agents, representatives, members, partners or stockholders, either orally or in writing.

**8.12     Estimated Employee Payroll Credit Adjustment**. After the Closing Date, Buyer or Seller, as the case may be, shall pay to the other party the amounts, if any, required to be paid as described in the definition of Estimated Employee Payroll Credit.

35

**8.13   Phase 1 Payments**. Buyer shall promptly pay, or shall cause to be promptly paid, to Seller any of the Phase 1 Payments that are received or credited to Buyer or its Affiliates after the Closing Date.

<div align="center">

**ARTICLE IX**
**INDEMNIFICATION**

</div>

**9.1   Indemnification by Buyer**.  Subject to the limitations set forth in <u>Section 9.3</u>, from and after the Closing, Buyer shall defend, indemnify and hold harmless Seller (and its respective Affiliates, and their respective officers, directors, employees, counsel, agents, successors and assigns) (collectively, the "*Seller Indemnified Parties*") from and against any and all Losses to the extent arising out of or resulting from:

(a)   any breach of or inaccuracy in any representation or warranty made by Buyer contained in this Agreement or in any certificate executed and delivered pursuant hereto;

(b)   any breach of or failure by Buyer to perform any covenant or obligation of Buyer contained in this Agreement;

(c)   any Third Party Claim arising solely from the operation of the Hospital Facilities and the Subsidiaries after the Closing Date;

(d)   Buyer's use of the Pipeline Trademarks and Logos as described in Section 8.6;

(e)   the failure of Buyer to pay when due after the Closing Date any premiums or other charges relating to the Employee Benefit Plans of the Subsidiaries or the failure to fund payroll and payroll taxes in accordance with Section 8.3; or

(f)   any fraud, willful misconduct or criminal acts of Buyer or its Affiliates.

**9.2   Indemnification by Seller**.  Subject to the limitations set forth in <u>Section 9.3</u>, from and after the Closing, Seller shall defend, indemnify and hold harmless Buyer and the Subsidiaries (and their respective Affiliates, and their respective officers, directors, employees, counsel, agents, successors and assigns) (collectively, the "*Buyer Indemnified Parties*" and collectively with the Seller Indemnified Parties, the "*Indemnified Parties*") from and against any and all Losses to the extent arising out of or resulting from:

(a)   any breach of or inaccuracy in any representation or warranty made by Seller contained in this Agreement or in any certificate executed and delivered pursuant hereto;

(b)   any breach of or failure by Seller to perform any covenant or obligation of Seller contained in this Agreement;

(c)   any Excluded Liability other than the Excluded Claims;

(d)   any Excluded Asset;

<div align="center">36</div>

(e)    the matters disclosed on Schedule 9.2(e);

(f)    the Excluded Claims; and

(g)    any fraud, willful misconduct or criminal acts of Seller or its Affiliates.

**9.3    Limitations**.

(a)    Buyer shall not be liable to any Seller Indemnified Party for any claim for indemnification under Section 9.1(a) unless and until the aggregate amount of indemnifiable Losses that may be recovered from Buyer thereunder equals or exceeds $100,000 (the "***Basket Amount***"), in which event Buyer shall be liable for the full amount of such Losses to the first dollar.  Seller shall not be liable to any Buyer Indemnified Party under Section 9.2(a) unless and until the aggregate amount of indemnifiable Losses that may be recovered from Seller thereunder equals or exceeds the Basket Amount, in which event Seller shall be liable for the full amount of such Losses to the first dollar.

(b)    The maximum aggregate amount of indemnifiable Losses that may be recovered from Buyer by Seller Indemnified Parties pursuant to Section 9.1(a) shall be an amount equal to Seven Million Five Hundred Thousand Dollars ($7,500,000).  The maximum aggregate amount of indemnifiable Losses that may be recovered from Seller by Buyer Indemnified Parties pursuant to Section 9.2(a) shall be an amount equal to Seven Million Five Hundred Thousand Dollars ($7,500,000).

(c)    No claim against Buyer or Seller, as applicable, pursuant to Section 9.1(a) or Section 9.2(a), as applicable, shall be brought or asserted after the date that is twelve (12) months after the Closing Date.

(d)    No claim against Buyer or Seller, as applicable, pursuant to Sections 9.1(b) through (e) or Sections 9.2 (b) through (e), as applicable, shall be brought or asserted after the later of 12 months or the date of expiration of the statute(s) of limitations applicable thereto.

(e)    An Indemnifying Party shall not be liable for any Loss to the extent that such Loss would not have arisen but for the passing of, or a change in, Law after the Effective Date, in each case that is not actually or prospectively in force on the Closing Date.

(f)    Any claim by an Indemnified Party under Section 9.1 or Section 9.2 that could be brought under Section 9.1(a) or Section 9.2(a), as applicable, shall be brought under such section, notwithstanding that such claim could also be brought under Sections 9.1(b) through (e) or Sections 9.2(b) through (d), as applicable.

(g)    In the event that any Excluded Claims are allowed to proceed against the Buyer Indemnified Parties post-Closing, then (i) for any Excluded Claims paid by the Buyer Indemnified Parties during the first year following the Closing Date, Seller shall pay or otherwise indemnify Buyer Indemnified Parties for any self-insured retention amount up to a maximum of Ten Million Dollars ($10,000,000.00); and (ii) for any Excluded Claims paid by the Buyer Indemnified Parties during the second year following the Closing Date, Seller shall pay or otherwise indemnify Buyer Indemnified Parties for any self-insured retention amount up to a

37

DM3\8379252.24

maximum of Five Million Dollars ($5,000,000.00); provided, however, that any such payment or indemnification shall be effected solely through a corresponding reduction in the aggregate amount of outstanding obligations under the Ramco Note immediately prior to such payment or indemnification. The calculation of the self-insured retention amounts hereunder includes any portion of the self-insured retention amount of $2,000,000 relating to the Seller Parties' Professional and General Liability Insurance Program, including excess liability and umbrella excess coverage, that was in effect for policy period January 29, 2019 through April 1, 2020, and Seller's payment of any portion of such $2,000,000 retention toward Excluded Claims shall be applied and counted against the respective indemnification caps identified herein.

(h)     For the purposes of calculating the amount of any Losses under Section 9.1 or Section 9.2, there shall be deducted an amount equal to the amount of any insurance proceeds actually received by an Indemnified Party in connection with the circumstances giving rise to the right to indemnification hereunder.

(i)     Buyer and Seller shall cooperate with each other with respect to resolving any claim, liability or Loss for which indemnification may be required hereunder, including by making, or causing the applicable Indemnified Party to make, all reasonable efforts to mitigate any such claim, liability or Loss.  In the event that Buyer or Seller shall fail to make such reasonable efforts to mitigate, then notwithstanding anything else to the contrary contained herein, the other Parties shall not be required to indemnify any Person for any claim, liability or Loss that could reasonably be expected to have been avoided if such efforts had been made. Without limiting the generality of the foregoing, Buyer and Seller shall, or shall cause the applicable Indemnified Party to, use reasonable efforts to seek full recovery under all insurance policies covering any Loss to the same extent as they would if such Loss were not subject to indemnification hereunder.

(j)     Notwithstanding anything to the contrary in this Agreement, Seller shall not have any obligation to indemnify the Buyer Indemnified Parties pursuant to Section 9.2 or otherwise for indemnification claims that accrue during the period between the Closing and the RPPA Closing until the RPPA Closing occurs and the execution and delivery of the Ramco Note to Seller in connection therewith (collectively, the "RPPA Closing"); provided, that if the RPPA Closing does not occur solely as a result of a default by the Chicago PropCos under the Real Property Purchase Agreement, then Seller's contingent indemnification obligations under this Agreement shall mature and become applicable upon the failure of the Chicago PropCos to cure such default(s), as applicable, under the Real Property Purchase Agreement. Moreover, if the RPPA Closing has not occurred by November 30, 2023, for any reason other than a default by the Chicago PropCos under the Real Property Purchase Agreement, then Seller's indemnification obligations under this Agreement, including the indemnification obligations described in Section 9.2, shall be void and of no effect, and any indemnification entitlement alleged or incurred by Buyer under this Agreement shall be automatically extinguished, canceled and waived by Buyer.

**9.4     Third Party Claims**.

(a)     An Indemnified Party seeking indemnity as set forth in this Article IX as a result of a claim or liability that is asserted in writing by a third party against such Indemnified Party (a "***Third Party Claim***") shall notify the Person against whom the indemnity is sought ("***Indemnifying Party***") in writing of the Third Party Claim within five (5) business days after

38

receipt of such written assertion of a claim or liability describing in reasonable detail (a) the facts giving rise to any claim for indemnification hereunder, (b) the amount or method of computation of the amount of such claim, (c) each individual item of Loss included in the amount so stated, to the extent known, and (d) the nature of the breach of representation, warranty, covenant or agreement with respect to which such Indemnified Party claims to be entitled to indemnification hereunder (all of the foregoing, the "***Claim Information***"), and shall provide any other information with respect thereto as the Indemnifying Party may reasonably request.  The failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article IX except to the extent that the Indemnifying Party is prejudiced by such failure.  The Indemnifying Party shall have the right to defend any such Third Party Claim and control the defense of such Third Party Claim; provided, however, that the Indemnified Party shall have the right to reasonably approve counsel selected by the Indemnifying Party.  If the Indemnifying Party, within ten (10) business days after notice of such Third Party Claim, fails to take appropriate steps to defend such Third Party Claim, the Indemnified Party will (upon further notice to the Indemnifying Party) have the right to undertake the defense of such Third Party Claim on behalf of and for the account and at the risk and expense of the Indemnifying Party.  If the Indemnifying Party assumes the defense of such Third Party Claim, the Indemnified Party shall have the right to employ separate counsel and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party; provided that if in the reasonable opinion of counsel for the Indemnified Party, there is a conflict of interest between the Indemnified Party and the Indemnifying Party, the Indemnifying Party shall be responsible for the reasonable fees and expenses of one counsel to such Indemnified Party in connection with such defense.  If the Indemnifying Party assumes the defense of any Third Party Claim, the Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party.  If the Indemnifying Party assumes the defense of any Third Party Claim, the Indemnified Party shall agree to any settlement, compromise or discharge of such Third Party Claim that the Indemnifying Party may recommend and that by its terms obligates the Indemnifying Party to pay the full amount of the liability in connection with such Third Party Claim, and which releases the Indemnified Party completely in connection with such Third Party Claim.  Whether or not the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnified Party shall not admit any liability with respect to, or settle, compromise or discharge, or offer to settle, compromise or discharge, such Third Party Claim without the Indemnifying Party's prior written consent, which consent shall not be unreasonably withheld.

(b)     With respect to the Excluded Claims, Seller shall control and decide on any settlement amount to be paid to such Third Party; provided, that Seller shall not argue or otherwise take a position that the Buyer or Subsidiaries are responsible to any Third Party for the Excluded Claims.  Buyer Indemnified Parties shall agree to any settlement, compromise or discharge of such Excluded Claims that Seller may reasonably decide or recommend and that obligates the Seller to indemnify Buyer Indemnified Parties in connection with such Excluded Claim, and which releases the Buyer Indemnified Parties completely in connection with such Excluded Claim; provided, that if any such settlement involves payments not covered by Seller's indemnification hereunder or the Subsidiaries' insurance policies and the Buyer Indemnified Parties are required to make a payment of any portion of such settlement, then the settlement shall be subject to Buyer's consent and approval, not to be unreasonably withheld, conditioned or delayed.

39

**9.5**     **Direct Claims**.   If an Indemnified Party becomes aware of any basis for indemnification under this Article IX (except as otherwise provided for under Section 9.4), the Indemnified Party shall notify the Indemnifying Party in writing of the same within fifteen (15) business days after becoming aware of such breach or claim, with such notice containing the Claim Information, and shall provide any other information with respect thereto as the Indemnifying Party may reasonably request.  The Indemnified Party shall reasonably cooperate and assist the Indemnifying Party in determining the validity of any claim for indemnity by the Indemnified Party and in otherwise resolving such matters.  Such assistance and cooperation shall include providing reasonable access to and copies of information, records and documents relating to such matters, furnishing employees to assist in the investigation, defense and resolution of such matters and providing legal and business assistance with respect to such matters.  Should the Indemnified Party fail to notify the Indemnifying Party within the time frame required above, the Indemnified Party nonetheless shall be entitled to indemnification by the Indemnifying Party to the extent that the Indemnifying Party has not established that it has been prejudiced by the failure to receive timely notice.

**9.6**     **Claims Made**.   The time limits set forth in Section 9.3 for making claims for indemnification are in lieu of, and the Parties expressly waive, any other applicable statute of limitations during which such claims may be brought or asserted.  Any notice for indemnification made pursuant to Section 9.4 or Section 9.5 prior to the expiration of the time limit set forth in Section 9.3 for the matter against which indemnity is sought shall for purposes of the time limits set forth in Section 9.3 constitute a claim or demand brought within such time limit, and the obligations of the Indemnifying Party therefor under this Article IX shall continue as to such matter, notwithstanding the expiration, if any, of such time limit.

**9.7**     **Scope of Liability**.  Except in the case of matters relating to intentional fraud, willful misconduct, or criminal acts, the sole and exclusive remedy of any Indemnified Party for any claim arising out of or relating to this Agreement is set forth in this Article IX.

## ARTICLE X
## DISPUTE RESOLUTION

**10.1**     **General**.  Except as otherwise expressly provided herein, the Parties agree that the exclusive remedy for any dispute, controversy, claim or disagreement arising out of or relating to this Agreement (a "***Dispute***"), shall be negotiation, mediation and arbitration pursuant to this Article X.

**10.2**     **Informal Negotiations**.   The Parties involved in a Dispute shall, as soon as reasonably practicable after one Party gives written notice of a Dispute to the other Parties, engage in good faith negotiations (the "***Negotiation***").

**10.3**     **Mediation**.  If the Negotiation does not resolve any Dispute within thirty (30) days after notice of such Dispute is received (the "***Negotiations Period***"), the Parties shall try in good faith to settle such Dispute through non-binding mediation under the Commercial Mediation Rules of the AAA.  The Parties will jointly appoint a mutually acceptable mediator, seeking assistance in such regard from the AAA if they do not agree upon such appointment within ten (10) days after

40

expiration of the Negotiations Period applicable to such Dispute.  The costs of such mediation, including fees and expenses, shall be borne equally by such Parties.

**10.4**    **Arbitration**.  If there remains unresolved any Dispute thirty (30) days after the expiration of the Negotiations Period applicable to such Dispute, then the Parties shall submit such Dispute to a three (3) member disinterested third-party arbitration panel selected (a) by mutual agreement of such Parties or (b) in the event such Parties do not reach an agreement regarding the selection of such panel within sixty (60) days after the expiration of the Negotiations Period applicable to such Dispute, each Party shall select one arbitrator within ten (10) business days after the expiration of such period, and those two arbitrators shall then select within ten (10) business days a third arbitrator.  If two arbitrators have been selected by such Parties and those two arbitrators are unable to select a third arbitrator within such ten (10) business day-period, a third arbitrator shall be appointed by the AAA within fifteen (15) days after the expiration of such period.  The arbitrators thus selected or appointed shall conduct the arbitration pursuant to the then-current rules of the AAA.  The arbitrators shall be governed by the provisions of this Agreement.  In the event the applicable Parties mutually agree upon the selection of such three (3) member panel, the fees and expenses of the arbitrators shall be shared equally between the applicable Parties.  In the event the applicable Parties are not able to mutually agree upon the selection of such three (3) member panel, each of the Parties, respectively, shall bear the costs of its appointed arbitrator, and the fees and expenses of the third arbitrator shall be shared equally between the Parties involved in the Dispute.  Each Party shall bear its own, and its Affiliates', costs and attorneys' fees in any arbitration proceeding.  The arbitration shall be concluded within no later than one hundred eighty (180) days following the expiration of the Negotiations Period.  The award of the arbitrators shall be final and binding on the Parties and may be enforced in a court having competent jurisdiction.

**10.5**    **Injunctive or Similar Relief**.  Solely for the purpose of obtaining a temporary restraining order, preliminary injunction or other interim injunctive or equitable relief or remedy or recognition or enforcement of any judgment relating thereto, each Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for purposes of enforcing this Agreement, waives any and all rights under the laws of any other state to object to jurisdiction within the State of Illinois, and consents to the service of process in any such action or proceedings, in addition to any other manner permitted by applicable laws, by compliance with the notices provision of this Agreement.

**10.6**    **Survival**.  This Article X shall survive the expiration or earlier termination of this Agreement.

<div align="center">

**ARTICLE XI**
**GENERAL PROVISIONS**

</div>

**11.1**    **Additional Assurances**.  The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein provided to the contrary; provided, however, at the request of a Party, the other Party or Parties shall execute such additional instruments and take such additional action as the requesting Party may deem necessary to effectuate this Agreement.  In addition, and from time to time after the Closing Date, Seller and

<div align="center">41</div>

Buyer shall each execute and deliver such other instruments of conveyance and transfer, and take such other actions as any Party may reasonably request, to more effectively convey and transfer full right, title and interest to, vest in, and place Buyer in legal and actual possession of the Purchased Assets.

**11.2    Recitals**. The recitals set forth at the beginning (starting on page one) of this Agreement are incorporated into this Agreement and made part of this Agreement as substantive provisions and not as mere recitals.

**11.3    Consideration**. The Parties acknowledge the mutual receipt and sufficiency of valuable consideration for the formation of the legally binding contract represented by this Agreement. That consideration includes all of the representations, warranties, covenants, and obligations contained in this Agreement and the Real Property Purchase Agreement.

**11.4    Consents, Approvals and Discretion**. Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by a Party or a Party must or may exercise discretion, such consent or approval shall not be unreasonably withheld, conditioned or delayed and such discretion shall be reasonably exercised.

**11.5    Legal Expenses**. In the event a Party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial proceedings, each Party shall pay its own legal expenses.

**11.6    Choice of Law; Venue**. This Agreement and all disputes or controversies arising out of or relating to this Agreement or the Transaction (in contract or tort) shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflicts of law principles and, subject to Article X, the venue of all disputes, claims, and lawsuits arising hereunder shall lie in Cook County, Illinois.

**11.7    Benefit, Assignment and Third Party Beneficiaries**. Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns; provided, however, that no Party may assign this Agreement without the prior written consent of the other Party except that Buyer may assign this Agreement and/or any of its rights hereunder to a wholly owned subsidiary of Buyer ("***Buyer Subsidiary***"). Buyer's assignment of its rights under this Agreement to a Buyer Subsidiary shall not release Buyer from performing its obligations hereunder, but rather Buyer and Buyer's Subsidiary shall be jointly and severally liable for such obligations. This Agreement is intended solely for the benefit of the Parties and is not intended to, and shall not, create any enforceable third party beneficiary rights, except with respect to the provisions of Article IX, which shall inure to the benefit of the Indemnified Parties, who are intended to be third-party beneficiaries thereof.

**11.8    No Brokerage**. The Parties represent to each other that no broker or finder is entitled to any brokerage fees, commissions or finder's fees in connection with the Transaction by reason of any action taken by the Parties. Each Party shall indemnify the other Party from and against all Losses arising out of claims for fees or commissions of any brokers or finders engaged or alleged to have been engaged by such Party.

DM3\8379252.24

**11.9    Cost of Transaction**.  Except as may be provided to the contrary elsewhere herein: (i) Buyer shall pay the fees, expenses and disbursements incurred by Buyer and its agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto; and (ii) Seller shall pay the fees, expenses and disbursements incurred by Seller and its agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto.

**11.10    Confidentiality**.  It is understood by the Parties that the information, documents and instruments delivered to each Party by the other Parties or agents thereof in connection with the negotiation of this Agreement or in compliance with the terms, conditions and covenants hereof are of a confidential and proprietary nature.  Both prior to and for a period of three (3) years following the Closing, the Parties shall maintain the confidentiality of all such confidential information, documents or instruments delivered to it by the other Parties or agents thereof and shall not disclose such confidential information, documents and instruments to any third parties other than its Representatives assisting in the Transaction or as may be required by applicable Laws.  If the Closing is not consummated, each Party shall return all such confidential information, documents and instruments and all copies thereof in its possession to the Party providing them. The terms and conditions of this Agreement and all other agreements and instruments executed and delivered by the Parties in connection with this Agreement shall remain confidential and the Parties shall not disclose such agreements or instruments, or any part thereof, to any third party other than its Representatives assisting in the Transaction for a period of three (3) years following the Closing or as may be required by applicable Laws.  Any breach of this Section 11.10 by a Party would result in irreparable harm to the other Parties and therefore the Parties shall be entitled to seek an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond in addition to other legal and equitable remedies.

**11.11    Public Announcements**.  No Party shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the Transaction without the prior written consent of Buyer and Seller, except for information and filings (a) reasonably necessary to be directed to Governmental Authorities to fully and lawfully effect the Transaction or (b) required under Law or the rules of any stock exchange applicable to a Party or its Affiliates.

**11.12    Waiver of Breach**.  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**11.13    Notice**.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered with signed receipt, when delivered by facsimile or other electronic means with electronic confirmation of delivery (unless not delivered on a business day or delivered after 5:00 p.m. Central Time on a business day, in which case such delivery shall be deemed effective on the next succeeding business day), when delivered by overnight courier with signed receipt, or when delivered by registered United States mail, with postage prepaid and return receipt requested, addressed to the

43

addresses below or to such other address as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

Buyer:                      AUM Global Healthcare Management, LLC
                            21 Forest Avenue
                            River Forest, Illinois 60305
                            Attn: President

With a Copy to:             Benesch Friedlander Coplan and Aronoff
                            71 South Wacker Drive, Suite 1600
                            Chicago, IL 60606
                            Attn: Juan Morado, Jr.
                            Email: jmorado@beneschlaw.com

Seller:                     SRC Hospital Investments II, LLC
                            898 N. Sepulveda Blvd., Suite 500
                            El Segundo, CA 90245
                            Attn:  Chief Executive Officer

With a Copy to:             Duane Morris LLP
                            190 South LaSalle Street, Suite 3700
                            Chicago, IL 60603-3433
                            Attn:  Paul Coyle, Esquire

                            Tel.:  (312) 499-0109
                            Fax: (312) 277-7590
                            Email: pcoyle@duanemorris.com

                            and

                            Kirkland & Ellis LLP
                            300 North LaSalle
                            Chicago, IL 60654
                            Attn: Jaimie Fedell
                            Tel.: (312) 862-3709
                            Fax: (312) 862-2200
                            Email: jaimie.fedell@kirkland.com

**11.14  Severability**.  In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or

44

DM3\8379252.24

unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

**11.15   Interpretation**.  In the interpretation of this Agreement, except where the context otherwise requires, (i) "including" or "include" does not denote or imply any limitation, (ii) "or" has the inclusive meaning "and/or," (iii) "and/or" means "or" and is used for emphasis only, (iv) "$" refers to United States dollars, (v) the singular includes the plural, and vice versa, and each gender includes each other gender, (vi) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (vii) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (viii) "Exhibit" refers to an exhibit to this Agreement (which is incorporated herein by reference), unless otherwise stated in this Agreement, (ix) "Schedule" refers to a schedule to this Agreement and incorporates any attachments thereto (which are incorporated herein by reference), unless otherwise stated in this Agreement, (x) all references to times are times in Chicago, Illinois, and (xi) "day" refers to a calendar day unless expressly identified as a "business day," which means any day that is not a Saturday, Sunday, or official federal holiday in the United States.

**11.16   Entire Agreement, Amendments and Counterparts**.   This Agreement supersedes all previous contracts, agreements and understandings between the Parties regarding the subject matter hereof and constitutes the entire agreement existing between or among the Parties respecting the subject matter hereof and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and neither Party is relying on any such oral statements or prior written material.  All prior representations or agreements, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties.  This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Signatures received via facsimile or other electronic transmission shall be accepted as originals. Notwithstanding any oral agreement or course of conduct of the Parties or their Representatives to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each Party.

**11.17   Personal Liability**.  This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect equity holder of either Party or any officer, director, employee, investor or other Representative of either Party.

**11.18   Disclosure Generally**.  Notwithstanding anything to the contrary contained in the Schedules or in this Agreement, the information and disclosures contained in any Schedule shall be deemed to be disclosed and incorporated by reference in any other Schedule as though fully set forth in such Schedule for which applicability of such information and disclosure is reasonably apparent on its face.  The fact that any item of information is disclosed in any Schedule shall not be construed to mean that such information is required to be disclosed by this Agreement. Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Change" or other similar terms in this Agreement.

**11.19   Offset Rights**.  Except as set forth below, each Party is entitled to set-off or recoup any amounts owed by the other Party (or any other Buyer or Seller Indemnified Party), including without limitation the outstanding obligations under the Ramco Note, and the amounts earned and billed or owed under the Transition Services Agreement either before or after the Closing Date (but in the case of the TSA, no such amounts that have not yet come due or have not been earned and billed), against any amounts due and payable by such Party to the other Party (or any Buyer or Seller Indemnified Party, respectively), including any indemnification payment due pursuant to Sections 9.1 or 9.2 of this Agreement or any amount owed by Seller to Buyer relating to the adjustment of the Estimated Employee Payroll Credit.  However, Buyer shall not have any right to set off the amounts owed by Seller to Buyer, including for indemnification or other reasons under this Agreement, against any fees, costs and expenses earned and billed under the Transition Services Agreement, and Buyer shall have an absolute obligation to pay all such fees, costs and expenses earned and billed under the Transition Services Agreement. For the avoidance of doubt, any indemnification payment due and payable by Seller pursuant to Section 9.2 of this Agreement shall be effected through a corresponding reduction in the aggregate amount of outstanding obligations under the Ramco Note immediately prior to such payment or indemnification.

**11.21   Time of Essence**.  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

**11.22   Waiver of Conflicts Regarding Representation; Non-Assertion of Attorney-Client Privilege**.

(a)   Buyer waives and agrees not to assert, and agrees to cause its Affiliates to waive and not to assert, any conflict of interest arising out of or relating to the representation, after the Closing (the "***Post-Closing Representation***"), of the Seller Parties or any member, officer, employee or director of the Seller Parties (any such Person, a "***Designated Person***") in any matter involving or relating to this Agreement or the Transaction, by any legal counsel currently representing the Seller Parties in connection with this Agreement or the Transaction (the "***Current Representation***").

(b)   Buyer waives and agrees not to assert, and agrees to cause its Affiliates to waive and to not assert, any attorney-client privilege with respect to any communication between any legal counsel and any Designated Person occurring during the Current Representation in connection with any Post-Closing Representation, including in connection with a dispute with Buyer or any of its Affiliates, it being the intention of the parties hereto that all such rights to such attorney-client privilege and to control such attorney-client privilege shall be retained by Seller; provided that the foregoing waiver and acknowledgement of retention shall not extend to any communication not involving this Agreement or the Transaction, or to communications with any Person other than the Designated Persons and their advisers.

(c)   Buyer, on behalf of itself and its Affiliates agrees that no communications (including email or other written communications) subject to attorney-client privilege in connection with the Current Representation shall be subject to disclosure, directly or indirectly, to Buyer or any Person acting on behalf of Buyer, and the same shall be controlled by Seller and shall not be claimed by Buyer or any of its Affiliates.

46

(d)     Nothing in this Section is intended to or shall be deemed to operate as a waiver of any applicable privilege or protection that could be asserted to prevent disclosure of any confidential communication by any legal counsel currently representing any Designated Person.

(e)     Seller and Buyer agree to take, and to cause their respective Affiliates to take, all steps reasonably necessary to implement the intent of this Section 11.19.

*[Signature Pages Follows]*

DM3\8379252.24

DocuSign Envelope ID: 0F9A28E0-73B2-4F4B-A131-61A1C402793F

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized officers as of the date set forth below.

**Seller:**

**SRC HOSPITAL INVESTMENTS II, LLC**

By:_____

Name: Nicholas Orzano
Title: Authorized Signatory
Date: November 22, 2022

**Buyer:**

**AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**

By:_____
Name:  Manoj Prasad
Title:   CEO
Date: November 22, 2022

Signature Page to Membership Interest Purchase Agreement

DocuSign Envelope ID: 358BD986-532A-4106-96CF-79FC99F85188

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized officers as of the date set forth below.

**Seller:**

**SRC HOSPITAL INVESTMENTS II, LLC**


By:_____
Name: Nicholas Orzano
Title: Authorized Signatory
Date: November 22, 2022



**Buyer:**

**AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**


By:___*Manoj Prasad*_____
Name: Manoj Prasad
Title:   CEO
Date: November 22, 2022

Signature Page to Membership Interest Purchase Agreement

DM3\8379252.24

# EXHIBIT A

## TRANSITION SERVICES AGREEMENT

### [To be finalized prior to Closing]

**Final**

**TRANSITION SERVICES AGREEMENT**

THIS TRANSITION SERVICES AGREEMENT (this "Agreement") is made and entered into as of December 2, 2022 (the "Effective Date"), by and between Pipeline Health System, LLC, a Delaware limited liability company ("Pipeline" or "Provider"), and AUM Global Healthcare Management, LLC, a Michigan limited liability company ("Recipient"). Each of Provider and Recipient may be referred to herein as a "Party" or, collectively, as the "Parties".

**RECITALS**

A.     **SRC Hospital Investments II, LLC**, a Delaware limited liability company ("Seller") and Recipient are parties to a Membership Interest Purchase Agreement dated as of November 22, 2022 (the "MIPA"), pursuant to which Recipient is purchasing from Seller all of the Membership Interests of the following entities (each a "Facility" and collectively, the "Facilities"):  (i) **PIPELINE – WEST SUBURBAN MEDICAL CENTER, LLC**, a Delaware limited liability company; (ii) **PIPELINE - WEISS MEMORIAL HOSPITAL, LLC**, a Delaware limited liability company; (iii) **PIPELINE - LAKEFRONT MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company; (iv) **PIPELINE - MIDWEST PHARMACIES, LLC**, a Delaware limited liability company; and (v) **PIPELINE - WEISS MEDICAL SPECIALISTS, LLC**, a Delaware limited liability company, as more specifically described therein.

B.     As required under the MIPA, to assist in the orderly transition of the operations of the Facilities (the "Healthcare Businesses"), Provider (directly and/or through its subsidiaries, affiliates or through various third party providers) will provide certain information technology services to Recipient in accordance with the terms and conditions of this Agreement.

C.     All capitalized terms used but not defined herein shall have the meaning ascribed to them, respectively, in the MIPA.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties incorporate the foregoing Recitals into this Agreement and agree as follows:

**SECTION 1 - SERVICES**

1.1     **Information Services.**

(a)     **Definition**. Provider shall provide, and Recipient hereby accepts the right to use and obtain, the Information Services in connection with Recipient's operation of the Healthcare Businesses during the Term (as herein defined). For purposes of this Agreement, "Information Services" shall mean those certain information technology services described on Schedule 1, attached hereto and incorporated herein by reference, which shall be provided subject

15962942 v15

to the terms and conditions of this Agreement and at materially the same level as Provider historically provided such services to the Facilities prior to the Effective Date and otherwise consistent with the service requirements of (but subject to the terms and conditions of) the agreements between Provider and its Subcontractors (defined in Section 4 below) and Vendors (defined in Section 4 below), subject to the terms and conditions of this Agreement and applicable law. For the avoidance of doubt, nothing in this Agreement shall preclude or restrict Provider from providing Information Services to its other hospitals and businesses or to any third party. While Provider has used reasonable efforts towards the accuracy of Schedule 1, Schedule 1 may be updated by Provider from time to time on written notice to Recipient to remedy inadvertent errors, to reflect additional items that have been unintentionally omitted and are in service at the time of the Effective Date. On written notice and subject to Recipient's prior written approval, which shall not be unreasonably withheld or delayed, Provider may update Schedule 1 from time to time to reflect services by third party subject matter experts or other service providers assisting in issue resolution, maintenance or support of day to day operations, or to add items that are otherwise deemed, in Provider's reasonable determination, necessary to the performance of the Information Services. Upon any update to Schedule 1.1, Provider will make appropriate adjustments to Schedule 4, referenced below. Any services not specifically enumerated herein are outside the scope of this Agreement and, if Provider determines to perform such services or add services to Schedule 1 as agreed upon by the Parties, any such additional services are subject to the negotiation and execution of a separate mutually agreeable statement of work describing the applicable terms and costs and signed by the Parties. Provider will (i) work towards reducing costs and managing the Information Services in an efficient manner, (ii) ensure that all Subcontractors are adequately qualified and experienced to perform the Information Services (iii) ensure that all Subcontractors comply with all laws and regulations applicable to the performance of any services under this Agreement, and (iv) remain fully liable for any acts or omissions of any Subcontractor. Parties agree that all costs related to Provider's efforts to separate any information technology assets that are shared with Provider's other operations shall be borne solely by the Provider in fulfillment of Provider's obligation to provide to Recipient as part of the sale.

(b)      **Policies**. Recipient's use and receipt of the Information Services shall conform to the reasonable procedures, requirements and limitations contained in the documentation and other policies, standards, procedures and instructions provided from time-to-time by Provider ("Provider Policies"). Provider may change its Provider Policies from time to time as may be necessary or appropriate to improve the Information Services, comply with the requirements of the applicable Supported Software Application (as herein defined) or as may be required by changes of law or Provider's third party agreements and outsourcing arrangements; provided, however, that no material changes will be implemented by Provider until it has furnished Recipient written notice thereof.

(c)      **Application Updates**. In the event that a new or updated version (an "Application Update") of any Supported Software Application (as herein defined) or software or firmware embedded in or otherwise used to operated Supported Hardware (as herein defined) is made available to Provider, Provider shall after consultation with Recipient only be required to implement such Application Update to the extent such Application Update: (i) is required by law, (ii) would otherwise implicate health or safety matters relating to patients of the Healthcare

2

Businesses, (iii) can be implemented with little or no cost to Provider, or (iv) is required to implement an important or urgent security patch, in each case as reasonably determined by Provider (each a "Required Update"). For each Required Update or other Application Update, Provider agrees to implement, Provider and Recipient must mutually agree in writing upon the costs related thereto in advance of Provider's commencement of services, which costs shall be borne by Recipient except to the extent the Application is not specific to Recipient and shared with other users of the Supported Software Application or Supported Hardware, in which case the cost will be pro-rated on a reasonable basis among all users, including Recipient.

       (d)     **Disruptions**. In the event there is a disruption of Information Services to the Healthcare Businesses, Provider shall use the same level of diligence, and no less, to restore such Information Services as would be used by Provider to restore services to similarly situated hospitals owned by Provider or its Affiliates under the circumstances (including taking into account the health and safety of patients).

       (e)     **Limitation**. In providing the Information Services, Provider shall not be obligated to (i) purchase, lease, or license any additional equipment or software unless, if Provider determines to do so, any additional costs to Provider are advanced by Recipient, (ii) create or supply any documentation or information not currently existing or available through minimal efforts of Provider, (iii) pay any costs related to the transfer or conversion of data to Recipient or any alternate supplier of the information technology services, or (iv) enter into additional contracts with third parties or change the scope of current agreements with third parties unless, if Provider determines to do so, any additional costs to Provider are reimbursed by Recipient.

       (f)     **Provider Internal Services**. Recipient acknowledges that Provider and its Affiliates may be providing similar services, and/or services that involve the same resources as those used to provide the Information Services, to its internal organizations and Affiliates and the provision of such similar services shall in no way be deemed to be a breach of Provider's obligations hereunder, and nothing herein shall require Provider to prioritize the provision of Information Services over such internal services.

       1.2     **Scope of Services**. Recipient may receive and use the Information Services solely for its own account and its own internal use solely in connection with the Healthcare Businesses. Recipient may access and use the Supported Software Applications only from the computer equipment at the Healthcare Businesses or any other site designated for use by Recipient including its overseas service locations (and which site is approved in advance by Provider, which approval shall not be unreasonably withheld). The scope of Recipient's use of Information Services is limited to the number of Recipient's beds, users, machines, desktops, patient volumes and other relevant metrics with respect to Recipient immediately prior to the Closing Date. Any growth or increase shall be reported immediately to Provider and will be subject to additional costs retroactive to the effective date of the increase as reasonably supported by documentation of the increase, and any decrease will result in a reduction in cost unless Provider can reasonably demonstrate that its actual costs did not decrease. Recipient will indemnify, defend and hold Provider harmless from any liability, Loss, cost, charge or fee in connection with Recipient's use of Supported Software Applications in excess of the scope of their permitted use or relevant usage metrics. At Recipient's request and pre-approval of any cost estimates, Provider

may from time to time determine to provide consulting or other advisory services to Recipient in connection with Recipient's building out of its own IT infrastructure and related matters ("Consultation"). Such Consultation services are provided at Recipient's cost. Provider is providing Consultation as a courtesy to Recipient and in the interest of facilitating a smooth transition. Provider makes no commitment to any amount of time or amount or level of service in this regard. Any Consultation is an informal arrangement to support Recipient and is limited by Provider's scheduling, staffing and other constraints. Provider disclaims any liability, and Recipient agrees not to hold Provider liable, in connection with its Consultation services. Provider is not responsible for ensuring any specific outcome in connection with its Consultation specifically disclaims any responsibility for the results of such Consultation. Provider is not providing any legal or tax advice, and Recipient should seek assistance from its own advisors in these areas.

      1.3    **Supported Software Applications.** Schedule 1, attached hereto and incorporated herein by reference, sets forth a list of software applications used in connection with the operation of the Healthcare Businesses for which Provider will provide support pursuant to this Agreement (the "Supported Software Applications"), either directly or through outsourcing or other third party arrangements as determined by Provider in its sole discretion. Where and as applicable, Provider will promptly notify Recipient if Provider (i) is required to obtain any third party consents to grant to Recipient a license to use the Supported Software Applications (each, a "Required Consent"), as necessary, (ii) is required to obtain a separate license or (iii) will otherwise continue to provide a Supported Software Application without a Required Consent, in which case Recipient will (A) notwithstanding Section 4.2 and subject to Recipient's pre-approval, reimburse Provider for Recipient's pro-rated share of Provider's out-of-pocket costs or expenses, or (B) have the option to terminate its use of such Supported Software Application. In the event that the use of any Supported Software Application is held by a court of competent jurisdiction to infringe or constitute the wrongful use of any third party's proprietary rights and Recipient's right to use the Supported Software Application is enjoined, or if Provider in the reasonable exercise of its discretion instructs Recipient to cease using the Supported Software Application in order to mitigate potential damages arising from a third party's claim that use of the Supported Software Application infringes on its rights, Recipient shall cease using the Supported Software Application. In such event, Provider shall use commercially reasonable efforts to enforce any contractual rights Provider has against the third-party licensor of the Supported Software Application and, subject to the terms and limitations of the agreement in place with such third party, use commercially reasonable efforts to either have the third party (i) replace or modify the infringing Supported Software Application with suitable non-infringing software or (ii) procure the right of Recipient and Provider to use the Supported Software Application, or if neither (i) or (ii) are practicable, then the Information Service Fees will be reduced by an amount equal to the pro-rated portion of the fees associated with the infringing Supported Software Application (and, if Recipient has previously paid any Information Service Fees associated with the infringing Supported Software Application and such fees are refunded to Provider, then Provider will refund a pro-rated portion of such refunded fees to Recipient).

      1.4    **Data Center**.

      (a)    Certain Supported Software Applications and Supported Hardware reside

in cabinets at leased premises (the "Data Center") within a third party data center facility under that certain [Lease Agreement] between [     ] and Databank, Ltd. dated [     ] ("Data Center Agreement"). The Parties acknowledge that the Data Center contains software, systems and data used in the operation of the Healthcare Businesses as well as Provider's, or its subsidiaries', separate businesses. Provider shall migrate the software and data used in its other businesses from the Data Center prior to the expiration of the Term. Administrative access, use and operation of the Data Center and the software, hardware and equipment located therein used or managed by Provider in the performance of this Agreement is solely allocated to Provider, and Recipient shall not have administrative level rights. Recipient shall be given reasonable access to the Data Center in a manner that is not disruptive to Data Center operations for the limited purpose of (a) overseeing the transition and (b) evaluating the potential assumption of the Data Center Agreement.

(b)      All Supported Software Applications, Supported Hardware, and Transferred Patient Data, defined below, will be migrated from the Data Center pursuant to the terms of this Agreement as Recipient discontinues or assumes responsibility for such items pursuant to this Agreement and the Transition Plan. At the expiration or earlier termination of this Agreement, or such earlier date as Provider gives written notice to Recipient that the last Supported Software Application has been removed from the Data Center and the Data Center is no longer needed for the Information Services, the Parties will work in good faith to assign the Data Center Agreement to Recipient. For avoidance of doubt, regardless of whether assigned, Provider shall continue all financial responsibility for and make all payments under the Data Center Agreement when due in accordance with Section 1.10(e) (Long Term Agreements).

1.5      **Supported Hardware.**

(a)      Schedule 1 sets forth the list of hardware used in connection with the Healthcare Businesses for which Provider will provide support pursuant to this Agreement (the "Supported Hardware"). Schedule 1 shall identify Supported Hardware that is (i) leased by Provider and provided to Recipient subject to the terms of the applicable lease together with the estimated monthly fee applicable to such use ("Leased Hardware"); (ii) owned by Recipient pursuant to the MIPA and licensed by Recipient to Provider hereunder for purposes of performing under this Agreement; or (iii) owned by Provider and licensed to Recipient for the limited purpose of performing under this Agreement. Recipient shall comply with the terms of all third party agreements applicable to the Supported Hardware to the extent those terms have been made available to Recipient.

(b)      At the expiration or earlier termination of this Agreement, or such earlier date as Provider gives written notice to Recipient that Leased Hardware is no longer needed for the Information Services the Parties will work in good faith to obtain written assignments from the lessor of the applicable lease agreement to Recipient. For avoidance of doubt, regardless of whether assigned, Recipient shall assume all financial responsibility for and make all payments when due under the applicable lease agreements in accordance with Section 1.10(e) (Long Term Agreements).

1.6      **Data Integrity and Information Security Measures.** In connection with

5

the Information Services provided under this Agreement, Provider and Recipient agree to the Information Security Requirements set forth in Schedule 2, attached hereto and incorporated herein by reference. For avoidance of doubt, information security services for Recipient's IT infrastructure as it is built out during Term by Recipient (and external to the IT infrastructure used for the Information Services), shall be provided by Recipient's own team and shall not be acquired from Provider.

1.7 **Electronic Mail System Access; Electronic Records.** Within ninety (90) days after the Effective Date or as soon as reasonably possible due to dependency on other migratory activities, Recipient shall transition Recipient's employees, representatives and agents ("Recipient Employees") to its own Microsoft electronic mail system. As of the Effective Date, Recipient Employees shall not use "pipelinehealth.us" e-mail addresses, or any other email domain owned by Provider or its subsidiaries, other than the domains transferred to Recipient at Closing (@weisshospital.com and @westsubmc.com). During the ninety (90) day period after the Effective Date, Recipient and the Recipient Employees may have continued access and use of Provider's electronic mail system as historically used to send and receive email (only using the @weisshospital.com and @westsubmc.com domains) and Provider will, as part of the Information Services, assist Recipient in the transfer of the email database to Recipient's new Microsoft system.

1.8 **Meaningful Use Reporting.** Provider and Recipient agree to work together in good faith to have Meaningful Use and eMeasures reporting capabilities maintained at the Facilities to enable Recipient to analyze and monitor its data for the Term; provided that if there are any costs shared with Provider's other hospitals, allpro-rated costs of Provider with respect thereto shall be borne by Recipient as set forth in Schedule 4.

1.9 **Transferred Patient Data**.

(a) **Identification and Storage**. As of the Effective Date, Provider stores and accesses all patient data involving any of Provider's businesses (including the businesses of the Facilities) (the "Patient Data") through various software applications and systems (the "Applications") in the Data Center or with a third party hosted or cloud service. As contemplated by the MIPA, Recipient will own and operate Provider's Chicago businesses (the "Transferred Businesses") following the Closing. Recipient and Provider jointly believe that it is necessary and in the best interest of the patients of the Transferred Businesses that Provider and/or its third party hosting or other service providers (which are Provider's Business Associates), provide access to Patient Data with respect to the patients of the Transferred Businesses (the "Transferred Patient Data"). Recipient acknowledges that the Transferred Patient Data is collectively stored with the other Patient Data and will, to the extent possible, limit its access, use and disclosure to only the Transferred Patient Data and will, to the extent possible, access, use, and disclose the Transferred Patient Data only (i) to the minimum necessary in order for Recipient to accomplish the intended purpose of the permitted use, disclosure or request; (ii) to conduct appropriate treatment, payment and health care operations as permitted by the HIPAA Rules (defined below); and (iii) as permitted by the privacy, information security and breach notification regulations, including the regulations contained in 45 C.F.R. Parts 160 and 164, promulgated under the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA") and the HITECH Act, as otherwise

6

amended from time to time ("HIPAA Rules").

(b)     **Access; Transition**. In furtherance of the foregoing, Provider shall, to the extent permitted by and subject to applicable laws and regulations and the terms of such Applications, provide, or cause to be provided, access to the Transferred Patient Data as shall be reasonably necessary to facilitate Recipient's transition of the Transferred Businesses during the Term or such earlier date as Recipient and Provider agree Recipient is able to extract and transfer the Transferred Patient Data to Recipient only for the purposes described above consistent with the HIPAA Rules. Such access to Transferred Patient Data shall be made available to persons employed by Recipient, in each case, to the extent such persons had similar access prior to the Effective Date. Recipient may also request and Provider shall not unreasonably withhold approval of additional individuals to be granted access to the Transferred Patient Data (or other data) from time to time to enable Recipient to operate the Healthcare Businesses, including without limitation new residents that may be associated with the Transferred Businesses, new employees, etc. Provider will further segregate any and all Transferred Patient Data that may reside in applications that commingle data with Provider's other hospitals and ensure that all Transferred Patient Data in Provider's possession is duly transferred to Recipient in an industry-standard format determined by Recipient. For avoidance of doubt, the cost of de-commingling Transferred Patient Data with other data held by Provider is borne by Provider and the cost of converting or transforming Transferred Patient Data into any other format or otherwise transforming such data to meet Recipient's requirements is borne by Recipient. In compliance with a data transition plan mutually agreeable to Provider and Recipient to be developed promptly after the Effective Date but in no event later than the expiration of the Term, Recipient will transfer such Transferred Patient Data to a separate environment as soon as practicable, as approved by Provider, and in a manner consistent with the HIPAA Rules. Recipient shall use appropriate safeguards and comply with applicable provisions of the HIPAA Rules with respect to the PHI (as defined in the HIPAA Rules) included in the Patient Data, in order to prevent the access, use or disclosure of PHI other than as provided in this Agreement and in accordance with the HIPAA Rules. Recipient shall ensure that the actions or omissions of its employees or agents do not breach the terms of this Agreement.

(c)     **Restrictions**. Recipient acknowledges that the Patient Data (including Transferred Patient Data) contains sensitive information under applicable Federal and State laws, including but not limited to HIPAA Rules, and that it shall not disclose any of such information that does not exclusively relate to the Transferred Businesses to any individual other than as set forth herein. Recipient agrees to use commercially reasonable efforts to prevent unauthorized access, use or disclosure of the Patient Data (including Transferred Patient Data), including through efforts and security measures no less favorable than by which Recipient collects, stores, transfers and uses its own patient data, including but not limited to the HIPAA Rules. Recipient represents that it has entered into a HIPAA-compliant Business Associate Agreement with each of the Application providers that are making available the Applications to Recipient pursuant to which Recipient will access Patient Data. Recipient also agrees to promptly report to Provider in writing, and in no case later than five (5) business days of becoming aware of such occurrence: (1) any access, use or disclosure of PHI by Recipient, its agents or employees with respect to the Patient Data not provided for by this Agreement; (2) any Breach of Unsecured PHI (as defined by the HIPAA Rules) by Recipient, its agents or employees arising from the Applications; and (3) any Security Incident (as defined by the HIPAA Rules) by Recipient, its agents or employees with

7

respect to the Patient Data.

(d)      **Indemnity with Respect to Patient Data**. Each Party ("Indemnitor") shall indemnify each Indemnitee from all third party claims, losses, damages, fines, penalties, proceedings, costs, expenses (including reasonable attorneys' fees) and other liabilities ("Losses") to the extent arising or resulting from (i) Indemnitor's access to the Patient Data (including the Transferred Patient Data), or (ii) Indemnitor's use of the Patient Data (including the Transferred Patient Data) and any disclosure thereof (whether intentional or unintentional, including as a result of any breach or security incident), except to the extent such Losses were caused by the gross negligence or willful misconduct of Indemnitee.

1.10      **Administration.**

(a)      **Transition Planning and Execution.** Commencing as promptly as possible after (if not commenced prior to) the Effective Date, Provider will work jointly with Recipient to prepare (and the Parties will use reasonable best efforts to complete within five (5) Business Days following the Effective Date an initial draft of) a high level transition plan for all Information Services, Supported Hardware, Supported Software Applications and the Data Center hereunder to transition them to Recipient or its contractors prior to the expiration of the Term (the "Information Services Transition"), including sequencing, milestones, time line, and allocation of responsibilities between Provider and Recipient and protocols and processes for approvals/notifications between the Parties, which the Parties agree may need to be modified from time to time during the Term as the Information Services are delivered and as circumstances and Recipient and Provider needs and resources evolve and transition (the "Transition Plan"). The Parties will use best efforts to comply with the Transition Plan and cooperate with each other in furtherance of the Information Services Transition to Recipient or its contractors prior to the expiration of the Term. While Provider is responsible for the performance of the Information Services, Recipient is responsible for effecting a smooth transition of the Information Services from Provider to Recipient in accordance with the Transition Plan, defined below, over the Term. Recipient acknowledges and agrees that its delay or failure to perform its obligations, respond to inquiries in a timely manner, or comply with the terms of this Agreement may impact Provider's ability to perform and cost of performance.

(b)      **Project Management**. Each Party shall provide a single point of contact for administration of this Agreement reasonably acceptable to the other Party ("Project Manager"). Each Party shall identify its Project Manager within five (5) business days after the Effective Date. Any replacement Project Manager shall be subject to the other Party's approval, which shall not be unreasonably withheld or delayed. The Project Managers shall be vested by their respective Party with sufficient authority to effectively administer this Agreement. The Project Managers together with any additional representatives requested by either Party shall meet once every week during the Term on a mutually agreeable schedule to review progress against the Transition Plan, report on status, and raise any issues or concerns. Provider will take minutes of the meeting and track assigned action items. Provider will utilize an established ticket system for managing issues and projects and other administrative protocols and Recipient and its contractors will cooperate and comply with such systems established by Provider. Prior to initiating any action or proceeding, any dispute, controversy or claim arising out of, relating to or in connection with the Information Services or this Agreement, or the breach, termination,

8

interpretation or validity thereof (a "Dispute"), shall be resolved by submitting such Dispute in writing first to the Project Managers, and the Project Managers shall seek to resolve such Dispute through good faith negotiation. If any Dispute is not resolved by the good faith negotiation between such persons within thirty (30) Business Days (or such longer period as the Parties may agree in writing) after the claiming Party or Parties provides Notice to the other Party or Parties of the Dispute, then the claiming Party or Parties may pursue any other remedy to which they may be entitled (in accordance herewith) at law or in equity.

(c)     **Transition of Certain Aspects of Information Services.** Due to interdependencies between software, hardware and other services that compose the Information Services, the Parties acknowledge that some elements may not be able to be transitioned to, or discontinued by, Recipient until others are also approved for transition or dealt with, as identified in the Transition Plan or otherwise documented by Provider. The Parties will work together to determine and agree as to when and the circumstances under which the transition of any software, hardware or other aspect of the Information Services to Recipient (*e.g.*, connecting the Information Services to Recipient's network, connecting any resources on Recipient's network to the Information Services, any "cut-over" or "switch-over") can be effected without material disruption or other adverse impact on the delivery of Information Services hereunder.

(d)     **Discontinuation of Certain Aspects of Information Services**. Subject to Section 1.10(c) above, Recipient may discontinue use of, or transition to itself or any third party, any Supported Software Application, Supported Hardware, the Data Center or other service under contract listed in Schedule 1 (a "Discontinued Service") without Provider's prior written consent, upon 30 days prior written notice to Provider. Provider's financial and other responsibilities for such Discontinued Service must be paid, or contractually assumed, by Recipient to Provider's satisfaction pursuant to the terms of Section 1.10(e) (Long Term Agreements); provided, however, that the Parties will negotiate with the applicable Vendor in good faith to attempt to reduce the amount owed and if any Long Term Agreements are shared services with Recipient facilities, Recipient is only responsible for its pro-rata share. If Provider reasonably agrees in writing to permit Recipient to discontinue or transition any Discontinued Service, such writing must also include the effective date when use shall cease, and thereafter Provider shall discontinue providing Information Services to Recipient with respect to such Discontinued Service. Provider and Recipient shall in good faith negotiate a reduction of the applicable portion of the Information Service Fee described in Schedule 4 of this Agreement to take into account the fact that Recipient will discontinue use of the applicable Discontinued Service.

(e)     **Long Term Agreements**. Provider will work in good faith towards the termination of all Long Term Agreements, defined below, prior to the end of the Term unless otherwise required by the terms of the Transition Plan. If not so terminated and if Recipient does not or is unable to assume all responsibility for the Long Term Agreements (through an assignment and assumption, subject to the third party's consent if applicable) prior to the expiration or earlier termination of this Agreement, then Recipient agrees to continue to pay to Provider Recipient's allocated portion (based on the terms of this Agreement as if such Discontinued Service was not discontinued) of the remaining obligations thereunder for the remainder of the term of such Long Term Agreement payable at least thirty (30) days prior to the

9

date of the applicable payments owed by Provider. "<u>Long Term Agreements</u>" are defined as third party licenses and agreements for Supported Software Applications, Supported Hardware, the Data Center or other agreements listed in <u>Schedule 1</u> (as may be amended by mutual agreement of the Parties upon finalization of the Transition Plan) that pertain to the Healthcare Businesses and (i) either (A) by their terms extend beyond the Term or (B) are required to be renewed or extended during the Term as determined by mutual agreement of both Parties and, therefore, extend beyond the Term; and (ii) are necessary to Provider's provision of Information Services or are a dependency for other Supported Software Application or Supported Hardware during the Term in Provider's reasonable judgment after consultation and agreement by Recipient and, therefore, extend beyond the Term; <u>provided</u> that to the extent that Recipient does not agree with respect to any matter in clause (i)(B) or clause (ii), Recipient shall be responsible, and Provider shall not be liable, to the extent that any Information Services or the performance thereof are delayed or otherwise adversely affected or prevented or any others consequences, direct or indirect whether or not foreseen or foreseeable, including with respect to Recipient's business and health care services.

(f)    **Discontinued Service Data**. As part of the Information Services, Provider will assist Recipient in creating extracts, as reasonably required, of Transferred Patient Data from Discontinued Services, subject to the terms of the applicable third party agreement for such applications or system, prior to the effective date of decommissioning from the Information Services. Recipient acknowledges that after a Discontinued Service is decommissioned or the applicable third party agreement for a service is terminated or expired, there may no longer be access to the related Transferred Patient Data.

1.11    **Access to Premises**.

(a)    In order to enable the provision of the Information Services by Provider, Recipient agrees that it shall provide to Provider, its employees, and any Subcontractors or Vendors who provide Information Services access to the locations and facilities, assets, and books and records of Recipient and the Facilities, in all cases to the extent reasonably necessary for Provider to fulfill its obligations under this Agreement. For the sake of clarity, Recipient will not be responsible for any travel expenses incurred by Provider employees or Subcontractors or any other party acting on Provider's behalf unless such expense was preapproved by Recipient in writing.

(b)    Provider agrees that all of its employees and any Subcontractors or Vendors, when on the property of Recipient or the Facilities, shall conform to and comply with the policies and reasonable procedures of Recipient concerning health, safety, and security which were made available to Provider in advance in writing.

1.12    **Use of Dedicated Employees**. The provision of the Information Services by Provider requires the services of certain personnel of Recipient or the Facilities (the "<u>Dedicated Employees</u>"). The initial list of Dedicated Employees is attached as <u>Schedule 3</u>.  Recipient will make the Dedicated Employees available to the Provider initially on a full-time basis consistent with their roles prior to the Closing. The Parties shall cooperate in good faith to transition the Dedicated Employees and their time to Recipient's operations as Recipient transitions over time from the Information Services to Recipient's own stand-alone information technology operations.

Dedicated Employees shall perform the Information Services and any work with respect to the Data Center, Applications, Supported Software Applications, and Supported Hardware under the sole direction of Provider and Recipient shall instruct the Dedicated Employees to comply with the direction, applicable policies, and guidelines of Provider in connection therewith. Recipient shall remain in all respects the sole employer of the Dedicated Employees. Recipient shall use commercially reasonable efforts, in its business judgment with respect to its own hiring needs, to hire replacements for any terminated Dedicated Employees; provided that an individual shall not become a Dedicated Employee (other than as set forth on Schedule 3 as of the date hereof) without the prior written consent of Recipient (not to be unreasonably conditioned, delayed, or withheld). To the extent any Dedicated Employee does not comply with the direction of Provider, any Dedicated Employee takes action at the direction of Recipient that is not at or consistent with the direction of Provider, Recipient prevents or restricts any Dedicated Employee from performing at the direction of Provider (including by reassigning such Dedicated Employee restricting the time that such Dedicated Employee is made available to Provider), or the employment of any Dedicated Employee with Recipient is terminated, in each case, Recipient shall be responsible, and Provider shall not be liable, to the extent that any Information Services or the performance thereof are delayed or otherwise adversely affected or prevented or any others consequences, direct or indirect whether or not foreseen or foreseeable, including with respect to Recipient's business and health care services. Provider shall not be liable under this Agreement for matters primarily attributable to, or that are a consequence of, any actions or inactions of a Dedicated Employee, except for any such actions or inactions undertaken pursuant to the specific direction of the Provider. All Dedicated Employee are and shall remain for all purposes employees of Recipient or the applicable Facility and shall not be deemed to be employees of Provider for any reason. Recipient or the applicable Facility is responsible for all payroll, vacation and sick time, benefits, employment taxes, withholding, workers' compensation insurance and other obligations of an employer in compliance with applicable law at Recipient's cost and expense.

1.13    **Audit**. Recipient will comply with applicable audit provisions in Provider's agreements for the Supported Software Applications and Supported Hardware, for example, to confirm compliance with the scope, restrictions and terms of such third party agreements. In the event any such audit reveals Recipient has exceeded the applicable scope limitations or other breach, Recipient shall be liable for, and shall indemnify Provider from, all related costs and expenses actually incurred by Provider as a result and Recipient shall take any additional steps required to cure any such breach.

1.14    **Disclaimer**. Unless expressly provided otherwise herein: (i) Provider shall be required to provide the Information Services hereunder only to the extent that such Information Services were provided to the Healthcare Businesses in the ordinary course prior to the Effective Date and (ii) the Information Services provided by Provider hereunder shall be available only for the purposes of conducting the Healthcare Businesses. Provider has sole discretion over the manner, method, means, location of performing the Information Services and its own staffing requirements; provided that (A) the Information Services will maintain the same functionality and service levels as prior to the Effective Date, (B) Provider will otherwise comply with the requirements of this Agreement, and (C) Provider will work in good faith with Recipient to facilitate an efficient and timely completion of the Transition Plan. Provider will make best efforts to control costs and provide Information Services on an efficient basis. Except as

11

specifically provided herein, Provider makes no, and Recipient is not relying on any, representations or warranties of any kind, implied or express, with respect to the Information Services, including, without limitation, no warranties of merchantability or fitness for a particular purpose, which are specifically disclaimed.

1.15    **Cerner**. As the Cerner systems included in the Information Services are multi-tenant services used by other Provider hospitals, Provider has the right, in consultation with Recipient, to declare a reasonably timed "blackout period" for the Cerner systems during which no changes can be made for a limited period of time in order to properly administer the Cerner systems. Provider will provide Recipient with notice of any such required Cerner blackout periods on the same timing as it provides notices to its own operations and will work with Recipient to minimize disruption to the Healthcare Businesses by scheduling such blackout periods during off-peak hours when scheduled maintenance would typically occur if reasonably possible. Without limiting Recipient's obligations under the MIPA, Recipient agrees to use its reasonable best efforts to negotiate and enter into a separate license agreement with Cerner with respect to the Facilities only (*i.e.*, not including any of Provider or any of its Affiliates or businesses) as promptly as practicable.

## SECTION 2 - TERM

2.1    **Term.** The term of this Agreement shall commence on the Effective Date and continue for eighteen months thereafter, unless sooner terminated in accordance with the provisions hereof (the "Term"). Notwithstanding anything in this Section 2.1 or otherwise in this Agreement to the contrary, Recipient acknowledges that Provider's ability to make available third party applications to Recipient is limited by the terms of Provider's agreements for such third party applications, and that in no event shall Provider be required to provide Information Services with respect to such third party applications beyond the term and scope permitted in Provider's agreements for such third party applications; provided that the foregoing shall not limit Provider's obligations to assist Recipient in obtaining any licenses necessary for Recipient to continue to receive the Information Services contemplated hereunder to the extent provided in Section 5.2.

2.2    **Termination For Cause.** Either Party may terminate this Agreement upon written notice to the other Party if the other Party commits a material breach of this Agreement and, to the extent such breach is curable, fails to cure such breach within thirty (30) days after written notice of such breach is provided by the nonbreaching Party to the breaching Party. For purposes hereof, a material breach of this Agreement shall include, without limitation, the breaching Party becoming insolvent or admitting in writing its insolvency or inability to pay its debts as they become due; being unable or not paying its debts as they become due; making or proposing an assignment for the benefit of creditors; convening or proposing to convene a meeting of its creditors or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; proposing any such moratorium, extension or composition; or commencing or having filed against it any bankruptcy, reorganization, liquidation or insolvency proceeding under any law in any jurisdiction for the relief of debtors; or if any receiver, trustee, liquidator or custodian is appointed to take possession of any substantial portion of the breaching Party's assets; provided, however, that Recipient acknowledges that, as of the Effective Date, Provider is a debtor in a chapter 11 bankruptcy case pending in the United States Bankruptcy Court

12

for the Southern District of Texas under case number 22-90291 (MI) (the "Bankruptcy Case") and agrees that none of the foregoing actions in or in connection with the Bankruptcy Case shall constitute a material breach of this Agreement.

2.3     **Effect of Termination.** Termination of this Agreement in whole or in part, for cause, shall be without prejudice to any other remedy otherwise available to the Parties. Except as provided in Section 2.4 below or unless the failure to complete the Transition Plan during the Term was primarily caused by Provider's breach of this Agreement, Provider has no obligation to continue providing Information Services after the expiration of the Term and, to the extent it agrees to do so, such services will be provided on fees and charges established by Provider and not on the financial terms of this Agreement.

2.4     **Effect of Provider Bankruptcy.** All rights and licenses granted by Provider to Recipient under this Agreement to intellectual property owned or, to the extent legally permitted, licensed by Provider, if any, are and shall be deemed to be rights and licenses to "intellectual property," and the Supported Software Application to which Recipient is granted access hereunder is an "embodiment" of such "intellectual property," in each case, as such terms are used in and interpreted under section 365(n) of the United States Bankruptcy Code (the "Bankruptcy Code") (11 U.S.C. § 365(n)). With respect to licenses to intellectual property granted by Provider to Recipient under this Agreement, Recipient shall have all rights, elections, and protections of a licensee under an executory intellectual property contract under the Bankruptcy Code and all other applicable bankruptcy, insolvency, and similar laws with respect to this Agreement and the subject matter hereof. Without limiting the generality of the foregoing, Provider acknowledges and agrees that, subject to Recipient's rights of election under 11 U.S.C. § 365(n), all licenses granted to Recipient under this Agreement to intellectual property owned or, to the extent legally permitted, licensed by Provider, if any, will continue subject to the respective terms and conditions hereof, and will not be affected, even by Provider's rejection of this Agreement.

2.5     **Expedited Arbitration**. Provider or Recipient may submit any disputes, claims or other disagreements regarding the material breach ore the termination of this Agreement for cause and the subsequent dissolution of their relationship to expedited arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Claims shall be heard by a single arbitrator. The arbitrator shall be knowledgeable in the management and operation of in patient health care facilities. The place of arbitration shall be Chicago, Illinois. The arbitration shall be governed by the laws of the State of Illinois. Time is of the essence for any arbitration under this agreement and arbitration hearings shall take place within ninety (90) days of filing and awards rendered within one hundred twenty (120) days. Arbitrator(s) shall agree to these limits prior to accepting appointment. The arbitrator shall award the costs and expenses of the arbitration, including attorney's fees, to the prevailing Party as determined by the arbitrator in its discretion. Except as may be required by law, neither a Party nor the arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both Parties.

**SECTION 3 – OUTSOURCING/SUBCONTRACTING**

13

3.1 **Subcontractors and Vendors**. Notwithstanding anything contained in this Agreement to the contrary, it is expressly understood that Provider has contracted, and in its discretion may in the future contract, with third parties for the provision of data processing, support and maintenance and other services in connections with its performance of the Information Services. Third party service providers fall into two categories: (i) third parties under Provider's control who are performing Information Services as part of Provider's own staff but who are not employees of Provider ("Subcontractors"); and (ii) third party software licensors, hosting providers or hardware manufacturers/distributors as well as other third parties not under Provider's control (each, a "Vendor"). Provider shall determine in its reasonable discretion and in consultation with Recipient, whether to provide any Information Services directly or through Subcontractors. Provider will work to control costs and provide the Information Services on an efficient basis. Provider will remain responsible for the actions or inactions of a Subcontractor. Except as otherwise expressly set forth in the proviso to the second sentence of Section 1.10(d) or Section 4.9(b), Provider is not responsible, and shall not be liable, for, and shall not have any liability hereunder arising from, (x) the actions or inactions of a Vendor, (y) the availability of any Information Services hosted or provided by a Vendor, or (z) the performance of (or failure to perform) software/hardware warranty, maintenance support or other services provided by a Vendor, in each case, including without limitation any Vendor's compliance (or non-compliance) with the applicable agreement(s) with such Vendor. Pipeline will use reasonable efforts to enforce the terms of the applicable Vendor agreement in the event of the Vendor's breach.

3.2 **Costs**. In the event that Provider's costs to provide Information Services under this Agreement are increased or decreased as a result of changes in any outsourcing or other third party arrangement, the Information Service Fee provided for in Section 4.1 below shall increase or decrease on a pass-through basis; provided that Provider shall notify Recipient in writing of any fee increase or decrease as soon as practicable and provide adequate documentary evidence of any increases or decreases. If Pipeline reasonably determines there is no dependency on another aspect of the Information Services and if the applicable third party agreement permits such action without any cost or fee, Recipient may, on written notice to Provider within 30 days after its receipt of notice of the cost increase, reject the price increase and may choose to discontinue that entire or part of that service impacted by the third party price increase with no further financial obligation. Recipient and Provider will work in good faith to agree upon outsourced subcontracted resources (taking into account, among other reasonable business considerations, the continuity to be afforded by continuing or promptly renewing such resources; such resources' prior experience and/or familiarity with the Information Services, the resources involved in the Information Services, and the use of the Information Services; the effect of such resource on the provision of Information Services and the completion of the Transition Plan; such resources' competencies; and qualifications, and price); provided that to the extent that Recipient does not agree with respect to good faith suggestions by Provider for such resources, Recipient shall be responsible, and Provider shall not be liable, to the extent that any Information Services or the performance thereof are delayed or otherwise adversely affected or prevented or any others consequences, direct or indirect whether or not foreseen or foreseeable, including with respect to Recipient's business and health care services.

**SECTION 4 - INFORMATION SERVICE FEE, EXPENSES, TAXES**

14

4.1 **Information Service Fee.** Recipient shall reimburse to Provider the costs, including fully burdened labor costs, incurred for Information Services performed by Provider, directly or through Subcontractors, or incurred from Vendors (the "Information Service Fee") in the amounts and on the payment terms provided in Schedule 4, as such costs are updated from time to time pursuant to the terms of this Agreement. To the extent Information Services are being provided through Subcontractors, Provider represents and warrants that the Information Service Fee will be solely on a pass-thru basis of the amounts charged to Provider by such Subcontractors and will not include any mark-up, surcharge, or similar charge by Provider with respect to such pass-thru amounts.

4.2 **Estimates**.

(a) The Information Service Fee is intended to cover all costs and expenses in connection with the performance of this Agreement (other than reimbursable expenses under Section 4.4). Therefore, the Parties acknowledge that the information provided on Schedule 4 is an estimate provided by Provider in good faith. Schedule 4 reflects the estimated Information Service Fee (not including amounts to be passed through and paid to third parties), and the Information Service Fee with respect to the resources set forth in Schedule 4 shall be invoiced in accordance with the information on Schedule 4. Work that is projected to require additional costs from with respect to the resources set forth in Schedule 4 which additional costs exceed Schedule 4 will not be initiated, and any such additional costs will not take effect, until Recipient approves writing; provided that to the extent that Recipient does not so approve, Recipient shall be responsible, and Provider shall not be liable, to the extent that any Information Services or the performance thereof are delayed or otherwise adversely affected or prevented or any others consequences, direct or indirect whether or not foreseen or foreseeable, including with respect to Recipient's business and health care services. The annual Information Service Fee with respect to the resources set forth in Schedule 4, as adjusted from time to time, divided by 12 is defined as the "Estimated Monthly Information Services Fee". Provider will invoice Recipient the Estimated Monthly Information Services Fee, in advance by the first day of each month for that month. Recipient shall remit payment in full to Provider of undisputed amounts no later than the first day of the immediately succeeding month (that is, between 28 and 31 days, depending on the month, after receipt of each such invoice). If: (i) the Effective Date is other than the first day of any calendar month or (ii) the effective date of termination is other than the last day of any calendar month, Recipient shall pay Provider a prorated Estimated Monthly Information Services Fee for the first or last partial month of the Agreement. On a monthly basis Provider will reconcile the Estimated Monthly Information Services Fee paid against the actual incurred and report such reconciliation to Recipient with supporting documents detailing such reconciliation. If the actual costs exceeded the estimate, Provider will work with Recipient in good faith to contain such costs before reflecting any revised estimate and any amounts underpaid on the next subsequent invoice. If the actual costs were less than the estimate, Recipient will receive a credit from Provider on the next subsequent invoice. Recipient agrees that it shall make any invoice disputes reasonably and in good faith and shall make and limit any such dispute to only the portion of the invoice that is disputed. (By way of example, if Recipient reasonably and in good faith believes an invoice is too high, Recipient shall dispute only the portion by which Recipient reasonably and in good faith believes exceeds the accurate amount.) To the extent that Recipient disputes invoiced amounts

15

and withholds payments of such amounts and Provider is unable to satisfy related costs and expenses to deliver related to Information Services and as a result is unable to deliver such related Information Services, Recipient shall be responsible, and Provider shall not be liable, to the extent that any Information Services or the performance thereof are delayed or otherwise adversely affected or prevented or any others consequences, direct or indirect whether or not foreseen or foreseeable, including with respect to Recipient's business and health care services.

(b)     If Recipient disputes reasonably and in good faith any amount on an invoice, Recipient shall deliver notice to Provider within ten (10) days of Recipient's receipt of such invoice setting forth in reasonable detail the basis for disputing such amount, and Recipient shall be entitled to withhold payment only of the amount in dispute pending resolution of such dispute in accordance with the terms hereof. Upon receipt of such notice, Provider and Recipient shall use commercially reasonable efforts to resolve such dispute in good faith for a period of ten (10) Business Days. To the extent such dispute is resolved, upon the resolution of such dispute, to the extent Recipient owes Provider some or all of the amount withheld, Recipient shall pay promptly (and in any event, within three (3) days of the date of such resolution) to Provider. If Recipient fails to comply with any terms of payment, Provider, in addition to its other rights and remedies, but not in limitation thereof, may withhold further Information Services. Provider shall be entitled to reasonable attorneys' fees, disbursements, and costs of collection incurred in connection with collection of any unpaid sums under this Agreement from Recipient.

4.3     **Pass Through Payments**. Some licenses and third party agreements are payable on an annual, quarterly or other periodic basis (other than monthly) and those costs will be passed through by Provider to Recipient and payable outside of the monthly estimate process outlined in Section 4.2 within thirty days (30) days after receipt of a sufficiently detailed invoice documenting the pass through expense to Provider and any applicable proration if such service is shared with other Provider businesses.

4.4     **Travel Expenses**. Recipient shall reimburse to Provider all out of pocket travel related expenses expressly pre-approved by Recipient in writing and incurred by Vendors or by Provider or its Subcontractors on behalf of Recipient in connection with this Agreement. These expenses will be invoiced monthly and are payable within thirty(30) days after receipt of an accurate and sufficiently detailed invoice.

4.5     **Taxes.** Recipient shall pay all sales, use and personal taxes, or payments in lieu of taxes, however levied or assessed, arising from this Agreement; provided, however, that Provider shall pay all taxes assessed based upon the net income of Provider.

4.6     **Late Payments**. In the event Recipient fails to make any undisputed payment when due, interest shall accrue on the undisputed amount due from the date such payment is due until it is paid at a per annum rate equal to the prime rate reported by the Wall Street Journal in its "Money Rates" or successor section on the date such payment is due plus five percent (5%) (or the maximum rate allowed by law, whichever is less). In addition, if any such late payment is not fully paid by Recipient within thirty (30) days of the applicable due date, (a) the rates and fees under this Agreement shall be subject to a twenty percent (20%) automatic increase for until such time as all past due amounts are paid in full, (b) Provider

16

may terminate this Agreement for cause immediately by providing written notice thereof to Recipient; and (c) Provider may take any and all actions necessary to assign or transfer to Recipient all software, hardware, subscription, services and other agreements contemplated to be transferred to Recipient hereunder along with the financial responsibility therefor (the "Early Assignment"). Recipient appoints Provider full irrevocable power and authority in the place and stead of Recipient and in the name of Recipient for the purpose of carrying out the Early Assignment, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to accomplish the purpose of the Early Assignment. Recipient hereby ratifies all that Provider shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

4.7     **Recipient Audit Right**. Provider shall allow the Recipient or its designees to review and audit Provider's financial books and records relating to the performance of this Agreement for the sole purpose of verifying amounts charged to and paid by Recipient. If an audit determines that Provider has overcharged Recipient, and Recipient has therefore overpaid, during the time period subject to audit, Provider will credit the Recipient in an amount equal to the overpayment. Any credits remaining at the expiration or earlier termination of this Agreement will be refunded to Recipient. Recipient may audit Provider no more than once per calendar quarter, on 7 business days' advance notice and in a manner that does not disrupt the operations of Provider.

4.8     **Direct Payments.**

(a)     If Provider fails to pay a licensor of a Supported Software Application amounts due with respect to the Healthcare Businesses on a timely basis, except in connection with a good faith dispute with such licensor, and Provider fails to cure the nonpayment within ten (10) business days after receipt of notice from Recipient of its intend to pay directly under this Section 4.8, Recipient may make such payment directly to the licensor and shall provide notice to Provider of such payment on the same day it is made, accompanied by sufficient detail for Provider to account for such payment.

(b)     For Vendor agreement entered into in the name of a Facility, Recipient will timely pay amounts due under such agreement directly to the applicable Vendor. Provider will continue to manage the applicable applications and services that are still subject to or interdependent with remaining Information Services, while jointly working with Recipient for transition as will be outlined in 1.10 Administration.

4.9     **Extension Fee**. If the Information Services Transition is not completed in full by the end of the Term and Provider determines in its discretion to extend the Term or otherwise continue to provide any Information Services, then in addition to Provider's other rights or remedies, the Information Service Fee shall increase by ten percent (10%) for the subsequent six (6) month period. Thereafter, the Information Service Fee then in effect shall be increased by ten percent (10%) every subsequent six (6) month period if Provider determines to continue to provide any Information Services in its discretion. If the Information Services Transition is not completed by the end of the Term, or as applicable by the end of any extension period, due primarily to the material breach of Provider and not the breach or other action or inaction of

17

Recipient, no such fee increase shall apply to the next period.

### SECTION 5 - USE OF SUPPORTED SOFTWARE APPLICATIONS

5.1     **Rights in Supported Software Applications.** Recipient shall obtain no rights in the Supported Software Applications other than the rights to use them as specifically granted in this Agreement. Recipient shall receive no title to or proprietary interest in the Supported Software Applications as a result of this Agreement, including, without limitation, any systems, programs, operating instructions or other documentation relating to the Supported Software Applications.

5.2     **Supported Software Applications Use License.**

(a)     Provider hereby grants to Recipient a license to use the Supported Software Applications subject to the terms, conditions and limitations of this Agreement and to the extent Provider has the right to grant such license pursuant to the terms of the underlying license agreement. Such license shall expire contemporaneously with the earlier of the expiration or termination of this Agreement or the underlying license agreement. Recipient acknowledges and agrees that the use by Recipient of the Supported Software Applications is subject to the terms of the underlying license agreement. Without limiting the foregoing, Recipient agrees to comply with the third party license terms, including but not limited to the Microsoft End User License Terms (together with all updates thereto from Microsoft) with respect to all Microsoft software applications included in the Supported Software Applications or otherwise made available by Provider to Recipient, and that Microsoft and the other third party licensors shall be a third-party beneficiary with respect thereto.

(b)     Recipient shall not copy, decompile, or otherwise reverse engineer the Supported Software Applications.

(c)     Upon termination or expiration of this Agreement or the earlier termination of Provider's provision of the Supported Software Applications, Recipient's access to the Supported Software Applications as applicable shall be discontinued and Recipient shall return all related documentation to Provider. Recipient shall certify in writing to Provider that Recipient has divested itself of all ability to implement and access the Supported Software Applications and destroyed or returned, as applicable all documentation as required hereunder.

(d)     Provider hereby agrees to use commercially reasonable efforts to cooperate with Recipient's efforts to obtain an assignment of or replacement licenses and support/maintenance agreements, in Recipient's name and at Recipient's sole cost and expense, for any Supported Software Applications directly with the applicable software licensor or other contracting party.

(e)     For the avoidance of doubt, nothing in this Agreement or the provisions of Information Services hereunder shall be deemed an assignment, novation or other transfer of any license or other agreement to which Provider is a party unless (i) otherwise agreed by Provider,

18

Recipient and, to the extent required under the applicable agreement, the third party or (ii) effected by Provider in accordance with Section 4.6. As a result, Recipient acknowledges that following the end of the Term, to the extent Recipient desires to continue using such applications, it shall be solely responsible for obtaining its own license or other access to such applications or services from the appropriate third parties along with any associated maintenance and support.

5.3     **Return of Equipment.** No later than thirty (30) days after Recipient is no longer receiving the Information Services in accordance with the terms of this Agreement (whether such event occurs as a result of the expiration or the earlier termination of this Agreement), Recipient shall: (a) return the hardware described on Schedule 5, as it may be updated from time to time by mutual agreement or to reflect, *e.g.*, hardware that Provider lends to Recipient or is used in connection with passing data via shuttle, (the "Excluded Hardware") to Provider or a third party identified by Provider and (b) provide written notice thereof to Provider together with all tracking information. Unless Provider elects in its discretion to assume this responsibility, Recipient shall be obligated to, in a responsible and workmanlike manner, disconnect, pack and ship the Excluded Hardware to Provider.

## SECTION 6 - BOOKS AND RECORDS

6.1     **Availability to Secretary and Others.** If required by applicable law, the Parties agree that until the expiration of four (4) years after the furnishing of services under this Agreement, Provider will make available to the Secretary of the United States Department of Health and Human Services (the "Secretary") and the United States Comptroller General, and their duly authorized representatives, this Agreement and all books, documents and records necessary to certify the nature and extent of the costs of the goods and services provided under this Agreement. No attorney-client, accountant-client or other legal privilege shall be deemed to have been waived by the Parties by virtue of this provision.

6.2     **Subcontracts.** If Provider carries out the duties of this Agreement through a subcontract or outsourcing arrangements worth Ten Thousand Dollars ($10,000) or more over a twelve (12)-month period with a related organization, the subcontract will also contain a clause substantially identical to Sections 6.1 above to permit access by Recipient, the Secretary, the United States Comptroller General and their representatives to the related organization's books and records.

6.3     **Term.** Recipient's rights under this Section 6 shall survive for a period of four years after termination or expiration of this Agreement.

## SECTION 7 - INDEMNITY; INSURANCE

7.1     **Indemnity.** Each Indemnitor shall indemnify, defend and hold harmless each other Party and its Affiliates, directors, officers, members, managers, partners, employees, contractors and agents (collectively, the "Indemnitee") against any action, suit, proceedings, claim, demand, investigation or assessment made or brought by an unaffiliated third party and any damages, costs, awards, penalties, assessments or the like finally awarded attributable to such

19

claim ("Loss") arising from or in connection with: (a) the Indemnitor's breach of this Agreement; or (b) the Indemnitor's gross negligence, willful misconduct or violation of law; provided, however, that Indemnitee gives Indemnitor: (y) written notice within a reasonable time after Indemnitee is served with legal process in an action asserting such claims; provided that the failure or delay to notify Indemnitor shall not relieve Indemnitor from any liability that it may have to Indemnitee hereunder so long as the failure or delay shall not have prejudiced the defense of such claim; and (z) reasonable assistance in defending the claim at Indemnitor's cost. The Indemnitor shall not be responsible for any Loss to the extent that such Loss is caused by, results from, or arises out of or is due to the fault of Indemnitee or its representatives.

7.2     **Membership Interest Purchase Agreement**. The Parties' indemnification obligations hereunder are separate and apart from and in addition to the indemnification obligations contained in the MIPA.

7.3     **Insurance.**

(a)     During the Term, each Party shall cause to be maintained continuously in force and effect policies of insurance covering acts and omissions occurring while this Agreement is in effect (a) in the case of Recipient, consistent with the insurance maintained by Provider with respect to the Healthcare Businesses prior to the Closing, and (b) in the case of Provider, consistent with the insurance maintained by Provider with respect to its other businesses prior to the Closing. Each Party agrees to furnish certificates of insurance and such other evidence of coverage as the other Party may reasonably request, from time to time, to confirm that all such coverages remain in full force and effect.

**SECTION 8 – DISCLAIMER OF WARRANTIES AND LIMITATIONS OF LIABILITY**

8.1     **DISCLAIMER. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE INFORMATION SERVICES, SUPPORTED SOFTWARE APPLICATIONS DATA CENTER SYSTEM, AND ALL SERVICES, SOFTWARE, HARDWARE, SYSTEMS, AND DELIVERABLES HEREUNDER ARE PROVIDED "AS IS." PROVIDER DOES NOT MAKE AND EXPRESSLY DISCLAIMS, AND RECIPIENT IS NOT REPLYING ON, ANY WARRANTIES WITH RESPECT TO THE INFORMATION SERVICES, THE SUPPORTED SOFTWARE APPLICATIONS AND THE DATA CENTER SYSTEM, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THE WARRANTIES AND OBLIGATIONS OF PROVIDER SET FORTH IN THIS AGREEMENT AND PROVIDER'S LIABILITY HEREUNDER IS EXPRESSLY CONDITIONED UPON RECIPIENT'S PROPER USE AND SUPERVISION OF THE INFORMATION SERVICES AND PROVIDER'S AND RECIPIENT'S COMPLIANCE WITH ALL PROVISIONS OF THIS AGREEMENT. PROVIDER DOES NOT WARRANT ANY THIRD PARTY EQUIPMENT OR THIRD PARTY SOFTWARE.**

RECIPIENT ACKNOWLEDGES AND AGREES THAT RECIPIENT AND ITS PROVIDERS ARE SOLELY RESPONSIBLE FOR ALL MEDICAL AND HEALTH RELATED DECISIONS AND ALL OTHER MATTERS RELATED TO PATIENT CARE. NEITHER PROVIDER, NOR ANY OF ITS CONTRACTORS OR LICENSORS, IS RESPONSIBLE OR LIABLE FOR ANY DIAGNOSIS, DECISION OR ASSESSMENT MADE BY RECIPIENT OR ANY DEATH OR INJURIES AS A RESULT OF ANY DECISIONS MADE BASED ON THE INFORMATION PROVIDED VIA SYSTEMS OR SOFTWARE PROVIDED BY RECIPIENT.

8.2     **Limitation of Liability.** Neither Party shall have any liability to the other Party for consequential, exemplary, indirect, special, incidental or punitive damages, including loss of profits, revenues, data or use, incurred by the other Party or its Affiliates or any third party (even if any such Party has been advised of the possibility of such damages), whether based on contract, tort or any other legal theory, arising out of or related to this Agreement or the transactions contemplated herein unless arising out of such Party's or its Affiliates' gross negligence or willful misconduct (i.e., the gross negligence or willful misconduct of any Party's unaffiliated third party contractors (including Subcontractors and Vendors) will not be imputed to such Party). Any liability of Provider under this Agreement and all Schedules, Exhibits, Addenda and attachments hereto (including the Business Associate Agreement) shall in no event exceed the aggregate amount of Information Service Fees paid hereunder to Provider by Recipient for the calendar month prior to the month during which the applicable claim arose.

8.3     **Recipient's Mitigation.** Recipient shall adopt such reasonable measures as it deems appropriate to limit its exposure with respect to the potential Losses and damages set forth in Section 8.4 above.

## SECTION 9 – CONFIDENTIALITY

9.1     **Definition.** "Confidential Information" is defined as all data and materials furnished by one Party to the other Party, or accessed by either Party in connection with this Agreement that a reasonable person would understand to be confidential in nature, including without limitation the identity of patients, the content of any medical records, financial and tax information, information regarding Medicare and Medicaid claims submission and reimbursements, the object and source codes for the Supported Software Applications, vendor pricing and terms, the documentation, and such other information constituting the Data Center and the Supported Software Applications.

9.2     **Obligation to Observe Confidentiality.** The Party receiving the Confidential Information (the "Receiving Party") from the Party who owns or holds in confidence such Confidential Information (the "Owning Party") may use the Confidential Information solely for the purpose of performing its obligations or enforcing its rights under this Agreement or, in the case of Recipient, in connection with Recipient's operation of the Healthcare Businesses.

9.3     **Protection.** The Receiving Party shall not disclose any of the Confidential Information except to those persons having a need to know for the purpose of

21

performing its obligations or enforcing its rights under this Agreement. Each Party shall have agreements in effect with its Affiliates, employees, agents, outsourced providers, and subcontractors, to maintain the confidentiality of the Confidential Information on terms no less protective than this Section 9. The Receiving Party shall promptly notify the Owning Party in the event that the Receiving Party learns of an unauthorized release of Confidential Information.

9.4 **Exceptions.** The Receiving Party shall have no obligation with respect to:

(a) Confidential Information made available to the general public without restriction by the Owning Party or by an authorized third party;

(b) Confidential Information known to the Receiving Party independently of disclosures by the Owning Party under this Agreement;

(c) Confidential Information independently developed by the Receiving Party without access to or use of the other Party's Confidential Information; or

(d) Confidential Information that the Receiving Party may be required to disclose pursuant to subpoena or other lawful process; provided, however, that to the extent permitted by law the Receiving Party notifies the Owning Party in a timely manner to allow the Owning Party to appear and protect its interests.

9.5 **Return of Confidential Information.** Upon the termination or expiration of this Agreement, each Party shall (a) immediately cease to use the other Party's Confidential Information, (b) return to the other Party or destroy such Confidential Information and all copies thereof within ten days of the termination, unless otherwise provided in this Agreement or otherwise to comply with bona fide document retention or other policies, as required by applicable Law, or data included in electronic backups or replication in the ordinary course, or to maintain continuity of services, and (c) upon request, certify in writing to the other Party that it has complied with its obligations set forth in this Section 9, unless otherwise provided in this Agreement. Each Party's obligations under this Section 9 shall survive the expiration or earlier termination of this Agreement for a period of five (5) years except that the Business Associate Agreements referenced in Section 9.8 shall survive indefinitely.

9.6 **Availability of Equitable Remedies.** The Parties acknowledge that monetary remedies may be inadequate to protect rights in Confidential Information and that, in addition to legal remedies otherwise available, injunctive relief is an appropriate judicial remedy to protect such rights.

9.7 **Reasonable Assistance.** Each Party agrees to provide reasonable assistance and cooperation upon the reasonable request of the other Party in connection with any dispute or litigation with third parties to protect the requesting Party's Confidential Information; provided that the Party seeking such assistance and cooperation shall reimburse the other Party for its reasonable out-of-pocket expenses.

9.8 **HIPAA Compliance.** The U.S. Department of Health and Human

22

Services issued regulations on "Standards for Privacy of Individually Identifiable Health Information," which comprise 45 C.F.R. Parts 160 and 164, promulgated pursuant to HIPPA (the "Privacy Standards"). In addition, the Health Information Technology for Economic and Clinical Health Act ("HITECH") provisions of the American Recovery and Reinvestment Act of 2009 ("ARRA") implemented certain changes related to business associates under HIPAA Administrative Simplification that is specified in HIPPA Section 13401: Application of Security Provisions and Penalties to Business Associates of Covered Entities, and also made certain modifications to the Privacy Standards affecting both Covered Entities and Business Associates. The Parties agree and acknowledge that each Party is a Covered Entity and that they are Business Associates of each other for purposes described in this Agreement and in the Business Associate Agreements attached hereto as Schedule 9.8(a) and Schedule 9.8(b) and incorporated herein by reference. In the event of a conflict between the terms of this Agreement and the Business Associate Agreement(s) the Business Associate Agreement(s) will control.

## SECTION 10 - INDEPENDENT CONTRACTOR; NON-SOLICITATION

10.1    **Independent Contractor**. In the performance of this Agreement, Provider and each of its Subcontractors is acting as an independent contractor and shall have the exclusive control of the manner and means of performing the work contracted for hereunder. Personnel supplied by Provider or Subcontractors hereunder, whether or not located on Recipient's premises, are not Recipient's Employees or agents and shall not hold themselves out as such, and Provider, or such Subcontractor, as applicable, assumes full responsibility for their acts and for compliance with any applicable employment and tax laws with respect to such personnel. Nothing contained in this Agreement shall be construed to create a joint venture or partnership between the Parties.

10.2    **Non-Solicitation**. During the Term and for a period of twelve (12) months thereafter, neither Party (the "Hiring Party") nor any of its Subsidiaries may, without the prior written consent of the other Party (the "Employer Party") directly or indirectly engage, recruit, solicit to employ or hire, offer employment to or hire (whether as an officer, employee, consultant or independent contractor) any employee of the Employer Party or their Subsidiaries that is set forth on Schedule 10.2 or encourage, induce or assist any such activities by any other person or entity. The restrictions under this Section 10.2 shall not prevent any Hiring Party or any of its Subsidiaries from (i) making, or hiring that results from, general employment solicitations such as through advertisements in publicly available media or through the efforts of a search firm so long as such solicitations do not specifically target the Employer Party or such employees, or (ii) soliciting, hiring or otherwise engaging any such employees following the termination of their employment with by the Employer Party or any of its Subsidiaries, as applicable.

## SECTION 11 - MISCELLANEOUS

11.1    **Force Majeure and Manner of Service.** If either Party's performance, excluding Recipient's payment obligations, is prevented, hindered or delayed by reason of any cause(s) beyond such Party's reasonable control which cannot be overcome by reasonable diligence, including without limitation, war, labor disputes, civil disorders, cyber events, governmental acts, epidemics, quarantines, embargoes, fires, earthquakes, storms, hurricanes, power failures, equipment failures, transmission failures, or acts of God, such Party shall be

excused from performance to the extent that it is prevented, hindered or delayed thereby, during the continuance of such cause(s); and such Party's obligations hereunder shall be excused so long as and to the extent that such cause(s) prevent or delay performance. Provider shall not be responsible for delays in connection with the Information Services that are attributable to causes beyond its reasonable control, including, without limitation, limitations upon the availability of telephone transmission facilities or failures of the internet or of equipment (including but not limited to CPU, terminals, printers, or network equipment) or failure of Recipient to prepare data properly for input into equipment of Provider (or its Affiliates) or applicable Supported Software Applications.

11.2     **Survival.** Termination of this Agreement shall not affect the rights and obligations of the Parties hereunder for any of their respective acts or omissions prior to or on the date of such termination. After the effective date of such termination, Sections 1.4(b), 1.5(b), 1.9(d), 2.4, 5.3, 6, 8, 9, 10, and 11 shall continue to be in full force and effect.

11.3     **Entirety of Agreement.** This Agreement (including the Schedules attached hereto), and the other documents and instruments specifically provided for herein and therein contain the entire understanding between the Parties concerning the subject matter of this Agreement and such other documents and instruments and, except as expressly provided for herein or therein, supersede all prior understandings and agreements, whether oral or written, between them with respect to the subject matter hereof and thereof. There are no representations, warranties, agreements, arrangements or understandings, oral or written, between the Parties hereto relating to the subject matter of this Agreement and such other documents and instruments which are not fully expressed herein or therein.

11.4     **Attorneys' Fees.** If any action is brought by either Party to enforce any provision of this Agreement, the prevailing Party shall be entitled to recover its court costs and reasonable attorneys' fees actually incurred.

11.5     **Incorporation of Provisions of MIPA.** Article XI of the MIPA (General Provisions) (other than Sections 11.16, 11.18, and 11.21 of the MIPA) is incorporated herein by reference and shall apply *mutatis mutandis* (with references in such provisions of the MIPA to "this Agreement" being deemed to refer to this Agreement and not the MIPA) as if fully set forth herein.

**[SIGNATURES ON FOLLOWING PAGE; REMAINDER OF PAGE IS BLANK]**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date.


PROVIDER


**PIPELINE HEALTH SYSTEM, LLC**


By: _____

Name: _____

Title: _____


RECIPIENT


**AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**


By: _____
            Manoj Prasad
Title:   CEO

Schedules

| | |
|---|---|
| 1 | Information Technology Services, Supported Software Applications; Supported Hardware Applications, |
| 2 | Information Security Requirements |
| 3 | Dedicated Employees |
| 4 | Information Services Costs |
| 5 | Excluded Hardware |
| | |
| 6 | Recipient BAA |
| 7 | Provider BAA |

**EXHIBIT B**

**RESTRICTIVE COVENANT AGREEMENT**

[**Attached**]

*FINAL*

## RESTRICTIVE COVENANT AGREEMENT

This RESTRICTIVE COVENANT AGREEMENT (this "Agreement"), dated as of _____ __, 2022, is made by and between **AUM Global Healthcare Management, LLC**, a Michigan limited liability company ("Buyer"), and **Pipeline Health System, LLC**, a [•] limited liability company (the "Equityholder"). Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, concurrently herewith, Buyer and **SRC Hospital Investments II, LLC**, a Delaware limited liability company ("Seller") are closing on that certain Membership Interest Purchase Agreement, dated [•], 2022 (the "Purchase Agreement"), providing for, among other things, the purchase of all of the issued and outstanding membership interests of the following entities (each an "Acquired Company" and, collectively, the "Acquired Companies"): (i) **Pipeline – West Suburban Medical Center, LLC**, a Delaware limited liability company; (ii) **Pipeline - Weiss Memorial Hospital, LLC**, a Delaware limited liability company; (iii) **Pipeline - Lakefront Medical Associates, LLC**, a Delaware limited liability company; (iv) **Pipeline - Midwest Pharmacies, LLC**, a Delaware limited liability company; and (v) **Pipeline - Weiss Medical Specialists, LLC**, a Delaware limited liability company, upon the terms and subject to the conditions set forth therein (the transactions contemplated by the Purchase Agreement, inclusive of those contemplated herein, the "Transaction");

WHEREAS, as of the date hereof, the Equityholder, directly or indirectly, owns or has complete investment authority over certain equity interests of Seller;

WHEREAS, the Equityholder, as a direct or indirect holder of equity of Seller, will benefit from the consummation of the Transaction and receive, directly or indirectly, significant cash proceeds in connection with the consummation of the Transaction by reason of its direct or indirect ownership of equity securities of Seller;

WHEREAS, the Equityholder recognizes and acknowledges Buyer's interest in protecting, among other things, relationships of the Acquired Companies with employees, customers, suppliers and others, and the goodwill associated with their ongoing businesses;

WHEREAS, the Equityholder recognizes and acknowledges Buyer's interest in protecting, among other things, the Confidential Information (as defined below); and

WHEREAS, as a condition and inducement to Buyer's willingness to enter into the Purchase Agreement, Buyer has required that the Equityholder agree, and the Equityholder has agreed, to enter into this Agreement with respect to the matters as set forth herein;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

20078016 v5

## ARTICLE 1
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Equityholder as follows:

1.1     Authority Relative to This Agreement. Buyer has all necessary corporate power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the Transaction. This Agreement has been duly and validly authorized, executed and delivered by Buyer and, assuming the due authorization, execution and delivery by the Equityholder, constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other similar laws relating to creditors rights generally and by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF THE EQUITYHOLDER

The Equityholder hereby represents and warrants to Buyer as follows with respect to the Equityholder:

2.1     Authority Relative to This Agreement. The Equityholder has all necessary power and authority to execute and deliver this Agreement on behalf of itself and its subsidiaries, to perform its obligations hereunder and to consummate the Transaction. This Agreement has been duly and validly executed and delivered by the Equityholder and, assuming the due authorization, execution and delivery by Buyer, constitutes a legal, valid and binding obligation of the Equityholder, enforceable against the Equityholder in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other similar laws relating to creditors rights generally and by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

2.2     No Conflict. The execution and delivery of this Agreement by the Equityholder does not, and the performance of its obligations under this Agreement by the Equityholder and the consummation by the Equityholder of the Transaction will not, (i) conflict with or violate any law, rule, regulation, order, judgment or decree applicable to the Equityholder or (ii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under any contract to which the Equityholder is a party.

2.3     Reliance. The Equityholder understands and acknowledges that Buyer is entering into the Purchase Agreement in reliance upon the Equityholder's execution, delivery and performance of this Agreement.

## ARTICLE 3
## COVENANTS OF THE EQUITYHOLDER

The Equityholder hereby covenants and agrees as follows:

2

3.1     <u>Restrictive Covenants</u>. The Equityholder hereby acknowledges that it is familiar with and has access to each Acquired Company's Trade Secrets and other Confidential Information, goodwill and other legitimate business interests. The Equityholder acknowledges and agrees that the covenants set forth in this <u>Section 3.1</u> are a material inducement to Buyer to enter into the Purchase Agreement and to perform its obligations thereunder, that Buyer and its respective subsidiaries, including, after Closing, the Acquired Companies, would be irreparably damaged if the Equityholder were to breach any such covenants, and that any such breach by the Equityholder would result in a significant loss of goodwill of the Acquired Companies. Therefore, in further consideration of the Purchase Price to be paid to Seller under the Purchase Agreement, which Purchase Price the Equityholder agrees and acknowledges is sufficient consideration to make the provisions of this <u>Section 3.1</u> enforceable, the Equityholder agrees as follows:

(a)     <u>Non-Compete</u>. During the Restricted Period, the Equityholder will not, and will cause its subsidiaries not to, directly or indirectly Participate in any manner in the Restricted Business in the Restricted Territory. For purposes of this <u>Section 3.1(a)</u>, the term "Participate" means to hold any direct or indirect interest in any enterprise or activity, whether as an equityholder, joint venturer, franchisor, franchisee, operator, lessor, manager, or otherwise; <u>provided</u>, <u>however</u>, that the term "Participate" shall <u>not</u> include, holding indebtedness in any Restricted Business, passive ownership of less than five percent (5%) of the stock of a publicly held corporation or passive ownership of less than ten percent (10%) of any entity that is not a publicly held corporation. The Equityholder agrees that this covenant is intended to protect Buyer's substantial investment and is reasonable with respect to its duration, geographical area and scope of activity.

(b)     <u>Non-Solicitation; No-Hire</u>. During the Restricted Period, the Equityholder shall not, and shall cause its subsidiaries not to, directly, or indirectly through another Person (including by participating in any other Person): (i) hire or engage, or solicit for hiring or engagement, any individual that served as an employee of any Acquired Company at any time during the twelve (12)-month period prior to such solicitation, hiring or engagement (a "<u>Restricted Employee</u>"), or induce or attempt to induce any Restricted Employee to leave the employ of the Acquired Companies, or in any way interfere with the relationship between any of the Acquired Companies and any Restricted Employee; (ii) encourage any independent contractor who provides services to any of the Acquired Companies as of the Closing Date, or who provided services to any of the Acquired Companies at any time within the twelve (12)- month period prior to the Closing, to terminate or materially reduce its relationship with any of the Acquired Companies; or (iii) call on, solicit or service any Person that is, or was during the twelve (12)-month period immediately preceding the Closing Date, a customer, client, vendor, supplier, licensee, licensor or other business relation of the Restricted Business in order to induce or attempt to induce such Person to cease doing or decrease their business with any of the Acquired Companies in respect of the Restricted Business, or seek to persuade any such customer, client, vendor,

<center>3</center>

supplier, licensee or other business relation, or any prospective customer, client, vendor, supplier, licensee or other business relation of the Restricted Business who is such as of the Closing or was such at any time within the twelve (12)-month period immediately preceding the Closing Date, to conduct with anyone else any Restricted Business activity in the Restricted Territory; provided, that the foregoing shall not prohibit the solicitation or hiring of a Restricted Employee or contractor (A) whose employment, or contractual relationship, as applicable, has been (x) terminated by an Acquired Company at least sixty (60) days prior to such solicitation or hiring or (y) voluntarily terminated by such Restricted Employee or contractor after a period of six (6) months prior to such solicitation or hiring or (B) pursuant to general solicitations (including through a recruiting firm) not targeted at such Restricted Employee or contractor, as applicable and the hiring of anybody who responds thereto.

(c)     Confidentiality. Buyer's success after the Closing depends upon the continued preservation of the Confidential Information possessed by the Equityholder. The Equityholder covenants and agrees that during the Restricted Period, neither the Equityholder nor any of its subsidiaries shall disclose or use, directly or indirectly, any Confidential Information unless disclosure or use is permitted under and in accordance with this Section 3.1(c). If the disclosure of Confidential Information is required by Law or the rules of any stock exchange or trading system, as advised by such Person's counsel in writing, the Equityholder agrees to promptly notify Buyer of its intent to disclose such Confidential Information so that Buyer (at Buyer's cost) can seek to obtain a protective order or other assurance of confidential treatment and has reasonably cooperated with Buyer (at Buyer's cost) in connection therewith. For the avoidance of doubt, neither the Equityholder nor any subsidiary thereof shall be in breach of this Section 3.1(c) or shall be held criminally or civilly liable under any federal or state trade secret law for disclosing a Trade Secret (x) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (y) in a complaint or other document filed under seal in a lawsuit or other proceeding; provided, however, that notwithstanding this immunity from liability, the Equityholder and/or its subsidiaries may be held liable if such Person unlawfully accesses Trade Secrets by unauthorized means.

(d)     Non-Disparagement. The Equityholder shall not, and shall cause its subsidiaries not to, make any derogatory or disparaging statement or communication regarding Buyer, the Acquired Companies or their respective subsidiaries or any of their directors, managers or officers; provided, however, that nothing in this Section 3.1(d) shall restrict the Equityholder or any of its Subsidiaries from taking any action or making any statement as required by applicable Law or in connection with any Action.

(e)     Enforcement of Restrictive Covenants. The Equityholder agrees that (i) the covenants contained in this Section 3.1 are necessary to protect the goodwill, Confidential Information, Trade Secrets and other legitimate interests of the

4

Acquired Companies, (ii) in the event that any court of competent jurisdiction declares any term or provision of Section 3.1(a), Section 3.1(b), Section 3.1(c) or Section 3.1(d) to be invalid or unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, that provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by Law, and will be enforceable as so modified, (iii) in the event of any actual or threatened breach of this Section 3.1, Buyer will have no adequate remedy at Law; (iv) Buyer, in addition to any other remedies available to it at law or in equity, shall be entitled to seek an injunction, specific performance and other equitable relief to prevent or address any breach or threatened breach by the Equityholder of any term or provision of Section 3.3(a), Section 3.1(b), Section 3.1(c) and Section 3.1(d) without having to post bond and without the necessity of showing actual damages or showing that monetary damages are inadequate, and (v) the Restricted Period applicable to the Equityholder shall be tolled, and shall not run, during the period of any breach by such Person of any term of provision of Section 3.1(a) or Section 3.1(b). The Equityholder agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to this Section 3.1 on the basis that the other parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity. The restrictive covenants set forth in this Section 3.1 shall be construed as agreements independent of any other provision in this Agreement, and the existence of any claim or cause of action of the Equityholder against any Acquired Company, Buyer or any of their respective subsidiaries, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by any of the Acquired Companies or Buyer of any restrictive covenant set forth in this Section 3.1. Buyer and the Acquired Companies have fully performed all obligations entitling it to the restrictive covenants set forth in this Section 3.1 and such restrictive covenants are therefore not executory or otherwise subject to rejection under Chapter 11 of Title 11 of the United States Code.

3.2    Definitions. As used in this Agreement, the following terms have the respective meanings set forth below.

(a)    "Confidential Information" means all information relating to the Acquired Companies' products, services, strategies, pricing, customers, representatives, suppliers, distributors, technology, finances, employee compensation, inventions, developments or Trade Secrets; provided, that Confidential Information shall not include (i) any information that has been disseminated to the public or is otherwise generally known to the public, (ii) any information that has become known as a result of disclosure by a third party not known by the recipient to have an obligation of confidentiality to the Acquired Companies, (iii) any information independently developed without reference to or relying on any Confidential Information, or (iv) any information required to be disclosed by applicable Law or the rules of any stock exchange or trading system that is disclosed in accordance with the penultimate and last sentences of 3.1(e).

5

(b)    "Restricted Business" means businesses providing acute, sub-acute, ambulatory, specialty and post-acute healthcare services similar to the health care services being provided by the Acquired Companies on the Closing Date, including, without limitation, acute care hospitals.

(c)    "Restricted Period" means a period of three (3) years following the Closing Date.

(d)    "Restricted Territory" means an air-mile radius of twenty-five (25) miles from the emergency departments of West Suburban Medical Center and Weiss Memorial Hospital.

## ARTICLE 4
## MISCELLANEOUS

4.1    Survival of Representations and Warranties. The representations and warranties of the Equityholder and Buyer contained herein shall not be deemed waived or otherwise affected by any investigation made by the other party hereto. The representations and warranties in this Agreement shall survive the Closing.

4.2    Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by E-mail (provided that no "bounce back" or notice of non-delivery is generated), or by registered or certified mail (postage prepaid, return receipt requested) to the other parties hereto as follows:

If to the Equityholder:

Pipeline Health System, LLC
898 N. Sepulveda Blvd., Suite 700
El Segundo, CA 90245
Attn:  General Counsel

with a copy to (which shall not constitute notice to Equityholder):

Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, IL 60603-3433
Attn:  Paul Coyle, Esquire
Tel.:  (312) 499-0109
Fax: (312) 277-7590
Email: pcoyle@duanemorris.com

If to the Buyer:

AUM Global Healthcare Management, LLC
21 Forest Avenue
River Forest, Illinois 60305
Attn: President

6

with a copy to (which shall not constitute notice to the Acquired Company or Buyer):

> Benesch Friedlander Coplan and Aronoff
> 71 South Wacker Drive, Suite 1600
> Chicago, IL 60606
> Attn: Juan Morado, Jr.
> Email: jmorado@beneschlaw.com

or to such other address as the Person to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

4.3    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement and the parties hereto agree to negotiate in good faith to adopt a replacement provision that is enforceable and as nearly as possible gives effect to the parties' original intent.

4.4    Entire Agreement; Assignment. This Agreement (a) constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof and (b) shall not be assigned by any party hereto (whether by operation of law or otherwise), without the prior written consent of the other party. Any attempted assignment of this Agreement not in accordance with the terms of this Section 4.5 shall be void. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.

4.5    Amendment. Subject to Section 4.7, this Agreement may be amended or modified only by a written agreement executed and delivered by each party hereto. This Agreement may not be modified or amended except as provided in the immediately preceding sentence and any purported amendment by any party or parties hereto effected in a manner which does not comply with this Section 4.6 shall be void.

4.6    Waiver. Any agreement on the part of any party hereto to any extension or waiver hereunder shall be valid only if set forth in a written instrument signed on behalf of such party. The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of such rights.

4.7    Governing Law; Venue. Section 11.6 of the Purchase Agreement shall apply to this Agreement.

4.8    Waiver of Trial by Jury.    EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY, UNCONDITIONALLY, IRREVOCABLY AND

7

INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), ACTIONS OR OMISSIONS OF ANY PARTY IN CONNECTION WITH ANY OF SUCH AGREEMENTS.

4.9   <u>Headings</u>. The headings of the Sections of this Agreement are for convenience only and in no way modify, interpret or construe the meaning of specific provisions of the Agreement.

4.10   <u>Parties in Interest; Third Party Beneficiaries</u>. The parties hereto hereby agree that their respective agreements and obligations set forth herein are solely for the benefit of the other parties hereto and their respective successors and permitted assigns, in accordance with and subject to the terms of this Agreement, and, except as otherwise expressly set forth in this Agreement, this Agreement is not intended to, and does not, confer upon any Person other than the parties hereto and their respective successors and permitted assigns any benefits, rights or remedies under or by reason of, or any rights to enforce or cause the Equityholder to enforce, the obligations set forth herein.

4.11   <u>Counterparts</u>. This Agreement may be signed in any number of counterparts with the same effect as if the signature on each such counterpart were on the same instrument. Facsimiles or other electronic forms of signatures (including e-mail, portable document format (.pdf) or similar generally accepted electronic means) shall be deemed to be originals.

<center>[*SIGNATURE PAGE FOLLOWS*]</center>

IN WITNESS WHEREOF, each of the parties hereto have caused this Restrictive Covenant Agreement to be duly executed on the date hereof.

**BUYER:**                                                    **EQUITYHOLDER:**

**AUM Global Healthcare Management, LLC**                     **Pipeline Health System, LLC**


                                                             By:_____
                                                             Name:_____
By:_____                         Title:_____
Name:_____
Title:_____


[Signature Page to Restrictive Covenant Agreement]

# EXHIBIT C

## DEA POWER OF ATTORNEY

## [Attached]

*Exhibit C to Membership Interest Purchase Agreement*

DM3\8379252.24

Final

## Authorization and Limited Power of Attorney

Through this Authorization and Limited Power of Attorney ("POA"), effective as of December 2, 2022 (the "Effective Date"), SRC HOSPITAL INVESTMENTS II, LLC ("Seller") hereby authorizes and empowers AUM GLOBAL HEALTHCARE MANAGEMENT, LLC ("Buyer") and Buyer's employees, agents, and representatives to use the Federal Drug Enforcement Administration Certificate of Registration Numbers ("DEA Registrations"), as set forth in **Schedule A** attached hereto, to otherwise utilize the privileges and benefits of the DEA Registration for the purposes of engaging in the ordering, storing, distributing, dispensing, prescribing and handling of controlled substances (the "Controlled Substance Activities") at the hospitals known as Pipeline-Weiss Memorial Hospital LLC located at 4646 N. Marine Drive, Chicago, IL 60640 and Pipeline-West Suburban Medical Center LLC, located at 3 Erie Street, Oak Park, IL 60302, as well as the pharmacies known as Pipeline Midwest Pharmacies, LLC d/b/a Midwest Pharmacies Inc., located at 1 Erie Court, Oak Park, IL 60302 and Pipeline-West Suburban Medical Center LLC d/b/a Center Pharmacy, located at 7420 Central Ave Ste 1100, River Forest, IL 60305 (collectively, the "Facilities") that Buyer is acquiring from Seller pursuant to that certain Membership Interest Purchase Agreement (the "Purchase Agreement"), until such time that Buyer has obtained updated DEA Registrations for the Facilities as set forth on the DEA POA form attached hereto as **Exhibit A** and as otherwise described herein.

Seller further empowers Buyer to use Seller's: (i) State of Illinois controlled substance registration license numbers ("IL CSA Licenses"), as set forth in **Schedule A** attached hereto, to otherwise utilize the privileges and benefits of the IL CSA Licenses for the purposes of engaging in the Controlled Substance Activities at the Facilities, and (ii) State of Illinois pharmacy license numbers ("IL Pharmacy Licenses") (together with the DEA Registrations and IL CSA Licenses, the "Licenses"), as set forth on **Schedule A** attached hereto, for the purpose of operating the Facilities, until such time that Buyer has obtained such new and updated Licenses.

Seller hereby makes, constitutes and appoints Buyer as its true and lawful attorney-in-fact in Seller's name, place and stead to carry out and perform the purpose and terms of this instrument, based on the following terms and covenants:

A.    Seller agrees to allow the Controlled Substance Activities to be carried out by Buyer at the Facilities under the Licenses as an agent in fact of Seller, effective as of the Effective Date;

B.    Seller acknowledges that, as the controlled substances registrant under the Licenses, including without limitation the DEA Registrations, Seller will be held accountable for any License-related violations of the applicable controlled substances laws;

C.    Buyer agrees to indemnify and hold harmless Seller, together with their past, present, and future executives, officers, directors, employees, supervisors, agents, stockholders, attorneys, servants, representatives, parent entities, subsidiary entities, affiliate entities, partners, insurers, joint venturers, and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing,

15972810 v6

from any and all claims, demands, rights, causes of action, damages, losses, attorneys' fees and expenses, and costs of every kind and nature whatsoever, known or unknown, fixed or contingent, incurred by Seller related to Buyer's use of the Licenses on or following the Effective Date;

D.   Buyer shall promptly notify Seller and their affiliates of any potential claims or issues related to Buyer's use of the Licenses following the Effective Date and shall reasonably cooperate with Seller and its affiliates to resolve such claims and issues;

E.   Buyer agrees that the Controlled Substance Activities may be carried out at the Facilities under the Licenses for no more than 90 days following the Effective Date, unless this POA is further renewed by a mutual signed writing of the parties;

F.   Buyer shall make timely application for, diligently pursue, and use their best efforts to obtain their own Licenses for the Facilities as soon as practicable prior to and following the Effective Date.

G.   This POA may be executed in two or more counterparts, including by an electronic signature method, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Remainder of page intentionally left blank]*

2

Final

**IN WITNESS WHEREOF**, this POA is made effective by the respective authorized signatories as of the Effective Date first set forth above.

**BUYER:**

AUM GLOBAL HEALTHCARE
MANAGEMENT, LLC

By: _____
Name: Manoj Prasad
Title:

**SELLER:**

SRC HOSPITAL INVESTMENTS II, LLC

By: _____
Name:
Title:

Signature Page to Authorization and Limited Power of Attorney for Use of DEA Registration

Final

## EXHIBIT A

**DEA POWER OF ATTORNEY**

<u>Registrants:</u>

PIPELINE – WEST SUBURBAN MEDICAL CENTER, LLC
3 Erie Court Oak Park, IL 60302
FP0901769

7420 Central Avenue, River Forest, IL 60305
FP0903232

PIPELINE - WEISS MEMORIAL HOSPITAL, LLC
4646 N. Marine Drive Chicago, IL 60640
FP0957033

PIPELINE - MIDWEST PHARMACIES, LLC
1 Erie Court, Suite 1975, Oak Park, IL 60302
FP0003955


I, _____ (name of person granting power), the undersigned, who am authorized to sign the current application for registration of the above-named registrants under the Controlled Substances Act or Controlled Substances Import and Export Act, have made, constituted, and appointed, and by these presents, do make, constitute, and appoint _____ (name of attorney-in-fact), my true and lawful attorney for me in my name, place, and stead, to execute applications for Forms 222 and to sign orders for Schedule I and II controlled substances, whether these orders be on Form 222 or electronic, in accordance with 21 U.S.C. 828 and Part 1305 of Title 21 of the Code of Federal Regulations. I hereby ratify and confirm all that said attorney must lawfully do or cause to be done by virtue hereof.

_____(Signature of person granting power)

I, _____ (name of attorney-in-fact), hereby affirm that I am the person named herein as attorney-in-fact and that the signature affixed hereto is my signature.

_____(Signature of attorney-in-fact)


Witnesses:

1. _____ (Signature of witness)

2. _____ (Signature of witness)


Signed and dated on _____ (current date)

## SCHEDULE A

## LICENSES

**Federal Drug Enforcement Administration Certificate of Registration Numbers**

1. Pipeline-Weiss Memorial Hospital LLC (d/b/a Louis A Weiss Memorial Hospital Pharmacy) (4646 N. Marine Dr, Chicago, IL 60640-5759)
   a. FP0957033
2. Pipeline Midwest Pharmacies, LLC (d/b/a Plaza Pharmacy) (1 Erie Ct, Suite 1975, Oak Park, IL 60302-2566)
   a. FP0003955
3. Pipeline-West Suburban Medical Center LLC (d/b/a West Suburban Medical Center) (3 Erie Ct, Oak Park, IL 60302)
   a. FP0901769
4. Pipeline-West Suburban Medical Center LLC (d/b/a Center Pharmacy) (7420 Central Ave Ste 1100, River Forest, IL 60305)
   a. FP0903232

**State of Illinois Controlled Substance Registration License Numbers**

1. Pipeline-Weiss Memorial Hospital LLC (d/b/a Louis A Weiss Memorial Hospital Pharmacy) (4646 N Marine Dr, Chicago, IL 60640-5759)
   a. 320.013038
   b. 054.021167
2. Pipeline-West Suburban Medical Center LLC (d/b/a West Suburban Medical Center) (3 Erie Ct, Oak Park, IL 60302-2519)
   a. 320.013040
   b. 054.021166
3. Pipeline Midwest Pharmacies LLC (d/b/a Plaza Pharmacy) (1 Erie Ct Ste 1975, Oak Park, IL 60302-2566)
   a. 320.013037
   b. 054.021169
4. Pipeline-West Suburban Medical Center LLC (d/b/a Center Pharmacy) (7420 Central Ave Ste 1100, River Forest, IL 60305-1800)
   a. 320.013039
   b. 054.021170

**State of Illinois Pharmacy License Numbers**

1. Pipeline-Weiss Memorial Hospital LLC (d/b/a Louis A Weiss Memorial Hospital Pharmacy) (4646 N Marine Dr, Chicago, IL 60640-5759)
   a. 054.021167
   b. 051.036116
2. Pipeline-West Suburban Medical Center LLC (d/b/a West Suburban Medical Center) (3 Erie Ct, Oak Park, IL 60302-2519)

Schedule A to Authorization and Limited Power of Attorney

      a.     054.021166
      b.     051.296766

3.    Pipeline Midwest Pharmacies LLC (d/b/a Plaza Pharmacy) (1 Erie Ct Ste 1975, Oak Park IL 60302-2566)
      a.     054.021169
      b.     051.294915

4.    Pipeline-West Suburban Medical Center LLC (d/b/a Center Pharmacy) (7420 Central Ave Ste 1100, River Forest, IL 60305-1800)
      a.  054.021170
      b.  051.299802

Schedule A to Authorization and Limited Power of Attorney

# EXHIBIT D

## EXCLUDED LIABILITY ASSUMPTION AGREEMENT

### [Attached]

*Execution Copy*

**EXCLUDED LIABILITY ASSUMPTION AGREEMENT**

THIS EXCLUDED LIABILITY ASSUMPTION AGREEMENT (this "Agreement"), dated as of December 2, 2022, is entered into by and among **AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**, a Michigan limited liability company ("*Buyer*"), and **SRC HOSPITAL INVESTMENTS II, LLC**, a Delaware limited liability company ("*SRC II*" or "*Seller*").  Buyer and Seller are collectively referred to as the "*Parties*" and each individually as a "*Party*."

Recitals

WHEREAS, Buyer and Seller have entered into that certain Membership Interest Purchase Agreement dated as of November 22, 2022 between Buyer and Seller (the "*MIPA*"; capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the MIPA).

WHEREAS, pursuant to the MIPA, Buyer is acquiring the outstanding membership interests of the Subsidiaries from Seller.

WHEREAS, Section 2.3 of the MIPA provides that Seller Parties (other than the Subsidiaries) shall retain or assume, as applicable, and Buyer shall not be liable for the Excluded Liabilities.

WHEREAS, the Excluded Liabilities include, without limitation: (i) any known or unknown professional liability claims arising from incidents that occurred prior to October 2, 2022 entitled to coverage (subject to any deductibles or retentions) under any of the Seller Parties' professional liability insurance policies set forth on Schedule 3.16 to the MIPA, including without limitation those professional liability claims set forth on Schedule 3.12 to the MIPA (defined in the MIPA as the Excluded Claims); and (ii) any and all liabilities or claims relating to the multi-facility system contracts relating to the operations of Seller's Affiliates listed on Schedule 2.2(f) to the MIPA, including, without limitation, the Employee Benefit Plans.

WHEREAS, this Agreement evidences the assumption of the Excluded Liabilities by the Seller Parties (other than the Subsidiaries) in connection with the MIPA, subject to consummation of the transactions contemplated thereby, and the Seller Parties' agreement to use commercially reasonable efforts to address such liabilities in a chapter 11 plan with respect to the Seller Parties (if such a plan is proposed, solicited for approval, and confirmed by the Bankruptcy Court).

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyer and Seller (on behalf of itself and Seller Parties (other than the Subsidiaries)) hereby agree as follows:

-1-

20067119 v7

1.      Recitals. The foregoing recitals are incorporated into this Agreement and made part of this Agreement as substantive provisions and not as mere recitals.

2.      Seller Parties' Assumption of Excluded Liabilities.  Seller Parties hereby agree to retain or assume, as applicable, the Excluded Liabilities in accordance with the terms and conditions set forth herein.  Buyer shall have no liability on account of the Excluded Liabilities and the Seller Parties will be fully responsible for all Excluded Liabilities.  Excluded Liabilities that do not constitute administrative expenses or priority unsecured claims under the Bankruptcy Code prior to Seller Parties' assumption of such Excluded Liabilities shall not constitute or be deemed to constitute administrative expenses or priority unsecured claims in respect of Seller Parties upon or after such assumption.   The Seller Parties shall use commercially reasonable efforts to address the Excluded Liabilities in any chapter 11 plan with respect to Seller Parties (if any) in a manner consistent with the terms and conditions of the MIPA.  If a chapter 11 plan is not ultimately proposed or effectuated, and the contracts listed on Schedule 2.2(f) to the MIPA are not otherwise rejected, any assignee(s) thereof shall acknowledge that Buyer and Subsidiaries are not liable or otherwise responsible for any obligations arising under such assigned contracts.

3.      Membership Interest Purchase Agreement.  This Agreement is subject in all respects to the terms and conditions of the MIPA.  Nothing in this Agreement in any way supersedes, enlarges, narrows, or modifies, or shall be deemed to supersede, enlarge, narrow or modify, any provision of the MIPA.  In the event of any conflict or inconsistency between the terms of the MIPA and the terms hereof, the terms of the MIPA shall govern.

4.      Seller Parties Authority.  Subject to entry of the Sale Order, Seller is authorized to execute this Agreement on behalf of itself and other Seller Parties (other than the Subsidiaries).

5.      Governing Law. Irrespective of the place of execution or delivery, this Agreement shall be governed by, and shall be construed in accordance with, the Laws of the State of Illinois.

6.      Counterparts.  This Agreement may be executed in one or more counterparts, and counterparts by facsimile or portable document format (.pdf), all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

*Remainder of Page Intentionally Blank*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized officers as of the date set forth above.

**Seller:**

**SRC HOSPITAL INVESTMENTS II, LLC**, on behalf itself and Seller Parties (Other than the Subsidiaries)

By:_____
Name:
Title:

**Buyer:**

**AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**

By:_____
Name:
Title:

# EXHIBIT E

## SALE ORDER

**[To be Attached**]

**EXHIBIT F**

**AMENDMENTS TO AMENDED AND RESTATED MASTER LEASES FOR CHICAGO REAL PROPERTY**

**[To be Attached]**

*Exhibit F to Membership Interest Purchase Agreement*

## SCHEDULES TO MEMBERSHIP INTEREST PURCHASE AGREEMENT

### [To be Attached]

SCHEDULES TO

MEMBERSHIP INTEREST PURCHASE AGREEMENT,

DATED AS OF NOVEMBER 22, 2022,

BY AND BETWEEN

AUM GLOBAL HEALTHCARE MANAGEMENT, LLC

AND

SRC HOSPITAL INVESTMENTS II, LLC

15840505 v8

These Schedules have been prepared and delivered in accordance with that certain Membership Interest Purchase Agreement, (the "Agreement"), dated as of November 22, 2022 (the "Effective Date"), by and between AUM Global Healthcare Management, LLC, a Michigan limited liability company ("Buyer"), and SRC Hospital Investments, II, LLC, a Delaware limited liability company ("SRC II" or "Seller").  Capitalized terms used herein, but not otherwise defined herein, shall have the respective meanings ascribed to them in the Agreement.

These Schedules are qualified in their entirety by reference to specific provisions of the Agreement, and are not intended to constitute, and shall not be construed as constituting, representations or warranties of any Party except as and to the extent provided in the Agreement, and shall not be deemed to expand the scope or effect of the relevant Party's representations or warranties in the Agreement.

The numbered headings in these Schedules correspond to the Section numbers in the Agreement and any disclosure in any Section or Subsection of these Schedules shall be deemed disclosed with respect to all other Sections of the Agreement and all other Sections or Subsections of these Schedules to the extent that the relevance of such disclosure to such other Section or Subsection is apparent, notwithstanding the omission of any cross-reference to such other Section of these Schedules or the omission of a reference in the particular representation and warranty to such Section of the Agreement.  Information set forth in these Schedules may be included solely for informational purposes and may not be required to be disclosed pursuant to the Agreement. The disclosure of any information will not be deemed or interpreted to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by the relevant party in the Agreement.  The mere inclusion of any information in any Section or Subsection herein shall not be deemed or construed as an admission that such item represents a material exception or fact, event, or circumstance or that such information constitutes, or is reasonably expected to have, a Material Adverse Change.  No disclosure in any Section or Subsection herein relating to any possible breach or violation of any contract or any law, regulation, order or similar legal requirement will be construed as an admission or indication that any such breach or violation exists or has actually occurred.

The attachments to these Schedules form an integral part of these Schedules and are incorporated by reference to the specific Section(s) of these Schedules to which such attachments relate (as identified herein) for all purposes as if set forth fully herein.  In disclosing the information in these Schedules, Seller expressly does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

DM3\8615431.9

Schedule 2.2(f)

Excluded Contracts

1. Bennett Master Services Agreement, dated September 1, 2021, by and between Pipeline Health System, LLC and Bennett Malbon
2. Businesssolver Master Service Agreement, dated January 1, 2017, by and between Avanti Hospitals, LLC and Businesssolver.com Inc., as amended
3. Carefusion Master Agreement, dated January 12, 2022, by and between Carefusion Solutions, LLC and Pipeline Health System, LLC
4. Cerner Business Agreement, dated May 10, 2019, by and between Pipeline Health and Cerner Corporation
5. Change Healthcare Master Relationship Agreement, dated January 15, 2020, by and between Pipeline Health System, LLC and Change Healthcare Technologies, LLC
6. CloudSAFE Order and Terms, dated April 25, 2022, by and between Pipeline Health System, LLC and CloudSAFE, Ltd
7. CorroHealth. Inc. Master Full Service Agreement, dated January 24, 2022, by and between Pipeline Health System, LLC and CorroHealth, Inc.
8. CrowdStrike Online Terms and Conditions CrowdStrike PHS Allocation, dated December 10, 2021, by and between Pipeline Health and Crowdstrike
9. Databank Master Service Agreement and Orders, dated May 25, 2021, by and between Pipeline Health System, LLC and Databank Holdings, Ltd
10. Fortinet Terms and Conditions, dated January 31, 2022, by and between Pipeline Health and Fortinet, Inc.
11. GE Dicom Agreement, dated October 23, 2020, by and between Pipeline Health System, LLC and GE Healthcare IITS USA Corp
12. GE PACs Agreement, dated March 29, 2022, by and between Pipeline Health System, LLC and GE Healthcare IITS USA Corp.
13. Global Healthcare Participation Agreement, dated February 28, 2018, by and between Pipeline Health Holdings and Global Healthcare Exchange, LLC
14. VitalWare Master Agreement and Amendments, dated September 1, 2016, by and between Pipeline Health System, LLC and VitalWare, LLC
15. Halcyon Agreement for Supplement Staffing Agencies, dated February 28, 2022, by and between Pipeline Health System, LLC and Halcyon Nurse Staffing, LLC
16. Health Stream Master Services Agreement Health Stream Order Form, dated October 26, 2018, by and between Pipeline East Dallas, LLC and HealthStream, Inc. (HCCS and Clinical Decision Support)
17. Health Stream Master Services Agreement Health Stream Order Form, dated October 26, 2018, by and between Pipeline East Dallas, LLC and HealthStream, Inc. (Learning Center)
18. HealthITq Master Agreement, dated June 3, 2022, by and between Pipeline Health System, LLC and HealthITq, Inc.
19. Heartbeat Service Agreement and Order, dated January 1, 2022, by and between Pipeline Health, LLC and Heartbeat AI Inc.
20. Imprivata Master Purchase Agreement, dated January 6, 2021, by and between Pipeline Health and Imprivata

3

DM3\8615431.9

21. Infor Software Agreement, dated August 23, 2019, by and between Pipeline Health System, LLC and Infor (US), Inc.
22. Intrinium Cyber Security SOW with MSA, dated August 31, 2021, by and between Pipeline Health System, LLC and Intrinium, Inc.
23. Torchlight Active Directory Audit with MSA, dated January 24, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.
24. TorchLight Cisco Umbrella Agreement with MSA, dated December 21, 2021, by and between and Pipeline Health System, LLC and Intrinium, Inc.
25. Torchlight Disaster Recovery Agreement with MSA, dated January 24, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.
26. Torchlight Incident Response Retainer with MSA, dated January 24, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.
27. TorchLight KnowB4 Agreement with MSA, dated December 30, 2021, by and between and Pipeline Health System, LLC and Intrinium, Inc.
28. Torchlight Mobile Mgmt & Vulverability Awareness Program Agreement with MSA, dated January 21, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.
29. Torchlight Security Operations Center with MSA, dated January 21, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.
30. Torchlight Staffing PHS Cybersecurity Agreement with MSA, dated April 18, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.
31. Torchlight Tenable Nessus Agreement with MSA, dated January 21, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.
32. Torchlight Virtual Chief Information Security Officer Agreement with MSA, dated April 5, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.
33. Iron Mountain Customer Agreement with Amendment to Transfer Records, dated February 1, 2022 by and between Pipeline Health System, LLC and Iron Mountain Information Management, LLC
34. Medigate End User License Agreement, dated December 29, 2021, by and between Pipeline Health System, LLC and Medigate Corporation
35. Meleeo Master Services Agreement, dated December 15, 2021, by and between Pipeline Health System, LLC and Meleeo, LLC
36. MHC License Agreement with Amendment, dated November 1, 2020, by and between Pipeline Health System, LLC and MHC Software, LLC
37. Microsoft Enterprise Agreement with Connection.docx, dated January 1, 2021, by and between Pipeline Health System, LLC and Connection, Inc.
38. Pipeline Health 6M CoTerm Renewal Nutanix Terms and Conditions, dated December 18, 2021, by and between Pipeline Health System and Nutanix
39. Novaseek Supplier Agreement, dated June 24, 2022, by and between Novaseek Research and Pipeline Health System, LLC
40. Optum Case Advisor Agreement, dated October 23, 2020, by and between Pipeline Health System, LLC and Optum360, LLC
41. Optum Case Advisor Agreement, dated September 21, 2020, by and between Pipeline Health System, LLC and Optum360, LLC
42. POA Lease Agreement, dated April, 20, 2020, by and between Avanti Hospitals, LLC and Pacific Office Automation

4

DM3\8615431.9

43. Press Ganey Master Service Agreement, dated March 1, 2022, by and between Pipeline Health System, LLC and Press Ganey Associates, LLC (d/b/a Press Ganey Associates, Inc.)

44. RLDatix Master Service Agreement; RLDatix BAA, dated February 1, 2022, by and between Pipeline Health System, LLC and RLDatix

45. Robert Half Master Services Agreement and Amendments, dated August 1, 2021, by and between Avanti Hospitals, LLC and Robert Half International Inc.

46. RPI AP Automation Agreement, dated January 1, 2022, by and between Pipeline Health System, LLC and RPI Consultants, LLC

47. RPI Consultants Master Services Agreement, dated October 21, 2019, by and between Pipeline Health Systems, LLC and RPI Consultants, LLC

48. S&P Consultants Professional Services Agreement, dated December 27, 2021, by and between Pipeline Health Systems, LLC and S&P Consultants, Inc.

49. Sequent Creative Master Services Agreement; Sequent Creative BAA, dated October 12, 2021, by and between Pipeline Health System, LLC and Sequent Creative, LLC (Website Design)

50. Sequent Creative Master Services Agreement; Sequent Creative BAA, dated October 12, 2021, by and between Pipeline Health System, LLC and Sequent Creative, LLC (Website Design-Third Party Software)

51. Syntellis Budgeting Subscription Agreement, dated September 5, 2018, by and between Avanti Hospitals, LLC and Syntellis Performance Solutions, LLC

52. Syntellis Cost Accounting Subscription Agreement, dated September 1, 2018, by and between Avanti Hospitals, LLC and Syntellis Performance Solutions, LLC

53. T2 Tech Group Master Service Agreement, dated February 20, 2020, by and between Pipeline Health System, LLC and T2 Tech Group, LLC

54. Triyam Master Software and Service Agreement, dated January 15, 2020, by and between Pipeline Health System, LLC and Triyam, Inc

55. Veeam Invoice and Terms, dated August 26, 2021, by and between West Sub Medical Center and Veeam

56. VMWare Agreement, dated January 28, 2022, by and between West Sub Medical Center and VMWare

57. Vyne Medical Master Services Agreement, SOW and Amendments, dated April 17, 2019, by and between Pipeline Health System, LLC and The White Stone Group, LLC (formerly The White Stone Group, Inc.) d/b/a Vyne Medical

58. Zix Services Agreement and Terms, dated March 20, 2019, by and between Pipeline Health System  and Zix

59. Zoho Corporation, dated December 22, 2021, by and between Pipeline Health System, LLC and Zoho Corporation

60. Zoom Master Subscription Agreement, dated April 30, 2018, by and between Avanti Hospitals, LLC and Zoom Video Communications, Inc.

61. Addison Group - Pipeline Health System Signed Agreement, dated September 28, 2021, by and between Pipeline Health System and Addison Group

62. Alcon GPO Laboratories Agreement, dated January 1, 2022, by and between Pipeline Health System and Alcon Laboratories, Inc.

63. Allergan GPO Agreement, dated January 1, 2022, by and between Pipeline Health System and Allergan

DM3\8615431.9

64. Avant-garde Health and Pipeline Health - BPCI Advanced Agreement, dated March 30, 2019, by and between Pipeline Health, LLC and Avant-garde

65. Aya Healthcare Agreement for Supplemental Staffing, dated February 1, 2022, by and between Pipeline Health System, LLC and Aya Healthcare, Inc.

66. Bard GPO Agreement, dated January 1, 2022, by and between Pipeline Health System and Bard Access Sys

67. Conifer Master Services Agreement, as amended, dated January 28, 2019, by and between SRC Hospital Investments II, LLC and Conifer Revenue Cycle Solutions , LLC

68. Cross America Financial Agreement, undated, by and between Pipeline Health System, LLC and Cross America Financial LLC

69. Crossroads Health Agreement, undated, by and between Pipeline Health System, LLC and Crossroads Health LLC

70. Delta Dental Insurance Agreement, undated, by and between Pipeline Health System and Delta Dental Insurance

71. Gallagher Basset Services Agreement, undated, by and between Pipeline Health System, LLC and Gallagher Basset Services, Inc

72. Grainger GPO Agreement, dated January 1, 2022, by and between Pipeline Health System and Grainger

73. KCI USA Agreement, undated, by and between Pipeline Health System, LLC and KCI USA INC

74. Medtronic Minimed Agreement, undated, by and between Pipeline Health System and Medtronic Minimed

75. Medtronic Sofamor Danek Agreement, undated, and between Pipeline Health System and Medtronic Sofamor Danek

76. Mimedx GPO Agreement, dated January 1, 2022, by and between Pipeline Health System and Mimedx

77. Mytonomy Agreement, dated July 31, 2020, by and between Pipeline Health System, LLC and Mytonomy, Inc.

78. Passport USA International Staffing Agreement, dated February 28, 2022, by and between Health Carousel, LLC and Pipeline Health System, LLC

79. Premier Agreement, dated January 1, 2022, by and between Pipeline Health System, LLC and Premier, Inc.

80.  Staples GPO Business Advantage Agreement, dated January 1, 2022, by and between Pipeline Health System and Staples Business Agreement

81. Stryker GPO Agreement, dated January 1, 2022, by and between Pipeline Health System and Stryker Flex Corp

82. Telefex GPO Agreement, dated January 1, 2022, by and between Pipeline Health System and Teleflex LLC

83. Tenet Information Technology Transition Services Agreement, dated January 29, 2019, by and between Pipeline – Weiss Memorial Hospital, LLC, Pipeline – West Suburban Medical Center, LLC, Pipeline – Westlake Hospital, LLC, Pipeline – Weiss Medical Specialists, LLC and Pipeline – Lakefront Medical Associates, LLC; and Tenet Business Services Corp

84. Terumo Medical GPO Agreement, dated January 1, 2022, by and between Pipeline Health System and Terumo Medical Corp

6

85. TRE Reimbursement Services Contract September, 2019, by and between Pipeline Health System, LLC and TRE Reimbursement

86. UnitedHealth Group Agreement, undated, by and between Pipeline Health System and UnitedHealth Group

87. Valley Medical Staffing Inc. Agreement for International Nursing Staff, dated March 22, 2021, by and between Pipeline Health System, LLC and Valley Medical Staffing, Inc.

88. VEMA Staffing Partners Agreement for International Nursing Staff, dated March 22, 2021, by and between Pipeline Health System, LLC and VEMA Staffing Partners

89. SOW 4 Staffing Support, dated June 16, 2021, by and between Pipeline Health System, LLC and Wakefield and Assoc Inc.

90. Businesssolver Master Service Agreement, dated January 1, 2017, by and between Avanti Hospitals, LLC and Businesssolver.com Inc., as amended

91. Pipeline Health System - CathWorks - Commercial Equipment Placement Agreement, dated March 25, 2022, by and between Pipeline Health System, LLC and CathWorks, Inc.

92. Cerner Business Agreement, dated May 10, 2019, by and between Pipeline Health and Cerner Corporation

93. Change Healthcare Hosted Storage Order and Terms, dated January 9, 2020, by and between Pipeline Health Systems, LLC and Change Healthcare Technologies, LLC

94. Change Healthcare Master Relationship Agreement, dated January 15, 2020, by and between Pipeline Health Systems, LLC and Change Healthcare Technologies, LLC

95. CIHQ Membership Agreement, dated July 24, 2019, by and between Pipeline Health Systems, LLC and Center for Improvement in Healthcare Quality

96. CloudSAFE Order and Terms, dated April 25, 2022, by and between Pipeline Health Systems, LLC and CloudSAFE, Ltd

97. CrowdStrike Online Terms and Conditions CrowdStrike PHS Allocation, dated December 10, 2021, by and between Pipeline Health and Crowdstroke

98. Databank Master Service Agreement and Orders, dated May 25, 2021, by and between Pipeline Health Systems, LLC and Databank Holdings, Ltd

99. DeliverHealth Agreement, dated September 15, 2020, by and between Pipeline Health System, LLC and DeliverHealth Solutions LLC

100. eSolutions Service Agreement, dated September 15, 2020, by and between Pipeline Health System, LLC and eSolutions, Inc.

101. ExponentHR Service Agreement, dated April 1, 2022, by and among GARDENA HOSPITAL, L.P., ELADH, L.P., CHHP MANAGEMENT, LLC, CPH HOSPITAL MANAGEMENT, LLC, AVANTI HOSPITALS, LLC, PIPELINE - WEISS MEMORIAL HOSPITAL, LLC, PIPELINE - WEST SUBURBAN MEDICAL CENTER, LLC, PIPELINE- LAKEFRONT MEDICAL ASSOCIATES, LLC, PIPELINE - WEISS MEDICAL SPECIALISTS, LLC, PIPELINE EAST DALLAS, LLC, CITY HOSPITAL PHYSICIAN GROUP, INC., PIPELINE HEALTH SYSTEM, LLC and Exponent Technologies, Inc.

102. Fortinet Terms and Conditions, dated January 31, 2022, by and between Pipeline Health and Fortinet, Inc.

103. GE Dicom Agreement, dated October 23, 2020, by and between Pipeline Health System, LLC and GE Healthcare IITS USA Corp

7

DM3\8615431.9

104. VitalWare Master Agreement and Amendments, dated September 1, 2016, by and between Pipeline Health Systems, LLC and VitalWare, LLC

105. Health Stream Master Services Agreement Health Stream Order Form, dated October 26, 2018, by and between Pipeline East Dallas, LLC and HealthStream, Inc. (HCCS and Clinical Decision Support)

106. Health Stream Master Services Agreement Health Stream Order Form, dated October 26, 2018, by and between Pipeline East Dallas, LLC and HealthStream, Inc. (Learning Center)

107. Heartbeat Service Agreement and Order, dated January 1, 2022, by and between Pipeline Health, LLC and Heartbeat AI Inc.

108. Infor Software Agreement, dated August 23, 2019, by and between Pipeline Health System, LLC and Infor (US), Inc.

109. Intrinium Cyber Security SOW with MSA, dated August 31, 2021, by and between Pipeline Health System, LLC and Intrinium, Inc.

110. Torchlight Active Directory Audit with MSA, dated January 24, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.

111. TorchLight Cisco Umbrella Agreement with MSA, dated December 21, 2021, by and between and Pipeline Health System, LLC and Intrinium, Inc.

112. Torchlight Disaster Recovery Agreement with MSA, dated January 24, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.

113. Torchlight Incident Response Retainer with MSA, dated January 24, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.

114. TorchLight KnowB4 Agreement with MSA, dated December 30, 2021, by and between and Pipeline Health System, LLC and Intrinium, Inc.

115. Torchlight Mobile Mgmt & Vulverability Awareness Program Agreement with MSA, dated January 21, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.

116. Torchlight Security Operations Center with MSA, dated January 21, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.

117. Torchlight Staffing PHS Cybersecurity Agreement with MSA, dated April 18, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.

118. Torchlight Tenable Nessus Agreement with MSA, dated January 21, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.

119. Torchlight Virtual Chief Information Security Officer Agreement with MSA, dated April 5, 2022, by and between and Pipeline Health System, LLC and Intrinium, Inc.

120. Medtel.com, Inc. Master Application Services Agreement, as amended, dated November 16, 2021 by and between Medtel.com, Inc. and Pipeline Health System, LLC

121. The Circle Managed Print Service Agreement, dated October 11, 2021, by and between Pipeline Health System, LLC and The Circle II, Inc

122. The Encompass Services Agreement, dated December 23, 2021, by and among Pipeline - Weiss Memorial Hospital, LLC,  Pipeline West Suburban Medical Center, LLC, Pipeline Lakefront Medical Specialists, LLC, Pipeline Weiss Medical Specialists, LLC, Pipeline East Dallas, LLC, City Hospital Physician Group, Inc., Gardena Hospital, LP, ELADH, LP, CHHP Management, LLC, CPH Hospital Management, LLC, Avanti

8

DM3\8615431.9

Hospitals, LLC, Pipeline Health System, LLC and TEG Holdings, Inc. d/b/a The Encompass Group

123.     Poseidon Sales Agreement; Poseidon Sales Agreement Terms; Trident BAA, dated April 1, 2021, by and between Pipeline Health Systems, LLC and Trident

124.     Triyam Master Software and Service Agreement, dated January 15, 2020, by and between Pipeline Health Systems, LLC and Triyam, Inc

125.     Vyne Medical Master Services Agreement, SOW and Amendments, dated April 17, 2019, by and between Pipeline Health System, LLC and The White Stone Group, LLC (formerly The White Stone Group, Inc.) d/b/a Vyne Medical

126.     Consulting Services Agreement, dated February 2, 2022, by and between Pipeline Health System, LLC and C. David Ross, as amended

127.     Consulting Agreement, dated August 1, 2021, by and between Pipeline Health System, LLC and Anthony Tedeschi, M.D., as assigned and amended by that certain First Amendment to Consulting Agreement, dated February 27, 2022, by and between Pipeline Health System, LLC and 4Square, LLC

9

Schedule 2.2(l)

Other Excluded Assets

1.      Any rights of Pipeline Health System, LLC or SRC Hospital Investments II, LLC with respect to all pending and/or potential indemnification claims of Pipeline Health System, LLC and SRC Hospital Investments II, LLC against Tenet Business Services Corporation ("TBSC") and/or any other "Sellers" as defined in, and in connection with, that certain Asset Purchase Agreement, dated July 17, 2018, by and among SRC Hospital Investments II, LLC, TBSC, and the other Sellers, as amended

2.      All proofs of claim and/or administrative claims held by or filed by or on behalf of SRC Hospital Investments II, LLC, Pipeline - Weiss Memorial Hospital, LLC and/or Pipeline-West Suburban Medical Center, LLC in the bankruptcy cases of Westlake Property Holdings, LLC and/or Pipeline-Westlake Hospital, LLC

3.      With respect to each Subsidiary, any and all claims or causes of action of such Subsidiary or of such Subsidiary's bankruptcy estate relating to or arising during Seller's period of ownership of such Subsidiary

10

DM3\8615431.9

Schedule 2.7(e)

Bonus Retention Agreements

1. Darren Jackson
2. Yolanda Coleman
3. Maryann Fiorentino
4. Teresa Tuohy
5. Debra Larkin
6. Elizabeth Kurien
7. Neil Jain
8. Deloris Neal
9. Michele Greenberg
10. Maria Suvacarov
11. Ventsislava Christoff
12. Nancy Ritz

11

DM3\8615431.9

Schedule 2.7(f)

Material Assigned Contracts

**Data Processing and Software Contracts:**

1. Abbott Facility Participation Agreement, dated September 20, 2019, by and between Pipeline Health (West Suburban Medical Center & Weiss Memorial Hospital) and Abbott Laboratories, Inc.
2. ATT Account 8310009539159, dated August 30, 2019, by and between Pipeline Health, LLC and AT&T Corp
3. ATT Account 8310009543475, dated August 30, 2019, by and between Pipeline Health, LLC and AT&T Corp
4. ATT Account 8310010040998, dated August 30, 2019, by and between Pipeline Health, LLC and AT&T Corp
5. ATT Account 8310010744545, dated February 2, 2022, by and between Pipeline Health, LLC and AT&T Corp
6. ATT Account 8310010880159, dated August 30, 2019, by and between Pipeline Health, LLC and AT&T Corp
7. GE MUSE Upgrade Agreement, dated August 1, 2022, by and between Pipeline Health and GE Medical System Information Technologies, Inc., a GE Healthcare Business
8. MetTel Marine Drive Agreement, dated November 1, 2021, by and between Pipeline Health System, LLC and Manhattan Telecommunications Corporation
9. MetTel Oak Park Agreement, dated November 1, 2021, by and between Pipeline Health System, LLC and Manhattan Telecommunications Corporation
10. MetTel River Forest Agreement, dated November 1, 2021, by and between Pipeline Health System, LLC and Manhattan Telecommunications Corporation
11. Verity Stream Master Service Agreement Verity Stream Order, dated April 1, 2022, by and between Pipeline Health Systems, LLC (Chicago Hospital Locations) and VerityStream, Inc.
12. 5493620-SO PIPELINE HEALTH 6161171; 5493620-WFCSaaS PIPELINE HEALTH 6161171; 5494397-SO PIPELINE HEALTH 6161171; Kronos Order 7.16.19; Q-98130 PIPELINE HEALTH 6161171, dated March 19, 2019, by and between Pipeline Health and Kronos Incorporated

**Payor Agreements**:

1. Inpatient and Outpatient Services Agreement, effective April 1, 2013, by and between VHS of Illinois, Inc. (on behalf of West Suburban Medical Center, MacNeal Hospital, Westlake Hospital and Louis A. Weiss Memorial Hospital) and Advocate Health and Hospitals Corporation d/b/a Advocate Medical Group
2. Hospital Agreement, as amended, effective September 15, 2019, by and between Aetna Network Services, LLC and SRC Hospital Investments II, LLC (on behalf of its Hospital Providers and locations)

12

DM3\8615431.9

3.  Performance Improvement Program Agreement, as amended, effective September 15, 2019, by and between Aetna Health, Inc. and SRC Hospital Investments II, LLC, on behalf of itself and its affiliates

4.  Hospital Services Agreement, effective April 1, 2009, by and between CIGNA HealthCare of Illinois, Inc. and VHS Acquisition Subsidiary Number 3, Inc. dba Louis A. Weiss Memorial Hospital (assigned to Pipeline Health)

5.  Participating Health System Letter of Agreement, effective June 11, 2019, by and between Pipeline Health on behalf of Weiss Memorial Hospital and West Suburban Medical Center and Clear Spring Health of Illinois, Inc.

6.  CountyCare Participating Facility Agreement, effective December 18, 2018, by and between Cook County Health and Hospital System and Pipeline Health and its affiliates, including Westlake Hospital, West Suburban Medical Center and Louis A. Weiss Memorial Hospital

7.  Hospital Services Agreement, effective May 1, 2005, by and between Harmony Health Plan of Illinois, Inc. and VHS Acquisition Subsidiary Number 3, Inc. dba Weiss Memorial Hospital

8.  Hospital Services Agreement, effective August 1, 1997, by and between Harmony Health Plan of Illinois, Inc. and VHS West Suburban Medical Center dba West Suburban Medical Center

9.  Letter of Agreement to Participate (Medicare), dated October 3, 2018, by and between Pipeline Health (on behalf of Providers) and Humana Insurance Company

10. Letter of Agreement to Participate (Commercial), dated September 24, 2018, by and between Pipeline Health (on behalf of Providers) and Humana Insurance Company

11. Institutional & Professional Agreement, effective August 1, 2019, by and between Pipeline Health and Humana Government Business, Inc. dba Humana Military

12. Participating Provider Agreement, effective October 1, 2019, by and between SRC Hospital Investments II, LLC and IlliniCare Health

13. Practitioner Agreement, effective March 17, 2017, by and between Meridian Health Plan of Illinois, Inc. and Pipeline Health

14. Hospital Agreement, effective March 1, 2017, by and between Meridian Health Plan of Illinois, Inc. and Pipeline Health

15. Master Agreement, effective January 1, 2018, by and between Meridian Affiliates and Tenet Providers

16. Hospital Services Agreement (Weiss), dated on or about July 26, 2019, by and between SRC Hospital Investments II, LLC and Molina Healthcare of Illinois, Inc.

17. Hospital Services Agreement (West Suburban), dated on or about July 26, 2019, by and between SRC Hospital Investments II, LLC and Molina Healthcare of Illinois, Inc.

18. MPI Participating Facility Agreement, effective January 24, 2019, by and between MultiPlan, Inc. and Pipeline Health (on behalf of Weiss Memorial Hospital and West Suburban Medical Center)

19. Hospital Participating Provider Agreement, effective September 15, 2019, by and between NextLevel Health Partners, Inc. and SRC Hospital Investments II, LLC on behalf of Weiss Memorial Hospital and West Suburban Medical Center

20. Facility Participation Agreement, effective January 1, 2021, as amended, by and between Oscar Health Plan, Inc. and SRC Hospital Investments II, LLC on behalf of West Suburban Medical Center and Weiss Memorial Hospital

13

DM3\8615431.9

21. Participating Provider Agreement, dated on or about June 26, 2019, by and between SRC Hospital Investments II, LLC (on behalf of Weiss Memorial Hospital, West Suburban Medical Center and Lakefront Medical Associates) and Zing Health
22. Facility Participation Agreement, effective January 29, 2019, between UnitedHealthcare of Illinois, Inc. and Pipeline Health (on behalf of Weiss Memorial Hospital and West Suburban Medical Center)

14

Schedule 3.1(b)

Corporate Capacity, Authority and Consents

**Weiss Memorial Hospital and West Suburban Medical Center
Licenses and Permits**

**NOTE: THIS SCHEDULE ASSUMES THE NAME, ADDRESS, FEDERAL TAX ID, AND MEDICARE AND MEDICAID PROVIDER NUMBERS FOR EACH ENTITY WILL NOT CHANGE AS A RESULT OF THE TRANSACTION; IN SOME CASES, THERE MAY BE TIME LIMITATIONS ASSOCIATED WITH NECESSARY PRE-CLOSING OR POST-CLOSING FILINGS, NOTIFICATIONS OR APPROVALS THAT ARE NOT IDENTIFIED IN THE SCHEDULE**

**Weiss Memorial Hospital**

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notification or Approval Required? |
|---|---|---|---|---|
| CLIA Certificate of Waiver | Weiss Memorial Hospital- POCT (point of care testing) 4646 N Marine Dr. | Centers for Medicare & Medicaid Services | CLIA ID No. 14D1025353 | No notification required if the present transaction will not change lab name, lab address, lab director, or federal tax ID |
| CLIA Certificate of Accreditation | Weiss Memorial Hospital Laboratory 4646 N. Marine Drive | Centers for Medicare & Medicaid Services | CLIA ID No. 14D1002692 | No notification required if present transaction will not change lab name, lab address, lab director, or federal tax ID |
| CLIA Certificate of Waiver | Chicago Health Med Group — Edgewater 6201 N Broadway Chicago, IL 60660 | Centers for Medicare & Medicaid Services | CLIA ID No. 14D2099737 | No notification required if present transaction will not change lab name, lab address, lab director, or federal tax ID |
| CLIA Certificate of Waiver | Lakefront Oncology Assoc 4700 N Marine Dr. Ste 315 Chicago, IL 60640 | Centers for Medicare & Medicaid Services | CLIA ID No. 14D2017169 | No notification required if present transaction will not change lab name, lab address, lab director, or federal tax ID |

15

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notification or Approval Required? |
|---|---|---|---|---|
| CLIA Certificate of Waiver | L M A Lakefront 4646 N. Marine Drive Chicago, IL 60640 | Centers for Medicare & Medicaid Services | CLIA ID No. 14D0427142 | No notification required if present transaction will not change lab name, lab address, lab director, or federal tax ID |
| Controlled Substance Registration Certificate | Pipeline-Weiss Hospital LLC  D/b/a Louis A Weiss Memorial Hospital Pharmacy,  4646 N. Marine Drive Chicago, IL 60640 | United States Department of Justice Drug Enforcement Administration | DEA Registration Number FP0957033 | New registration required; registration can be filed once receive updated pharmacy/controlled substance approvals from IDFPR. In the interim, a DEA-permitted Power of Attorney between seller and buyer is possible. |
| Radio Station Authorization | Louis A. Weiss Memorial Hospital 4646 N. Marine Dr. Chicago, IL 60640 | Federal Communications Commission Public Safety and Homeland Security Bureau | FCC Registration Number (FRN): 0022763601 Call Sign WQRX593 File Number 0006886531 | Application for transfer of control (Form 603) required before closing. Once hospital files Form 603, it will have temporary conditional authority under 47 CFR 90.159(c) to continue operating during the pendency of the application, up to 180 days.  The conditional authority will cease if the application is dismissed by the FCC. |
| Hospital License | Pipeline—Weiss Memorial Hospital LLC dba Louis A. Weiss Memorial Hospital 4646 North Marine Drive, Chicago, IL 60640 | Illinois Department of Public Health | I.D. Number 0006122 HF124728 | Hospital license application must be filed with IDPH before closing |
| Mammography Facility Certification | Weiss Memorial Hospital 4646 Marine Drive, Chicago, IL 60640-5700 | State of Illinois Emergency Management Agency | Facility ID Number 121061 Control Number 16-04138 | No notification required if present transaction will not change entity name, address, federal tax ID, or Medicare provider number. |

16

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notification or Approval Required? |
|---|---|---|---|---|
| Pharmacy License | Pipeline-Weiss Memorial Hospital LLC<br><br>d/b/a Louis A Weiss Hospital Pharmacy<br><br>4646 N. Marine Drive Chicago, IL 60640 | State of Illinois Department of Financial and Professional Regulation | License No. 054.021167 051.036116 | New application must be filed before closing. |
| Controlled Substance License | Pipeline-Weiss Memorial Hospital LLC<br><br>d/b/a Louis A Weiss Hospital Pharmacy<br><br>4646 N. Marine Drive Chicago, IL 60640 | State of Illinois Department of Financial and Professional Regulation | License No. 320.013038 054.021167 | New application must be filed before closing. |
| Radioactive Material License | Pipeline-Weiss Memorial Hospital, LLC<br><br>d/b/a Louis A. Weiss Memorial Hospital<br><br>4646 North Marine Dr., Chicago, IL | Illinois Emergency Management Agency, Bureau of Radiation Safety; 1035 Outer Park Drive; Springfield, Illinois 62704 | License Number IL-01595- 01 Amendment Number 25 | Written notification to IEMA required before closing, and written consent from IEMA required before closing. |
| IEPA Lifetime Operating Permit Exemption | Louis A. Weiss Memorial Hospital 4646 North Marine Drive, Chicago, IL | Illinois Environmental Protection Agency | Application No. 77120016 ID No. 031600EXZ Four natural gas fired boilers and two storage tanks | Unable to locate |
| Acknowledgement of Successful CLIA Inspection | Fertility & Cryogenic Lab Weiss Memorial Hospital | Illinois Department of Public Health | None | No notification required if present transaction will not change lab name, lab address, lab director, or federal tax ID |

17

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notification or Approval Required? |
|---|---|---|---|---|
| Certificate of Recognition as a Primary Stroke Center Facility | Weiss Memorial Hospital | Illinois Department of Public Health | None | No notification required if the present transaction will not change the name, address or federal tax ID number |
| Underground Storage Tank Green Tag Decal | Louis A. Weiss Memorial Hospital | Office of the Illinois State Fire Marshal | Permit No. V001956 Facility # 2033188 | No notification required if the present transaction will not change the tax ID number or other information about the facility, such as facility name |
| Certificate of X-Ray Registration | Weiss Memorial Hospital | State of Illinois Illinois Emergency Management Agency Division of Nuclear Safety | Registration No. 9001439 | No notification required if the present transaction will not change the administrator or facility contact |
| Illinois Business Authorization Sales and use taxes and fees | Pipeline-Weiss Memorial Hospital, LLC DBA: Pipeline-Weiss Memorial Hospital 4646 N Marine Dr Chicago, IL 60640-5759 | Illinois Department of Revenue | Account ID: 4310-4797 Loc. Code: 016-0001-1-006 Chicago, Cook County | Completed form REG-1-O must be filed after closing |
| Change of Ownership Exemption | Pipeline-Louis Weiss Memorial Hospital, Chicago | State of Illinois Health Facilities and Services Review Board | Exemption #E-027-22 | Approval required before closing Approval received effective June 7, 2022 |
| Change of Ownership Exemption | Pipeline-Louis Weiss Memorial Hospital, Chicago | State of Illinois Health Facilities and Services Review Board | Exemption #E-028-22 | Approval required before closing Approval received effective June 7, 2022 |
| Regulated Business License | Louis A. Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago | 2206030 Code 4404 | Online update to owners/managing members required after closing |
| Retail Food Establishment License | Louis A. Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago | 1249761 Code 1006 | Online update to owners/managing members required after closing |

18

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notification or Approval Required? |
|---|---|---|---|---|
| Food Establishment Inspection Certification | Louis A. Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago Department of Public Health | [no number listed] | No notice required if the legal name and d/b/a name will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago Department of Buildings | No. 286884 Passenger AUTO B-4 | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 286885 Passenger AUTO B-5 | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407995 Passenger AUTO C-8 | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 286889 Passenger AUTO D-9 | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 292703 Passenger AUTO C-10 | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 286887 Passenger AUTO D-11 | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago Department of Buildings | No. 285759 Passenger AUTO 2 W GAR | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago Department of Buildings | No. 285758 Passenger AUTO 1 E GAR | No notification required if the facility name and address will not change |

19

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notification or Approval Required? |
|---|---|---|---|---|
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 408201 Platform lift PB Dock | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407993 Passenger AUTO A-3 | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407994 Passenger AUTO C-7 | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407991 Passenger AUTO A-1 | No notification required if the facility name and address will not change |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407992 Passenger AUTO A-2 | No notification required if the facility name and address will not change |
| Boiler Inspection Certificate of Operation | Weiss Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | Area No. N044W004 Control No. BR029198 | No notification required if the facility name and address will not change |
| Use Permit for Pedestrian Sky Bridge | Louis A Weiss Memorial Hospital | City of Chicago Department of Business Affairs and Consumer Protection Small Business Center — Public Way Use Unit | Permit No: 1128950 | No notification required if the account number with the City of Chicago will not change |
| Hospital Accreditation | Louis A. Weiss Memorial Hospital | The Joint Commission | ID No. 7286 | Notification required before closing |
| Advanced Certification as a Primary Stroke Center | Louis A. Weiss Memorial Hospital | The Joint Commission | ID No. 7286 | Notification required before closing |
| Mammographic Imaging Services Accreditation | Weiss Memorial Hospital 4646 North Marine Drive | American College of Radiology | MAP# 04605-05 Approved Unit: Lorad Medical Systems Inc. Selenia Dimensions 2012 | Online update required after closing |

20

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notification or Approval Required? |
|---|---|---|---|---|
| Computed Tomography Accreditation | Weiss Memorial Hospital 4646 North Marine Drive | American College of Radiology | CTAP# 50946-02 Approved Unit: GE Medical Systems VCT Lightspeed 2008 | Signed form for New Owner Modality ID Designation Form required after closing |
| Computed Tomography Accreditation | Weiss Memorial Hospital 4646 North Marine Drive | American College of Radiology | CTAP# 50946-03 Approved Unit: Siemens Somatom Perspective 2015 | Signed form for New Owner Modality ID Designation Form required after closing |
| Laboratory Accreditation | Weiss Memorial Hospital Clinical Laboratory | College of American Pathologists | CAP No. 7180518 | Online update required after closing |
| Community Cancer Program Accreditation | Louis A. Weiss Memorial Hospital | American College of Surgeons, Commission on Cancer | [no number listed] | Online update required after closing |
| Echocardiography Facility Accreditation | Weiss Memorial Hospital 4646 North Marine Drive | Intersocietal Accreditation Commission, Echocardiography | [no number listed] Adult Transthoracic; Adult Stress | No notification required if the information on the certificate, such as federal tax ID and facility name, will not change |
| Vascular Testing Facility Accreditation | Louis A. Weiss Memorial Hospital 4646 North Marine Drive | Intersocietal Accreditation Commission, Vascular Testing | [no number listed] Extracranial Cerebrovascular Testing; Peripheral Venous Testing; Peripheral Arterial Testing | No notification required if the information on the certificate, such as federal tax ID and facility name, will not change |

21

**Provider Numbers:**   CMS and Medicaid must be properly notified by
Buyer and Seller after closing

| | |
|---|---|
| Medicaid Hospital: | 352637418   001 |
| Medicaid Lab: | 352637418   401 |
| Medicaid Psych: | Same as hospital |
| Medicaid Rehab: | Same as hospital |

| | |
|---|---|
| Medicare Hospital: | 14-0082 |
| Medicare Lab: | 14-0082 |
| Medicare Psych: | 14-S082 |
| Medicare Rehab: | 14-T082 |

| | |
|---|---|
| TRICARE: | 362637418 |

DM3\8615431.9

## West Suburban Medical Center

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice:  Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| CLIA Certificate of Accreditation | West Suburban Medical Center 3 Erie Court - LAB — 4ʰ FL | Centers for Medicare & Medicaid Services | CLIA ID #14D0665351 | No notification required if the present transaction will not change lab name, lab address, lab director, or federal tax ID |
| CLIA Certificate of Accreditation | Medical Oncology Lab-West Suburban Medical Center

7420 Central Ave River Forest, IL | Centers for Medicare & Medicaid Services | CLIA ID #14D0926031 | No notification required if the present transaction will not change lab name, lab address, lab director, or federal tax ID |
| CLIA Certificate of Provider-Performed Microscopy Procedures | A L Burdick Family Medicine Center West Suburban Medical Center

1 Erie Court Suite 6160 Oak Park, IL 60302 | Centers for Medicare & Medicaid Services | CLIA ID #14D0879519 | No notification required if the present transaction will not change lab name, lab address, lab director, or federal tax ID |
| CLIA Certificate of Waiver | Wound Care and Hyperbaric Medicine Center

3 Erie Court, Ste L-600, Oak Park, IL 60302 | Centers for Medicare & Medicaid Services | CLIA ID #14D2061861 | No notification required if the present transaction will not change lab name, lab address, lab director, or federal tax ID |

23

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice: Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| CLIA Certificate of Provider-Performed Microscopy Procedures | Chicago Health Medical Group  7411 W Lake Street, Suite 1120 - Building A River Forest, IL 60305 | Centers for Medicare & Medicaid Services | CLIA ID # 14D0967234 | No notification required if the present transaction will not change lab name, lab address, lab director, or federal tax ID |
| Radio Station Authorization | Pipeline-West Suburban Medical Center LLC | Federal Communications Commission, Public Safety and Homeland Security Bureau | FCC Registration No. (FRN) 0031825565  File Number 0009868774  Call Sign WRPC214 | Application for transfer of control (Form 603) required before closing. Once hospital files Form 603, it will have temporary conditional authority under 47 CFR 90.159(c) to continue operating during the pendency of the application, up to 180 days. The conditional authority will cease if the application is dismissed by the FCC. |
| Controlled Substance Registration Certificate | Pipeline-West Suburban Medical Center LLC  d/b/a West Suburban Medical Center  3 Erie Court Oak Park, IL 60302 | United States Department of Justice Drug Enforcement Administration | DEA Registration Number FP0901769 | New registration required; registration can be filed once receive updated pharmacy/controlled substance approvals from IDFPR. In the interim, a DEA-permitted Power of Attorney between seller and buyer is possible. |

24

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice:  Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| Controlled Substance Registration Certificate | Pipeline Midwest Pharmacies, LLC<br><br>d/b/a Midwest Pharmacies Inc. DBA Plaza Pharmacy<br><br>1 Erie Court, Oak Park, IL 60302 | United States Department of Justice Drug Enforcement Administration | DEA Registration Number FP0003955 | New registration required; registration can be filed once receive updated pharmacy/controlled substance approvals from IDFPR. In the interim, a DEA-permitted Power of Attorney between seller and buyer is possible. |
| Controlled Substance Registration Certificate | Pipeline-West Suburban Medical Center LLC<br><br>d/b/a Center Pharmacy<br><br>7420 Central Avenue, River Forest, IL | United States Department of Justice Drug Enforcement Administration | DEA Registration Number FP0903232 | New registration required; registration can be filed once receive updated pharmacy/controlled substance approvals from IDFPR. In the interim, a DEA-permitted Power of Attorney between seller and buyer is possible. |
| Hospital License | Pipeline--West Suburban Medical Center, LLC dba West Suburban Medical Center 3 Erie Court, Oak Park, IL | Illinois Department of Public Health | I.D. Number 0006130<br><br>HF124729 | Hospital license application must be filed with IDPH before closing |

25

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice:  Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| Pharmacy License | Pipeline-West Suburban Medical Center  d/b/a West Suburban Medical Center  3 Erie Ct, Oak Park, IL | State of Illinois Department of Financial and Professional Regulation | License No. 054.021166 051.296766 | New application must be filed before closing. |
| Controlled Substance License | Pipeline-West Suburban Medical Center  d/b/a West Suburban Medical Center  3 Erie Ct, Oak Park, IL | State of Illinois Department of Financial and Professional Regulation | License No. 320.013040 054.021166 | New application must be filed before closing. |
| Pharmacy License | Pipeline Midwest Pharmacies LLC  d/b/a Plaza Pharmacy  1 Erie CT, Oak Park IL | State of Illinois Department of Financial and Professional Regulation | License No. 054.021169 051.294915 | New application must be filed before closing. |

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice:  Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| Controlled Substance License | Pipeline Midwest Pharmacies LLC<br><br>d/b/a Plaza Pharmacy<br><br>1 Erie CT, Oak Park IL | State of Illinois Department of Financial and Professional Regulation | License No. 320.013037 054.021169 | New application must be filed before closing. |
| Pharmacy License | Pipeline-West Suburban Medical Center<br><br>d/b/a Center Pharmacy<br><br>7420 Central Ave. River Forest, IL | State of Illinois Department of Financial and Professional Regulation | License No. 054.021170 051.299802 | New application must be filed before closing. |
| Controlled Substance License | Pipeline-West Suburban Medical Center<br><br>d/b/a Center Pharmacy<br><br>7420 Central Ave. River Forest, IL | State of Illinois Department of Financial and Professional Regulation | License No. 320.013039 054.021170 | New application must be filed before closing. |
| Certificate of X-Ray Registration | West Suburban Medical Center<br><br>3 Erie Ct, Oak Park IL | State of Illinois IEMA Division of Nuclear Safety | Registration No. 9003039 | No notification required if the present transaction will not change the administrator or facility contact |

27

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice:  Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| Certificate of X-Ray Registration | River Forest Breast and Imaging Center, 420 Williams St, River Forest IL | State of Illinois IEMA Division of Nuclear Safety | Registration No. 9253929 | No notification required if the present transaction will not change the administrator or facility contact |
| Mammography Facility Certification | River Forest Breast Care Center, 420 William St, 2nd Floor, River Forest, IL | Illinois Emergency Management Agency, Registration & Certification; 1035 Outer Park Drive; Springfield, IL 62704 | Facility ID Number: 205617 | No notification required if present transaction will not change entity name, address, federal tax ID, or Medicare provider number. |
| Illinois Business Authorization Sales and use taxes and fees | Pipeline-West Suburban Medical Specialists, LLC  DBA: West Suburban Medical Center  3 Erie Court, Oak Park, IL 60302 | Illinois Department of Revenue | (4310-4940)  Loc. Code: 016-0050-8-001  Oak Park, Cook County | Completed form REG-1-O must be filed after closing |
| Radioactive Material License | West Suburban Medical Center 3 Erie Court, Oak Park, IL | Illinois Emergency Management Agency Bureau of Radiation Safety | License Number IL-01520-01, Amendment 48 | Written notification to IEMA required before closing, and written consent from IEMA required before closing. |
| Boiler Inspection Certificate | West Suburban Hospital 3 Erie Ct., Oak Park, IL | Illinois Office of the State Fire Marshal, Division of Boiler and Pressure Vessel Safety; 1035 Stevenson Drive; Springfield, IL 62703-4259 | Ill Number B0023799 [Boiler No. 1] | No notification required if the entity name or contact information will not change. |

28

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice: Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| Boiler Inspection Certificate | West Suburban Hospital 3 Erie Ct., Oak Park, IL | Illinois Office of the State Fire Marshal, Division of Boiler and Pressure Vessel Safety; 1035 Stevenson Drive; Springfield, IL 62703-4259 | Ill Number B0023883 [Boiler No. 2] | No notification required if the entity name or contact information will not change. |
| Boiler Inspection Certificate | West Suburban Hospital 3 Erie Ct., Oak Park, IL | Illinois Office of the State Fire Marshal, Division of Boiler and Pressure Vessel Safety; 1035 Stevenson Drive; Springfield, IL 62703-4259 | Ill Number B0023887 [Boiler No. 3] | No notification required if the entity name or contact information will not change. |
| Air Pollution Control Lifetime Operating Permit | West Suburban Medical Center 3 Erie Court, Oak Park, IL 60302 | Illinois Environmental Protection Agency; 1021 North Grand Avenue East; P.O. Box 19506; Springfield, IL 62794-9506 | Application No. 73050587 I.D. No. 031225ABE | No notification required if the company name, contact info, and FEIN will not change. |
| Change of Ownership Exemption | Pipeline-West Suburban Medical Center, Oak Park | State of Illinois Health Facilities and Services Review Board | Exemption #E-025-22 | Approval required before closing<br><br>Approval received effective June 7, 2022 |
| Change of Ownership Exemption | Pipeline-West Suburban Medical Center, Oak Park | State of Illinois Health Facilities and Services Review Board | Exemption #E-026-22 | Approval required before closing<br><br>Approval received effective June 7, 2022 |
| Oak Park Business License | Pipeline – West Suburban Medical Center, LLC 3 Erie Ct Oak Park IL 60302 | Village of Oak Park, Illinois | License # 202200794 | Business Registration Application required after closing |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct, Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # T001145 Passenger Elevator Unit #4 | No notification required if the name and tax ID will not change |

29

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice:  Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| Certificate of Operation | West Suburban Hospital Medical Center<br><br>3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H001646<br><br>Elevator Unit 20 Fit | No notification required if the name and tax ID will not change |
| Certificate of Operation | West Suburban Hospital Medical Center<br>3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # N/A<br><br>Elevator Unit 21 Dklft Dk Area | No notification required if the name and tax ID will not change |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # D001026 Elevator Unit 22DW X-Ray D/E | No notification required if the name and tax ID will not change |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H001648 Elevator Unit 26 Pass Ctr PCP (3) | No notification required if the name and tax ID will not change |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H001650 Elevator Unit 27 Pass/Svc Rt PCP (4) | No notification required if the name and tax ID will not change |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H021588 Elevator Unit 1 Pass(28) New/Lft | No notification required if the name and tax ID will not change |
| Hospital Accreditation Program | Pipeline West Suburban Medical Center, LLC<br><br>3 Erie Court,<br>Oak Park, IL | The Joint Commission | ID# 7399 | Notification required before closing |

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice:  Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| Certificate of Distinction - Advanced Certification for Primary Stroke Center | West Suburban Medical Center Oak Park, IL | The Joint Commission | ID# 7399 | Notification required before closing |
| Breast MR Imaging Services Accreditation | Pipeline West Suburban Medical Center Breast MRI  3 Erie Court, Oak Park, IL 60302 | American College of Radiology | BMRAP# 50604-01  Approved Unit: GE SIGNA HDX 3.0T 2006 | Signed form for New Owner Modality ID Designation Form required after closing |
| Computed Tomography Services Accreditation | Pipeline West Suburban Medical Center – E.D. VCT  3 Erie Court, Oak Park, IL 60302 | American College of Radiology | CTAP# 50265-01  Approved Unit: GE Medical Systems Lightspeed VCT 2005 | Signed form for New Owner Modality ID Designation Form required after closing |
| Computed Tomography Services Accreditation | Pipeline West Suburban Medical Center – E.D. VCT  3 Erie Court, Oak Park, IL 60302 | American College of Radiology | CTAP# 50265-03  Approved Unit: Siemens Somatom Perspective 2015 | Signed form for New Owner Modality ID Designation Form required after closing |
| Nuclear Medicine Services Accreditation | Pipeline West Suburban Medical Center — Nuclear Medicine  3 Erie Court, Oak Park, IL | American College of Radiology | NMAP# 52424-01  Approved Unit: Siemens E-Cam Signature Seri 2005 | Signed form for New Owner Modality ID Designation Form required after closing |
| Ultrasound Services Accreditation | West Suburban Hospital Medical Center  3 Erie Court, Oak Park, IL | American College of Radiology | UAP# 50511  Services: Obstetrical (1", 2nd and 3rd Trimesters), Gynecological, General, Vascular | Signed form for New Owner Modality ID Designation Form required after closing |

31

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Notice: Change of Controlling Interest/Corporate Reorganization |
|---|---|---|---|---|
| Breast Imaging Center of Excellence | River Forest Breast Care Center River Forest, IL | American College of Radiology, Commission on Quality and Safety and the Commission on Breast Imaging | [not listed] | Update required after closing |
| Magnetic Resonance Imaging Services Accreditation | River Forest Advanced Imaging Center 420 William St, 1st Floor River Forest, IL | American College of Radiology | MRAP# 50302-01 Approved Unit: Siemens ESPREE 2008 | Signed form for New Owner Modality ID Designation Form required after closing |
| Ultrasound Services Accreditation | River Forest Advanced Imaging Center 420 William Street, Building B, 1st Floor, River Forest, IL | American College of Radiology | UAP# 04442 Accredited Services: Obstetrical (is% 2nd and 3rd Trimesters), Gynecological, General | Signed form for New Owner Modality ID Designation Form required after closing |
| Medical Oncology Laboratory Accreditation | West Suburban Hospital Center Medical Oncology Laboratory River Forest, IL | The College of American Pathologists | CAP Number: 1857902 AU-ID: 1184120 CLIA Number: 14D0926031 | Online update required after closing |
| Main Laboratory Accreditation | West Suburban Hospital Center Main Laboratory 4th Floor Oak Park, IL | The College of American Pathologists | CAP Number: 1857901 AU-ID: 1184118 CLIA Number: 14D0665351 | Online update required after closing |

32

**Provider Numbers:**    CMS and Medicaid must be properly notified by
Buyer and Seller after closing

| | | |
|---|---|---|
| Medicaid Hospital: | 611899386 | 001 |
| Medicaid Lab: | 611899386 | 401 |
| Medicare Hospital: | 14-0049 | |
| | | |
| Medicare Lab: | 14-0049 | |
| Medicare SNF: | 14-5743 | |
| TRICARE: | 611899386 | |

DM3\8615431.9

Schedule 3.4

Subsidiaries

1.    Pipeline Chicago Graduate Education Foundation
2.    West Suburban Property Holdings, LLC
3.    River Forest Property Holdings, LLC
4.    Weiss Property Holdings, LLC
5.    Weiss MOB Property Holdings, LLC

DM3\8615431.9



* Please note that this slide omits the upstream ownership of Pipeline Health System, LLC in order to show the structure more clearly.

35

Schedule 3.5

Debt

1.  None.

DM3\8615431.9

Schedule 3.6

Financial Statements

See attached.

DM3\8615431.9

|  |  | CY - 2021 | YTD - Sep'22 |
|---|---|---|---|
| Income Statement Summary | _ | Actual | Actual |
| _ | _ |  |  |
| **Patient Revenue (in 000s)** |  |  |  |
| Inpatient |  | 697,761 | 485,181 |
| Sub Acute |  | 0 | 0 |
| Outpatient |  | 670,687 | 506,167 |
| Total Patient Revenue |  | 1,368,447 | 991,348 |
| **Deductions From Revenue (in 000s)** |  |  |  |
| Contractual Adjustments |  | 1,113,538 | 838,791 |
| Denials |  | 21,498 | -25,364 |
| Administration and Policy Adjustments |  | 2,933 | 1,465 |
| Charity |  | 732 | 16,611 |
| Provision For Bad Debt |  | 20,952 | 12,263 |
| Bad Debt Recoveries |  | -2,030 | -3,186 |
| Bad Debt Expense |  | 0 | 0 |
| Cost Report Adjustments |  | 88 | -175 |
| DSH Supplemental |  | 0 | 0 |
| Other Deductions |  | -35 | 3,186 |
| Total Deductions From Revenue |  | 1,157,675 | 843,590 |
| **Medicaid Supplemental Revenue (in 000s)** |  |  |  |
| Medicaid Supplemental Income |  | 31,041 | 32,629 |
| Medicaid Supplemental Expense |  | 16,903 | 11,503 |
| Net Medicaid Supplemental Revenue |  | 14,138 | 21,127 |
| **Net Patient Revenue (in 000s)** |  | **224,911** | **168,885** |

DM3\8615431.9

| | | |
|---|---|---|
| **Other Operating Revenue (in 000s)** | | |
| Capitation Revenue | 0 | 0 |
| CARES Act Provider Relief Grant | 3,294 | 1,845 |
| Other Operating Revenue | 12,585 | 13,397 |
| Total Other Operating Revenue | 15,880 | 15,242 |
| **Total Operating Revenue (in 000s)** | **240,790** | **184,127** |
| **Operating Expenses (in 000s)** | | |
| Salaries & Wages | 100,437 | 76,419 |
| Salaries & Wages - Non Productive | 10,803 | 7,756 |
| Contract Labor | 12,451 | 22,310 |
| Benefits | 14,221 | 12,602 |
| Medical Supplies | 39,147 | 26,877 |
| Drugs & Pharmaceuticals | 4,138 | 6,977 |
| Other Supplies | 4,742 | 4,231 |
| Professional Fees | 14,170 | 12,661 |
| Purchased Services | 40,627 | 34,213 |
| Maintenance and Repairs | 4,854 | 4,137 |
| Utilities | 5,003 | 4,210 |
| Lease and Rental | 1,954 | 1,046 |
| Property Taxes and Other | 4,688 | 3,060 |
| Insurance | 11,287 | 2,873 |
| Other Expenses | 2,935 | 2,109 |
| Capitated Patients Expense | 0 | 7 |
| Total Operating Expenses | 271,457 | 221,488 |
| **EBIDAR (in 000s)** | **-30,666** | **-37,361** |

39

| | | | |
|---|---|---|---|
| **Non-Operating (in 000s)** | | | |
| Depreciation & Amortization | | 5,874 | 4,616 |
| Interest | | 1,025 | 650 |
| Property Rent | | 339 | 359 |
| Corporate Allocation | | 0 | 0 |
| Management Fees | | 0 | 50 |
| Other Non-Operating Rev (Exp) | | -3,255 | 140 |
| **Total Non-Operating (in 000s)** | | **10,493** | **5,536** |
| | | | |
| Income Tax | | 0 | 0 |
| **Total Income Tax (in 000s)** | | **0** | **0** |
| | | | |
| **Net Income / (Loss) (in 000s)** | | **-41,159** | **-42,897** |
| | | | |
| | | | |
| | | 12/31/2021 | 9/30/2022 |
| Balance Sheet Summary | - | Actual | Actual |
| - | - | | |
| **Current Assets:** | | | |
| Cash and Cash Equivalents | | 4,033,420 | 415,099 |
| Current Assets limited as to use: | | | |
| | | | |
| Patient Accounts Receivable | | 186,002,470 | 173,519,646 |
| Allowance for Doubtful Accounts | | (2,615,398) | (3,243,609) |
| Allowance for Medicare and Medi-Cal | | (74,454,139) | (63,571,154) |
| Allowance for Managed Care | | (21,860,469) | (23,891,937) |
| Other Allowances | | (26,455,782) | (23,089,082) |
| **Net Patient Accounts Receivable** | | **60,616,682** | **59,723,865** |

DM3\8615431.9

| | | | |
|---|---|---|---|
| Inventory | | 8,641,639 | 8,282,076 |
| Prepaid Expenses | | 4,315,093 | 4,230,127 |
| Prepaid Insurance | | 0 | 0 |
| Current Receivables | | 1,672,457 | 7,092,935 |
| Other Receivable Allowances | | (169,932) | (176,828) |
| Medicare & Medi-Cal Receivables | | 0 | 0 |
| Other Assets | | 0 | 0 |
| Other Current Assets | | 0 | 0 |
| **Total Current Assets** | | **79,109,359** | **79,567,274** |
| | | | |
| **Property and Equipment:** | | | |
| Land & Improvements | | 174,294 | 174,294 |
| Buildings & Improvements | | 5,462,106 | 5,805,645 |
| Leasehold Improvements | | 0 | |
| Equipment | | 27,537,645 | 29,898,124 |
| Construction In Progress | | 1,807,740 | 4,543,465 |
| **Total Property, Plant & Equipment** | | **34,981,785** | **40,421,528** |
| | | | |
| Accumulated Depreciation | | (11,406,393) | (15,992,771) |
| **Net Property and Equipment** | | **23,575,392** | **24,428,758** |
| | | | |
| **Other Assets:** | | | |
| Equity Investment | | 0 | 0 |
| Other Deferred Costs & Other L/T Assets | | 424,512 | 502,513 |
| **Total Other Assets** | | **424,512** | **502,513** |

41

DM3\8615431.9

| | | | |
|---|---|---|---|
| **Total Assets** | | **103,109,263** | **104,498,545** |
| | | | |
| **Current Liabilities:** | | | |
| Accounts Payable - Processed | | 18,249,087 | 32,326,951 |
| Accounts Payable - Accruals | | 9,066,030 | 7,938,504 |
| Accounts Payable - Patient Refunds | | 4,060,181 | 2,860,268 |
| Accounts Payable - Other | | 4,258,175 | 7,686,794 |
| **Total Accounts Payable** | | **35,633,473** | **50,812,517** |
| | | | |
| Accrued Payroll | | 3,138,969 | 4,343,641 |
| Accrued Compensation & Benefits | | 6,409,694 | 3,900,002 |
| Medicare & Medi-Cal Payable | | 29,052,180 | 1,276,752 |
| Accrued Other Expenses | | 11,126,043 | 7,565,782 |
| Deferred Income | | 0 | 0 |
| Accrued Interest Payable | | 0 | 0 |
| Current Portion - Long Term Debt | | (0) | 0 |
| Current Portion - Capitalized Leases | | 23,034 | 281,304 |
| Revolving Credit | | 50,365,580 | 54,152,338 |
| **Total Current Liabilities** | | **135,748,972** | **122,332,336** |
| | | | |
| Long-Term Debt - Properties | | 0 | 0 |
| Long-Term Debt - Term Loan | | 0 | 0 |
| Long-Term Debt - Subordinate Debt | | 0 | 0 |
| Long-Term Debt - Capitalized Leases | | 47,153 | 1,032,778 |
| **Total Long Term Debt** | | **47,153** | **1,032,778** |

DM3\8615431.9

| | | | |
|---|---|---|---|
| **Inter-Company Obligations:** | | | |
| Inter-Company for Regional Elimination | | 573,053 | 1,205,475 |
| Inter-Company Payable (Receivable) | | 29,654,417 | 86,597,872 |
| **Total Inter-Company Obligations** | | **30,227,469** | **87,803,347** |
| | | | |
| Other Long Term Liabilities | | 24,455,264 | 26,121,032 |
| Deferred Income - Long Term | | 0 | 0 |
| **Total Liabilities** | | **190,478,858** | **237,289,493** |
| | | | |
| **Equity:** | | | |
| Retained Earnings (Deficit) | | (46,210,191) | (89,892,742) |
| Additional Paid-in Capital | | 0 | 0 |
| Net Income | | (41,159,404) | (42,897,453) |
| **Total Equity** | | **(87,369,595)** | **(132,790,195)** |
| | | | |
| **Equity Net Assets** | | **103,109,263** | **104,499,298** |

43

DM3\8615431.9

<u>Schedule 3.7(a)</u>

Regulatory Compliance – Actions

1.  In February 2021, the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation ("IDFPR") issued a complaint against Louis A. Weiss Memorial Hospital Pharmacy ("Pharmacy") alleging certain pharmacy licensure violations identified during an inspection that took place in April 2019. After production of an Answer by Weiss Memorial Hospital ("Hospital") and a preliminary hearing before an Administrative Law Judge, IDFPR  and the Hospital entered into a Non-Disciplinary Consent Order in late 2021 that  resolved the matter with payment of a $2000 fine and without an adverse impact on the Pharmacy's license.

2.  In October 2020, the Illinois Department of Financial and Professional Regulation, Division of Professional Regulation ("IDFPR") issued a complaint against Midwest Pharmacies ("Pharmacy") alleging certain pharmacy licensure violations identified during an inspection that took place in December 2019. After production of an Answer by Pharmacy and a preliminary hearing before an Administrative Law Judge, IDFPR and the Pharmacy entered into a Non-Disciplinary Consent Order in mid-2021 that resolved the matter with payment of a $4000 fine and without an adverse impact on the Pharmacy's license.

3.  In approximately September 2022, the Illinois Department of Financial and Professional Regulation Division of Profession Regulation ("IDFPR") initiated the investigation of a complaint against Dr. Joshua Rosengarten, a former Transitional Resident (who was in a rotation at Weiss in June of 2021), alleging medical negligence while treating a patient at Weiss Memorial Hospital. On October 25, 2022, Dr. Rosengarten provided the IDFPR with a written statement in response to their investigation.

Schedule 3.7(b)

Regulatory Compliance – Compliance with Laws

1.  Approximately eighteen thousand (18,000) patient images (mostly mammograms and ultrasounds) stemming from services provided at West Suburban – River Forest Campus between the years 2012 and 2020, are unable to be accessed due to such files being corrupted.

2.  A change of ownership cannot be located on file with the National Council for Prescription Drug Programs in connection with Center Pharmacy (West Suburban) and the Pipeline/Tenet transaction.

45

Schedule 3.7(c)

Regulatory Compliance – Permits

**Weiss Memorial Hospital**

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| **FEDERAL** | | | | |
| CLIA Certificate of Waiver | Weiss Memorial Hospital-POCT (point of care testing) 4646 N Marine Dr. | Centers for Medicare & Medicaid Services | CLIA ID No. 14D1025353 | Expires 5/4/2024 |
| CLIA Certificate of Accreditation | Weiss Memorial Hospital Laboratory 4646 N. Marine Drive | Centers for Medicare & Medicaid Services | CLIA ID No. 14D1002692 | No expiration date |
| CLIA Certificate of Waiver | Chicago Health Med Group — Edgewater 6201 N Broadway Chicago, IL 60660 | Centers for Medicare & Medicaid Services | CLIA ID No. 14D2099737 | Expires 7/30/2023 |
| CLIA Certificate of Waiver | Lakefront Oncology Assoc 4700 N Marine Dr. Ste 315 Chicago, IL 60640 | Centers for Medicare & Medicaid Services | CLIA ID No. 14D2017169 | Expires 12/5/2022 |
| CLIA Certificate of Waiver | L M A Lakefront 4646 N. Marine Drive Chicago, IL 60640 | Centers for Medicare & Medicaid Services | CLIA ID No. 14D0427142 | Expires 12/22/2023 |
| Controlled Substance Registration Certificate | Pipeline-Weiss Hospital LLC

D/b/a
Louis A Weiss Memorial Hospital Pharmacy,

4646 N. Marine Drive Chicago, IL 60640 | United States Department of Justice Drug Enforcement Administration | DEA Registration Number FP0957033 | Expires 3/31/2024 |

46

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Radio Station Authorization | Louis A. Weiss Memorial Hospital 4646 N. Marine Dr. Chicago, IL 60640 | Federal Communications Commission Public Safety and Homeland Security Bureau | FCC Registration Number (FRN): 0022763601 Call Sign WQRX593 File Number 0006886531 | Expires 8/9/2023 |
| **STATE** | | | | |
| Hospital License | Pipeline—Weiss Memorial Hospital LLC dba Louis A. Weiss Memorial Hospital 4646 North Marine Drive, Chicago, IL 60640 | Illinois Department of Public Health | I.D. Number 0006122 HF124728 | Expires 1/27/2023 |
| Mammography Facility Certification | Weiss Memorial Hospital 4646 Marine Drive, Chicago, IL 60640-5700 | State of Illinois Emergency Management Agency | Facility ID Number 121061 Control Number 16-04138 | Expires 6/27/2025 |
| Pharmacy License | Pipeline-Weiss Memorial Hospital LLC  d/b/a Louis A Weiss Hospital Pharmacy  4646 N. Marine Drive Chicago, IL 60640 | State of Illinois Department of Financial and Professional Regulation | License No. 054.021167 051.036116 | Expires 3/31/2024 |
| Controlled Substance License | Pipeline-Weiss Memorial Hospital LLC  d/b/a Louis A Weiss Hospital Pharmacy  4646 N. Marine Drive Chicago, IL 60640 | State of Illinois Department of Financial and Professional Regulation | License No. 320.013038 054.021167 | Expires 3/31/2024 |

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Radioactive Material License | Pipeline-Weiss Memorial Hospital, LLC<br><br>d/b/a Louis A. Weiss Memorial Hospital<br><br>4646 North Marine Dr., Chicago, IL | Illinois Emergency Management Agency, Bureau of Radiation Safety; 1035 Outer Park Drive; Springfield, Illinois 62704 | License Number IL-01595- 01 Amendment Number 25 | Expires 7/31/2023 |
| IEPA Lifetime Operating Permit Exemption | Louis A. Weiss Memorial Hospital 4646 North Marine Drive, Chicago, IL | Illinois Environmental Protection Agency | Application No. 77120016 ID No. 031600EXZ Four natural gas fired boilers and two storage tanks | Unable to locate |
| Certificate of Recognition as a Primary Stroke Center Facility | Weiss Memorial Hospital | Illinois Department of Public Health | None | Expires 2/3/2023 |
| Underground Storage Tank Green Tag Decal | Louis A. Weiss Memorial Hospital | Office of the Illinois State Fire Marshal | Permit No. V001956 Facility # 2033188 | Expires 12/31/2022 |
| Certificate of X-Ray Registration | Weiss Memorial Hospital | State of Illinois Illinois Emergency Management Agency Division of Nuclear Safety | Registration No. 9001439 | No expiration date |
| Illinois Business Authorization Sales and use taxes and fees | Pipeline-Weiss Memorial Hospital, LLC<br><br>DBA: Pipeline-Weiss Memorial Hospital<br><br>4646 N Marine Dr Chicago, IL 60640-5759 | Illinois Department of Revenue | Account ID: 4310-4797<br><br>Loc. Code: 016-0001-1-006<br><br>Chicago, Cook County | Expires 7/1/2022. New permit can be pulled from agency website after expiration. |
| Change of Ownership Exemption | Pipeline-Louis Weiss Memorial Hospital, Chicago | State of Illinois Health Facilities and Services Review Board | Exemption #E-027-22 | N/A |

48

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Change of Ownership Exemption | Pipeline-Louis Weiss Memorial Hospital, Chicago | State of Illinois Health Facilities and Services Review Board | Exemption #E-028-22 | N/A |
| **LOCAL** | | | | |
| Regulated Business License | Louis A. Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago | 2206030 Code 4404 | Expires 7-15-2023 |
| Retail Food Establishment License | Louis A. Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago | 1249761 Code 1006 | Expires 7-15-2023 |
| Food Establishment Inspection Certification | Louis A. Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago Department of Public Health | [no number listed] | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago Department of Buildings | No. 286884 Passenger AUTO B-4 | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 286885 Passenger AUTO B-5 | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407995 Passenger AUTO C-8 | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 286889 Passenger AUTO D-9 | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 292703 Passenger AUTO C-10 | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 286887 Passenger AUTO D-11 | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago Department of Buildings | No. 285759 Passenger AUTO 2 W GAR | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Drive | City of Chicago Department of Buildings | No. 285758 Passenger AUTO 1 E GAR | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 408201 Platform lift PB Dock | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407993 Passenger AUTO A-3 | |

49

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407994 Passenger AUTO C-7 | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407991 Passenger AUTO A-1 | |
| Certificate of Elevator Inspection | Weiss Memorial Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | No. 407992 Passenger AUTO A-2 | |
| Boiler Inspection Certificate of Operation | Weiss Hospital 4646 North Marine Dr. | City of Chicago Department of Buildings | Area No. N044W004 Control No. BR029198 | |
| Use Permit for Pedestrian Sky Bridge | Louis A Weiss Memorial Hospital | City of Chicago Department of Business Affairs and Consumer Protection Small Business Center — Public Way Use Unit | Permit No: 1128950 | |

**Provider Numbers:**

Medicaid Hospital:  352637418   001
Medicaid Lab:      352637418   401
Medicaid Psych:    Same as hospital
Medicaid Rehab:    Same as hospital

Medicare Hospital:  14-0082
Medicare Lab:       14-0082
Medicare Psych:     14-S082
Medicare Rehab:     14-T082

TRICARE:            362637418

50

**West Suburban Medical Center**

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| **FEDERAL** | | | | |
| CLIA Certificate of Accreditation | West Suburban Medical Center 3 Erie Court - LAB — 4th FL | Centers for Medicare & Medicaid Services | CLIA ID #14D0665351 | Expires 2/27/2023 |
| CLIA Certificate of Accreditation | Medical Oncology Lab-West Suburban Medical Center 7420 Central Ave River Forest, IL | Centers for Medicare & Medicaid Services | CLIA ID #14D0926031 | Expires 3/3/2023 |
| CLIA Certificate of Provider-Performed Microscopy Procedures | A L Burdick Family Medicine Center West Suburban Medical Center 1 Erie Court Suite 6160 Oak Park, IL 60302 | Centers for Medicare & Medicaid Services | CLIA ID #14D0879519 | Expires 8/11/2024 |
| CLIA Certificate of Waiver | Wound Care and Hyperbaric Medicine Center 3 Erie Court, Ste L-600, Oak Park, IL 60302 | Centers for Medicare & Medicaid Services | CLIA ID #14D2061861 | Expires 7/7/2023 |
| CLIA Certificate of Provider-Performed Microscopy Procedures | Chicago Health Medical Group 7411 W Lake Street, Suite 1120 - Building A River Forest, IL 60305 | Centers for Medicare & Medicaid Services | CLIA ID # 14D0967234 | Expires 2/25/2023 |

51

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Radio Station Authorization | Pipeline-West Suburban Medical Center LLC | Federal Communications Commission, Public Safety and Homeland Security Bureau | FCC Registration No. (FRN) 0031825565<br><br>File Number 0009868774<br><br>Call Sign WRPC214 | Expires 1/14/2032 |
| Controlled Substance Registration Certificate | Pipeline-West Suburban Medical Center LLC<br><br>d/b/a<br>West Suburban Medical Center<br><br>3 Erie Court<br>Oak Park, IL 60302 | United States Department of Justice Drug Enforcement Administration | DEA Registration Number FP0901769 | Expires 3/31/2024 |
| Controlled Substance Registration Certificate | Pipeline Midwest Pharmacies, LLC<br><br>d/b/a Midwest Pharmacies Inc. DBA Plaza Pharmacy<br><br>1 Erie Court,<br>Oak Park, IL 60302 | United States Department of Justice Drug Enforcement Administration | DEA Registration Number FP0003955 | Expires 3/31/2024 |
| Controlled Substance Registration Certificate | Pipeline-West Suburban Medical Center LLC<br><br>d/b/a Center Pharmacy<br><br>7420 Central Avenue,<br>River Forest, IL | United States Department of Justice Drug Enforcement Administration | DEA Registration Number FP0903232 | Expires 3/31/2024 |

52

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| **STATE** | | | | |
| Hospital License | Pipeline--West Suburban Medical Center, LLC dba West Suburban Medical Center 3 Erie Court, OakPark, IL | Illinois Department of Public Health | I.D. Number 0006130 HF124729 | Expires 1/27/2023 |
| Pharmacy License | Pipeline-West Suburban Medical Center d/b/a West Suburban Medical Center 3 Erie Ct, Oak Park, IL | State of Illinois Department of Financial and Professional Regulation | License No. 054.021166 051.296766 | Expires 3/31/2024 |
| Controlled Substance License | Pipeline-West Suburban Medical Center d/b/a West Suburban Medical Center 3 Erie Ct, Oak Park, IL | State of Illinois Department of Financial and Professional Regulation | License No. 320.013040 054.021166 | Expires 3/31/2024 |
| Pharmacy License | Pipeline Midwest Pharmacies LLC d/b/a Plaza Pharmacy 1 Erie CT, Oak Park IL | State of Illinois Department of Financial and Professional Regulation | License No. 054.021169 051.294915 | Expires 3/31/2024 |

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Controlled Substance License | Pipeline Midwest Pharmacies LLC<br><br>d/b/a Plaza Pharmacy<br><br>1 Erie CT, Oak Park IL | State of Illinois Department of Financial and Professional Regulation | License No. 320.013037 054.021169 | Expires 3/31/2024 |
| Pharmacy License | Pipeline-West Suburban Medical Center<br><br>d/b/a Center Pharmacy<br><br>7420 Central Ave. River Forest, IL | State of Illinois Department of Financial and Professional Regulation | License No. 054.021170 051.299802 | Expires 3/31/2024 |
| Controlled Substance License | Pipeline-West Suburban Medical Center<br><br>d/b/a Center Pharmacy<br><br>7420 Central Ave. River Forest, IL | State of Illinois Department of Financial and Professional Regulation | License No. 320.013039 054.021170 | Expires 3/31/2024 |
| Certificate of X-Ray Registration | West Suburban Medical Center<br><br>3 Erie Ct, Oak Park IL | State of Illinois IEMA Division of Nuclear Safety | Registration No. 9003039 | No expiration date |
| Certificate of X-Ray Registration | River Forest Breast and Imaging Center, 420 Williams St, River Forest IL | State of Illinois IEMA Division of Nuclear Safety | Registration No. 9253929 | No expiration date |
| Mammography Facility Certification | River Forest Breast Care Center, 420 William St, 2nd Floor, River Forest, IL | Illinois Emergency Management Agency, Registration & Certification; 1035 Outer Park Drive; Springfield, IL 62704 | Facility ID Number: 205617 | Expires 8/17/2023 |

54

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Illinois Business Authorization Sales and use taxes and fees | Pipeline-West Suburban Medical Specialists, LLC<br><br>DBA: West Suburban Medical Center<br><br>3 Erie Court, Oak Park, IL 60302 | Illinois Department of Revenue | (4310-4940)<br><br>Loc. Code: 016-0050-8-001<br><br>Oak Park, Cook County | Expires 1/25/2023 |
| Radioactive Material License | West Suburban Medical Center 3 Erie Court, Oak Park, IL | Illinois Emergency Management Agency Bureau of Radiation Safety | License Number IL-01520-01, Amendment 48 | Expires 4/30/2023 |
| Boiler Inspection Certificate | West Suburban Hospital 3 Erie Ct., Oak Park, IL | Illinois Office of the State Fire Marshal, Division of Boiler and Pressure Vessel Safety; 1035 Stevenson Drive; Springfield, IL 62703-4259 | Ill Number B0023799 [Boiler No. 1] | Expires 07/13/2023 |
| Boiler Inspection Certificate | West Suburban Hospital 3 Erie Ct., Oak Park, IL | Illinois Office of the State Fire Marshal, Division of Boiler and Pressure Vessel Safety; 1035 Stevenson Drive; Springfield, IL 62703-4259 | Ill Number B0023883 [Boiler No. 2] | Expires 8/11/2022 (This boiler was just recently inspected on 11/16/22, and the certificate is not yet available) |
| Boiler Inspection Certificate | West Suburban Hospital 3 Erie Ct., Oak Park, IL | Illinois Office of the State Fire Marshal, Division of Boiler and Pressure Vessel Safety; 1035 Stevenson Drive; Springfield, IL 62703-4259 | Ill Number B0023887 [Boiler No. 3] | Expires 6/09/2023 |
| Air Pollution Control Lifetime Operating Permit | West Suburban Medical Center<br><br>3 Erie Court, Oak Park, IL 60302 | Illinois Environmental Protection Agency; 1021 North Grand Avenue East; P.O. Box 19506; Springfield, IL 62794-9506 | Application No. 73050587 I.D. No. 031225ABE | Expires 180 days after Illinois EPA sends a written request for renewal of this permit |
| Change of Ownership Exemption | Pipeline-West Suburban Medical Center, Oak Park | State of Illinois Health Facilities and Services Review Board | Exemption #E-025-22 | N/A |
| Change of Ownership Exemption | Pipeline-West Suburban Medical Center, Oak Park | State of Illinois Health Facilities and Services Review Board | Exemption #E-026-22 | N/A |

55

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| **LOCAL** | | | | |
| Oak Park Business License | Pipeline – West Suburban Medical Center, LLC<br><br>3 Erie Ct<br>Oak Park IL 60302 | Village of Oak Park, Illinois | License # 202200794 | Expires 3/31/2023 |
| Certificate of Operation | West Suburban Medical Center<br>3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # T001142 | Expires 3/23/2023 |
| Certificate of Operation | West Suburban Hospital Medical Center<br><br>3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # T001146 | Expires 3/24/2023 |
| Certificate of Operation | West Suburban Hospital Medical Center<br>3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # T001152 | Expires 3/25/2023 |
| Certificate of Operation | West Suburban Medical Center<br>3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # T001154 | Expires 3/25/2023 |
| Certificate of Operation | West Suburban Medical Center<br>3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # T001158 | Expires 3/24/2023 |
| Certificate of Operation | West Suburban Medical Center<br>3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # N/A | Expires 3/25/2023 |
| Certificate of Operation | West Suburban Medical Center<br>3 Erie Ct,<br>Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # T001141 | Expires 3/24/2023 |

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct, Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H001627 | Expires 3/21/2023 |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct, Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H001647 | Expires 3/21/2023 |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct, Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H001648 | Expires 3/21/2023 |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct, Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H001650 | Expires 3/21/2023 |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct, Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H021588 | Expires 3/21/2023 |
| Certificate of Operation | West Suburban Medical Center 3 Erie Ct, Oak Park, IL | Village of Oak Park, Development Customer Services; 123 Madison St, Oak Park, IL 60302 | Conveyance ID # H021589 | Expires 3/21/2023 |

**Provider Numbers:**

Medicaid Hospital:    611899386          001
Medicaid Lab:         611899386          401

Medicare Hospital:    14-0049
Medicare Lab:         14-0049
Medicare SNF:         14-5743

TRICARE:              611899386

57

DM3\8615431.9

Schedule 3.7(d)

Regulatory Compliance – Accreditations

| Facility/Department | Accreditation | Number | Location |
|---|---|---|---|
| West Sub OpCo (All Departments) | The Joint Commission | 345402<br>651202<br>651120<br>215525<br>345171<br>345187<br>572194<br>348717 | 420 William Street, River Forest, IL<br>420 William Street, 1st Floor, River Forest, IL<br>7411 W. Lake Street, Suite L180, River Forest, IL<br>3 Erie Court, Lower Level, Oak Park, IL<br>1 Erie Court, Oak Park, IL<br>3 Erie Court, Oak Park, IL<br>3 Erie Court, Oak Park, IL<br>7420 Central Avenue, River Forest, IL |
| | | | |

## Weiss Memorial Hospital

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| **ACCREDITATIONS** | | | | |
| Hospital Accreditation | Louis A. Weiss Memorial Hospital | The Joint Commission | ID No. 7286 | Customarily valid up to November 16, 2022 |
| Advanced Certification as a Primary Stroke Center | Louis A. Weiss Memorial Hospital | The Joint Commission | ID No. 7286 | Customarily valid up to August 24, 2024 |
| Mammographic Imaging Services Accreditation | Weiss Memorial Hospital 4646 North Marine Drive | American College of Radiology | MAP# 04605-05<br>Approved Unit: Lorad Medical Systems Inc. Selenia Dimensions 2012 | Expires June 27, 2025 |

DM3\8615431.9

| | | | | |
|---|---|---|---|---|
| Computed Tomography Accreditation | Weiss Memorial Hospital 4646 North Marine Drive | American College of Radiology | CTAP# 50946-02 Approved Unit: GE Medical Systems VCT Lightspeed 2008 | Expires October 12, 2023 |
| Computed Tomography Accreditation | Weiss Memorial Hospital 4646 North Marine Drive | American College of Radiology | CTAP# 50946-03 Approved Unit: Siemens Somatom Perspective 2015 | Expires October 12, 2023 |
| Laboratory Accreditation | Weiss Memorial Hospital Clinical Laboratory | College of American Pathologists | CAP No. 7180518 | Expires July 15, 2023 |
| Community Cancer Program Accreditation | Louis A. Weiss Memorial Hospital | American College of Surgeons, Commission on Cancer | [no number listed] | Deficiency resolution due date extended to December 15, 2022 |
| Echocardiography Facility Accreditation | Weiss Memorial Hospital 4646 North Marine Drive | Intersocietal Accreditation Commission, Echocardiography | [no number listed] Adult Transthoracic; Adult Stress | Expires 4/30/2024 |
| Vascular Testing Facility Accreditation | Louis A. Weiss Memorial Hospital 4646 North Marine Drive | Intersocietal Accreditation Commission, Vascular Testing | [no number listed] Extracranial Cerebrovascular Testing; Peripheral Venous Testing; Peripheral Arterial Testing | Expires April 30, 2024 |

59

**West Suburban Medical Center**

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| **ACCREDITATIONS** | | | | |
| Hospital Accreditation Program | Pipeline West Suburban Medical Center, LLC<br><br>3 Erie Court, Oak Park, IL | The Joint Commission | ID# 7399 | Customarily valid up to August 6, 2022 |
| Certificate of Distinction - Advanced Certification for Primary Stroke Center | West Suburban Medical Center Oak Park, IL | The Joint Commission | ID# 7399 | Customarily valid up to May 11, 2024 |
| Breast MR Imaging Services Accreditation | Pipeline West Suburban Medical Center Breast MRI<br><br>3 Erie Court, Oak Park, IL 60302 | American College of Radiology | BMRAP# 50604-01<br><br>Approved Unit: GE SIGNA HDX 3.0T 2006 | Expires 8/19/2024 |
| Computed Tomography Services Accreditation | Pipeline West Suburban Medical Center – E.D. VCT<br><br>3 Erie Court, Oak Park, IL 60302 | American College of Radiology | CTAP# 50265-01<br><br>Approved Unit: GE Medical Systems Lightspeed VCT 2005 | Expires 10/7/2023 |
| Computed Tomography Services Accreditation | Pipeline West Suburban Medical Center – E.D. VCT<br><br>3 Erie Court, Oak Park, IL 60302 | American College of Radiology | CTAP# 50265-03<br><br>Approved Unit: Siemens Somatom Perspective 2015 | Expires 10/7/2023 |

DM3\8615431.9

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Nuclear Medicine Services Accreditation | Pipeline West Suburban Medical Center — Nuclear Medicine<br><br>3 Erie Court,<br>Oak Park, IL | American College of Radiology | NMAP# 52424-01<br><br>Approved Unit: Siemens E-Cam Signature Seri 2005 | Expires 11/5/2024 |
| Ultrasound Services Accreditation | West Suburban Hospital Medical Center<br><br>3 Erie Court,<br>Oak Park, IL | American College of Radiology | UAP# 50511<br><br>Services: Obstetrical (1", 2nd and 3rd Trimesters), Gynecological, General, Vascular | Expires 7/15/2023 |
| Breast Imaging Center of Excellence | River Forest Breast Care Center<br>River Forest, IL | American College of Radiology, Commission on Quality and Safety and the Commission on Breast Imaging | [not listed] | No expiration date |
| Magnetic Resonance Imaging Services Accreditation | River Forest Advanced Imaging Center<br>420 William St,<br>1st Floor<br>River Forest, IL | American College of Radiology | MRAP# 50302-01<br>Approved Unit: Siemens ESPREE 2008 | Expires 3/18/2025 |
| Ultrasound Services Accreditation | River Forest Advanced Imaging Center<br><br>420 William Street,<br>Building B,<br>1st Floor,<br>River Forest, IL | American College of Radiology | UAP# 04442<br>Accredited Services: Obstetrical (is% 2nd<br>and 3rd Trimesters), Gynecological, General | Expires 9/14/2024 |
| Medical Oncology Laboratory Accreditation | West Suburban Hospital Center<br><br>Medical Oncology Laboratory<br><br>River Forest, IL | The College of American Pathologists | CAP Number:<br>1857902<br><br>AU-ID: 1184120<br><br>CLIA Number: 14D0926031 | Expires May 15, 2024. |

61

| Type of Permit/License | Entity Name | Licensing Agency | Permit/License No. | Expiration Date |
|---|---|---|---|---|
| Main Laboratory Accreditation | West Suburban Hospital Center<br><br>Main Laboratory 4th Floor<br><br>Oak Park, IL | The College of American Pathologists | CAP Number: 1857901<br><br>AU-ID: 1184118<br><br>CLIA Number: 14D0665351 | Expires May 15, 2024. |

DM3\8615431.9

Schedule 3.8

Compliance and Reporting

1. On September 28, 2020, patient (Darlene Rivers) submitted a complaint to the U.S. Department of Health and Human Services (HHS), Office for Civil Rights (OCR), regarding the alleged failure of Chicago Health Medical Group (CHMG) to provide Ms. Rivers with her requested medical records. OCR determined to resolve the matter informally through the provision of technical assistance to CHMG. OCR confirmed that on October 14, 2020, CHMG provided Ms. Rivers with her records, and OCR closed this case without further action on July 19, 2021.

DM3\8615431.9

Schedule 3.9(a)

Material Contracts

i.

   1.  See attached matrices.

**ii.**    **Employment Contracts:**

   1.  The employment contracts with physicians set forth in subsection (v) of this Schedule 3.9(a) are incorporated herein by reference.

**iii.**    **Contracts re Patents, Trademarks, Trade Names, Service Names:**

   1.  None.

**iv.**    **Data Processing and Software Contracts:**

   1.  Abbott Facility Participation Agreement, dated September 20, 2019, by and between Pipeline Health (West Suburban Medical Center & Weiss Memorial Hospital) and Abbott Laboratories, Inc.
   2.  Abbott Equipment Service Program Agreement WMH, effective July 2, 2021,  by and between Louis A Weiss Memorial Hospital and Abbott Laboratories, Inc.
   3.  Abbott Equipment Service Program Agreement #2 WMH, effective July 2, 2021,  by and between Louis A Weiss Memorial Hospital and Abbott Laboratories, Inc.
   4.  Abbott Equipment Service Program Agreement WSMC, effective July 2, 2021,  by and between West Suburban Med Ctr and Abbott Laboratories, Inc.
   5.  Abbott Equipment Service Program Agreement #2 WSMC, effective July 2, 2021,  by and between West Suburban Med Ctr and Abbott Laboratories, Inc.
   6.  Abbott COVID-19 Master Agreement WMH, dated February 2, 2022, by and between Weiss Memorial Hospital and Abbott Rapid DX North America LLC
   7.  Abbott COVID-19 Master Agreement WSMC, dated February 2, 2022, by and between West Suburban Medical Center and Abbott Rapid DX North America LLC
   8.  ADP WMH Order and Terms, dated August 14, 2018, by and between Pipeline Weiss and ADP, LLC
   9.  ADP WSMC Order and Terms, dated August 14, 2018, by and between Pipeline West Suburban and ADP, LLC
  10.  Agiliti BioMed360 Agreement, dated December 7, 2019, by and among Pipeline - Weiss Memorial Hospital, LLC, Pipeline - West Suburban Medical Center, LLC and Agiliti Health, Inc
  11.  Agiliti Supplemental Equipment Service Agreement WMH, dated September, 22, 2020, by and between Weiss Memorial Hospital and Agiliti Health, Inc
  12.  Agiliti Supplemental Equipment Service Agreement WSMC, dated September, 22, 2020, by and between West Suburban Medical Center and Agiliti Health, Inc

64

DM3\8615431.9

13. ATT Account 8310009539159, dated August 30, 2019, by and between Pipeline Health, LLC and AT&T Corp
14. ATT Account 8310009543475, dated August 30, 2019, by and between Pipeline Health, LLC and AT&T Corp
15. ATT Account 8310010040998, dated August 30, 2019, by and between Pipeline Health, LLC and AT&T Corp
16. ATT Account 8310010744545, dated February 2, 2022, by and between Pipeline Health, LLC and AT&T Corp
17. ATT Account 8310010880159, dated August 30, 2019, by and between Pipeline Health, LLC and AT&T Corp
18. Athena Services Agreement for MSO Client, dated June 21, 2021, by and between Pipeline – Lakefront Medical Associates, LLC and AthenaHealth, Inc.
19. Athena Services Agreement for MSO Client, dated June 21, 2021, by and between Pipeline – Weiss Medical Specialists, LLC
20. Brightly Master Service Agreement, dated November 1, 2021, by and between West Suburban Medical Center and Dude Solutions
21. Datcard Pacscube RFMC Purchase and Warranty, dated May 12, 2022, by and between River Forrest Hospital and DatCard Systems, Inc.
22. DatCard Pacscube Service Agreement WSMC, dated April 3, 2022, by and between West Suburban Medical Center and DatCard Systems, Inc.
23. Datcard Pacscube WMH Purchase and Warranty, dated May 12, 2022, by and between Weiss Memorial Hospital and DatCard Systems, Inc.
24. FUJIFILM Medical Systems Master Services Agreement and EULA, dated July 1, 2019, by and between VHS West Suburban Medical Center, Inc. and FUJIFILM Medical Systems U.S.A., Inc.
25. GE MUSE Upgrade Agreement, dated August 1, 2022, by and between Pipeline Health and GE Medical System Information Technologies, Inc., a GE Healthcare Business
26. HPE Invoice and Terms, dated February 12, 2022, by and between West Sub Medical Center and Hewlett Packard Enterprise
27. RF Svcs and Subscription, dated September 25, 2018, by and between VHS Acquistion Subsidiary 4, Inc. DBA River Forest Advanced Imaging Center and medInt Holdings, LLC
28. WS Svcs and Subscription, dated September 25, 2018, by and between VHS West Suburban Medical Center DBA West Suburban Medical Center and medInt Holdings, LLC
29. Imprivata End User License Agreement and PO, dated June 27, 2022, by and between West Suburban Medical Center and Imprivata
30. McKesson Lab Equipment Agreement, dated October 8, 2021, by and between West Suburban Medical Center and McKesson Medical-Surgical Inc
31. Merge Health West Surburban Agreement Support Renewal, dated January 10, 2022, by and between West Suburban Hospital Medical Center and Merge Healthcare
32. MetTel Marine Drive Agreement, dated November 1, 2021, by and between Pipeline Health System, LLC and Manhattan Telecommunications Corporation
33. MetTel Oak Park Agreement, dated November 1, 2021, by and between Pipeline Health System, LLC and Manhattan Telecommunications Corporation

DM3\8615431.9

34. MetTel River Forest Agreement, dated November 1, 2021, by and between Pipeline Health System, LLC and Manhattan Telecommunications Corporation
35. Mindray Proposal WMH PO4550708, dated November 2, 2020, by and between Weiss Memorial Hospital and Mindray North America
36. Mindray Proposal WMH PO4555977, dated June 9, 2021, by and between Weiss Memorial Hospital and Mindray North America
37. Mindray Proposal WMH PO4558467, dated October 6, 2021, by and between Weiss Memorial Hospital and Mindray North America
38. Omnicell WMH Order Omnicell-Vanguard 28409CPA, dated January 1, 2022, by and between Weiss Memorial Hospital and Omnicell, Inc
39. Omnicell WSMC Order Omnicell-Vanguard 28409CPA, dated February 1, 2022, by and between West Suburban Hospital Medical Center and Omnicell, Inc
40. Northwestern Medical Service Agreement, dated August 1, 2019, by and between Weiss Memorial Hospital and Northwest Memorial Healthcare
41. Paessler Order with Terms and Conditions, dated August 27, 2021, by and between West Sub Medical Center and Paessler
42. PenVasc Purchase Documents, dated April 12, 2016, by and between Weiss Memorial Hospital and In Record Time, LLC
43. Phillips IntellSpace Software Maintenance Agreement; Phillips IntellSpace Software Renewal, dated August 9, 2019, by and between Weiss Memorial Hospital and Philips Healthcare
44. Phillips Xper Software Maintenance Agreement, dated December 16, 2021, by and between Louis A. Weiss Memorial Hospital and Philips Healthcare
45. QPS Maintenance Agreement, dated February 15, 2022, by and between West Suburban Medical Center and Quality Power Solutions
46. IPA One Linen Control Subscription Agreement WMH, dated March 29, 2017, by and between Weiss Memorial Hospital and IPA, LLC
47. IPA One Linen Control Subscription Agreement WSMC, dated March 29, 2017, by and between Pipeline - West Suburban Medical Center and IPA, LLC
48. Shiftwise Software License and Services Agreement, dated February 10, 2020, by and between Shiftwise, Inc. on one hand and Pipeline – West Suburban Medical Center, LLC and Pipeline – Weiss Memorial Hospital, LLC on the other hand
49. Sonifi Agreement, dated March 7, 2022, by and between Pipeline - Weiss Memorial Hospital, LLC and SONIFI Health, Inc.
50. Telehealth-Avidex Cable TV West Suburban Medical Center.PDF, dated November 1, 2017, by and between West Suburban Medical Center and Telehealth Service a division of Telerent Leasing Corporation
51. Telehealth-Avidex DirecTV West Suburban Medical Center.PDF, dated April 27, 2017, by and between West Suburban Medical Center and Telehealth Service a division of Telerent Leasing Corporation
52. TeraRecon Sales Agreement, dated January 19, 2021, by and between West Suburban Medical Center and TeraRecon, Inc.
53. TigerConnect Invoice and Website Terms WMH, dated June 1, 2021, by and between Weiss Memorial Hospital and TigerConnect, Inc.
54. TigerConnect Invoice and Website Terms WSMC, dated June 1, 2021, by and between West Suburban Medical Center and TigerConnect

66

55. UpToDate Content License Agreement; UpToDate Content License Amendment, dated March 1, 2019, by and between West Suburban Medical Center and UpToDate, Inc.

56. UpToDate Subscription License Agreement WMH, dated November 1, 2021, by and between Pipeline - Weiss Memorial Hospital, LLC d/b/a Louis A. Weiss Memorial Hospital, LLC and UpToDate, Inc.

57. UpToDate Subscription License Agreement WSMC, dated November 1, 2021, by and between Pipeline West Suburban Medical Center and UpToDate, Inc.

58. Veeam Invoice and Terms, dated August 26, 2021, by and between West Sub Medical Center and Veeam

59. Verity Stream Master Service Agreement Verity Stream Order, dated April 1, 2022, by and between Pipeline Health Systems, LLC (Chicago Hospital Locations) and VerityStream, Inc.

60. Volpara Master Services Agreement, dated March 29, 2022, by and between River Forest Breast Care Center and Volpara

61. WardManager Subscription Agreement; WMH WardManager BAA, dated June 8, 2020, by and between Weiss Memorial Hospital and Ward Manager, Inc.

62. WardManager Subscription Agreement; WSMC WardManager BAA, dated September 16, 2019, by and between West Suburban Medical Center and Ward Manager, Inc.

63. Workpartners Services Agreement, dated September 3, 2020, by and among Pipeline - West Suburban Memorial Hospital, LLC d/b/a West Suburban Medical Center and Pipeline - Weiss Memorial Hospital. LLC d/b/a Weiss Memorial Hospital and UPMC Benefit Management Services, Inc d/b/a Workpartners

**v.     Contracts with Physicians and other Referral Sources:**

1. See attached matrices.

vi.     **Payor Agreements**:

1. Directed Care (Blue Choice) Hospital Service Agreement, as amended, effective January 1, 2013, by and between Blue Cross and Blue Shield of IL and Pipeline – Weiss Memorial Hospital, LLC

2. Directed Care (Blue Choice) Hospitals Service Agreement, as amended, effective July 1, 2012, by and between Blue Cross and Blue Shield of IL and Pipeline – West Suburban Medical Center, LLC

3. Hospital Service Agreement (HMO), as amended, effective January 1, 2015, by and between Blue Cross and Blue Shield of IL and Pipeline – West Suburban Medical Center, LLC

4. Hospital Service Agreement (HMO), as amended, effective January 1, 2015, by and between Blue Cross and Blue Shield of IL and Pipeline – Weiss Memorial Hospital, LLC

5. Blue Cross Participating Provider Option (PPO) Hospital Contract, as amended, effective January 1, 1992, by and between Blue Cross and Blue Shield of Illinois and Pipeline – Weiss Memorial Hospital, LLC

6. Blue Cross Participating Provider Option (PPO) Hospital Contract, as amended, effective January 1, 1987, by and between Blue Cross and Blue Shield of Illinois and Pipeline – West Suburban Medical Center, LLC

DM3\8615431.9

7. Inpatient and Outpatient Services Agreement, effective April 1, 2013, by and between VHS of Illinois, Inc. (on behalf of West Suburban Medical Center, MacNeal Hospital, Westlake Hospital and Louis A. Weiss Memorial Hospital) and Advocate Health and Hospitals Corporation d/b/a Advocate Medical Group

8. Hospital Agreement, as amended, effective September 15, 2019, by and between Aetna Network Services, LLC and SRC Hospital Investments II, LLC (on behalf of its Hospital Providers and locations)

9. Performance Improvement Program Agreement, as amended, effective September 15, 2019, by and between Aetna Health, Inc. and SRC Hospital Investments II, LLC, on behalf of itself and its affiliates

10. Hospital Services Agreement, effective April 1, 2009, by and between CIGNA HealthCare of Illinois, Inc. and VHS Acquisition Subsidiary Number 3, Inc. dba Louis A. Weiss Memorial Hospital (assigned to Pipeline Health)

11. Participating Health System Letter of Agreement, effective June 11, 2019, by and between Pipeline Health on behalf of Weiss Memorial Hospital and West Suburban Medical Center and Clear Spring Health of Illinois, Inc.

12. CountyCare Participating Facility Agreement, effective December 18, 2018, by and between Cook County Health and Hospital System and Pipeline Health and its affiliates, including Westlake Hospital, West Suburban Medical Center and Louis A. Weiss Memorial Hospital

13. Multi-Specialty Group Agreement, effective January 1, 2008, by and between Harmony Health Plan of Illinois, Inc. and Lakefront Medical Associates, LLC

14. Physician Provider Agreement, effective January 1, 2008, by and between Harmony Health Plan of Illinois, Inc. and Lakefront Medical Associates, LLC

15. Hospital Services Agreement, effective May 1, 2005, by and between Harmony Health Plan of Illinois, Inc. and VHS Acquisition Subsidiary Number 3, Inc. dba Weiss Memorial Hospital

16. Hospital Services Agreement, effective August 1, 1997, by and between Harmony Health Plan of Illinois, Inc. and VHS West Suburban Medical Center dba West Suburban Medical Center

17. Letter of Agreement to Participate (Medicare), dated October 3, 2018, by and between Pipeline Health (on behalf of Providers) and Humana Insurance Company

18. Letter of Agreement to Participate (Commercial), dated September 24, 2018, by and between Pipeline Health (on behalf of Providers) and Humana Insurance Company

19. Hospital Participation Agreement, dated April 21, 2020, by and between Pipeline – West Suburban Medical Center, LLC and Humana Insurance Company

20. Institutional & Professional Agreement, effective August 1, 2019, by and between Pipeline Health and Humana Government Business, Inc. dba Humana Military

21. Participating Provider Agreement, effective October 1, 2019, by and between SRC Hospital Investments II, LLC and IlliniCare Health

22. Longevity Health Plan of Illinois, Inc. Participating Hospital Agreement, effective August 30, 2019, by and between West Suburban Medical Center and Longevity Health Plan of Illinois, Inc.

23. Network Participation Agreement, effective February 1, 2020, as amended, by and between Loyola Physician Partners, LLC and Pipeline – Lakefront Medical Associates, LLC

68

24. Practitioner Agreement, effective March 17, 2017, by and between Meridian Health Plan of Illinois, Inc. and Pipeline Health

25. Hospital Agreement, effective March 1, 2017, by and between Meridian Health Plan of Illinois, Inc. and Pipeline Health

26. Master Agreement, effective January 1, 2018, by and between Meridian Affiliates and Tenet Providers

27. Provider Services Agreement, dated on or about July 29, 2019, by and between Pipeline – Lakefront Medical Associates, LLC and Molina Healthcare of Illinois, Inc.

28. Hospital Services Agreement (Weiss), dated on or about July 26, 2019, by and between SRC Hospital Investments II, LLC and Molina Healthcare of Illinois, Inc.

29. Hospital Services Agreement (West Suburban), dated on or about July 26, 2019, by and between SRC Hospital Investments II, LLC and Molina Healthcare of Illinois, Inc.

30. MPI Participating Professional Group Agreement, effective January 24, 2019, by and between MultiPlan, Inc. and Pipeline – Lakefront Medical Associates, LLC dba Chicago Health Medical Group

31. MPI Participating Facility Agreement, effective January 24, 2019, by and between MultiPlan, Inc. and Pipeline Health (on behalf of Weiss Memorial Hospital and West Suburban Medical Center)

32. Participating Provider Agreement, effective September 15, 2019, by and between NextLevel Health Partners, Inc. and Pipeline – Lakefront Medical Associates, LLC

33. Hospital Participating Provider Agreement, effective September 15, 2019, by and between NextLevel Health Partners, Inc. and SRC Hospital Investments II, LLC on behalf of Weiss Memorial Hospital and West Suburban Medical Center

34. Facility Participation Agreement, effective January 1, 2021, as amended, by and between Oscar Health Plan, Inc. and SRC Hospital Investments II, LLC on behalf of West Suburban Medical Center and Weiss Memorial Hospital

35. Participating Provider Agreement, dated on or about June 26, 2019, by and between SRC Hospital Investments II, LLC (on behalf of Weiss Memorial Hospital, West Suburban Medical Center and Lakefront Medical Associates) and Zing Health.

36. Facility Participation Agreement, effective January 29, 2019, between UnitedHealthcare of Illinois, Inc. and Pipeline Health (on behalf of Weiss Memorial Hospital and West Suburban Medical Center)

37. Medicare Enrollment Confirmation; Pipeline – Lakefront Medical Associates, LLC

38. Medicare Enrollment Confirmation; Pipeline – Weiss Memorial Hospital, LLC

39. Medicare Enrollment Confirmation; Pipeline – West Suburban Medical Center, LLC

40. Medicare Enrollment Confirmation; Pipeline – Weiss Medical Specialists, LLC

41. Medicaid Enrollment Confirmation; West Suburban Medical Center

42. Medicaid Enrollment Confirmation; Weiss Memorial Hospital

vii.   **Collective Bargaining Agreements:**

1. None

viii.   **Partnership or Joint Venture Agreements:**

DM3\8615431.9

1. POD Membership Agreement, effective July 28, 2021, by and between West Suburban Health Providers and EPA IPA, LLC

### ix.      **Contracts Containing Restrictive Covenants:**

1. UpToDate Content License Agreement; UpToDate Content License Amendment, dated March 1, 2019, by and between West Suburban Medical Center and UpToDate, Inc.
2. UpToDate Subscription License Agreement WMH, dated November 1, 2021, by and between Pipeline - Weiss Memorial Hospital, LLC d/b/a Louis A. Weiss Memorial Hospital, LLC and UpToDate, Inc.
3. UpToDate Subscription License Agreement WSMC, dated November 1, 2021, by and between Pipeline West Suburban Medical Center and UpToDate, Inc.
4. Time Share Agreement dated March 25, 2021, by and between Pipeline – West Suburban Medical Center, LLC and The Board of Trustees of the University of Illinois, as extended and modified.
5. Agreement for Radiology Department Coverage, dated October 23, 2020 by and between Pipeline Health System, LLC and Specialists in Medical Imaging, SC, as amended.
6. Agreement for Temporary Staffing Services, effective as of September 28, 2021, by and between Medical Solutions, LLC and West Suburban Medical Center
7. Staffing Services Agreement, dated September 21, 2021, by and between First RN Staffing, LLC and Pipeline – West Suburban Medical Center
8. Behavioral Health Management Services Agreement, effective December 18, 2019, by and between Maximon Behavioral, LLC and Pipeline – Weiss Memorial Hospital, LLC
9. Behavioral Health Management Services Agreement, effective October 11, 2021, by and between Maximon Behavioral, LLC and Pipeline – West Suburban Medical Center, LLC
10. Transportation Agreement, effective June 1, 2022, by and between HPH Transport, Inc. and Pipeline – West Suburban Medical Center, LLC
11. Van Service Agreement, effective November 16, 2019, by and between HPH Transport, Inc. and Weiss Memorial Hospital
12. Clinical Wound Care with Hyperbaric Oxygen Therapy Management Services Agreement, effective April 24, 2019, by and between Healogics Wound Care
13. Clinical Wound Care with Hyperbaric Oxygen Therapy Management Services Agreement, effective April 22, 2022, by and between Medical Management, Inc. and Pipeline – West Suburban Medical Center, LLC
14. Ludi Master Software Subscription Agreement, dated May 25, 2022, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Ludi, Inc.
15. Day Porter/Night Janitorial Services Agreement, dated October 8, 2018, by and between River Forest Medical Campus and E.B.M., Inc.
16. Day Porter/Night Janitorial Services Agreement, dated June 27, 2018 by and between Weiss Memorial Hospital and E.B.M., Inc.
17. Janitorial & Floor Cleaning Services Agreement, dated December 1, 2018, by and between West Suburban Medical Center and E.B.M., Inc.
18. Management Services Agreement, dated April 22, 2020, by and between West Suburban Medical Center and E.B.M., Inc.

DM3\8615431.9

19. Inpatient Transport Service Management Agreement, effective by and between VHS Acquisition Subsidiary 3 d/b/a Weiss Memorial Hospital, LLC and

20. Purchaser-Specific Agreement, effective June 1, 2021, by and between Towne Park, LLC and VHS Acquisition Subsidiary 3 d/b/a Weiss Memorial Hospital

**x.** **Contracts for Lease of Real Property ($100,000+/year):**

1. See attached matrices.
2. Lease, dated July 25, 2011, by and between FirstMerit Bank, N.A., as successor trustee to Midwest Bank and Trust Company, and MacNeal Physicians Group, LLC, as assigned to West Sub OpCo by that certain Assignment and Assumption of Tenant's Interest in Lease, dated January 28, 2019, between MacNeal Physicians Group, LLC and West Sub OpCo
3. Lease Agreement, dated October 20, 2022, between Pipeline – West Suburban Medical Center, LLC, dba West Suburban Medical Center and PCC Community Wellness Center
4. Donation Agreement, dated July 25, 2022, by and between Pipeline – West Suburban Medical Center, LLC, dba West Suburban Medical Center and PCC Community Wellness Center

**xi.** **Other Contracts Requiring Payments of $100,000+/year:**

1. See attached matrices.
2. Consulting Services Agreement, dated February 2, 2022, by and between Pipeline Health System, LLC and C. David Ross, as amended
3. Consulting Agreement, dated August 1, 2021, by and between Pipeline Health System, LLC and Anthony Tedeschi, M.D., as assigned and amended by that certain First Amendment to Consulting Agreement, dated February 27, 2022, by and between Pipeline Health System, LLC and 4Square, LLC
4. Agreement for Supplemental Staffing Agencies, dated February 26, 2020, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Alternate Nurse Staffing Solutions, LLC
5. Agreement for Supplemental Staffing Agencies, dated February 24, 2020, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Fusion Medical Staffing, LLC
6. Agreement for Supplemental Staffing Agencies, dated October 25, 2021, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Host Health Care, Inc.
7. Agreement for Supplemental Staffing Agencies, as amended, dated February 21, 2020, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Maxim Healthcare Services, Inc.
8. Agreement for Supplemental Staffing Agencies, dated March 6, 2020, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical center, LLC; and Med-Call Healthcare, Inc.
9. Agreement for Supplemental Staffing Agencies, dated February 26, 2020, by and between Pipeline - Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and PRN Health Services, Inc.

71

DM3\8615431.9

10. Agreement for Supplemental Staffing Agencies, dated February 28, 2020, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Professional Nursing Inc.

11. Agreement for Supplement Staffing Agencies, dated February 27, 2020, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Relief Medical Services, Inc.

12. Agreement for Supplemental Staffing Agencies, dated February 19, 2020, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Acumen Medical Staffing

13. Agreement for Supplemental Staffing Agencies, dated May 10, 2021, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Alliant Staffing, LLC

14. Agreement for Supplemental Staffing Agencies, dated November 15, 2021, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and MedOP Solutions, LLC

15. Agreement for Supplemental Staffing Agencies, dated August 4, 2020, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Midwest Nurse Staffing

16. Agreement for Supplemental Staffing Agencies, dated September 3, 2021, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Pulmonary Exchange, Ltd.

17. Agreement for Supplemental Staffing Agencies, dated February 19, 2020, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and The Nurse Source, Ltd.

18. Education and Affiliation Agreement, dated July 1, 2013, by and between Franciscan St. James Health and Vanguard Weiss Hospital

19. Master Distribution Agreement, dated September 1, 2022, by and between Medline Industries, L.P./Medline Industries Holdings, L.P. and Pipeline – Weiss Memorial Hospital and Pipeline – West Suburban Medical Center, LLC

DM3\8615431.9

Schedule 3.9(b)

Material Contracts Exceptions

1. On April 7, 2022, Weiss OpCo received a letter from Alteon Health claiming Weiss OpCo's breach of its obligations to provide certain reports, exports, extracts, and interfaces to Alteon Health, all as required pursuant to the Alteon ED Agreement. This breach was resolved by the parties and the letter was rescinded by Alteon Health on April 29, 2022

2. On April 7, 2022, West Sub OpCo received a letter from Alteon Health claiming West Sub OpCo's breach of its obligations to compensate Alteon Health with a shortage in the amount of $458,342. On April 12, 2022, West Sub OpCo paid Alteon Health an amount of $458,343 in order to fully resolve the matter, and Alteon accepted such amount as payment in full and the breach was rescinded by Alteon Health on April 18, 2022

3. The Subsidiaries are generally behind on a significant portion of Subsidiaries' accounts payable and are currently working to reduce the same, all as previously disclosed to Buyer

4. Settlement Agreement and Mutual Release, effective July 22, 2022, by and between Pipeline – Weiss Memorial Hospital, LLC d/b/a Weiss Memorial Hospital and Ayoade Akere, M.D.
    a. Independent physician regarding timeshare office space rented by physician at Weiss (Dr. Akere owes back rent)

5. Settlement Agreement and Mutual Release, effective July 22, 2022, by and between Pipeline – Weiss Memorial Hospital, LLC d/b/a Weiss Memorial Hospital and Ayoade Akere, M.D.
    a. Same Dr. Akere. Settlement re payment for resident teaching services; Weiss memorial owes Dr. Akere overdue teaching compensation (Net of the two settlements amount to Dr. Akere owing Weiss Memorial a total of $1,425)

6. Settlement Agreement and Mutual Release, effective July 22, 2022, by and between Pipeline – Weiss Memorial Hospital, LLC d/b/a Weiss Memorial Hospital and Suzanne Pham, M.D.
    a. Employed physician regarding payment for additional duties Dr. Pham performed during this past year (Weiss Memorial to pay Dr. Pham $44,312 over four pay periods)

73

Schedule 3.10(a)

Employee Benefit Plans

1.      Pipeline Health System, LLC 401k Plan
2.      Executives are eligible for the Annual Bonus Plan.
3.      Retention Bonus Plan (See Schedule 2.7(e))
4.      Sale Bonus Plan (Barbara Martin/Irene Dumanis)

DM3\8615431.9

**PIPELINE CHICAGO**
**YEAR 2022 BENEFITS RENEWAL**

| Coverage / Carrier |
| --- |
| **Medical -- Keenan TPA (# H1000-H1061) -- All Pipeline Locations** |
| Medical Administration |
| **Medical -- Anthem Medical Network (#278208)** |
| Medical Network |
| |
| **Medical/Rx Stop Loss -- Symetra/Point 6 (#16-015651-000)** |
| Specific Stop Loss |
| Aggregate Stop Loss |
| **Prescription Drug -- Express Scripts** |
| KPPC Service/Access Fee |
| KPCM (USRx Care) |
| |
| **DeltaCare HMO  -- Delta Dental (#79384) -- Pipeline All Locations** |
| Fully Insured Dental HMO |
| **Dental PPO -- Delta Dental (#21130) -- Pipeline All Locations** |
| Fully Insured Dental PPO |

**PIPELINE CHICAGO**
**YEAR 2022 BENEFITS RENEWAL**

| Coverage / Carrier |
| --- |
| **Vision -- VSP (#30089703) -- Pipeline All Locations** |
| Fully Insured Vision PPO |
| |
| **Basic Life/AD&D -- New York Life (#FLX969908)** |
| Benefit - Class 3: All Other EEs of Pipeline LA (Avanti), Pipeline Chicago & Dallas: 1x BAE to $50,000 |
| Maximum AD&D Benefit (All Classes): Equal to Basic Life Benefit |
| |
| **Voluntary Life (Employee) -- New York Life ((#FLX969908)** |
| Same Benefit for Class 1, 2 & 3 |
| Benefit: 1-5x BAE to $1M |
| GI: Lesser of 3X BAE or 500K |
| |
| **Voluntary Life (Spouse) -- New York Life (#FLX969908)** |
| Same Benefit for Class 1, 2 & 3 |
| Benefit: Increments of $10K to $250K, up to 100% EE Vol. Life amount |
| GI: $50,000 |
| |
| **Voluntary Life (Child) -- New York Life (#FLX969908)** |
| Same Benefit for Class 1, 2 & 3 |
| Benefit: 2 options - Units of $5,000 to $10,000 |
| GI: GI for all amounts |
| |
| **Voluntary AD&D -- New York Life (#OK971350)** |
| Benefit: Equal to Supplemental EE Life Benefit |
| Benefit: Equal to Supplemental Spouse Life Benefit |
| Benefit: Equal to Supplemental Child Life Benefit |
| |
| **STD -- New York Life (#LK752844)** |
| Benefit - Class 2 - Pipeline Chicago & Dallas Directors, Managers, Resident or Physicians |
| Benefit: 60% to $3,464; EP: 30 days Accidents/30 days Sickness; Benefit Duration: 13 weeks (includes EP) |
| |
| Benefit - Class 3 - All Other FT/PT EES of Corporate PHS, Pipeline LA (Avanti), Chicago and Dallas |
| Benefit: 60% to $1,385; EP: 30 days Accidents/30 days Sickness; Benefit Duration: 26 weeks (includes EP) |

**PIPELINE CHICAGO**
**YEAR 2022 BENEFITS RENEWAL**

| Coverage / Carrier |
| --- |
| **LTD -- New York Life (#LK966567)** |
| Benefit - Class 2 - Pipeline Chicago & Dallas Executives, Directors, managers, Residents or Physicians<br>Benefit: : 60% to $15,000; EP: 90 days; Benefit Duration: SSNRA |
| Benefit - Class 3 - All Other Ees of Pipeline LA, Chicago and Dallas<br>Benefit: 60% to $6,000; EP: 180 days; Benefit Duration: SSNRA |
| Life Assistance Program (LAP) |
| **Benefit Administration System -- Benefitsolver** |
| Enrollment/Eligibility, Billing & Financial Reporting |
| **FSA/ HSA / Commuter Benefits -- Tri-Ad** |
| FSA - LA/Chicago/Dallas/Corporate PHS |
| HSA - LA/Chicago/Dallas/Corporate PHS |
| Commuter - Chicago Only |
| **COBRA -- WEX** |
| COBRA Admin - LA/Chicago/Dallas/Corporate PHS |
| **AETNA - VOLUNTARY BENEFITS - TX & IL** |
| Hospital Indemnity, Critical Illness, Accident |
| **Prepaid Legal -- MetLife Hyatt Legal -- Pipeline All Locations** |
| **J1 Travel Program  -- WorldTrips Travel Insurance -- Pipeline Chicago** |

Schedule 3.10(b)

Employee Benefit Plans – Claims

1.      None.

DM3\8615431.9

Schedule 3.11

Employee Relations

| Patient/Claimant /Plaintiff Name | Facility | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| Thomas, Cherry & Phillips, Tina | West Suburban Medical Center | Alleged Wage & Hour violations, focusing on overtime calculations & auto-deduct mechanism | US District Court, Northern District of Illinois. 22-CV-01122 | Initial investigation underway; Def. has retained firm of Jackson Lewis. |
| Hill, Tommy | West Suburban Medical Center | EEOC charge filed on 7/27/2021, which includes allegations of race and age discrimination. | EEOC Charge No. 440-2021-03903 | Notice of Right to Sue dated 4/21/22. Employee has 90 days from receipt of the Notice to file a related civil complaint. |
| Fitter, Fawad | West Suburban Medical Center | EEOC charge filed on 11/1/2021, which includes allegations of disability discrimination. | EEOC Charge No. 440-2021-06767 | This matter was settled in Mediation. Final Settlement Agreement has been prepared and signed by the parties. |
| Crosby, Reginald | West Suburban Medical Center | IDHR charge filed on 9/16/2019, which includes allegations of harassment and employment discharge based on sex (male). | IDHR Charge No. 2020CF1214  EEOC Charge No. 21BA00463 | Notice of Dismissal due to Lack of Evidence dated February 14, 2022 received. Complainant has appealed this decision. We have replied and expect to receive a decision in 2-3 months. |
| Crawford, Andrea | West Suburban Medical Center | IDHR complaint received dated 10/29/21, which includes allegations of disability discrimination. | IDHR Charge No. 2021CF2405 | Charge of Discrimination received and defense counsel has been retained. IDHR dismissed the charges and Complainant has until Jan 9. 2023 to appeal. |
| Broadnax, Shanya | West Suburban Medical Center | EEOC charge filed 4/22/2022, which includes allegations of discrimination based on race and disability. | EEOC Charge No. 440-2021-04881 | Defense counsel has been retained. |
| Ochoa, Salvador | West Suburban Medical Center | Received communication from an attorney alleging violations of IL | N/A | Received a Notice of Representation on 8/31/21, following Ochoa's termination. No further |

DM3\8615431.9

| Patient/Claimant /Plaintiff Name | Facility | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| | | Human Rights Act stemming from complainant's termination. | | communication received subsequent to Ochoa's receipt of the Termination Appeal decision dated 9/3/2021. |
| Heard, Corey | Weiss Memorial Hospital | Alleged Biometric Information Protection Act ("BIPA") violation. | Circuit Court of Cook County, Illinois 19-CH-06763 | This case is currently stayed pending a decision of the Ill. Supreme Court regarding whether the Illinois Workers Compensation Act preempts BIPA claims in the workplace. A motion to dismiss has been filed. |
| Parrish, Mark | Weiss Memorial Hospital | Alleged employment discrimination and retaliation relating to his layoff. | N/A | Received communication from former employee's attorney. We have retained counsel and the parties have entered into a Settlement Agreement. |
| Holmquist, Judy | Weiss Memorial Hospital & West Suburban Medical Center | Alleged wrongful termination and retaliation relating to her layoff. IDHR claim filed on 8/24/22. | IDHR Charge No.2022CF1876 | Received communication from former employee's attorney and received notice of the IDHR claim thereafter. We have retained counsel. |
| Delgado, Pedro | Weiss Memorial Hospital | EEOC charge filed on 09/09/2022, which includes allegations of race and national origin discrimination. | EEOC Charge No. 440-2022-08841 | We have noticed our carrier and hired counsel. |
| Jacobs, Erika | Weiss Memorial Hospital | Alleged defamation, and violations of labor laws and human rights relating to the requirement to take weekly COVID tests. | Circuit Court of Cook County 22 L 008089; US District Court – Northern District of IL 1:22-cv-04955 | The State matter was filed on 09/18/22 and the Federal matter was filed on 09/12/22. We have been served with the Federal Complaint and have notified our carrier. |

**Workers' Compensation Claims**

80

DM3\8615431.9

| Claimant | Claim Number | Loss Date | Location | Location Name | Claim Type | Status | Total Incurred |
|---|---|---|---|---|---|---|---|
| Bercan, Paolo | UHC230404947 | 10/28/2020 | 680 | West Suburban Medical Center | Indemnity | Reopened | $16,449.00 |
| DAVIS, LASHON | UHC230501452 | 3/9/2022 | 680 | West Suburban Medical Center | Indemnity | Open | $31,566.67 |
| Shaw, Larry | UHC230323065 | 7/26/2020 | 680 | West Suburban Medical Center | Indemnity | Reopened | $62,014.32 |
| Ang, Marie Joy | UHC230418197 | 6/10/2021 | 680 | West Suburban Medical Center | Indemnity | Open | $219,390.34 |
| Stinson-Burns-Anyanwu, Joyce | UHC230312159 | 6/26/2020 | 680 | West Suburban Medical Center | Indemnity | Open | $23,699.00 |
| Bercan, Paolo | UHC230349524 | 8/29/2020 | 680 | West Suburban Medical Center | Indemnity | Open | $148,641.78 |
| Mitchell, LaGretta | UHC230454015 | 6/29/2021 | 680 | West Suburban Medical Center | Indemnity | Reopened | $29,970.91 |
| Samuelian, Esmyraluna | UHC230460942 | 8/2/2021 | 680 | West Suburban Medical Center | Indemnity | Open | $17,086.41 |
| Mabeza Butardo, Armida | UHC230366672 | 11/9/2020 | 680 | West Suburban Medical Center | Indemnity | Open | $118,093.47 |
| Casiano, Victor | UHC230396033 | 3/23/2021 | 790 | Louis A Weiss Memorial Hospital | Indemnity | Reopened | $44,434.60 |
| RENIGUNTALA, SOLOMON | UHC230480892 | 1/1/2022 | 680 | West Suburban Medical Center | Indemnity | Open | $143,694.63 |
| DELGADO, PEDRO | UHC230503560 | 3/10/2022 | 790 | Louis A Weiss Memorial Hospital | Indemnity | Open | $28,532.72 |
| Skoglund, Cheryl L | UHC230400498 | 4/8/2021 | 795 | Lakefront Medical Associates dba Chicago Health Me | Indemnity | Open | $29,142.85 |
| CARRILERO, LUIS | UHC230507889 | 3/30/2022 | 790 | Louis A Weiss Memorial Hospital | Indemnity | Reopened | $21,162.43 |
| ARNS, RENEE | UHC230507836 | 3/29/2022 | 790 | Louis A Weiss Memorial Hospital | Indemnity | Open | $87,486.42 |
| TRAIS, HANNAH | UHC230511116 | 4/13/2022 | 790 | Louis A Weiss Memorial Hospital | Medical | Open | $5,550.00 |
| BUSS, TAMARA L | UHC230512992 | 12/16/2021 | 790 | Louis A Weiss Memorial Hospital | Medical | Open | $2,050.00 |
| Reynolds, Michelle | UHC230513672 | 4/22/2022 | 680 | West Suburban Medical Center | Indemnity | Open | $37,549.27 |
| WOJTOWICZ, TIMOTHY | UHC230518521 | 5/9/2022 | 680 | West Suburban Medical Center | Indemnity | Open | $79,108.98 |
| AIT BOUCHERBIL, MOHAMED | UHC230519125 | 5/5/2022 | 790 | Louis A Weiss Memorial Hospital | Indemnity | Open | $35,170.78 |
| ALBERTO, ESTELITA M | UHC230524507 | 2/10/2022 | 790 | Louis A Weiss Memorial Hospital | Medical | Open | $3,850.00 |
| DELGADO, ANDRES | UHC230527510 | 5/23/2022 | 790 | Louis A Weiss Memorial Hospital | Medical | Open | $2,050.00 |

DM3\8615431.9

| Claimant | Claim Number | Loss Date | Location | Location Name | Claim Type | Status | Total Incurred |
|---|---|---|---|---|---|---|---|
| ELOUGA, MARCELLE | UHC230545757 | 8/10/2022 | 790 | Louis A Weiss Memorial Hospital | Indemnity | Open | $11,550.00 |
| WILLIAMS, WILLIE M | UHC230550782 | 8/27/2022 | 680 | West Suburban Medical Center | Indemnity | Open | $12,550.00 |
| MORGAN, KAY | UHC230550944 | 8/30/2022 | 680 | West Suburban Medical Center | Indemnity | Reopened | $7,050.00 |
| Olayo, Raul | UHC230557185 | 9/21/2022 | 680 | West Suburban Medical Center | Medical | Open | $850.00 |
| Medina, Gladys | UHC230559522 | 9/27/2022 | 795 | Lakefront Medical Associates dba Chicago Health Me | Indemnity | Open | $5,650.00 |
| Broadnax, Shanya | UHC230559922 | 4/8/2020 | 680 | West Suburban Medical Center | Indemnity | Open | $12,000.00 |
| Carlisle, Linda | UHC230560557 | 10/1/2022 | UNK | Unknown | Medical | Open | $4,050.00 |
| Walsh, Thomas | UHC230562352 | 9/26/2022 | UNK | Unknown | Medical | Open | $950.00 |
| Tengbeh, Josepha | UHC230563209 | 10/8/2022 | 795 | Lakefront Medical Associates dba Chicago Health Me | Medical | Open | $950.00 |

DM3\8615431.9

Schedule 3.12

Litigation and Proceedings

| Patient/Claimant /Plaintiff Name | Facility/Defendant | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| Tenet | Pipeline Health System, LLC/SRC Hospital Investments II, LLC | Tenet has filed a claim in arbitration for alleged claims relating SRC's failure to adhere to terms of the Asset Purchase Agreement, resulting in a monetary loss to Tenet in the Westlake bankruptcy. | AAA 01-22-0001-0628-2-G | Arbitration with AA is scheduled to take place in February 2023. |
| Pipeline Health System, LLC | Tenet | PHS has filed a claim in arbitration for failure to appropriate value multiple medical malpractice claims. | AAA 01-21-0016-4028-1-SG | Arbitration with AAA is scheduled to take place in March 2023. |
| Brown, Linda (on behalf of deceased Christine Miles) | West Suburban Medical Center | Alleged Med. Mal. involving worsening of pressure ulcers. DOI – N/A | Circuit Court of Cook County, Illinois 19 L 001666 | West Sub was named as a Respondent in Discovery only (not a Defendant), which was terminated on 2/25/2020. |
| Vargas-Butler, Ashley and Butler, Christopher Butler | West Suburban Medical Center | Alleged Negligence, involving failure to timely deliver and causing subgaleal bleed during delivery. DOI – 10/21/13 | Circuit Court of Cook County, Illinois 19 L 008400 | This matter was filed on 7/30/19 and liability has been assumed by Tenet, as the DOI is prior to Pipeline's acquisition of the facility. |
| Shelton, Thomas | West Suburban Medical Center | Alleged Negligence, concerning failure to diagnose spinal epidural abscess resulting in paraplegia. DOI – 5/11/19 | Circuit Court of Cook County, Illinois 20 L 006834 | Patient had laparotomy and splenectomy at WSMC in June 2016. In May 2019 patient treated for lower extremities numbness; alleges missed/delayed diagnosis of presence of blastomycosis, a fungal infection, in the spine. |

DM3\8615431.9

| Patient/Claimant /Plaintiff Name | Facility/Defendant | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| Quinntero-Jacobo, Victor | West Suburban Medical Center | Alleged Negligence, involving alleged failure to diagnose and prevent a pulmonary embolism, leading to patient death. DOI – 7/12/19 | Circuit Court of Cook County, Illinois 21 L 006951 | WSMC direct liability is limited, with allegations largely physician-focused. (Physicians involved: Brian Lassner; Sankha Bajerjee; Evyan Jawad; Mark Balek; Melvin Speisman; Kirubel Herano). |
| Thomas, Cherry & Phillips, Tina | West Suburban Medical Center | Alleged Wage & Hour violations, focusing on overtime calculations & auto-deduct mechanism DOI – 6/1/21 (approx.) | US District Court, Northern District of Illinois. 22-CV-01122 | Initial investigation underway; Def. has retained firm of Jackson Lewis. |
| Daker, David | West Suburban Medical Center; Pipeline Health System | Alleged slip and fall of individual delivering ventilators. DOI – 10/27/2020 | N/A | A letter of intent to sue was received on 2/22/21 and a complaint was recently served. Defense counsel has been retained. |
| Colin, Adelaida | West Suburban Medical Center | Labor and delivery incident where infant possibly experienced a hypoxic event. DOI – 2/17/21 | N/A | No claim has been asserted; no lawsuit filed. |
| Hernandez, Edwina | West Suburban Medical Center | Med. Mal.; Alleged Negligence concerning fetal demise, from various complications during labor DOI – 5/21/21 | N/A | No complaint or notice to sue received; incident alert/potential claim only, but patient is represented by counsel. |
| Koran, Samantha | West Suburban Medical Center | Med. Mal.; Alleged Negligence involving a patient fall while under general anesthesia. DOI – 3/9/2021 | N/A | No complaint filed. Notice of Attorney Lien received from patient's counsel. |
| Owaynat, Symaya | West Suburban Medical Center | Med. Mal.; Alleged Negligence involving foreign object left in patient following a bariatric surgical procedure. DOI - 06/24/2021. | Circuit Court of Cook County, Illinois 22 L 007674 | Complaint was filed on August 25, 2022. Counsel has been assigned. |
| Love, Isadora | West Suburban Medical Center | Alleged Negligence, involving alleged failure to diagnose stroke. DOI – March 18, 2022 | N/A | A letter of intent dated May 16, 2022 to sue was received. |
| Earl, Allison (on behalf of deceased | West Suburban Medical Center | Alleged Negligence/Wrongful Death. | Circuit Court of Cook County, Illinois | Complaint was filed on June 15, 2022. Counsel has been assigned. |

84

DM3\8615431.9

| Patient/Claimant /Plaintiff Name | Facility/Defendant | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| Janice – Johnson Harris) | | DOI – June 16, 2020 | 22 L 005410 | |
| Hill, Tommy | West Suburban Medical Center | EEOC charge filed on 7/27/2021, which includes allegations of race and age discrimination. | EEOC Charge No. 440-2021-03903 | Notice of Right to Sue dated 4/21/22. Employee has 90 days from receipt of the Notice to file a related civil complaint. |
| Fitter, Fawad | West Suburban Medical Center | EEOC charge filed on 11/1/2021, which includes allegations of disability discrimination. | EEOC Charge No. 440-2021-06767 | This matter was settled in Mediation. Final Settlement Agreement has been fully executed. |
| Crosby, Reginald | West Suburban Medical Center | IDHR charge filed on 9/16/2019, which includes allegations of harassment and employment discharge based on sex (male). | IDHR Charge No. 2020CF1214<br><br>EEOC Charge No. 21BA00463 | Notice of Dismissal due to Lack of Evidence dated February 14, 2022 received. Complainant filed an appeal in connection with the Dismissal as of May 20, 2022. Counsel has been retained and we filed a response. We expect a decision in 2-3 months. |
| Crawford, Andrea | West Suburban Medical Center | IDHR complaint received dated 10/29/21, which includes allegations of disability discrimination. | IDHR Charge No. 2021CF2405 | Charge of Discrimination received and defense counsel has been retained. IDHR dismissed the charges and Complainant has until Jan 9. 2023 to appeal |
| Broadnax, Shanya | West Suburban Medical Center | EEOC charge filed 4/22/2022, which includes allegations of discrimination based on race and disability. | EEOC Charge No. 440-2021-04881 | Defense counsel has been retained. |
| Ochoa, Salvador | West Suburban Medical Center | Received communication from an attorney alleging violations of IL Human Rights Act stemming from complainant's termination. | N/A | Received a Notice of Representation on 8/31/21, following Ochoa's termination. No further communication received subsequent to Ochoa's receipt of the Termination Appeal decision dated 9/3/2021. |
| TK Elevator Corporation | Weiss Memorial Hospital | Received Mechanics Lien dated 03/29/22. Alleges West Sub owes a | Cook County Clerk | This should have been discharged in the Weiss parking lot sale. |

85

DM3\8615431.9

| Patient/Claimant /Plaintiff Name | Facility/Defendant | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| | | balance of $139,357.12 plus interest. | | |
| TK Elevator Corporation | Weiss Memorial Hospital | Received Mechanics Lien dated 09/21/22. Alleges West Sub owes a balance of $56,235.27 plus interest. | Cook County Clerk | |
| Premier Environmental Services, Inc. | West Suburban Medical Center | Received Mechanics Lien dated 6/15/22. Alleges West Sub owes a balance of $23,538.00 plus interest. | Cook County Clerk | Received Release of Contractor's Claim for Lien dated 8/12/22. |
| Premier Environmental Services, Inc. | West Suburban Medical Center | Received Mechanics Lien dated 6/15/22. Alleges West Sub owes a balance of $6,375.00 plus interest. | Cook County Clerk | Received Release of Contractor's Claim for Lien dated 8/12/22. |
| First Point Medical | West Suburban Medical Center | Received Mechanics Lien dated September 20, 2022. Alleges West Sub owes a balance of $522,504.73 plus interest. | Cook County Clerk | |
| Jamerson & Bauwens, Electrical Contracts, Inc. | West Suburban Medical Center | Received Mechanics Lien dated October 27, 2022. Alleges West Sub owes a balance of $2,659.87 plus interest | Cook County Clerk | |
| Jamerson & Bauwens, Electrical Contracts, Inc. | Weiss Memorial Hospital | Received Mechanics Lien dated October 27, 2022. Alleges Weiss owes a balance of $23,354.84 | Cook County Clerk | |
| La Force, LLC | Weiss Memorial Hospital | Received Mechanics Lien dated 6/7/22. Alleges Weiss Memorial Hospital owes a balance of $7,261.90 plus interest. | Cook County Clerk | This should have been discharged in the Weiss parking lot sale. |
| Emcor Services Team Mechanical, Inc. | Weiss Memorial Hospital | Received Mechanics Lien dated September 19, 2022. Alleges Weiss owes a balance of $253,323.03 plus interest. | Cook County Clerk | |
| Roberts Environmental Control Corp. | Weiss Memorial Hospital | Received Mechanics Lien dated August 30, 2022. Alleges Weiss | Cook County Clerk | |

86

DM3\8615431.9

| Patient/Claimant /Plaintiff Name | Facility/Defendant | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| | | owes a balance of $93,634.55 plus interest. | | |
| Beverly Asphalt Paving Co. | Weiss Memorial Hospital | Received Mechanics Lien dated September 19, 2022. Alleges Weiss owes a balance of $14,500 plus interest. | Cook County Clerk | |
| International Decorators | Weiss Memorial Hospital | Received Mechanics Lien dated October 18, 2022. Alleges Weiss owes a balance of $53,183.50 plus interest. | Cook County Clerk | |
| R.C.J. Enterprises, Ltd dba Chadwick Contracting Company | Weiss Memorial Hospital | Received Mechanics Lien mailed October 25, 2022. Alleges Weiss owes a balance of $198,102.15 plus interest. | Cook County Clerk | |
| Templar Construction, Inc. | Weiss Memorial Hospital | Received Mechanics Lien dated October 19, 2022. Alleges Weiss owes a balance of $31,057.00 plus interest. | Cook County Clerk | |
| Bergland Construction Company | Weiss Memorial Hospital | Received Mechanics Lien dated October 10, 2022. Alleges Weiss owes a balance of $512,242.05 plus interest. | Cook County Clerk | |
| Alteon Health Illinois, PLLC | West Suburban | Alleged breach of Coverage Agreement (Notice dated April 7, 2022), stemming from unpaid invoices. | N/A | Breach Notice rescinded by Group on April 18, 2022. |
| Gallegos, Jesse and Gallegos, Refugio | Weiss Memorial Hospital | Med. Mal., involving alleged failure to prevent pressure ulcers resulting in death. DOI – 3/22/2017 | Circuit Court of Cook County 19 L 003383 | This matter was filed on 3/29/19 and liability has been assumed by Tenet, as the DOI is prior to Pipeline's acquisition of the facility. |
| Bell, Natalie (on behalf of deceased Jasmine Wilks) | Weiss Memorial Hospital | Alleged Negligence/Wrongful Death stemming from the development of pressure sores that led to death. | Circuit Court of Cook County 19 L 004926 | This matter was filed on 5/06/19 and liability has been assumed by Tenet, as the DOI is prior to Pipeline's acquisition of the facility. |

DM3\8615431.9

| Patient/Claimant /Plaintiff Name | Facility/Defendant | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| | | DOI – 4/27/2017 | | |
| Watson, Ellen (on behalf of the Estate of Doris Franklin) | Weiss Memorial Hospital | Alleged Negligence, stemming from the development of a stage IV pressure ulcer that led to death. DOI – 11/21/2017 | Circuit Court of Cook County 19 L 008357 | This matter was filed on 7/29/19 and liability has been assumed by Tenet, as the DOI is prior to Pipeline's acquisition of the facility. |
| Nyquist, Cheryl (on behalf of the Estate of Doris Nyquist) | Weiss Memorial Hospital | Alleged Negligence, stemming from the development of pressure sores which contributed to death. DOI – 5/20/2018 | Circuit Court of Cook County 20 L 005316 | This matter was filed on 5/14/2020 and liability has been assumed by Tenet, as the DOI is prior to Pipeline's acquisition of the facility. |
| Velez, Sarah (on behalf of the Estate of Anilda Sepulveda) | Weiss Memorial Hospital | Alleged Negligence, stemming from the development of multiple pressure sores which contributed to death. DOI – N/A | Circuit Court of Cook County 20 L 006211 | Weiss has been named as a Respondent in Discovery only (not a Defendant). |
| Zeltzer, Ida | Weiss Memorial Hospital | Alleged Negligence, stemming from a fall which caused a fractured left femur. DOI – 1/19/2019 | Circuit Court of Cook County 20 L 009462 | This matter was filed on 9/03/2020 and liability has been assumed by Tenet, as the DOI is prior to Pipeline's acquisition of the facility. |
| Dingee, Jeanette | Weiss Memorial Hospital | Alleged Negligence, stemming from a bacterial infection resulting in heart damage. DOI – 9/5/2016 | Circuit Court of Cook County 21 L 008278 | This matter was filed on 08/17/2021 and liability has been assumed by Tenet, as the DOI is prior to Pipeline's acquisition of the facility. |
| Montgomery, Elaine – Estate of | Weiss Memorial Hospital | Alleged failure to prevent ulcer in 68-year-old female patient resulting in death. DOI – 1/29/2019. | Circuit Court of Cook County 19 L 5603 | This matter has settled for $45K. The insured and Tenet entered into a joint defense agreement and the settlement will be spilt 50/50. The insured's share is $22.5K. Awaiting Medicare lien. |
| Lamont, Frank | Weiss Memorial Hospital | Alleged Negligence, concerning treatment of amputee at Continental Nursing and Rehab Center; Patient was transferred for treatment at Weiss. | Circuit Court of Cook County, Illinois 20 L 12518 | Facility is named as Respondent in Discovery by Plaintiff; Facility not named in complaint. |

DM3\8615431.9

| Patient/Claimant /Plaintiff Name | Facility/Defendant | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| | | (Plaintiff is patient's daughter, Carolyn Williamson) DOI – 12/18/19 | | |
| Powers, Nadine – Estate of (Cheryl Rojeck) | Weiss Memorial Hospital | Alleged Negligence, regarding RN's administration of heparin following a surgical procedure, resulting in death. DOI – 2/14/2021. | Circuit Court of Cook County, Illinois 22 L 3975 | Defense counsel has been assigned. |
| Pine, Millicent – Estate of (Michael Taplinger) | Weiss Memorial Hospital | Alleged Negligence stemming from a patient fall. DOI – 1/05/2021 | Circuit Court of Cook County, Illinois 22 L 2923 | This matter was just recently served and has been reported to our carrier. |
| Delelegn, Gete | Weiss Memorial Hospital | Alleged Negligence stemming from a fall. DOI – 6/08/2022 | N/A | Attorney communication/preservation letter received on 07/20/22. |
| Heard, Corey | Weiss Memorial Hospital | Alleged Biometric Information Protection Act ("BIPA") violation. | Circuit Court of Cook County, Illinois 19-CH-06763 | This case is currently stayed pending a decision of the Ill. Supreme Court regarding whether the Illinois Workers Compensation Act preempts BIPA claims in the workplace. A motion to dismiss has been filed. |
| Meyer, Winifred | Weiss Memorial Hospital | Alleged slip & fall, on hospital sidewalk DOI – 1/11/22 | N/A | Received notice of intent to sue; initial investigation underway. |
| Foster, Sheila | Weiss Memorial Hospital | Alleged sexual assault/harassment by hospital personnel, during ultrasound examination DOI – 3/24/22 | N/A | Initial investigation underway. Patient has retained counsel. |
| Parrish, Mark | Weiss Memorial Hospital | Alleged employment discrimination and retaliation relating to his layoff. | N/A | Received communication from former employee's attorney. We have retained counsel and have entered into a Settlement Agreement. |
| Holmquist, Judy | Weiss Memorial Hospital & West Suburban Medical Center | Alleged wrongful termination and retaliation relating to her layoff. IDHR claim filed on 8/24/22. | IDHR Charge No.2022CF1876 | Received communication from former employee's attorney and received notice of the IDHR claim thereafter. We have retained counsel. |

89

DM3\8615431.9

| Patient/Claimant /Plaintiff Name | Facility/Defendant | Type of Case & Description (DOI – Date of Incident/Loss) | Court/Complaint No. | Additional Info/Notes |
|---|---|---|---|---|
| Delgado, Pedro | Weiss Memorial Hospital | EEOC charge filed on 09/09/2022, which includes allegations of race and national origin discrimination. | EEOC Charge No. 440-2022-08841 | We have noticed our carrier and hired counsel. |
| Jacobs, Erika | Weiss Memorial Hospital | Alleged defamation, and violations of labor laws and human rights relating to the requirement to take weekly COVID tests. | Circuit Court of Cook County 22 L 008089; US District Court – Northern District of IL 1:22-cv-04955 | The State matter was filed on 09/18/22 and the Federal matter was filed on 09/12/22. The federal matter has been served and we have notified our carrier. |
| Alteon Health Illinois, PLLC | Weiss Memorial Hospital | Alleged breach of Coverage Agreement (Notice dated April 7, 2022), stemming from certain metrics not being provided timely to Group. | N/A | Breach Notice rescinded by Group on April 29, 2022. |
| City of Chicago Dept. of Buildings | Weiss Memorial Hospital | Alleged violations of municipal code relating to its elevators. | Dept of Building #522E0672361 | A hearing is scheduled to take place on December 12, 2022 at 3P CT. |
| Specialists in Medical Imaging, PC | Pipeline Health System, LLC | Alleged breach of Coverage Agreement (Notices dated 8/23/21 and 12/30/21), stemming from HL7 interface/IT issues. | N/A | Matter resolved by entering into a Second Amendment to the Coverage Agreement effective 01/18/22. |
| Dinavahi, Kaushik | Weiss Memorial Hospital | Alleged automobile break-ins at the Weiss Memorial Hospital parking garage. | N/A | Received letter from Mr. Dinavahi's attorney, dated November 2, 2022, demanding $40,000 to compensate Mr. Dinavahi for losses arising out of automobile break-ins. |

90

DM3\8615431.9

Schedule 3.13

Medical Staff Matters

1.  None.

Schedule 3.14

Tax Liabilities

1.  West Sub OpCo: $2,424,008.93 outstanding in underpaid state sales tax
2.  Weiss OpCo: $2,357,177.16 outstanding in underpaid state and city sales tax

DM3\8615431.9

Schedule 3.15(b)

Reimbursement Contracts

1. The Medicare and Illinois Medicaid cost reports of West Suburban Medical Center have been filed for all reporting years through the reporting year ending April 30, 2022. Such cost reports for West Suburban Medical Center have been fully settled through reporting year April 30, 2020 (the cost reports for reporting years 2021 and 2022 have not been fully settled).

2. The Medicare and Illinois Medicaid cost reports of Weiss Memorial Hospital have been filed for all reporting years through the reporting year ending May 31, 2021. Such cost reports for Weiss Memorial Hospital have been fully settled through reporting year May 31, 2020 (the cost reports for reporting year 2021 have not been fully settled).

3. Medicare is auditing GME and bad debt for the cost report ended May 31, 2019 for Weiss Memorial Hospital.  For the past three years, no cost report for West Suburban Medical Center has been audited.  For the past three years, no cost report for the Hospital Facilities has been audited with respect to Medicaid payments.

4. The table below summarizes the most recent BPCI Advanced reconciliations from CMS for West Sub OpCo and Weiss OpCo, which totaled $634,662.92, to be invoiced by CMS in August and payable immediately or within 30-days from the invoice date.  If check payment is not received on due date, CMS will recoup with interest from Medicare remittances.

| Sum of Adjustment | | | Performance Period | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Market | Facility | Model Year (MY) | PP3 | | PP4 | | PP5 | | PP6 | | Grand Total |
| Chicago | WMH | 3 | $ | - | $ | (149,894.64) | $ | (2,365.36) | | | $ (152,260.00) |
| | | 4 | | | | | $ | 65,744.16 | $ | (316,287.86) | $ (250,543.70) |
| | WMH Total | | $ | - | $ | (149,894.64) | $ | 63,378.80 | $ | (316,287.86) | $ (402,803.70) |
| | WSMC | 3 | $ | - | $ | (19,275.03) | $ | (36.42) | | | $ (19,311.45) |
| | | 4 | | | | | $ | 24,850.21 | $ | (237,397.98) | $ (212,547.77) |
| | WSMC Total | | $ | - | $ | (19,275.03) | $ | 24,813.79 | $ | (237,397.98) | $ (231,859.22) |
| Chicago Total | | | $ | - | $ | (169,169.67) | $ | 88,192.59 | $ | (553,685.84) | $ (634,662.92) |

93

Schedule 3.15(c)

Payment Programs Compliance

1. BCBSIL's Uniform Payment Plan Program ("UPP") system of payment is a method of reimbursement designed to equalize payments to Blue Cross facilities (including the Hospital Facilities). Pursuant to the UPP, BCBSIL's PPO contracted facilities must demonstrate that they have an effective utilization program and will participate in cost containment activities. BCBSIL then provides an accelerated, predictable, weekly payment that approximates an average weeks' worth of Blue Cross claims for the relevant contracted facility. The advance is monitored on a weekly basis and adjusted as necessary. Over a period of time, the advance should approximate claims processed.

   As of March 31, 2022, BCBSIL asserted that in connection with the arrangements under their provider contracts, the Hospital Facilities carry a payable of approximately $8,000,000 to BCBSIL for contractual allowances, Medicaid balances and other advances due and owing to BCBSIL, which balance is expected to change from month to month (the "Payable"). Pipeline disputes the amount of the "Payable" as well as the nomenclature used by BCBSIL to determine outstanding balances because it does not represent cash provided by BCBSIL, but rather a component of the process utilized by BCBSIL to manage the UPP system, should Pipeline or a successor cease as a contracted provider with BCBSIL (which did not, and will not occur).

   On or about May 13, 2022, BCBSIL, via the UPP system, began improper withholds of cash due Pipeline under the contract and spirit of the UPP program, totaling approximately $6,016,000 to date (with withholds impacting Weiss ceasing as of 09/23/22 and withholds impacting West Suburban ceasing as of 10/03/22).

   BCBSIL has asserted that a portion of the Payable related to Medicaid balances is $920,000 as of March 31, 2022, which balance is expected to change from month to month (the "Medicaid Payable"). BCBSIL has provided no detail which Pipeline can utilize to review, validate or invalidate the demand for the $920,000. To allow for the proper review and validation of the Medicaid Payable, we have offered that the parties agree to place 75% of the Medicaid Payable, or approximately $690,000 into escrow to allow the teams to audit the account details and determine the validity and appropriateness of the amounts asserted by BCBSIL. Thus far, BCBSIL has rejected the escrow idea and has insisted on payment of the $690,000. The parties are continuing to negotiate a settlement of this issue. BCBSIL's consent to this Transaction is conditioned on the payment of the Medicaid Payable by the Hospital Facilities.

94

DM3\8615431.9

Schedule 3.15(d)

Cares Act

1. Cares Act Grants:               $1,296,717.55
2. Cares Act Offset Closing Amount: $1,321,594.47
3. Cares Act Deposit:              **$648,358.78**

DM3\8615431.9

Schedule 3.16

Insurance

| First Named Insured | Insurer | Policy # | Type | Coverage Period |
|---|---|---|---|---|
| Pipeline-Weiss Memorial Hospital, LLC | Lloyd's London<br>AM Best: A+ XV / A++ XV | B0595XR7094022 | Excess Liability Lead Excess | 4/1/2022 - 4/1/2023 |
| Pipeline-Weiss Memorial Hospital, LLC | National Fire & Marine<br>AM Best: A++, XV | EN035231 | Excess Liability/Umbrella 2nd Layer Excess | 4/1/2022 - 4/1/2023 |
| SRC Hospital Investments II, LLC | Accident Fund General Insurance Company<br>AM Best: A, XII | 1400022244 | Workers' Compensation | 4/1/2022 - 4/1/2023 |
| Pipeline Health System, LLC | Zurich American Insurance Company<br>AM Best: A, XV | BAP 0533234-04 | Auto | 4/1/2022 - 4/1/2023 |
| Pipeline Health System, LLC | Affiliated FM<br>AM Best: A+, XV | 1076682 | Property | 4/1/2022 - 4/1/2023 |
| Pipeline Health System, LLC | Tokio Marine Specialty Insurance Company<br>AM Best: A++XV | PPK2398681 | Pollution Liability | 4/1/2022 - 4/1/2023 |
| SRC Hospital Investments II, LLC | Tokio Marine Specialty Insurance Company<br>AM Best: A++XV | PPK2398769 | Storage Tank Environmental Liability | 4/1/2022 - 4/1/2023 |
| Pipeline Health System, LLC | Allied World National Assurance Company<br>AM Best: A XV | 0312-2902 | Cyber Liability Primary Layer | 4/1/2022 - 4/1/2023 |
| Pipeline Health System, LLC | Crum & Forster Specialty Insurance Co.<br>AM Best: A XIV | CYB-103906 | Cyber Liability Excess Layer | 4/1/2022 - 4/1/2023 |
| Pipeline Health System, LLC | Axis Surplus Insurance Co.<br>AM Best: A XV | P-001-000851750-01 | Cyber Liability Excess Layer | 4/1/2022 - 4/1/2023 |

96

| First Named Insured | Insurer | Policy # | Type | Coverage Period |
|---|---|---|---|---|
| Pipeline Health System, LLC | Endurance American Specialty Insurance Co. AM Best: A+ XV | PVX30018057600 | Cyber Liability Excess Layer | 4/1/2022 - 4/1/2023 |
| Pipeline Health System, LLC | Evanston Insurance Company (Markel) (A XV) | MKLV3MML000134 | Management Liability & Employment Practices Liability | 6/1/2021 - 6/1/2023 |
| Pipeline Health System, LLC | Landmark American Insurance Company (RSUI) (A+ XIV) | LHS693677 | Excess Directors & Officers / Employment Practices Liability | 6/1/2021 - 6/1/2023 |
| Pipeline Health System, LLC | Hudson Excess Insurance Company (Hudson) (A XV) | HE-0303-6509-060121 | Excess Liability Directors & Officers Liability | 6/1/2021 - 6/1/2023 |
| Pipeline Health System, LLC | Capitol Indemnity Corporation (CapSpecialty) (A IX) | DO20211037-01 | Excess Liability Directors & Officers Liability | 6/1/2021 - 12/1/2022 |
| Pipeline Health System, LLC | Capitol Indemnity Corporation (CapSpecialty) (A IX) | DO20211037-02 | Excess Liability Directors & Officers Liability | 12/1/2022 - 6/1/2023 |
| Pipeline Health System, LLC | Associated Industries Insurance Co, Inc. (AmTrust) (A- XV) | AES1056511 00 | Side-A DIC | 6/1/2021 - 6/1/2023 |
| Pipeline Health System, LLC | Beazley Insurance Company (A XIV) | V25EE2210301 | Crime | 6/1/2021 - 6/1/2023 |

DM3\8615431.9

Schedule 4.1(b)

Buyer Governmental Approvals and Consents

**Pre-Closing:**

1. Filing of Hospital License Application from the Illinois Department of Public Health:
   a. Pipeline—Weiss Memorial Hospital LLC, I.D. Number 0006122
   b. Pipeline—West Suburban Medical Center, LLC, I.D. Number 0006130
2. Notification of Change of Control to the Joint Commission:
   a. Weiss Memorial Hospital Accreditation ID No. 7286
   b. West Suburban Medical Center Accreditation ID No. 7399
3. Notification and consent request to Illinois Emergency Management Agency, Bureau of Radiation Safety:
   a. Pipeline – Weiss Memorial Hospital, LLC Radioactive Material License Number IL-01595- 01
   b. Pipeline - West Suburban Medical Center, LLC Radioactive Material License Number IL-01520-01
4. Application for Transfer of Control for Radio Station Authorization
   a. Pipeline - Weiss Memorial Hospital, LLC FCC Registration Number (FRN): 0022763601 Call Sign WQRX593
   b. Pipeline-West Suburban Medical Center, LLC FCC Registration No. (FRN) 0031825565 File Number 0009868774 Call Sign WRPC214; Call Sign KLD978 File Number 0009023377 FRN: 0028016566
5. Receive Change of Ownership Exemption Approval from the State of Illinois Health Facilities and Services Review Board
   a. Weiss Memorial Hospital Exemption #E-028-22; Exemption #E-027-22
   b. Pipeline-West Suburban Medical Center Exemption #E-025-22; #E-026-22
6. Joint Application for Pharmacy License and Controlled Substance Licenses from IDFPR
   a. Pipeline-Weiss Memorial Hospital LLC
      i. Controlled Substance Registration 320.013038; 054.021167
      ii. Pharmacy License 054.021167; 051.036116
   b. Pipeline-West Suburban Medical Center LLC
      i. Controlled Substance Registration 320.013040; 054.021166
      ii. Pharmacy License 054.021166; 051.296766
   c. Pipeline Midwest Pharmacies LLC (d/b/a Plaza Pharmacy)
      i. Controlled Substance Registration 320.013037; 054.021169
      ii. Pharmacy License 054.021169; 051.294915
   d. Pipeline-West Suburban Medical Center LLC (d/b/a Center Pharmacy)
      i. Controlled Substance Registration 320.013039; 054.021170
      ii. Pharmacy License 054.021170; 051.299802

**Post-Closing:**

1. Provide Notice to Illinois Department of Public Health within 30 days regarding CLIA Certificate change of name:

98

DM3\8615431.9

      a. CLIA ID No. 14D1025353
      b. CLIA ID No. 14D1002692
      c. CLIA ID No. 14D2099737
      d. CLIA ID No. 14D2017169
      e. CLIA ID No. 14D0427142

2. File new Drug Enforcement Administration Certificate of Registration upon Pharmacy License Approvals from IDFPR:
      a. FP0957033
      b. FP0901769
      c. FP0903232
      d. FP0003955

3. Change of Ownership Notification to Medicare through Form 855 or Update to PECOS Profile within 30 days
      a. West Suburban Medical Center
          i. Medicare Lab: 14-0049
          ii. Medicare SNF: 14-5743
      b. Weiss Memorial Hospital
          i. Medicare Hospital: 14-0082
          ii. Medicare Lab: 14-0082
          iii. Medicare Psych: 14-S082
          iv. Medicare Rehab: 14-T082

4. Change of Ownership Notification to Medicaid or Update in Provider Portal within 30 days
      a. West Suburban Medical Center
          i. Medicaid Hospital: 611899386 001
          ii. Medicaid Lab: 611899386 401
      b. Weiss Memorial Hospital
          i. Medicaid Hospital: 352637418 001
          ii. Medicaid Lab: 352637418 401
      c. Weiss Memorial Hospital TRICARE: 362637418
      d. West Suburban Medical Center TRICARE: 611899386

5. File Updated Business Registrations for Hospital Locations
      a. West Suburban Medical Center License # 202200794
      b. Weiss Memorial Hospital License # 2206030; Code 4404

6. Notice for Inspection of Air Permit to Illinois Environmental Protection Agency
      a. Louis A. Weiss Memorial Hospital  - 77120016 ID No. 031600EXZ
      b. West Suburban Medical Center - No. 73050587 I.D. No. 031225ABE

7. Notice for Boiler Inspections to Illinois Office of the State Fire Marshal
      a. West Suburban Hospital – No. B0023887; B0023799; B0023883
      b. Weiss Memorial Hospital - No. BR029198

8. Change of Name Notice to All Other Third-Parties and Government Entities as set forth on Schedule 3.1(b), incorporated herein by reference

9. File REG 1-O form with Illinois Department of Revenue
      a. Pipeline-Weiss Memorial Hospital, LLC: Account ID 4310-4797
      b. Pipeline-West Suburban Medical Specialists, LLC: Account ID 4310-4940

10. Make online updates with American College of Radiology

<center>99</center>

      a.  Weiss Memorial Hospital
            i.  MAP# 04605-05

11. File signed New Owner Modality ID Designation Form with American College of Radiology
      a.  Weiss Memorial Hospital
            i.  CTAP# 50946-02
           ii.  CTAP# 50946-03
      b.  Pipeline West Suburban Medical Center
            i.  BMRAP# 50604-01
           ii.  CTAP# 50265-01
          iii.  CTAP# 50265-03
          iv.  NMAP# 52424-01
           v.  UAP# 50511
      c.  River Forest Advanced Imaging Center
            i.  MRAP# 50302-01
           ii.  UAP# 04442

12. Make online updates with College of American Pathologists
      a.  Weiss Memorial Hospital Clinical Laboratory: CAP No. 7180518
      b.  West Suburban Hospital Center
            i.  CAP No. 1857902
           ii.  CAP No. 1857901

DM3\8615431.9

Schedule 4.6

Buyer Regulatory Compliance

1.  None.

DM3\8615431.9

Schedule 5.3(b)

Administrative Expense Terms

Pipeline Health System, LLC
Schedule 5.3(b)

| # | Vendor | Cash Advance | Pre-pay/COD | Modified | Modified Terms |
|---|--------|--------------|-------------|----------|----------------|
| | | | | Type of Term Modification | |
| 1 | ABBOTT LABORATORIES | | x | | |
| 2 | ABBOTT RAPID DX NORTH AMERICA | | x | | |
| 3 | ABT TV & APPLICANCE GLENVIEW | | x | | |
| 4 | ADVANCED PULMONARY CARE LLC | | | x | Paid bi-weekly versus the contract of trailing month (new group until cash flow syncs up) |
| 5 | AGILITI HEALTH INC | | x | | |
| 6 | AGILITI SURGICAL INC | | x | | |
| 7 | ALCON LABORATORIES INC | | x | | |
| 8 | ALPHATEC SPINE INC | | x | | |
| 9 | AMERICAN RED CROSS | | | x | Trailing weekly COD payment due each Friday based upon prior week invoices |
| 10 | Amerisource Bergen | x | | | |
| 11 | APOLLO ENDOSURGERY INC | | x | | |
| 12 | APPLIED MEDICAL | | x | | |
| 13 | ARTHREX INC | | | x | Net 14 days |
| 14 | ASAHI INTECC USA INC | | x | | |
| 15 | BARD ACCESS SYS | | x | | |
| 16 | BAXTER HEALTHCARE CORP | | x | | |
| 17 | BECTON DICKINSON | | x | | |
| 18 | BIO-RAD LABORATORIES INC | | x | | |
| 19 | BIOTRONIC NATL LLC | | x | | |
| 20 | BIOTRONIK INC | | x | | |
| 21 | CAREFUSION 2200 INC | | x | | |
| 22 | CDW GOVERNMENT INC | | x | | |
| 23 | CHICAGO HEARING SOC | | x | | |
| 24 | CR BARD INC | | x | | |
| 25 | EDWARDS LIFESCIENCES | | x | | |
| 26 | FISHER HEALTHCARE | | x | | |
| 27 | GREAT LAKES COCA COLA DISTRIB | | x | | |
| 28 | IMMUCOR INC | | x | | |
| 29 | INTRANERVE | | x | | |
| 30 | INTUITIVE SURGICAL INC | | x | | |
| 31 | JEDMED INSTRUMENT | | x | | |
| 32 | KATENA PRODUCTS INC | | x | | |
| 33 | KCI USA INC | | x | | |
| 34 | KEY SURGICAL INC | | x | | |
| 35 | KLEEN AIR SVC CORP | | x | | |
| 36 | MCKESSON | | x | | |
| 37 | MEDIVATORS INC | | x | | |
| 38 | MEDLINE INDUSTRIES INC | x | | | |
| 39 | MIDWEST BLOOD RECOVERY SYS | | x | | |
| 40 | MIMEDX GROUP INC | | x | | |
| 41 | OSIRIS THERAPEUTICS INC | | x | | |
| 42 | PERFORMANCE HEALTH SUPPLY INC | | x | | |
| 43 | RESHAPE LIFESCIENCES INC | | x | | |
| 44 | SHPS, PLLC | | | x | Weekly (start-up ) versus bi-weekly payments in contract |
| 45 | SIEMENS INDUSTRY INC | | x | | |
| 46 | SYSMEX AMERICA | | x | | |
| 47 | TELEFLEX LLC | | x | | |
| 48 | TERUMO MEDICAL CORP | | x | | |
| 49 | THERMO FISHER SCIENTIFIC | | x | | |
| 50 | THYSSENKRUPP ELEVATOR | | x | | |
| 51 | TYPENEX MEDICAL LLC | | x | | |

PHS - Chicago Vendor Term Modification (2022 10 24_1430)                                                    Page 1 of 2

DM3\8615431.9

**Pipeline Health System, LLC**
**Schedule 5.3(b)**

| # | Vendor | Cash Advance | Pre-pay/COD | Modified | Modified Terms |
|---|--------|---|---|---|---|
| | | | | **Type of Term Modification** | |
| | | Cash Advance | Pre-pay/COD | Modified | Modified Terms |
| 52 | US FOODSERVICE INC | | | x | Weekly payments for early October, normal contact terms expected by Nov |
| 53 | UTAH MEDICAL PRODUCTS INC | | x | | |
| 54 | VALLEY MEDICAL STAFFING INC | | | x | Paid weekly for prior week service |
| 55 | VEMA STAFFING PARTNERS | | | x | Paid weekly for prior week service |
| 56 | WL GORE & ASSOC INC | | x | | |
| 57 | ZIMMER US INC | x | | | |
| 58 | ZOLL MEDICAL CORP | | x | | |

DM3\8615431.9

Schedule 5.6(b)

Required Consents

1.  Any notices or consents required under the terms of the Contracts listed on Schedule 2.7(f) are incorporated herein by reference.

2.  Consents to a change of control under the following agreements:

    a.  Provider Services Agreement, dated on or about July 29, 2019, by and between Pipeline – Lakefront Medical Associates, LLC and Molina Healthcare of Illinois, Inc.

    b.  Participating Provider Agreement, effective September 15, 2019, by and between NextLevel Health Partners, Inc. and Pipeline – Lakefront Medical Associates, LLC

    c.  Ludi Master Software Subscription Agreement, dated May 25, 2022, by and between Pipeline – Weiss Memorial Hospital, LLC and Pipeline – West Suburban Medical Center, LLC; and Ludi, Inc.

104

Schedule 9.2(e)

Indemnification by Seller

1. With respect to any payments made directly by Weiss Memorial Hospital to certain physicians under that certain 7th Amendment to the Co-Management Services Agreement, such amendment effective July 18, 2021, by and between Weiss Memorial Hospital on one hand, and Thomas McNally, M.D., Henry Finn, Inc., Center for Athletic Medicine, Ltd., Eldin Karaikovic, M.D., and Illinois Bone and Joint Institute, LLC, on the other hand (the "Co-Management Agreement"), Seller will indemnify and hold harmless the Buyer Indemnified Parties from and against any and all Losses that are based upon, occasioned by or attributable to, in whole or in part, directly or indirectly, any claims brought against any of the Buyer Indemnified Parties under concepts of strict liability, contract, tort, fraud, statute, regulation or otherwise pursuant to or arising from or related to alleged violations of the physician self-referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), the anti-kickback statute (42 U.S.C. § 1320a-7b), the Medicare and Medicaid Program Integrity Provisions (42 U.S.C. § 1320a-7k), the Illinois Claims Fraud Prevention Act (740 ILCS 92/1), Illinois Public Assistance Fraud Act (305 ILCS 5/8A-3; 5/4A-16), the Illinois Health Care Worker Self-Referral Act (225 ILCS 47/1), or the Illinois False Claims Act (740 ILCS 175) with respect to any facts or circumstances in existence during the period from January 1, 2016 until the Closing Date related to the Co-Management Agreement

2. Seller will indemnify Buyer for any of the sales tax liability disclosed on Schedule 3.14 that is paid by Buyer or the Subsidiaries to the taxing authorities after the Closing Date in excess of $2,050,000

DM3\8615431.9

**Exhibit 2-A**

**Original Real Estate Purchase Agreement**

**EXECUTION VERSION**

**REAL ESTATE ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**RAMCO HEALTHCARE HOLDINGS, LLC**

**AND**

**WEST SUBURBAN PROPERTY HOLDINGS, LLC, RIVER FOREST PROPERTY HOLDINGS, LLC, WEISS PROPERTY HOLDINGS, LLC, AND WEISS MOB PROPERTY HOLDINGS, LLC**

**July 19, 2022**

DM3\8385359.26

**TABLE OF CONTENTS**

**ARTICLE I - DEFINITIONS**..................................................................................1

    1.1        Definitions...........................................................................................1

**ARTICLE II – TRANSACTIONS AT THE CLOSING** .............................................4

    2.1        Purchase and Sale. ..............................................................................4

    2.2        Purchase Price.....................................................................................5

    2.3        Closing. ...............................................................................................5

    2.4        Actions of Sellers at Closing...............................................................6

    2.5        Actions of Buyer at Closing.................................................................7

    2.6        Title Commitments and Surveys; Due Diligence Period; Real Estate Matters. ...............................................................................................7

**ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLERS** ....................12

    3.1        Corporate Capacity, Authority and Consents. .........................................13

    3.2        Binding Agreement..............................................................................13

    3.3        Assets. ................................................................................................13

    3.4        Material Contracts...............................................................................14

    3.5        Real Property. .....................................................................................14

    3.6        Environmental Laws. ...........................................................................16

    3.7        Litigation and Proceedings. .................................................................16

    3.8        Disclaimer of Warranties. ....................................................................17

**ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYER** .........................17

    4.1        Corporate Capacity, Authority and Consents. .........................................17

    4.2        Binding Agreement..............................................................................18

    4.3        Litigation and Proceedings. .................................................................18

    4.4        Representations of Sellers.....................................................................18

i

DM3\8385359.26

**ARTICLE V - COVENANTS OF THE PARTIES PRIOR TO CLOSING** ..........................18

5.1      Access. ......................................................................................................18

5.2      Updates of Schedules. ...............................................................................19

5.3      Operating Covenants.................................................................................19

5.4      Negative Covenants. .................................................................................20

5.5      No-Shop Clause. .......................................................................................21

5.6      Third Party Consents.................................................................................21

5.7      Reformation Efforts. .................................................................................22

5.8      Notice of Certain Events. ..........................................................................22

5.9      Environmental Compliance. ......................................................................23

5.10    Intentionally Omitted. ..............................................................................23

5.11    Tenant Estoppel Certificates.....................................................................23

5.12    Risk of Loss. .............................................................................................23

**ARTICLE VI - CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER** ...............24

6.1      Representations and Warranties; Covenants.............................................25

6.2      Required Governmental Approvals, Consents...........................................25

6.3      Actions and Proceedings............................................................................25

6.4      Insolvency of Sellers.................................................................................25

6.5      Closing Deliveries.....................................................................................25

6.6      Closing on Membership Interest Transfer. ...............................................25

6.7      Intentionally Deleted.................................................................................26

**ARTICLE VII - CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS**..........26

7.1      Representations and Warranties; Covenants.............................................26

7.2      Pre-Closing Confirmations. ......................................................................26

ii

DM3\8385359.26

7.3     Actions and Proceedings.................................................................26

7.4     Insolvency of Buyer.....................................................................26

7.5     Closing Deliveries.......................................................................27

7.6     Closing on Membership Interest Transfer. .........................................27

**ARTICLE VIII - ADDITIONAL AGREEMENTS.....................................................27**

8.1     Termination Prior to Closing. .......................................................27

8.2     Consents to Certain Assignments. ..................................................28

8.3     Refunds and Remittances.............................................................28

8.4     Waiver of Bulk Sales Law Compliance.............................................28

8.5     Lease Guaranties........................................................................29

**ARTICLE IX - INDEMNIFICATION .....................................................................29**

9.1     Indemnification by Buyer. ............................................................29

9.2     Indemnification by Sellers. ...........................................................29

9.3     Limitations; Exception to Limitations. .............................................30

9.4     Third Party Claims......................................................................32

9.5     Direct Claims. ...........................................................................33

9.6     Claims Made. ............................................................................33

9.7     Scope of Liability.......................................................................33

9.8     Survival ...................................................................................33

**ARTICLE X - DISPUTE RESOLUTION .................................................................33**

10.1    General...................................................................................33

10.2    Informal Negotiations. ................................................................33

10.3    Mediation. ...............................................................................33

10.4    Arbitration................................................................................34

iii

10.5     Injunctive or Similar Relief. ....................................................................................34

10.6     Survival. ...................................................................................................................35

**ARTICLE XI - GENERAL PROVISIONS**..................................................................................**35**

11.1     Additional Assurances. ............................................................................................35

11.2     Consents, Approvals and Discretion........................................................................35

11.3     Legal Expenses. ......................................................................................................35

11.4     Choice of Law; Venue. ...........................................................................................35

11.5     Benefit, Assignment and Third Party Beneficiaries. ..............................................35

11.6     No Brokerage. .........................................................................................................36

11.7     Cost of Transaction. ................................................................................................36

11.8     Confidentiality. .......................................................................................................36

11.9     Public Announcements. ...........................................................................................36

11.10    Waiver of Breach. ...................................................................................................37

11.11    Notice.......................................................................................................................37

11.12    Severability. ............................................................................................................38

11.13    Interpretation............................................................................................................38

11.14    Entire Agreement, Amendments and Counterparts. ................................................38

11.15    Personal Liability. ...................................................................................................39

11.16    Enforcement.............................................................................................................39

11.17    Disclosure Generally...............................................................................................39

11.18    Time of Essence. .....................................................................................................39

11.19    Like-Kind Exchange. ..............................................................................................39

11.20    Waiver of Conflicts Regarding Representation; Non-Assertion of Attorney-Client Privilege. .....................................................................................................40

iv

DM3\8385359.26

## LIST OF EXHIBITS AND SCHEDULES

**Exhibits**

| | |
|---|---|
| Exhibit A | Owned Real Property |
| Exhibit B | Form of Special Warranty Deed |
| Exhibit C | Form of Assignment and Assumption of Landlord's Interests in Leases |
| Exhibit D | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exbibit E | Form of Owner's Affidavit |
| Exhibit G | Form of Tenant Estoppel Certificate |
| Exhibit H | Pipeline Guaranty Agreement |

**Schedules**

| | |
|---|---|
| Schedule 2.1(b) | Tenant Leases |
| Schedule 2.1(c) | Lessor Leases |
| Schedule 2.1(d) | Tangible Personal Property |
| Schedule 2.1(f) | Service Contracts |
| Schedule 3.2(d) | Allocation of Purchase Price |
| Schedule 2.6(a)(i) | Existing Title Policies |
| Schedule 2.6(a)(ii) | Existing Seller Surveys |
| Schedule 3.1(b) | Consents, Approvals or Filings With Governmental Authorities or Third Parties |
| Schedule 3.1(c) | Material Breaches of Any Service Contracts |
| Schedule 3.3 | Encumbrances |
| Schedule 3.9(b) | Material Contracts Exceptions |
| Schedule 3.4(a) | Material Contracts |
| Schedule 3.4(b) | Exceptions to Validity / Obligations Under Service Contracts |
| Schedule 3.5 | Exceptions to Real Estate Representations |
| Schedule 3.6 | Environmental Matters |
| Schedule 3.7 | Litigation |
| Schedule 4.1(b) | Governmental Approvals |
| Schedule 8.5 | Lease Guarantees to Be Terminated or Replaced |

v

DM3\8385359.26

## REAL ESTATE ASSET PURCHASE AGREEMENT

This Real Estate Asset Purchase Agreement (this "**Agreement**") is entered into as of July 19, 2022 (the "**Effective Date**"), by and among **RAMCO HEALTHCARE HOLDINGS, LLC,** a Delaware limited liability company, as buyer, designee of and successor to Ramoco Marketing Group, LLC ("**Buyer**"), and **WEST SUBURBAN PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("**West Sub PropCo**"), **RIVER FOREST PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("**River Forest PropCo**"), **WEISS PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("**Weiss PropCo**"), and **WEISS MOB PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("**Weiss MOB Propco**"), each as a seller (each, a "**Seller**" and collectively, "**Sellers**").  Buyer and Sellers are collectively referred to as the "**Parties**" and each individually as a "**Party**."

### BACKGROUND

**WHEREAS**, Sellers' are the owners of certain land and improvements more specifically described on Exhibit A attached hereto (collectively, the "**Owned Real Property**"); and

**WHEREAS**, a portion of the Owned Real Property is used by the SRC Subsidiaries (as defined below) in connection with the operation by the SRC Subsidiaries of those acute care hospitals known as Weiss Memorial Hospital and West Suburban Medical Center and other medical businesses incident thereto;

**WHEREAS**, the Parties desire to enter into a transaction whereby Sellers sell, assign, and deliver to Buyer, and Buyer purchases, accepts assignment of, and accepts delivery from Sellers of the Purchased Assets (as defined below);

**WHEREAS**, the Parties desire to set forth certain representations, warranties and covenants made by each to the other, on which they will rely as a condition to entering into this Agreement and to the closing of the transactions contemplated hereunder, and to set forth certain additional agreements relating to the transactions contemplated hereby;

**NOW, THEREFORE**, in consideration of the promises, covenants, representations and warranties hereinafter set forth, the Parties agree as follows:

### ARTICLE I - DEFINITIONS

**1.1**  **Definitions.**  As used in this Agreement, the following terms have the following meanings (unless otherwise expressly provided herein):

"**Actions**" means any pending or threatened claim, cause of action, demand, litigation, action, suit, arbitration, proceeding, or right in action, whether known or unknown, that may be alleged or brought by any Person, Governmental Authority or any administrative, arbitration, or governmental proceeding, investigation or inquiry.

DM3\8385359.26

"**Agreement**" means this Real Estate Asset Purchase Agreement between the Parties, as from time to time amended, modified or supplemented in accordance with its terms, including the Exhibits and Schedules attached hereto.

"**Affiliate**" means, with respect to a Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person.  The term "**control**" used in the preceding sentence shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the work activities, management and policies of a Person whether through ownership of membership interests or voting securities, the election or appointment of board members, by contract or otherwise.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Consent**" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"**Encumbrances**" means any and all mortgages, liens, pledges, security interests, leases, subleases, levies, rights of way, easements, agreements, rights of first refusal, options, restrictions, covenants, reservations or similar matters of record, zoning ordinance restrictions, encroachments, liabilities, claims, assessments, obligations or encumbrances of any nature whatsoever, or any conditional sale contracts, title retention contracts or other agreements or arrangements to give or to refrain from giving any of the foregoing.

"**Governing Documents**" means, for the entity in question, that entity's Certificate of Formation, Certificate of Limited Partnership, other filings with the applicable Secretary of State, Limited Liability Company Agreement or other similar documents for the governance of the entity.

"**Governmental Authority**" means any federal, state, local or municipal government; any governmental or quasi-governmental authority of any nature (including any government agency, branch, board, department, official, instrumentality or entity); anybody exercising or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature; any entity that contracts with a governmental entity to administer or assist in the administration of a governmental; or any arbitrator with authority to bind a party at Law.

"**IHFSRB**" means the Illinois Health Facilities and Services Review Board.

"**IHFSRB Approval**" means the issuance by the IHSFRB of Certificates of Exemption to the necessary applicant entities: (i) authorizing the transfer by SRC Healthcare Investments of its membership interests in the IHFSRB-Governed Operating Entities; and (ii) authorizing the transfer by the IHFSRB-Governed Property Entities of their real estate assets, which IHFSRB Approval was issued on June 7, 2022.

2

"**IHFSRB-Governed Operating Entities**" means Pipeline-Weiss Memorial Hospital, LLC and Pipeline-West Suburban Medical Center, LLC.

"**IHFSRB-Governed Property Entities**" means  West Sub PropCo, Weiss PropCo, and Weiss MOB PropCo.

"**IRS**" means the Internal Revenue Service.

"**Knowledge**" of Sellers (and any similar expression, including, the expression "Sellers' Knowledge") means, as to a particular matter, shall mean, with respect to any of the Sellers the knowledge of Nick Orzano, Co-President Pipeline Health Systems, LLC, after due and reasonable inquiry.

"**Law**" means any federal, state, local, foreign or other statute, law, ordinance, regulation, rule, code, injunction, judgment, ruling, decree or order of any Governmental Authority, including common law.

"**Membership Interests**"  means SRC Healthcare Investment's Membership Interests in the SRC Subsidiaries.

"**Membership Interest Purchase Agreement**" means the Membership Interest Purchase Agreement dated on or about the date hereof (as the same may be amended, restated, modified or otherwise supplemented from time to time), by and between SRC Healthcare Investments, as seller and AUM Global Healthcare, LLC, as buyer, with respect to the transfer by SRC Healthcare Investments of the Membership Interests.

"**Membership Interest Transfer**" means the transfer by SRC Healthcare Investments of all the Membership Interests pursuant to the Membership Interest Purchase Agreement.

"**Permits**" means all licenses, permits, franchises, registrations, approvals, authorizations, consents, waivers, exemptions, releases, variances, or orders issued by any Governmental Authority required for Sellers' ownership of the Owned Real Property.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"**Purchase Price**" means an amount equal to Ninety-Two Million and 00/100 Dollars ($92,000,000).

"**Representatives**" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"**Service Contracts**"  shall have the meaning give in Section 2.1(f) below.

3

"**SRC Subsidiaries**" means the following subsidiaries of SRC Healthcare Investments, LLC: Pipeline West Suburban Medical Center, LLC; Pipeline Weiss Memorial Hospital, LLC; Pipeline – Lakefront Medical Associates, LLC; Pipeline Midwest Pharmacies, LLC and Pipeline Weiss Medical Specialists, LLC, each of which is a Delaware limited liability company.

"**SRC Healthcare Investments**" means SRC Healthcare Investments II, LLC, a Delaware limited liability Company.

## ARTICLE II – TRANSACTIONS AT THE CLOSING

**2.1**   **Purchase and Sale.**   Subject to the terms and conditions of this Agreement, at the Closing and effective as of the Effective Time, Sellers shall sell, assign, transfer and deliver to Buyer, and Buyer shall acquire, all of Sellers' right, title and interest to all of the assets owned, exclusively used or held for use by Sellers as follows (collectively, the "**Purchased Assets**"):

(a)      all interests of Sellers in the Owned Real Property, including all rights of Sellers in the land, buildings, fixtures, parking lots, construction in progress, and other improvements located thereon as to each parcel of real property included in such Owned Real Property;

(b)      all leasehold interests of Sellers in and to all real property leases, subleases, licenses, use and other occupancy agreements for the real property that is leased by Sellers as a tenant (the "**Tenant Leases**") (the real property that is subject to the Tenant Leases being referred to as the "**Leased Real Property**"), described in Schedule 2.1(b) (the term "**Real Property**" shall mean collectively the Owned Real Property and the Leased Real Property);

(c)      all leasehold interests of Sellers, to the extent assignable or transferable, in and to all real property leases, subleases, licenses, use and other occupancy agreements to which any of the Sellers is a party and under which any of the Sellers, in such capacity as a party thereto, is the lessor, sublessor, licensor or other grantor of use and occupancy rights to a third party (each a "**Lessor Lease**") described in Schedule 2.1(c), together with all guaranties of any of such Lessor Leases and all security deposits delivered by tenants thereunder, whether in cash or letter of credit or pursuant to a guaranty agreement;

(d)      all tangible personal property owned by Sellers, located on and exclusively used in connection with the ownership of the Real Property, including all equipment, furniture, furnishings, machinery, tools, supplies, telephones, office equipment, leasehold improvements and, to the extent assignable or transferable, all rights in all warranties of any manufacturer or vendor with respect thereto, including the personal property listed in Schedule 2.1(d) (collectively, the "**Personal Property**");

(e)      all intangible personal property owned by Sellers and exclusively used in connection with the ownership of the Real Property, including such Seller's respective rights and interests in and to licenses, permits, warranties, guaranties, trade names, variances, special permits, consents, certificates of occupancy and governmental approvals, to the extent assignable (collectively, the "**Intangible Property**");

4

(f)      all of the Sellers' interests in the commitments, contracts, leases and agreements of Sellers for services, equipment, supply and maintenance as set forth in Schedule 2.1(f) as Material Contracts (defined below) and which Buyer, in Buyer's sole discretion, agrees in writing prior to the end of the Due Diligence Period (as defined below) to be assigned to and assumed by Buyer (the "**Service Contracts**").

**2.2      Purchase Price.**

(a)      Prior to the date hereof, Buyer deposited Three Million and 00/100 Dollars ($3,000,000.00) on March 2, 2022 (the "**Deposit**") into an escrow account with MBL Title LLC, a Texas limited liability company (in such capacity, the "**Deposit Escrow Agent**"), under the terms of a mutually agreed upon Escrow Agreement effective as of March 2, 2022 (the "**Deposit Escrow Agreement**"), and that notwithstanding anything to the contrary contained herein, Buyer and Sellers confirm and agree that the Deposit has been fully earned by Sellers as of the Effective Date, has been released to Sellers and is nonrefundable to Buyer.  Buyer and Sellers agree that Chicago Title Insurance Company, 1111 Superior Avenue, Suite 600, Cleveland, Ohio 44114 ("**Escrow Agent**" and "**Title Company**") shall act as Escrow Agent for the closing of the transactions contemplated herein.

(b)      At the Closing, Buyer and Sellers agree that  the Deposit shall be credited towards payment of the Purchase Price.  In the event that Closing does not occur for any reason, including Sellers' default, Buyer confirms that the Deposit has been fully earned by Sellers and shall not be returned to Buyer.

(c)      At the Closing, Buyer will pay to Sellers the Purchase Price, less the amount of the Deposit, and as further adjusted pursuant to the terms hereof, which amount shall be payable in immediately available funds by wire transfer to the account of Sellers as set forth in wiring instructions provided by Sellers to Buyer.

(d)      Sellers and Buyer have agreed upon an allocation of the Purchase Price among the various categories of Purchased Assets for tax reporting and other purposes as shown on Schedule 2.2(d), in a manner which is intended to be consistent with the allocation methods and principles required by the Code.  Buyer and Sellers shall report, act and file all tax returns, including IRS Form 8594, with their respective federal income tax returns for the tax year in which the Closing Date occurs consistent with such agreed upon allocation.

**2.3      Closing.**  Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated under this Agreement (the "**Closing**") shall take place electronically on that date (the "**Closing Date**") (a) that is August 15, 2022, or (b) such other date as the Parties may mutually agree upon in writing. Notwithstanding the foregoing or anything to the contrary contained herein, Buyer may extend the Closing Date from August 15, 2022 for an additional fifteen (15) days up to August 30, 2022 upon written notice to Sellers given on or before August 15, 2022 for the purpose of closing on its financing required in order to complete the purchase of the Property contemplated hereby.

DM3\8385359.26

The Closing shall be deemed to have occurred and to be effective as between the parties as of 12:01 a.m. (Chicago, Illinois time) on the first calendar day after the Closing Date (the "**Effective Time**").  At Closing and in consideration of the payment of the Purchase Price, (i) Sellers shall convey (a) the Owned Real Property to Buyer pursuant to the form of the Special Warranty Deed (the "**Special Warranty Deed**") in the form attached hereto as Exhibit B, (b) Sellers' interests in the Lessor Leases pursuant to the form of the Assignment and Assumption of Landlord's Interests in Leases attached as Exhibit C (the "**Assignment and Assumption of Landlord's Interest in Leases**"), and (c) the remainder of the Purchased Assets as described above pursuant to the form of Bill of Sale and Assignment and Assumption Agreement attached as Exhibit D (the "**Bill of Sale and Assignment and Assumption Agreement**") and (ii) the Parties shall execute and deliver such documents, agreements, instruments and certificates as may be necessary or reasonably requested to effect such transactions and to evidence the satisfaction of the conditions precedent to the obligations of the Parties hereunder (except to the extent waived in writing by the appropriate Party).

**2.4**     **Actions of Sellers at Closing.**  At the Closing or within such other timeframes as specified below and unless otherwise waived in writing by Buyer, Sellers shall deliver or cause to be delivered to Buyer the following:

(a)     The Special Warranty Deeds executed by the applicable Sellers.

(b)     The Assignment and Assumption of Landlord's Interest in Leases executed by the applicable Sellers.

(c)     The Bill of Sale and Assignment and Assumption Agreements executed by the applicable Sellers.

(d)     Intentionally Omitted.

(e)     Copies of resolutions duly adopted by the Board of Directors or other governing body of Sellers authorizing and approving Sellers' execution and delivery of this Agreement and consummation of the transactions under this Agreement.

(f)     Certificates of existence and good standing of each Seller from the state of its incorporation or formation, each dated the most recent practicable date prior to the Closing Date.

(g)     A non-foreign affidavit of Sellers, dated as of the Closing Date, in form and substance consistent with the Treasury Regulations issued pursuant to Section 1445 of the Code stating that Sellers is not a "foreign person" as defined in Section 1445 of the Code.

(h)     A certificate of Sellers updating the representations and representations contained in Article III below as of Closing.

(i)     The final Settlement Statement.

(j)     A duly executed owner's affidavit in the form attached hereto as Exhibit E.

6

(k)     Tenant Estoppel Certificates at least equal to the number required in order to meet the Tenant Estoppel Requirement (as defined below).

(l)     A duly executed Pipeline Guaranty Agreement in the form attached hereto as <u>Exhibit H</u>.

(m)     Any other documents reasonably required by the Title Company to issue the Title Policy, subject only to the Permitted Encumbrances and close the transactions contemplated herein.

**2.5     <u>Actions of Buyer at Closing.</u>**  At the Closing and unless otherwise waived in writing by Sellers, Buyer shall deliver or cause to be delivered to Sellers the following:

(a)     The Purchase Price, less the amount of the Deposit, and as further adjusted pursuant to the terms hereof, by wire transfer of immediately available funds.

(b)     The Assignment and Assumption of Landlord's Interest in Leases executed by Buyer.

(c)     The Bill of Sale and Assignment and Assumption Agreements executed by Buyer.

(d)     Intentionally Omitted.

(e)     A certificate of Buyer updating the representations and representations contained in Article IV below as of Closing.

(f)     The final Settlement Statement.

(g)     Copies of resolutions duly adopted by the governing body of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and consummation of the transactions under this Agreement.

(h)     Any other documents reasonably required by the Title Company to issue the Title Policy, subject only to the Permitted Encumbrances and close the transactions contemplated herein.

**2.6     <u>Title Commitments and Surveys; Due Diligence Period; Real Estate Matters.</u>**

(a)     <u>Title Commitments and Surveys</u>. Prior to the Effective Date, Sellers have delivered or caused to be delivered to Buyer, (i) those certain owner's title insurance policies for the Owned Real Property issued by Chicago Title Insurance Company (collectively, the "**Existing Title Policies**"), which Existing Title Policies are attached hereto as <u>Schedule 2.6(a)(i)</u>, and (ii) those certain ALTA surveys of the Owned Real Property listed on <u>Schedule 2.6(a)(ii)</u> herein ("**Existing Seller Surveys**").  Prior to or promptly following the Effective Date, Buyer has ordered or will order from the Title Company, title commitments for each Owned Real Property (each, a "**Title Commitment**" and collectively, the  "**Title Commitments**"), pursuant

7

to which the Title Company shall have committed to insure Buyer as the fee owner of the Real Property by issuance of an ALTA owner's title insurance policy in the standard form, with extended coverage, issued by the Title Company in the State of Illinois (each a "**Title Policy**", and collectively, the "**Title Policies**"). Prior to or promptly following the Effective Date, Sellers have ordered for the benefit of Buyer or will order a current ALTA/NSPS Land Title Survey for each Owned Real Property (each, a "**Buyer Survey**" and collectively, the  "**Surveys**"), certified to Buyer, Sellers, Buyer's lender (if any) and the Title Company. Buyer shall provide to Sellers copies of all Title Commitments and New Buyer Surveys within five (5) business days of receipt thereof by Buyer.

(b)　　Buyer Title and Survey Objections.  Buyer shall have until July 31, 2022, to submit written objections to Sellers with respect to any matters shown thereon to which Buyer objects("**Buyer's Objections**"). Buyer shall not be required to make objection to Monetary Liens (as defined below), which shall automatically be deemed to be a part of Buyer's Objections, other than those Monetary Liens of which Buyer has knowledge and that are not shown in the Title Commitments or on the Surveys.  If Buyer timely provides Buyer's Objections, then Sellers shall have the right, but not the obligation, for ten (10) days from the date Sellers are notified in writing of Buyer's Objections ("**Sellers' Response Period**") to notify Buyer that Sellers will either (i) remedy the objection(s) (or elect to remedy the objection(s) on or before Closing); (ii) obtain title insurance over the claimed defect(s) satisfactory to Buyer; or (iii) not satisfy or otherwise resolve Buyer's Objections.  If Sellers fail to give Buyer written notice of Sellers' election with respect to any Buyer's Objections by the expiration of Sellers' Response Period, Sellers shall be deemed to have elected not to cure such Buyer's Objection.  If, with respect to any such given Owned Real Property, Sellers elect (or are deemed to have elected) not to satisfy or otherwise resolve any of Buyer's Objections or are unable to remedy the title and/or survey defect or obtain title insurance reasonably satisfactory to Buyer over such defect(s) within the time period specified to the extent Sellers expressly elect to cure such defect, then, notwithstanding anything contained herein to the contrary, Buyer may, at its option, upon notice to Sellers, which shall be received within five (5) days of the expiration of Sellers' Response Period ("**Buyer's Response Period**"), either to  (x) terminate this Agreement in its entirety (the "**Title/Survey Termination Right**") upon notice to Sellers stating with reasonable specificity the reasons for such termination, and neither Sellers nor Buyer shall have any further obligation to the other pursuant to this Agreement, except as otherwise specifically set forth herein; provided, or (y) waive such Buyer's Objection(s) and proceed with the transaction pursuant to the remaining terms and conditions of this Agreement, without deduction or credit against the Purchase Price, in which case Buyer's Objections shall be deemed Permitted Encumbrances (as hereinafter defined) for all purposes hereunder. The foregoing notwithstanding, no mortgages, security deeds, deeds of trust, judgment liens, mechanics' and materialmen's liens, and other monetary liens and monetary encumbrances, in each case created by, though, under or at the direction of Sellers, or with respect to any involuntary lien filed against the respective Sellers' during such Sellers' period of ownership, in each case against the Real Property or any other Purchased Assets (*other than* liens of real estate Taxes and assessments accruing for the year in which Closing occurs or with respect to any covenants, easements or other similar agreements benefitting the Real Property and the other Purchase Assets that are not yet due and payable shown on the Title Commitments and monetary

8

encumbrances that are to be assumed by Buyer as expressly set forth herein), which either secure indebtedness or can be removed by payment of a liquidated sum of money (collectively, "**Monetary Liens**") shall be considered Permitted Encumbrances (as hereinafter defined), and Sellers shall discharge, release or otherwise satisfy all Monetary Liens affecting the Owned Real Property at or prior to Closing.

(c)    Permitted Encumbrances.  For purposes of this Agreement all general real estate taxes and assessments not yet due and payable, zoning ordinances, and any title matters approved in writing by Buyer (or deemed approved pursuant to Section 2.6(b) above) in the Title Commitments and Buyer Surveys shall be deemed to be "**Permitted Encumbrances**."

(d)    Due Diligence Period.  During the period commencing prior to the Effective Date and ending at 5:00 p.m. Chicago, Illinois time on the Closing Date (the "**Due Diligence Period**"), Buyer, and its agents, investors, employees and contractors and any others entering onto the Real Property at the written request of Buyer (collectively, "**Buyer's Representatives**") its agents and contractors shall have the right, at all reasonable times and with reasonable prior notice to Sellers, to enter upon the Real Property for the purpose of conducting any and all examinations of the Real Property and Purchased Assets deemed necessary by Buyer, including, but not limited to surveys, environmental studies and audits, soil tests, test borings and examinations of the present condition of the Real Property and Purchased Assets ("**Examinations**").  Sellers agrees that they shall cooperate with the Buyer and its agents and contractors in making the Examinations and allow them to do any acts reasonably necessary or incidental thereto.  All costs and expenses incurred in performing the Examinations shall be borne by Buyer.  Buyer acknowledges that prior to the Effective Date, Sellers have made available to Buyer and Buyer's Representatives access to the Owned Real Property to allow for the conduct of its and their Examinations, and that for the remainder of the Due Diligence Period, Buyer's Examinations shall principally consist of obtaining and/or reviewing the following: (i) the Title Commitments and Surveys, (ii) environmental assessments, (ii) property condition reports and analyses, (iv) Lessor Leases and Service Contracts, and (v) zoning reports and related matters.  In addition to the foregoing, Buyer may conduct other diligence during the remainder of the Due Diligence Period, but in no event shall Buyer be entitled to any extension of the Due Diligence Period for any reason.  Notwithstanding anything in this Agreement to the contrary, Buyer shall have the right to terminate this Agreement for any reason or no reason at all by providing Sellers written notice of such termination prior to the expiration of the Due Diligence Period.  In addition to the foregoing:

(i)    Buyer shall indemnify, defend and hold harmless each Seller and any agent, advisor, representative, affiliate, employee, director, officer, partner, member, beneficiary, investor, servant, shareholder, trustee or other person or entity (each, a "**Person**") acting on Sellers' behalf or otherwise related to or affiliated with Sellers (including each Seller, collectively, the "**Seller Related Parties**") from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including attorneys' fees and disbursements) (collectively, "**Claims**"), suffered or incurred by any of the Seller Related Parties and arising out of or in connection with (i) entry upon the Real Property by Buyer or any of the  Buyer's Representatives, (ii) any

9

DM3\8385359.26

Examinations or other activities conducted thereon by Buyer or any of the Buyer's Representatives, (iii) any liens or encumbrances filed or recorded against the Real Property as a consequence of the Investigations and/or (iv) any and all other activities undertaken by Buyer or any of the Buyer's Representatives with respect to the Real Property.

(ii)     Buyer shall promptly repair any damage that occurs as a result of any inspections and shall promptly restore the Real Property to substantially its prior condition following completion of such inspection.  Such repairs and restoration shall be performed at Buyer's sole expense.

(iii)     Buyer shall furnish to Sellers, at no cost or expense to Sellers, copies of all surveys, soil test results, engineering, asbestos, environmental and other studies and reports (other than internal analysis and proprietary information of Buyer) relating to the Examinations which Buyer shall obtain with respect to the Real Property promptly after Buyer's receipt of same (collectively, the "**Buyer Reports**").  In the event the transaction fails to close, Sellers shall promptly (i) return to Buyer the Buyer Reports that Seller elects not to retain, and (ii)  reimburse Buyer for the actual out-of-pocket costs of the Buyer Reports that Sellers elect to retain.

(iv)     Buyer shall maintain or cause to be maintained, at Buyer's expense,  a policy of commercial general liability insurance, with a broad form contractual liability endorsement and with a combined single limit of not less than $1,000,000.00 per occurrence for bodily injury and property damage, $1,000,000 per occurrence with regard to property damage and $2,000,000 in the aggregate, insuring Sellers and its property management company, against any and all liability for or related to any injury to or death of any person, or damage to any property, proximately caused by any act or omission of Buyer, its agents, employees, consultants, invitees and/or visitors in connection with the activities of Buyer and/or any other such person on or about the Real Property.

(v)     Notwithstanding the foregoing to the contrary, (i) in no event shall Buyer perform any intrusive or invasive environmental or physical testing with respect to the Real Property, including any Phase II environmental testing, or test borings, or any testing or sampling of surface or subsurface soils, water, groundwater or any materials in or about the improvements of the Real Property without the prior written consent of Sellers, which consent may be granted or withheld in Sellers' reasonable discretion, and (ii) if Buyer intends to enter into any one or more portion(s) of the Real Property occupied by a Tenant and/or to interview any Tenants, Buyer shall provide not less than one (1) business day's prior written notice to Sellers' Representative, which notice shall identify the Tenant or Tenants (including those that Buyer wishes to interview), and Sellers' Representative shall have the right to accompany Buyer during such inspection(s) and interview(s).  Further notwithstanding the foregoing, (i) Buyer shall not interview, meet with, or communicate directly with any of the Tenants, except in accordance with the foregoing sentence, and (ii) Buyer shall not contact any governmental authority with respect to matters concerning the Real Property, other than

10

for the purposes of confirming the zoning of the Real Property, determining the Real Property's compliance with any laws, ordinances, orders or regulations of any governmental authority applicable to any Real Property, or of the existence of any violations thereof, and for obtaining copies of plats, plans, permits, notices and other documents in connection with Buyer's Investigations and for no other purpose.  In the event the need arises to notify under applicable law any federal, state or local public agencies of any environmental conditions at the Real Property, as a result of Buyer's investigations, Buyer and Sellers agree that Sellers, and not Buyer or Buyer's Representatives, shall make such disclosure as Sellers deems appropriate, unless such disclosure is required by law to be made by Buyer or Buyer's Representatives, in which instance Buyer or such Buyer's Representatives shall notify Sellers' Representative in writing at least five (5) business days prior to making any such disclosure.

(vi)    Buyer's indemnification and repair obligations under Section 2.6(d)(i) and Section 2.6(d)(ii) shall survive the Closing or a termination of this Agreement, provided Buyer shall have no obligation to repair the Real Property on behalf of Sellers if Buyer acquires the Real Property at the Closing.

(e)    Real Estate Costs. Buyer will pay the costs of all title examinations and the Title Commitments, the premium for owner's coverage, the costs of any endorsements to the Title Policies required by Buyer or its lender and any transfer Taxes and recording costs associated with the conveyance of the Owned Real Property to Buyer.  Buyer and Sellers shall each pay 50% of the escrow fees and (ii) Buyer shall be solely responsible for the costs of the Buyer Surveys.  In addition, Buyer shall pay all taxes, including without limitation, transfer taxes and recording costs and any applicable income taxes payable by any Sellers and their parents, attributable to the characterization hereunder that the aggregate Purchase Price is equal to $92,000,000.  The foregoing obligation shall survive Closing hereunder.

(f)    Adjustments.

(i)    Real estate taxes and assessments, both general and special, shall be prorated by Escrow Agent as of Closing based upon the latest available tax statement, and such proration shall be subject to adjustment between Sellers and Buyer based upon the issuance of any final tax statement for the applicable period.  Notwithstanding the foregoing or anything to the contrary contained herein, Sellers retain the right to continue to pursue any tax appeals with respect to the Real Property initiated prior to the Effective Date and to the receipt of all proceeds attributable to such appeal for such period prior to the Effective Date, for which no adjustment shall be made.  Buyer agrees to cooperate with Sellers in connection with any such tax appeals, but at no cost to Buyer.

(ii)    Rents and other periodic payments under the Lessor Leases, including without limitation tenant reimbursement of operating expenses and common area maintenance charges, shall be prorated between the parties as of midnight on the day prior to Closing.  All prepaid rents and security deposits (if any) under the Lessor Leases shall be credited for Buyer's benefit against the Purchase Price.  The parties acknowledge

<div align="center">11</div>

that rent and both the expense and reimbursement of tenant pass-through items such as operating expenses and common area maintenance charges, insurance charges and real estate taxes and assessments (the expense and tenant reimbursement thereof are collectively referred to herein as "**Pass-Throughs**") attributable to the period prior to Closing may have been prepaid by tenants.  Subject to the terms hereof, the rent and Pass-Throughs attributable to the period prior to Closing and previously paid by tenants shall be the property of or borne by Sellers (as the case may be), and rent and Pass-Throughs attributable to the period from and after Closing and previously paid by tenants shall be the property of or borne by Buyer (as the case may be).  No proration shall be made of any rents or other payments which are unpaid and due as of Closing.    In the event that there are any delinquent rents or Pass-Throughs as of Closing, Sellers waive any rights therein and transfer such delinquencies to Buyer; provided, that Sellers shall have no liability to Buyer or its Affiliates whatsoever arising from or relating to any such delinquencies, and Buyer hereby waives and releases any claims that it may have against Sellers related to same..

(iii)    The periodic revenues and charges under the Service Contracts shall be prorated between Seller and Buyer as of midnight on the day prior to Closing.

(iv)    To the extent not paid directly by any of the SRC Subsidiaries under the Lessor Leases, use charges for any utility serving the Real Property shall be prorated only if Seller and Buyer are unable to arrange for a final billing to Seller through the day preceding Closing, without interruption of such utility service.   The parties shall cooperate, each using reasonable efforts, to make such arrangements for each utility serving the Real Property.

(v)    All security deposits and reserves held by Sellers under the Lessor Leases shall be credited for Buyer's benefit against the Purchase Price.

(vi)    All leasing commissions, tenant improvement allowances, rent abatements or similar concessions accrued prior to the Closing Date and owed under the Lessor Leases but not yet paid by Sellers, shall be credited for Buyer's benefit against the Purchase Price, and Buyer shall assume responsibility therefor on and after the Closing Date.  Notwithstanding the foregoing, any tenant improvement allowances paid by or on behalf of any of the Sellers with respect to that certain Office Lease dated as of November 15, 2019 between River Forest Property Holdings, LLC and Romano Orthopedics, LLC shall be credited to Sellers' benefit at the Closing, not to exceed Two Hundred Thousand and 00/100 Dollars ($200,000.00).

(vii)    This Section 2.6(f) shall survive Closing.

## ARTICLE III- REPRESENTATIONS AND WARRANTIES OF SELLERS

As of the Effective Date and as of the Closing Date, when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2(b), Sellers represent and warrant to Buyer the following:

12

**3.1**   **Corporate Capacity, Authority and Consents.**  Sellers are duly organized and validly existing in good standing under the Laws of the state of their formation, registration or incorporation with the requisite limited liability company power and authority to enter into the transactions under this Agreement, to perform its obligations hereunder.  The execution, delivery and performance of this Agreement and all other agreements referenced herein to which Sellers are or will become a party and the actions to be taken by Sellers in connection with the consummation of the transactions contemplated herein:

(a)   are within the limited liability company powers of Sellers, are not in contravention of applicable Law or the terms of Sellers' Governing Documents and have been duly authorized by all appropriate limited liability company action;

(b)   except as otherwise expressly herein provided or as set forth in Schedule 3.1(b), do not require any approval or consent of, or filing with, any third party or any Governmental Authority;

(c)   except as otherwise expressly herein provided or as set forth in Schedule 3.1(c), will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or the termination of or constitute a default under, any of the Service Contracts; and

(d)   will not result in the creation or imposition of any Encumbrance on any Purchased Assets other than Permitted Encumbrances.

**3.2**   **Binding Agreement.**  This Agreement and all agreements to which Sellers are or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Sellers, and are and will be enforceable against Sellers in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3**   **Assets.**

(a)   Sellers own valid title to, or possesses  valid leasehold interests in, all the Purchased Assets.  Sellers have sole custody and control of all of the Purchased Assets, except with respect to any Encumbrances that do not, individually or in the aggregate, materially impair the usefulness or values of the Purchased Assets.

(b)   The Purchased Assets are free and clear of all Encumbrances except (i) those that do not, individually or in the aggregate, materially impair the usefulness or values of the Purchased Assets, (ii) those for taxes, assessments and governmental charges or levies not yet due or payable or that are being contested in good faith, (iii) mechanic's, materialman's and similar statutory liens for sums not yet due and payable or that are being contested in good faith, (iv) those related to the Material Contracts, (v) leases that have been disclosed to Buyer on the Schedules to this Agreement, (vi) zoning regulations and other Laws affecting the Owned Real Property, (vii) matters arising as a result of the acts or omissions of Buyer or any of its Affiliates, agents, employees, contractors or representatives or with the permission or consent of Buyer as

13

set forth in this Agreement, (viii) standard printed exceptions customarily set forth in title reports, title commitments or title policies, (ix) Monetary Liens, any other matters disclosed by the Existing Title Policies or Existing Seller Surveys or otherwise recorded in the real property records where the Owned Real Property is located, and (x) those Encumbrances listed on Schedule 3.3.

**3.4     Material Contracts.**

(a)     Schedule 3.4(a) sets forth a complete and accurate list of the following commitments, contracts and agreements, whether written or oral, of Sellers, in each case relating to Sellers' ownership of the Real Property:  (i) intentionally omitted; (ii) maintenance, service or supply contracts; or (iii) any other contracts, commitments, or agreements that involve payments, performance of services or provision of items in an amount exceeding One Hundred Thousand Dollars ($100,000) or that cannot be performed in the normal course within twelve (12) months after the Closing Date or canceled within such period upon 30 days' notice or less without breach or penalty (the "**Material Contracts**").   Sellers have delivered complete copies of such agreements to Buyer, or has given the Representatives of Buyer access to complete copies of such agreements or, in the case of any oral agreements, accurate summaries of such agreements. Buyer, in Buyer's sole discretion, shall have until the expiration of the Due Diligence Period to notify Sellers in writing with respect to which Material Contracts Buyer desires to assume at Closing, and those Material Contracts not assumed by Buyer shall remain the responsibility and obligation of Sellers.

(b)     Except as set forth on Schedule 3.4(b), the Service Contracts constitute valid and legally binding obligations of the Seller, a party thereto, and are enforceable in accordance with their terms, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally, and except as enforceability may be subject to general principles of equity, and no event, act or omission has occurred or failed to occur which, with the giving of notice, the lapse of time or both would constitute a material default under the Service Contracts by the Seller, a party thereto. .

**3.5     Real Property.**   Sellers are the owners of each parcel of real property included in the Owned Real Property.  Except as set forth on Schedule 3.5 hereto:

(a)     To Sellers' Knowledge, Sellers are not in material default under any leases of the Owned Real Property and no event or condition has occurred or exists which, with the passage of time, the giving of notice or both, would cause Sellers to be in material default thereunder;

(b)     Sellers have not received written notice of a violation of any applicable Law, or any covenant, condition, restriction or easement affecting the Owned Real Property or the use and occupation thereof, or of a material default under any leases of the Owned Real Property, which has not been fully complied with or remedied and has not received written notice of condemnation, lien, assessment or the like, relating to any part of the Owned Real Property or the operation thereof;

14

(c)     To Sellers' Knowledge, no zoning, building, flood control, fire, safety, toxic materials, hazardous waste or any other applicable Law is violated by the current operation or use of the Owned Real Property in any material respect (excepting only instances of non-compliance which will not materially and adversely affect the business conducted on the Owned Real Property as of the Effective Date, and the sale of the Owned Real Property contemplated herein will not result in a violation of any applicable zoning ordinance or the termination of any applicable zoning variance now existing;

(d)     To Sellers' Knowledge, the buildings and improvements located on the Owned Real Property which require government approval have been approved by all Governmental Authorities having jurisdiction and a certificate of occupancy and all material Permits required by all Governmental Authorities having jurisdiction have been issued for the ownership of the Owned Real Property and any improvements thereon and, to Sellers' Knowledge, the buildings and improvements on the Owned Real Property comply with all applicable building codes (excepting only instances of non-compliance which will not materially and adversely affect the ownership of the Owned Real Property);

(e)     To Sellers' Knowledge, no part of the Owned Real Property is located within any area which has been designated by any Governmental Authority as being subject to special flood hazards or any other area which is subject to special state, federal or municipal regulation, control or protection;

(f)     To Sellers' Knowledge, (i) there are no material structural defects in any of the improvements located on the Owned Real Property, and (ii) the heating, electrical, plumbing and drainage systems at or servicing the Owned Real Property and all facilities and equipment relating thereto are in good working condition and repair in all material respects;

(g)     To Sellers' Knowledge, no portion of the Owned Real Property is subject to or affected by any special assessment, whether or not such special assessment constitutes a lien on the Owned Real Property;

(h)     To Sellers' Knowledge, there are adequate means of ingress and egress for vehicular and pedestrian traffic to and from the Owned Real Property;

(i)     At the Closing, Sellers shall not be indebted to any contractor, laborer, mechanic, materialman, architect or engineer for work, labor or services performed or rendered, or for materials supplied or furnished, in connection with the Owned Real Property and in an amount greater than Ten Thousand Dollars ($10,000), for which any such person could lawfully claim a lien against the Owned Real Property, unless otherwise paid by Sellers in connection with the Closing or otherwise adjusted for in the adjustments pursuant to Section 2.6(f) above;

(j)     There are no outstanding options or rights of first refusal or other rights to purchase, or to lease, the Owned Real Property or any portion thereof or interest therein, except in any Lessor Leases with respect to the lease of any additional property;

15

(k)      Schedule 2.1(b) and Schedule 2.1(c) attached hereto contain a true and correct list of all leases entered into by a Seller or to which a Seller is a party with respect to the Owned Real Property (collectively, the "**Leases**").  Other than the Leases, there are no other real estate leases entered into by a Seller or to which a Seller is a party with respect to the Owned Real Property.  Sellers have provided or will provide to Buyer true and complete copies of all such Leases within ten (10) business days of execution of this Agreement.  To Sellers' Knowledge, each such Lease is in full force and effect, all rents due on or before the Effective Date under each Lease have been paid and there is no ongoing issue or dispute as to past rental payments.  Neither Sellers nor, to the Knowledge of Sellers, any other party to any such Lease is in material default in any respect thereunder, and there has been no written waiver of Sellers' obligations as the lessor or tenant under the Leases.  Sellers have no Knowledge of and has not received written notice that there exists any occurrence, event, condition or act which, upon the giving of notice or the lapse of time or both, would become a material default by Sellers (or, to the Knowledge of Sellers, any other party to such Lease) under any such Lease; and

(l)      Except for routine expenditures for repairs and replacements in connection with the ongoing maintenance and upkeep of the Owned Real Property, Sellers do not have any outstanding contracts for capital expenditures relating to the Owned Real Property, nor do Sellers have any agreement, obligations or commitments for capital expenditures relating to the Owned Real Property, including, without limitation, additions to property, plant, equipment or intangible capital assets.

**3.6     Environmental Laws.**  Except as set forth on Schedule 3.6, no Hazardous Materials, toxic substances or related materials have been generated, released, discharged, stored, handled or disposed of on, under, in or about the Owned Real Property by Sellers or any of its Affiliates, except in all material respects, in compliance with all federal, state and local health, safety, building, fire control, environmental, toxic materials and hazardous waste Laws ("**Environmental Laws**").     The term "**Hazardous Materials**" shall mean any substance, material or waste which is or becomes regulated by any Governmental Authority, including any material or substance which is (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. §1317), (v) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq. (42 U.S.C. §6903), or (vi) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §9601 et seq. (42 U.S.C. §9601).

**3.7     Litigation and Proceedings.**  Except as set forth on Schedule 3.7, there are no Actions pending or, to Sellers' Knowledge, threatened against Sellers, or any governing persons thereof in their capacities as such, with respect to the Purchased Assets, at law or in equity, or before or by any Governmental Authority.  There is no Action pending or, to the Knowledge of Sellers, threatened, against Sellers which seeks to prevent or delay consummation of the transactions contemplated herein, seeks damages in connection with transactions contemplated herein or would impair the ability of Sellers to perform its obligations under this Agreement. The Sellers

16

have not commenced any Action against a third party relating to the Purchased Assets that is still pending, nor is there any ground for any such Action.

**3.8     Disclaimer of Warranties.**  Except as expressly set forth in this Article III or elsewhere in this Agreement, the Purchased Assets transferred to Buyer will be sold by Sellers and purchased by Buyer "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, with respect to the Real Property, and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the personal property and inventory, any and all of which warranties (both express and implied) Sellers hereby disclaim.  All of the real and personal property included in the Purchased Assets shall be further subject to normal wear and tear and normal and customary use in the ordinary course of business up to the Effective Time.  Buyer acknowledges that Buyer has examined, reviewed and inspected all matters which in Buyer's judgment bear upon the Purchased Assets and their value and suitability for Buyer's purposes and, except as affirmatively represented and warranted by Sellers, is relying solely on its own examination, review and inspection of the Purchased Assets.  However, the investigations and inquiries made by or on behalf of Buyer and the information, materials and documents supplied to Buyer and/or its advisors in connection with their review of the Purchased Assets shall not limit or affect the representations and warranties of the Sellers or relieve the Sellers from any of his or her respective obligations and liabilities in respect thereof. Except to the extent of any representation made by Sellers herein and except with respect to the express indemnification obligations specifically set forth in this Agreement, Buyer releases Sellers and their Affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the Purchased Assets, or their suitability for any purpose whatsoever.  Buyer acknowledges and agrees that any title commitments, surveys and related materials relating to the Owned Real Property provided to Buyer by Sellers or Sellers' agents on or before the Effective Date hereof were for informational purposes only and not to be relied on by Buyer.

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYER

As of the Effective Date and as of the Closing Date, when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2(b), Buyer represents and warrants to Sellers the following:

**4.1     Corporate Capacity, Authority and Consents.**  Buyer is duly organized and validly existing in good standing under the Laws of the state of its formation, registration or incorporation in the requisite limited liability company power and authority to enter into the transactions under this Agreement, to perform its obligations hereunder.  The execution, delivery and performance of this Agreement and all other agreements referenced herein to which Buyer is or will become a party and the actions to be taken by Buyer in connection with the consummation of the transactions contemplated herein:

17

(a)      are within the limited liability company powers of Buyer, are not in contravention of applicable Law or the terms of Buyer's Governing Documents and have been duly authorized by all appropriate corporate action;

(b)      except as otherwise expressly herein provided or as set forth on Schedule 4.1(b), do not require any approval or consent of, or filing with, any third party or any Governmental Authority;

(c)      except as otherwise expressly provided herein, will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any material indenture, mortgage, contract, agreement or other instrument to which Buyer is a party or otherwise bound that could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement; and

(d)      will not violate any Law to which Buyer is subject.

**4.2   Binding Agreement.**   This Agreement and all agreements to which Buyer is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Buyer, and are and will be enforceable against Buyer in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.3   Litigation and Proceedings.**   There are no Actions pending or, to Buyer's knowledge, threatened against Buyer, or any governing Persons thereof, at law or in equity, or before or by any Governmental Authority, that if adversely determined could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement.

**4.4   Representations of Sellers.**   Buyer acknowledges that it is purchasing the Purchased Assets on an "AS IS, WHERE IS" basis (as more particularly described in Section 4.1(b)), and that Buyer is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Sellers other than as expressly set forth in this Agreement.

<div align="center">

**ARTICLE V - COVENANTS OF THE PARTIES PRIOR TO CLOSING**

</div>

**5.1   Access.**   From and after the Effective Date until the Closing or the earlier termination of this Agreement (the "**Interim Period**"), Sellers shall (a) provide Buyer and its Representatives reasonable access to and, as applicable, the right to inspect, the plants, properties, books and records of and related to the Owned Real Property and the other Purchased Assets, subject to the rights of any tenants under any of the Leases, and (b) furnish Buyer with such additional information as to the Owned Real Property and the other Purchased Assets as reasonably requested; provided, however, that such access shall be subject to prior reasonable notice to and approval by Sellers and shall be coordinated through persons as may be designated in writing by Sellers for such purpose.   Notwithstanding the foregoing, all disclosures of information shall be consistent with wall agreements, joint defense agreements and any other nondisclosure agreements entered into between the Parties.   Buyer's right of access and inspection shall be

<div align="center">18</div>

exercised during normal business hours and in such a manner as not to interfere unreasonably with the operations of the businesses conducted on the Owned Real Property as of the Effective Date and to be in compliance with applicable Laws.

5.2     **Updates of Schedules.**

(a)     At the time of execution of this Agreement, Sellers have provided Buyer with copies of all Schedules referenced as part of this Agreement subject to the following provisions:

(b)     After the Effective Date, and no later than five (5) business days prior to the Closing Date, the Parties shall supplement or update any and all Schedules with respect to any matter arising after the Effective Date which if existing as of the Effective Date would have been required to be set forth or described in such Schedules and such updated Schedules shall be incorporated into this Agreement. Any supplemental or amended disclosures pursuant to this Section 5.2 relating to any matter arising after the Effective Date or relating to Additional Contracts which are not Material Contracts, shall be deemed to have cured any breach of any representation or warranty made in this Agreement for purposes of the indemnification provided for in Article IX; provided, however, in the event such Schedules are updated and such updates materially and adversely affect the Owned Real Property then Buyer shall have the right to terminate this Agreement within five (5) business days of receipt of such updated Schedules and the parties shall be released from any and all other obligations hereunder except as otherwise specifically set forth herein, provided the Deposit shall be non-refundable and in no event shall the Deposit be returned to Buyer.

5.3     **Operating Covenants.**  During the Interim Period, except with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed) or as required by this Agreement, Sellers shall:

(a)     carry on its businesses in respect of the Owned Real Property and the other Purchased Assets in the ordinary course of business consistent with past practice in all material respects;

(b)     maintain the Owned Real Property and the other Purchased Assets or cause the Owned Real Property and the other Purchased Assets to be maintained thereof in substantially the same operating condition in which the Owned Real Property and the other Purchased Assets is currently maintained, ordinary wear and tear excepted;

(c)     perform its obligations relating to or affecting the Owned Real Property and the other Purchased Assets in all material respects, including paying in full before delinquency all bills and invoices for labor, services, materials, repair, maintenance or leasing of Owned Real Property and the other Purchased Assets as well as other debts and liabilities and contractual obligations in the ordinary course of business consistent with past practice;

(d)     keep in full force and effect current insurance policies, self-funded plans or trusts or other comparable insurance relating to or affecting the Owned Real Property and the other Purchased Assets or cause the same to be kept in full force and effect; and

19

(e)      use its commercially reasonable efforts to comply with all Laws applicable to the Owned Real Property and the other Purchased Assets, and keep in force all Permits necessary for the ownership of the Owned Real Property and the other Purchased Assets , or to cause the same to be complied with or kept in force.

**5.4      Negative Covenants.**  During the Interim Period, except as required by Law, Sellers shall not, with respect to the Owned Real Property and the other Purchased Assets, without the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed):

(a)      amend or terminate any of its contracts, enter into any contract or commitment, or incur or agree to incur any liability, except with respect to any such contract, commitment or liability that is amended, terminated or entered into in the ordinary course of business and that, over the life of such contract, commitment or liability, involves less than One Hundred Thousand Dollars ($100,000) or can be terminated without cause within thirty (30) days or less; provided, however, that:

(i)      Sellers may enter into a renewal of such existing contracts without the prior written consent of Buyer if Buyer has not responded in writing to Sellers' request for approval within five (5) business days of Buyer's receipt of such request together with copies of any such proposed contract;

(ii)      Sellers may enter into a renewal or amendment of an existing Lessor Lease or Contract with respect to an existing tenant, all in the ordinary course of business or in furtherance of a genuine business purpose, which ordinary course of business shall include renewals of any Lessor Lease or Contract, provided that any such renewal or amendment is in accordance in all material respects with terms and conditions provided therein as of the Effective Date, and provided that such renewal or amendment is pursuant to, and in accordance with, the express terms and conditions of an existing right of the tenant under such Lessor Lease or is materially consistent with the terms and conditions of such tenant's current lease;

(iii)      Sellers may terminate a Lessor Lease by reason of the material default by the tenant thereunder, which default is not cured within any cure period applicable thereto; and

(iv)      Sellers may enter into an amendment or renewal of a Tenant Lease, so long as such amendment is expressly permitted by the terms of such Tenant Lease or is in the ordinary course of business, is for a genuine business purposes, or would not have a material adverse effect on the applicable Real Property to which such Tenant Lease relates; provided that any such renewal or amendment is in accordance in all material respects with terms and conditions provided therein as of the Effective Date, and provided that such renewal or amendment is pursuant to, and in accordance with, the express terms and conditions of an existing right of the tenant under such Tenant Lease or is materially consistent with the terms and conditions of such tenant's current lease.

DM3\8385359.26

(b)     create, incur, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other Encumbrance affecting the Owned Real Property or the other Purchased Assets following the Closing other than Permitted Encumbrances;

(c)     sell, assign, lease or otherwise transfer or dispose of any property, plant or equipment used in connection with the operation of the Owned Real Property or the other Purchased Assets except in the ordinary course of business with comparable replacement thereof;

(d)     undertake any capital projects, except for projects occurring in the ordinary course of business and not in excess of Fifty Thousand Dollars ($50,000) for any single project or One Hundred Thousand Dollars ($100,000) in the aggregate for all such projects;

(e)     intentionally omitted;

(f)     settle or compromise any material pending or threatened action that (i) would involve the payment of an amount greater than One Hundred Thousand Dollars ($100,000) for any single action, (ii) involves or results in any restriction on the business or operations, or (iii) includes any admission of fault or wrongdoing by Sellers; or

(g)     cancel or waive any material rights in respect to the Owned Real Property or the other Purchased Assets.

**5.5     No-Shop Clause.**  During the Interim Period, unless this Agreement is earlier terminated as provided herein, Sellers shall not (and shall cause their Affiliates and each of their respective officers, directors, employees, agents, attorneys, investment bankers and other representatives not to), without the prior written consent of Buyer:  (i) offer for sale all or any portion of the Purchased Assets or any ownership interest in any entity owning any of the Purchased Assets, (ii) solicit offers to buy all or a portion of the Purchased Assets or any ownership interest in any entity owning any of the Purchased Assets, (iii) hold discussions with any Person (other than Buyer or any Affiliate of Buyer) pertaining to such an offer or solicitation or pertaining to a merger or consolidation of any entity owning any of the Purchased Assets or (iv) enter into any agreement with any Person (other than Buyer or any Affiliate of Buyer) with respect to the sale or other disposition of all or a portion of the Purchased Assets or any ownership interests in any entity owning any of the Purchased Assets or with respect to any merger, consolidation, or similar transaction involving any entity owning any of the Purchased Assets, in each case, excluding the replacement of any of the Purchased Assets constituting fixtures or personal property in the ordinary course of the maintenance of the Owned Real Property. Notwithstanding the foregoing, this Section 5.5 shall not be construed to prohibit Sellers or their Affiliates from engaging in corporate transactions involving Sellers' stock or securities, including macro-level mergers, reorganizations or other transactions, so long as the terms thereof (x) do not contemplate the sale of the Purchased Assets, or (y) would not otherwise restrict the ability of Sellers to convey the Purchased Assets to Buyer at the Closing.

**5.6     Third Party Consents.**

DM3\8385359.26

(a)      During the Interim Period, each Party shall use its good faith, commercially reasonable efforts to take, or cause to be taken, all actions, and do, or cause to be done, and assist and cooperate with the other Parties in doing, all things necessary to consummate and make effective, as soon as reasonably possible, the Closing and the other transactions contemplated by this Agreement in accordance with the terms hereof.  Without limiting the generality of the foregoing, upon the terms and subject to the conditions set forth in this Agreement, each of the Parties agrees to use good faith, commercially reasonable efforts to take, or cause to be taken, all actions that are necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Closing, including the following: (i) obtain all required or advisable consents, approvals or waivers from third Persons, including as required under any Assumed Material Contract, (ii) obtain all necessary actions or non-actions, waivers, consents, approvals, orders and authorizations from Governmental Authorities, and (iii) make all necessary registrations, declarations and filings with any Governmental Authority, none of which shall be a condition to Closing unless otherwise expressly provided in this Agreement.

(b)      During the Interim Period, Sellers shall use good faith, commercially reasonable efforts to obtain the required third party consents identified on Schedule 3.1(b) (and Buyer will reasonably cooperate with respect thereto) and Buyer shall use good faith, commercially reasonable efforts to obtain the required third party consents identified on Schedule 4.1(b) (and Sellers will reasonably cooperate with respect thereto); provided, however, such commercially reasonable efforts shall be limited to the following: (i) Sellers shall send letter requests to such third parties requesting such consents (but only to the extent such consent is explicitly required by the terms of the applicable contracts), (ii) Sellers shall follow up with the applicable third party one time after the initial request on any consents not received, (iii) thereafter Sellers shall, subject to Sellers' good faith determination that any such required third party consent that has not been obtained is reasonably likely to be obtained, reasonably consider  following up with the applicable third party one additional time, and (iv) thereafter Sellers shall have no further obligation to follow up or otherwise obtain such consents.

**5.7     Reformation Efforts.**  In the event that subsequent to the Effective Date all or part of this Agreement or the transactions contemplated hereunder are successfully challenged by any Governmental Authorities, the Parties shall use good faith, commercially reasonable efforts to analyze, revise, reform and, to the extent necessary, restructure this Agreement and the transactions contemplated hereby in order to fully comply with all applicable requirements of such Governmental Authorities in a manner that is equitable to both Parties in light of the intent of the Parties regarding the transactions contemplated by this Agreement.

**5.8     Notice of Certain Events.**  During the Interim Period, each Party shall promptly notify the other Parties in writing of, and contemporaneously provide the other Parties with accurate and complete copies of any and all information and documents relating to, any event, transaction or circumstance that would reasonably be expected to cause any condition to Closing set forth in Article VI or Article VII not to be satisfied.  Any such notice should not be deemed to cure any breach of a representation, warranty or covenant for purposes of determining whether or not the conditions set forth in Article VI or Article VII have been satisfied (except with respect to updates or supplements to Schedules as provided in Section 5.2).

22

**5.9**    **Environmental Compliance.**  Prior to the Closing, (a) Sellers shall use its commercially reasonable efforts to not allow any Hazardous Materials to be discharged, possessed, managed, processed or otherwise handled on any part of the Owned Real Property in a manner which is in material violation of or materially inconsistent with applicable Law, (b) Sellers shall, in all material respects, comply with all Environmental Laws affecting any part of the Owned Real Property, and (c) Sellers shall promptly notify Buyer of any lien, notice, litigation or threat of litigation relating to any alleged unauthorized release of any Hazardous Materials or the existence of any Hazardous Materials or other environmental contamination, liability or problem with respect to or arising out of or in connection with any part of the Owned Real Property.

**5.10**    **Intentionally Omitted.**

**5.11**    **Tenant Estoppel Certificates.**  Prior to the date hereof, Sellers have requested from each Tenant listed on Schedule 2.1(c) attached hereto to deliver to Sellers an estoppel certificate (i) substantially in the form attached hereto as Exhibit F, or (ii) if required by a particular Lease, in the form attached to or otherwise called for by the subject Lease (each, a "**Tenant Estoppel Certificate**").  Prior to sending the estoppel certificates to the Tenants, Sellers have prepared the estoppel certificates (and complete all blanks and other relevant information).  Sellers shall use commercially reasonable efforts to obtain an executed Tenant Estoppel Certificate from each Tenant listed on Schedule 2.1(c) attached hereto; provided, however, that Sellers shall be deemed to have fully performed their obligations under this Section 5.11 upon delivery to Buyer of executed Tenant Estoppel Certificates from Tenants under Leases with Sellers equal to not less than eighty percent (80%) of the total leased square footage of the buildings located on the Owned Real Property (excluding the square footage attributable to any parking lots or parking garages located within any buildings or other improvements) (the "**Tenant Estoppel Certificate Requirement**").  Sellers shall deliver to Buyer the original of each executed Tenant Estoppel Certificate received by Sellers promptly upon receipt by Sellers, but in no event later than three (3) business days prior to the Closing Date.  Sellers shall not be required to send any default (or threatened default) notice(s) to any Tenants in connection With any request for Tenant Estoppel Certificates.  Notwithstanding the foregoing or anything to the contrary contained herein, Buyer shall have the right to reject any Tenant Estoppel Certificate delivered by a Tenant as meeting the Tenant Estoppel Certificate Requirement if such Tenant Estoppel Certificate discloses or contains any information that is (i) materially inconsistent with any information contained in such Lease or the Tenant Estoppel Certificate prepared for initial delivery to such Tenant, or (ii) that indicates that the applicable Seller, as landlord, or the Tenant is in breach of or is in default under the Lease or that Tenant has any knowledge of an event or condition which, with the giving of notice or the passage of time, or both, would constitute a default by such Seller or Tenant under the Lease.

**5.12**    **Risk of Loss.**

(a)    Risk of loss until Closing shall be borne exclusively by Sellers.  Sellers shall provide written notice of any damage or destruction to all or any part of the Owned Real Property within three (3) days of such damage or destruction.  In the event of damage or destruction more than twenty-five percent (25%) of the total leased square footage of the Owned

23

Real Property prior to Closing ("**Material Damage**"), as determined by independent contractors reasonably approved by Buyer and Sellers in good faith, Buyer shall have the option of either (i) terminating this Agreement by providing written notice of such termination in accordance with Section 11.11 below within ten (10) days after written notice from Sellers of such Material Damage, or (ii) accepting the Owned Real Property, together with an assignment by Sellers of all of Sellers' rights under policies of insurance upon the Owned Real Property covering such damage or destruction.  In the event that Buyer elects to terminate this Agreement pursuant to this Section 5.12(a), Sellers and Buyer shall each be relieved of all further liability under this Agreement except as expressly set forth herein, including but not limited to that Buyer shall remain liable for Buyer's restoration and indemnification obligations.  In the event that the damage or destruction to the Owned Real Property is less than Material Damage, Buyer may not terminate this Agreement; provided, however, Sellers shall assign to Buyer all of Sellers' rights under its policies of insurance covering such damage or destruction.

(b)    In the event of a taking of all of the Owned Real Property or such portion as shall reduce by more than twenty-five percent (25%) the total leased square footage of the Owned Real Property as determined by independent contractors reasonably approved by Buyer and Sellers in good faith, a taking that materially alters the access to the Property, or the material flow of vehicular or pedestrian traffic or materially affects the parking on the Owned Real Property ("**Material Taking**") by reason of eminent domain, or deed in lieu thereof as determined by Sellers and Buyer in good faith, Buyer shall have the option of either (i) terminating this Agreement by providing written notice of such termination to Sellers in accordance with Section 11.11 below within ten (10) days after receipt of written notice of such Taking, or (ii) accepting the Owned Real Property, together with an assignment by Sellers of all its rights to the proceeds of such taking or deed in lieu thereof.  In the event that Buyer elects to terminate this Agreement pursuant to this Section 5.2(b), Sellers and Buyer shall each be relieved of all further liability under this Agreement except as expressly set forth herein, including but not limited to that Buyer shall remain liable for Buyer's restoration and indemnification obligations. In the event that the taking is less than a Material Taking, Buyer may not terminate this Agreement; provided, however, Sellers shall, on the Closing Date, (i) assign and remit to Buyer the full amount of any award or other proceeds of such taking which may have been collected by Sellers as a result of such taking, or (ii) if no award or other proceeds has been received, deliver to Buyer an assignment of Sellers' right to any such award or other proceeds which may be payable to Sellers as a result of such taking.

(c)    For the avoidance of doubt, the Deposit has been released to Sellers, shall be non-refundable and in no event shall the Deposit be returned to Buyer.

**ARTICLE VI- CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**

Notwithstanding anything herein to the contrary, the obligations of Buyer to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Buyer on or prior to the Closing:

DM3\8385359.26

**6.1**     **Representations and Warranties; Covenants.**  The representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth herein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date. All of the covenants in this Agreement to be complied with or performed by Sellers on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth therein).

**6.2**     **Required Governmental Approvals, Consents.**     Buyer   shall   have   obtained documentation or other evidence reasonably satisfactory to Buyer that:

    (a)     the IHFSRB has issued the IHFSRB Approval; and

    (b)     the Parties have obtained the consents and approvals listed on Schedule 6.2(b) (the "**Required Consents**").

**6.3**     **Actions and Proceedings.**  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement.  On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Owned Real Property, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Owned Real Property, (b) enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby, which Action, in the reasonable opinion of Buyer, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the transactions contemplated by this Agreement.

**6.4**     **Insolvency of Sellers.**  Sellers shall not (a) be in receivership or dissolution, (b) have made any assignment for the benefit of creditors, (c) have admitted in writing its inability to pay its debts as they mature, (d) have been adjudicated a bankrupt or (e) have filed a petition in voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy Law or any other similar Law.

**6.5**     **Closing Deliveries.**  Sellers shall have executed and delivered, or caused to have been executed and delivered, to Buyer the documents and items described in Section 2.4.

**6.6**     **Closing on Membership Interest Transfer.**  The closing on the transfer by SRC Healthcare Investments of its membership interests in the SRC Subsidiaries shall have occurred simultaneously with the Closing hereunder.

DM3\8385359.26

**6.7**     **Intentionally Deleted.**

### ARTICLE VII- CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

Notwithstanding anything herein to the contrary, the obligations of Sellers to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Sellers on or prior to the Closing:

**7.1**     **Representations and Warranties; Covenants.**  The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date. All of the covenants in this Agreement to be complied with or performed by Buyer on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein).

**7.2**     **Pre-Closing Confirmations.**     Sellers shall have obtained documentation or other evidence reasonably satisfactory to Sellers that:

(a)     the IHFSRB has issued the IHFSRB Approval; and

(b)     the Parties have obtained the Required Consents.

**7.3**     **Actions and Proceedings.**  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement.  On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Owned Real Property, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Owned Real Property, (b) enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby, which Action, in the reasonable opinion of Sellers, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Sellers or Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the transactions contemplated by this Agreement.

**7.4**     **Insolvency of Buyer.**  Buyer shall not (a) be in receivership or dissolution, (b) have made any assignment for the benefit of creditors, (c) have admitted in writing its inability to pay its debts as they mature, (d) have been adjudicated a bankrupt or (e) have filed a petition in

26

DM3\8385359.26

voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy Law or any other similar Law.

**7.5    Closing Deliveries.**   Buyer shall have executed and delivered, or caused to have been executed and delivered, to Sellers the documents and items described in Section 2.5.

**7.6    Closing on Membership Interest Transfer.**   The closing on the transfer by SRC Healthcare Investments of its membership interests in the SRC Subsidiaries shall have occurred simultaneously with the Closing hereunder.

## ARTICLE VIII- ADDITIONAL AGREEMENTS

**8.1    Termination Prior to Closing.**

(a)    Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(i)    by the mutual written consent of Sellers and Buyer;

(ii)    by Buyer, if Sellers breach or fail to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 6.1, (2) cannot be or has not been cured within thirty (30) days following delivery of written notice of such breach or failure to perform and (3) has not been waived by Buyer;

(iii)    by Sellers, if Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 7.1, (2) cannot be or has not been cured within thirty (30) days following delivery of written notice of such breach or failure to perform and (3) has not been waived by Sellers;

(iv)    intentionally omitted;  or

(v)    by either of Sellers or Buyer for any other reason if the Closing has not occurred by the Closing Date.

(b)    The Party seeking to terminate this Agreement pursuant to this Section 8.1(a) shall give prompt written notice of such termination to the other Parties.

(c)    In the event of a termination of this Agreement pursuant to Section 8.1(a), each Party shall pay the costs and expenses incurred by it in connection with this Agreement.  In the event of termination of this Agreement as provided in Section 8.1(a), this Agreement shall

27

forthwith become void and there shall be no liability on the part of either Party except (i) for the provisions of this Section 8.1 and Article XI and (ii) that nothing herein shall relieve either Party from liability for any breach of this Agreement or any agreement made as of the date hereof or subsequent thereto pursuant to this Agreement.

(d)     For the avoidance of doubt, the Deposit has been released to Sellers, shall be non-refundable and in no event shall the Deposit be returned to Buyer.

**8.2     Consents to Certain Assignments.**

(a)     Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or Law to which Sellers are a party or by which it is bound, or in any way adversely affect the rights of Seller or, upon transfer, Buyer under such asset, permit, claim or right.  Sellers shall use their commercially reasonable efforts to obtain any consents or waivers required to assign to Buyer any Purchased Asset that requires the consent of a third party, without any conditions to such transfer or changes or modifications of terms thereunder.  Buyer agrees that Sellers shall not have any liability to Buyer arising out of or relating to the failure to obtain any such consent that may be required in connection with the transactions contemplated by this Agreement or because of any circumstances resulting therefrom.

(b)     If any such consent is not obtained prior to Closing and as a result thereof Buyer shall be prevented by such third party from receiving the rights and benefits with respect to such Purchased Asset intended to be transferred hereunder, or if any attempted assignment would adversely affect the rights of Sellers thereunder so that Buyer would not in fact receive all such rights or Sellers would forfeit or otherwise lose the benefit of rights that Sellers are entitled to retain, Sellers and Buyer shall cooperate in any lawful and commercially reasonable arrangement, as Sellers and Buyer shall agree, under which Buyer would, to the extent practicable, obtain the economic claims, rights and benefits under such asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to Buyer; provided that all reasonable out-of-pocket expenses of such cooperation and related actions shall be paid by Buyer.

**8.3     Refunds and Remittances.**  After the Closing:  (i) if Sellers or any of their Affiliates receive any refund or other amount that is a Purchased Asset or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyer and (ii) if Buyer or any of its Affiliates receive any refund or other amount that is not a Purchased Asset or is otherwise properly due and owing to Sellers or any of its Affiliates in accordance with the terms of this Agreement, Buyer promptly shall remit, or shall cause to be remitted, such amount to Sellers

**8.4     Waiver of Bulk Sales Law Compliance.**  Buyer hereby waives compliance by Sellers with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any

28

DM3\8385359.26

state in which the Assets are located and all other similar laws applicable to bulk sales and transfers.

**8.5** **Lease Guaranties.**   Buyer will cooperate with Sellers and use its commercially reasonable efforts to enter into and deliver replacement guaranty agreements with any landlords or sublandlords in order to terminate any existing guaranty agreements by any Seller in favor of any such landlord or sublandlord under any Tenant Leases, if any.  To the extent any landlord or sublandlord under any Tenant Lease will not permit a termination of any guaranty agreement from the applicable Seller party as of the Effective Time, Buyer (i) shall indemnify such Seller for any cost, liability, claim or cause of action incurred by Seller or its Affiliates relating to such guaranty agreement arising on or after the Effective Date, (ii) shall cause the guaranty agreement between Seller and such landlord or sublandlord to be terminated as promptly as possible, and (iii) shall not enter into any amendments, extensions or other modifications to such lease agreement without prior written consent of such Seller.  Notwithstanding the foregoing or anything to the contrary contained herein, the guarantees of any of the Lessor Leases or Tenant Leases provided by Pipeline Health System, LLC identified on Schedule 8.5 shall be terminated or replaced effective as of the Closing Date.

## ARTICLE IX- INDEMNIFICATION

**9.1** **Indemnification by Buyer.**   Subject to the limitations set forth in Section 9.3, from and after the Closing, Buyer shall defend, indemnify and hold harmless Sellers (and its respective Affiliates, and their respective officers, directors, employees, counsel, agents, successors and assigns) (collectively, the "**Sellers Indemnified Parties**") from and against any and all losses, damages, liabilities, deficiencies, claims, interest, awards, judgments, penalties, costs and expenses (including reasonable attorneys' fees, costs and other out-of-pocket expenses incurred in investigating or defending the foregoing) (hereinafter collectively, "**Losses**") to the extent arising out of or resulting from:

(a)   any breach of representation or warranty by Buyer under this Agreement or in any certificate executed and delivered pursuant hereto;

(b)   any breach by Buyer of, or any failure by Buyer to perform, any covenant or agreement of, or required to be performed by, Buyer under this Agreement; or

(c)   any fraud, willful misconduct or criminal acts of Buyer or its Affiliates.

**9.2** **Indemnification by Sellers.**   Subject to the limitations set forth in Section 9.3, from and after the Closing, Sellers shall defend, indemnify and hold harmless Buyer (and its respective Affiliates, and their respective officers, directors, employees, counsel, agents, successors and assigns) (collectively, the "**Buyer Indemnified Parties**" and collectively with the Sellers Indemnified Parties, the "**Indemnified Parties**") from and against any and all Losses to the extent arising out of or resulting from:

(a)   any breach of representation or warranty by Sellers under this Agreement or in any certificate executed and delivered pursuant hereto;

29

DM3\8385359.26

(b)      any breach by Sellers of, or any failure by Seller to perform, any covenant or agreement of, or required to be performed by, Sellers under this Agreement; or

(c)      any fraud, willful misconduct or criminal acts of Sellers or their Affiliates.

**9.3      Limitations; Exception to Limitations.**

(a)      Buyer shall not be liable to any Sellers Indemnified Party for any claim for indemnification under Section 9.1 unless and unless and until the aggregate amount of indemnifiable Losses that may be recovered from Buyer thereunder equals or exceeds One Hundred Thousand Dollars ($100,000) (the "**Basket Amount**"), in which event Buyer shall be liable for the Losses in excess of the Basket Amount.  Sellers shall not be liable to any Buyer Indemnified Party under Section 9.2 unless and until the aggregate amount of indemnifiable Losses that may be recovered from Sellers thereunder equals or exceeds the Basket Amount, in which event Sellers shall be liable for the Losses in excess of the Basket Amount.

(b)      The maximum aggregate amount of indemnifiable Losses that may be recovered (i) from Buyer by Sellers Indemnified Parties pursuant to Section 9.1, and (ii) from Sellers by Buyer Indemnified Parties pursuant to Section 9.2 shall be an amount equal to Five Hundred Thousand and 00/100 Dollars ($500,000) (the "**Cap Amount**"); provided, that any claims arising from fraud, willful misconduct or criminal acts of the parties will not be subject to such Cap Amount, provided that in no event shall Sellers' indemnity obligations under this Agreement, in the aggregate, exceed the Purchase Price.  Additionally, in order to secure Sellers' indemnity obligations under Section 9.2 above, Pipeline Health System, LLC, a Delaware limited liability company, and the indirect parent of Sellers, shall guaranty Sellers' indemnity obligations under Section 9.2 above pursuant to a guaranty agreement to be executed and delivered at the Closing in the form attached hereto as Exhibit H (the "**Pipeline Guaranty Agreement**"), which Pipeline Guaranty Agreement shall  have a term not to exceed a period of twelve (12) months following the Closing.

(c)      No claim against Buyer or Sellers, as applicable, pursuant to Section 9.1(a) or Section 9.2(a), as applicable, shall be brought or asserted after the date that is twelve (12) months after the Closing Date.

(d)      No claim against Buyer or Sellers, as applicable, pursuant to Section 9.1(b) or Section 9.2(b), as applicable, with respect to a breach of or failure to perform any covenant or agreement to be performed *prior to or on the Closing* shall be brought or asserted after the date that is twelve (12) months after the Closing Date.

(e)      No claim against Buyer or Sellers, as applicable, pursuant to Section 9.1(b) or Section 9.2(b), as applicable, with respect to a breach of or failure to perform any covenant or agreement to be performed *after the Closing* shall be brought or asserted after the date of expiration of the applicable statute(s) of limitations applicable thereto.

DM3\8385359.26

(f)     No claim against Buyer or Sellers, as applicable, pursuant to Section 9.1(c) or Section 9.2(c), as applicable, shall be brought or asserted after the date of expiration of the applicable statute(s) of limitations applicable thereto.

(g)     An Indemnifying Party shall not be liable for any Loss to the extent that such Loss would not have arisen but for the passing of, or a change in, Law after the Effective Date, in each case that is not actually or prospectively in force on the Closing Date.

(h)     An Indemnifying Party shall not be liable for any Losses which are punitive, indirect, incidental or consequential in nature (as opposed to direct), including, without limitation, multiple damages, loss of future revenue or income or loss of business reputation or opportunity or any diminution in value or increased operating or compliance expenses.

(i)     For the purposes of calculating the amount of any Losses under Section 9.1 or Section 9.2, there shall be deducted (i) an amount equal to the amount of any tax benefit actually received by the Indemnified Party in connection with the accrual, incurrence or payment of any such Losses and (ii) an amount equal to the amount of any insurance proceeds actually received by an Indemnified Party in connection with the circumstances giving rise to the right to indemnification hereunder.

(j)     Buyer and Sellers shall cooperate with each other with respect to resolving any claim, liability or Loss for which indemnification may be required hereunder, including by making, or causing the applicable Indemnified Party to make, all reasonable efforts to mitigate any such claim, liability or Loss.  In the event that Buyer or Sellers shall fail to make such reasonable efforts to mitigate, then notwithstanding anything else to the contrary contained herein, the other Parties shall not be required to indemnify any Person for any claim, liability or Loss that could reasonably be expected to have been avoided if such efforts had been made. Without limiting the generality of the foregoing, Buyer and Sellers shall, or shall cause the applicable Indemnified Party to, use reasonable efforts to seek full recovery under all insurance policies covering any Loss to the same extent as they would if such Loss were not subject to indemnification hereunder.

(k)     Notwithstanding anything to the contrary contained herein, if Buyer defaults in its obligation to close under this Agreement, Sellers shall be entitled to terminate this Agreement and may continue to own and retain the entire Deposit as agreed liquidated damages (and not as a penalty) and as Sellers' sole remedy, in lieu of, and as full compensation for, all other rights or claims of Sellers against Buyer by reason of such default.  Upon such payment to Sellers of the Deposit, this Agreement shall terminate and, except as expressly provided in this Agreement, neither Sellers nor Buyer shall have any further liability or obligation under this Agreement at law or in equity.  Buyer and Sellers acknowledge that the damages to Sellers resulting from Buyer's default would be difficult, if not impossible, to ascertain with any accuracy, and that the liquidated damages amount set forth in this Section 9.3(k) represents both parties' reasonable efforts to approximate such potential damages.  Any dispute with respect to Buyer's right to the receipt of the Deposit shall be governed by Article X below.

DM3\8385359.26

**9.4**     **Third Party Claims.**  An Indemnified Party seeking indemnity as set forth in this Article IX as a result of a claim or liability that is asserted in writing by a third party against such Indemnified Party (a "**Third Party Claim**") shall notify the Person against whom the indemnity is sought ("**Indemnifying Party**") in writing of the Third Party Claim within ten (10) business days after receipt of such written assertion of a claim or liability describing in reasonable detail (a) the facts giving rise to any claim for indemnification hereunder, (b) the amount or method of computation of the amount of such claim, (c) each individual item of Loss included in the amount so stated, to the extent known, and (d) the nature of the breach of representation, warranty, covenant or agreement with respect to which such Indemnified Party claims to be entitled to indemnification hereunder (all of the foregoing, the "**Claim Information**"), and shall provide any other information with respect thereto as the Indemnifying Party may reasonably request.  The failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article IX except to the extent that the Indemnifying Party is prejudiced by such failure; provided, however, that the Indemnifying Party shall in no event be liable in respect of any Loss, claim or liability from and after the expiration of six (6) months after the date the Indemnified Party receives written assertion of such Loss, claim or liability, unless the Claim Information in respect of such Loss, claim or liability has been provided to the Indemnifying Party pursuant to this Section 9.4.  The Indemnifying Party shall have the right to defend any such Third Party Claim and control the defense of such Third Party Claim; provided, however, that the Indemnified Party shall have the right to reasonably approve counsel selected by the Indemnifying Party.  If the Indemnifying Party, within ten (10) business days after notice of such Third Party Claim, fails to take appropriate steps to defend such Third Party Claim, the Indemnified Party will (upon further notice to the Indemnifying Party) have the right to undertake the defense of such Third Party Claim on behalf of and for the account and at the risk and expense of the Indemnifying Party.  If the Indemnifying Party assumes the defense of such Third Party Claim, the Indemnified Party shall have the right to employ separate counsel and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party; provided that if in the reasonable opinion of counsel for the Indemnified Party, there is a conflict of interest between the Indemnified Party and the Indemnifying Party, the Indemnifying Party shall be responsible for the reasonable fees and expenses of one counsel to such Indemnified Party in connection with such defense.  If the Indemnifying Party assumes the defense of any Third Party Claim, the Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party.  If the Indemnifying Party assumes the defense of any Third Party Claim, the Indemnified Party shall agree to any settlement, compromise or discharge of such Third Party Claim that the Indemnifying Party may recommend and that by its terms obligates the Indemnifying Party to pay the full amount of the liability in connection with such Third Party Claim, and which releases the Indemnified Party completely in connection with such Third Party Claim.  Whether or not the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnified Party shall not admit any liability with respect to, or settle, compromise or discharge, or offer to settle, compromise or discharge, such Third Party Claim without the Indemnifying Party's prior written consent, which consent shall not be unreasonably withheld.

DM3\8385359.26

**9.5** **Direct Claims.** If an Indemnified Party becomes aware of any breach of the representations or warranties of the Indemnifying Party hereunder or any other basis for indemnification under this Article IX (except as otherwise provided for under Section 9.4), the Indemnified Party shall notify the Indemnifying Party in writing of the same within twenty (20) business days after becoming aware of such breach or claim, with such notice containing the Claim Information, and shall provide any other information with respect thereto as the Indemnifying Party may reasonably request. The Indemnified Party shall reasonably cooperate and assist the Indemnifying Party in determining the validity of any claim for indemnity by the Indemnified Party and in otherwise resolving such matters. Such assistance and cooperation shall include providing reasonable access to and copies of information, records and documents relating to such matters, furnishing employees to assist in the investigation, defense and resolution of such matters and providing legal and business assistance with respect to such matters. Should the Indemnified Party fail to notify the Indemnifying Party within the time frame required above, the Indemnified Party nonetheless shall be entitled to indemnification by the Indemnifying Party to the extent that the Indemnifying Party has not established that it has been prejudiced by the failure to receive timely notice.

**9.6** **Claims Made.** The time limits set forth in Section 9.3 for making claims for indemnification are in lieu of, and the Parties expressly waive, any other applicable statute of limitations during which such claims may be brought or asserted. Any notice for indemnification made pursuant to Section 9.4 or Section 9.5 prior to the expiration of the time limit set forth in Section 9.3 for the matter against which indemnity is sought shall for purposes of the time limits set forth in Section 9.3 constitute a claim or demand brought within such time limit, and the obligations of the Indemnifying Party therefor under this Article IX shall continue as to such matter, notwithstanding the expiration, if any, of such time limit.

**9.7** **Scope of Liability.** Except in the case of matters relating to intentional fraud or equitable relief, from and after the Closing, the sole and exclusive remedy of any Indemnified Party for any breach of any representation, warranty, covenant or other claim arising out of or relating to this Agreement and/or the transactions contemplated hereby is set forth in this Article IX.

**9.8** **Survival**. This Article IX shall survive the Closing.

## ARTICLE X - DISPUTE RESOLUTION

**10.1** **General.** Except as otherwise expressly provided herein, the Parties agree that the exclusive remedy for any dispute, controversy, claim or disagreement arising out of or relating to this Agreement (a "**Dispute**"), shall be negotiation, mediation and arbitration pursuant to this Article X.

**10.2** **Informal Negotiations.** The Parties involved in a Dispute shall, as soon as reasonably practicable after one Party gives written notice of a Dispute to the other Parties, engage in good faith negotiations (the "**Negotiation**").

**10.3** **Mediation.** If the Negotiation does not resolve any Dispute within thirty (30) days after notice of such Dispute is received (the "**Negotiations Period**"), the Parties shall try in good faith

33

to settle such Dispute through non-binding mediation under the Commercial Mediation Rules of the AAA. The Parties will jointly appoint a mutually acceptable mediator, seeking assistance in such regard from the AAA if they do not agree upon such appointment within ten (10) days after expiration of the Negotiations Period applicable to such Dispute. The costs of such mediation, including fees and expenses, shall be borne equally by such Parties.

**10.4     Arbitration.** If there remains unresolved any Dispute thirty (30) days after the expiration of the Negotiations Period applicable to such Dispute, then the Parties shall submit such Dispute to a three (3) member disinterested third-party arbitration panel selected (a) by mutual agreement of such Parties or (b) in the event such Parties do not reach an agreement regarding the selection of such panel within sixty (60) days after the expiration of the Negotiations Period applicable to such Dispute, each Party shall select one arbitrator within ten (10) business days after the expiration of such period, and those two arbitrators shall then select within ten (10) business days a third arbitrator. If two arbitrators have been selected by such Parties and those two arbitrators are unable to select a third arbitrator within such ten (10) business day-period, a third arbitrator shall be appointed by the AAA within fifteen (15) days after the expiration of such period. The arbitrators thus selected or appointed shall conduct the arbitration pursuant to the then-current rules of the AAA. The arbitrators shall be governed by the provisions of this Agreement. In the event the applicable Parties mutually agree upon the selection of such three (3) member panel, the fees and expenses of the arbitrators shall be shared equally between the applicable Parties. In the event the applicable Parties are not able to mutually agree upon the selection of such three (3) member panel, each of the Parties, respectively, shall bear the costs of its appointed arbitrator, and the fees and expenses of the third arbitrator shall be shared equally between the Parties involved in the Dispute. Each Party shall bear its own, and its Affiliates', costs and attorneys' fees in any arbitration proceeding. The arbitration shall be concluded within no later than one hundred eighty (180) days following the expiration of the Negotiations Period. The award of the arbitrators shall be final and binding on the Parties and may be enforced in a court having competent jurisdiction.

**10.5     Injunctive or Similar Relief.** Solely for the purpose of obtaining a temporary restraining order, preliminary injunction or other interim injunctive or equitable relief or remedy or recognition or enforcement of any judgment relating thereto, each Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for purposes of enforcing this Agreement, waives any and all rights under the laws of any other state to object to jurisdiction within the State of Illinois, and consents to the service of process in any such action or proceedings, in addition to any other manner permitted by applicable laws, by compliance with the notices provision of this Agreement. The non-prevailing Party in any action or proceeding arising out of or related to this Section 10.5 shall pay to the prevailing Party or Parties reasonable fees and costs incurred in such proceeding or action, including reasonable attorneys' fees and costs (including the reasonable costs of in-house counsel) and the fees and costs of experts and consultants. The prevailing Party shall be the Party who is entitled to recover its costs of suit (as determined by the court or tribunal of competent jurisdiction), whether or not the action or proceeding proceeds to final order, judgment or award.

**10.6** **Survival.** This Article X shall survive the expiration or earlier termination of this Agreement.

## ARTICLE XI - GENERAL PROVISIONS

**11.1** **Additional Assurances.** The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; provided, however, at the request of a Party, the other Party or Parties shall execute such additional instruments and take such additional action as the requesting Party may deem necessary to effectuate this Agreement. In addition and from time to time after the Closing Date, Sellers and Buyer shall each execute and deliver such other instruments of conveyance and transfer, and take such other actions as any Party may reasonably request, to more effectively convey and transfer full right, title and interest to, vest in, and place Buyer in legal and actual possession of the Purchased Assets.

**11.2** **Consents, Approvals and Discretion.** Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by a Party or a Party must or may exercise discretion, such consent or approval shall not be unreasonably withheld, conditioned or delayed and such discretion shall be reasonably exercised.

**11.3** **Legal Expenses.** In the event a Party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial proceedings, the prevailing Party will be entitled to recover such legal expenses in addition to any other relief to which the prevailing Party shall be entitled.

**11.4** **Choice of Law; Venue.** This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflicts of law principles and, subject to Article X, the venue of all disputes, claims, and lawsuits arising hereunder shall lie in Cook County, Illinois.

**11.5** **Benefit, Assignment and Third Party Beneficiaries.** Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns; provided, however, that no Party may assign this Agreement without the prior written consent of the other Party except that Buyer may assign this Agreement and/or any of its rights hereunder to a wholly owned subsidiary of Buyer ("**Buyer Subsidiary**"), or to an entity or entities consisting of a joint venture between an Affiliate of Buyer and an Affiliate of any other Person and Buyer may collaterally assign its rights, but not its obligations, under this Agreement to the foregoing joint venture entity or entities, or any party that provides the Buyer Funding for the transactions hereunder as additional security for Buyer's obligations to such party without the prior written consent of Sellers. The Parties acknowledge that Buyer may assign ownership and title to certain of the Purchased Assets to certain designees of Buyer, including the joint venture entities described above, such that more than one entity may own the Purchased Assets at Closing (each is referred to herein as a "**Buyer Designee**"). Each Buyer Designee shall be jointly and severally liability for the

35

DM3\8385359.26

obligations of Buyer under <u>Section 2.5(f)-(g)</u> and <u>Article IX</u> of this Agreement.  This Agreement is intended solely for the benefit of the Parties and is not intended to, and shall not, create any enforceable third party beneficiary rights, except with respect to the provisions of <u>Article IX</u>, which shall inure to the benefit of the Indemnified Parties, who are intended to be third-party beneficiaries thereof.  Notwithstanding anything in this <u>Section 10.5</u> to the contrary, any assignment by Buyer shall be subject to the approval of any applicable Governmental Authority, including the IIHSRB, required by the IIHSRB in the issuance of the IIHSRB Approval.

**11.6    No Brokerage.**  The Parties represent to each other that no broker or finder is entitled to any brokerage fees, commissions or finder's fees in connection with the transactions contemplated hereby by reason of any action taken by the Parties.  Each Party shall indemnify the other Party from and against all Losses arising out of claims for fees or commissions of any brokers or finders engaged or alleged to have been engaged by such Party.

**11.7    Cost of Transaction.**  Except as may be provided to the contrary elsewhere herein: (i) Buyer shall pay the fees, expenses and disbursements incurred by Buyer and its agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto; and (ii) Sellers shall pay the fees, expenses and disbursements incurred by Sellers and their agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto.

**11.8    Confidentiality.**  It is understood by the Parties that the information, documents and instruments delivered to each Party by the other Parties or agents thereof in connection with the negotiation of this Agreement or in compliance with the terms, conditions and covenants hereof are of a confidential and proprietary nature.  Both prior to and following the Closing, the Parties shall maintain the confidentiality of all such confidential information, documents or instruments delivered to it by the other Parties or agents thereof and shall not disclose such confidential information, documents and instruments to any third parties other than its Representatives assisting in the transactions contemplated herein or as may be required by applicable Laws.  If the transactions contemplated hereby are not consummated, each Party shall return all such confidential information, documents and instruments and all copies thereof in its possession to the Party providing them.  The terms and conditions of this Agreement and all other agreements and instruments executed and delivered by the Parties in connection with this Agreement shall remain confidential and the Parties shall not disclose such agreements or instruments, or any part thereof, to any third party other than its Representatives assisting in the transactions contemplated herein or as may be required by applicable Laws.  Any breach of this <u>Section 11.8</u> by a Party would result in irreparable harm to the other Parties and therefore the Parties shall be entitled to seek an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond in addition to other legal and equitable remedies.

**11.9    Public Announcements.**  No Party shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions herein contemplated without the prior written consent of Buyer and Sellers, except for information and filings (a) reasonably necessary to be directed to Governmental Authorities

DM3\8385359.26

to fully and lawfully effect the transactions herein contemplated or (b) required under Law or the rules of any stock exchange applicable to a Party or its Affiliates.

**11.10   Waiver of Breach.**  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**11.11   Notice.**  Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered with signed receipt, when delivered by facsimile or other electronic means with electronic confirmation of delivery (unless not delivered on a business day or delivered after 5:00 p.m. Central Time on a business day, in which case such delivery shall be deemed effective on the next succeeding business day), when delivered by overnight courier with signed receipt, or when delivered by registered United States mail, with postage prepaid and return receipt requested, addressed to the addresses below or to such other address as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

| | |
|---|---|
| Sellers: | West Suburban Property Holdings, LLC<br>River Forest Property Holdings, LLC<br>Weis Property Holdings, LLC<br>Weis MOB Property Holdings, LLC<br>c/o SRC Healthcare Investments II, LLC<br>898 N. Sepulveda Blvd., Suite 500<br>El Segundo, CA 90245<br>Attn:  Nick Orzano<br>Email:  norzano@pipelinehealth.us |
| With a Copy to: | Pipeline Health System, LLC<br>898 N. Pacific Coast Highway, Suite 700<br>El Segundo, CA  90245<br>Attn:  Brittany M. Whitman, Esq.<br>Email:  bwhitman@pipelinehealth.us |
| And to: | Duane Morris LLP<br>190 South LaSalle Street, Suite 3700<br>Chicago, IL 60603<br>Attn:  N. Paul Coyle<br>Email: pcoyle@duanemorris.com |

Buyer:                                           Ramco Healthcare Holdings, LLC
103 Carnegie Center, Suite 345
Princeton, NJ 08540
Attn: Reddy Rathnakar
Email: preddy89@gmail.com

With a Copy to:                   Benesch Friedlander Coplan and Aronoff
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Attn: Juan Morado, Jr.
Email: jmorado@beneschlaw.com

**11.12   Severability.**  In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

**11.13   Interpretation.**   In the interpretation of this Agreement, except where the context otherwise requires, (i) "including" or "include" does not denote or imply any limitation, (ii) "or" has the inclusive meaning "and/or," (iii) "and/or" means "or" and is used for emphasis only, (iv) "$" refers to United States dollars, (v) the singular includes the plural, and vice versa, and each gender includes each other gender, (vi) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (vii) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (viii) "Exhibit" refers to an exhibit to this Agreement (which is incorporated herein by reference), unless otherwise stated in this Agreement, (ix) "Schedule" refers to a schedule to this Agreement and incorporates any attachments thereto (which are incorporated herein by reference), unless otherwise stated in this Agreement, (x) all references to times are times in Chicago, Illinois, and (xi) "day" refers to a calendar day unless expressly identified as a "business day," which means any day that is not a Saturday, Sunday, or official federal holiday in the United States.

**11.14   Entire Agreement, Amendments and Counterparts.**  This Agreement supersedes all previous contracts, agreements and understandings between the Parties regarding the subject matter hereof  and constitutes the entire agreement existing between or among the Parties respecting the subject matter hereof and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and neither Party is relying on any such oral statements or prior written material.  All prior representations or agreements, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties.  This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Signatures received via facsimile or other electronic transmission shall be accepted as originals. Notwithstanding any oral agreement or course of conduct of the Parties or their Representatives

DM3\8385359.26

to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each Party.

**11.15** **Personal Liability.**  This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect equity holder of either Party or any officer, director, employee, investor or other Representative of either Party.

**11.16** **Enforcement.**  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, each Party shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any state or federal court sitting in Cook County, Illinois (or, if such court lacks subject matter jurisdiction, in any appropriate Illinois state or federal court), this being in addition to any other remedy to which such Party is entitled at law or in equity.  Each Party hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any Law to post security as a prerequisite to obtaining equitable relief.

**11.17** **Disclosure Generally.**  Notwithstanding anything to the contrary contained in the Schedules or in this Agreement, the information and disclosures contained in any Schedule shall be deemed to be disclosed and incorporated by reference in any other Schedule as though fully set forth in such Schedule for which applicability of such information and disclosure is reasonably apparent on its face.  The fact that any item of information is disclosed in any Schedule shall not be construed to mean that such information is required to be disclosed by this Agreement.  Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the term "material" adverse change" or other similar terms in this Agreement.

**11.18** **Time of Essence.**  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

**11.19** **Like-Kind Exchange.**  Each party hereto acknowledges that the other party may effect a so-called tax deferred "like-kind" exchange in accordance with the requirements of Section 1031 of the Internal Revenue Code of 1986, as amended, and all regulations related thereto (the "**Code**").  Each party agrees to cooperate with the other, at no cost to the cooperating party, to allow the other to comply with the requirements of the Code, including the designation of a "qualified intermediary".  Each party agrees that the other party may assign its rights under this Agreement (without being released of its obligations hereunder) to a "qualified intermediary," and, if requested by the requesting party, each party agrees that it shall execute any and all documents as are reasonably necessary or appropriate in connection with effecting such exchange on a tax-deferred basis.  Neither party shall be required to take an assignment of the purchase agreement for any identified property nor be required to hold title to any identified property for purpose of consummating such exchange. The party requesting the tax deferred

39

DM3\8385359.26

"like-kind" exchange shall hold the other party harmless from and against all claims, losses, costs, damages and liabilities (including reasonable attorneys' fees) in connection with assisting in the exchange sought by the requesting party.

**11.20  Waiver of Conflicts Regarding Representation; Non-Assertion of Attorney-Client Privilege.**

(a)     Buyer waives and agrees not to assert, and agrees to cause its Affiliates to waive and not to assert, any conflict of interest arising out of or relating to the representation, after the Closing (the "**Post-Closing Representation**"), of the Seller Parties or any member, officer, employee or director of the Seller Parties (any such Person, a "**Designated Person**") in any matter involving or relating to this Agreement or the transactions contemplated hereby or thereby, by any legal counsel currently representing the Seller Parties in connection with this Agreement or the transactions contemplated hereby or thereby (the "**Current Representation**").

(b)     Buyer waives and agrees not to assert, and agrees to cause its Affiliates to waive and to not assert, any attorney-client privilege with respect to any communication between any legal counsel and any Designated Person occurring during the Current Representation in connection with any Post-Closing Representation, including in connection with a dispute with Buyer or any of its Affiliates, it being the intention of the parties hereto that all such rights to such attorney-client privilege and to control such attorney-client privilege shall be retained by Seller; provided that the foregoing waiver and acknowledgement of retention shall not extend to any communication not involving this Agreement or the transactions contemplated hereby or thereby, or to communications with any Person other than the Designated Persons and their advisers.

(c)     Buyer, on behalf of itself and its Affiliates agrees that no communications (including email or other written communications) subject to attorney-client privilege in connection with the Current Representation shall be subject to disclosure, directly or indirectly, to Buyer or any Person acting on behalf of Buyer, and the same shall be controlled by Seller and shall not be claimed by Buyer or any of its Affiliates.

(d)     Nothing in this Section is intended to or shall be deemed to operate as a waiver of any applicable privilege or protection that could be asserted to prevent disclosure of any confidential communication by any legal counsel currently representing any Designated Person.

(e)     Seller and Buyer agree to take, and to cause their respective Affiliates to take, all steps reasonably necessary to implement the intent of this Section 11.190.

[Signature Pages Follows]

40

DM3\8385359.26

IN WITNESS WHEREOF, the Parties have caused this Real Estate Asset Purchase Agreement to be executed by their authorized officers as of the Effective Date.

**SELLERS:**

WEST SUBURBAN PROPERTY HOLDINGS, LLC
RIVER FOREST PROPERTY HOLDINGS, LLC
WEISS PROPERTY HOLDINGS, LLC
WEISS MOB PROPERTY HOLDINGS, LLC

By:_____

Name: Nicholas Orzano

Title: Authorized Signatory

**BUYER:**

RAMCO HEALTHCARE HOLDINGS, LLC

By:_____

Name: _____

Tile: _____

Signature Page to Real Estate Purchase Agreement

DM3\8385359.26

IN WITNESS WHEREOF, the Parties have caused this Real Estate Asset Purchase Agreement to be executed by their authorized officers as of the Effective Date.


**SELLERS:**

WEST SUBURBAN PROPERTY HOLDINGS, LLC
RIVER FOREST PROPERTY HOLDINGS, LLC
WEISS PROPERTY HOLDINGS, LLC
WEISS MOB PROPERTY HOLDINGS, LLC


By:_____
Name: Nicholas Orzano
Title: Authorized Signatory


**BUYER:**

RAMCO HEALTHCARE HOLDINGS, LLC


By:_____
Name:___RATHNAKER REDDY PATLOLW___
Tile:___Managing Member___


Signature Page to Real Estate Purchase Agreement

DM3\8385359.26

## EXHIBIT A

**OWNED REAL PROPERTY**

**[Attached]**

Exhibit A

DM3\8385359.26

## West Suburban Property Holdings, LLC

**PARCEL 1:**

THE SOUTH 7 FEET OF LOT 6 AND THE NORTH 1/2 OF LOT 7 IN BLOCK 20 IN RIDGELAND, A SUBDIVISION IN SECTIONS 7 AND 8, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS (EXCEPT THEREFROM THAT PORTION DEDICATED FOR N. HUMPHREY AVENUE BY PLAT OF DEDICATION RECORDED OCTOBER 28, 1994 AS DOCUMENT 94922877).

PIN: 16-08-116-023-0000

**PARCEL 2:**

LOTS 1 TO 12 INCLUSIVE, IN HENRY DATES RESUBDIVISION OF LOTS 10 TO 18 INCLUSIVE, OF BLOCK 19 (EXCEPTING FROM SAID LOTS 3 AND 4 TAKEN AS A TRACT THAT PART THEREOF BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WEST LINE OF SAID LOT 3, SAID WEST LINE BEING ALSO THE EAST LINE OF HUMPHREY AVENUE AT A POINT BEING 89.19 FEET DISTANT SOUTH FROM THE NORTH LINE OF LOT 1 IN THE SAID RESUBDIVISION (SAID NORTH LINE BEING ALSO THE SOUTH LINE OF ERIE STREET); THENCE SOUTHERLY ALONG THE SAID WEST LINE OF LOTS 3 AND 4 AFORESAID FOR A DISTANCE OF 29.93 FEET TO A POINT IN THE WEST LINE OF LOT 4 AFORESAID; THENCE NORTHEASTERLY AND NORTHWESTERLY ALONG A LINE CURVING CIRCULARLY TO THE LEFT AND HAVING A RADIUS OF 30.00 FEET, AN ARC DISTANCE OF 31.34 FEET TO THE POINT OF BEGINNING); AND THE WEST 1/2 OF THE VACATED NORTH AND SOUTH 20 FOOT ALLEY LYING EAST OF AND ADJOINING SAID LOTS 1 TO 12 IN THE VILLAGE OF RIDGELAND, BEING A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND ALSO THE NORTH WEST 1/4 AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTH WEST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN; AND LOTS 1 TO 9 INCLUSIVE AND THE EAST 1/2 OF THE VACATED NORTH AND SOUTH 20 FOOT ALLEY LYING WEST OF AND ADJOINING SAID LOTS 1 TO 9 IN BLOCK 19 IN THE VILLAGE OF RIDGELAND, A SUBDIVISION OF THE EAST 1/2 OF THE EAST HALF OF SECTION 7 AND THE NORTH WEST 1/4 AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTH WEST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD

Deed
West Suburban Medical Center

1

PRINCIPAL MERIDIAN, AND THAT PORTION OF VACATED HUMPHREY STREET AS DESCRIBED BY DOCUMENT 94922877, ALL IN COOK COUNTY, ILLINOIS. THAT PORTION OF VACATED HUMPHREY STREET ALSO SET FORTH IN DOCUMENT 94897562.

PIN:  Part of 16-08-117-001-0000; 16-08-117-007-0000; 16-08-117-008-0000; 16-08-117-009-0000; 16-08-117-010-0000; 16-08-117-011-0000; 16-08-117-012-0000; Part of 16-08-117-013-0000; Part of 16-08-117-015-0000; 16-08-117-016-0000

**PARCEL 3:**

LOTS 1 TO 4 INCLUSIVE, AND LOT 7 AND THE VACATED 10 FOOT NORTH AND SOUTH ALLEY LYING EAST OF AND ADJOINING SAID LOT 7 LYING NORTH OF THE SOUTH LINE OF SAID LOT 7 EXTENDED EAST, IN THE RESUBDIVISION OF LOTS 1 TO 4 IN BLOCK 20 IN THE VILLAGE OF RIDGELAND, BEING A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND THE NORTH WEST 1/4 AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTH WEST 1/4 QUARTER OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 16-08-116-012-0000; 16-08-116-013-0000; 16-08-116-014-0000; 16-08-116-015-0000; 16-08-116-016-0000

**PARCEL 4:**

LOT 6 (EXCEPT THE NORTH 6 FEET AND EXCEPT THE SOUTH 7 FEET THEREOF) IN BLOCK 20 IN RIDGELAND, A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND THE NORTH WEST 1/4 AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTH WEST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 16-08-116-022-0000

**PARCEL 5:**

LOT 4 (EXCEPT THE NORTH 16 FEET THEREOF) AND ALL OF LOTS 5 TO 14 BOTH INCLUSIVE, (EXCEPTING FROM SAID LOTS 13 AND 14 TAKEN AS A TRACT THAT PART THEREOF BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT IN THE WEST LINE OF SAID LOT 13 BEING 165.03 FEET DISTANT NORTH OF THE SOUTH LINE OF LOT 10 (SAID SOUTH LINE BEING ALSO THE NORTH LINE OF ERIE STREET); THENCE NORTHERLY ALONG THE WEST LINES OF LOTS 13 AND 14 (BEING ALSO THE EAST LINE OF HUMPHREY AVENUE) FOR A DISTANCE OF 29.93 FEET TO A POINT IN THE WEST LINE OF SAID LOT 14; THENCE SOUTHEASTERLY AND SOUTHWESTERLY ALONG A LINE CURVING CIRCULARLY TO THE RIGHT AND HAVING A RADIUS OF 30.00 FEET IN ARC DISTANCE OF 31.34 FEET TO THE POINT OF BEGINNING);
AND LOT 15 (EXCEPT THE NORTH 15 FEET THEREOF);

AND THAT PART OF THE VACATED NORTH AND SOUTH 20 FOOT ALLEY IN BLOCK 18 IN VILLAGE OF RIDGELAND SUBDIVISION, LYING NORTH OF THE SOUTH LINE OF LOT 9 EXTENDED OVER AND LYING SOUTH OF SOUTH LINE OF 16 FOOT EAST WEST ALLEY IN SAID BLOCK 18 EXTENDED WEST IN BLOCK 18 IN RIDGELAND, A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND THE NORTH WEST QUARTER AND THE WEST HALF OF THE WEST HALF OF THE SOUTH WEST QUARTER OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN:    16-08-111-006-0000; Part of16-08-111-009-0000; 16-08-111-013-0000; 16-08-111-014-0000;
        16-08-111-015-0000; 16-08-111-016-0000; 16-08-111-017-0000; Part of 16-08-111-018-0000;
        Part of 16-08-111-021-0000; Part of16-08-111-022-0000

Deed
West Suburban Medical Center

3

**PARCEL 6:**

THE SOUTH 1/2 OF LOT 5 AND ALL OF LOTS 6 TO 9 INCLUSIVE IN BLOCK 17 IN THE VILLAGE OF RIDGELAND, BEING A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND OF THE NORTH WEST 1/4 AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTH WEST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN:    Part of 16-08-110-019-0000;    Part of 16-08-110-020-0000;    Part of 16-08-110-021-0000;
        Part of 16-08-110-022-0000;    Part of 16-08-110-023-0000

**PARCEL 7:**

LOTS 328 TO 332 BOTH INCLUSIVE, IN BLOCK 12 IN AUSTINS SECOND ADDITION TO AUSTINVILLE, A SUBDIVISION OF THE WEST 1/2 OF THE SOUTH EAST 1/4 AND THE WEST 1/2 OF THE NORTH EAST 1/4 (EXCEPT THE EAST 15 ACRES OF THE NORTH HALF OF THE NORTH WEST 1/4 OF THE NORTH EAST 1/4 AND RAILROAD RIGHT OF WAYS) OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN:    16-08-211-020-0000;    16-08-211-021-0000;    16-08-211-022-0000;    16-08-211-023-0000

Deed
West Suburban Medical Center

4

**PARCEL 8:**

THAT PART OF VACATED ERIE STREET AND VACATED HUMPHREY AVENUE DESCRIBED AS FOLLOWS:

THAT PART OF 66 FOOT WIDE ERIE STREET LYING EAST OF A LINE RUNNING FROM THE SOUTH WEST CORNER OF LOT 9 IN BLOCK 17 IN THE VILLAGE OF RIDGELAND, AND THENCE SOUTH ALONG THE WEST LINE OF SAID LOT 9, EXTENDED SOUTH, TO THE NORTH WEST CORNER OF LOT 7 IN THE RESUBDIVISION OF LOTS 1 THROUGH 4 IN BLOCK 20 IN THE SAID VILLAGE OF RIDGELAND (SAID LINE BEING ALSO THE EASTERLY LINE, AS EXTENDED, OF THE NORTH SOUTH 20 FOOT ALLEY RUNNING THROUGH SAID BLOCKS 17 AND 20), AND LYING WEST OF A LINE RUNNING FROM THE SOUTHEAST CORNER OF LOT 9 IN BLOCK 18 IN THE VILLAGE OF RIDGELAND; AND THENCE SOUTH ALONG THE EAST LINE OF SAID LOT 9, EXTENDED SOUTH TO THE NORTHEAST CORNER OF LOT 1 IN BLOCK 19 IN THE SAID VILLAGE OF RIDGELAND, (BEING ALSO THE WEST LINE OF AUSTIN BOULEVARD);

TOGETHER WITH THAT PART OF 80 FOOT WIDE VACATED HUMPHREY AVENUE LYING EAST OF AND ADJOINING THE EAST LINES OF BLOCKS 17 AND 20 AFORESAID AND LYING WEST OF AND ADJOINING THE WEST LINES OF BLOCKS 18 AND 19 AFORESAID;

TOGETHER WITH ALL OF THE RECTANGULAR AREA FORMING THE INTERSECTION OF THE AFORESAID ERIE STREET AND AFORESAID HUMPHREY AVENUE, ALL TAKEN TOGETHER AS A TRACT, AND FALLING WITHIN THE FOLLOWING DESCRIBED TRACT OF LAND (BEING ENTIRELY WITHIN THE SAID VILLAGE OF RIDGELAND, A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND OF THE NORTH WEST QUARTER AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY), ILLINOIS BOUNDED AND DESCRIBED AS FOLLOWS: COMMENCING

AT THE NORTHEAST CORNER OF LOT 1 IN BLOCK 19 AFORESAID (BEING THE INTERSECTION OF THE WEST LINE OF AUSTIN BOULEVARD AND THE SOUTH LINE OF ERIE STREET) AND RUNNING THENCE WESTERLY ALONG THE NORTHERLY LINE OF LOT 1 IN BLOCK 19 AFORESAID (SAID LINE BEING THE SOUTH LINE OF ERIE STREET) FOR A DISTANCE OF 362.26 FEET TO THE NORTHWEST CORNER OF LOT 1 IN HENRY DATE'S RESUBDIVISION OF LOTS 10 TO 18, BOTH INCLUSIVE, IN BLOCK 19 AFORESAID; THENCE SOUTHERLY ALONG THE WEST LINE OF LOTS 1, 2, AND 3 IN DATE'S RESUBDIVISION AFORESAID (SAID WEST LINE BEING ALSO THE EAST LINE OF HUMPHREY AVENUE); FOR A DISTANCE 89.19 FEET TO A POINT; THENCE NORTHWESTERLY AND SOUTHWESTERLY ALONG A LINE CIRCULARLY CURVING TO THE LEFT, AND HAVING A RADIUS OF 30.00 FEET, AN ARC DISTANCE OF 78.57 FEET TO A POINT (SAID POINT BEING 24.0 FEET EAST OF THE EAST LINE OF BLOCK 20; SAID EAST LINE BEING ALSO THE WEST LINE OF HUMPHREY AVENUE) AND RUNNING THENCE SOUTHERLY ALONG A LINE 24.0 FEET EAST OF AND PARALLEL TO THE SAID WEST LINE OF HUMPHREY AVENUE, FOR A DISTANCE OF 30.0 FEET TO A POINT ON THE SOUTH LINE OF LOT 4 IN THE RESUBDIVISION OF LOTS 1 THROUGH 4 IN BLOCK 20 AFORESAID EXTENDED EAST; THENCE WESTERLY ALONG THE SOUTH LINE OF SAID LOT 4, EXTENDED EAST, A DISTANCE OF 24.0 FEET TO THE SOUTHEAST CORNER OF SAID LOT 4 (WHICH POINT IS ALSO THE WEST LINE OF HUMPHREY AVENUE); THENCE NORTHERLY ALONG THE EAST LINE OF LOTS 4, 3, 2, AND 1 IN THE SAID RESUBDIVISION IN BLOCK 20, FOR A DISTANCE OF 134.16 FEET TO A POINT (BEING THE SOUTH LINE OF WEST ERIE STREET) AT THE

Deed
West Suburban Medical Center

5

NORTHEAST CORNER OF SAID LOT 1; THENCE WESTERLY ALONG THE NORTH LINE OF LOT 1, AND THE NORTH LINE OF LOT 1 EXTENDED WEST, AND ALONG THE NORTH LINE OF LOT 7 IN THE SAID RESUBDIVISION OF LOTS 1 THROUGH 4 IN BLOCK 20, FOR A DISTANCE OF 171.13 FEET TO THE NORTHWEST CORNER OF SAID LOT 7 IN THE RESUBDIVISION, THENCE NORTH 66.00 FEET TO THE SOUTHWEST CORNER OF LOT 9 IN BLOCK 17 AFORESAID; THENCE EAST ALONG THE SOUTH LINE OF SAID LOT 9 IN BLOCK 20 (BEING ALSO THE NORTH LINE OF ERIE STREET) FOR A DISTANCE OF 171.13 FEET TO THE SOUTHEAST CORNER OF SAID LOT 9; THENCE NORTH ALONG THE EAST LINES OF SAID LOTS 5 TO 9 IN SAID BLOCK 17, FOR A DISTANCE OF 210.0 FEET TO THE NORTH LINE OF THE SOUTH 1/2 OF LOT 5 IN BLOCK 17; THENCE EAST ALONG THE NORTH LINE OF THE SOUTH 1/2 OF SAID LOT 5 EXTENDED EAST, FOR A DISTANCE OF 24.0 FEET; THENCE SOUTH ALONG A LINE 24.0 FEET EAST OF AND PARALLEL TO THE EAST LINE OF LOT 5 AFORESAID (BEING ALSO THE WEST LINE OF HUMPHREY AVENUE) 30.0 FEET TO A POINT; THENCE SOUTHEASTERLY AND NORTHEASTERLY ALONG A LINE CIRCULARLY CURVING TO THE LEFT, AND HAVING A RADIUS OF 30.0 FEET, AN ARC DISTANCE OF 78.57 FEET TO A POINT ON THE WEST LINE OF LOT 13 IN BLOCK 18 AFORESAID (SAID WEST LINE BEING ALSO THE EAST LINE OF HUMPHREY AVENUE); THENCE SOUTH ALONG THE WEST* LINES OF LOTS 10 TO 13, (BEING THE EAST LINE OF HUMPHREY AVENUE) FOR A DISTANCE OF 165.03 FEET TO THE SOUTHWEST CORNER OF LOT 10 IN BLOCK 18; THENCE EAST ALONG THE SOUTH LINE OF LOT 10, THE SOUTH LINE OF LOT 10 EXTENDED EAST, AND THE SOUTH LINE OF LOT 9, ALL IN BLOCK 18, FOR A DISTANCE OF 362.26 FEET TO THE SOUTHEAST CORNER OF SAID LOT 9 IN BLOCK 18 (SAID CORNER BEING ALSO THE EAST LINE OF SAID LOT 9 AND THE WEST LINE OF AUSTIN BOULEVARD); THENCE SOUTH ALONG THE EAST LINE OF SAID LOT 9, EXTENDED SOUTH, FOR A DISTANCE OF 66.0 FEET TO THE POINT OF BEGINNING, ALL IN THE AFOREMENTIONED VILLAGE OF RIDGELAND SUBDIVISION IN SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, ALL IN COOK COUNTY, ILLINOIS.

(*Inadvertently referred to as "East" in prior deeds)

| | | |
|---|---|---|
| PIN: Part of 16-08-110-019-0000 | Part of 16-08-116-015-0000 | Part of 16-08-117-001-0000 |
| Part of 16-08-110-020-0000 | Part of 16-08-116-016-0000 | Part of 16-08-117-007-0000 |
| Part of 16-08-110-021-0000 | Part of 16-08-116-018-0000 | Part of 16-08-117-008-0000 |
| Part of 16-08-110-022-0000 | Part of 16-08-116-019-0000 | Part of 16-08-117-009-0000 |
| Part of 16-08-110-023-0000 | Part of 16-08-116-020-0000 | Part of 16-08-117-010-0000 |
| Part of 16-08-111-009-0000 | Part of 16-08-116-021-0000 | Part of 16-08-117-011-0000 |
| Part of 16-08-111-018-0000 | Part of 16-08-116-022-0000 | Part of 16-08-117-012-0000 |
| Part of 16-08-111-021-0000 | Part of 16-08-116-023-0000 | Part of 16-08-117-013-0000 |
| Part of 16-08-116-012-0000 | Part of 16-08-116-024-0000 | Part of 16-08-117-015-0000 |
| Part of 16-08-116-013-0000 | Part of 16-08-116-025-0000 | Part of 16-08-117-016-0000 |
| Part of 16-08-116-014-0000 | Part of 16-08-116-026-0000 | |

**PARCEL 9:**

INTENTIONALLY DELETED.

**PARCEL 10:**

INTENTIONALLY DELETED.

Deed
West Suburban Medical Center

6

**PARCEL 11:**

INTENTIONALLY DELETED.

**PARCEL 12:**

INTENTIONALLY DELETED.

**PARCEL 13:**

THE SOUTH 12 1/2 FEET OF LOT 4 AND THE NORTH 1/2 OF LOT 5 IN BLOCK 17 IN THE VILLAGE OF RIDGELAND BEING A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND NORTHWEST 1/4 AND WEST 1/2 OF WEST 1/2 OF SOUTHWEST 1/4 OF SECTION 8,TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN IN COOK COUNTY, ILLINOIS.

PIN: 16-08-110-018-0000

**PARCEL 14:**

LOT 5 IN THE RESUBDIVISION OF LOTS 1, 2, 3, AND 4 IN BLOCK 20 IN RIDGELAND IN SECTIONS 7 AND 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 16-08-116-017-0000

**PARCEL 15:**

THE NORTH 17 FEET OF LOT 5 IN BLOCK 20 IN VILLAGE RIDGELAND AND ALL OF LOT 6 IN BATHORN'S SUBDIVISION OF LOT 1 THROUGH 4 IN SAID BLOCK 20 BEING A SUBDIVISION OF SECTION 7 AND 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN:    16-08-116-018-0000;    16-08-116-019-0000

**PARCEL 16:**

THE SOUTH 33 FEET OF LOT 5 AND THE NORTH 6 FEET OF LOT 6 IN BLOCK 20 IN THE VILLAGE OF RIDGELAND BEING A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND THE NORTHWEST 1/4 AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTH WEST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN:    16-08-116-020-0000;    16-08-116-021-0000

**PARCEL 17:**

THE NORTH 37 1/2 FEET OF LOT 4 IN BLOCK 17 IN VILLAGE OF RIDGELAND BEING A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7, AND THE NORTHWEST 1/4 AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 8, ALL IN TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN: 16-08-110-017-0000

**PARCEL 18:**

INTENTIONALLY DELETED.

**PARCEL 19:**

INTENTIONALLY DELETED.

**PARCEL 20:**

INTENTIONALLY DELETED.

**PARCEL 21:**

THE SOUTH 7 FEET OF LOT 6 AND ALL OF LOTS 7, 8 AND 9 IN BLOCK 20 IN RIDGELAND, A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND THE NORTHWEST 1/4 AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS (EXCEPTING FROM SAID LOT 6 (EXCEPT THE NORTH 6 FEET) AND SAID LOTS 7, 8 AND 9 THAT PORTION DEDICATED FOR N. HUMPHREY AVENUE BY PLAT OF DEDICATION RECORDED OCTOBER 28, 1994 AS DOCUMENT 94922877).
EXCEPTING THEREFROM THE SOUTH 7 FEET OF LOT 6 AND THE NORTH 1/2 OF LOT 7 IN BLOCK 20 IN RIDGELAND, A SUBDIVISION IN SECTIONS 7 AND 8, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS (EXCEPT THEREFROM THAT PORTION DEDICATED FOR N. HUMPHREY AVENUE BY PLAT OF DEDICATION RECORDED OCTOBER 28, 1994 AS DOCUMENT 94922877).
AND EXCEPTING THEREFROM LOT 6 (EXCEPT THE NORTH 6 FEET AND EXCEPT THE SOUTH 7 FEET THEREOF) IN BLOCK 20 IN RIDGELAND, A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND THE NORTH WEST 1/4 AND THE WEST 1/2 OF THE

WEST 1/2 OF THE SOUTH WEST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN:    16-08-116-024-0000;    16-08-116-025-0000;    16-08-116-026-0000

**PARCEL 22:**

THOSE PORTIONS OF HUMPHREY AVENUE AND EAST WEST PUBLIC ALLEY VACATED BY ORDINANCE RECORDED MARCH 2, 2007 AS DOCUMENT NUMBER 0706134053 DESCRIBED AS FOLLOWS:

THAT PART OF HUMPHREY AVENUE RIGHT-OF-WAY LYING NORTH OF ONTARIO STREET IN THE EAST 1/2 OF THE NORTHWEST 1/4 OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTH LINE OF ONTARIO STREET AND THE WEST LINE OF HUMPHREY AVENUE (AS DEDICATED PER DOCUMENT 94922877); THENCE NORTH ALONG THE WEST LINE OF HUMPHREY AVENUE AS DEDICATED BY DOCUMENT 94922877 A

DISTANCE OF 237.94 FEET; THENCE EAST PARALLEL WITH THE NORTH LINE OF ONTARIO STREET, 14.00 FEET TO A POINT ON THE EAST LINE OF LOT 6 IN BLOCK 20 IN VILLAGE OF RIDGELAND SUBDIVISION, THENCE NORTH ALONG THE EAST LINE OF SAID LOT 6 AND LOT 5 IN BLOCK 20 IN SAID VILLAGE OF RIDGELAND (SAID EAST LINE OF LOTS 5 AND 6 ALSO BEING THE WEST LINE OF HUMPHREY AVENUE) A DISTANCE OF 57.28 FEET; THENCE EAST PARALLEL WITH SAID NORTH LINE OF ONTARIO STREET A DISTANCE OF 24.00 FEET; THENCE NORTH PARALLEL WITH SAID WEST LINE OF HUMPHREY AVENUE 29.98 FEET TO A POINT OF CURVATURE; THENCE EASTERLY ALONG A CURVE TO THE RIGHT, TANGENT TO THE LAST DESCRIBED LINE AND HAVING A RADIUS OF 30.00 FEET FOR AN ARC DISTANCE OF 78.57 FEET TO A POINT ON THE EAST LINE OF SAID HUMPHREY AVENUE; THENCE SOUTHEASTERLY AND SOUTHWESTERLY 31.34 FEET ALONG THE ARC OF A CIRCLE CONVEX EASTERLY, HAVING A RADIUS OF 30.00 FEET AND A CHORD DIMENSION OF 29.93 FEET TO A POINT ON THE EAST LINE OF HUMPHREY AVENUE; THENCE SOUTH ALONG SAID EAST LINE, 72.46 FEET; THENCE WEST PARALLEL WITH THE NORTH LINE OF ONTARIO STREET, 14.00 FEET; THENCE SOUTH ALONG A LINE 14.00 FEET WEST OF AND PARALLEL WITH SAID EAST LINE OF HUMPHREY AVENUE A DISTANCE OF 237.97 FEET TO A POINT ON THE NORTH LINE OF ONTARIO STREET; THENCE WEST ALONG SAID NORTH LINE OF ONTARIO STREET 80.00 FEET TO THE POINT OF BEGINNING,

ALSO,

ALL THAT PART OF THE EAST AND WEST 10.00 FOOT PUBLIC ALLEY LYING SOUTH OF THE SOUTH LINE OF LOT 7 AND ITS EASTERLY EXTENSION TO THE WEST LINE OF LOT 4 IN THE RESUBDIVISION OF LOTS 1 TO 4 IN BLOCK 20 IN THE VILLAGE OF RIDGELAND, BEING A SUBDIVISION OF THE EAST 1/2 OF THE EAST 1/2 OF SECTION 7 AND THE NORTHWEST 1/4 AND THE WEST 1/2 OF THE WEST 1/2 OF THE SOUTHWEST 1/4 QUARTER OF SECTION 8, TOWNSHIP 39 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

PIN:    Part of 16-08-116-012-0000; Part of 16-08-116-017-0000;  Part of 16-08-116-019-0000
        Part of 16-08-116-020-0000; Part of 16-08-116-021-0000; Part of 16-08-116-022-0000;
        Part of 16-08-116-023-0000; Part of 16-08-116-024-0000; Part of 16-08-116-025-0000;
        Part of 16-08-116-026-0000

Deed
West Suburban Medical Center

9

## River Forest Holdings, LLC

PARCEL 1:

THAT PART FOR THE FOLLOWING DESCRIBED TRACT OF LAND, LYING EAST OF A LINE DRAWN PERPENDICULAR TO THE NORTH LINE OF THE SOUTH 50.00 FEET OF SAID TRACT (BEING THE NORTH LINE OF CENTRAL AVENUE) AND THROUGH A POINT OF SAID NORTH LINE THAT IS 222.25 FEET WEST, (AS MEASURED ALONG SAID NORTH LINE) ON THE EAST LINE OF SAID TRACT AND LYING NORTH OF AND ADJOINING THE NORTH LINE OF SAID SOUTH 50.00 FEET THEREOF, SAID TRACT OF LAND BEING DESCRIBED AS:

THAT PART OF THE SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 12, TOWNSHIP 39 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EAST LINE OF THE SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION, 63.88 FEET NORTH OF THE SOUTH LINE OF SAID NORTHEAST 1/4, SAID POINT BEING AT THE INTERSECTION OF THE NORTH LINE OF THE RIGHT OF WAY OF THE CHICAGO AND NORTHWESTERN RAILWAY COMPANY, WITH THE EAST LINE OF THE SAID SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION; THENCE NORTH ALONG THE EAST LINE OF SAID SOUTHWEST 1/4 OF SAID NORTHEAST 1/4 OF SAID SECTION, A DISTANCE OF 271.4 FEET: THENCE WEST AND PARALLEL WITH THE SOUTH LINE OF SAID SOUTHWEST 1/4 OF SAID NORTHEAST 1/4 OF SAID SECTION TO A POINT 575-1/2 FEET EAST OF THE WEST LINE OF SAID NORTHEAST 1/4 OF SAID SECTION; THENCE SOUTH PARALLEL WITH THE WEST LINE OF SAID NORTHEAST 1/4 OF SAID SECTION TO SAID NORTH LINE OF THE RIGHT OF WAY OF SAID CHICAGO AND NORTHWESTERN RAILWAY COMPANY; THENCE EAST ALONG THE NORTH LINE OF SAID RIGHT OF WAY TO THE PLACE OF BEGINNING, (EXCEPTING THEREFROM ANY PORTION OF SAID PREMISES LYING NORTH OF A LINE 15 RODS SOUTH OF AND PARALLEL TO THE CENTERLINE OF LAKE STREET), AND EXCEPT THAT PART DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EAST LINE OF THE SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION, 63.88 FEET NORTH OF THE SOUTH LINE OF SAID NORTHEAST 1/4, SAID POINT BEGINNING AT THE INTERSECTION OF THE NORTH LINE OF THE RIGHT OF WAY OF THE CHICAGO AND NORTHWESTERN RAILROAD COMPANY WITH THE EAST LINE OF SAID SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION; THENCE NORTH ALONG THE EAST LINE OF SAID SOUTHWEST 1/4 OF SAID NORTHEAST 1/4 OF SAID SECTION, A DISTANCE OF 50.00 FEET AND THENCE CONTINUING NORTH ALONG THE EAST LINE OF SAID SOUTHWEST 1/4 OF SAID NORTHEAST 1/4 OF SAID SECTION, A DISTANCE OF 221.40 FEET TO A POINT 271.40 FEET

10

Deed
River Forest MOB

NORTH OF SAID POINT OF BEGINNING, SAID POINT BEING AT A POINT 247.5 FEET SOUTH OF THE CENTERLINE OF LAKE STREET; THENCE WEST ON A LINE 247.5 FEET SOUTH OF AND PARALLEL TO THE CENTERLINE OF LAKE STREET, FOR A DISTANCE OF 246.52 FEET AND THENCE SOUTH, 217.71 FEET TO THE NORTH LINE OF CENTRAL AVENUE AT A POINT 248.67 FEET WEST OF THE EAST LINE OF THE SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION 12; THENCE CONTINUING SOUTH ON A PROLONGATION OF THE LAST DESCRIBED LINE TO THE SAID NORTH LINE OF THE RIGHT OF WAY OF SAID CHICAGO AND NORTHWESTERN RAILROAD COMPANY; THENCE EAST ALONG THE NORTH LINE OF SAID RIGHT OF WAY TO THE POINT OF BEGINNING, IN COOK COUNTY, ILLINOIS.

PARCEL 2:

THAT PART OF THE NORTHEAST 1/4 OF SECTION 12, TOWNSHIP 39 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF THE WEST 1/2 OF THE NORTHEAST 1/4 OF SAID SECTION 12; THENCE NORTH ALONG THE EAST LINE OF SAID WEST 1/2 OF THE NORTHEAST 1/4, A DISTANCE OF 336-1/2 FEET TO A POINT, WHICH IS 247-1/2 FEET SOUTH OF THE CENTER LINEOF LAKE STREET AS A PLACE OF BEGINNING; THENCE NORTH ALONG SAID EAST LINE 247-1/2 FEET TO THE CENTERLINE OF LAKE STREET; THENCE WEST ALONG THE CENTERLINE OF LAKE STREET, A DISTANCE OF 296.00 FEET; THENCE SOUTH PARALLEL WITH THE SAID EAST LINE, A DISTANCE OF 247-1/2 FEET; THENCE EAST, 296.00 FEET TO THE PLACE OF BEGINNING, (EXCEPTING FROM SAID TRACT THOSE PORTIONS THEREOF, FALLING IN STREETS AND HIGHWAYS), IN COOK COUNTY, ILLINOIS.

PARCEL 3:

THAT PART OF THE SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SECTION 12, TOWNSHIP 39 NORTH, RANGE 12,EAST OF THE THIRD PRINCIPAL MERIDIAN, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EAST LINE OF THE SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION, A DISTANCE OF 63.88 FEET NORTH OF THE SOUTH LINE OF SAID NORTHEAST 1/4, SAID POINT BEING AT THE INTERSECTION OF THE NORTH LINE OF THE RIGHT OF WAY OF THE CHICAGO AND NORTHWESTERN RAILROAD COMPANY, WITH THE EAST LINE OF SAID SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION; THENCE NORTH ALONG THE EAST LINE OF SAID SOUTHWEST 1/4 OF SAID NORTHEAST 1/4 OF SAID SECTION, A DISTANCE OF 50.00 FEET AND THENCE CONTINUING NORTH ALONG THE EAST LINE OF SAID SOUTHWEST 1/4 OF SAID NORTHEAST 1/4 OF SAID SECTION, A DISTANCE OF 221.40 FEET TO A POINT 271.40 FEET

R FOREST

*Merlyn Scott* (signature)

Deed
River Forest MOB

11

NORTH OF SAID POINT OF BEGINNING, SAID POINT BEING AT A POINT 247.5 FEET SOUTH OF THE CENTERLINE OF LAKE STREET; THENCE WEST ON A LINE 247.5 FEET SOUTH OF AND PARALLEL TO THE CENTERLINE OF LAKE STREET, FOR A DISTANCE OF 246.52 FEET AND THENCE SOUTH 217.71 FEET TO THE NORTH LINE OF CENTRAL AVENUE AT A POINT 248.67 FEET WEST OF THE EAST LINE OF THE SOUTHWEST 1/4 OF THE NORTHEAST 1/4 OF SAID SECTION 12; THENCE CONTINUING SOUTH ON A PROLONGATION OF THE LAST DESCRIBED LINE TO THE SAID NORTH LINE OF THE RIGHT OF WAY OF SAID CHICAGO AND NORTHWESTERN RAILROAD COMPANY; THENCE EAST ALONG THE NORTH LINE OF SAID RIGHT OF WAY TO THE POINT OF BEGINNING, (EXCEPTING FROM SAID TRACT THOSE PORTIONS THEREOF, FALLING IN STREETS AND HIGHWAY), IN COOK COUNTY, ILLINOIS.

Permanent Index No.: 15-12-220-038-0000

12

Deed
River Forest MOB

## Weiss Property Holdings, LLC

All that certain lot or parcel of land situate in the City of Chicago, County of Cook, State of Illinois, and being more particularly described as follows:

PARCEL 1:

THAT PART OF LOT 1 IN THE SUPERIOR COURT PARTITION OF THE SOUTH 1531 FEET OF LOT 1 (EXCEPT SO MUCH THEREOF AS WAS CONVEYED TO DEVOTION C. EDDY BY DEED DATED FEBRUARY 10, 1855 AND RECORDED FEBRUARY 13, 1855 IN BOOK 80 AT PAGE 538) WITH ACCRETIONS THERETO, IN SCHOOL TRUSTEES SUBDIVISION OF FRACTIONAL SECTION 16, TOWNSHIP 40 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING EAST OF THE EAST LINE OF NORTH CLARENDON AVENUE, LYING SOUTH OF THE SOUTH LINE OF WEST LELAND AVENUE AS OPENED BY CITY ORDINANCE PASSED OCTOBER 17, 1923, AND LYING WEST OF THE WESTERLY BOUNDARY LINE OF LINCOLN PARK, AS ESTABLISHED BY AGREEMENT BETWEEN THE LINCOLN PARK COMMISSIONERS AND THE OWNERS OF LOT 1 IN SUPERIOR COURT PARTITION AFORESAID, IN COOK COUNTY, ILLINOIS.

TOGETHER WITH THE SOUTH ½ OF THAT PART OF WEST LELAND AVENUE LYING EAST OF THE EAST LINE OF NORTH CLARENDON AVENUE AND WESTERLY OF THE WESTERLY LINE OF NORTH MARINE DRIVE, AS VACATED BY SUBSTITUTE ORDIANCE RECORDED JANUARY 14, 2005 AS DOCUMENT 0501422209 AND SUBSTITUTE ORDINANCE RECORDED JUNE 13, 2015 AS DOCUMENT 0516439110.

PIN: 14-16-102-001-0000

PARCEL 2:

THAT PART OF LOT 2 IN THE SUPERIOR COURT PARTITION OF THE SOUTH 1531 FEET OF LOT 1 (EXCEPT SO MUCH THEREOF AS WAS CONVEYED TO DEVOTION C. EDDY BY DEED DATED FEBRUARY 10, 1855 AND RECORDED FEBRUARY 13, 1855 IN BOOK 80 AT PAGE 538) WITH ACCRETIONS THERETO, IN SCHOOL TRUSTEES SUBDIVISION OF FRACTIONAL SECTION 16, TOWNSHIP 40 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING EAST OF THE EAST LINE OF NORTH CLARENDON AVENUE, LYING NORTH OF THE NORTH LINE OF LOT 25 IN EDDY'S SUBDIVISION OF THE SOUTH 10 RODS OF THE NORTH 80 RODS OF THE EAST 1/2 OF THE NORTHEAST 1/4 OF SECTION 17, TOWNSHIP 40 NORTH, RANGE 14 (EXCEPT THE NORTH 8.0 FEET THEREOF), TOGETHER WITH THAT PART OF SECTION 16 LYING EAST AND ADJOINING SAID 10 RODS, ALL IN TOWNSHIP 40 NORTH, RANGE 14 EAST AFORESAID, AND LYING WEST OF THE WESTERLY BOUNDARY LINE OF LINCOLN PARK, AS ESTABLISHED BY AGREEMENT BETWEEN THE LINCOLN PARK COMMISSIONERS AND THE OWNER OF LOT 2 IN SUPERIOR COURT PARTITION AFORESAID, IN COOK COUNTY, ILLINOIS.

PIN: 14-16-102-008-0000

Deed
Weiss Memorial Hospital

PARCEL 3: **Parcel 3 Intentionally Omitted**

~~THAT PART OF LOT 25 TOGETHER WITH ACCRETIONS THERETO, LYING WEST OF THE WESTERLY BOUNDARY LINE OF LINCOLN PARK, AS ESTABLISHED BY AGREEMENT BETWEEN THE LINCOLN PARK COMMISSIONERS AND THE OWNER OF SAID LOT 25 AFORESAID, IN EDDY'S SUBDIVISION OF THE SOUTH 10 RODS OF THE NORTH 80 RODS OF THE EAST 1/2 OF THE NORTHEAST 1/4 OF SECTION 17 (EXCEPT THE NORTH 8.0 FEET THEREOF) TOGETHER WITH THAT PART OF SECTION 16 LYING EAST OF AND ADJOINING SAID 10 RODS, ALL IN TOWNSHIP 40 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.~~

~~PIN: 14-16-102-004-0000; 14-16-102-005-0000~~

PARCEL 4:

LOTS 1, 2, 3, 4 AND 5 (EXCEPT THE WEST 16 FEET OF SAID LOT 5 ALLEY) IN JOHN N. YOUNG'S SUBDIVISION OF THE SOUTH 5 ACRES OF THE NORTH 25 ACRES OF THE EAST 1/2 OF THE NORTHEAST 1/4 OF SECTION 19, TOWNSHIP 40 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

AND

LOTS 1, 2, 3, 4 AND 5 (EXCEPT THE WEST 16 FEET OF SAID LOT 5 FOR ALLEY) IN H.A. GOODRICHS SUBDIVISION OF THE SOUTH 10 RODS OF THE NORTH 60 RODS OF THE EAST 1/2 OF THE NORTHEAST 1/4 OF SECTION 17, TOWNSHIP 40 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, TOGETHER WITH THE VACATED ALLEY LYING SOUTH OF AND ADJOINING LOTS 1, 2, 3, 4 AND 5 (EXCEPT THE WEST 16 FEET OF SAID LOT 5 FOR ALLEY) IN JOHN N. YOUNG'S SUBDIVISION AFORESAID AND LYING NORTH OF LOTS 1, 2, 3, 4 AND 5 (EXCEPT THE WEST 16 FEET OF SAID LOT 5 FOR ALLEY) IN H.A. GOODRICHS SUBDIVISION AFORESAID, ALL IN COOK COUNTY, ILLINOIS.

PIN: 14-17-213-025-0000; 14-17-213-026-0000

PARCEL 5

THAT PART OF THE NORTH HALF OF VACATED WEST LELAND AVENUE, LYING EAST OF THE EAST LINE OF NORTH CLARENDON AVENUE AND WESTERLY OF THE WESTERLY LINE OF NORTH MARINE DRIVE, AS VACATED BY SUBSTITUTE ORDINANCE RECORDED JANUARY 14, 2005 AS DOCUMENT 0501422209 AND BY SUBSTITUTE ORDINANCE RECORDED JUNE 13, 2005 AS DOCUMENT 0516439110 AND ALSO BEING DESCRIBED AS A PORTION OF THE NORTH 66 FEET OF THE SOUTH 123.75 FEET OF LOT 1 IN PARTITION OF THE SOUTH 1531 FEET OF LOT 1 IN SCHOOL TRUSTEES' SUBDIVISION OF FRACTIONAL SECTION 16, TOWNSHIP 40 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING SOUTH OF A LINE DRAWN FROM A POINT 31.12 FEET SOUTH FROM THE INTERSECTION OF THE NORTH LINE OF THE SOUTH 123.75 FEET OF LOT 1 AFORESAID, BEING ALSO THE NORTH LINE OF VACATED WEST LELAND AVENUE AFORESAID, WITH THE EAST LINE OF NORTH CLARENDON AVENUE AFORESAID, AS MEASURED ALONG SAID EAST LINE, TO A POINT 31.51 FEET SOUTHERLY FROM THE INTERSECTION OF THE NORTH LINE OF THE SOUTH 123.75 FEET OF LOT 1 AFORESAID WITH THE WESTERLY LINE OF NORTH MARINE DRIVE, AS MEASURED ALONG SAID WESTERLY LINE, IN COOK COUNTY ILLINOIS.

PIN: 14-16-101-001-0000; 14-16-102-001-0000

Quit Claim Deed
Weiss Memorial Hospital

## Weiss MOB Property Holdings, LLC

Parcel 1:

Lot 1 (except the South 123.75 feet and except that part thereof included in Lakeside Place Superior Court Partition of the South 1531 feet of Lot 1, except so much thereof as was conveyed to Devotion C. Eddy by Deed dated February 10, 1855 and recorded February 13, 1855 in Book 80, Page 338) in School Trustee's Subdivision of Fractional Section 16, Township 40 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois; being also described as follows:

Lot 1 (except the North 28 feet thereof taken for Lakeside Place and except the South 123.75 feet thereof as measured along the West line of said Lot) according to the Plat thereof filed as Document 88095 in the Superior Court partition of part of the South 1531 feet of Lot 1 in the School Trustee's Subdivision of Fractional Section 16, Township 40 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois;

Parcel 2:

The North half of that part of West Leland Avenue lying East of the East line of North Clarendon Avenue and Westerly of the Westerly line of North Marine Drive (being a tract lying North of a line commencing at a point that is equidistant from the Northwest and Southwest corners thereof and extended due East to the Westerly line of North Marine Drive), and also being described as a portion of the North 66 feet of the South 123.75 feet of Lot 1 in partition of the South 1531 feet of Lot 1 in School Trustee's Subdivision of fractional Section 16, Township 40 North, Range 14, East of the Third Principal Meridian, as vacated by Substitute Ordinance recorded January 14, 2005 as Document 0501422209, in Cook County, Illinois.

excluding from the foregoing that part of the North half of vacated West Leland Avenue, lying East of the East line of North Clarendon Avenue and Westerly of the Westerly line of North Marine Drive, as vacated by substitute ordinance recorded January 14, 2005 as document number 0501422209 and by substitute ordinance recorded June 13, 2005 as document number 0516439110 and also being described as a portion of the North 66 feet of the South 123.75 feet of Lot 1 in partition of the South 1531 feet of Lot 1 in School Trustee's Subdivision of fractional Section 16, Township 40 North, Range 14, East of the Third Principal Meridian, lying South of a line drawn from a point 31.12 feet South from the intersection of the North line of the South 123.75 feet of Lot 1 aforesaid, being also the North line of vacated West Leland Avenue aforesaid, with the East line of North Clarendon Avenue aforesaid, as measured along said East line, to a point 31.51 feet Southerly from the intersection of the North line of the South 123.75 feet of Lot 1 aforesaid with the Westerly line of North Marine Drive, as measured along said Westerly line, in Cook County, Illinois.

Deed
Weiss MOB

16

**EXHIBIT B**

**FORM OF SPECIAL WARRANTY DEED**

---

*(Space Above for Recorder's Use)*

| Prepared by: | Mail recorded document to: | Send subsequent tax bills to: |
|---|---|---|
| Duane Morris LLP<br>1075 Peachtree Street NE<br>Suite 1700<br>Atlanta, GA 30309-39291<br>Attention Kirk Domescik | | |

P.I.N.: _____
[_____]

**SPECIAL WARRANTY DEED**

**THIS INDENTURE**, made as of _____ ___, 2022, between **[PIPELINE ENTITY: _____],** a Delaware limited liability company, party of the first part ("Grantor"), [successor by merger to _____], and **[BUYER ENTITY: _____],** a _____, party of the second part ("Grantee").

**WITNESSETH**, that Grantor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration in hand paid, by Grantee, the receipt of which is hereby acknowledged, by these presents does **REMISE, RELEASE, ALIENATE AND CONVEY** unto Grantee, **FOREVER**, all the following described real estate, situated in the County of Cook and State of Illinois, known and described on **Exhibit A** attached hereto and made a part hereof, together with all and singular the hereditaments and appurtenances belonging thereto, or in any way appertaining, and the reversion or reversions, remainder or remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim or demand whatsoever, of Grantor, either at law or in equity of, in and to the above-described premises.

**TO HAVE AND TO HOLD** the said premises as described above, unto Grantee, its successors and assigns, in fee simple, forever.

And the Grantor, for itself and its successors, does covenant, promise and agree to and with Grantee and its successors that it has not done or suffered to be done anything whereby the said premises hereby granted are, or may be, in any manner encumbered or charged, except as herein recited; and that it is lawfully seized of said premises in fee simple; and that it **WILL WARRANT AND DEFEND** said premises against all persons lawfully claiming, or to claim the same, by, through or under Grantor, subject only to the matters set forth on **Exhibit B** attached hereto and made a part hereof, but not otherwise.

Exhibit B

DM3\8385359.26

[Signature on Following Page]

**IN WITNESS WHEREOF**, said party of the first part has executed and sealed this Deed, the day and year first above written.

**[PIPELINE ENTITY: _____]**, a
Delaware limited liability company


By:_____
        Name: Nicholas Orzano
        Title:  Authorized Signatory



This Instrument Prepared by:

Duane Morris LLP
1075 Peachtree Street NE, Suite 1700
Atlanta, GA 30309-39291
Attention:  Kirk Domescik

Send Subsequent Tax Bills to:

[Buyer Entity: _____]
[_____]
[_____]
Attention: _____

Mail recorded document to:

[Buyer Entity: _____]
[_____]
[_____]
Attention: _____

Exhibit B

DM3\8385359.26

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
Los Angeles County

On _____, 2022, before me,_____ (here insert name and title of officer),  personally appeared Nicholas Orzano, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the  within  instrument  and  acknowledged  to  me  that  he/she/they executed  the  same  in  his/her/their  authorized  capacity(ies),  and  that  by  his/her/their signature(s)  on  the  instrument  the  person(s),  or  the  entity  upon  behalf  of  which  the person(s) acted, executed the instrument.

I certify  under  PENALTY  OF  PERJURY  under  the  laws  of  the  State  of  California  that the foregoing paragraph is true and correct

WITNESS my hand and official seal.


Signature _____          (Seal)


Exhibit B

DM3\8385359.26

**EXHIBIT A**

**LEGAL DESCRIPTION**

[LEGAL DESCRIPTION AND PIN TO BE INSERTED]

Legal Description:

PIN: _____

DM3\8385359.26

**EXHIBIT B**

**PERMITTED EXCEPTIONS**

1.      Real Estate Ad Valorem Taxes for the year [202__] and subsequent years, not yet due and payable.

2.      [reserved]

3.      Rights of tenants (and subtenants) and/or lessees (and sublessees) in possession under any recorded or unrecorded leases or rental agreements.

4.      Zoning regulations and building laws, ordinances and regulations, and other similar laws now or hereinafter in effect and applicable to the real property conveyed hereby.

5.      [reserved]

        ATTACH TITLE COMMITMENT EXCEPTIONS AND SURVEY REFERENCES

DM3\8385359.26

## EXHIBIT C

## FORM OF

## ASSIGNMENT AND ASSUMPTION OF LANDLORD'S INTEREST IN LEASES

This **ASSIGNMENT AND ASSUMPTION OF LANDLORD'S INTEREST IN LEASES** (the "**Assignment**") is made as of _____, 2022 (the "**Effective Time**"), between _____, a Delaware limited liability company ("**Assignor**"), and _____, a _____ ("**Assignee**").

For and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration to it in hand paid by Assignee to Assignor, and the mutual covenants herein contained, the receipt and sufficiency of the foregoing consideration being hereby acknowledged by the parties hereto, Assignor hereby assigns, transfers, sets over and conveys to Assignee, as of the Effective Time, all of Assignor's right, title and interest, as landlord, in, to and under all those lease and occupancy agreements described on Schedule I attached hereto and incorporated herein by this reference (each, a "**Lessor Lease**", and collectively, the "**Lessor Leases**"), together with all security deposits tendered under the Lessor Leases and remaining in the possession of Assignor.  This Assignment is executed and delivered pursuant to that certain Real Estate Asset Purchase Agreement among Assignor, certain Affiliates of Assignor and _____ _____, dated as of_____, 2022 (as at any time amended, modified or restated, the "**Asset Purchase Agreement**").  Capitalized terms used in this Assignment, unless otherwise defined herein, have the respective meanings assigned to them in the Asset Purchase Agreement.

Assignee hereby accepts the assignment from the Assignor of the Lessor Leases, and Assignee does hereby assume and agree to perform all of Assignor's obligations as landlord under or with respect to the Lessor Leases accruing from and after the Effective Time, which obligations (if any) are expressly stated in a Lessor Lease and which are due or payable from and after the Effective Time with respect to the Lessor Leases, and claims made by tenants with respect to the tenants' security deposits (i) only to the extent such security deposits were tendered to Assignee, or (ii) credited for the account of Assignee by Assignor at Closing under the Asset Purchase Agreement.  Assignee further acknowledges that it has not received hereunder any security deposits previously applied by Assignor in accordance with the terms of the Lessor Leases and that Assignor has no obligation to replenish any security deposits which have been so applied by Assignor.  Assignor shall remain liable for all of Assignor's obligations under or with respect to the Lessor Leases accruing prior to the Effective Time.

This Assignment is subject to the terms, conditions and limitations of the Asset Purchase Agreement to the extent such terms expressly survive closing, including, without limitation, the provisions thereof concerning each party's duties of indemnification with respect to the assignment and assumption of the Lessor Leases made hereunder.  Nothing in this Assignment shall be deemed to supersede, enlarge or modify any of the provisions of the Asset Purchase

Exhibit C

Agreement, which shall survive the execution and delivery of this Assignment solely to the extent expressly provided in, and subject to, the limitations set forth in the Asset Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern and control.

This Assignment is not intended to, and does not, in any way ratify, extend or renew the Lessor Leases or any obligation thereunder that has terminated or expired pursuant to its terms or otherwise.

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to its conflicts of laws principles.

To the extent consistent with the terms and conditions of the Asset Purchase Agreement, the parties hereby agree to take such additional actions and to execute, acknowledge and deliver any and all other acts, instruments or other documents as may reasonably be required to effect the intent and purposes of this Assignment and the transactions contemplated hereby and/or by the Asset Purchase Agreement.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document with the same effect as if such signatures were on the same page. Signatures received via facsimile or other electronic transmission shall be accepted as originals.

*(Remainder of Page Intentionally Left Blank)*

Exhibit C

DM3\8385359.26

       **IN WITNESS WHEREOF**, Assignor and Assignee have each executed this Assignment as of the date first written above.

<div align="right">

**ASSIGNOR:**

_____, a Delaware
limited liability company

By:_____
   Nicholas Orzano
   Authorized Signatory

**ASSIGNEE:**

_____, a _____

By:_____
Name:
Title:

</div>

<div align="center">Exhibit C</div>

DM3\8385359.26

**SCHEDULE 1 TO**

**ASSIGNMENT AND ASSUMPTION OF LANDLORD'S INTEREST IN LEASES**

**LESSOR LEASES**

## EXHIBIT D

## FORM OF

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This **BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "**Agreement**") is made as of _____, 2022 (the "**Effective Date**") by and between _____, a Delaware limited liability company (the "**Assignor**") and_____, a _____ (the "**Assignee**").

**WHEREAS**, this Agreement is being executed in connection with the transactions contemplated under that certain Real Estate Asset Purchase Agreement dated as of _____ _____, 2022 by and among Assignor, certain Affiliates of Assignor and _____ _____, dated as of_____, 2022 (as at any time amended, modified or restated, the "**Asset Purchase Agreement**").  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Asset Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual agreements contained in this Agreement and the Asset Purchase Agreement, the parties hereto agree as follows:

1.      Transfer of Assets. On and subject to the terms and conditions set forth in the Asset Purchase Agreement, as of the Effective Date, Assignor hereby grants, sells, transfers and assigns to the Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Assigned Real Property Purchased Assets (as hereinafter defined).

2.      Assignment and Assumption. On and subject to the terms and conditions set forth in the Asset Purchase Agreement, as of the Effective Date, (a) Assignor hereby assigns, conveys and transfers to Assignee, and Assignee hereby accepts and assumes, all of the rights, obligations and liabilities of Assignor described in Sections 2.1(d), 2.1(e) and 2.1(f) of the Asset Purchase Agreement that relate to the Assigned Real Property Purchased Assets.  For purposes of this Agreement,  "**Assigned Real Property Purchased Assets**" means that portion of the Purchased Assets which constitute tangible or intangible personal property relating to real property (including, without limitation, building permits, as-built plans and specifications and other construction drawings, and certificates of occupancy (other than certificates of occupancy for tenant spaces)) and used solely in connection with the operation or maintenance of the land, buildings, fixtures and other improvements being transferred at the Closing to Assignee, as grantee

3.      Binding Effect. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

4.      Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to its conflicts of laws principles.

Exhibit D

Case 22-90291   Document 534-1   Filed in TXSB on 11/22/22   Page 307 of 405

Page 373 of 443


5.      Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document with the same effect as if such signatures were on the same page. Signatures received via facsimile or other electronic transmission shall be accepted as originals.

6.      Asset Purchase Agreement Controls. In the event of any conflict or inconsistency between the terms of this Agreement and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern and control.

7.      No Third-Party Beneficiaries. This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon third parties any remedy, claim, liability, reimbursement, claim of action or other right in excess of those existing without reference to this Agreement.

8.      Severability. Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement, and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

9.      Amendment. Neither this Agreement nor any term hereof may be amended, waived, discharged or terminated, except by a written instrument duly executed on behalf of each party hereto by its duly authorized officer or employee (or other authorized person).

10.     Descriptive Headings. The division of this Agreement into sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

*[Signature Page Follows]*

Exhibit D

DM3\8385359.26

IN WITNESS WHEREOF, Assignor and Assignee have duly executed this Agreement as of the date first above written.

**ASSIGNOR:**

_____, a Delaware limited liability company

By:_____
    Nicholas Orzano
    Authorized Signatory

**ASSIGNEE:**

_____, a _____

By:_____
Name:
Title:

Exhibit D

DM3\8385359.26

## EXHIBIT E

## FORM OF OWNER'S AFFIDAVIT

**Commitment No.:** _ _ _ _ _ _ _ _ _ _ _

THIS STATEMENT (the "**Statement**") is entered into as of the _____ day of _____ _____, 2022 (the "**Effective Date**"), by [**SELLER NAME**]_____, a Delaware limited liability company (the "**Seller**") for the benefit of Chicago Title Insurance Company (the "**Title Company**").

WHEREAS, the Title Company has issued that certain commitment No. _____ _____) for an owner's policy of title insurance (the "**Commitment**") to [Ramco Healthcare Holdings, LLC], a Delaware limited liability company (the "**Buyer**") with respect to that certain real property located in Cook County, Illinois and more particularly described on Schedule __ to the Tile Commitments (the "**Property**").

NOW THEREFORE, to the actual knowledge and belief of the undersigned, the following is hereby certified with respect to the Property described in the above Commitment.

1.  That, other than as is disclosed in the Commitment and as is noted at the end of this paragraph, within the last six (6) months (a) no labor, service or materials have been furnished to improve the land, or to rehabilitate, repair, refurbish, or remodel the building(s) situated on the land by or on behalf of Seller; (b) nor have any goods, chattels, machinery, apparatus or equipment been attached to the building(s) thereon, as fixtures by or on behalf of Seller; (c) nor have any contracts been let for the furnishing of labor, service, materials, machinery, apparatus or equipment which are to be completed subsequent to the date hereof by or on behalf of Seller; (d) nor have any notices of lien been received by or on behalf of Seller with respect to any of the foregoing described items or other than with respect to such work or other described matters that has and continues to be carried out in the ordinary course of Seller's business as owner of the Property that remain unpaid or for which the Seller shall remain liable, and except the following, if any, provided that no statement is given with respect to any of the foregoing work or matters by or on behalf any of the tenants occupying any of the Property:

2.  There are no unrecorded revolving credit mortgages, line of credit mortgages, home equity loan mortgages or other voluntary liens or mortgages encumbering Seller's title to the Property, other than those shown on Schedule B of the Commitment, except the following, if any:

3.  That all property management fees owed by Seller, if any, are fully paid, except the following:

4.  That there are no unrecorded security agreements, leases, financing statements, chattel mortgages or conditional sales agreements in respect to any of Seller's interest in appliances, equipment or chattels that have or are to become attached to the Property as fixtures, other than those shown on Schedule B of the Commitment, except the following, if any:

5.  That there are no unrecorded contracts or options to purchase the Property to which Seller is a party, except the following, if any:

Exhibit E

DM3\8385359.26

6.   That there are no unrecorded leases, easements or other servitudes to which Seller is a party with respect to which the land or buildings, or portions thereof, are subject, except as is set forth on **Exhibit A**.

7.   Intentionally Omitted

8.   Intentionally Omitted

The undersigned makes the above statement solely for the purpose of inducing Chicago Title Insurance Company to issue its owner's policy of title insurance pursuant to the above Commitment and may not be relied upon by any other person or entity.

IN WITNESS WHEREOF, the undersigned has executed this document on the date(s) set forth below.

**SELLER:**

[**Seller Name**], a Delaware limited liability company

BY:_____
Name:
Title:

Subscribed and sworn to before me this ___of_____, _____.
_____, _____.

_____          _____

                                                        Notary Public

Exhibit E

DM3\8385359.26

## EXHIBIT A

## UNRECORDED LEASES, EASEMENTS OR OTHER SERVITUDES

Exhibit E

DM3\8385359.26

## EXHIBIT G

## FORM OF TENANT ESTOPPEL CERTIFICATE

_____
_____
Attention: _____

> Re:   Lease between [_____] LLC, a Delaware limited liability company, as Landlord ("**Landlord**"), and _____ as Tenant ("**Tenant**"), dated _____, for approximately _____ square feet of space in the building located at [_____], [_____], Illinois ("**Building**"), as amended, supplemented and/or modified by the amendments, modifications, side letters, guaranties, letters of credit and other documents listed on **Schedule 1** attached hereto (as so amended, supplemented and/or modified, the "**Lease**")

Ladies/Gentlemen:

The undersigned Tenant understands, acknowledges and agrees that _____ ("**Buyer**") is purchasing the Building from Landlord and has obtained or is in the process of obtaining a mortgage loan ("**Loan**") from a lender (together with its successors and assigns, "**Lender**"), and that Landlord, Buyer and Lender and each of their successors and assigns are relying on Tenant's certifications herein and that such certifications shall be binding on the undersigned and the undersigned's successors and assigns.

Tenant hereby certifies to Buyer and Lender and each of their successors and assigns that:

1.      The undersigned is the tenant under the terms of the Lease.  The Lease has commenced pursuant to its terms and is in full force and effect.  Tenant has not given Landlord any notice of termination of the Lease.

2.      There are no amendments, supplements or modifications of any kind to the Lease except as set forth on **Schedule 1**.  The Lease represents the entire agreement between Tenant and Landlord with respect to the leasing and occupancy of the premises leased under the Lease; there are no other promises, agreements, understandings, or commitments of any kind between Landlord and Tenant with respect thereto.

3.      Tenant has not assigned the Lease (or any rights therein) or sublet all or any portion of the leased premises, the undersigned does not hold the leased premises under assignment or sublease, nor does anyone except the undersigned and its employees occupy the leased premises except as follows (if left blank will be deemed "none"):
_____.

4.      Tenant is open for business and in operation in the Building.

5.      To the best of Tenant's knowledge, no uncured default, event of default, or breach by Landlord exists under the Lease, and no facts or circumstances exist that, with the passage of

DM3\8385359.26

time or giving of notice, will or could constitute a default, event of default, or breach by Landlord under the Lease.  Tenant has neither made a claim nor threatened to make a claim against Landlord alleging Landlord's default under the Lease.

6.      Tenant has accepted full possession of its leased premises in the Building.  All of the construction obligations of the Landlord under the Lease have been performed and completed including, without limitation, any obligations of the Landlord to make or to pay the Tenant for any improvements, alterations or work done on the demised premises, and the improvements described in the Lease have been accepted by Tenant.  The common areas of the Building are in compliance with the Lease.

7.      To the best of Tenant's knowledge and belief, there are no rental, lease, or similar commissions payable with respect to the Lease, except as may be expressly set forth therein.

8.      The term of the Lease commenced on _____, the rent commencement date was _____ and the Lease terminates on _____, unless sooner terminated in accordance with the terms of the Lease.  Tenant has no option to renew or extend the Lease term except as follows [list or if none, say "none"]:

_____
_____

9.      The minimum base rent in the monthly amount of $_____ and a monthly operating expense and real estate tax estimate in the amount of $_____ are currently payable under the Lease.

10.     Tenant has paid rent for the leased premises up to and including _____ __, 20___.

11.     No rent under the Lease has been paid more than thirty (30) days in advance of its due date except: _____.

12.     As of the date hereof, Tenant is not entitled to any credits, reductions, offsets, defenses, free rent, rent concessions or abatements of rent under the Lease or otherwise against the payment of rent or other charges under the Lease.

13.     A security deposit in the amount of $_____ has been given by Tenant under the terms of, or with respect to, the Lease.

14.     Tenant has no option, rights of first refusal or other rights to purchase the property of which the premises are a part, or any part thereof.

15.     Tenant has not at any time and does not presently use the leased premises for the generation, manufacture, refining, transportation, treatment, storage or disposal of any hazardous substance or waste or for any purpose that poses a substantial risk of imminent damage to public health or safety or to the environment.

16.     Tenant has received no notice of any prior sale, assignment, pledge or other transfer of the Lease or of the rents received therein, except (if left blank will be deemed "none"): _____.

Exhibit G

DM3\8385359.26

17.     The undersigned representative of Tenant is duly authorized and fully qualified to execute this instrument on behalf of Tenant thereby binding Tenant.

18.     No actions, whether voluntary or otherwise, are pending against the Tenant or any guarantor of the Lease under the bankruptcy laws of the United States or any state and there are no claims or actions pending against the undersigned which if decided against Tenant or any guarantor would materially and adversely affect the Tenant's or guarantor's financial condition or their ability to perform the Tenant's obligations under the Lease.

19.     Tenant acknowledges and agrees that Landlord, Buyer, Lender, their respective successors and assigns, and third parties who are interested in the matters covered by this tenant estoppel certificate, shall be entitled to rely on tenant's certifications set forth herein.

**TENANT**

_____
(please type or print name of Tenant)

By:     _____
Name:
Title:

Acknowledgment of Guarantor [IF APPLICABLE]

The undersigned guarantor of the Tenant's obligations under the Lease pursuant to that certain [Guaranty] dated _____, _____ ("Guaranty"), hereby certifies to Buyer, Lender and each of their successors and assigns that it has no defenses, claims or offsets to enforcement of the Guaranty against the undersigned.

EXECUTED this _____ day of _____, 2021.

**GUARANTOR**:

_____,
a _____

By:     _____

Exhibit G

DM3\8385359.26

**<u>Schedule 1</u>**

**Lease Documents**

Exhibit G

DM3\8385359.26

**EXHIBIT H**

**PIPELINE GUARANTY AGREEMENT**

**GUARANTY AGREEMENT**
**(PIPELINE HEALTH SYSTEM, LLC)**

This Guaranty Agreement (the "**Guaranty**") is entered into as of _____, 2022 (the "**Effective Date**") by **PIPELINE HEALTH SYSTEM, LLC**, a Delaware limited liability company (the "**Guarantor**") in favor of **RAMCO HEALTHCARE HOLDINGS, LLC**. a Delaware limited liability company (the "**Buyer**").

**RECITALS**

**A.** West Suburban Property Holdings LLC, a Delaware limited company, River Forest Property Holdings, LLC, a Delaware limited company, Weiss Property Holdings, LLC, a Delaware limited company, and Weiss MOB Property Holdings, LLC, a Delaware limited company (collectively, the "**Sellers**") and Buyer are parties to that certain Real Estate Asset Purchase Agreement dated as of July ___, 2022 (as amended from time to time, the "**Purchase Agreement**"). All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Purchase Agreement.

**B.** Pursuant to Section 9.2 of the Purchase Agreement, Sellers agree to defend, indemnify and hold harmless the Buyer Indemnified Parties from and against any and all Losses to the extent arising out of or resulting from the matters set forth in Sections 9.2(a), 9.2(b) and 9.2(c) of the Purchase Agreement, but subject to the limitations set forth in Section 9.3 of the Purchase Agreement (collectively, "**Sellers' Indemnity Obligations**").

**C.** As required by Section 9.3(b) of the Purchase Agreement, Guarantor has agreed to guaranty Sellers's Indemnity Obligations, subject to certain limitations set forth in such Section 9.3(b).

**D.** Guarantor is an indirect member of Sellers, and will obtain substantial direct and indirect benefit from the sale contemplated by the Purchase Agreement.

NOW, THEREFORE, to induce Buyer to close on the acquisitions contemplated by the Purchase Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, the Guarantor hereby represents, warrants, covenants and agrees as follows:

**Section 1.     Guaranty Guaranteed Obligations; Termination and Release**

1.1     <u>Unconditional Guaranty of Payment and Performance</u>. In consideration of the foregoing, the Guarantor hereby irrevocably, absolutely and unconditionally guarantees to

Exhibit H

DM3\8385359.26

Buyer the prompt payment and performance when due of Sellers' Indemnity Obligations (collectively, the "**Guarantied Obligations**").

1.2.  Separate Obligations.  These obligations are independent of Sellers' obligations and separate actions may be brought against the Guarantor (whether action is brought against Sellers or whether Sellers are joined in the action).

1.3  Termination and Release.  Buyer must make any claim, if any, against the Guarantor under this Guaranty on or before that date that is twelve (12) months from the Effective Date (the "**Termination Date**") and that other than with respect to any such claim made before the Termination Date, this Guaranty shall be deemed terminated and released, of no further force and effect and the Guarantor shall have no additional obligations hereunder.

**Section 2.     Representations and Warranties; Covenants.**

2.1     Guarantor hereby represents and warrants that:

(a)     The Guarantor (i) is duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) is duly qualified to do business and is in good standing in every jurisdiction where the nature of its business requires it to be so qualified (except where the failure to so qualify would not have a material adverse effect on the Guarantor's condition, financial or otherwise, or on the Guarantor's ability to pay or perform the obligations hereunder); and (iii) has all requisite power and authority to execute and deliver this Guaranty and to perform its obligations hereunder.

(b)     The execution, delivery and performance by the Guarantor of this Guaranty (i) are within the Guarantor's powers and have been duly authorized by all necessary action; (ii) do not contravene the Guarantor's charter documents or any law or any contractual restriction binding on or affecting the Guarantor or by which the Guarantor's property may be affected; (iii) do not require any authorization or approval or other action by, or any notice to or filing with, any governmental authority or any other Person under any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Guarantor is a party or by which the Guarantor or any of the Guarantor's property is bound, except such as have been obtained or made; and (iv) do not result in the imposition or creation of any Lien upon any property of the Guarantor.

(c)     This Guaranty is a valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, except as the enforceability thereof may be subject to or limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws relating to or affecting the rights of creditors generally.

(d)     As of the date hereof, there is no action, suit or proceeding affecting the Guarantor pending or threatened before any court, arbitrator, or governmental authority, domestic or foreign, that will have a material adverse effect on the ability of the Guarantor to perform the Guarantor's obligations under this Guaranty.

DM3\8385359.26

(e)     As of the date hereof, the Guarantor's obligations hereunder are not subject to any offset or defense against Buyer or Sellers of any kind.

(f)     The incurrence of the Guarantor's obligations under this Guaranty will not cause the Guarantor to (i) become insolvent; (ii) be left with unreasonably small capital for any business or transaction in which Guarantor is presently engaged or plans to be engaged; or (iii) be unable to pay the Guarantor's debts as such debts mature.

(g)     The Guarantor covenants, warrants, and represents to Buyer that all representations and warranties contained in this Guaranty shall be true at the time of the Guarantor's execution of this Guaranty and shall continue to be true and correct in all material respects so long as this Guaranty remains in effect.

2.2     Guarantor covenants and agrees that Guarantor will not enter into any agreement, document, instrument or other arrangement (except with or in favor of Buyer) with any Person which directly or indirectly prohibits the Guarantor from providing this Guaranty or fulfilling its obligations hereunder, except to the extent that the Guarantor obtains a prior written waiver from such Person(s) acknowledging the existence of this Guaranty and the Guarantor's duty to comply with its obligations hereunder.

**Section 3.     General Waivers**.  The Guarantor hereby waives, to the extent permitted by law:

(a)     Any claim that Buyer may not exercise any right or remedy it has against Sellers with respect to Sellers' Indemnity Obligations without affecting the Guarantor's liability hereunder.

(b)     Any defenses of disability or other defense of Sellers, other than the defense that Sellers have no liability or obligation with respect to the applicable Sellers' Liability Obligation, or that Sellers' have complied with their obligations under the Purchase Agreement and have performed or otherwise met such applicable Sellers' Liability Obligation.

(c)     Any right of Buyer  to enforce any remedy that Buyer has against Sellers with respect to Sellers' Indemnity Obligations.

**Section 4.     No Waiver; Amendments**.  No failure on the part of Buyer to exercise, no delay in exercising and no course of dealing with respect to, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.  This Guaranty may not be amended or modified except by written agreement between Guarantor and Buyer, and no consent or waiver hereunder shall be valid unless in writing and signed by Buyer.

**Section 5.     Notice**.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered with signed receipt, when delivered by facsimile or other electronic means with electronic

DM3\8385359.26

confirmation of delivery (unless not delivered on a business day or delivered after 5:00 p.m. Central Time on a business day, in which case such delivery shall be deemed effective on the next succeeding business day), when delivered by overnight courier with signed receipt, or when delivered by registered United States mail, with postage prepaid and return receipt requested, addressed to the addresses below or to such other address as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

Guarantor:

Pipeline Health System, LLC
898 N. Sepulveda Blvd., Suite 500
El Segundo, CA 90245
Attn: Nick Orzano
Email: norzano@pipelinehealth.us

With a Copy to:

Pipeline Health System, LLC
898 N. Pacific Coast Highway, Suite 700
El Segundo, CA 90245
Attn: Brittany M. Whitman, Esq.
Email: bwhitman@pipelinehealth.us

And to:

Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, IL 60603
Attn: N. Paul Coyle
Email: pcoyle@duanemorris.com

Buyer:

Ramco Healthcare Holdings, LLC
103 Carnegie Center, Suite 345
Princeton, NJ 08540
Attn: Reddy Rathnakar
Email: preddy89@gmail.com

With a Copy to:

Benesch Friedlander Coplan and Aronoff
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Attn: Juan Morado, Jr.
Email: jmorado@beneschlaw.com

**Section 6.     Entire Agreement**.  This Guaranty constitutes and contains the entire agreement of the parties and supersedes any and all prior and contemporaneous agreements, negotiations, correspondence, understandings and communications between the Guarantor and Buyer, whether written or oral, respecting the subject matter hereof.

**Section 7.     Severability**.  If any provision of this Guaranty is held to be unenforceable under applicable law for any reason, it shall be adjusted, if possible, rather than voided in order to achieve the intent of Guarantor and Buyer to the extent possible.  In any event,

all other provisions of this Guaranty shall be deemed valid and enforceable to the full extent possible under applicable law.

**Section 8.     Payment of Expenses**.  In addition to the Guaranteed Obligations, the Guarantor shall pay, promptly on demand, all Expenses incurred by Buyer in defending and/or enforcing this Guaranty.  For purposes hereof, "Expenses" shall mean costs and expenses (including reasonable fees and disbursements of any law firm or other external counsel and the allocated cost of internal legal services and all disbursements of internal counsel) for defending and/or enforcing this Guaranty (including those incurred in connection with appeals or proceedings by or against Guarantor under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with the Guarantor's creditors, or proceedings seeking reorganization, arrangement, or other relief).

**Section 9.     Assignment**.  This Guaranty shall be binding upon and inure to the benefit of the Guarantor and Buyer and their respective successors and assigns, except that the Guarantor shall not have the right to assign the Guarantor's rights herein or obligations hereunder without the prior written consent of Buyer, which may be granted or withheld in Buyer' sole discretion.  Any such purported assignment by any Guarantor without Lender's written consent shall be void.

**Section 10.     Governing Law; Jurisdiction; Consent to Service of Process; Waiver of Special Damages**.

(a)     This Guaranty shall be construed in accordance with and governed by the laws of the State of Illinois.  The Guarantor and the Buyer (by its acceptance hereof) each hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the State and Federal courts in Chicago, Illinois, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Guaranty, or for recognition or enforcement of any judgment, and the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such Illinois State court or, to the extent permitted by law, in such Federal court.  The Guarantor and the Buyer (by its acceptance hereof) each hereto agrees that a final judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     The Guarantor and the Buyer (by its acceptance hereof) each hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Guaranty in any court referred to in this Section.  The Guarantor and the Buyer (by its acceptance hereof) each hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)     THE GUARANTOR AND THE BUYER (BY ITS ACCEPTANCE HEREOF) EACH WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY

DM3\8385359.26

APPLICABLE LAW, ANY RIGHT THE GUARANTOR OR THE BUYER MAY HAVE TO CLAIM OR RECOVER FROM THE OTHER PARTIES IN ANY LEGAL ACTION OR PROCEEDING, ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

**Section 11.**   WAIVER OF JURY TRIAL.  THE GUARANTOR AND THE BUYER (BY THEIR ACCEPTANCE HEREOF) EACH HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  THE GUARANTOR AND THE BUYER (BY THEIR ACCEPTANCE HEREOF) EACH (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH GUARANTOR OR BUYER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT EACH OF IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

[Signature Page Follows]

DM3\8385359.26

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty Agreement as of the date first above written.

GUARANTOR:

**PIPELINE HEALTH SYSTEM, LLC**, a
Delaware limited liability company

By:_____
Nicholas Orzano
Authorized Signatory

DM3\8385359.26

Execution Version

**Reinstatement and Amendment to
Real Estate Asset Purchase Agreement**

**Amended and Restated Disclosure Schedules**

**November 22, 2022**

These Schedules have been prepared and delivered in accordance with that certain Reinstatement and Amendment to Real Estate Asset Purchase Agreement dated as of November 22, 2022 (the "**Effective Date**"), which instrument reinstates and amends that certain Real Estate Purchase Agreement dated as of July 19, 2022 (collectively, the "**Agreement**"), by and among Ramco Healthcare Holdings, LLC, a Delaware limited liability company ("**Buyer**"), and West Suburban Property Holdings, a Delaware limited liability company, River Forest Property Holdings, LLC, a Delaware limited liability company, Weiss Property Holdings, LLC, a Delaware limited liability company and Weiss MOB Property Holdings, LLC, a Delaware limited liability company (each a "**Seller**" and collectively, "**Sellers**"). Capitalized terms used herein, but not otherwise defined herein, shall have the respective meanings ascribed to them in the Agreement.

These Schedules are qualified in their entirety by reference to specific provisions of the Agreement, and are not intended to constitute, and shall not be construed as constituting, representations or warranties of any Party except as and to the extent provided in the Agreement, and shall not be deemed to expand the scope or effect of the relevant Party's representations or warranties in the Agreement.

The numbered headings in these Schedules correspond to the Section numbers in the Agreement and any disclosure in any Section or Subsection of these Schedules shall be deemed disclosed with respect to all other Sections of the Agreement and all other Sections or Subsections of these Schedules to the extent that the relevance of such disclosure to such other Section or Subsection is apparent, notwithstanding the omission of any cross-reference to such other Section of these Schedules or the omission of a reference in the particular representation and warranty to such Section of the Agreement. Information set forth in these Schedules may be included solely for informational purposes and may not be required to be disclosed pursuant to the Agreement. The disclosure of any information will not be deemed or interpreted to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by the relevant party in the Agreement. The mere inclusion of any information in any Section or Subsection herein shall not be deemed or construed as an admission that such item represents a material exception or fact, event, or circumstance or that such information constitutes, or is reasonably expected to have, a Material Adverse Change. No disclosure in any Section or Subsection herein relating to any possible breach or violation of any contract or any law, regulation, order or similar legal requirement will be construed as an admission or indication that any such breach or violation exists or has actually occurred.

The attachments to these Schedules form an integral part of these Schedules and are incorporated by reference to the specific Section(s) of these Schedules to which such attachments relate (as identified herein) for all purposes as if set forth fully herein. In disclosing the information in these Schedules, Seller expressly does not waive any attorney-client privilege associated with

i

20563822 v3

such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

**Schedules**

| | |
|---|---|
| Schedule 2.1(b) | Tenant Leases |
| Schedule 2.1(c) | Lessor Leases |
| Schedule 2.1(d) | Tangible Personal Property |
| Schedule 2.1(f) | Service Contracts |
| Schedule 2.2(d) | Allocation of Purchase Price |
| Schedule 2.6(a)(i) | Existing Title Policies |
| Schedule 2.6(a)(ii) | Existing Seller Surveys |
| Schedule 3.1(b) | Consents, Approvals or Filings With Governmental Authorities or Third Parties |
| Schedule 3.1(c) | Material Breaches of Any Service Contracts |
| Schedule 3.3 | Encumbrances |
| Schedule 3.4(a) | Material Contracts |
| Schedule 3.4(b) | Exceptions to Validity / Obligations of Sellers Under Service Contracts |
| Schedule 3.5 | Exceptions to Real Estate Representations |
| Schedule 3.6 | Environmental Matters |
| Schedule 3.7 | Litigation |
| Schedule 4.1(b) | Governmental Approvals Required |
| Schedule 8.5 | Lease Guarantees to Be Terminated or Replaced |

Schedule 2.1(b)

Tenant Leases

NONE

1

Schedule 2.1(c)

Lessor Leases

1.  Amended and Restated West Sub/River Forest Master Lease dated December 30, 2019, as amended by First Amendment dated August 25, 2020 and effective as of January 1, 2020, and as amended by Second Amendment effective as of January 1, 2020 between River Forest Property Holdings, LLC and West Suburban Property Holdings, LLC and Pipeline-West Suburban Medical Center, LLC, and as amended by Third Amendment effective as of December 2, 2022 between River Forest Property Holdings, LLC and West Suburban Property Holdings, LLC and Pipeline-West Suburban Medical Center, LLC (*Miscellaneous premises at 3 Erie Court, 1 Erie Court, 7411 W. Lake St., 420 William St., 7420 Central Ave. 309 W. Humphrey Ave.*)

2.  Intentionally Omitted [*The following expired and was replaced with a new lease between Pipeline-West Suburban Medical Center, LLC and PCC Community Wellness Center:* Lease Agreement dated as of July 24, 2017 between West Suburban Property Holdings, LLC, successor to VHS West Suburban Medical Center, Inc., and PCC Community Wellness, Inc. (*Suite 100, 3 Erie Court - Premises is located within Hospital and may be a Sublease to Pipeline-West Suburban Medical Center, LLC*)]

3.  Office Lease dated as of April 15, 2021 between West Suburban Property Holdings, LLC and Kamran Heydarpour, M.D. (*Suite 3100, 1 Erie Court*)

4.  Lease Agreement dated as of October 17, 2016, as amended by First Amendment to Lease Agreement dated as of February 17, 2017 between West Suburban Property Holdings, LLC, successor to VHS West Suburban Medical Center, Inc., and Metro Chicago Surgical Oncology, LLC (*Suite 4030, 1 Erie Court*) [**Note:  Lease has expired. Tenant is currently month-to-month.**]

5.  Intentionally Omitted [*The following expired and Licensee is no longer in possession of Premises*: License Agreement dated as of March 3, 2016, as amended by First Amendment March 24, 2017, between West Suburban Property Holdings, LLC, successor to VHS West Suburban Medical Center, Inc., and Temple Jerimiah (*Suite 4050, 1 Erie Court*) This is a "Community Charitable Donation".]

6.  Medical Office Lease dated as of July 13, 2010, as amended by First Amendment to Medical Office Lease dated as of October 8, 2019 between West Suburban Property Holdings, LLC and WSKC Dialysis Services, Inc. d/b/a West Suburban Dialysis Center, a/k/a  Fresenius Kidney Care West Suburban (*Suite 5000, 1 Erie Court*)

7.  Office Lease dated as of August 28, 2020, as amended by First Amendment to Office Lease dated as of February 2, 2021 between West Suburban Property Holdings, LLC and PCC Community Wellness Center (*Suites 6040 and 6050, 1 Erie Court*)

2

8. Office Lease dated as of August 7, 2020 between West Suburban Property Holdings, LLC and West Suburban Eye Associates, L.L.C. (*Suites 6100 and 6140, 1 Erie Court*) [**Note:  Lease has expired. Tenant is currently month-to-month.**]

9. Office Lease dated as of October 19, 2019 between West Suburban Property Holdings, LLC AND Respiratory Critical Care and Sleep Specialists, LLC (*Suite 7010, 1 Erie Court*)

10. Intentionally Omitted

11. Office Lease dated as of October 6, 2021 between West Suburban Property Holdings, LLC and Nephrology Associates of Northern Illinois, Ltd. (*Suite 7040, 1 Erie Court*)

12. Office Lease dated as of October 14, 2020, as amended by First Amendment to Office Lease dated as of February 2, 2021 between West Suburban Property Holdings, LLC and PCC Community Wellness Center (*Suites 7120 and 7150, 1 Erie Court*)

13. Lease Agreement dated as of March 8,  2018 between West Suburban Property Holdings, LLC, successor to VHS West Suburban Medical Center, Inc., and PCC Community Wellness Center (*Suite 7140, 1 Erie Court*)

14. Office Lease dated as of February 22, 2022 between West Suburban Property Holdings, LLC and Shree West Suburban Inc. (*Lobby, 1 Erie Cour*t)

15. Space License Agreement dated as of November 26, 2017 between West Suburban Property Holdings, LLC, successor to VHS West Suburban Medical Center, Inc., and Lori's Gift, Inc. (*Lobby, 1 Erie Court*) [**Note:  License has expired. Licensee is still in possession of the Premises.**]

16. Office Lease dated as of August 6, 2020 between River Forest Property Holdings, LLC and Suburban West Eye Associates, L.L.C. (*Suite 1140, 7411 W. Lake Street*)

17. Office Lease dated as of November 15, 2019 between River Forest Property Holdings, LLC and Romano Orthopedics, LLC (*Suites 2110(A), 2110(B) and 2115, 7411 W. Lake Street*)

18. Office Lease dated as of February 7, 2020 between River Forest Property Holdings, LLC and Affiliates in Primary Care, S.C. (*Suite 2210, 7411 W. Lake Street*)

19. Office Lease dated as of October 4, 2019 between River Forest Property Holdings, LLC and Catrambone Dental Associates, P.C. (*Suite L100, 7411 W. Lake Street*)

20. Office Lease dated as of October 1, 2021 between River Forest Property Holdings, LLC and Dynamed Clinical Research LP (*Suite L120, 7411 W. Lake Street*)

21. Office Lease dated as of August 11, 2021 between River Forest Property Holdings, LLC and Rachna Shah MD S.C., d/b/a Allergy, Sinus, and Asthma Professionals (*Suite 2020, 7420 Central Ave.*)

3

22. Office Lease dated as of October 21, 2020 between River Forest Property Holdings, LLC and Wazni, PLLC, d/b/a United Vein Centers (*Suite 2030, 7420 Central Ave.*)

23. Office Lease dated as of February 15, 2021, as amended by First Amendment to Office Lease dated as of December 27, 2021 between River Forest Property Holdings, LLC and Scott Mercola, MD (*Suite 2040, 7420 Central Ave.*)

24. Amended and Restated Master Lease dated December 30, 2019 and as amended by First Amendment effective as of January 1, 2020, and as further modified by that certain Removal Agreement dated as of August 15, 2022 between Weiss Property Holdings, LLC and Pipeline-Weiss Memorial Hospital, LLC and as amended by Second Amendment effective as of December 2, 2022 between Weiss Property Holdings, LLC and Pipeline-Weiss Memorial Hospital, LLC (*Miscellaneous premises at 4646 N. Marine Dr. 4601 N. Clarendon Ave., 4602 N. Marine Dr. and 4652 N. Clarendon Ave.*)

25. Office Lease dated May 26, 2005, as amended (i) by Office Lease Amendment (First Floor) dated May, 2010, (ii) by Office Lease Amendment (Third Floor) dated June, 2010, (iii) by Second Amendment to Lease dated as of April 16, 2018, (iv) by Third Amendment to Combined Medical Office Lease dated as of August 25, 2020, (v) by Fourth Amendment to Combined Medical Office Lease dated as of December 15, 2020, (vi) by Fifth Amendment to Combined Medical Office Lease effective as of January 1, 2020, and (v) by Sixth Amendment to Combined Medical Office Lease effective as of December 2, 2022 between Weiss MOB Property Holdings , LLC and Pipeline-Lakefront Medical Associates, LLC,  d/b/a Chicago Health Medical Group (*Suites 02, 100A, 100B, 300, 315, 320 and 506, 4700 N. Marine Dr.*)

26. Lease dated as of January 14, 2005 between Weiss MOB Property Holdings, LLC, successor to ZRG-CVI Lakeshore Marine Drive, LLC (successor to Wellness Associates, LLC), and Walgreens Co. (*Suite 130, 4700 N. Marine Dr.*)

27. Office Lease dated as of December 20, 2004, as amended (i) by First Amendment to Lease dated January 29, 2008, (ii) by Second Amendment to Lease Agreement dated December 17, 2008, (iii) by Third Amendment to Lease Agreement dated December 23, 2014, and (iv) by Fourth Amendment to Lease Agreement dated as of April 7, 2020 between Weiss Property Holdings, LLC and Renal Care Group Chicago Uptown, LLC (*Suite 204, 4700 N. Marine Dr.*)

28. Office Lease dated April 11, 2018 between Weiss MOB Property Holdings, LLC, successor to ZRG-CVI Lakeshore Marine Drive, LLC, and University Dermatology and Vein Clinic, L.L.C. (*Suite 220, 4700 N. Marine Dr.*)

4

Schedule 2.1(d)

Tangible Personal Property

NONE

5

Schedule 2.1(f)

Service Contracts

1. Commercial Security System and Services Agreement between Alarm Detection Services Inc. and River Forest Property Holdings, LLC dated June 4, 2021 (FLS-Monitoring, *7411 West Lake – Building A*)

2. Service Contract between EBM Inc. and River Forest Property Holdings, LLC dated May 25, 2021 (Cleaning-Janitorial Services; *7411 West Lake*)

3. Service Contract between Wet Solutions Inc. and River Forest Property Holdings, LLC dated July 14, 2021 (HVAC – Water Treatment; *7411 West Lake and 7420 West Central*)

4. Commercial Security System and Services Agreement between Alarm Detection Services Inc. and River Forest Property Holdings, LLC dated June 4, 2021 (FLS-Monitoring, *7420 West Central – Building C*)

5. Commercial Security System and Services Agreement between Alarm Detection Services Inc. and River Forest Property Holdings, LLC dated June 4, 2021 (FLS-Monitoring, *7420 West Central - Garage*)

6. Service Contract between EBM Inc. and River Forest Property Holdings, LLC dated May 25, 2021 (Cleaning-Janitorial Services; *7420 West Central*)

7. Service Contract between EBM Inc. and River Forest Property Holdings, LLC dated May 20, 2021 (Cleaning-Janitorial Services; *420 William Street*)

8. Commercial Security System and Services Agreement between Alarm Detection Services Inc. and River Forest Property Holdings, LLC dated June 4, 2021 (FLS-Monitoring, *420 William Street – Building B*)

9. Service Contract between McAdam Landscaping Inc. and River Forest Property Holdings, LLC dated November 2, 2021 (Grounds Snow Removal; *420 William Street, 7411 West Lake, 7420 West Central*)

10. Service Contract between TK Elevator Corp. and River Forest Property Holdings, LLC dated October 8, 2021 (VT – Elevators/Escalators; *420 William Street, 7411 West Lake, 7420 West Central*)

11. Service Contract between The Stone Group Inc. and West Suburban Property Holdings, LLC, River Forest Property Holdings, LLC and Weiss Property Holdings, LLC dated October 27, 2021 (Plumbing - Services; *420 William Street, 7411 West Lake, 7420 West Central, 4700 North Marine Drive, 1 Erie Court*)

12. Service Contract between Landcare Holdings Inc. and River Forest Property Holdings, LLC dated May 17, 2022 (Exterior Landscaping; *420 William Street, 7411 West Lake, 7420 West Central*)

6

13. Service Contract between BluSky Restoration Contractors LLC and River Forest Property Holdings LLC dated May 18, 2022 *(T&M for Disaster Restoration, if needed, at 7420 West Central)*

14. Service Contract between BluSky Restoration Contractors LLC and River Forest Property Holdings LLC dated May 18, 2022 *(T&M for Disaster Restoration, if needed, at 7411 West Lake)*

15. Service Contract between BluSky Restoration Contractors LLC and River Forest Property Holdings LLC dated May 18, 2022 *(T&M for Disaster Restoration, if needed, at 420 William Street)*

16. Service Contract between Hard Surface Solutions Inc. and Weiss Property Holdings, LLC dated November 3, 2021 (Grounds – Snow Removal; *4700 North Marine Drive*)

17. Commercial Security System and Services Agreement between Alarm Detection Services Inc. and Weiss MOB Property Holdings, LLC dated June 4, 2021 (FLS-Monitoring, *4700 North Marine Drive*)

18. Service Contract between Universal Protection Services LP and Weiss Property Holdings, LLC dated May 25, 2021 (Security – Guard Services; *4700 North Marine Drive*)

19. Statement of Work for Master Service Agreement between ABM Industries Inc. and Weiss Property Holdings, LLC dated July 1, 2021 (Cleaning – Janitorial Services; *4700 North Marine Drive*)

20. Service Contract between Wet Solutions Inc. and Weiss Property Holdings, LLC dated July 14, 2021 HVAC – Water Treatment; *4700 North Marine Drive*)

21. Service Contract between Lionheart Engineering PC and Weiss Property Holdings, LLC dated May 25, 2021 (Electrical – General Maintenance; *4700 North Marine Drive*)

22. Service Contract between TK Elevator Corp and Weiss Property Holdings, LLC dated October 27, 2021 (VT – Elevator/Escalators; *4700 North Marine Drive*)

23. Service Contract between Intelli Building Control & Solution and Weiss Property Holdings, LLC dated March 17, 2022 (HVAC – Building Automation; *4700 North Marine Drive*)

24. Service Contract between Emcor Services Midwest Inc. and Weiss Property Holdings, LLC dated March 22, 2022 (HVAC – Preventive Maintenance/Service/Repair; *4700 North Marine Drive*)

25. Service Contract between BluSky Restoration Contractors, LLC and Weiss Property Holdings, LLC dated May 18, 2022 *(T&M for Disaster Restoration, if needed, at 4700 North Marine)* [**Note:  Property is actually owned by Weiss MOB Property Holdings LLC, but contract is with Weiss Property Holdings LLC**]

7

26. Service Contract between EBM Inc. and West Suburban Property Holdings, LLC dated May 17, 2022 (Cleaning-Janitorial Services; *1 Erie Court*)

27. Service Contract between BluSky Restoration Contractors LLC and West Suburban Property Holdings, LLC dated May 18, 2022 *(T&M for Disaster Restoration, if needed, at 1 Erie Court)*

Schedule 3.2(d)

Allocation of Purchase Price

| | |
|---|---|
| West Suburban Property Holdings, LLC | $ 32,524,804 |
| River Forest Property Holdings, LLC | $ 22,876,466 |
| Weiss Property Holdings, LLC | $ 12,696,872 |
| Weiss MOB Property Holdings, LLC | $ 23,901,858 |
| Total | $ 92,000, 000 |

Schedule 2.6(a)(i)

Existing Title Policies

Owner's Policy of Title Insurance from Chicago Title Insurance Company dated February 1, 2019, Policy No. 2889-1-ILCH18-2916A-2019,72306-216060060, issued by Land Services USA, Inc. (Fee Owner - West Suburban Property Holdings, LLC)

Owner's Policy of Title Insurance from Chicago Title Insurance Company dated February 1, 2019, Policy No. 2889-1-ILCH18-2916B-2019,72306-216060059, issued by Land Services USA, Inc. (Fee Owner - River Forest Property Holdings, LLC)

Owner's Policy of Title Insurance from Chicago Title Insurance Company dated January 29, 2019, Policy No. 2889-1-ILCH18-2914-2019,72306-216051702, issued by Land Services USA, Inc. (Fee Owner - Weiss Property Holdings, LLC)

Owner's Policy of Title Insurance from Old Republic National Title Insurance Company dated March 29, 2019, Policy No. IL1809439, issued by Near North Chicago Title Insurance Company (Fee Owner - Weiss MOB Property Holdings, LLC)

Owner's (Leasehold) Policy of Title Insurance from Chicago Title Insurance Company dated February 1, 2019, Policy No. 2889-2-ILCH18-2916A-2019,72306-216060213, issued by Land Services USA, Inc. (Fee Owner - West Suburban Property Holdings, LLC; Leasehold Owner – Pipeline - West Medical Center, LLC)

Owner's (Leasehold) Policy of Title Insurance from Chicago Title Insurance Company dated February 1, 2019, Policy No. 2889-2-ILCH18-2916B-2019,72306-216060416, issued by Land Services USA, Inc. (Fee Owner - River Forest Property Holdings, LLC; Leasehold Owner – Pipeline - West Medical Center, LLC)

Owner's (Leasehold) Policy of Title Insurance from Chicago Title Insurance Company dated Januuary 29, 2019, Policy No. 2889-1-ILCH18-2916-2019,72306-216052013, issued by Land Services USA, Inc. (Fee Owner - Weiss Property Holdings, LLC; Leasehold Owner – Pipeline – Weiss Memorial Hospital, LLC)

Also, Any Matters Disclosed on the followng Buyer's Title Commitments:

Commitment No. 220833NOWF issued by Chicago Title Insurance Company dated April 20, 2022, as amended (Fee Owner – West Suburban Property Holding, LLC)

Commitment No. 220834NOWF issued by Chicago Title Insurance Company dated April 20, 2022, as amended (Fee Owner – River Forest Property Holding, LLC)

Commitment No. 220832NOWF issued by Chicago Title Insurance Company dated April 20, 2022, as amended (Fee Owner – Weiss Property Holdings, LLC)

Commitment No. 220835NOWF issued by Chicago Title Insurance Company dated April 20, 2022, as amended (Fee Owner – Weiss MOB Property Holdings, LLC)

Schedule 2.6(a)(ii)

Existing Seller Surveys

ALTA/NSPS Land Title Survey of West Suburban Hospital (known as 518 N. Austin Blvd, Oak Park, IL), made by National Survey Service, Inc. dated June 15, 2010 and last revised July 18, 2018, Project No. N-130057 (West Suburban Property Holdings, LLC)

ALTA/NSPS Land Title Survey of of West Suburban Hospital (known as 7451 W. Lake Street, River Forest, IL) made by National Survey Service, Inc. dated June 16, 2010 and last revised July 12, 2018, Project No. N-130059 (River Forest Property Holdings, LLC)

ALTA/NSPS Land Title Survey of Weiss Hospital (known as 4646-4720 N. Marine Drive & 4650 N. Clarendon Avenue, Chicago, IL) made by National Survey Service, Inc. dated March 25, 2003 and last revised July 11, 2018, Project No. N-140060 (Weiss Property Holdings, LLC)

ALTA/NSPS Land Title Survey of 4700 N. Marine Drive, Chicago, IL, made by National Survey Service, Inc. last revised March 4, 2019, Project No. N-130388 (Weiss MOB Property Holdings, LLC)

Also, Any Matters Disclosed on the followng Buyer's Surveys:

ALTA/NSPS Land Title Survey of West Suburban Hospital (known as NW Corner of N. Austin Blvd. and W. Ohio St, Chicago, IL), made by National Survey Service, Inc. dated June 15, 2010 and last revised June 22, 2022, Survey No. N-130826 (West Suburban Property Holdings, LLC)

ALTA/NSPS Land Title Survey of of West Suburban Medical Center (known as 7451 W. Lake Street, River Forest, IL) made by National Survey Service, Inc. dated June 16, 2010 and last revised June 14, 2022, Survey No. N-120829 (River Forest Property Holdings, LLC)

ALTA/NSPS Land Title Survey of Weiss Hospital (known as 4646-4720 N. Marine Drive & 4650 N. Clarendon Avenue, Chicago, IL) made by National Survey Service, Inc. dated March 25, 2003 and last revised June 17, 2022, Survey No. N-130827 (Weiss Property Holdings, LLC)

ALTA/NSPS Land Title Survey of 4700 N. Marine Drive, Chicago, IL, made by National Survey Service, Inc. dated March 25, 2003, last revised June 17, 2022, Survey No. N-130828 (Weiss MOB Property Holdings, LLC)

11

Schedule 3.1(b)

Consents, Approvals or Filings

With Governmental Authorities or Third Parties

The issuance by the Illinois Health Facilities and Services Review Board ("**IHSFRB**") of Certificates of Exemption to the necessary applicant entities authorizing the transfer by the IHFSRB-Governed Property Entities (as defined in the Real Estate Asset Purchase Agreement) of their real estate assets, which approval was issued on June 7, 2022.

Consent to the purchase and sale transaction is required from the United States Bankruptcy Court for the Southern District of Texas as result of the filing on October 3, 2022 by Pipeline Health System, LLC, on behalf of itself, Sellers, and certain other debtors, of a voluntary petition for relief under chapter 11 of the United States Code (Case No. 22-90291 (MI) (the "**Sale Order**").

Consent is required under that certain definitive superpriority senior secured debtor-in-possession credit agreement, dated as of October 4, 2022, by and among the Debtors party thereto, the agent and the lenders thereto the "**DIP Agreement**"),  The foregoing is to be released in connection the approval of the Sale Order.

Consent is required under that certain Amended and Restated Facility Agreement dated as of December 30, 2019 by among Pipeline Health System, LLC, Pipeline Health System Holdings, LLC and the other Borrowers named therein, and Alter Domus Products Corp. (formally known as Cortland products Corp., as Agent, and the Lenders named therein, as amended (collectively the "**Alter Domus Credit Facility**").  West Suburban Property Holdings, LLC, Weiss Property Holdings, LLC and River Forest Property Holdings, LLC are Borrowers under the Alter Domus Credit Faciltiy.  The foregoing is to be released in connection the approval of the Sale Order.

A Notice of Federal Interest ("**NFI**") with respect to a portion of the property owned by West Suburban Property Holdings, LLC recorded as instrument 1530716040 with the Cook County Recorder of Deed may have required certain federal agency approvals in connection with the sale of the real property transaction contemplated in the Purchase Agreement.  In response to a withdrawal request, the Health Resources and Services Administration of the U.S. Department of Health and Human Services has issued its Withdrawal of Filed Notice of Federal Interest dated 8/11/202 with respect to the recorded NFI.

The filing of forms required by Governmental Authorites in connection with the transfer of real property in Chicago, IL, Oak Park, IL and River Forest, IL, including any Illinois Real Estate Transfer Tax Declaratrion Forms.

12

Schedule 3.1(c)

Material Breaches of Any Service Contracts

Breaches that may arise as a result of or in connection with the Chapter 11Cases

Breaches that may arise as a result of or in connection with the mechanic's lien claims by TK Elevator Corporation (FKA Thyssenkrupp Elevator Corporation) described in Schedule 3.7 below.

Schedule 3.3

Encumbrances

(Additional Encumbrances Not Identified in Section 3.3)

West Suburban Property Holdings, LLC, Weiss Property Holdings, LLC and River Forest Property Holdings, LLC are Borrowers under the Alter Domus Credit Faciltiy (as defined in Schedule 3.1(b)) and have granted an "all asset" lien on their assets to secure the Alter Domus Credit Facility.

Bankruptcy and Mechanic's Lien Matters Listed on Schedule 3.7 hereof.

Any additional liens or encumbrances shown on lien searches performed by the Title Company, Sellers, Buyer or Buyer's lender prior to or after the Effective Date of the Purchase Agreement.

14

Schedule 3.4(a)

Material Contracts

3.4(a)(i) -  Intentionally Omitted.

3.4(a)(ii) – Maintnance, Service or Supply Contracts

- Service Contracts Listed on Schedule 2.1(f)
- Management Agreement made as of April 15, 2021 between West Suburban Property Holdings, LLC and CBRE, Inc. (West Suburban Campus) [Regarding 1 and 3 Erie Court]
- Management Agreement made as of April 15, 2021 between River Forest Property Holdings, LLC and CBRE, Inc. (River Forest Campus) [Regarding 7411 Lake Street, 7420 Central Street and 420 William Street]
- Management Agreement made as of April 15, 2021 between Weiss Property Holdings, LLC and CBRE, Inc. (Weiss Medical Office Building) [Regarding 4700 N. Marine Street which is owned by Weiss MOB Property Holdings, LLC]
- Leasing Agremeement between West Suburban Property Holdings, LLC and Remedy Medical Properties, Inc. dated as of January 1, 2022
- Leasing Agremeement between River Forest Property Holdings, LLC and Remedy Medical Properties, Inc. dated as of January 1, 2022
- Leasing Agremeement between Weiss MOB Property Holdings, LLC and Remedy Medical Properties, Inc. dated as of January 1, 2022

3.4(b)(iii) -  Any other contracts, commitments, or agreements that involve payments, performance of services or provision of items in an amount exceeding $100,000 or that cannot be performed in the normal course within twelve (12) months after the Closing Date or canceled within such period upon 90 days' notice or less without breach or penalty.  - NONE

15

Schedule 3.4(b)

Exceptions to Validity / Obligations of Sellers Under Service Contracts

Matters that may arise as a result of the Chapter 11Cases

Schedule 3.5

Exceptions to Real Estate Representations

Matters disclosed in the following reports:

Property Condition Report – West Suburban Medical Center, 3 Erie Court and 1 Erie Court, Oak Park, Illinois 60302 dated June 6, 2018, prepared by Partner Engineering and Science, Inc., Project No-18-215470.3.

Property Condition Report – River Forest Medical Campus, 7411 Lake Street, 7420 Central Avenue and 429 Williams Street, River Forest, Illinois 60305 dated June 1, 2018, prepared by Partner Engineering and Science, Inc., Project No-18-215470.5.

Property Condition Report – Weiss Memorial Hospital, 4646 Marine Drive, Chicago, Illinois 60340 dated May 30, 2018, prepared by Partner Engineering and Science, Inc., Project No-18-215470.1.

Property Condition Report – Lakeshore Medical Center, 4700 North Marine Drive, Chicago, Ilinois, 60640, Draft Date: February 8, 2019, prepared by CBRE, Project No. PC90150877.

Elevator No. 18 located in the West Suburban Hospital Medical Office Building with an address at 1 Erie Court is not operable.

Matters disclosed in Notice of Violation and Summons and Administistrative Complaint dated 10/29/2022 from the City of Chicago, Department of Buildings (Dept of Buildings NOV# 522E0672361) to Weiss Property Holdings, LLC setting forth Municipal Code Violations at 4646 N. Marine Drive, Chicago, IL.

Any Property Condition Reports prepared for Buyer by Partner Engineering and Science, Inc. with respect to property owned by West Suburban Property Holdings, LLC, River Forest Property Holdings, LLC, Weiss Property Holdings, LLC and Weiss MOB Prperty Holdings, LLC, as amended

Schedule 3.6

Environmental Matters

Matters disclosed in the following reports:

Phase I Environmental Site Assessment Report – Weiss Hospital and Parking Garage 4646 North Marine Drive, Chicago, IL 60640 dated May 30, 2018, prepared by Partner Engineering and Science, Inc., Project No-18-215470.1

Phase I Environmental Site Assessment Report – West Suburban Hospital, MOB and Parking Garage, 3 Erie Court and 1 Erie Court, Oak Park, Illinois 60302 dated May 31, 2018, prepared by Partner Engineering and Science, Inc., Project No-18-215470.3

Phase I Environmental Site Assessment Report – West Suburban Forest River 3 Buildings, 420 William Street, 7411 West Lake Street , 7420 Central Avenue, River Forest, IL 60305 dated May 31, 2018, prepared by Partner Engineering and Science, Inc., Project No-18-214570.4

Phase II Subsurface Investigation Report – Weiss Hospital and Parking Garage 4646 and 4650 North Marine Drive, Chicago, IL 60640 dated july 19, , 2018, prepared by Partner Engineering and Science, Inc., Project No-18-215470.5

Phase II Subsurface Investigation Report – West Suburban Hospital, MOB, and Parking Garage, 3 Erie Street and 1 Erie Court, Oak Park  Il 60302 dated July 19, 2018, prepared by Partner Engineering and Science, Inc., Project No-18-215470.7

Phase II Subsurface Investigation Report – West Suburban Forest River 3 Buildings, 420 William Street, 7411 West Lake Street , 7420 Central Avenue, River Forest, IL 60305 dated July 20, 2018, prepared by Partner Engineering and Science, Inc., Project No-18-214570.8

Limited Phase II Environmental Site Assessment – Report of Findings by V3, dated January 24, 2020, attached as Exhibit A to the Reinstatement of and Fifth Amendment to Agreement for Purchase and Sale of Real Property dated as of July 28, 2020 by and between Weiss Property Holdings, LLC and Lincoln Property Company National LLC for Parking Lot located at 4600 N. Marine Drive t, Chicago, Illinois

Any Environmental Assessments prepared for Buyer by Partner Engineering and Science, Inc. with respect to property owned by West Suburban Property Holdings, LLC, River Forest Property Holdings, LLC, Weiss Property Holdings, LLC and Weiss MOB Prperty Holdings, LLC, as amended

18

Schedule 3.7

Litigation

Bankruptcy matters:

The filing on October 3, 2022 by Pipeline Health System, LLC, on behalf of itself, Sellers, and certain other debtors, of a voluntary petition for relief under chapter 11 of the United States Code (Case No. 22-90291 (MI) in the United States Bankruptcy Court for the Southern District of Texas.

Litigation and disputes involving the following mechanic's lien matters:

- Mechanics lien claim in favor of Fetts Love & Sieben, Inc. against West Suburban Property Holdings, LLC recorded November 27, 2019 as document number 1933155172 in the amount of $30,874.90. [**PAID AND RELEASED BY SATISFACTION OR RELEASE DATED JULY 6, 2022**]

- Mechanics lien claim in favor of TK Elevator Corporation (FKA Thyssenkrupp Elevator Corporation) against Pipeline - West Suburban Medical Center, LLC and/or West Suburban Property Holdings, LLC recorded March 28, 2022 as document number 2208704098 in the amount of $15,742.00. [**PAID AND RELEASED BY RELEASE DATED _____, 2022**]

- Contractor's Claim For Lien (Private Construction) by Premier Environmental Services, Inc. against VHS West Suburban Medical Center, Inc. d/b/a West Suburban Medical Center, Pipeline - West Suburban Medical Center, LLC d/b/a West Suburban Medical Center  and all other persons or entities having or claiming an interest in the real estate described therein recorded June 15, 2022 as document number 2216615021 in the amount of $6,375. [**PAID AND RELEASED BY RELEASE DATED AUGUST 12, 2022**]

- Contractor's Claim For Lien (Private Construction) by Premier Environmental Services, Inc. against VHS West Suburban Medical Center, Inc. d/b/a West Suburban Medical Center, Pipeline - West Suburban Medical Center, LLC d/b/a West Suburban Medical Center  and all other persons or entities having or claiming an interest in the real estate described therein recorded June 15, 2022 as document number 2216615022 in the amount of $23,528.00. [**PAID AND RELEASED BY RELEASE DATED AUGUST 12, 2022**]

- Mechanic's Lien Notice by LaForce, LLC vs. Weiss Property Holdings, LLC, Pipeline-Weiss Memorial Hospital, LLC and Bergland Construction Companyby delivery dated June 7, 2022 in the amount of $7,261.90. [**PAID AND RELEASED BY RELEASE DATED _____, 2022**]

19

- Civil Action 2022-L-006032 by David Baker vs. Pipeline Health System, LLC, et al (including West Suburban Property Holdings, LLC), filed 07/06.2022 seeking damages in excess of $50,000, plus costs and attorney's fees

  - Mechanic's Lien Claim by International Decorators, Inc. against Bergland Construction Company, Weiss Property Holdings, LLC and Pipeline-Weiss Memorial Hospital, LLC dated October 18, 2022 in the amount of $53,183.50, recorded 11/01/2022 as document 2230542274.

  - General Contractor's Claim for Mechanics Liens by TK Elevator Corporation FKA Thyssenkrupp Elevator Corporation against Weiss Property Holdings, LLC, Louis A. Weiss Memorial Hospital and Pipeline-Weiss Memorial Hospital, LLC dated July 18, 2022 in the amount of $139,357.12. [**PAID AND RELEASED BY RELEASE DATED SEPTEMBER 8, 2022**]

  - Illinois Mechanic's Lien Claim by First Point Mechanical, Division of Premistar against VHS West Suburban Medical Center, Inc., Pipeline - West Suburban Medical Center, LLC d/b/a West Suburban Medical Center, West Suburban Property Holdings, LLC, Owners or Interested Person and All Unknown Owners and Nonrecord Claimants dated September 20, 2022 in the amount of $522,504.73.

  - General Contractor's Claim for Mechanics Liens by TK Elevator Corporation FKA Thyssenkrupp Elevator Corporation against Pipeline-Weiss Memorial Hospital, LLC and Weiss Property Holdings, LLC dated September 21, 2022 in the amount of $56,235.27.

  - Mechanic's Lien Claim by R.C.J. ENTERPRISES, LTD DBA CHADWICK CONTRACTING COMPANY against Bergland Construction Company, Weiss Property Holdings. LLC, Pipeline-Weiss Memorial Hospital, LLC and dated October 17, 2022 in the amount of $198,102.15, recorded 10/18/2022 as document 2229149205.

  - Original Contractor's Mechanic's Lien Notice and Claim by Templar Construction, Inc. against Weiss Property Holdings. LLC, Pipeline-Weiss Memorial Hospital, LLC and Louis A. Weiss Memorial Hospital dated October 19, 2022 in the amount of $31,057.00, recorded 10/21/2022 as Document 2229445154.

  - Original Contractor's Claim for Mechanic's Lien by Bergland Construction Company against Weiss Property Holdings. LLC, and/or Pipeline-Weiss Memorial Hospital, LLC d/b/a Weiss Memorial Hospital, and/or Resilience Healthcare – Weiss Memorial Hospital, LLC dated October 10, 2022 in the amount of $512,242.05, recorded 10/17/2022 as document 2229015027.

20

- Verified Notice of Lien by Roberts Environmental Control Corp. to Weiss Property Holdings, LLC, Pipeline-Weiss Memorial Hospital, LLC and Bergland Construction Company dated October 26, 2022 in the aggregate amount of $93,634.55.

- Subcontractor's Notice  and Claim for Lien by Beverly Asphalt Paving Co. against Bergland Construction Company, Weiss Property Holdings, LLC, Pipeline-Weiss Memorial Hospital, LLC d/b/a Louis A. Weiss Memorial Hospital and Resilience Healthcare Management exe3cuted November 4, 2022 in the aggregate amount of $14,500.

Demands:

Letter by Kershner Sledziewski Law, LLC dated November 2, 2022 on behalf of Kaushik Dinavahi addressed to Weiss Property Holdings, LLC, SRC Hospital Investments II, LLC and Weiss Memorial Hospital  demanding $40,000.00 to compensate Mr. Dinavahi for losses arising out of automobile break-ins at the Weiss Memorial Hospital Garage.


Any litigation matters shown on litigation searches preformed by the Title Company, Sellers, Buyer or Buyer's lender prior to or after the Effective Date of the Purchase Agreement.

21

Schedule 4.1(b)

Governmental Approvals

The issuance by the Illinois Health Facilities and Services Review Board ("IHSFRB") of Certificates of Exemption to the necessary applicant entities authorizing the transfer by the IHFSRB-Governed Property Entities (as defined in the Real Estate Asset Purchase Agreement) of their real estate assets, which approval was issued on June 7, 2022.

Consent to the purchase and sale transaction is required from the United States Bankruptcy Court for the Southern District of Texas as result of the filing on October 3, 2022 by Pipeline Health System, LLC, on behalf of itself, Sellers, and certain other debtors, of a voluntary petition for relief under chapter 11 of the United States Code (Case No. 22-90291 (MI),

A Notice of Federal Interest ("**NFI**") with respect to a portion of the property owned by West Suburban Property Holdings, LLC recorded as instrument 1530716040 with the Cook County Recorder of Deed may have required certain federal agency approvals in connection with the sale of the real property transaction contemplated in the Purchase Agreement.  In response to a withdrawal request, the Health Resources and Services Administration of the U.S. Department of Health and Human Services has issued its Withdrawal of Filed Notice of Federal Interest dated 8/11/202 with respect to the recorded NFI.

22

Schedule 8.5

Lease Guarantees to Be Terminated

Guaranty of Master Lease from Pipeline Health System, LLC to Weiss Property Holdings, LLC dated January 28, 2019  [To be terminated.   This Guaranty was provided in connection with the original Master Lease dated January 28, 2019 between Weiss Property Holdings, LLC and Pipeline-Weiss Memorial Hospital, LLC.  It was not required when the original Master Lease was amended and restated in December 30, 2019.  Note that the Amended and Restated Master Lease dated December 30, 2019 shows Exhibit D - Form of Lease Guaranty as "N/A".]

Guaranty of Master Lease from Pipeline Health System, LLC to River Forest Property Holdings, LLC and West Suburban Property Holdings, LLC dated January 28, 2019  [To be terminated.  This Guaranty was provided in connection with the original West Sub/River Forest Master Lease dated January 28, 2019 between River Forest Property Holdings, LLC and West Suburban Property Holdings, LLC and Pipeline-West Suburban Medical Center, LLC.  It was not required when the original Master Lease was amended and restated in December 30, 2019.  Note that the Amended and Restated Master Lease dated December 30, 2019 shows Exhibit E - Form of Lease Guaranty as "N/A".]

23

**EXECUTION COPY**

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT AND SUCH LAWS.

## PROMISSORY NOTE

**Issue Date:** _____                                                            **$67,000,000.00**

       **RAMCO HEALTHCARE HOLDINGS, LLC,** a Delaware limited liability company ("Ramco Healthcare"), **AUM GLOBAL HEALTHCARE, LLC**, a Michigan limited liability, **PIPELINE – WEST SUBURBAN MEDICAL CENTER, LLC**, a Delaware limited liability company, **PIPELINE - WEISS MEMORIAL HOSPITAL, LLC**, a Delaware limited liability company, **PIPELINE - LAKEFRONT MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company, **PIPELINE - MIDWEST PHARMACIES, LLC**, a Delaware limited liability company, **PIPELINE - WEISS MEDICAL SPECIALISTS,** LLC, a Delaware limited liability company  (collectively, together with each of their permitted successors and assigns, "Maker"), hereby promises to pay to the order of **WEST SUBURBAN PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("West Sub PropCo"), **RIVER FOREST PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("River Forest PropCo"), **WEISS PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("Weiss PropCo"), and **WEISS MOB PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("Weiss MOB Propco"; together with West Sub PropCo, River Forest PropCo and Weiss PropCo, collectively, together with each of their successors and assigns, the "Payee"), the principal amount of SIXTY SEVEN MILLION AND NO/100 DOLLARS ($67,000,000.00), together with interest accrued on the portion of such principal amount equal to THIRTY SEVEN MILLION AND NO/100 DOLLARS ($37,000,000.00) (the lesser of (i) the principal amount outstanding hereunder and (ii) Thirty-Seven Million Dollars ($37,000,000), the "Principal Balance") calculated from the date hereof (the "Issue Date") in accordance with the provisions of this Promissory Note (as the same may be amended, restated, modified or otherwise supplemented from time to time, this "Note").

       1.     Borrowings.  This Note is issued pursuant to that certain Reinstatement and Amendment of Real Estate Purchase Agreement dated as of November __, 2022 (as amended, restated, replaced or modified from time to time, the "Purchase Agreement"), by and among Ramco Healthcare, as buyer, and the Sellers party thereto, as payment, on behalf of Maker, of the portion of the consideration payable thereunder by Maker to the Sellers for the purchase of the Purchased Assets (as defined in the Purchase Agreement).  This Note is the "Buyer Subordinated Note" referred to in Section 3(h) of the Purchase Agreement.  It is acknowledged and agreed that the obligations evidenced by this Note represent seller financing provided by Payee.

       2.     Payment of Interest.  Commencing on the Issue Date, interest shall accrue daily on the outstanding Principal Balance of this Note until repayment of all amounts due hereunder at a per annum rate of interest of ten percent (10.0%) computed based on a 360-day year, which principal and accrued interest shall payable by Maker to Payee in cash on the Maturity Date.  Following the occurrence and during the continuance of an Event of Default, the interest rate otherwise applicable pursuant to this Section 2 shall be increased, at Payee's election upon written notice to Maker, by five hundred (500) basis points per annum (the "Default Rate").

3.      Payment of Principal on Note.

(a)      Payment on Maturity Date.  Maker shall pay to Payee on the earlier of (i) acceleration of the Obligations hereunder and (ii) _____, 2024 (such earlier date being the "Maturity Date") the entire unpaid outstanding principal amount of this Note, together with all accrued but unpaid interest on the Principal Balance; provided, however, such Maturity Date may be extended by mutual agreement in writing by Maker and Payee.

(b)      [Reserved].

(c)      Optional Prepayments.  Maker may, at any time and from time to time, prepay all or any portion of the unpaid principal amount of this Note together with any unpaid interest which has accrued on the portion of the Principal Balance so prepaid, without any penalty or prior notice. For the avoidance of doubt, the principal amount outstanding under this Note will be reduced by an amount equal to the Cares Act Deposit on or after the Maturity Date in accordance with Section 2.5(b) of the Membership Interest Purchase Agreement.

(d)      Time of Payment.  If any payment on this Note becomes due on a Saturday, Sunday or legal holiday under the laws of the State of Illinois (any day, other than any of the foregoing days, being referred to herein as a "Business Day"), then such payment shall not be due until the next Business Day and such extension of time shall be included in computing interest in connection with such payment.

(e)      Application of Payments.  Except as may be otherwise agreed by the parties, all payments under this Note (including pursuant to the foregoing clause (c)) shall be applied (i) first, to (x) any outstanding reasonable, documented, and out-of-pocket fees, costs and expenses of Payee incurred in connection with any amendments or other modifications to the Note Documents requested by Maker and (y) any outstanding reasonable, documented, and out-of-pocket fees, costs and expenses of Payee incurred in connection with enforcing any rights under this Note and the other Note Documents (collectively, "Reimbursable Expenses"), and (ii) second, to the repayment of the outstanding unpaid principal and unpaid accrued interest amounts under this Note.  Notwithstanding the foregoing, following an Event of Default, Payee may apply any payments received in any order determined by Payee in its sole discretion.

4.      Representations and Warranties.  As of the Issue Date, Maker hereby makes the representations and warranties to Payee set forth on Exhibit A hereto.

5.      Affirmative Covenants.  On the Issue Date and at all times thereafter, until the repayment in full of all the Obligations (other than any contingent indemnification obligation for which no claim has been asserted that are expressly stated in this Note or any of the other Note Documents to survive payment in full of the Obligations), Maker hereby agrees to comply with each of the covenants set forth on Exhibit B hereto.

6.      Negative Covenants.  On the Issue Date and at all times thereafter until the repayment in full of all the Obligations (other than any contingent indemnification obligation for which no claim has been asserted that are expressly stated in this Note or any of the other Note Documents to survive payment in full of the Obligations), Maker agrees not to:

(a)      declare, order, pay, make, or set apart any sum for any Restricted Payment, except, solely if Maker is a pass-through entity for income tax purposes, Permitted Tax Distributions;

2

DM3\9131440.9

(b)      create, incur, assume or suffer to exist any Indebtedness, except Indebtedness incurred in the ordinary course of business, Indebtedness under this Note and the other Note Documents and Indebtedness under the Bridge Loan Documents and Working Capital Facility;

(c)      create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except for Liens granted under the Note Documents securing the Obligations, Liens granted under the Bridge Loan Documents, Working Capital Facility and Permitted Liens;

(d)      guaranty or otherwise become liable for any Indebtedness or other obligations of any Person (including any Affiliate, except to the extent there is joint and several liability under the Indebtedness expressly permitted by clause (b) above);

(e)      engage in any line of business other than ownership and operation of the Mortgaged Property and the Hospital Facilities and all activities related or incidental to the ownership and operation of such Mortgaged Property and Hospital Facilities;

(f)      sell, lease, assign, transfer or otherwise dispose of any material portion of its property or assets (for the avoidance of doubt, excluding any leases of the Mortgaged Property and Hospital Facilities);

(g)      merge, dissolve, liquidate or consolidate with or into another Person, or acquire or agree to acquire by merger, consolidation, recapitalization or other business combination or otherwise, the stock, assets or business of any Person;

(h)      make loans to any Person or make any other Investment other than (i) ordinary trade credit provided on customary terms (based on similarly situated businesses); (ii) intercompany loans that are properly documented in each entity's books and records; and (iii) advances to employees made on customary terms;

(i)      except as required by applicable law, amend or otherwise modify any organizational documents of Maker (each as in effect and delivered to Payee on the Issue Date) in violation of Section 6(j) below or if any such amendment or modification could materially and adversely affect the rights and interests of Payee under the Note Documents; it being understood that Maker shall fully disclose all amendments or other modifications to Maker's organizational documents to Payee in writing within thirty (30) days after the filing or effectiveness, as applicable, thereof;

(j)      change Maker's state of formation or organization, its existence as a limited liability company or its legal name, in each case as in effect on the Issue Date; or

(k)      enter into any transaction or series of related transactions with any Affiliate of Maker, except for (i) agreements listed on Schedule 6(k) attached hereto (and commercially reasonable modifications, amendments, and replacements thereto, so long as Maker delivers copies of such modifications to Payee concurrently with the execution thereof) and (ii) transactions the terms of which are no less favorable to Maker than would reasonably be obtained by Maker at that time in a comparable arm's-length transaction with a Person other than any such Affiliate.

7.      Further Assurances.  Maker agrees that from time to time, at its own expense, Maker will promptly execute and deliver all further instruments and documents, and take all further action, that Payee may reasonably request to create, perfect or protect the security interest purported to be granted by Maker

3

under the Mortgages and any other Note Document or to enable Payee to exercise and enforce its rights and remedies under each Mortgage and any other Note Document.

8.      Defaults and Remedies.

(a)      Events of Default.  An "Event of Default" shall occur under this Note if:

(i)      Maker shall fail to make payment of (A) any principal under this Note when and as the same shall become due and payable upon the occurrence of the Maturity Date, or (B) interest under this Note or any other Obligations or amounts under any Note Document, in each case, within ten (10) days after the date on which the same shall become due and payable, or upon the occurrence of the Maturity Date; or

(ii)      Maker shall breach or otherwise fail to comply with its covenants and agreements set forth in Section 6 of this Note; or

(iii)      an Insolvency Event shall occur with respect to Maker; or Maker shall consent to, approve of, or acquiesce to, an Insolvency Event with respect to Maker, or Maker shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(iv)      a Change of Control occurs; or

(v)      any of the representations and warranties set forth in the Note Documents shall be untrue or shall be incorrect in any material respect when made (without duplication of materiality for a representation or warranty that is already qualified by materiality) and which Maker fails to correct or cure within ten (10) days following written notice thereof (or, by its nature, cannot be cured within such time period); or

(vi)      Maker shall breach, fail to comply with, or otherwise default under, covenants and agreements set forth in this Note, any Mortgage or any other Note Document (other than those described in other clauses of this Section 8) and such breach or failure shall not have been remedied by Maker or waived in writing by Payee within ten (10) Business Days after the earlier of (x) receipt by Maker of notice from Payee of such default and (y) actual knowledge of such default by Maker; or

(vii)      there is entered against Maker (x) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $750,000.00 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company and as to which the relevant insurance company has acknowledged coverage or otherwise covered by an appeal bond), or (y) any one or more non-monetary final judgements that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Maker or the Collateral, and, in either case, enforcement proceedings are commenced by any creditor upon such judgement or order, or there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgement, by reason of a pending appeal or otherwise, is not in effect; provided that this subsection (vii) will not apply to liabilities in existence on the Issue Date to the extent such liabilities were assumed under the terms of the Purchase Agreement or Membership Interest Purchase Agreement; or

4

(viii)    the Mortgage or any other Note Document, after delivery thereof pursuant to the terms of the Note Documents, shall for any reason cease to create a valid and perfected second priority Lien (unless such cessation to be perfected is caused by Payee's failure to file Uniform Commercial Code continuation statements to continue such Lien) on the collateral purported to be covered thereby (subject to (A) Permitted Liens described in clauses (b) and (c) of the definition thereof and (B) any other Permitted Liens that have priority over such Liens by operation of law or as provided herein, in the Purchase Agreement or in an intercreditor agreement in form and substance agreed to in writing by Payee); or

(ix)    Maker or any of its Affiliates fails to make, when due, payments under the Transition Service Agreement (as defined in the Purchase Agreement), the effect of which is to permit any party thereto (other than Maker or any of its Affiliates) to terminate such agreement; provided that, if Maker asserts in good faith that such payment is excused or not due and payable due to a breach by Payee, no Event of Default will occur under this subsection (ix) until a court of competent jurisdiction determines that the Transition Service Agreement may be terminated due to such non-payment (other than by Maker or any of its Affiliates); or

(x)    Maker fails to satisfy any liabilities when due and payable (after taking into account all applicable grace and cure periods), other than the Excluded Liabilities (as defined in the Purchase Agreement or any liabilities in existence on the Issue Date to the extent such liabilities were assumed under the terms of the Purchase Agreement or Membership Interest Purchase Agreement) in excess of $750,000.00 and Maker fails to correct or cure such failure within thirty (30) days following written notice from Payee: or

(xi)    Maker fails to fund insurance premiums for the medical, dental and vision plans for employees of the hospitals or Maker or any of its Affiliates fails to implement the "Buyer New Plans" (as defined in the Membership Interest Purchase Agreement), in each case, as required under Section 8.3 of the Membership Interest Purchase Agreement; or

(xii)    any cessation of operations at any Mortgaged Property for a period of more than thirty (30) days; or

(xiii)    the occurrence of an Event of Default under any Bridge Loan Document or under any Working Capital Facility; or

(xiv)    if any of the following occurs:

(A)    if by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of any Mortgaged Property, or any part thereof, or of Maker shall be appointed and such order shall not be discharged or dismissed within ninety (90) days after such appointment; or

(B)    subject to Permitted Contest, if any Person having or claiming an interest in Maker or the Mortgaged Property, or any part thereof, commences an action or proceeding against Maker, the Mortgaged Property, or any part thereof or the Mortgaged Property, or any part thereof that could reasonably be expected to have a Material Adverse Effect; or

(C)    subject to Permitted Contest, the issuance of any other execution or distraint process against the Mortgaged Property that could reasonably be expected to have a Material Adverse Effect; or

5

(D)     there shall be commenced against Maker any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) calendar days from the entry thereof.

(b)     Remedies.  If an Event of Default occurs and is continuing,

(i)     Payee may declare, subject to the proviso below, through written notice to Maker, the entire outstanding unpaid principal amount of this Note, together with all accrued but unpaid interest on the Principal Balance, and all other Obligations, to be immediately due and payable without presentment, demand, declaration, protest or other notice or act of any kind, all of which are hereby expressly waived by Maker, and thereupon the same shall forthwith become and be immediately due and payable in cash; provided that, notwithstanding anything herein to the contrary, upon the occurrence of an Event of Default under Section 8(a)(iii) above, the entire outstanding unpaid principal amount of this Note, together with all accrued but unpaid interest on the Principal Balance, and all other Obligations shall automatically become due and payable without further act of Payee or any other Person; and

(ii)     Payee shall be entitled to exercise against Maker or the Collateral any other rights of a secured creditor and which Payee may have been afforded under any contract or agreement with Maker (including the Mortgages or any other Note Document) at any time and other rights which Payee may have pursuant to applicable Law.

9.     Definitions.

"Affiliate" means, with respect to a Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person.  The term "*control*" used in the preceding sentence shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the work activities, management and policies of a Person whether through ownership of membership interests or voting securities, the election or appointment of board members, by contract or otherwise.

"Anti-Terrorism Laws" means any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, all as amended, supplemented or replaced from time to time, including Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by U.S. Department of Treasury Office of Foreign Assets Control.

"Blocked Person" means any Person:  (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (b) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (c) with which Payee is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, or (e) that is named a "specially designated national" or "blocked person" on the most current list published by U.S. Department of Treasury Office of Foreign Assets Control or other similar list or is named as a "listed person" or "listed entity" on other lists made under any Anti-Terrorism Law.

"Bridge Loan Documents" means the loan agreements, mortgages, security agreements, notes, and other loan and financing documents executed and delivered on the Issue Date in connection

6

with that certain bridge loan to Maker (or one or more of Maker's Affiliates) provided by a lender reasonably acceptable to Payee in an amount not to exceed Twenty One Million and No/100 Dollars ($21,000,000.00).

"Change of Control" means (a) the merger, dissolution, liquidation, or consolidation of Maker (including with or into another Person), or the sale, transfer, license, lease or the sale or other disposition of (whether in one transaction or in a series of transactions) all or substantially all of the Equity Interests or assets (whether now owned or hereafter acquired) of Maker to or in favor of any Person (other than in connection with the lease of the Mortgaged Property and Hospital Facilities), or (b) the failure of Buyer (as defined in the Membership Interest Purchase Agreement) to directly own or control the majority of the aggregate ordinary voting power represented by the Membership Interests (as defined in the Membership Interest Purchase Agreement).

"Code" means the Internal Revenue Code of 1986, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereafter.

"Collateral" means (a) the Mortgaged Property and (b) any other assets in which a Lien is granted after the date hereof to secure the Obligations.

"Environmental Laws" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other governmental directives or requirements, as well as common law, pertaining to the environment, natural resources, pollution, health (including any environmental clean-up statutes and all regulations adopted by any local, state, federal or other Governmental Authority, and any statute, ordinance, code, order, decree, law rule or regulation all of which pertain to or impose liability or standards of conduct concerning medical waste or medical products, equipment or supplies), safety or clean-up that apply to Maker and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4851 et seq.), any analogous state or local laws, any amendments thereto, and the regulations promulgated pursuant to said laws, together with all amendments from time to time to any of the foregoing and judicial interpretations thereof.

"Equity Interests" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, limited liability company interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"Event of Default" has the meaning specified in Section 8(a) hereto.

"GAAP" means generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial

7

Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession) including, without limitation, the FASB Accounting Standards Codification, that are applicable to the circumstances as of the date of determination, consistently applied

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Hazardous Materials" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; any substance the presence of which on the Mortgaged Property is prohibited by any Environmental Laws; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law, including: (a) any "hazardous substance" defined as such in (or for purposes of) CERCLA, or any so-called "superfund" or "superlien" under Law, including the judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products, including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls ("PCB's"), flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents); and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority.

"Hospital Facilities" means: (i) West Suburban Medical Center, a 234-bed acute care hospital with its main campus located at 3 Erie Court, Oak Park, Illinois 60302; (ii) Weiss Memorial Hospital, a 236-bed acute care hospital with its main campus located at 4646 N. Marine Drive, Chicago, Illinois 60640, a campus located at 4601 N. Clarendon Avenue, Chicago, Illinois 60640 and a campus located at 4602 N. Marine Drive, Chicago, Illinois 60640; (iii) the cancer center located at 7420 West Central Avenue, River Forest, Illinois 60305; and (iv) the breast imaging center located at 420 Williams Street, River Forest, Illinois 60305.

"Indebtedness" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money (including principal, interest, fees and charges), (ii) all indebtedness of such Person for the deferred purchase price of property or services, and (iii) all other indebtedness of such Person that would be required to be reflected as debt on the liability side of a consolidated balance sheet of Person in accordance with GAAP.

"Insolvency Event" means, with respect to any Person, the occurrence of any of the following: (i) such Person shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or such Person shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against such Person any case, proceeding or other action of a nature referred to in clause

8

(i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) calendar days.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of the purchase or other acquisition of Equity Interests of another Person, a loan, advance or capital contribution to, guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person (including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor guaranties Indebtedness of such other Person), or the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person which constitute all or substantially all of the assets of such Person or of a division, line of business or other business unit of such Person.

"Indemnified Liability" has the meaning assigned to such term in Section 25.

"Indemnified Party" has the meaning assigned to such term in Section 25.

"Issue Date" has the meaning specified in the preamble hereto.

"Lien" shall mean any mortgage, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, deemed or statutory trust, security conveyance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, and any lease having substantially the same effect as any of the foregoing).

"Maker" has the meaning specified in the preamble hereto.

"Material Adverse Effect" means any event, circumstance or effect that results in or causes a material adverse change in any of (a) the financial condition, business, performance, operations or assets (including any Mortgaged Property and any of the Hospital Facilities) of Maker; (b) the ability of Maker to perform its obligations under any Note Document; or (c) the validity or enforceability of any Note Document or the rights and remedies of Payee thereunder.

"Maturity Date" has the meaning specified in Section 3(a) hereto.

"Membership Interest Purchase Agreement" means that certain Membership Interest Purchase Agreement dated as of November __, 2022 by and between AUM GLOBAL HEALTHCARE, LLC, a Michigan limited liability company, as buyer, and SRC HOSPITAL INVESTMENTS II, LLC, a Delaware limited liability company, as seller ("SRC II"), as the same may from time to time be amended, restated, replaced or modified.

"Mortgage" means each of, and "Mortgages" means the collective reference to, that certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated as of the Closing Date (as defined in the Purchase Agreement), given by Maker (or one of its Affiliates) in favor of Payee, as amended, restated, supplemented or otherwise modified from time to time.

"Mortgaged Property" has the meaning assigned, individually and collectively, to the terms "Property" and "Personalty" in the respective Mortgage.

"Note" has the meaning specified in the preamble hereto.

9

DM3\9131440.9

"Note Documents" means this Note, the Mortgage, and any other agreements, documents or instruments executed and/or delivered by Maker from time to time in connection with the foregoing.

"Obligations" means (a) all of the obligations of Maker to repay the entire outstanding unpaid principal amount of this Note and other amounts under this Note and the other Note Documents, (b) all obligations of Maker under any Note Document, and (c) any and all costs and expenses (including counsel fees and out-of-pocket expenses) incurred by Payee in enforcing any rights under any of the Note Documents.

"Payee" has the meaning specified in the preamble hereto.

"Permits" means all certificates of need, governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals required under all applicable laws.

"Permitted Contest" means, with respect to any tax obligation or other obligation allegedly or potentially owing from Maker to any governmental tax authority or other third party, a contest maintained in good faith by appropriate proceedings promptly instituted and diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made on the books and records and financial statements of the Maker; *provided*, *however*, that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) Maker's title to, and its right to use, the Collateral is not adversely affected thereby and Payee's Lien and priority on such Collateral are not adversely affected, altered or impaired thereby; (c) the Collateral or any part thereof or any interest therein shall not be in any imminent danger of being sold, forfeited or lost by reason of such contest by Maker; and (d) upon a final determination of such contest, Maker shall promptly comply with the requirements thereof.

"Permitted Liens" means (a) Liens for taxes not yet due and payable or the non-payment of which is subject to a Permitted Contest, (b) the matters set forth on the Schedule B of the title insurance policy insuring the lien of the Mortgage, including, without limitation, the standard printed exceptions that are not customarily removed on the Issue Date; (c) zoning regulations and other Laws affecting the Mortgaged Property; (d) matters as shown on the Surveys or that would be revealed by a physical inspection of the Mortgaged Property; (e) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of deposit accounts in the ordinary course of business, (f) deposits or pledges of cash to secure statutory obligations, surety and appeal bonds and other obligations of like nature arising in the ordinary course of business, (g) mechanic's, workmen's, materialmen's or other like Liens arising in the ordinary course of business that are being contested in good faith pursuant to a Permitted Contest, (h) Liens on the Mortgaged Property in favor of First Credit Bank (or other lender acceptable to Payee) pursuant to the Bridge Loan Documents securing Indebtedness in an amount not to exceed Twenty One Million and No/100 Dollars ($21,000,000.00) and (i) Liens securing the Working Capital Facility.

"Permitted Tax Distributions" means, for any taxable year for which Maker is treated under the Code as a Subchapter S corporation, partnership for income tax purposes, disregarded entity for income tax purposes or otherwise disregarded under the Code for income tax purposes, dividends and/or distributions paid by Maker to its partners or members in an amount not to exceed the *product of* (a) taxable income related to such partners' or members' ownership interest in Maker *multiplied by* (b) the sum of the highest marginal federal and state income tax rates in any State in which any such partner or member is organized or resident (or, to the extent such partner or member is itself a pass-through entity or

10

disregarded entity under the Code, the State in which an ultimate taxpaying partner or member of such partner or member is organized or resident) which were applicable in such taxable year.

"Person" means and includes an individual, a partnership, a joint venture, a limited liability company, a corporation or trust, an unincorporated organization, a group, a government or other department or agency thereof, or any other entity.

"Purchase Agreement" has the meaning specified in Section 1 hereto.

"Reimbursable Expenses" has the meaning specified in Section 3(e) hereto.

"Restricted Payment" means any dividend or other distribution, direct or indirect, on account of any shares (or equivalent) of any class of Equity Interests of Maker, now or hereafter outstanding, any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares (or equivalent) of any class of Equity Interests of Maker, now or hereafter outstanding, and any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Equity Interests of Maker, now or hereafter outstanding.

"Transition Service Agreement" shall have the meaning assigned to such term in the Membership Interest Purchase Agreement.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Illinois.

"Working Capital Facility" means a credit facility entered into by Maker (or their Affiliates) with a lender or lenders reasonably acceptable to Payee that provides working capital for the Hospital Facilities and is secured by a first priority Lien on substantially all assets of the Maker (other than the Mortgaged Property). Such Working Capital Facility will be on commercially reasonable terms reflecting a good faith, arms' length negotiation and may require terms customary for revolving credit facilities.

10.    Place of Payment. All payments of principal, interest and other amounts due under this Note shall be made by 3:00 p.m. Central Time on the date when due, in United States Dollars and in immediately available funds and shall be made free and clear of and without reduction or withholding for any taxes, unless such withholding is required by applicable law; provided that, if any applicable law requires the deduction or withholding of any taxes from any such payment, then the sum payable by Maker hereunder shall be increased as necessary so that after such deduction or withholding Payee receives an amount equal to the sum it would have received had no such deduction or withholding of taxes been made. All payments under this Note shall be made by wire transfer of immediately available funds to the account identified on Schedule I hereto or to such other account as Payee (or one of its Affiliates) shall notify Maker in writing from time to time.

Each party listed as a Payee hereby appoints Pipeline Health System, LLC, a Delaware limited liability company, as its agent for purposes of receiving payments under this Note and agrees that any payment made by Maker to the account listed on Schedule I hereto (or any other account as properly noticed to Maker in writing from time to time by Payee (or one of its Affiliates) will be credited to Maker's account as if such funds had been directly transferred to such party.

11.    Notices. Any notice to be given hereunder shall be given in writing and shall be deemed given: (a) when received if given in person, (b) on the date of transmission if sent by facsimile or email

11

with receipt electronically confirmed to the sender, (c) three (3) days after being deposited in the U.S. mail, certified or registered mail, postage prepaid, and (d) if sent by recognized overnight delivery service, the second day following the date given to such overnight delivery service (specified for overnight delivery). All such notices shall be given to Maker and Payee at their respective address set forth below:

| If to Maker: | Ramco Healthcare Holdings, LLC<br>103 Carnegie Center, Suite 345<br>Princeton, NJ 08540<br>Attn: Reddy Rathnakar<br>Email: preddy89@gmail.com |
|---|---|
| With a Copy to: | Benesch Friedlander Coplan and Aronoff<br>71 South Wacker Drive, Suite 1600<br>Chicago, IL 60606<br>Attn: Juan Morado, Jr., Esq.<br>Email: jmorado@beneschlaw.com |
| Sellers: | West Suburban Property Holdings, LLC<br>River Forest Property Holdings, LLC<br>Weis Property Holdings, LLC<br>Weis MOB Property Holdings, LLC<br>c/o SRC Healthcare Investments II, LLC<br>898 N. Sepulveda Blvd., Suite 500<br>El Segundo, CA 90245<br>Attn: Nick Orzano<br>Email: norzano@pipelinehealth.us |
| With a Copy to: | Pipeline Health System, LLC<br>898 N. Pacific Coast Highway, Suite 700<br>El Segundo, CA 90245<br>Attn: Brittany M. Whitman, Esq.<br>Email: bwhitman@pipelinehealth.us |
| And to: | Duane Morris LLP<br>190 South LaSalle Street, Suite 3700<br>Chicago, IL 60603<br>Attn: N. Paul Coyle<br>Email: pcoyle@duanemorris.com |

Any party hereto may designate additional or different addresses for notices or communications by notice to the other party hereto in accordance with the foregoing.

12.     Expense Reimbursement. Maker promises to pay, no later than seven (7) days following written demand therefor, all reasonable, third-party, documented, and out-of-pocket costs and expenses, including reasonable outside attorney's fees, and all other Reimbursable Expenses, incurred by Payee in connection with the collection and enforcement of this Note.

13.     Maximum Rate. In no event shall the amount of interest due or payable under this Note exceed the maximum rate of interest allowed by applicable law and, in the event any such payment is inadvertently paid by Maker or inadvertently received by Payee, then such excess sum shall be credited as

12

a payment of principal hereunder.  It is the express intent of the parties hereto that Maker not pay and Payee not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by Maker under applicable law.  If Maker makes any payment of interest hereunder in excess of such lawful rate, such excess shall be applied to reduce the outstanding principal amount of this Note.

14.     Independent Obligations.  The obligations of Maker hereunder are independent and separate obligations from the obligations of Maker arising under the other Note Documents, and all obligations of Maker hereunder shall be paid without setoff, defense, or counterclaim for any claim arising under the other Note Documents or out of the transactions contemplated thereby.

15.     Waiver of Presentment, Demand and Dishonor.  Maker hereby waives presentment for payment, protest, demand, notice of protest, notice of nonpayment and diligence with respect to this Note, and waives and renounces all rights to the benefits of any statute of limitations or any moratorium, appraisement, exemption, or homestead now provided or that hereafter may be provided by any federal or applicable state statute, including but not limited to exemptions provided by or allowed under the United States Bankruptcy Code, both as to itself and as to all of its property, whether real or personal, against the enforcement and collection of the Indebtedness hereunder and any and all extensions, renewals, and modifications hereof.

16.     Replacement.  Upon receipt of evidence reasonably satisfactory to Maker of the loss, theft, destruction or mutilation of this Note and, in the case of any such loss, theft or destruction of this Note, upon receipt of an indemnity reasonably satisfactory to Maker or, in the case of any such mutilation, upon the surrender and cancellation of this Note, Maker shall execute and deliver, in lieu thereof, a new Note the same terms and conditions and dated the date of such lost, stolen, destroyed or mutilated Note.  Any Note in lieu of which any such new Note has been so executed and delivered by Maker shall not be deemed to be an outstanding Note and shall be deemed cancelled.

17.     Amendment and Waiver.  All amendments to this Note, and any waiver or consent of Payee, must be in writing and signed by Payee and Maker.  No delay or failure on the part of Payee in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Payee of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

18.     Assignment and Transfer.  The rights and obligations of Maker and Payee shall be binding upon and benefit the successors and assigns and transferees of Maker and Payee, as applicable; provided that (i) in no event may Maker assign this Note or any of its rights or obligations hereunder without Payee's prior written consent, which may be given or withheld in Payee's sole and absolute discretion, and (ii) subject to the Right of First Refusal, Payee may assign this Note and its rights and obligations hereunder to any Person without consent of Maker.Upon any assignment or other transfer of this Note by Payee, Maker shall issue a replacement Note with the appropriate legends to the transferee and such transferee shall become a "Payee" for purposes hereof.

19.     Right of First Refusal. If at any point Payee seeks to sell or assign this Note or any rights under the Note Documents to a third-party who is not an Affiliate, Maker will have the right, but not the obligation, to purchase (or have its designee purchase) the Note (or other portion of the Note being assigned) from Payee on the same terms and conditions (including purchase price) as the proposed sale or assignment (such right to purchase, the "Right of First Refusal"). To effect the Right of First Refusal, Payee hereby agrees that it will notify Maker in writing of any proposed sale or assignment and all terms, conditions, prices, and draft documentation related thereto, no later than twenty (20) day prior to any closing of such sale or assignment (such notice, the "ROFR Notice").

13

If Maker elects to purchase the Note (or other portion of the Note being assigned or sold), then Maker will send written notice to Payee of such intent no later than twenty (20) days after receiving the ROFR Notices. Upon sending written notice of such selection, Maker will be bound to purchase the Note (or portion of the note) on such terms, conditions, and price as set forth in the ROFR Notice, and Payee will be obligated to convey, assign, or otherwise transfer such interest to Maker promptly thereafter at such price and on such terms. Such sale will occur no later than ten (10) Business Days following Payee's receipt of Maker's notice electing to exercise the Right of First Refusal.

If Maker elects not to purchase such interest or fails to provide the notice of its election in the twenty-day period, Payee shall be free to convey, assign, or otherwise transfer such interest to the third party at a price not less than stated in the ROFR Notice or on more favorable terms than those stated in the ROFR Notice. Any conveyance by Payee shall be subject to the terms of this Section 19. If Payee shall not have so disposed of such interest to said third party within ninety (90) days after receipt of notice that Maker elects not to exercise the Right of First Refusal or after expiration of the twenty-day period within which to give notice, the provisions of this Section shall again apply to the disposition by Payee of any such interest.

20.     Working Capital Facility. Payee agrees that Maker has the right to enter into a Working Capital Facility and Payee will negotiate in good faith with any lender providing the Working Capital Facility to enter into a customary intercreditor agreement subordinating Payee's lien on the accounts of Maker.

21.     Bridge Loan Facility. The Bridge Loan Documents will be entered into in connection with this Note, and such Indebtedness shall be secured by Liens on the Mortgaged Property with priority over the Liens on the Mortgaged Property created in favor of Payee as more fully set forth in an intercreditor agreement in form and substance satisfactory to Payee.

22.     Governing Law.  This Note shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to any choice or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Illinois.

23.     Waiver of Jury Trial.  EACH OF MAKER AND PAYEE HEREBY KNOWINGLY AND WILLINGLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO KNOWINGLY AND WILLINGLY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO (OR ACCEPT) THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

24.     Submission to Jurisdiction.  EACH OF MAKER AND PAYEE HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES NO ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, SHALL BE COMMENCED IN ANY WAY RELATING TO THIS NOTE, IN ANY FORUM OTHER THAN THE STATE COURT SITTING IN CHICAGO, ILLINOIS OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

14

DM3\9131440.9

DISTRICT OF ILLINOIS, AND ANY APPELLATE COURT FROM ANY THEREOF, IN EACH CASE ARISING OUT OF OR RELATING TO THIS NOTE, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH ILLINOIS STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

25.    Integration; Conflict; No Strict Construction.  This Note represents the agreement of Maker and Payee with respect to the subject matter hereof and supersedes all negotiations and prior writings with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by Maker and Payee relative to subject matter hereof that are not expressly set forth or referred to herein or in the other Note Documents. The parties hereto have participated jointly in the negotiation and drafting of this Note. In the event an ambiguity or question of intent or interpretation arises, this Note shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Note.  Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or thereof in such jurisdiction, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

26.    Construction.  The headings of the various sections and subsections of this Note have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  Unless the context otherwise requires, words in the singular include the plural and words in the plural include the singular.  The words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Note in its entirety and not to any particular provision of this Note unless the context shall otherwise require.  All references herein to Sections, paragraphs, clauses, subclauses and Exhibits shall be deemed references to Sections, paragraphs, clauses and subclauses of, and Exhibits to, this Note unless the context shall otherwise require.  Time is of the essence of this Note.

27.    Setoff Rights.  Maker and Payee hereby acknowledge and agree that, notwithstanding anything to the contrary contained in the Purchase Agreement or the Membership Interest Purchase Agreement, Payee is entitled to set-off or recoup against any amounts owed by Maker or any of its Affiliates, whether currently owed, due or payable in the future (including without limitation amounts owed under this Note (including the principal thereon), and the Transition Services Agreement), any amounts due or payable by Payee or by any of its Affiliates to Maker or any of Maker's Affiliates, including without limitation any indemnification payment due pursuant to either the Purchase Agreement or the Membership Interest Purchase Agreement or pursuant to any other agreement related to the transactions contemplated thereby.

Payee hereby acknowledges and agrees that Maker and its Affiliates may, notwithstanding anything to the contrary contained in the Purchase Agreement, the Membership Interest Purchase Agreement, or any Note Document, set-off and recoup against, or otherwise credit and reduce, on a dollar-for-dollar basis, any amounts owing under this Note or any other Note Document any amount owing by Payee or its

15

DM3\9131440.9

Affiliates under the Purchase Agreement or the Membership Interest Purchase Agreement, even if the parties obligated under such agreements do not match the Payees under this Note.

28.     Indemnification; Special Damages.   Maker agrees to indemnify and hold harmless the Payee and its Affiliates, and each of their respective employees, partners, representatives, shareholders, officers, directors, trustees, agents, advisors, other representatives thereof and Persons having control thereof (any of the foregoing shall be an "Indemnified Party") from and against any and all claims, liabilities, losses, damages, actions, reasonable attorneys' fees and reasonable and documented out-of-pocket expenses (as such fees and out-of-pocket expenses are incurred) and demands by any party (regardless of whether any such Indemnified Party is a party thereto and regardless of whether such matter is initiated by a third party, Maker or any of its equity holders, affiliates or creditors), including the costs of investigating and defending such claims (all of the foregoing, collectively, the "Indemnified Liabilities"), in each case arising out of or resulting from (a) any material breach by Maker of any representation or warranty made hereunder or any other Note Document or the breach of any covenant hereunder or under any other Note Document, in each case, resulting in an Event of Default; (b) [reserved]; (c) [reserved]; (d) any claim in respect of any Collateral caused by Maker's ownership, use or operation of the Collateral from and after the Effective Date (as defined in the Mortgage); and (e) the actual or alleged presence of Hazardous Materials relating in any way to any real property (including the Mortgaged Property) owned, leased or operated, at any time, by Maker; the generation, storage, transportation, handling, release or threat of release of Hazardous Materials by Maker at any location; the non-compliance by Maker or any lessee of a Maker with any Environmental Law (including applicable permits thereunder) applicable to any real property (including the Mortgaged Property); or any claim asserted in any way to any real property (including the Mortgaged Property) at any time owned, leased or operated by Maker, solely to the extent such claims arise out of Hazardous Materials first placed upon the real property after the Effective Date.   The parties' indemnification obligations concerning Hazardous Materials and Environmental Laws with respect to the ownership and use of the Property prior to the date of this Mortgage shall be governed by the terms of the Purchase Agreements.   Notwithstanding the foregoing, no Maker shall be required to indemnify any Indemnified Party pursuant this Section if and to the extent that the Indemnified Liability in respect of which indemnity is sought arises out of the gross negligence or willful misconduct of the Indemnified Party seeking indemnification hereunder.   No claim may be made by Maker against Payee or any other Indemnified Party or by Payee or any other Indemnified Party against Maker for any special, speculative, indirect, exemplary, punitive or consequential damages (collectively "Special Damages") in respect of any breach or wrongful conduct (whether the claim therefor is based on contract, tort or duty imposed by law) in connection with, arising out of, or in any way related to this Note or the transactions contemplated or relationship established by this Note, any other Note Document or any other document executed and/or delivered in connection therewith, or any act, omission or event occurring in connection herewith or therewith; and to the fullest extent permitted by applicable law each of Maker and Payee hereby waives, releases and agrees not to sue upon any such claim for Special Damages, whether or not accrued and whether or not known or suspected to exist in its favor.   The foregoing provisions of this Section 25 shall not apply to any matters or conditions identified in the Purchase Agreement (including but not limited to the Exhibits and Schedules attached thereto, and any underlying document referenced therein) or to any matter or condition which otherwise existed prior to the Issue Date.

29.     Reinstatement.   Notwithstanding anything herein to the contrary, this Note shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of Maker or any other Note Party is made in respect of the Obligations and such payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any bankruptcy, insolvency, reorganization or debtor relief Laws or otherwise, all as if such payment had not been made and whether or not Payee is in possession of or has released this Note or any other Note Document, and regardless of

16

any prior revocation, rescission, termination or reduction of any Note Document or the Obligations.  The obligations of Maker under this paragraph shall survive termination of this Note.

<p style="text-align:center">*        *        *</p>

DM3\9131440.9

IN WITNESS WHEREOF, Maker has executed and delivered this Note on the Issue Date.

**MAKER**

**RAMCO HEALTHCARE HOLDINGS, LLC,** a Delaware limited liability company

By: _____

     Name:_____

     Title:_____

**AUM GLOBAL HEALTHCARE, LLC,** a Michigan limited liability company

By: _____

     Name:_____

     Title:_____

**PIPELINE – WEST SUBURBAN MEDICAL CENTER, LLC,**
**PIPELINE - WEISS MEMORIAL HOSPITAL, LLC**,
**PIPELINE - LAKEFRONT MEDICAL ASSOCIATES, LLC**
**PIPELINE - MIDWEST PHARMACIES, LLC**
**PIPELINE - WEISS MEDICAL SPECIALISTS, LLC**,
each a Delaware limited liability company

By:_____

Name: _____

Title: Authorized Signatory

*[Signature Page – Senior Promissory Note]*

DM3\9131440.9

**<u>Schedule I</u>**

**Payee Account Information**

**[Payee to provide]**

DM3\9131440.9

**Exhibit A**

**Representations and Warranties**

(1) Maker (i) is a limited liability company, is duly organized, validly existing and in good standing under the laws of the State of its formation, is qualified to do business in the State of Illinois and is not organized under any other jurisdiction, and (ii) has all powers and all Permits necessary or desirable in the operation of its business as presently conducted or as proposed to be conducted, except where the failure to have such powers or Permits would not reasonably be expected to have a Material Adverse Effect.

(2) The execution, delivery and performance by Maker of the Note Documents to which it is a party (a) are within its powers, have been duly authorized by all necessary action pursuant to its organizational documents, (b) require no material order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, or any other action of, any Governmental Authority or other Person (except for (x) those that have otherwise been obtained or made on or prior to the Issue Date and which remain in full force and effect on the Issue Date and (y) those, the failure of which to receive, would not reasonably be expected to have a Material Adverse Effect), and (c) do not violate, conflict with or cause a breach or a default under (i) any law applicable to Maker or any of the organizational documents of Maker, or (ii) any agreement or instrument binding upon it (other than any agreement or instrument assumed, assigned or otherwise acquired from Payee or any of its Affiliates), except for such violations, conflicts, breaches or defaults as would not, with respect to this clause (c), reasonably be expected to have a Material Adverse Effect. The parties acknowledge and agree that approval by the Bankruptcy Court of the sale and related issuance of this Note is a condition precedent for the occurrence of the Issue Date.

(3) Each of the Note Documents to which Maker is a party constitutes a valid and binding agreement or instrument of Maker, enforceable against Maker in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles. The terms and conditions of the Note Documents, including, without limitation, the default interest rate, are commercially reasonable and constitute good faith and fair dealing on the part of Payee.

(4) Except as disclosed to Payee in writing prior to the Issue Date, there is no action, suit or proceeding before any court, mediator, arbitrator or Governmental Authority, pending against, or to Maker's knowledge threatened in writing against, Maker that, (a) individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) in any manner draws into question the validity of any of the Note Documents. The foregoing provisions of subclause (a) of this clause (4) shall not apply to any matters or conditions identified in the Purchase Agreement (including but not limited to the Exhibits and Schedules attached thereto, and any underlying document referenced therein) or to any matter or condition which otherwise existed prior to the Issue Date.

(5) Maker is not an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," all within the meaning of the Investment Company Act of 1940.

(6) Maker is not (i) in violation of any Anti-Terrorism Law, (ii) engaging in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, (iii) a Blocked Person, or is controlled by a Blocked Person, (iv) acting for or on behalf of a Blocked Person, (v) associated with a Blocked Person or (vi) providing material, financial or technical support or other services to or in support of acts of terrorism of a Blocked Person.  Neither Maker nor, to the knowledge of Maker, any of its agents acting or benefiting in any capacity in connection with the transactions contemplated by this Note, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

DM3\9131440.9

**Exhibit B**

**Affirmative Covenants**

(1)  Maker will preserve, renew and keep in full force and effect its existence.

(2)  Maker (a) will pay and discharge, at or prior to maturity, all of their respective obligations and liabilities, including tax liabilities (including, without limitation, as required under any Mortgage), except for such obligations and/or liabilities (i) that may be the subject of a Permitted Contest, and (ii) the nonpayment or nondischarge of which could not reasonably be expected to have a Material Adverse Effect or result in a Lien against any Collateral, except for Permitted Liens, and (b) will maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities.  Maker will comply in all material respects with the requirements of all applicable laws and all contractual obligations.  The foregoing provisions of this clause (2) shall not apply to any matters or conditions identified in the Purchase Agreement (including but not limited to the Exhibits and Schedules attached thereto, and any underlying document referenced therein) or to any matter or condition which otherwise existed prior to the Issue Date.

(3)      Maker will give prompt written notice to Payee (a) of any litigation or governmental proceedings pending or threatened (in writing) against Maker which would reasonably be expected to have a Material Adverse Effect or which in any manner calls into question the validity or enforceability of this Note or the other Note Documents, (b) upon Maker becoming aware of the existence of any default under the Note Documents or any Event of Default, (c) of any strikes or other labor disputes pending or, to Maker's knowledge, threatened in writing against Maker.  In the case of any notice given pursuant to foregoing, Maker shall contemporaneously deliver a certificate of a senior officer of Maker specifying the nature and period of existence of such condition, event or change, or specifying the notice given and action taken by any such Person and the nature of such claimed Event of Default, default, event or condition, and what action Maker have taken, are taking and propose to take with respect thereto.

DM3\9131440.9

**EXECUTION COPY**

**SECURITY AGREEMENT**

This SECURITY AGREEMENT, dated as of [_____] (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and among **PIPELINE – WEST SUBURBAN MEDICAL CENTER, LLC**, a Delaware limited liability company, **PIPELINE - WEISS MEMORIAL HOSPITAL, LLC**, a Delaware limited liability company, **PIPELINE - LAKEFRONT MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company, **PIPELINE - MIDWEST PHARMACIES, LLC**, a Delaware limited liability company, **PIPELINE - WEISS MEDICAL SPECIALISTS,** LLC, a Delaware limited liability company (collectively, together with each of their permitted successors and assigns, the "**Grantor**"), in favor of **WEST SUBURBAN PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("West Sub PropCo"), **RIVER FOREST PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("River Forest PropCo"), **WEISS PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("Weiss PropCo"), and **WEISS MOB PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("Weiss MOB Propco"; together with West Sub PropCo, River Forest PropCo and Weiss PropCo, collectively, together with each of their successors and assigns, "**Secured Party**").

WHEREAS, on the date hereof, Grantor and certain of its Affiliates have executed that certain Promissory Note payable to the order of Secured Party (as amended, supplemented or otherwise modified from time to time, the "**Note**") in an aggregate unpaid principal amount equal to SIXTY SEVEN MILLION AND NO/100 DOLLARS ($67,000,000.00) (the "**Loan**"). Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Note;

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all of the Obligations; and

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

      1.      Definitions.

      (a)      For purposes of this Agreement, the following terms shall have the following meanings:

      "**AR Collateral**" has the meaning set forth in Section 2(a) hereof.

      "**Collateral**" means (a) the Mortgaged Property and (b) the AR Collateral and any other assets in which a Lien has been granted to secure the Obligations.

      "**Event of Default**" has the meaning set forth in the Note.

      2.      Grant of Security Interest.

      (a)      To secure the prompt payment and performance in full when due, whether by lapse of time, acceleration, mandatory prepayment or otherwise, of the Obligations, Grantor hereby grants to Secured Party a continuing security interest in, and a right to set off against, any and all right, title and interest of Grantor in and to all of the following, whether now owned or existing or owned, acquired, or arising hereafter (collectively, the "AR Collateral"): (a) all Accounts (as defined in the UCC); (b) all cash and currency; (c) all General Intangibles (as defined in the UCC) reasonably necessary or useful to realizing upon the value of the Accounts; (d) all books and records pertaining to the foregoing; and (e) all collections, Accessions (as

DM3\9131700.4

20573663 v5

defined in the UCC), receipts and all Proceeds (as defined in the UCC) of any and all of the foregoing.

(b)     The Obligations under this Note and the other Note Documents are secured by the Collateral.

(c)     Further Assurances.

(i)     Grantor agrees that from time to time, at its own expense, Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that Secured Party may reasonably request to create, perfect or protect Secured Party's security interest in the Collateral purported to be granted by Grantor under this Agreement, any Mortgage or any other Note Document or to enable Secured Party to exercise and enforce its rights and remedies under any Mortgage or any other Note Document with respect to any of the Collateral.

(ii)     Grantor will execute and deliver to Secured Party such other instruments or notices, as Secured Party may reasonably request, in order to perfect and preserve Secured Party's security interest in the Collateral.

(iii)     Each Grantor hereby authorizes Secured Party to file financing statements, without notice to Grantor, with all appropriate jurisdictions to perfect or protect Secured Party's interest or rights hereunder. Such financing statements may indicate the Collateral as "the AR Collateral" and such phrase's definition as set forth herein, or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in Secured Party's reasonable discretion.

3.     Representations and Warranties. The Grantor represents and warrants as follows:

(a)     Each of this Agreement and the Note has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

4.     Remedies Upon Default.

(a)     If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law.

5.     SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description other than those specifically required by the Note Documents. All rights of the Secured Party and liens and security interests hereunder, and all Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)     any illegality or lack of validity or enforceability of any of the Obligations or any related agreement or instrument;

2

DM3\9131700.4

(b)     any change in the time, place or manner of payment of, or in any other term of, the Obligations, or any rescission, waiver, amendment or other modification of the Note, this Agreement or any other agreement;

(c)     any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Obligations;

(d)     any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Obligations;

(e)     any default, failure or delay, willful or otherwise, in the performance of the Obligations; or

(f)     any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party.

6.     <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

7.     <u>Addresses For Notices</u>. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Note.

8.     <u>Working Capital Facility</u>. Secured Party agrees that Grantor has the right to enter into a Working Capital Facility, which will be secured by Liens with priority over the Liens on the AR Collateral created hereby. Secured Party agrees to negotiate in good faith and to enter into a commercially reasonable intercreditor agreement with the lender or lenders providing the Working Capital Facility.

9.     <u>Expense Reimbursement</u>.  Grantor promises to pay, no later than seven (7) days following written demand therefor, all reasonable, third-party, documented, and out-of-pocket costs and expenses, including reasonable outside attorney's fees, and all other Reimbursable Expenses, incurred by Secured Party in connection with the collection and enforcement of this Agreement.

10.     <u>GOVERNING LAW</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to any choice or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Illinois.

11.     <u>Waiver of Jury Trial</u>.  EACH OF GRANTOR AND SECURED PARTY HEREBY KNOWINGLY AND WILLINGLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO KNOWINGLY AND WILLINGLY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER

3

DM3\9131700.4

PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO (OR ACCEPT) THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

12.     Submission to Jurisdiction.  EACH OF GRANTOR AND SECURED PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES NO ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, SHALL BE COMMENCED IN ANY WAY RELATING TO THIS AGREEMENT, IN ANY FORUM OTHER THAN THE STATE COURT SITTING IN CHICAGO, ILLINOIS OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, AND ANY APPELLATE COURT FROM ANY THEREOF, IN EACH CASE ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH ILLINOIS STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

13.     Integration; Conflict; No Strict Construction.  This Agreement represents the agreement of Grantor and Secured Party with respect to the subject matter hereof and supersedes all negotiations and prior writings with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by Grantor and Secured Party relative to subject matter hereof that are not expressly set forth or referred to herein or in the other Note Documents. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or thereof in such jurisdiction, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

14.     Construction.  The headings of the various sections and subsections of this Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  Unless the context otherwise requires, words in the singular include the plural and words in the plural include the singular.  The words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement unless the context shall otherwise require. All references herein to Sections, paragraphs, clauses, subclauses and Exhibits shall be deemed references to Sections, paragraphs, clauses and subclauses of, and Exhibits to, this Agreement unless the context shall otherwise require.  Time is of the essence of this Agreement.

15.     Setoff Rights.    Grantor and Secured Party hereby acknowledge and agree that, notwithstanding anything to the contrary contained in the Purchase Agreement or the Membership Interest Purchase Agreement, Secured Party is entitled to set-off or recoup against any amounts owed by

4

Grantor or any of its Affiliates, whether currently owed, due or payable in the future (including without limitation amounts owed under this Agreement (including the principal thereon) and the Transition Services Agreement), any amounts due or payable by Secured Party or by any of its Affiliates to Grantor or any of Grantor's Affiliates, including without limitation any indemnification payment due pursuant to either the Purchase Agreement or the Membership Interest Purchase Agreement or pursuant to any other agreement related to the transactions contemplated thereby.

Secured Party hereby acknowledges and agrees that Grantor and its Affiliates may, notwithstanding anything to the contrary contained in the Purchase Agreement, the Membership Interest Purchase Agreement, or any Note Document, set-off and recoup against, or otherwise credit and reduce, on a dollar-for-dollar basis, any amounts owing under this Agreement or any other Note Document any amount owing by Secured Party or its Affiliates under the Purchase Agreement, the Membership Interest Purchase Agreement, even if the parties obligated under such agreements do not match the Secured Party under this Agreement.

\* \* \*

5

DM3\9131700.4

IN WITNESS WHEREOF, Grantor has executed and delivered this Agreement on the date hereof.

**GRANTOR**

**RAMCO HEALTHCARE HOLDINGS, LLC,**
a Delaware limited liability company

By: _____
    Name:_____
    Title:_____

**AUM GLOBAL HEALTHCARE, LLC,**
a Michigan limited liability company

By: _____
    Name:_____
    Title:_____

*Signature Page to Security Agreement*

**BUYER:**


**PIPELINE – WEST SUBURBAN MEDICAL CENTER, LLC,**
**PIPELINE - WEISS MEMORIAL HOSPITAL, LLC,**
**PIPELINE - LAKEFRONT MEDICAL ASSOCIATES, LLC**
**PIPELINE - MIDWEST PHARMACIES, LLC**
**PIPELINE - WEISS MEDICAL SPECIALISTS, LLC**, each a Delaware limited liability company


By:_____
Name: _____
Title: Authorized Signatory


*Signature Page to Security Agreement*

**SECURED PARTY:**

**WEST SUBURBAN PROPERTY HOLDINGS, LLC,**
**RIVER FOREST PROPERTY HOLDINGS, LLC,**
**WEISS PROPERTY HOLDINGS, LLC,**
**WEISS MOB PROPERTY HOLDINGS, LLC**, each a
Delaware limited liability company


By:_____
Name: Nicholas Orzano
Title: Authorized Signatory

*Signature Page to Security Agreement*

**Exhibit 2-B**

**Reinstatement and Amendment
of Real Estate Purchase Agreement**

*Execution Copy*

**REINSTATEMENT AND AMENDMENT OF REAL ESTATE PURCHASE AGREEMENT**

THIS REINSTATEMENT AND AMENDMENT OF REAL ESTATE PURCHASE AGREEMENT (this "**Reinstatement Agreement**") is made by and among **RAMCO HEALTHCARE HOLDINGS, LLC,** a Delaware limited liability company ("**Buyer**"), as buyer, and **WEST SUBURBAN PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("**West Sub PropCo**"), **RIVER FOREST PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("**River Forest PropCo**"), **WEISS PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("**Weiss PropCo**"), and **WEISS MOB PROPERTY HOLDINGS, LLC**, a Delaware limited liability company ("**Weiss MOB Propco**"), each as a seller (each, a "**Seller**" and collectively, "**Sellers**"). Buyer and Sellers are collectively referred to as the "**Parties**" and each individually as a "**Party**." This Reinstatement Agreement shall be effective as of November 22, 2022 (the "**Reinstatement Date**").

RECITALS:

A.     Sellers and Buyer entered into that certain Real Estate Purchase Agreement having an Effective Date of July 19, 2022 ("**Original Purchase Agreement**") with respect to the purchase and sale of the Purchased Assets, as more particularly described in the Original Purchase Agreement.

B.     Pursuant to Section 8.1(a)(v) of the Original Purchase Agreement, Buyer terminated the Original Purchase Agreement on August 30, 2022.

C.     AUM Global Healthcare Management, LLC, a Michigan limited liability company ("**OpCo Purchaser**") has engaged in discussions with SRC Hospital Investments II, LLC, a Delaware limited liability company ("**SRC Healthcare Investments**") and Affiliate of Sellers, in regard to SRC Healthcare Investments' sale of all of the issued and outstanding membership interests of the SRC Subsidiaries (as that term is defined in the Original Purchase Agreement) to OpCo Purchaser.

D.     On October 2, 2022 (the "**Petition Date**"), the Sellers, SRC Healthcare Investments, the SRC Subsidiaries, and certain of their Affiliates (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), initiating chapter 11 bankruptcy cases which are currently pending in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") as Joint Case No. 22-90291 (MI) (the "**Chapter 11 Cases**").

E.     On the Reinstatement Date, SRC Healthcare Investments and AUM Global Healthcare Management, LLC executed that certain Membership Interest Purchase Agreement (as that term is defined in the Original Purchase Agreement and amended herein).

F.     Sellers and Buyer desire to reinstate the Original Purchase Agreement and amend the Original Purchase Agreement as more particularly provided herein.

20045203 v12

1

20045203 v11

G.      The transactions contemplated under the Original Purchase Agreement (as reinstated and amended herein) and under the Membership Interest Purchase Agreement are mutually dependent on each other and constitute an integrated transaction with separate closing dates.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements and undertakings set forth herein, and intending to be legally bound hereby, Sellers and Buyer hereby agree as follows:

1.      **Recitals**.   The foregoing recitals (including the definitions therein) are incorporated into this Reinstatement Agreement and made part of this Reinstatement Agreement as substantive provisions and not as mere recitals.

2.      **Reinstatement and Amendment**. The Original Purchase Agreement is hereby (a) reinstated and agreed to be in full force and effect as if the Original Purchase Agreement had not previously terminated, and (b) amended as set forth in this Reinstatement Agreement.  The Original Purchase Agreement as amended by this Reinstatement Agreement is (x) hereby ratified and confirmed by Sellers and Buyer, and (y) hereinafter referred to collectively as the "**Purchase Agreement**".  The Effective Date of the Purchase Agreement continues to be July 19, 2022.

3.      **Defined Terms**.   The following terms have the following meanings, and such meanings shall amend any meanings provided for the same terms that may appear in the Original Purchase Agreement:

    a. "**ABL Credit Agreement**" means that Credit and Guaranty Agreement, dated as of December 30, 2019, as amended, restated, replaced, supplemented or otherwise modified from time to time, by and among Gardena Hospital, L.P.; ELADH, L.P.; CHHP Management, LLC; CHHP Holdings II, LLC; CPH Hospital Management, LLC; the Subsidiaries; and Pipeline East Dallas, LLC, Avanti Hospitals, LLC; Avanti Hospital Holdings I, LLC; HealthPlus+ Holdings, LLC; Gardena Hospital Management, L.L.C. and ELADH Management, L.L.C., the lenders party thereto and Credit Suisse AG, New York Branch, in its capacity as administrative agent for itself and the other lenders.

    b. "**Actions**" means any pending or threatened claim, cause of action, demand, litigation, action, suit, arbitration, proceeding, or right in action, whether known or unknown, that may be alleged or brought by any Person, Governmental Authority or any administrative, arbitration, or governmental proceeding, investigation, or inquiry.

    c. "**Buyer Senior Financing**" means that certain financing from the Senior Lender to Buyer evidenced by the Buyer Senior Note and secured by the Buyer Senior Mortgage.

    d. "**Buyer Senior Mortgage**" means that certain mortgage agreement between Senior Lender and Buyer securing the Buyer Senior Financing.

2

DM3\9107114.20

e.  "**Buyer Senior Note**" means that certain secured promissory note in the aggregate principal amount of $21,000,000.00, dated as of the Closing Date, as amended, restated, replaced, supplemented or otherwise modified from time to time, made by Buyer in favor of the Senior Lender.

f.  "**Buyer Subordinated Financing**" means that certain financing from the Sellers to Buyer evidenced by the Buyer Subordinated Note and secured by the Buyer Subordinated Security Documents.

g.  "**Buyer Subordinated Security Documents**" means collectively, (i) each certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, each dated as of the Closing Date, as amended, restated, replaced, supplemented or otherwise modified from time to time, from Buyer (or one of its Affiliates), as mortgagor, to the respective Seller, as mortgagee; and (ii) any other agreements and security documents relating to the Buyer Subordinated Financing, in each case, which Buyer Subordinated Security Documents shall be in form and substance reasonably satisfactory to Sellers and Buyer.

h.  "**Buyer Subordinated Note**" means that certain promissory note in the aggregate principal amount of $67,000,000.00, dated as of the Closing Date, as amended, restated, replaced, supplemented or otherwise modified from time to time, made by Buyer in favor of the Sellers, which Buyer Subordinated Note shall be in form and substance reasonably satisfactory to Sellers and Buyer.

i.  "**Claim**" shall have the meaning provided in section 101(5) of the Bankruptcy Code.

j.  "**DIP Credit Agreement**" means the definitive superpriority senior secured debtor-in-possession credit agreement, dated as of October 4, 2022, by and among the Debtors party thereto, the agent and the lenders thereto, as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms, including any ancillary loan documents contemplated therein.

k.  "**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will

3

have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rule of Bankruptcy Procedure, may be filed with respect to such order will not preclude such order from being a Final Order.

l.   "**Intercreditor Agreement**" means that certain intercreditor agreement dated as of the Closing Date, as amended, restated, replaced, supplemented or otherwise modified from time to time, among the Senior Lender and the Sellers that addresses, among other things, the rights and obligations of the Senior Lender and the Sellers with respect to the Buyer Senior Financing and the Buyer Subordinated Financing, which Intercreditor Agreement shall be in form and substance reasonably satisfactory to Sellers, Buyer and Senior Lender.

m.   "**Membership Interest Purchase Agreement**" means the Membership Interest Purchase Agreement dated as of November 21, 2022 (as the same may be amended, restated, modified or otherwise supplemented from time to time), by and between SRC Healthcare Investments, as seller and AUM Global Healthcare Management, LLC, as buyer, with respect to the transfer by SRC Healthcare Investments of the Membership Interests.

n.   "**Sale Order**" means a Final Order of the Bankruptcy Court approving the transactions contemplated under the Purchase Agreement (including the assumption and assignment of certain contracts and unexpired leases) and the Membership Interest Purchase Agreement, consistent with the respective terms and conditions of such agreements (as applicable), with the subject assets being transferred free and clear of all Claims and Encumbrances except as expressly permitted in the Purchase Agreement and Membership Interest Purchase Agreement (as applicable), which Final Order shall be in form and substance reasonably acceptable to Sellers and Buyer..

o.   "**Senior Lender**" means First Credit Bank (or other lender acceptable to the Parties).

p.   "**Term Loan Credit Agreement**" means that certain Amended and Restated Facility Agreement, dated as of December 30, 2019 (as amended, modified and restated from time to time), by and among Pipeline Health System, as a Guarantor, Pipeline Health System Holdings, LLC, a Delaware limited liability company, and each of Pipeline Health System's subsidiaries (other than certain excluded subsidiaries), as Borrowers, the Lenders party thereto, and Alter Domus Products Corp. (formerly known as Cortland Products Corp.), a Delaware corporation, as agent for itself and the other Lenders.

Capitalized terms used but not defined in this Reinstatement Agreement shall have the meanings provided in the Original Purchase Agreement.

4

DM3\9107114.20

4.     **Free and Clear Sale**.   Notwithstanding anything in the Original Purchase Agreement to the contrary, the Purchased Assets shall be transferred to Buyer in accordance with the terms and conditions of the Purchase Agreement free and clear of all Claims and Encumbrances, except those Permitted Encumbrances previously approved or deemed to be approved by Buyer pursuant to Section 2.6 of the Purchase Agreement.   Notwithstanding the foregoing or anything in the Purchase Agreement to the contrary and for the avoidance of doubt, Sellers shall pay up to a maximum of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) at the Closing to cause any mechanic's liens or similar statutory liens on the Purchased Assets to be released.   Buyer shall pay any and all additional amounts (*i.e.,* above $1,500,000.00) required to cause any mechanic's liens or similar statutory liens on the Purchased Assets to be released, provided that such payments by Buyer shall be *in addition to* and not be a reduction of the Purchase Price.

5.     **Section 2.2(c) Amendment**.   Section 2.2(c) of the Original Purchase Agreement is hereby deleted in its entirety and replaced and restated with the following:

"(c)  At the Closing, Buyer will pay to Sellers an amount equal to (i) the Purchase Price, (ii) less (A) the Deposit (without interest) in the amount of $3,000,000.00, and (B) an amount equal to the Buyer Subordinated Note in the amount of $67,000,000.00 (which is to be delivered to Sellers as provided in Section 2.5 hereof), and (iii) as further adjusted pursuant to the terms hereof, which amount shall be payable in immediately available funds by wire transfer to the account of Sellers as set forth in wiring instructions provided by Sellers to Buyer.   For the avoidance of doubt, the Parties acknowledge that at Closing, Sellers are to receive additional gross proceeds in immediately available funds, *before* any adjustments, in the amount of $22,000,000.00, which amount shall be in the form of additional cash contributions from Buyer in the amount of $2,000,000.00 and proceeds from the Buyer Senior Financing (i.e. $92,000,000.00 Purchase Price, *less* $3,000,000.00 Deposit (previously disbursed to Sellers and applied to the Purchase Price), *less* $67,000,000.00 Buyer Subordinated Note, *equals* $22,000,000.00 in additional cash from Buyer in the amount of $2,000,000.00 and proceeds from Buyer Senior Financing, which $22,000,000.00 shall be the amount of the gross proceeds (before any adjustments) paid to Sellers at Closing).

**Section 2.3 Amendment**.   The first (1st) paragraph of Section 2.3 of the Original Purchase Agreement is hereby deleted in its entirety and replaced and restated with the following:  "Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated under this Agreement (the "**Closing**") shall take place electronically on or before that date that is thirty (30) days from the date of the MIPA Closing or such other date as the Parties may mutually agree upon in writing (the "**Closing Date**"); provided that by notice given to Sellers not less than five (5) days before the end of the initial Closing Date, Buyer may extend the Closing Date in order to close on the Buyer Senior Financing, but in no event may Buyer extend the Closing Date beyond June 30, 2023."

6.     **Section 2.4 Amendment**.   Section 2.4 is hereby amended to include the following additional items that Sellers must deliver to Buyer at Closing:

5

DM3\9107114.20

(n)     A certified copy of the Sale Order entered by the Bankruptcy Court.

(o)     A duly executed copy of the Intercreditor Agreement.

(p)     Written evidence of Credit Suisse AG, New York Branch's (i) consent to the sale of the Purchased Assets free and clear of all Claims and Encumbrances arising under the ABL Credit Agreement pursuant to the Sale Order and (ii) release/termination of any Encumbrances on the Purchased Assets arising under the ABL Credit Agreement; provided that the Parties agree this deliverable shall be satisfied if the Sale Order includes factual findings regarding such consent and ordering such release/termination (in form and substance reasonably acceptable to Sellers and the Title Company).

7.     **Section 2.5 Amendment**. Section 2.5 is hereby amended to include the following additional items that Buyer must deliver to Sellers at Closing:

(i)     A duly executed copy of the Buyer Subordinated Note.

(j)     A duly executed copy of each Buyer Subordinated Security Document.

(l)     A duly executed copy of the Intercreditor Agreement.

8.     **Section 2.6(d) Amendment**. Notwithstanding the change in the "Closing Date" pursuant to Section 5 of this Reinstatement Agreement or anything in the Original Purchase Agreement to the contrary, the Due Diligence Period has expired, and as a result, the last complete sentence of Section 2.6(d) of the Original Purchase Agreement (providing Buyer with a discretionary termination right during or at the end of the Due Diligence Period) is hereby deleted in its entirety.

9.     **Section 3.2 Qualification**. Buyer acknowledges that the effectiveness of Section 3.2 is subject to approval of the Bankruptcy Court.

10.     **Section 5.5 Amendment**. Section 5.5 of the Original Purchase Agreement is hereby deleted in its entirety and replaced and restated with the following:

"**5.5 Sale Order**. Sellers shall diligently pursue entry of the Sale Order in the Chapter 11 Cases. The Debtors shall serve the motion for approval and entry of the Sale Order on that portion of the Debtors' creditor matrix in the Chapter 11 Cases related to the Debtors' operations in Illinois."

11.     **Section 6.2 Amendment**. Section 6.2 of the Original Purchase Agreement is hereby deleted in its entirety and replaced and restated with the following:

"**6.2   Pre-Closing Confirmations.** Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that the IHFSRB has issued the IHFSRB Approval."

DM3\9107114.20

12.      **Section 6.4 Amendment**.   Section 6.4 of the Original Purchase Agreement is hereby deleted in its entirety and replaced and restated with the following: "**6.4  Reserved**."

13.      **Section 6.7 Amendment**.   Section 6.7 of the Original Purchase Agreement is hereby deleted in its entirety and replaced and restated with the following: "**6.7  Entry of Sale Order**. The Bankruptcy Court shall have entered the Sale Order."

14.      **Section 7.2 Amendment**.   Section 7.2 of the Original Purchase Agreement is hereby deleted in its entirety and replaced and restated with the following:

> "**7.2  Pre-Closing Confirmations.** Sellers shall have obtained documentation or other evidence reasonably satisfactory to Sellers that the IHFSRB has issued the IHFSRB Approval."

15.      **Section 8.1(a)(ii) and (iii) Amendment**.   Section 8.1(a)(ii) and (iii) of the Original Purchase Agreement are each  hereby deleted in its entirety and replaced and restated with the following:

> "(ii)     by Buyer, if Sellers breach or fail to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) cannot be or has not been cured within thirty (30) days following delivery of written notice of such breach or failure to perform and (2) has not been waived by Buyer;"

> "(iii)    by Sellers, if Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) cannot be or has not been cured within thirty (30) days following delivery of written notice of such breach or failure to perform and (2) has not been waived by Sellers;"

16.      **Section 8.1(a)(iv) Amendment**.   Section 8.1(a)(iv) of the Original Purchase Agreement is hereby deleted in its entirety and replaced and restated with the following:

> "(iv)    by Buyer, immediately upon the occurrence of any of the following events:

> > (A)     the Bankruptcy Court denies the motion to approve the Sale Order;

> > (B)     the Debtors pursue approval of an alternative transaction with respect to the Purchased Assets, the Membership Interests, or the assets of the SRC Subsidiaries;

> > (C)     the dismissal or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;

> > (D)     the appointment of a chapter 11 trustee or an examiner with expanded powers pursuant to section 1106(b) of the Bankruptcy Code; or

7

DM3\9107114.20

> (E)    A Governmental Authority issues a Final Order or similar ruling prohibiting the transactions contemplated under the Purchase Agreement or under the Membership Interest Agreement; or"

17.    **Section 8.1(c) Amendment**.  Section 8.1(c) of the Original Purchase Agreement is hereby deleted in its entirety and replaced and restated with the following: "In the event of a termination of this Agreement pursuant to Section 8.1(a), each Party shall pay the costs and expenses incurred by it in connection with this Agreement, and this Agreement shall forthwith become void and there shall be no liability on the part of either Party."

18.    **Section 9.3(b) Amendment; Exhibit H; References to Pipeline Guaranty Agreement**.  The last sentence of Section 9.3(b) and Exhibit H of the Original Purchase Agreement together with any and all references in the Original Purchase Agreement to the "Pipeline Guaranty Agreement" are hereby deleted in their entirety, Buyer and Sellers agreeing that Sellers shall have no obligation to cause the Pipeline Guaranty Agreement to be provided at the Closing.

19.    **Intercreditor Agreement**.  As a result of Buyer intending to obtain both the Buyer Senior Financing and the Buyer Subordinated Financing in connection with the financing of the Purchase Price, Sellers shall reasonably cooperate with Buyer and the Senior Lender in connection with the preparation of the Intercreditor Agreement.

20.    **Bifurcated Closing**.  The Parties acknowledge that there will be a bifurcated closing, with the closing of the transactions contemplated under the Membership Interest Purchase Agreement occurring on December 2, 2022 (the "**MIPA Closing**") and the closing hereunder occurring on the Closing Date.

21.    **Disclosure Schedules**.  The Disclosure Schedules delivered to Buyer dated July 19, 2022, in connection with the delivery of the Original Purchase Agreement, are replaced in their entirety with the Amended and Restated Disclosure Schedules attached hereto as **Exhibit A**.

22.    **Tenant Estoppel Certificates**.  Notwithstanding anything in the Original Purchase Agreement or herein to the contrary, Buyer acknowledges that the Tenant Estoppel Requirement in Section 5.11 of the Original Purchase Agreement has been met and that Sellers shall have no further obligation to obtain a Tenant Estoppel Certificate from any Tenant or to deliver any additional Tenant Estoppel Certificates to Buyer.

23.    **Governing Law**.  This Reinstatement Agreement shall be governed by the laws of the State of Illinois, without regard to rules regarding conflicts of laws.

24.    **Counterparts**.  This Reinstatement Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

25.    **Entire Agreement**.  The Original Purchase Agreement, as reinstated and amended by this Reinstatement Agreement, together with the schedules and exhibits attached to the Original Purchase Agreement and this Reinstatement Agreement, contains all of the terms

DM3\9107114.20

and conditions of the agreement between the parties hereto, and any and all prior and contemporaneous oral and written agreements are merged herein.

26. **Amendments; Waivers**. This Reinstatement Agreement cannot be changed nor can any provision of this Reinstatement Agreement, or any right or remedy of any party, be waived orally. Changes and waivers can only be made in writing, and the change or waiver must be signed by the party against whom the change or waiver is sought to be enforced. Any waiver of any provision of this Reinstatement Agreement, or any right or remedy, given on any one or more occasions shall not be deemed a waiver with respect to any other occasion.

27. **Severability**. If one or more of the provisions of this Reinstatement Agreement or the application thereof shall be invoked, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions or any other application thereof shall in no way be affected or impaired.

*[Signatures Appear on Following Pages]*

9

DM3\9107114.20

DocuSign Envelope ID: 0F9A28E0-73B2-4F4B-A131-61A1C402793F

IN WITNESS WHEREOF, the parties hereto have caused this Reinstatement Agreement to be duly executed on the respective dates specified below, but effective as of the Reinstatement Date.

**SELLERS:**

WEST SUBURBAN PROPERTY HOLDINGS, LLC
RIVER FOREST PROPERTY HOLDINGS, LLC
WEISS PROPERTY HOLDINGS, LLC
WEISS MOB PROPERTY HOLDINGS, LLC

By:_____
Name: Nicholas Orzano
Title: Authorized Signatory


**BUYER:**

RAMCO HEALTHCARE HOLDINGS, LLC


By:_____
Name: Rathnaker Reddy Patlola
Tile:  Managing Member


*Signature page to Reinstatement and Amendment of Real Estate Purchase Agreement*

DocuSign Envelope ID: 358BD986-532A-4106-96CF-79FC99F85188

IN WITNESS WHEREOF, the parties hereto have caused this Reinstatement Agreement to be duly executed on the respective dates specified below, but effective as of the Reinstatement Date.

**SELLERS:**

WEST SUBURBAN PROPERTY HOLDINGS, LLC
RIVER FOREST PROPERTY HOLDINGS, LLC
WEISS PROPERTY HOLDINGS, LLC
WEISS MOB PROPERTY HOLDINGS, LLC


By:_____
Name: Nicholas Orzano
Title: Authorized Signatory



**BUYER:**

RAMCO HEALTHCARE HOLDINGS, LLC


By:_____
    *Rathnaker Reddy Patlola*
Name: Rathnaker Reddy Patlola
Tile: Managing Member

*Signature page to Reinstatement and Amendment of Real Estate Purchase Agreement*

**EXHIBIT A**

**AMENDED AND RESTATED DISCLOSURE SCHEDULES**

**Exhibit 3-A**

**Third Amendment to Amended and
Restated West Sub/River Forest Master Lease**

## THIRD AMENDMENT TO AMENDED AND RESTATED
## WEST SUB/RIVER FOREST MASTER LEASE

**THIS THIRD AMENDMENT TO AMENDED AND RESTATED MASTER LEASE** (this "**Amendment**") is made and entered into effective as of December __, 2022, by and between **WEST SUBURBAN PROPERTY HOLDINGS, LLC**, a Delaware limited liability company and **RIVER FOREST PROPERTY HOLDINGS, LLC**, a Delaware limited liability company (collectively, the "**Landlord**") and **PIPELINE -WEST SUBURBAN MEDICAL CENTER, LLC**, a Delaware limited liability company (the "**Tenant**").

## RECITALS

A.      Landlord and Tenant entered into that certain Master Lease dated as of January 28, 2019, between Landlord and Tenant (the "**Master Lease**") with respect to that certain premises known generally as West Suburban Medical Center, River Forest Medical Center and related parking garages in the Cities of Oak Park and River Forest, Cook County, Illinois, as more specifically described therein (the "**Premises**").

B.      Landlord and Tenant amended and restated the Master Lease by that certain Amended and Restated Master Lease dated as of December 30, 2019 (the "**Original A/R Master Lease**"), and further amended the Original Master Lease by that certain First Amendment to Amended and Restated Master Lease dated August 25, 2020, but effective as of January 1, 2020 (the "**First Amendment**"), and that certain Second Amendment to Amended and Restated Master Lease effective as of January 1, 2020 (the "**Second Amendment**," and collectively with the First Amendment and the Original A/R Master Lease, the "**A/R Master Lease**").

C.      Landlord, River Forest Property Holdings, LLC, Weiss Property Holdings, LLC and Weiss MOB Property Holdings, LLC (collectively, the "**Sellers**") and Ramco Healthcare Holdings, LLC (the "**Buyer**") have entered into that certain Real Estate Purchase Agreement having an effective date of July 19, 2022, as reinstated and amended by that certain Reinstatement and Amendment of Real Estate Purchase Agreement dated as of November ___, 2022 (collectively, the "**Purchase Agreement**"), with respect to the purchase and sale of the Purchased Assets, as defined and more particularly described in the Purchase Agreement.

D.      Landlord and Tenant now desire to further amend the A/R Master Lease.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.   Recitals; Defined Terms.   The above Recitals are incorporated herein by reference.  Any capitalized terms not otherwise defined herein shall have the meaning given them in the A/R Master Lease.

1

DM3\9205541.8
20598266 v2

2.  <u>Modifications to A/R Master Lease</u>.

    (a) Notwithstanding anything in the A/R Master Lease to the contrary regarding any abatements of Base Rent, Additional Rent, and all other monetary obligations of Tenant payable to Landlord under the A/R Master Lease during the Abatement Period, commencing on that date which is thirty (30) days from the date hereof, and continuing until the date on which Buyer, or its successors or assigns, completes the acquisition of the Purchased Assets pursuant to the Purchase Agreement (the "**Rent Payment Period**"), Tenant shall pay Base Rent to the Landlord in the amount of $333,333.33 per month, such amount being payable on the first day of each month, without any demand, abatement or offset. For the avoidance of doubt, Base Rent shall be abated until the date that is thirty (30) days from the date hereof.

    (b) Further, all payments required to be paid by Tenant under (i) Section 4.2 of the Original A/R Master Lease, or (ii) elsewhere in the A/R Master Lease shall no longer be abated and shall be paid by Tenant during the Rent Payment Period.

    (c) Notwithstanding anything in the A/R Master Lease to the contrary, Tenant shall have no obligation to replenish any security deposit.

    (d) Sections 5.19 and 6.2.1.3 of the A/R Master Lease are hereby deleted in their entirety.

    (e) Notwithstanding anything in the A/R Master Lease to the contrary, in the event of any casualty or condemnation as contemplated in Section 12 and 13 of the A/R Master Lease, Landlord shall not have the right to terminate the A/R Master Lease, provided that, in either case, Tenant proceeds to restore the applicable Facility.

    (f) The term of the A/R Master Lease shall expire on June 30, 2023; provided, however, Tenant shall have the right to extend the term of the A/R Master Lease on the same terms and conditions for one (1) additional period of six (6) months by providing Landlord written notice of such extension prior to the expiration of the current term.

3.  <u>Absolute Net Lease; No Landlord Obligations</u>. Landlord and Tenant agree that the A/R Lease is and continues to be an "Absolute Net Lease" as set forth in Section 4.6 of the A/R Master Lease and, notwithstanding anything in the A/R Master Lease to the contrary, Landlord shall have no further obligations to Tenant thereunder, including, without limitation, the obligation to make or pay for any improvements, to provide or pay for any services or to make any other contributions to Tenant.

4.  <u>No Credit Against Purchase Price</u>. None of the payments made with respect to the Lease Obligations shall be credited against to the Purchase Price (as defined in the Purchase Agreement) payable to Sellers by Buyer under the Purchase Agreement.

2

DM3\9205541.8

5.   <u>Waiver of Defaults</u>.  Landlord hereby releases, waives and forever discharges Tenant from any obligations, liabilities or defaults under the A/R Master Lease occurring or accruing any time up to the date hereof.

6.   <u>Ratification</u>.  Except for the modifications set forth herein set forth herein, the A/R Master Lease is hereby ratified and shall remain in full force and effect.

7.   <u>Miscellaneous</u>.  This Amendment may be executed in multiple counterparts or by email or facsimile transmissions, each of which shall be treated as an original of this Amendment for all purposes, and all of which shall constitute one (1) Amendment binding upon all of the parties hereto.  The terms and conditions of this Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  This Amendment shall be construed in accordance with the laws of the State of Illinois.  This Amendment contains the entire agreement between the parties hereto with respect to the amendment to the A/R Master Lease, and the terms of this Amendment are contractual and not merely recitals.  From and after the date hereof, references to the "Lease" or the "A/R Master Lease" (including, without limitation, any and all references contained in this Amendment) shall mean the Lease or the A/R Master Lease as amended by this Amendment.

[Signatures Contained on Following Page]

3

IN WITNESS WHEREOF, Landlord and Tenant have caused this Third Amendment to Amended and Restated Master Lease be executed effective as of the date first set forth above.

**LANDLORD:**

**WEST SUBURBAN PROPERTY HOLDINGS, LLC**, a Delaware limited liability company

By: _____

Name: _____

Title: Authorized Signatory

**RIVER FOREST PROPERTY HOLDINGS, LLC**, a Delaware limited liability company

By: _____

Name: _____

Title: Authorized Signatory

**TENANT:**

**PIPELINE –  WEST SUBURBAN MEDICAL CENTER, LLC**, a Delaware limited liability company

By: _____

Name: _____

Title: Authorized Signatory

Signature Page to Third Amendment to A/R Master Lease

20598266 v2

**Exhibit 3-B**

**Sixth Amendment to**
**Combined Medical Office Lease**

## SIXTH AMENDMENT TO COMBINED MEDICAL
## OFFICE LEASE

### (WEISS MOB – PIPELINE - LAKEFRONT MEDICAL ASSOCIATES MEDICAL OFFICE LEASE)

**THIS SIXTH AMENDMENT TO COMBINED MEDICAL OFFICE LEASE** (this "**Amendment**") is made and entered into effective as of December __, 2022, by and between **WEISS MOB PROPERTY HOLDINGS, LLC**, a Delaware limited liability company (the "**Landlord**") and **PIPELINE - LAKEFRONT MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company (the "**Tenant**").

### RECITALS

A.      Landlord and Tenant are parties to that certain Office Lease dated May 26, 2005, as amended (i) by Office Lease Amendment (First Floor) dated May, 2010, (ii) by Office Lease Amendment (Third Floor) dated June, 2010, (iii) by Second Amendment to Lease dated as of April 16, 2018, (iv) by Third Amendment to Combined Medical  Office Lease dated as of August 25, 2020, (v) by Fourth Amendment to Combined Medical Office Lease dated as of December 15, 2020, and (vi) by Fifth  Amendment to Combined Medical Office Lease effective as of January 1, 2020 (collectively, the "**Lease**"), with respect to that certain premises located at 4700 N. Marine Drive, Chicago, Cook County, Illinois, as more specifically described therein (the "**Premises**").

B.      Landlord, West Suburban Property Holdings, LLC, River Forest Property Holdings, LLC, and Weiss Property Holdings, LLC (collectively, the "**Sellers**") and Ramco Healthcare Holdings, LLC (the "**Buyer**") have entered into that certain Real Estate Purchase Agreement having an effective date of July 19, 2022, as reinstated and amended by that certain Reinstatement and Amendment of Real Estate Purchase Agreement dated as of November ___, 2022 (collectively, the "**Purchase Agreement**"), with respect to the purchase and sale of the Purchased Assets, as defined and more particularly described in the Purchase Agreement.

C.      Landlord and Tenant now desire to further amend the Lease.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.  Recitals; Defined Terms.  The above Recitals are incorporated herein by reference.  Any capitalized terms not otherwise defined herein shall have the meaning given them in the Lease.

2.  Modifications to Lease.

    (a) Notwithstanding anything in the Lease to the contrary, regarding any abatements of Base Rent, Additional Rent, and all other monetary obligations of Tenant payable to Landlord under the Lease during the Abatement Period, commencing on that date that is thirty (30) days from the date hereof, and continuing until the date on which Buyer, or its successors or assigns, completes the acquisition of the Purchased Assets pursuant to the Purchase Agreement (the "**Rent Payment**

1

**Period**"), Tenant shall pay Base Rent to the Landlord in the amount of $333,333.33 per month, such amount being payable on the first day of each month, without any demand, abatement or offset.  For the avoidance of doubt, Base Rent shall be abated until the date that is thirty (30) days from the date hereof.

(b) Further, all payments required to be paid by Tenant under the Lease, including all Additional Rent and other amounts otherwise payable by Tenant shall no longer be abated and shall be paid by Tenant during the Rent Payment Period (all such payments being hereinafter, together with the Base Rent referenced above and being paid during the Rent Payment Period, collectively, the "**Lease Obligations**").

(c) Notwithstanding anything in the Lease to the contrary, Tenant shall have no obligation to replenish any security deposit.

(d) Notwithstanding anything in the Lease to the contrary, any financing, secured or otherwise by Tenant, and any mechanics liens filed against the Premises relating to activities prior to the date hereof, shall not be a default hereunder.

(e) Notwithstanding anything in the Lease to the contrary, in the event of any casualty or condemnation as contemplated in the Lease, Landlord shall not have the right to terminate the Lease, provided that, in either case, Tenant proceeds to restore the Premises.

(f) The term of the Lease shall expire on June 30, 2023; provided, however, Tenant shall have the right to extend the term of the Lease on the same terms and conditions for one (1) additional period of six (6) months by providing Landlord written notice of such extension prior to the expiration of the current term.

3. <u>Absolute Net Lease; No Landlord Obligations</u>.  Notwithstanding anything in the Lease to the contrary, Landlord and Tenant agree that the Lease shall be an "Absolute Net Lease" and Landlord shall have no further obligations to Tenant thereunder, including, without limitation, the obligation to make or pay for any improvements, to provide or pay for any services or to make any other contributions to Tenant.

4. <u>No Credit Against Purchase Price</u>.   None of the payments made with respect to the Lease Obligations shall be credited against to the Purchase Price (as defined in the Purchase Agreement) payable to Sellers by Buyer under the Purchase Agreement.

5. <u>Waiver of Default</u>.  Landlord hereby releases, waives and forever discharges Tenant from any obligations, liabilities or defaults under the Lease occurring or accruing any time up to the date hereof.

6. <u>Ratification</u>.  Except for the modificationsset forth herein, the Lease is hereby ratified and shall remain in full force and effect.

7. <u>Miscellaneous</u>.  This Amendment may be executed in multiple counterparts or by email or facsimile transmissions, each of which shall be treated as an original of this Amendment for

2

all purposes, and all of which shall constitute one (1) Amendment binding upon all of the parties hereto.  The terms and conditions of this Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  This Amendment shall be construed in accordance with the laws of the State of Illinois.  This Amendment contains the entire agreement between the parties hereto with respect to the amendment to the Lease, and the terms of this Amendment are contractual and not merely recitals.  From and after the date hereof, references to the "Lease" (including, without limitation, any and all references contained in this Amendment) shall mean the Lease as amended by this Amendment.

[Signatures Contained on Following Page]

DM3\9220260.7
20598295 v2

IN WITNESS WHEREOF, Landlord and Tenant have caused this Sixth Amendment to Combined Medical Office Lease be executed effective as of the date first set forth above.

**LANDLORD:**

**WEISS MOB PROPERTY HOLDINGS, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: Authorized Signatory

**TENANT:**

**PIPELINE – LAKEFRONT MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: Authorized Signatory

Signature Page to Sixth Amendment to Combined Medical Office Lease

20598295 v2

**Exhibit 3-C**

**Second Amendment to Amended
and Restated Weiss Hospital Master Lease**

## SECOND AMENDMENT TO AMENDED AND RESTATED
## WEISS HOSPITAL MASTER LEASE

**THIS SECOND AMENDMENT TO AMENDED AND RESTATED MASTER LEASE** (this "**Amendment**") is made and entered into effective as of December __, 2022, by and between **WEISS PROPERTY HOLDINGS, LLC**, a Delaware limited liability company (the "**Landlord**") and **PIPELINE - WEISS MEMORIAL HOSPITAL, LLC**, a Delaware limited liability company (the "**Tenant**").

## RECITALS

A.      Landlord and Tenant entered into that certain Master Lease dated as of January 28, 2019, between Landlord and Tenant (the "**Master Lease**") with respect to that certain premises known generally as Weiss Memorial Hospital and parking garage located in the City of Chicago, Cook County, Illinois, as more specifically described therein (the "**Premises**").

B.      Landlord and Tenant amended and restated the Master Lease by that certain Amended and Restated Master Lease dated as of December 30, 2019 (the "**Original A/R Master Lease**"), and further amended the Original Master Lease by that certain First Amendment to Amended and Restated Master Lease effective as of January 1, 2020 (the "**First Amendment**," and collectively with the Original A/R Master Lease, the "**A/R Master Lease**").

C.      Landlord, West Suburban Property Holdings, LLC, River Forest Property Holdings, LLC, and Weiss MOB Property Holdings, LLC (collectively, the "**Sellers**") and Ramco Healthcare Holdings, LLC (the "**Buyer**") have entered into that certain Real Estate Purchase Agreement having an effective date of July 19, 2022, as reinstated and amended by that certain Reinstatement and Amendment of Real Estate Purchase Agreement dated as of November ___, 2022 (collectively, the "**Purchase Agreement**"), with respect to the purchase and sale of the Purchased Assets, as defined and more particularly described in the Purchase Agreement.

D.      Landlord and Tenant now desire to further amend the A/R Master Lease.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.  Recitals; Defined Terms.  The above Recitals are incorporated herein by reference.  Any capitalized terms not otherwise defined herein shall have the meaning given them in the A/R Master Lease.

2.  Modifications to A/R Master Lease.

(a) Notwithstanding anything in the A/R Master Lease to the contrary regarding any abatements of Base Rent, Additional Rent, and all other monetary obligations of Tenant payable to Landlord under the A/R Master Lease during the Abatement Period, commencing on that date that is thirty (30) days from the date hereof and continuing until the date on which Buyer, or its successors or assigns, completes

1

DM3\9219686.9

20598259 v2

the acquisition of the Purchased Assets pursuant to the Purchase Agreement (the "**Rent Payment Period**"), Tenant shall pay Base Rent to the Landlord in the amount of $333,333.33 per month, such amount being payable on the first day of each month, without any demand, abatement or offset. For the avoidance of doubt, Base Rent shall be abated until the date that is thirty (30) days from the date hereof.

(b) Further, all payments required to be paid by Tenant under (i) Section 4.2 of the Original A/R Master Lease, or (ii) elsewhere in the A/R Master Lease shall no longer be abated and shall be paid by Tenant during the Rent Payment Period (all such payments being hereinafter, together with the Base Rent referenced above and being paid during the Rent Payment Period, collectively, the "**Lease Obligations**").

(c) Notwithstanding anything in the A/R Master Lease to the contrary, Tenant shall have no obligation to replenish any security deposit.

(d) Sections 5.19 and 6.2.1.3 of the A/R Master Lease are hereby deleted in their entirety.

(e) Notwithstanding anything in the A/R Master Lease to the contrary, in the event of any casualty or condemnation as contemplated in Section 12 and 13 of the A/R Master Lease, Landlord shall not have the right to terminate the A/R Master Lease, provided that, in either case, Tenant proceeds to restore the applicable Facility.

(f) The term of the A/R Master Lease shall expire on June 30, 2023; provided, however, Tenant shall have the right to extend the term of the A/R Master Lease on the same terms and conditions for one (1) additional period of six (6) months by providing Landlord written notice of such extension prior to the expiration of the current term.

3. <u>Absolute Net Lease; No Landlord Obligations</u>. Landlord and Tenant agree that the A/R Lease is and continues to be an "Absolute Net Lease" as set forth in Section 4.6 of the A/R Master Lease and, notwithstanding anything in the A/R Master Lease to the contrary, Landlord shall have no further obligations to Tenant thereunder, including, without limitation, the obligation to make or pay for any improvements, to provide or pay for any services or to make any other contributions to Tenant.

4. <u>No Credit Against Purchase Price</u>. None of the payments made with respect to the Lease Obligations shall be credited against to the Purchase Price (as defined in the Purchase Agreement) payable to Sellers by Buyer under the Purchase Agreement.

5. <u>Waiver of Defaults</u>. Landlord hereby releases, waives and forever discharges Tenant from any obligations, liabilities or defaults under the A/R Master Lease occurring or accruing any time up to the date hereof.

6. <u>Ratification</u>. Except for the modifications set forth herein, the A/R Master Lease is hereby ratified and shall remain in full force and effect

2

7.   <u>Miscellaneous</u>.  This Amendment may be executed in multiple counterparts or by email or facsimile transmissions, each of which shall be treated as an original of this Amendment for all purposes, and all of which shall constitute one (1) Amendment binding upon all of the parties hereto.  The terms and conditions of this Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  This Amendment shall be construed in accordance with the laws of the State of Illinois.  This Amendment contains the entire agreement between the parties hereto with respect to the amendment to the A/R Master Lease, and the terms of this Amendment are contractual and not merely recitals.  From and after the date hereof, references to the "Lease" or the "A/R Master Lease" (including, without limitation, any and all references contained in this Amendment) shall mean the Lease or the A/R Master Lease as amended by this Amendment.

[Signatures Contained on Following Pages]

DM3\9219686.9

IN WITNESS WHEREOF, Landlord and Tenant have caused this Second Amendment to Amended and Restated Master Lease be executed effective as of the date first set forth above.

**LANDLORD:**

**WEISS PROPERTY HOLDINGS, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: Authorized Signatory

**TENANT:**

**PIPELINE – WEISS MEMORIAL HOSPITAL, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: Authorized Signatory

20598259 v2