# EXHIBIT 11

**Membership Interest Purchase Agreement between AUM Global Healthcare Management, LLC and SRC Hospital Investments II, LLC (Nov. 22, 2022) (ancillary documents omitted)**

*Execution Copy*

**MEMBERSHIP INTEREST PURCHASE AGREEMENT**


**BY AND BETWEEN**


**AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**

**As Buyer**

**AND**

**SRC HOSPITAL INVESTMENTS II, LLC**

**As Seller**


**November 22, 2022**

15576184 v30

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS ..................................................................................................2
    1.1     Definitions......................................................................................... 2

ARTICLE II TRANSACTIONS AT THE CLOSING ........................................................10
    2.1     Acquisition of Membership Interests..................................................... 10
    2.2     Excluded Assets ............................................................................. 10
    2.3     Excluded Liabilities ......................................................................... 11
    2.4     Purchase Price ................................................................................ 12
    2.5     Closing and Post-Closing Credits to Buyer .......................................... 12
    2.6     Closing ......................................................................................... 13
    2.7     Actions of Seller at Closing .............................................................. 13
    2.8     Actions of Buyer at Closing.............................................................. 15

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER...............................15
    3.1     Corporate Capacity, Authority and Consents ....................................... 15
    3.2     Binding Agreement.......................................................................... 16
    3.3     Membership Interests; Title to Assets.................................................. 16
    3.4     Subsidiaries ................................................................................... 17
    3.5     Debt............................................................................................. 17
    3.6     Financial Statements ........................................................................ 17
    3.7     Regulatory Compliance .................................................................... 17
    3.8     Compliance and Reporting ................................................................ 19
    3.9     Material Contracts........................................................................... 19
    3.10    Employee Benefit Plans .................................................................... 20
    3.11    Employee Relations ......................................................................... 20
    3.12    Litigation and Proceedings ................................................................ 20
    3.13    Medical Staff Matters ...................................................................... 21
    3.14    Tax Liabilities ................................................................................ 21
    3.15    Reimbursement Contracts.................................................................. 21
    3.16    Insurance ...................................................................................... 22
    3.17    Limitation on Representations and Warranties....................................... 22

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER...............................23
    4.1     Corporate Capacity, Authority and Consents ....................................... 23
    4.2     Binding Agreement.......................................................................... 23
    4.3     Litigation and Proceedings ................................................................ 23
    4.4     [Reserved]..................................................................................... 23
    4.5     Independent Evaluation .................................................................... 24
    4.6     Regulatory Compliance .................................................................... 24
    4.7     Compliance Program ....................................................................... 24
    4.8     Compliance and Reporting ................................................................ 24

ARTICLE V COVENANTS OF THE PARTIES PRIOR TO CLOSING .................................25

DM3\8379252.24

| 5.1 | Access | 25 |
| 5.2 | Updates of Schedules | 25 |
| 5.3 | Operating Covenants | 25 |
| 5.4 | Negative Covenants | 26 |
| 5.5 | Sale Order | 26 |
| 5.6 | Third Party Consents | 27 |
| 5.7 | Reformation Efforts | 27 |
| 5.8 | Notice of Certain Events | 27 |
| 5.9 | Cerner Agreement | 27 |
| 5.10 | Insurance | 28 |

ARTICLE VI CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER ...28

| 6.1 | Representations and Warranties; Covenants | 28 |
| 6.2 | Pre-Closing Confirmations | 28 |
| 6.3 | Actions and Proceedings | 28 |
| 6.4 | Entry of Sale Order | 28 |
| 6.5 | Closing Deliveries | 28 |

ARTICLE VII CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER...29

| 7.1 | Representations and Warranties; Covenants | 29 |
| 7.2 | Pre-Closing Confirmations | 29 |
| 7.3 | Actions and Proceedings | 29 |
| 7.4 | Insolvency | 29 |
| 7.5 | Closing Deliveries | 29 |

ARTICLE VIII ADDITIONAL AGREEMENTS ...30

| 8.1 | Termination Prior to Closing | 30 |
| 8.2 | Post-Closing Filings and Access to Information | 31 |
| 8.3 | Employee Benefit Plans | 32 |
| 8.4 | Medical Staff | 33 |
| 8.5 | Consents to Certain Assignments | 34 |
| 8.6 | Name Change; License for Use of Name | 34 |
| 8.7 | Refunds, Remittances and CHOW Period Billing | 34 |
| 8.8 | Restrictive Covenants | 35 |
| 8.9 | Waiver of Bulk Sales Law Compliance | 35 |
| 8.10 | Graduate Education Foundation | 35 |
| 8.11 | Non-Disparagement | 35 |
| 8.12 | Estimated Employee Payroll Credit Adjustment | 35 |
| 8.13 | Phase 1 Payments | 36 |

ARTICLE IX INDEMNIFICATION ...36

| 9.1 | Indemnification by Buyer | 36 |
| 9.2 | Indemnification by Seller | 36 |
| 9.3 | Limitations | 37 |
| 9.4 | Third Party Claims | 38 |
| 9.5 | Direct Claims | 40 |
| 9.6 | Claims Made | 40 |

ii

DM3\8379252.24

9.7    Scope of Liability.................................................................................................... 40

ARTICLE X DISPUTE RESOLUTION ........................................................................................40
10.1    General..................................................................................................................... 40
10.2    Informal Negotiations ............................................................................................ 40
10.3    Mediation ................................................................................................................ 40
10.4    Arbitration............................................................................................................... 41
10.5    Injunctive or Similar Relief .................................................................................. 41
10.6    Survival ................................................................................................................... 41

ARTICLE XI GENERAL PROVISIONS .....................................................................................41
11.1    Additional Assurances ........................................................................................... 41
11.2    Recitals.................................................................................................................... 42
11.3    Consideration .......................................................................................................... 42
11.4    Consents, Approvals and Discretion..................................................................... 42
11.5    Legal Expenses ....................................................................................................... 42
11.6    Choice of Law; Venue ........................................................................................... 42
11.7    Benefit, Assignment and Third Party Beneficiaries ........................................... 42
11.8    No Brokerage .......................................................................................................... 42
11.9    Cost of Transaction ................................................................................................ 43
11.10  Confidentiality ....................................................................................................... 43
11.11  Public Announcements ........................................................................................... 43
11.12  Waiver of Breach .................................................................................................... 43
11.13  Notice 43
11.14  Severability ............................................................................................................. 44
11.15  Interpretation........................................................................................................... 45
11.16  Entire Agreement, Amendments and Counterparts ............................................. 45
11.17  Personal Liability .................................................................................................... 45
11.18  Disclosure Generally.............................................................................................. 45
11.19  Offset Rights ........................................................................................................... 46
11.21  Time of Essence...................................................................................................... 46
11.22  Waiver of Conflicts Regarding Representation; Non-Assertion of Attorney-
        Client Privilege .................................................................................................... 46

iii

## LIST OF EXHIBITS AND SCHEDULES

**Exhibits**

| | |
|---|---|
| Exhibit  A | Transition Services Agreement |
| Exhibit  B | Restrictive Covenant Agreement |
| Exhibit C | DEA Power of Attorney |
| Exhibit D | Excluded Liability Assumption Agreement |
| Exhibit E | Sale Order |
| Exhibit F | Amendments to Amended and Restated Master Leases for Chicago Real Property |

**Schedules**

| | |
|---|---|
| Schedule 2.2(f) | Excluded Contracts |
| Schedule 2.2(l) | Other Excluded Assets |
| Schedule 2.7(e) | Executives and Employees of the Seller Parties |
| Schedule 3.1(b), (c) | Corporate Capacity, Authority and Consents |
| Schedule 3.4 | Subsidiaries |
| Schedule 3.5 | Debt |
| Schedule 3.6 | Financial Statements |
| Schedule 3.7(a) | Investigations |
| Schedule 3.7(b) | Compliance with Laws |
| Schedule 3.7(c) | Permits |
| Schedule 3.7(d) | Accredited Facilities |
| Schedule 3.8 | Compliance and Reporting |
| Schedule 3.9(a) | Material Contracts |
| Schedule 3.9(b) | Material Contracts Exceptions |
| Schedule 3.10(a) | Employee Benefit Plans |
| Schedule 3.10(b) | Employee Benefit Claims |

iv

Schedule 3.11          Employee Relations

Schedule 3.12          Litigation and Proceedings

Schedule 3.13          Medical Staff Matters

Schedule 3.14          Tax Liabilities

Schedule 3.15(b)       Medicare & Medicaid

Schedule 3.15(c)       Billing Practices

Schedule 3.15(d)       Cares Act Grants and Deposit

Schedule 3.16          Insurance

Schedule 4.6           Buyer Regulatory Compliance

Schedule 5.3(b)        Administrative Expenses

Schedule 5.6(b)        Required Consents

Schedule 9.2(e)        Indemnification by Seller

DM3\8379252.24

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "***Agreement***") is entered into as of November 22, 2022 (the "***Effective Date***") by and between **AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**, a Michigan limited liability company ("***Buyer***"), and **SRC HOSPITAL INVESTMENTS II, LLC**, a Delaware limited liability company ("***SRC II***" or "***Seller***").  Buyer and Seller are collectively referred to as the "***Parties***" and each individually as a "***Party***."

## BACKGROUND

**WHEREAS**, SRC II is the sole owner, beneficially and of record, of all of the issued and outstanding membership interests (collectively, the "***Membership Interests***") of the following entities (each a "***Subsidiary***" and collectively, the "***Subsidiaries***"):  (i) **PIPELINE – WEST SUBURBAN MEDICAL CENTER, LLC**, a Delaware limited liability company ("***West Sub OpCo***"); (ii) **PIPELINE - WEISS MEMORIAL HOSPITAL, LLC**, a Delaware limited liability company ("***Weiss OpCo***"); (iii) **PIPELINE - LAKEFRONT MEDICAL ASSOCIATES, LLC**, a Delaware limited liability company ("***Chicago Health Medical Group***"); (iv) **PIPELINE - MIDWEST PHARMACIES, LLC**, a Delaware limited liability company ("***Midwest Pharmacies***"); and (v) **PIPELINE - WEISS MEDICAL SPECIALISTS, LLC**, a Delaware limited liability company ("***Weiss Medical Specialists***");

**WHEREAS**, West Sub OpCo is the owner and licensed operator of West Suburban Medical Center, a 234-bed acute care hospital with its main campus located at 3 Erie Court, Oak Park, Illinois 60302 (the "***West Suburban Medical Center***");

**WHEREAS**, West Sub OpCo is the owner of: (i) the cancer center located at 7420 West Central Avenue, River Forest, Illinois 60305 (the "***River Forest Cancer Center***"); and (ii) the breast imaging center located at 420 Williams Street, River Forest, Illinois 60305 (the "***River Forest Breast Imaging Center***"; and together with the River Forest Cancer Center, the "***Hospital-Based Centers***");

**WHEREAS**, Weiss OpCo is the owner and licensed operator of Weiss Memorial Hospital, a 236-bed acute care hospital with its main campus located at 4646 N. Marine Drive, Chicago, Illinois 60640, a campus located at 4601 N. Clarendon Avenue, Chicago, Illinois 60640 and a campus located at 4602 N. Marine Drive, Chicago, Illinois 60640 (collectively, "***Weiss Memorial Hospital***");

**WHEREAS**, West Suburban Property Holdings, LLC ("***West Sub PropCo***") owns the real estate on which the West Suburban Medical Center and the Hospital-Based Centers operate (including the parking garage located at 305 N. Humphrey Ave., Oak Park, Illinois (the "***West Sub Parking Garage***")) (collectively, the "***West Sub Property***");

**WHEREAS**, River Forest Property Holdings, LLC ("***River Forest PropCo***") owns the real estate located at 7420 Central Avenue, 420 Williams Street and 7411 West Lake Street, each in River Forest, Illinois (collectively, the "***River Forest MOB Property***");

**WHEREAS**, Weiss Property Holdings, LLC ("***Weiss PropCo***") owns the real estate on which Weiss Memorial Hospital operates (including the parking garage located at 4652 N.

DM3\8379252.24

Clarendon Avenue, Chicago, Illinois 60640 (the "***Weiss Memorial Parking Garage***")) (collectively, "***Weiss Memorial Property***");

WHEREAS, Weiss MOB Property Holdings, LLC ("***Weiss MOB PropCo***") owns the real estate located at 4700 N. Marine Drive, Chicago, Illinois 60640 (the "***Weiss Memorial MOB Property***"; together with the West Sub Property, the River Forest MOB Property and the Weiss Memorial Property, collectively the "***Chicago Real Property***");

WHEREAS, Chicago Health Medical Group, Midwest Pharmacies and Weiss Medical Specialists operate their businesses in spaces leased from Weiss Property Holdings, LLC, each of which such leased premises is located on 4646 N. Marine Drive, Chicago, Illinois 60640;

WHEREAS, Ramco Healthcare Holdings, LLC ("***Real Estate Buyer***") has entered into that certain Real Estate Purchase Agreement dated July 19, 2022, which Real Estate Buyer terminated on August 30, 2022, but which was reinstated and amended pursuant to that certain Reinstatement and Amendment of Real Estate Purchase Agreement, dated as of the Effective Date (as the same may be amended, the "***Real Property Purchase Agreement***") with West Sub PropCo, River Forest PropCo, Weiss PropCo and Weiss MOB PropCo (collectively, the "***Chicago PropCos***") whereby Real Estate Buyer will acquire the Chicago Real Property;

WHEREAS, the transactions contemplated herein and under the Real Property Purchase Agreement are mutually dependent on each other and although the two transactions will close separately and at different times, constitute an integrated transaction (the "***Transaction***"); and

WHEREAS,  on October 2, 2022 (the "***Petition Date***"), the Seller, Subsidiaries, West Sub PropCo, River Forest PropCo, Weiss PropCo, Weiss MOB PropCo, and certain of their Affiliates (collectively, the "***Debtors***") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***"), initiating chapter 11 bankruptcy cases which are currently pending in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") as Joint Case No. 22-90291 (MI) (the "***Chapter 11 Cases***").

WHEREAS, the Parties desire to set forth certain representations, warranties and covenants made by each to the other, on which they will rely as a condition to entering into this Agreement and to the closings contemplated hereunder, and to set forth certain additional agreements relating to the Transaction.

NOW, THEREFORE, in consideration of the promises, covenants, representations and warranties hereinafter set forth, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1**   **Definitions**.  As used in this Agreement, the following terms have the following meanings (unless otherwise expressly provided herein):

"***ABL Credit Agreement***" means that Credit and Guaranty Agreement, dated as of December 30, 2019, as amended, restated, replaced, supplemented or otherwise modified from

time to time, by and among Gardena Hospital, L.P.; ELADH, L.P.; CHHP Management, LLC; CHHP Holdings II, LLC; CPH Hospital Management, LLC; the Subsidiaries; and Pipeline East Dallas, LLC, Avanti Hospitals, LLC; Avanti Hospital Holdings I, LLC; HealthPlus+ Holdings, LLC; Gardena Hospital Management, L.L.C. and ELADH Management, L.L.C., the lenders party thereto and Credit Suisse AG, New York Branch, in its capacity as administrative agent for itself and the other lenders.

"***Accounts Receivable***" means all accounts, notes, interest and other receivables of the Subsidiaries net of all adjustments, and all claims, rights, interests and proceeds related thereto, arising from the rendering of services to inpatients and outpatients at the Hospital Facilities, billed and unbilled, recorded and unrecorded (including any accounts previously written off or charged off as bad debts), for services provided by such Subsidiaries whether payable by private pay patients or Third Party Payors, or by any other source, including the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients at the Hospital Facilities relating to Medicare, Medicaid, TRICARE and other third party patient claims of such Subsidiaries due from beneficiaries or governmental Third Party Payors; provided, however, that Accounts Receivable shall not include any intercompany receivables of the Subsidiaries due from the Seller or Seller Parties (other than the Subsidiaries).

"***Actions***" means any pending or threatened claim, cause of action, demand, litigation, action, suit, arbitration, proceeding, or right in action, whether known or unknown, that may be alleged or brought by any Person, Governmental Authority or any administrative, arbitration, or governmental proceeding, investigation or inquiry.

"***Agreement***" means this Membership Interest Purchase Agreement between the Parties, as from time to time amended, modified or supplemented in accordance with its terms, including the Exhibits and Schedules attached hereto.

"***Affiliate***" means, with respect to a Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. The term "***control***" used in the preceding sentence shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the work activities, management and policies of a Person whether through ownership of membership interests or voting securities, the election or appointment of board members, by contract or otherwise.

"***CARES Act***" means Section 3719 of the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. No. 116-136)(H.R. 748).

"***CARES Act Deposit***" means an amount equal to one of the following: (a) one-half of the CARES Act Grants, if such amount is less than or equal to one-half of the CARES Act Offset Closing Amount; (b) one-half of the CARES Act Offset Closing Amount, if such amount is less than one-half of the CARES Act Grants; or (c) zero, if the CARES Act Grants are zero.

"***CARES Act Grants***" means funds received by the Seller Parties from CARES Act grants during the period from March 2, 2022, through and including the Closing Date.

3

"*CARES Act Offsets*" means the right of CMS to offset against or recoup certain patient accounts receivable as permitted under the Accelerated and Advance Payment Program for Medicare Part A and Part B providers and suppliers as expanded during the period of the COVID-19 public health emergency by the CARES Act.

"*CARES Act Offset Closing Amount*" means the total outstanding unpaid or unrecouped liability of the Seller Parties for CARES Act Offsets on the Closing Date.

"*Cerner Agreement*" means a support and services agreement that Buyer shall procure and execute with Cerner for Cerner's suite of products and services at a level that the Buyer shall approve in its sole discretion.

"*Claim*" shall have the meaning provided in section 101(5) of the Bankruptcy Code.

"*CMS*" means the Centers for Medicare and Medicaid Services.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Consent*" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"*Deferred Payroll Tax Liability*" means the portion of payroll taxes that the Seller Parties were entitled to defer for payment until December 31, 2022 under the CARES Act in the aggregate unpaid amount of $2,211,471.46.

"*DIP Credit Agreement*" means the definitive superpriority senior secured debtor-in-possession credit agreement, dated as of October 4, 2022, by and among the Debtors party thereto, the agent and the lenders thereto, as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms, including any ancillary loan documents contemplated therein.

"*D&O Tail Policy*" means a new 6-year Side A D&O tail policy covering the individual directors and officers of the Subsidiaries that Pipeline Health System will obtain by the Closing Date.

"*Employee Benefit Plans*" means, collectively, each "employee pension benefit plan" and "employee welfare benefit plan" as those terms are defined in Section 3(3) of ERISA (whether or not subject to ERISA), stock option or equity-based compensation, employee stock ownership, employment, deferred compensation, severance pay, vacation, bonus or other incentive agreement, arrangement, plan or policy, currently maintained by, sponsored in whole or in part by, or contributed to by the Seller Parties for the benefit of any current or former employees of the Hospital Facilities and their respective dependents, spouses, or other beneficiaries.

"*Employees*" means employees at the Hospital Facilities, including employees who are on leaves of absence and staff that may be employed by an Affiliate of Seller but are allocated to the Hospital Facilities for substantially all of the services they perform.

DM3\8379252.24

"*Encumbrances*" means any and all mortgages, liens, pledges, security interests, leases, subleases, levies, rights of way, easements, agreements, rights of first refusal, options, restrictions, covenants, reservations or similar matters of record, zoning ordinance restrictions, encroachments, liabilities, claims, assessments, obligations or encumbrances of any nature whatsoever, or any conditional sale contracts, title retention contracts or other agreements or arrangements to give or to refrain from giving any of the foregoing.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Estimated Employee Payroll Credit*" means the credit to be given to Buyer at Closing, calculated and potentially adjusted with post-Closing payments being made by Buyer or Seller as follows:

(a)     One day before the Closing Date, Seller will provide to Buyer an estimate of the costs of all employee wages, benefits, employment taxes, and expenses that will have accrued but remain unpaid through the Closing Date (such credit shall include accrued but unpaid retirement benefits but shall not include accrued but unused PTO).  The Estimated Employee Payroll Credit amount shall be part of Closing Credits as calculated and paid by Seller to Buyer at Closing. As soon as reasonably practicable, but not later than sixty (60) days after the Closing Date, Seller shall prepare and deliver to the Buyer a statement (the "*Employee Payroll Credit Statement*") setting forth the actual calculation and amount of the Employee Payroll Credit.  Within thirty (30) days after the Buyer's receipt of the Employee Payroll Credit Statement (the "Objection Period"), the Buyer shall either notify Seller in writing that the Employee Payroll Credit Statement is acceptable or object thereto in writing (the "Objection Notice"), setting forth a description of each disputed item in reasonable detail.  If the Buyer delivers a timely Objection Notice and Seller and the Buyer do not resolve such objections on a mutually agreeable basis within thirty (30) days after Seller's receipt of the Objection Notice, the remaining disputed items shall be resolved within an additional thirty (30) days by a mutually agreed upon independent accounting firm (the "Referral Firm").  The calculation of the Employee Payroll Credit (i) agreed to by the Parties, (ii) as determined by the Referral Firm or (iii) if the Buyer fails to deliver a timely Objection Notice within the Objection Period, as set forth in the Employee Payroll Credit Statement shall be final, conclusive and binding on the Parties (the "*Final Employee Payroll Credit*").  The fees, costs and expenses of the Referral Firm shall be paid by the Seller and Buyer in inverse proportion to their success on the merits in the resolution of the disputed items.

(b)  No later than five (5) Business Days after the date on which the Final Employee Payroll Credit is determined pursuant to subsection (a) above, if the Final Employee Payroll Credit is greater than the sum of the Estimated Employee Payroll Credit and $10,000, then Seller shall pay to the Buyer by wire transfer of immediately available funds, an aggregate amount, if any, equal to the difference of the Final Employee Payroll Credit and the Estimated Employee Payroll Credit. If the Final Employee Payroll Credit is less than the difference between the Estimated Employee Payroll Credit and $10,000, then Buyer shall pay to the Seller by wire transfer of immediately available funds, an aggregate amount, if any, equal to the difference between the Estimated Employee Payroll Credit and the Final Employee Payroll Credit.

"*Excluded Claims*" means any known or unknown professional liability claims arising from incidents that occurred prior to the Petition Date entitled to coverage (subject to any

5

DM3\8379252.24

deductibles or retentions) under any of the Seller Parties' professional liability insurance policies set forth on Schedule 3.16, including without limitation those professional liability claims set forth on Schedule 3.12 hereto, which shall be assumed by the Seller Parties (other than the Subsidiaries) and otherwise addressed as contemplated herein.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any other court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rule of Bankruptcy Procedure, may be filed with respect to such order will not preclude such order from being a Final Order.

"*GAAP*" means generally accepted accounting principles, consistently applied.

"*Governing Documents*" means, for the entity in question, that entity's Articles of Incorporation, Certificate of Formation, Certificate of Limited Partnership, other filings with the applicable Secretary of State, Bylaws, Partnership Agreement, Limited Liability Company Agreement or other similar documents for the governance of the entity.

"*Governmental Authority*" means any federal, state, local or municipal government; any governmental or quasi-governmental authority of any nature (including any government agency, branch, board, department, official, instrumentality or entity); any body exercising or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature; any entity that contracts with a governmental entity to administer or assist in the administration of a governmental program (including any Medicare or Medicaid administrative contractors and the Medicare Advantage Program); or any arbitrator with authority to bind a party at Law.

"*Government Reimbursement Programs*" shall mean any programs funded or administered by federal or state government, or contractor(s) thereof, for the purposes of paying for health care services.  Such programs shall include Medicare, Medicaid, TRICARE, programs administered by the U.S. Department of Labor Employment Standards Administration's Office of Workers' Compensation Programs (e.g., administration of claims pursuant to the Black Lung Benefits Act), and similar or successor programs with or for the benefit of designated federal or state residents.

"*Healthcare Laws*" means, collectively, any and all federal, state or local statutes, rules, regulations and administrative manuals, orders, guidelines and requirements of law of any Governmental Authority governing the licensure or regulation of healthcare providers, professionals, facilities, or payors or otherwise governing or regulating the provision of, or

DM3\8379252.24

payment for, healthcare services, the sale of controlled substances or other pharmaceuticals, medical devices or supplies and the like. Without limiting the generality of the foregoing, Healthcare Laws include Illinois corporate practice of medicine laws, statutes and regulations, Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. § 1320a-7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute," Section 1877 of the Social Security Act, as amended, 42 U.S.C. § 1395nn and related regulations (Prohibition Against Certain Referrals), commonly referred to as "Stark Law," the federal False Claims Act, 31 U.S.C. § 3729 et seq., the Privacy Laws, and all applicable rules, regulations and licensing requirements of the Illinois Department of Public Health and other state and federal fraud and abuse laws.

"*HHS*" means the U.S. Department of Health and Human Services.

"*Hospital Facilities*" means West Suburban Medical Center, Weiss Memorial Hospital and the Hospital-Based Centers.

"*IHFSRB*" means the Illinois Health Facilities and Services Review Board.

"*Indebtedness*" means the aggregate amount, as of immediately prior to the Closing, of: (a) all indebtedness of the Seller Parties for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (b) all indebtedness of the Seller Parties evidenced by any note, bond, debenture or other similar instrument or debt security, (c) all liabilities of the Seller Parties for any drawn letters of credit, performance bonds, surety bonds and similar obligations, (d) all obligations and liabilities of the Seller Parties in respect of declared but unpaid dividends or distributions on the Membership Interests, (e) all guarantees made by the Seller Parties in connection with the foregoing and (f) all obligations of the type referred to in clauses (a) through (e) secured by any lien on any property or asset of the Seller Parties. Indebtedness will not include any guarantees made by the Seller Parties of the Subsidiaries' payment obligations under vendor, purchasing and supply agreements.

"*IRS*" means the Internal Revenue Service.

"*Knowledge of Buyer*" (and any similar expression, including, the expression "Buyer's Knowledge") means, as to a particular matter, the knowledge of the CEO, CFO, Chief Nursing Officer and Compliance Officer of Buyer, after due and reasonable inquiry, and all facts which such individuals should have known as a result of such due and reasonable inquiry, which shall include those facts as to which Buyer has received written notice from any Governmental Authority.

"*Knowledge of Seller*" (and any similar expression, including, the expression "Seller's Knowledge") means, as to a particular matter, the knowledge of the CEO, CFO, Chief Nursing Officer and Compliance Officer of each of West Suburban Medical Center and Weiss Memorial Hospital, after due and reasonable inquiry, and all facts which such individuals should have known as a result of such due and reasonable inquiry, which shall include those facts as to which Seller has received written notice from any Governmental Authority.

7

"*Law*" means any federal, state, local, foreign or other statute, law, ordinance, regulation, rule, code, injunction, judgment, ruling, decree or order of any Governmental Authority, including common law.

"*Losses*" means losses, damages, liabilities, deficiencies, claims, interest, awards, judgments, penalties, costs and expenses (including reasonable attorneys' fees, costs and other out-of-pocket expenses incurred in investigating or defending the foregoing), but excluding punitive, exemplary, treble, consequential, incidental, or other special damages, lost profits, or diminution in value, regardless of legal theory unless they are part of a Third Party Claim.

"*Material Adverse Change*" means a change, event or occurrence that is discovered or disclosed following the Effective Date, regardless of whether such change, event or occurrence actually occurred before or after the Effective Date, and that has, individually or in the aggregate, a material adverse effect on the financial condition, properties, assets, liabilities, business, or results of operations of the Hospital Facilities.  Notwithstanding the foregoing, a Material Adverse Change shall not include any change, event or occurrence resulting from: (i) any actual or proposed change in Law or accounting standards or the interpretation or implementation thereof; (ii) any change that is generally applicable to the healthcare industry or such industry in the State of Illinois; (iii) the entry into this Agreement or the announcement, pendency or consummation of the Transaction; (iv) any action taken by Seller or its Affiliates that is required to be taken by this Agreement; (v) any omission to act or action taken with the prior written consent of Buyer or its Affiliates; (vi) any change in general business, economic, geopolitical or financial market conditions, that does not disproportionately affect the Hospital Facilities relative to similarly situated Persons in the healthcare industry; (vii) any national or international political event or occurrence, including acts of war or terrorism, that does not disproportionately affect the Hospital Facilities relative to similarly situated Persons in the healthcare industry; (viii) any natural disaster or calamity that does not disproportionately affect the Hospital Facilities relative to similarly situated Persons in the healthcare industry in the Chicago market; and (ix) any seasonal fluctuations in the operations of the Hospital Facilities consistent with prior fiscal years. In addition, the mere fact that Seller and its Affiliates filed the Chapter 11 Cases in and of itself shall not constitute a Material Adverse Change.

"*Payment Program*" means any Government Reimbursement Programs and other managed care contracts, participation agreements or other billing arrangements with insurance providers or other third-party payers pursuant to which the Subsidiaries and/or any of the Hospital Facilities submit claims for reimbursement for health care services.

"*Permits*" means all licenses, permits, franchises, certificates, rights, registrations, approvals, authorizations, consents, provider numbers, waivers, exemptions, releases, variances, certificates of authority, accreditations, or orders issued by any Governmental Authority.

"*Person*" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

8

DM3\8379252.24

"***Phase 1 Payments***" means any additional "Phase 1" general distribution amounts that are paid to the Subsidiaries post-Closing relating to the request for reconsideration submitted to the Health Resources and Services Administration by Pipeline Health System for return of the approximately $2.1 million that was incorrectly credited to an entity affiliated with the prior owner of the Hospital Facilities, and which the Health Resources and Services Administration required Pipeline Health System to refund to HHS in October of 2021 on behalf of the Subsidiaries, and which Pipeline Health System contends was required to be refunded in error.

"***Pipeline Health System***" means Pipeline Health System, LLC, a Delaware limited liability company and a Debtor.

"***Privacy Laws***" means the Health Insurance Portability and Accountability Act of 1996, as amended ("***HIPAA***") and the applicable rules and regulations promulgated under HIPAA pursuant to 45 CFR Parts 160, 162, and 164 (subparts A, D and E) and the changes thereto imposed by the Health Information Technology for Economic Clinical Health Act, Division A, Title XIII § 1301 et. seq. of the American Recovery and Reinvestment Act of 2009, as amended from time to time, and other applicable state and federal Laws regarding patient or consumer privacy and the security, use, sale or disclosure of healthcare records.

"***Ramco Note***" means that certain promissory note in the aggregate principal amount of $67,000,000.00, dated as of the closing date of the RPPA Closing, made by Ramco Healthcare Holdings, LLC in favor of the Chicago PropCos.

"***Representatives***" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"***Retroactive Insurance Coverage***" means the general and professional liability insurance policies, with retroactive coverage to Jan 29, 2019, for the professional liability policy and retroactive coverage to April 1, 2021, for the general liability policy, that Buyer will obtain in connection with binding insurance coverage for the Subsidiaries effective as of the Closing Date.

"***RPPA Closing***" means the closing of the transactions contemplated by the Real Property Purchase Agreement and the execution and delivery of the Ramco Note to Seller in connection therewith.

"***Sale Order***" means the Final Order of the Bankruptcy Court approving the transactions contemplated under this Agreement and the Real Property Purchase Agreement, consistent with the terms and conditions herein and in the Real Property Purchase Agreement, with the subject assets being transferred free and clear of all Claims and Encumbrances (including the Excluded Claims) except as expressly permitted in this Agreement and Real Property Purchase Agreement (as applicable), which Final Order shall be substantially in the form attached hereto as Exhibit E, or as otherwise acceptable to Seller and Buyer.

"***Seller Parties***" means Seller, the Subsidiaries, and their Affiliates (excluding any equityholders of Pipeline Health System).

"***Term Loan Credit Agreement***" means that certain Amended and Restated Facility Agreement, dated as of December 30, 2019 (as amended, modified and restated from time to time),

9

by and among Pipeline Health System, as a Guarantor, Pipeline Health System Holdings, LLC, a Delaware limited liability company, and each of Pipeline Health System's subsidiaries (other than certain excluded subsidiaries), as Borrowers, the Lenders party thereto, and Alter Domus Products Corp. (formerly known as Cortland Products Corp.), a Delaware corporation, as agent for itself and the other Lenders.

"***Third Party Payor***" means any entity whether private or Governmental Authority-owned or operated (including the Government Reimbursement Programs, any entity authorized to provide health insurance (or property, casualty, or life insurance covering health benefits) in Illinois, any health maintenance organization, or any employer authorized under Law to self-insure its workers' compensation risk) that pays for or reimburses at least some of the health care expenses of its beneficiaries.

## ARTICLE II
## TRANSACTIONS AT THE CLOSING

**2.1** <u>**Acquisition of Membership Interests**</u>.  Subject to the terms and conditions of this Agreement, at the Closing, the Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, acquire, take and accept from the Seller, all of the Membership Interests, free and clear of all Claims and Encumbrances (other than restrictions on transfer under the Securities Act or applicable state securities Laws) (the "***Acquisition***").

**2.2** <u>**Excluded Assets**</u>.  The following assets of the Seller Parties shall be retained by, or transferred to, the Seller and not included as part of Buyer's acquisition of the Membership Interests (collectively, the "***Excluded Assets***"):

(a)  all cash and cash equivalents of the Seller Parties, less any outstanding checks that have been issued by the Seller Parties but have not been deposited or negotiated on the Closing Date (the "***Uncleared Checks***");

(b)  all intercompany receivables of the Subsidiaries due from the Seller or Seller Parties (other than the Subsidiaries) (for the avoidance of doubt, the Accounts Receivable and utility deposits or deposits held by third parties (but not any deposits held by Seller or the Subsidiaries) are <u>*not*</u> Excluded Assets);

(c)  with respect to the CARES Act Grants, an amount equal to the greater of: (i) the difference between the CARES Act Grants received by the Seller Parties and one-half of the CARES Act Offset Closing Amount; or (ii) one-half of the CARES Act Grants received by the Seller Parties;

(d)  the Phase 1 Payments;

(e)  State of Illinois Tax Credits for investor-owned hospitals relating to the Hospital Facilities for the portion of tax years 2020, 2021 and 2022 during which Seller owned the Subsidiaries, which tax credits shall accrue to or shall otherwise be available for use by Seller or Pipeline Health System;

10

DM3\8379252.24

(f)     the commitments, contracts, leases and agreements of Seller or the Subsidiaries that (A) relate to the Excluded Liabilities or the Excluded Assets, (B) do not relate to the Hospital Facilities (except for real property leases to which the Subsidiaries are a party for space in any of the Chicago Real Property), or (C) are those multi-facility system contracts relating to the operations of Seller's Affiliates listed on Schedule 2.2(f), including, without limitation, the Employee Benefit Plans;

(g)     all United States and worldwide inventions, trade secrets, know-how, whether or not patentable, mask work rights, patents, patent applications, trademarks, service marks, trade names, trade dress, copyrights, and all applications, registrations and renewals in connection with any of the above including the names "Pipeline" and "Pipeline Health System", and any other trade names, trademarks, service marks, trade dress, logos, symbols (as well as all abbreviations, variations or derivations thereof), copyrights and applications therefor of Seller or its Affiliates or world-wide web addresses (including any world-wide web address containing "pipeline") not used exclusively at the Hospital Facilities, any promotional material, educational material, signage, stationery, supplies or other items of inventory bearing such names, marks, trade dress, logos, or symbols or abbreviations, variations or derivations thereof, and any URLs, sites, blogs or pages hosted on Pipeline system websites, including associated content embodied within the foregoing (collectively, the "***Excluded IP***");

(h)     computer software, programs and hardware or data processing equipment, data processing system manuals and licensed software materials which are proprietary to Seller and/or its Affiliates or used in connection with the operation of one or more of Seller's or their Affiliates' acute care hospitals other than the Hospital Facilities (the "***Excluded IT Equipment***"), provided that such Excluded IT Equipment shall not include any computer software, programs and hardware or data processing equipment, data processing system manuals and licensed software materials which are located at the Hospital Facilities);

(i)     all minute books and corporate organizational records relating to Seller and its Affiliates, other than the Subsidiaries, and all other books and records that the Seller is required by Law to retain in its possession;

(j)     all other records that Seller is required by Law to retain in its possession; provided that Seller shall, at Seller's expense and to the extent permitted by Law, make and provide copies of such records to Buyer;

(k)     the rights of Seller and its Affiliates under this Agreement; and

(l)     other specifically excluded assets set forth in Schedule 2.2(l).

**2.3     Excluded Liabilities**.  Seller Parties (other than the Subsidiaries) shall retain or assume, as applicable, and Buyer shall not be liable for, the following liabilities relating to the Hospital Facilities (collectively, the "***Excluded Liabilities***"):

(a)     Any intercompany payables owing from the Subsidiaries to any other Seller Parties;

11

(b)     Any Indebtedness of the Seller Parties, including without limitation: (i) any Claims or liabilities arising under the ABL Credit Agreement, (ii) any Claims or liabilities arising under the Term Loan Credit Agreement, and (iii) any Claims or liabilities arising under the DIP Credit Agreement;

(c)     Any Claims of Seller Parties (other than the Subsidiaries) against the Subsidiaries, including without limitation any and all Claims of such Seller Parties under chapter 5 of the Bankruptcy Code;

(d)     Any and all fees and expenses related to the Debtors' restructuring, including without limitation: (i) fees and expenses of professionals employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code, (ii) compensation and reimbursement awarded pursuant to section 503(b)(4) of the Bankruptcy Code, (iii) Restructuring Expenses (as that term is defined in the proposed chapter 11 plan filed at Docket No. 21 in the Chapter 11 Cases), (iv) Other Restructuring Disbursements (as set forth in line item 19 in the budget attached to the interim order approving post-petition financing filed at Docket No. 86 in the Chapter 11 Cases), and (v) fees owing to the Office of the United States Trustee, including fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717;

(e)     Any liability or claim relating to the Excluded Assets;

(f)     The Deferred Payroll Tax Liability; and

(g)     The Excluded Claims.

**2.4**    **Purchase Price**.  At the Closing, Buyer will pay to Seller, as the total consideration for the Membership Interests, One and No/100 Dollar ($1.00) ("***Purchase Price***").

**2.5**    **Closing and Post-Closing Credits to Buyer**.

(a)     At the Closing, Seller shall transfer to Buyer, by wire transfer of immediately available funds, the following amounts (collectively, the "***Closing Credits***"):

(i)     The Estimated Employee Payroll Credit.

(b)     On or after the maturity date of the Ramco Note, the principal balance due under the Ramco Note shall be reduced by an amount equal to the Cares Act Deposit. Interest will accrue on the full principal balance of the Ramco Note (or such reduced amount after any payments by Ramco Healthcare Holdings, LLC during the term of the Ramco Note) through the maturity date and before the credit for the Cares Act Deposit is applied.

(c)     At such time after the RPPA Closing when Ramco Healthcare Holdings, LLC delivers a lump-sum payment of at least Thirty Million and No/100 Dollars ($30,000,000) on the Ramco Note, Seller shall cause the Chicago PropCos to immediately transfer to Buyer, by wire transfer of immediately available funds, the following amounts:

12

DM3\8379252.24

(i)  An amount equal to Eighteen Million and No/100 Dollars ($18,000,000.00), which Seller and Buyer each acknowledge is an additional agreed-upon adjustment to address pre-Closing changes to Accounts Receivable, accounts payable, and costs associated with purchasing the Retroactive Insurance Coverage; ***plus***

(ii)  An amount equal to Twelve Million and No/100 Dollars ($12,000,000.00), which Buyer, in cooperation with Real Estate Buyer, shall use for the benefit of Weiss Memorial Hospital to honor the written and oral commitments made in connection with obtaining the Certificates of Exemption from IHFSRB.

2.6  **Closing**.  Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated under this Agreement (the "***Closing***") shall take place at a mutually agreeable location on December 2, 2022, and which transactions shall be effective as of 12:01 a.m. on the day immediately following such date (the "***Closing Date***").  At Closing and in consideration of the payment of the Purchase Price, the Parties shall execute and deliver such documents, agreements, instruments and certificates as may be necessary or reasonably requested to consummate such transactions and to evidence the satisfaction of the conditions precedent to the obligations of the Parties hereunder (except to the extent waived in writing by the appropriate Party).

2.7  **Actions of Seller at Closing**.  At the Closing or within such other timeframes as specified below and unless otherwise waived in writing by Buyer, Seller shall deliver or cause to be delivered to Buyer the following:

(a)  Limited liability company interest transfer powers evidencing the transfer of the Membership Interests from the Seller to Buyer, duly executed by the Seller;

(b)  Copies of resolutions duly adopted by the governing body of Seller authorizing and approving Seller's execution and delivery of this Agreement and consummation of the Transaction;

(c)  Certificate of good standing of Seller from the State of Delaware, dated as of the most recent practicable date prior to the Closing Date;

(d)  The Transition Services Agreement between Pipeline Health System and Buyer in a form to be negotiated by the parties and attached hereto as Exhibit A and incorporating such additional terms on transition services as mutually agreed upon prior to Closing (the "***Transition Services Agreement***") executed by Pipeline Health System;

(e)  Assignment and assumption agreements (the "***Retention Bonus Assignments***") for the assignment to, and assumption by, Buyer or Buyer's designee of those certain retention bonus letter agreements (the "***Retention Bonus Agreements***") by and between Pipeline Health System or the Subsidiaries, on the one hand, and those executives and employees of the Seller Parties listed on Schedule 2.7(e), on the other hand;

(f)  An assignment and assumption agreement (the "***Material Contract Assignment***") for the assignment to, and assumption by, Buyer or Buyer's designee of those

13

certain Material Contracts to which Seller and other Affiliates of Seller that are not the Subsidiaries are a party, and which are listed on Schedule 2.7(f);

(g)     Written evidence of Credit Suisse AG, New York Branch's (i) consent to the sale of the Membership Interests free and clear of all Claims and Encumbrances arising under the ABL Credit Agreement pursuant to the Sale Order and (ii) release/termination of any Encumbrances on the assets of the Subsidiaries arising under the ABL Credit Agreement; provided that, the Parties agree this deliverable may be satisfied if the Sale Order includes factual findings regarding such consent and ordering such release/termination (all in form and substance reasonably acceptable to Buyer);

(h)     Written evidence of Alter Domus Products Corp.'s (i) consent to the sale of the Membership Interests free and clear of all Claims and Encumbrances arising under the Term Loan Credit Agreement pursuant to the Sale Order and (ii) release/termination of any Encumbrances on the assets of the Subsidiaries arising under the Term Loan Credit Agreement; provided that, the Parties agree this deliverable may be satisfied if the Sale Order includes factual findings regarding such consent and ordering such release/termination (all in form and substance reasonably acceptable to Buyer);

(i)     Evidence reasonably satisfactory to Buyer that Seller has paid the Deferred Payroll Tax Liability to the appropriate Governmental Authorities;

(j)     The Restrictive Covenant Agreement, in the form attached hereto as Exhibit B, executed by Seller and binding on Seller and Seller's Affiliates;

(k)     (i) An aged trial balance, list of all Uncleared Checks, Income Statement with General Ledger to support same, balance sheet with general ledger to support aged accounts payable, aged Accounts Receivable identifying payor and detailed claims, each of which shall be part of the Financial Statements and delivered to Buyer at least three (3) business days prior to the Closing Date and updated again on the Closing Date;

(l)     Evidence of the purchase and binding of the D&O Tail Policy reasonably satisfactory to Buyer;

(m)     The Drug Enforcement Administration ("**DEA**") Power of Attorney (the "**DEA POA**") for use of the Hospital Facilities' DEA Controlled Substance Registration in the form attached hereto as Exhibit C and executed by Seller;

(n)     Payment to Buyer of the Closing Credits, as adjusted;

(o)     An assumption agreement whereby the Seller Parties (other than the Subsidiaries) assume any and all liabilities relating to the Excluded Liabilities, including without limitation the Excluded Claims, and agree to address such Excluded Liabilities in a chapter 11 plan in the form attached hereto as Exhibit D and executed by the Buyer and Seller Parties (other than the Subsidiaries);

(p)     A certified copy of the Sale Order entered by the Bankruptcy Court;

14

DM3\8379252.24

(q)     Amendments to the amended and restated master leases for the Chicago Real Property in the forms attached hereto as Exhibit F (the "*Lease Amendments*"), executed by the Chicago PropCos; and

(r)     Such other agreements, instruments and documents as Buyer reasonably deems necessary to consummate the transactions under this Agreement.

**2.8     Actions of Buyer at Closing**.  At the Closing and unless otherwise waived in writing by Seller, Buyer shall deliver or cause to be delivered to Seller the following:

(a)     The Purchase Price by wire transfer of immediately available funds;

(b)     Copies of resolutions duly adopted by the Board of Managers of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and consummation of the Transaction;

(c)     The Transition Services Agreement executed by Buyer;

(d)     The Retention Bonus Assignments executed by Buyer;

(e)     The Material Contract Assignment executed by Buyer;

(f)     Evidence of the purchase and binding of the Retroactive Insurance Coverage, reasonably satisfactory to Seller;

(g)     The Restrictive Covenant Agreement executed by Buyer;

(h)     The DEA POA executed by Buyer;

(i)     The Lease Amendments, executed by the Buyer on behalf of the Subsidiaries; and

(j)     Such other agreements, instruments and documents as Seller reasonably deems necessary to consummate the transactions under this Agreement.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

As of the Effective Date and as of the Closing Date, when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, Seller represents and warrants to Buyer the following:

**3.1     Corporate Capacity, Authority and Consents**.  Seller is duly organized and validly existing in good standing under the Laws of the state of its formation, registration or incorporation with the requisite corporate power and authority to enter into the transactions under this Agreement, to perform its obligations hereunder and to conduct its business as now being conducted.  The execution, delivery and performance of this Agreement and all other agreements

15

referenced herein to which Seller is or will become a party and the actions to be taken by Seller in connection with the consummation of the transactions contemplated herein:

(a)     are within the corporate powers of Seller, are not in contravention of applicable Law or the terms of Seller's Governing Documents and have been duly authorized by all appropriate corporate action;

(b)     except as otherwise expressly herein provided or as set forth on Schedule 3.1(b), do not require any approval or consent of, or filing with, any Governmental Authority; and

(c)     except as otherwise expressly provided herein or as set forth on Schedule 3.1(c), will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any material indenture, mortgage, contract, agreement or other instrument to which Seller or any of the Subsidiaries is a party or otherwise bound that could be reasonably expected to materially impair Seller's ability to fulfill its obligations under this Agreement; and

(d)     will not violate any Law to which Seller or the Hospital Facilities is subject.

**3.2     Binding Agreement**.  Subject to entry of the Sale Order, Seller has all necessary corporate power and authority to enter into this Agreement and to carry out its obligations hereunder.  This Agreement and all agreements to which Seller is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Seller, and are and will be enforceable against Seller in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3     Membership Interests; Title to Assets**.

(a)     Seller is the sole owner, beneficially and of record, of all of the Membership Interests, free and clear of any Encumbrances. All such Membership Interests have been duly authorized, are validly issued, fully paid, and nonassessable, and were not issued in violation of the preemptive rights of any Person or any agreement or Law by which Seller at the time of issuance was bound.  There are no outstanding subscriptions, options, warrants, rights (including preemptive rights), calls, convertible or exchangeable securities, appreciation rights, or other agreements or commitments of any character relating to the issued or unissued Membership Interests or obligating any of the Subsidiaries or Hospital Facilities to issue or redeem any of the foregoing securities of any kind.  None of the Subsidiaries or Hospital Facilities has any appreciation rights, equity incentive or option plan or similar rights or obligations outstanding. Except for the limited liability company agreement of the Seller, there are no voting trusts, voting agreements, proxies, equity-holder agreements, or other agreements that may affect the voting or transfer of the Membership Interests.  There are no declared dividends or distributions of any of the Subsidiaries or Hospital Facilities that remain unpaid.

(b)     Each of the respective Subsidiaries is the sole owner of, and has good, valid and marketable title to, or in the case of property held under a lease or license, an enforceable leasehold interest in, or right to use, all material tangible assets used in connection with the

16

respective operations of the Subsidiaries. All such assets are free from any Encumbrances, except for permitted Encumbrances. In addition, since January 1, 2022, none of the Subsidiaries' assets have been (i) sold or (ii) transferred to Seller or Seller's Affiliates.

3.4     **Subsidiaries**. Except for the Subsidiaries and except as set forth on Schedule 3.4, Seller does not have any subsidiaries and does not own any interest, directly or indirectly, in any other Person. An organizational chart reflecting the pre-Closing ownership of the Subsidiaries and Hospital Facilities is set forth on Schedule 3.4.

3.5     **Debt**.   Except as set forth on Schedule 3.5, as of the Closing there is no Indebtedness on or affecting the Membership Interests, or the tangible and intangible assets owned or used by the Subsidiaries in the operation of the Hospital Facilities.

3.6     **Financial Statements**. Attached on Schedule 3.6 are complete and accurate copies of the unaudited balance sheets and statements of income of Seller with respect to the operation of the Hospital Facilities for the year ended December 31, 2021 and unaudited balance sheets and statements of income of Seller with respect to the operation of the Hospital Facilities for the period ended September 30, 2022   (the "***Balance Sheet Date***") (collectively, the "***Financial Statements***"). Except as set forth on Schedule 3.6, the Financial Statements present fairly in all material respects the financial condition and results of operations of Seller, the Subsidiaries and the Hospital Facilities as of the dates and for the periods indicated therein in accordance with GAAP, except that the Financial Statements (i) that are not for a fiscal year-end do not reflect normal recurring year-end adjustments (ii) do not contain footnotes, (iii) are prepared without physical inventories, (iv) do not contain an unaudited statement of cash flow, (v) omit substantially all the disclosures required by GAAP, (vi) are not restated for subsequent events, (vii) may not reflect any adjustments for impairment of long-lived assets, or restructuring charges or the reclassification of assets held for sale on the applicable balance sheet, and (viii) balance sheets reflect the following liabilities in intercompany liabilities: (A) accruals in respect of Seller's self-insured employee health benefits, (B) liabilities payable in connection with workers' compensation claims, (C) liabilities payable pursuant to any employee welfare benefit plan (within the meaning of Section 3(1) of ERISA) maintained by Seller or any Affiliate of Seller on account of any of the Employees, (D) payroll and bonuses payable and vacation, holiday and similar accruals with respect to some but not all Employees. Federal, state and local income or franchise taxes accruals are not reflected on the balance sheets or income statements. Except as set forth on Schedule 3.6, to the Knowledge of Seller, there are no obligations or liabilities, whether absolute, accrued, contingent or otherwise, of Seller that are required in accordance with GAAP to be reflected or disclosed in the Financial Statements except for obligations or liabilities (a) reflected or disclosed in the Financial Statements and (b) incurred in the ordinary course of business since the Balance Sheet Date, none of which have had a Material Adverse Change.

3.7     **Regulatory Compliance**.

(a)     Except as set forth on Schedule 3.7(a), neither Seller, nor any of the Subsidiaries, with respect to the operation of the Hospital Facilities, have been charged with or given notice of, or are under any obligation to take remedial action under, are not subject to any subpoena, and to the Knowledge of Seller, are not under investigation with respect to, any applicable material Law (other than any Environmental Law).

17

DM3\8379252.24

(b)    Except as set forth on Schedule 3.7(b), to Seller's Knowledge, the operations, properties, and offices of Seller, the Subsidiaries, and the Hospital Facilities are currently conducted, held, owned and operated in material compliance with all Laws, including without limitation all Healthcare Laws, as well as all material requirements of each Governmental Authority having jurisdiction over Seller, the Subsidiaries, and the Hospital Facilities and their respective businesses. With respect to the Hospital Facilities, except as set forth on Schedule 3.7(b), neither Seller, nor any of the Subsidiaries, have  made or are in the process of making a voluntary self-disclosure under the Self-Referral Disclosure Protocol established by the Secretary of HHS pursuant to Section 6409 of the Patient Protection and Affordable Care Act, or under the self-disclosure protocol established and maintained by the HHS Office of the Inspector General, or any United States Attorney or other Governmental Authority.  Seller and the Subsidiaries and Hospital Facilities have screened all current Employees against the Exclusion Authorities and to Seller's Knowledge, Seller and the Subsidiaries currently are not engaging or employing any Person who has a conviction or other sanction that would prohibit such engagement under any Healthcare Laws.

(c)    To Seller's Knowledge, the Seller Parties hold all Permits necessary for the conduct of their respective business (as currently being operated), including the Permits set forth on Schedule 3.7(c), and, to Seller's Knowledge, all such Permits are, in all material respects, currently valid and in effect and in good standing. The Hospital Facilities are duly registered and licensed pursuant to the Laws of the State of Illinois. No written notice or written warning from any governmental or regulatory authority with respect to the suspension, restriction, revocation or termination of such Permits has been issued or given to any Subsidiary or the Hospital Facilities, nor does Seller have any Knowledge of the proposed or threatened issuance of any such notice or warning.

(d)    The facilities set forth on Schedule 3.7(d) ("**Accredited Facilities**") operated by Seller and the Subsidiaries are accredited by, and in good standing with, The Joint Commission or such other accrediting organization identified on Schedule 3.7(d) (the "**Accrediting Organizations**").  Seller has made available correct and complete copies of the most recent accreditation reports received from the Accrediting Organizations for the Accredited Facilities. To Seller's Knowledge, there are no deficiencies presently in existence which would preclude the Accredited Facilities' accreditation by the Accrediting Organizations.

(e)    The Subsidiaries and the Hospital Facilities each have adopted, maintained and implemented privacy and security policies, procedures and safeguards relating to the applicable requirements of the Privacy Laws.  The Subsidiaries and the Hospital Facilities each have appointed a designated security and privacy officer responsible for overseeing compliance with the Privacy Laws and such policies and procedures.  To the Seller's Knowledge, the Subsidiaries and the Hospital Facilities each are currently conducted in material compliance with the Privacy Laws. Neither Seller nor any Subsidiary has received any notice from any Governmental Authority or other Person alleging a violation of the Privacy Laws that is currently pending or has not been finalized or closed. To Seller's Knowledge, neither Seller nor any Subsidiary is currently required to make any disclosures or notifications to any Person (including a patient or any Governmental Authority) regarding a violation of the Privacy Laws.

DM3\8379252.24

**3.8**     **Compliance and Reporting**.  Seller, Subsidiaries, and the Hospital Facilities have adopted, maintained and implemented a compliance program, and related policies, procedures and manuals (collectively, the "***Compliance Program***").  Neither Seller nor any of the Subsidiaries, Hospital Facilities, or Employees (a) is a party to a Corporate Integrity Agreement or Certification of Compliance Agreement with the OIG; (b) has a reporting obligation pursuant to any settlement agreement entered into with any Governmental Authority; (c) is, to Seller's Knowledge, the subject of any Governmental Reimbursement Program investigation conducted by any federal or state enforcement agency; (d) to Seller's Knowledge, is a defendant in any unsealed qui tam/False Claims Act litigation; (e) except as set forth on Schedule 3.8, has been served with or received any open or pending search warrant, subpoena, civil investigation demand or contact letter from any federal or state enforcement agency related to participation in any Governmental Reimbursement Program in the past three (3) years; (f) to the Knowledge of Seller, has been the subject of an enforcement action by or resolution agreement with the U.S. Department of Health & Human Services, Office for Civil Rights or any other Governmental Authority related to HIPAA within the past three (3) years; (g) has had any civil monetary penalty assessed under Section 1128A of the Social Security Act or comparable state Laws and Orders, or (h) has been convicted of a criminal or civil offense under any Healthcare Laws.

**3.9**     **Material Contracts**.

(a)     Schedule 3.9(a) sets forth a complete and accurate list of the following commitments, contracts, leases and agreements, whether written or oral, of Seller, in each case relating to the Hospital Facilities (the "***Material Contracts***"), and Seller has delivered complete copies of such Material Contracts to Buyer, or has given the Representatives of Buyer access to complete copies of such Material Contracts (except for those multi-facility system contracts relating to the operations of Seller's Affiliates listed on Schedule 2.2(f)) or, in the case of any oral agreements, accurate summaries of such oral Material Contracts:

(i)     contracts involving the lease of equipment or personal property that require payments of greater than $100,000 on an annual basis;

(ii)     employment contracts or other contracts with individual employees;

(iii)     contracts with respect to patents, trademarks, trade names or service names;

(iv)     contracts applicable by their terms only to the Hospital Facilities relating to data processing programs or software used in connection with the operation of the Hospital Facilities;

(v)     contracts with physicians or other referral sources;

(vi)     Payment Program contracts;

(vii)     collective bargaining agreements;

(viii)     partnership or joint venture agreements;

19

DM3\8379252.24

(ix)     contracts containing a covenant not to compete or restrictive covenant which is binding upon Seller or the Subsidiaries with respect to the operation of the Hospital Facilities;

(x)     contracts involving the lease of real property that require payments of greater than $100,000 on an annual basis, and

(xi)     any other contracts, commitments, leases or agreements that involve payments, performance of services or provision of items in an amount exceeding $100,000 on an annual basis.

(b)     Except as set forth on Schedule 3.9(b), and excluding any breaches or defaults on account of the Chapter 11 Cases, Seller and the Subsidiaries have not been given notice of any breach or default of any of the Material Contracts, and, other than with respect to Seller's and certain of Seller's Subsidiaries being in compliance with certain payment terms of such Material Contracts, Seller has no Knowledge of any event, act or omission that has occurred or failed to occur which, with the giving of notice, the lapse of time or both would constitute a default under the Material Contracts by Seller, the Subsidiaries or, to Seller's Knowledge, the counterparties thereto.

3.10     **Employee Benefit Plans**.

(a)     Schedule 3.10(a) sets forth each Employee Benefit Plan maintained or participated in by Seller or any Seller Affiliate relating to the Employees that is currently in effect.

(b)     Except as disclosed in Schedule 3.10(b), there are no pending, or to Seller's Knowledge, threatened claims or disputes under the terms of, or in connection with, the Employee Benefit Plans of Seller or the Subsidiaries relating to the Hospital Facilities, other than claims for benefits which are payable in the ordinary course.

3.11     **Employee Relations**.   There is no pending or, to the Knowledge of Seller, threatened employee strike, work stoppage or labor dispute concerning the Employees.  Except as set forth on Schedule 3.11, there are no pending or, to the Knowledge of Seller, threatened fair employment claims, wage and hour claims, unemployment compensation claims or workers' compensation claims in respect of the Employees. Neither Seller nor any Seller Affiliate is a party to or bound by any collective bargaining agreement relating to the Employees. With respect to the Employees, during the last twelve (12) months, there has been no mass layoff, plant closing or shutdown that triggers application of the Worker Adjustment & Retraining Notification Act of 1988, as amended, or any similar Law. Except as set forth in Schedule 3.11, neither Seller nor any Seller Affiliate is a party to, or otherwise bound by, any consent decree with, or citation by, any governmental authority relating to employees or employment practices at the Hospital Facilities. Neither Seller nor any Seller Affiliate, or, to Seller's Knowledge, the officers thereof, has received any written notice of intent by any governmental authority responsible for the enforcement of labor or employment Laws to conduct an investigation relating to Seller or any Seller Affiliate that remains unresolved and, to Seller's Knowledge, no such investigation is in progress.

3.12     **Litigation and Proceedings**.  Except as set forth on Schedule 3.12 and except for the Chapter 11 Cases and those matters disclosed in Schedule 3.11, there are no Actions pending

20

DM3\8379252.24

or, to Seller's Knowledge, threatened against the Seller Parties, with respect to the Hospital Facilities, at law or in equity, or before or by any Governmental Authority. There is no Action pending or, to the Knowledge of Seller, threatened, against the Seller Parties which seeks to prevent or delay consummation of the Transaction or would impair the ability of Seller to perform its obligations under this Agreement.

       **3.13**    **Medical Staff Matters**. Seller has provided to Buyer, with respect to the Hospital Facilities, the material forms generally used as of the Effective Date with respect to medical staff privileges and membership application, and true, correct and complete copies of the Medical Staff Bylaws, policies, rules and regulations of the Hospitals, as in effect as of the Effective Date as well as a list of all current members of such medical staff. Except as otherwise disclosed to Buyer on Schedule 3.13, to the extent the Hospital Facilities are permitted under applicable Law to disclose such matters, there are no pending or, to Seller's Knowledge, threatened challenges with respect to any medical staff member or any applicant thereto for which a medical staff member or applicant has requested a judicial review hearing which has not been scheduled or has been scheduled but has not been completed.

       **3.14**    **Tax Liabilities**. Except as set forth on Schedule 3.14, all material taxes, penalties, interest, and any other statutory additions which have become due prior to the Closing from Seller or the Subsidiaries relating to the Hospital Facilities have been paid when due or adequately provided for by the reserves shown in the Financial Statements and to the Knowledge of Seller there is no pending tax examination or audit of, nor any action, investigation or claim asserted or threatened against Seller or the Subsidiaries by any federal, state or local taxing authority in respect of the Hospital Facilities.

       **3.15**    **Reimbursement Contracts**.

       (a)    Neither the Illinois Department of Medicaid nor CMS (or predecessors thereof) has refused to enter into or has terminated any participation agreement pursuant to which any Seller Party was entitled to reimbursement for services or facilities provided to patients of the Hospital Facilities. There is no pending or to Seller's Knowledge, threatened proceeding or any pending or, to Seller's Knowledge, threatened investigation, under the Medicare or Illinois Medicaid programs against Seller, the Subsidiaries, or the Hospital Facilities (excluding routine audit activity by such agencies). To Seller's Knowledge, Seller, Subsidiaries and the Hospital Facilities are currently in compliance in all material respects with the conditions of participation in each Payment Program.

       (b)    Schedule 3.15(b) describes the filing status of the Medicare and Illinois Medicaid cost reports of the Subsidiaries and the Hospital Facilities, including through which filing year such cost reports have been fully settled. Except as set forth on Schedule 3.15(b), the filed cost reports of the Hospital Facilities for Medicare payments have not been audited. As of the Closing Date, there have not been any audits of any cost report of the Hospital Facilities for Medicaid payments. Except as set forth on Schedule 3.15(b) and as described in the Financial Statements: (1) no written notice of any offsets against future reimbursement in any amount in excess of $25,000 has been received by Seller or the Subsidiaries or Hospital Facilities from the Medicare or Illinois Medicaid programs nor is there any basis therefor; (2) there are no pending appeals, adjustments, challenges, audits, litigation, notices of intent to reopen cost reports of the

21

DM3\8379252.24

Subsidiaries or Hospital Facilities with respect to the Medicare or Illinois Medicaid programs; and (3) there is no dispute between Seller, the Subsidiaries, or the Hospital Facilities and any governmental authority or the Medicare fiscal intermediary regarding such cost reports, other than with respect to adjustments thereto made in the ordinary course of business which do not involve amounts owed (or claimed to be owed) by Seller, the Subsidiaries, or the Hospital Facilities greater than $25,000 per adjustment or $100,000 in the aggregate.

(c)     Except as set forth on Schedule 3.15(c), to Seller's Knowledge, (i) the billing practices of Seller, Subsidiaries and the Hospital Facilities and any business owned and operated thereby, with respect to all Payment Programs, are currently in material compliance with all Laws and the applicable contractual requirements of each Payment Program, and (ii) neither Seller, the Subsidiaries, nor the Hospital Facilities has any bill or billing statement that is currently pending for payment or reimbursement that is in excess of amounts allowed by Law or the applicable contractual requirements of each Payment Program, except for customary offsets, refunds and patient credits incurred in the ordinary course of business consistent with Seller's past practice.

(d)     Schedule 3.15(d) sets forth a true and complete list of the Cares Act Grants, Cares Act Offset Closing Amount, and the Cares Act Deposit.

**3.16    Insurance**.  Schedule 3.16 sets forth a true and complete list of all current insurance or self-insurance policies of all risk properties, including professional liability, fire, commercial and general liability, product liability, errors and omissions, malpractice, workers' compensation, vehicular (often referred to as automobile liability), directors' and officers' liability, employment practices, fiduciary liability and any and all other forms of insurance maintained by or on behalf of Seller, the Subsidiaries, and the Hospital Facilities to provide insurance protection for the assets and business thereof. Seller will provide Buyer access to claims loss runs related to such insurance policies for the period commencing on January 29, 2019 through the Effective Date pursuant to a letter of authorization that Seller will file with its insurance carrier.

**3.17    Limitation on Representations and Warranties**.  Except for the representations and warranties contained in this Agreement (including the related portions of the Schedules attached hereto), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation and warranty as to the future revenue, potential reimbursement from Governmental Authorities, profitability or success of the Hospital Facilities, or any representation or warranty arising in Law, and Seller expressly disclaims any other representations, warranties, forecasts, projections, statements or information, whether made or furnished by Seller or any of its Affiliates or any of their respective Representatives or any other Person. To Seller's Knowledge, none of the representations and warranties made by Seller in this Article III contains any untrue statement of

22

a material fact or omits to state a material fact necessary to make such representation and warranty not misleading.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

As of the Effective Date and as of the Closing Date, when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, Buyer represents and warrants to Seller the following:

**4.1** **Corporate Capacity, Authority and Consents**. Buyer is duly organized and validly existing in good standing under the Laws of the state of its formation, registration or incorporation, and has the requisite corporate power and authority to enter into the transactions under this Agreement, to perform its obligations hereunder and to conduct its business as now being conducted. The execution, delivery and performance of this Agreement and all other agreements referenced herein to which Buyer is or will become a party and the actions to be taken by Buyer in connection with the consummation of the transactions contemplated herein:

(a) are within the corporate powers of Buyer, are not in contravention of applicable Law or the terms of Buyer's Governing Documents and have been duly authorized by all appropriate corporate action;

(b) do not require any approval or consent of, or filing with, any third party or any Governmental Authority;

(c) except as otherwise expressly provided herein, will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any material indenture, mortgage, contract, agreement or other instrument to which Buyer is a party or otherwise bound that could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement; and

(d) will not violate any Law to which Buyer is subject.

**4.2** **Binding Agreement**. This Agreement and all agreements to which Buyer is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Buyer, and are and will be enforceable against Buyer in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.3** **Litigation and Proceedings**. There are no Actions pending or, to Buyer's Knowledge, threatened against Buyer, or any governing Persons thereof, at law or in equity, or before or by any Governmental Authority, that if adversely determined could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement.

**4.4** **[Reserved]**.

23

DM3\8379252.24

**4.5**      **Independent Evaluation**. Buyer is an experienced, sophisticated, and knowledgeable investor and purchaser in the healthcare industry. Buyer has been advised by and, other than with respect to Seller's representations and warranties in ARTICLE III, Buyer has relied solely on, Buyer's own expertise and legal, tax, environmental, and other professional counsel concerning this Agreement, each of the other documents contemplated hereby and the transactions contemplated hereby and thereby, and not on any comments, statements, projections, or other material made or given by the Seller Parties or their Affiliates, or any representative, consultant, or advisor of the Seller Parties or any of their Affiliates. Buyer acknowledges and affirms that on or prior to Closing, Buyer shall have completed Buyer's independent investigation, verification, analysis, and evaluation of the Subsidiaries and the Hospital Facilities and made all such reviews and inspections as Buyer has deemed necessary or appropriate to consummate the transactions contemplated hereunder.

**4.6**      **Regulatory Compliance**.

(a)      Except as set forth on Schedule 4.6, neither Buyer, nor any of its Affiliates, have been charged with or given notice of, or are under any obligation to take remedial action under, are not subject to any subpoena, and to the Knowledge of Buyer, are not under investigation with respect to, any applicable material Law (other than any Environmental Law).

(b)      Neither Buyer, nor any of its Affiliates, have  made or are in the process of making a voluntary self-disclosure under the Self-Referral Disclosure Protocol established by the Secretary of HHS pursuant to Section 6409 of the Patient Protection and Affordable Care Act, or under the self-disclosure protocol established and maintained by the HHS Office of the Inspector General, or any United States Attorney or other Governmental Authority; provided, however, that this Section 4.6(b) shall not apply to any self-disclosure that Buyer or any of its Affiliates may be in the process of making on behalf of the Subsidiaries or Hospital Facilities.

**4.7**      **Compliance Program**. Buyer acknowledges and agrees that if it elects to use the Compliance Program and related materials, or any employment policies and procedures, or any other operating policies and procedures adopted by the Seller Parties for the operations of the Hospital Facilities post-Closing, then Seller shall have no liability for Buyer's post-Closing use of or reliance upon the Compliance Program or any of the materials described above.

**4.8**      **Compliance and Reporting**.  Buyer and its Affiliates (a) are not a party to a Corporate Integrity Agreement with the OIG; (b) do not have reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (c) are not, to Buyer's Knowledge, the subject of any Governmental Reimbursement Program investigation conducted by any federal or state enforcement agency; (d) are not a defendant in any unsealed qui tam/False Claims Act litigation; and (e) have not been served with or received any search warrant, subpoena, civil investigation demand or contact letter from any federal or state enforcement agency relating to participation in any Governmental Reimbursement Program in the past three (3) years.

24

**ARTICLE V**
**COVENANTS OF THE PARTIES PRIOR TO CLOSING**

**5.1**      **Access**.  From and after the Effective Date until the Closing (the "*Interim Period*"), Seller shall (a) provide Buyer and its Representatives reasonable access to and, as applicable, the right to inspect, the plants, properties, books and records, and Representatives of the Hospital Facilities and (b) furnish Buyer with such additional financial and operating data and other information as to the business and properties of the Hospital Facilities as reasonably requested, including copies of the updated Financial Statements following each calendar month during the Interim Period; provided, however, that such access shall be subject to prior reasonable approval by Seller and shall be coordinated through persons as may be designated in writing by Seller for such purpose.  Buyer's right of access and inspection shall be exercised during normal business hours and in such a manner as not to interfere unreasonably with the operations of the Hospital Facilities and to be in compliance with applicable Laws.  Notwithstanding the foregoing, all disclosures of information shall be consistent with wall agreements, joint defense agreements and any other nondisclosure agreements entered into between the Parties.

**5.2**      **Updates of Schedules**.  No later than seven (7) days following execution of this Agreement by both Parties, Seller and Buyer shall agree on a final set of all Schedules referenced as part of this Agreement. After such date, and no later than one (1) day prior to the Closing Date, the Parties shall supplement or update any and all Schedules with respect to any matter arising after the Effective Date which if existing as of the Effective Date would have been required to be set forth or described in such Schedules.

**5.3**      **Operating Covenants**.  During the Interim Period, except with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed) or as required by this Agreement, Seller shall:

(a)      carry on its businesses in respect of the Hospital Facilities and the Subsidiaries in the ordinary course of business consistent with past practice in all material respects, taking into account the Chapter 11 Cases;

(b)      timely pay all post-Petition Date ordinary course administrative expense payables within terms, which terms are specified on Schedule 5.3(b);

(c)      maintain the Hospital Facilities and all parts thereof in substantially the same operating condition in which the Hospital Facilities are currently maintained, ordinary wear and tear excepted;

(d)      keep in full force and effect current insurance policies, self-funded plans or trusts or other comparable insurance relating to or affecting the Hospital Facilities or Subsidiaries;

(e)      provide Buyer with weekly financial updates, including cash collections, accounts payable paid, and Accounts Receivable; and

(f)      use its commercially reasonable efforts to cause the Subsidiaries and Hospital Facilities to comply with all Laws applicable to the Hospital Facilities, keep in force all Permits necessary to the operation of the Hospital Facilities, maintain and preserve its business

25

organizations intact and retain the current Employees at the Hospital Facilities (excluding terminations of employment in the ordinary course), maintain its relationships with physicians, suppliers, customers and others having business relations with the Hospital Facilities, and take such actions as are reasonably necessary to cause the smooth, efficient and successful transition of the business operations of the Hospital Facilities and Subsidiaries to the control of Buyer as of the Closing.

**5.4** **Negative Covenants**.  During the Interim Period, except as required by Law, Seller shall not, with respect to the Hospital Facilities and the Subsidiaries, without the prior written consent of Buyer (which, except as set forth below, shall not be unreasonably withheld, conditioned or delayed):

(a)     issue, sell or grant any equity securities or ownership interests of the Subsidiaries, or any options, warrants, calls, subscriptions or other rights, agreements or commitments obligating the Subsidiaries to issue, sell or grant any equity securities or ownership interests of the Subsidiaries, to any Person without the prior written consent of Buyer, which consent may be withheld in Buyer's sole discretion;

(b)     sell, assign, convey or otherwise transfer any of the Membership Interests to any Person without the prior written consent of Buyer, which consent may be withheld in Buyer's sole discretion.

(c)     remove or transfer any material portion of the assets of the Hospital Facilities (other than obsolete or damaged and consistent with past practices), or make any material changes to the business or operations of the Hospital Facilities;

(d)     enter into any written agreement with a governmental or private body, the provisions of which include payments in excess of One Hundred Thousand and No/100 Dollars ($100,000.00) in the aggregate during any 12-month period;

(e)     increase compensation payable or to become payable, make any bonus payment to, or otherwise enter into one or more bonus agreements with, any Employee, except in the ordinary course of business in accordance with existing personnel policies and consistent with prior practice or with respect to any retention bonuses which are to be paid in full prior to the Closing Date;

(f)     create, incur, assume or permit to exist any new debt, mortgage, deed of trust, pledge or other Encumbrance affecting the Hospital Facilities other than Permitted Encumbrances; or

(g)     sell, assign, lease or otherwise transfer or dispose of any property, plant or equipment used in connection with the operation of the Hospital Facilities except in the ordinary course of business with comparable replacement thereof.

**5.5** **Sale Order**.  Seller shall diligently pursue entry of the Sale Order in the Chapter 11 Cases.  The Debtors shall serve the motion for approval and entry of the Sale Order on that portion of the Debtors' creditor matrix in the Chapter 11 Cases related to the Debtors' operations in Illinois.

5.6     **Third Party Consents**.

(a)     During the Interim Period, each Party shall use its good faith, commercially reasonable efforts to take, or cause to be taken, all actions, and do, or cause to be done, and assist and cooperate with the other Parties in doing, all things necessary to consummate and make effective, as soon as reasonably possible, the Closing and the Transaction in accordance with the terms hereof.  Without limiting the generality of the foregoing, upon the terms and subject to the conditions set forth in this Agreement, each of the Parties agrees to use good faith, commercially reasonable efforts to take, or cause to be taken, all actions that are necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Closing, including the following: (i) obtain all required or advisable consents, approvals or waivers from third Persons, (ii) obtain all necessary actions or non-actions, waivers, consents, approvals, orders and authorizations from Governmental Authorities, and (iii) make all necessary registrations, declarations and filings with any Governmental Authority.

(b)     During the Interim Period, Seller shall use good faith, commercially reasonable efforts to provide or obtain, as applicable, those certain third-party notices and consents identified on Schedule 5.6(b) (the "***Required Consents***"), and Buyer will reasonably cooperate with respect thereto.

5.7     **Reformation Efforts**.  In the event that subsequent to the Effective Date all or part of this Agreement or the Transaction is successfully challenged by any Governmental Authorities, the Parties shall use good faith, commercially reasonable efforts to promptly analyze, revise, reform and, to the extent necessary, restructure this Agreement and the Transaction in order to fully comply with all applicable requirements of such Governmental Authorities in a manner that is equitable to both Parties in light of the intent of the Parties regarding the Transaction.

5.8     **Notice of Certain Events**.  During the Interim Period, each Party shall promptly notify the other Parties in writing of, and contemporaneously provide the other Parties with accurate and complete copies of any and all information and documents relating to, any event, transaction or circumstance that would reasonably be expected to cause any condition to Closing set forth in Article VI or Article VII not to be satisfied.  Any such notice should not be deemed to cure any breach of a representation, warranty or covenant for purposes of determining whether or not the conditions set forth in Article VI or Article VII have been satisfied (except with respect to updates or supplements to Schedules as provided in Section 5.2).

5.9     **Cerner Agreement**.  Buyer shall undertake commercially reasonable efforts to execute and deliver the Cerner Agreement by the Closing Date. If Buyer does not execute and deliver the Cerner Agreement within sixty (60) days after the Closing Date, then Buyer shall pay to Pipeline Health System an amount equal to one month of fees to be paid under the Transition Services Agreement, which Pipeline Health System will hold as a deposit to be applied against unpaid amounts due and owing under the Transition Services Agreement until such time as the Cerner Agreement is executed and delivered, at which point half of the deposit shall be applied immediately to any outstanding balance under the TSA.  After the Cerner Agreement is executed and delivered by Buyer and Cerner, the remaining half of such deposit shall continue be held by Pipeline Health System as a deposit to be applied against unpaid amounts due and owning under

27

DM3\8379252.24

the Transition Services Agreement. Notwithstanding the foregoing, Buyer shall be required to execute and deliver the Cerner Agreement no later than six (6) months after the Closing Date.

**5.10** **Insurance**. Buyer shall obtain the Retroactive Insurance Coverage. Pipeline Health System shall obtain the D&O Tail Policy.

## ARTICLE VI
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

Notwithstanding anything herein to the contrary, the obligations of Buyer to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Buyer on or prior to the Closing:

**6.1** **Representations and Warranties; Covenants**.   The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth herein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date.  All of the covenants in this Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth therein).  Buyer shall have received a certificate signed on behalf of Seller by a duly authorized officer of Seller to such effect.

**6.2** **Pre-Closing Confirmations**.  Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that the Parties have Obtained the Certificates of Exemption approval from the IHFSRB.

**6.3** **Actions and Proceedings**.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the Transaction.  On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Hospital Facilities, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Hospital Facilities, (b) enjoining or otherwise preventing the consummation of this Agreement or the Transaction, which Action, in the reasonable opinion of Buyer, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the Transaction.

**6.4** **Entry of Sale Order**.  The Bankruptcy Court shall have entered the Sale Order.

**6.5** **Closing Deliveries**.  Seller shall have executed and delivered, or caused to have been executed and delivered, to Buyer the documents and items described in Section 2.7.

DM3\8379252.24

# ARTICLE VII
# CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Seller on or prior to the Closing:

**7.1    Representations and Warranties; Covenants**.    The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein), when read in light of any Schedules that are updated prior to the Closing Date in accordance with the provisions of Section 5.2, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date.  All of the covenants in this Agreement to be complied with or performed by Buyer on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein).  Seller shall have received a certificate signed on behalf of Buyer by a duly authorized officer of Buyer to such effect.

**7.2    Pre-Closing Confirmations**.  Seller shall have obtained documentation or other evidence reasonably satisfactory to Seller that the Parties have Obtained the Certificates of Exemption approval from the IHFSRB.

**7.3    Actions and Proceedings**.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the Transaction.  On the Closing Date, there shall not be pending or threatened any Action (a) seeking to restrain or prohibit Buyer's ownership, use or operation of any material portion of the Hospital Facilities, or to compel Buyer or the Parties to dispose of or hold separate any material portion of the assets comprising the Hospital Facilities, (b) enjoining or otherwise preventing the consummation of this Agreement or the Transaction, which Action, in the reasonable opinion of Seller, may result in a decision, ruling or finding that has or would reasonably be expected to have a material adverse effect on the validity or enforceability of this Agreement, or on the ability of Seller or Buyer to perform its obligations under this Agreement, or (c) seeking to restrain or prohibit or make materially more costly the consummation of the Transaction.

**7.4    Insolvency**.  Buyer shall not (a) be in receivership or dissolution, (b) have made any assignment for the benefit of creditors, (c) have admitted in writing its inability to pay its debts as they mature, (d) have been adjudicated a bankrupt or (e) have filed a petition in voluntary bankruptcy, a petition or answer seeking reorganization, or an arrangement with creditors under the federal bankruptcy Law or any other similar Law.

**7.5    Closing Deliveries**.  Buyer shall have executed and delivered, or caused to have been executed and delivered, to Seller the documents and items described in Section 2.8.

29

DM3\8379252.24

## ARTICLE VIII
## ADDITIONAL AGREEMENTS

**8.1     Termination Prior to Closing**.

(a)      Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(i)      by the mutual written consent of Seller and Buyer;

(ii)      by Buyer: if Seller breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (A) would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 6.1, (B) cannot be or has not been cured within thirty (30) days following delivery of written notice of such breach or failure to perform and (C) has not been waived by Buyer;

(iii)      by Seller, if Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform (1) would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 7.1, (2) cannot be or has not been cured within thirty (30) days following delivery of written notice of such breach or failure to perform and (3) has not been waived by Seller;

(iv)      by Buyer, immediately upon the occurrence of any of the following events:

(A)      the Bankruptcy Court denies the motion to approve the Sale Order;

(B)      the Debtors pursue approval of an alternative transaction with respect to the Membership Interests, assets of the Subsidiaries, or assets that are subject to the Real Property Purchase Agreement;

(C)      the dismissal or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;'

(D)      the appointment of a chapter 11 trustee or an examiner with expanded powers pursuant to section 1106(b) of the Bankruptcy Code; or

(E)      A Governmental Authority issues a Final Order or similar ruling prohibiting the transactions contemplated herein or under the Real Property Purchase Agreement.

(v)      by either of Seller or Buyer for any other reason if the Closing has not occurred by the Closing Date (the "***Termination Date***").

30

DM3\8379252.24

The Party seeking to terminate this Agreement pursuant to this <u>Section 8.1(a)</u> (other than <u>Section 8.1(a)(i)</u>) shall give prompt written notice of such termination to the other Parties.

(b)        In the event of a termination of this Agreement pursuant to <u>Section 8.1(a)(i)</u>, <u>8.1(a)(iv)</u>, <u>or 8.1(a)(v)</u>, each Party shall pay the costs and expenses incurred by it in connection with this Agreement, and this Agreement shall forthwith become void whereupon each Party shall have no further obligations under this Agreement.

**8.2        <u>Post-Closing Filings and Access to Information</u>**.

(a)        After the Closing, each Party shall promptly deliver to the other Party upon reasonable notice copies of any post-closing filings, financial statements or reports that may be required to be prepared and delivered to any Governmental Authority as a result of the consummation of the Transaction.

(b)        The Parties acknowledge that subsequent to the Closing, Seller may need access to information or documents in the control or possession of Buyer for the purposes of concluding transactions herein contemplated, audits (including CARES ACT Grants compliance audits), compliance with Laws, and the prosecution or defense of third-party claims.  Accordingly, Buyer shall for a period of seven (7) years after the Closing, and indefinitely with respect to any governmental or third party claims, maintain in accordance with retention requirements under Applicable Law and make reasonably available to Seller and its respective Representatives and/or Governmental Authorities, upon written request and at the expense of Seller, such documents and information as may be available relating to the Hospital Facilities for periods prior to the Closing Date to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws and the prosecution or defense of claims.  Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

(c)        The Parties acknowledge that subsequent to the Closing Buyer may need access to information or documents in the control or possession of Seller for the purposes of concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of third-party claims.  Accordingly, for a period of seven (7) years after the Closing, and indefinitely with respect to any governmental or third party claims, Seller shall maintain in accordance with retention requirements under Applicable Law and make reasonably available to Buyer and its Representatives and/or Governmental Authorities, upon written request and at the expense of Buyer, such documents and information as may be available relating to the Hospital Facilities to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws and the prosecution or defense of claims.  Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

(d)        Upon reasonable notice and during normal business office hours, Seller will cooperate with Buyer regarding Buyer's preparation and filing of cost reports covering any period prior to Closing.  Upon reasonable notice and during normal business office hours, Seller will cooperate with Buyer in connection with any cost report audits, appeals, disputes and/or other claim adjudication matters relative to governmental program reimbursement. Such cooperation

31

shall include providing Buyer with files, data and statistics.  If such assistance and cooperation to be provided by the Buyer to Seller involves a significant or substantial investment of time and resources, then Buyer shall pay a reasonable fee to Seller for such services to be mutually agreed upon by the parties in a commercially reasonable manner and Seller may refuse to provide such services that involve such substantial effort until the parties reach agreement on the fee that Buyer will pay to Seller.

      **8.3**      **Employee Benefit Plans**.

      (a)      Seller agrees to allow the Employees to continue to participate in the Seller Parties' medical and pharmacy benefit plans in place on the Closing Date, at Buyer's sole cost and expense and at no cost to the Seller, until the earlier of the date upon which Buyer or its Affiliates can implement its own medical and pharmacy benefit plans ("***Buyer New Medical Plans***") or March 31, 2023 (the "***Medical Benefit Termination Date***"); provided, however, that Buyer may extend the Medical Benefit Termination Date until April 30, 2023, by providing Seller no less than 30 days advance written notice. Buyer covenants and agrees to fully implement the Buyer New Medical Plans no later than the Medical Benefit Termination Date. Effective as of the Medical Benefit Termination Date, Seller and its Affiliates shall have the right to terminate or discontinue the participation of the Employees in the Seller Parties' medical and pharmacy benefit plans and to notify the Employees that they no longer will have the right to participate in such medical and pharmacy benefit plans effective as of the Medical Benefit Termination Date.  For the avoidance of doubt: (i) Buyer shall be responsible for any and all premiums, costs and expenses for claims incurred following the Closing Date (including, but not limited to, run-out claims to the extent the claim was incurred following the Closing Date, and PCORI fees) relating to the continued participation of the Employees in the Seller Parties' medical and pharmacy benefit plans after the Closing Date (whether pursuant to active coverage or COBRA coverage); and (ii) Seller shall be responsible for any and all premiums, costs and expenses for all claims incurred on or prior to the Closing Date (including, but not limited to, run-out claims to the extent the claim was incurred on or prior to the Closing Date, and PCORI fees) related to the participation of the Employees in the Seller Parties' medical and pharmacy benefit plans on or prior to the Closing Date (whether pursuant to active coverage or COBRA coverage).  With respect to COBRA coverage, Seller shall be responsible for any and all costs and expenses relating to the provision of COBRA coverage (subject to premium costs, co-insurance amounts and deductibles that are the responsibility of the Employees) for those former Employees who have elected COBRA coverage under Seller Parties' medical and pharmacy benefit plans on or prior to the Closing Date, and Buyer shall be responsible for any and all costs and expenses relating to the provision of COBRA coverage (subject to premium costs, co-insurance amounts and deductibles that are the responsibility of the Employees) for those Employees who elect COBRA coverage under Seller Parties' medical and pharmacy benefit plans after the Closing Date.

      (b)      Buyer shall be obligated to arrange payment of all of the premiums, costs and expenses of the Seller Parties' medical, dental, and vision plans that will be continued for the Employees, as described in Section 8.3(a) above and Section 8.3(c) below, pursuant to the following procedure: Buyer will designate a bank account that will be used to fund the premiums, costs and expenses and will grant access to such bank account to Seller Parties' third-party administrator of employee benefit plans ("***Keenan***"). For the costs and expenses of the medical plan to be funded by Buyer, Keenan will provide a voucher for payment of the relevant benefit

DM3\8379252.24

plan on Monday of each week for the relevant claims expense, and Buyer shall fund the amount stated in each voucher into the designated bank account by Tuesday of the same week. Keenan will sweep the funds from the designated bank account on Wednesday of each week to satisfy the plan costs and expenses. The same procedure will be used for the pharmacy benefit plan, but such costs and expenses will be funded on a bi-weekly basis. Other benefit plan expenses, including Keenan's fees, stop loss costs and expenses and other costs will be invoiced and funded in a similar manner by Buyer on a monthly basis.

(c)     Notwithstanding the foregoing, Seller agrees to allow the Employees to continue to participate in the Seller Parties' Employee Benefit Plans in place on the Closing Date (but excluding Seller Parties' employee pension benefit plan(s)), at Buyer's sole cost and expense and at no cost to the Seller, until December 31, 2022.  Except as otherwise set forth in Section 8.3(a), Buyer will implement its own Employee Benefit Plans and will offer participation in such plans to the Employees beginning on January 1, 2023.

(d)     For purposes of the Employees' eligibility to participate, vesting, service credit and, with respect to severance, vacation and other paid time off benefits only, determining level of benefits, under the Buyer New Medical Plans and any other employee benefit plans sponsored by Buyer (other than any equity based plans), each Employee shall be credited with his or her years of service with the Subsidiaries before the Closing Date, to the same extent as such Employee was entitled, before the Closing Date, to credit for such service under any similar Employee Benefit Plan in which such Employee participated or was eligible to participate immediately prior to the Closing Date; provided, however, that the foregoing shall not apply to the extent that its application would result in a duplication of benefits. Notwithstanding the foregoing, Buyer agrees to comply with any continuity of care requirements when transitioning Employees to Buyer New Medical Plans.

(e)     The Buyer shall take such actions as are necessary to ensure that the Buyer New Medical Plans in which the Employees participate will recognize, for purposes of annual deductible, coinsurance and out-of-pocket limits under its medical, dental, vision and other employee benefit plans, as applicable, with respect to the plan year in which the Closing Date occurs, all deductible, coinsurance and out-of-pocket expenses paid by the Employees (or their covered dependents) in the plan year in which the Closing Date occurs.

(f)     No provision in this Section 8.3, whether express or implied, shall (i) create any third party beneficiary or other rights in any Employee or former employee of the Subsidiaries (including any beneficiary or dependent thereof), any other participant in any Employee Benefit Plan or any other Person; (ii) create any rights to continued employment with Buyer or the Subsidiaries or in any way limit the ability of the Buyer or the Subsidiaries to terminate the employment of any individual at any time and for any reason; or (iii) constitute or be deemed to constitute an amendment to any Employee Benefit Plan or employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by the Buyer or any of its Affiliates.

**8.4     Medical Staff**.  To ensure continuity of care in the community, Buyer agrees that the medical staff members of the Hospital Facilities who are in good standing as of the Closing Date shall maintain medical staff privileges at the Hospital Facilities as of the Closing.  After the

33

DM3\8379252.24

Closing, the medical staff will be subject to the Medical Staff Bylaws of the Hospital Facilities then in effect, as amended from time to time.

**8.5**     **Consents to Certain Assignments**.

(a)     Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer or assign any asset, permit, claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment thereof, without the consent of a third party, would constitute a breach or other contravention under any agreement or Law to which Seller is a party or by which it is bound, or in any way adversely affect the rights of Seller or, upon transfer, Buyer under such asset, permit, claim or right.  Seller shall use its commercially reasonable efforts to obtain any third-party consents or waivers required to sell and transfer the Membership Interests to Buyer. Buyer agrees that Seller shall not have any liability to Buyer arising out of or relating to the failure to obtain any such consent that may be required in connection with the transactions contemplated by this Agreement or because of any circumstances resulting therefrom.

(b)     If any such consent is not obtained prior to Closing and as a result thereof Buyer shall be prevented by such third party from receiving the rights and benefits of certain contracts and agreements in connection with the purchase of the Membership Interests, Seller and Buyer shall cooperate in any lawful and commercially reasonable arrangement, as Seller and Buyer shall agree, under which Buyer would, to the extent practicable, obtain the economic claims, rights and benefits of such contracts and agreements and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing to Buyer; provided, that all reasonable out-of-pocket expenses of such cooperation and related actions shall be paid by Buyer except as otherwise provided in this Agreement.

**8.6**     **Name Change; License for Use of Name**. Buyer acknowledges and agrees that it is not purchasing, acquiring or otherwise obtaining any right, title or interest in the names "Pipeline" and "Pipeline Health System", in any trade names, trademarks, logos, domain names or service marks related thereto or containing the words "Pipeline" or any part or variation of any of the foregoing or any similar trade names, trademarks, logos, domain names or service marks (the "*Pipeline Trademarks and Logos*"). For a period of sixty (60) days after the Closing Date, Buyer will be granted a royalty-free, limited and non-exclusive license to use the name "Pipeline" or "Pipeline Health System" solely for the purposes of providing Buyer with a transition period to replace all "Pipeline" signage and badges issued to Employees with Buyer's own trademarks and logos. For the avoidance of doubt, Buyer shall have no right to use the name "Pipeline" individually in any context or for any purpose, including marketing its products and services or in communicating with patients, vendors or potential patients and vendors. Within sixty (60) days after the Closing Date, Buyer shall also ensure that the Pipeline Trademarks and Logos cease to appear in all signage, stationery, websites and domain names and other material.

**8.7**     **Refunds, Remittances and CHOW Period Billing**.

(a)     After the Closing:  (i) if Seller or any of its Affiliates receive any refund or other amount that relates to the operation of the Hospital Facilities and is properly due and owing to Buyer in accordance with the terms of this Agreement, Seller promptly shall remit, or shall

34

DM3\8379252.24

cause to be remitted, such amount to Buyer and (ii) if Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to Seller or any of its Affiliates in accordance with the terms of this Agreement, or if Buyer receives any refund or other amount that is due and owing to the prior owner of the Hospital Facilities, Buyer promptly shall remit, or shall cause to be remitted, such amount to Seller. Seller shall cooperate with Buyer to execute appropriate Lock Box agreements and bank account sweep instructions to facilitate the transfer of Accounts Receivable to Buyer following the Closing as reasonably requested by Buyer and Buyer's lender and consistent with applicable Healthcare Laws.

(b)     For  a period of twelve (12) months after the Closing, Seller agrees to cooperate with and provide reasonable assistance to Buyer in facilitating the change of ownership ("**CHOW**") filings related to the assignment and assumption of the Hospital Facilities' Medicare and Medicaid provider agreements by Buyer and the billing of services rendered by Buyer at the Hospital Facilities under such existing provider agreements during the period following the Closing and until such CHOW filings are approved with issuance of "tie-in" notices (the "**CHOW Period**") in a manner consistent with applicable Medicare and Medicaid rules and regulations. Buyer shall have sole responsibility for preparing and coordinating the filing of the CHOW filings, subject to Seller providing reasonable assistance with such filings. Buyer shall retain sole responsibility and liability for the billing of such services provided by Buyer at the Hospital Facilities during the CHOW Period and Seller shall promptly remit to Buyer any payments received by Seller for such services.

**8.8     Restrictive Covenants**. At Closing, the Parties shall enter into that restrictive covenant agreement substantially in the form attached hereto as Exhibit B the ("**Restrictive Covenant Agreement**").

**8.9     Waiver of Bulk Sales Law Compliance**. Buyer hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in Illinois and all other similar laws applicable to bulk sales and transfers.

**8.10     Graduate Education Foundation**.  Seller shall take all necessary steps to effectively transfer control of the Pipeline Chicago Graduate Education Foundation to Buyer or Buyer's designee, effective as of the Closing Date.

**8.11     Non-Disparagement**. At any time after the Effective Date, neither party shall, and shall instruct its Affiliates and their respective directors, officers, agents, representatives, members, partners and senior management employees not to, disparage the other party or any of its respective Affiliates, any of their respective services, including the business conducted at the Hospital Facilities, or any of their respective directors, officers, employees, agents, representatives, members, partners or stockholders, either orally or in writing.

**8.12     Estimated Employee Payroll Credit Adjustment**. After the Closing Date, Buyer or Seller, as the case may be, shall pay to the other party the amounts, if any, required to be paid as described in the definition of Estimated Employee Payroll Credit.

DM3\8379252.24

**8.13**   **Phase 1 Payments**. Buyer shall promptly pay, or shall cause to be promptly paid, to Seller any of the Phase 1 Payments that are received or credited to Buyer or its Affiliates after the Closing Date.

**ARTICLE IX**
**INDEMNIFICATION**

**9.1**   **Indemnification by Buyer**.  Subject to the limitations set forth in <u>Section 9.3</u>, from and after the Closing, Buyer shall defend, indemnify and hold harmless Seller (and its respective Affiliates, and their respective officers, directors, employees, counsel, agents, successors and assigns) (collectively, the "*Seller Indemnified Parties*") from and against any and all Losses to the extent arising out of or resulting from:

(a)   any breach of or inaccuracy in any representation or warranty made by Buyer contained in this Agreement or in any certificate executed and delivered pursuant hereto;

(b)   any breach of or failure by Buyer to perform any covenant or obligation of Buyer contained in this Agreement;

(c)   any Third Party Claim arising solely from the operation of the Hospital Facilities and the Subsidiaries after the Closing Date;

(d)   Buyer's use of the Pipeline Trademarks and Logos as described in Section 8.6;

(e)   the failure of Buyer to pay when due after the Closing Date any premiums or other charges relating to the Employee Benefit Plans of the Subsidiaries or the failure to fund payroll and payroll taxes in accordance with Section 8.3; or

(f)   any fraud, willful misconduct or criminal acts of Buyer or its Affiliates.

**9.2**   **Indemnification by Seller**.  Subject to the limitations set forth in <u>Section 9.3</u>, from and after the Closing, Seller shall defend, indemnify and hold harmless Buyer and the Subsidiaries (and their respective Affiliates, and their respective officers, directors, employees, counsel, agents, successors and assigns) (collectively, the "*Buyer Indemnified Parties*" and collectively with the Seller Indemnified Parties, the "*Indemnified Parties*") from and against any and all Losses to the extent arising out of or resulting from:

(a)   any breach of or inaccuracy in any representation or warranty made by Seller contained in this Agreement or in any certificate executed and delivered pursuant hereto;

(b)   any breach of or failure by Seller to perform any covenant or obligation of Seller contained in this Agreement;

(c)   any Excluded Liability other than the Excluded Claims;

(d)   any Excluded Asset;

36

(e)      the matters disclosed on Schedule 9.2(e);

(f)      the Excluded Claims; and

(g)      any fraud, willful misconduct or criminal acts of Seller or its Affiliates.

**9.3      Limitations**.

(a)      Buyer shall not be liable to any Seller Indemnified Party for any claim for indemnification under Section 9.1(a) unless and until the aggregate amount of indemnifiable Losses that may be recovered from Buyer thereunder equals or exceeds $100,000 (the "**Basket Amount**"), in which event Buyer shall be liable for the full amount of such Losses to the first dollar.  Seller shall not be liable to any Buyer Indemnified Party under Section 9.2(a) unless and until the aggregate amount of indemnifiable Losses that may be recovered from Seller thereunder equals or exceeds the Basket Amount, in which event Seller shall be liable for the full amount of such Losses to the first dollar.

(b)      The maximum aggregate amount of indemnifiable Losses that may be recovered from Buyer by Seller Indemnified Parties pursuant to Section 9.1(a) shall be an amount equal to Seven Million Five Hundred Thousand Dollars ($7,500,000).  The maximum aggregate amount of indemnifiable Losses that may be recovered from Seller by Buyer Indemnified Parties pursuant to Section 9.2(a) shall be an amount equal to Seven Million Five Hundred Thousand Dollars ($7,500,000).

(c)      No claim against Buyer or Seller, as applicable, pursuant to Section 9.1(a) or Section 9.2(a), as applicable, shall be brought or asserted after the date that is twelve (12) months after the Closing Date.

(d)      No claim against Buyer or Seller, as applicable, pursuant to Sections 9.1(b) through (e) or Sections 9.2 (b) through (e), as applicable, shall be brought or asserted after the later of 12 months or the date of expiration of the statute(s) of limitations applicable thereto.

(e)      An Indemnifying Party shall not be liable for any Loss to the extent that such Loss would not have arisen but for the passing of, or a change in, Law after the Effective Date, in each case that is not actually or prospectively in force on the Closing Date.

(f)      Any claim by an Indemnified Party under Section 9.1 or Section 9.2 that could be brought under Section 9.1(a) or Section 9.2(a), as applicable, shall be brought under such section, notwithstanding that such claim could also be brought under Sections 9.1(b) through (e) or Sections 9.2(b) through (d), as applicable.

(g)      In the event that any Excluded Claims are allowed to proceed against the Buyer Indemnified Parties post-Closing, then (i) for any Excluded Claims paid by the Buyer Indemnified Parties during the first year following the Closing Date, Seller shall pay or otherwise indemnify Buyer Indemnified Parties for any self-insured retention amount up to a maximum of Ten Million Dollars ($10,000,000.00); and (ii) for any Excluded Claims paid by the Buyer Indemnified Parties during the second year following the Closing Date, Seller shall pay or otherwise indemnify Buyer Indemnified Parties for any self-insured retention amount up to a

37

maximum of Five Million Dollars ($5,000,000.00); provided, however, that any such payment or indemnification shall be effected solely through a corresponding reduction in the aggregate amount of outstanding obligations under the Ramco Note immediately prior to such payment or indemnification. The calculation of the self-insured retention amounts hereunder includes any portion of the self-insured retention amount of $2,000,000 relating to the Seller Parties' Professional and General Liability Insurance Program, including excess liability and umbrella excess coverage, that was in effect for policy period January 29, 2019 through April 1, 2020, and Seller's payment of any portion of such $2,000,000 retention toward Excluded Claims shall be applied and counted against the respective indemnification caps identified herein.

(h)     For the purposes of calculating the amount of any Losses under Section 9.1 or Section 9.2, there shall be deducted an amount equal to the amount of any insurance proceeds actually received by an Indemnified Party in connection with the circumstances giving rise to the right to indemnification hereunder.

(i)     Buyer and Seller shall cooperate with each other with respect to resolving any claim, liability or Loss for which indemnification may be required hereunder, including by making, or causing the applicable Indemnified Party to make, all reasonable efforts to mitigate any such claim, liability or Loss.  In the event that Buyer or Seller shall fail to make such reasonable efforts to mitigate, then notwithstanding anything else to the contrary contained herein, the other Parties shall not be required to indemnify any Person for any claim, liability or Loss that could reasonably be expected to have been avoided if such efforts had been made. Without limiting the generality of the foregoing, Buyer and Seller shall, or shall cause the applicable Indemnified Party to, use reasonable efforts to seek full recovery under all insurance policies covering any Loss to the same extent as they would if such Loss were not subject to indemnification hereunder.

(j)     Notwithstanding anything to the contrary in this Agreement, Seller shall not have any obligation to indemnify the Buyer Indemnified Parties pursuant to Section 9.2 or otherwise for indemnification claims that accrue during the period between the Closing and the RPPA Closing until the RPPA Closing occurs and the execution and delivery of the Ramco Note to Seller in connection therewith (collectively, the "RPPA Closing"); provided, that if the RPPA Closing does not occur solely as a result of a default by the Chicago PropCos under the Real Property Purchase Agreement, then Seller's contingent indemnification obligations under this Agreement shall mature and become applicable upon the failure of the Chicago PropCos to cure such default(s), as applicable, under the Real Property Purchase Agreement. Moreover, if the RPPA Closing has not occurred by November 30, 2023, for any reason other than a default by the Chicago PropCos under the Real Property Purchase Agreement, then Seller's indemnification obligations under this Agreement, including the indemnification obligations described in Section 9.2, shall be void and of no effect, and any indemnification entitlement alleged or incurred by Buyer under this Agreement shall be automatically extinguished, canceled and waived by Buyer.

**9.4     Third Party Claims**.

(a)     An Indemnified Party seeking indemnity as set forth in this Article IX as a result of a claim or liability that is asserted in writing by a third party against such Indemnified Party (a "***Third Party Claim***") shall notify the Person against whom the indemnity is sought ("***Indemnifying Party***") in writing of the Third Party Claim within five (5) business days after

38

receipt of such written assertion of a claim or liability describing in reasonable detail (a) the facts giving rise to any claim for indemnification hereunder, (b) the amount or method of computation of the amount of such claim, (c) each individual item of Loss included in the amount so stated, to the extent known, and (d) the nature of the breach of representation, warranty, covenant or agreement with respect to which such Indemnified Party claims to be entitled to indemnification hereunder (all of the foregoing, the "***Claim Information***"), and shall provide any other information with respect thereto as the Indemnifying Party may reasonably request.  The failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article IX except to the extent that the Indemnifying Party is prejudiced by such failure.  The Indemnifying Party shall have the right to defend any such Third Party Claim and control the defense of such Third Party Claim; provided, however, that the Indemnified Party shall have the right to reasonably approve counsel selected by the Indemnifying Party.  If the Indemnifying Party, within ten (10) business days after notice of such Third Party Claim, fails to take appropriate steps to defend such Third Party Claim, the Indemnified Party will (upon further notice to the Indemnifying Party) have the right to undertake the defense of such Third Party Claim on behalf of and for the account and at the risk and expense of the Indemnifying Party.  If the Indemnifying Party assumes the defense of such Third Party Claim, the Indemnified Party shall have the right to employ separate counsel and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party; provided that if in the reasonable opinion of counsel for the Indemnified Party, there is a conflict of interest between the Indemnified Party and the Indemnifying Party, the Indemnifying Party shall be responsible for the reasonable fees and expenses of one counsel to such Indemnified Party in connection with such defense.  If the Indemnifying Party assumes the defense of any Third Party Claim, the Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party.  If the Indemnifying Party assumes the defense of any Third Party Claim, the Indemnified Party shall agree to any settlement, compromise or discharge of such Third Party Claim that the Indemnifying Party may recommend and that by its terms obligates the Indemnifying Party to pay the full amount of the liability in connection with such Third Party Claim, and which releases the Indemnified Party completely in connection with such Third Party Claim.  Whether or not the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnified Party shall not admit any liability with respect to, or settle, compromise or discharge, or offer to settle, compromise or discharge, such Third Party Claim without the Indemnifying Party's prior written consent, which consent shall not be unreasonably withheld.

(b)     With respect to the Excluded Claims, Seller shall control and decide on any settlement amount to be paid to such Third Party; provided, that Seller shall not argue or otherwise take a position that the Buyer or Subsidiaries are responsible to any Third Party for the Excluded Claims.  Buyer Indemnified Parties shall agree to any settlement, compromise or discharge of such Excluded Claims that Seller may reasonably decide or recommend and that obligates the Seller to indemnify Buyer Indemnified Parties in connection with such Excluded Claim, and which releases the Buyer Indemnified Parties completely in connection with such Excluded Claim; provided, that if any such settlement involves payments not covered by Seller's indemnification hereunder or the Subsidiaries' insurance policies and the Buyer Indemnified Parties are required to make a payment of any portion of such settlement, then the settlement shall be subject to Buyer's consent and approval, not to be unreasonably withheld, conditioned or delayed.

DM3\8379252.24

**9.5**     **Direct Claims**.   If an Indemnified Party becomes aware of any basis for indemnification under this Article IX (except as otherwise provided for under Section 9.4), the Indemnified Party shall notify the Indemnifying Party in writing of the same within fifteen (15) business days after becoming aware of such breach or claim, with such notice containing the Claim Information, and shall provide any other information with respect thereto as the Indemnifying Party may reasonably request.   The Indemnified Party shall reasonably cooperate and assist the Indemnifying Party in determining the validity of any claim for indemnity by the Indemnified Party and in otherwise resolving such matters.   Such assistance and cooperation shall include providing reasonable access to and copies of information, records and documents relating to such matters, furnishing employees to assist in the investigation, defense and resolution of such matters and providing legal and business assistance with respect to such matters.   Should the Indemnified Party fail to notify the Indemnifying Party within the time frame required above, the Indemnified Party nonetheless shall be entitled to indemnification by the Indemnifying Party to the extent that the Indemnifying Party has not established that it has been prejudiced by the failure to receive timely notice.

**9.6**     **Claims Made**.   The time limits set forth in Section 9.3 for making claims for indemnification are in lieu of, and the Parties expressly waive, any other applicable statute of limitations during which such claims may be brought or asserted.   Any notice for indemnification made pursuant to Section 9.4 or Section 9.5 prior to the expiration of the time limit set forth in Section 9.3 for the matter against which indemnity is sought shall for purposes of the time limits set forth in Section 9.3 constitute a claim or demand brought within such time limit, and the obligations of the Indemnifying Party therefor under this Article IX shall continue as to such matter, notwithstanding the expiration, if any, of such time limit.

**9.7**     **Scope of Liability**.   Except in the case of matters relating to intentional fraud, willful misconduct, or criminal acts, the sole and exclusive remedy of any Indemnified Party for any claim arising out of or relating to this Agreement is set forth in this Article IX.

### ARTICLE X
### DISPUTE RESOLUTION

**10.1**     **General**.   Except as otherwise expressly provided herein, the Parties agree that the exclusive remedy for any dispute, controversy, claim or disagreement arising out of or relating to this Agreement (a "*Dispute*"), shall be negotiation, mediation and arbitration pursuant to this Article X.

**10.2**     **Informal Negotiations**.   The Parties involved in a Dispute shall, as soon as reasonably practicable after one Party gives written notice of a Dispute to the other Parties, engage in good faith negotiations (the "*Negotiation*").

**10.3**     **Mediation**.   If the Negotiation does not resolve any Dispute within thirty (30) days after notice of such Dispute is received (the "*Negotiations Period*"), the Parties shall try in good faith to settle such Dispute through non-binding mediation under the Commercial Mediation Rules of the AAA.  The Parties will jointly appoint a mutually acceptable mediator, seeking assistance in such regard from the AAA if they do not agree upon such appointment within ten (10) days after

40

DM3\8379252.24

expiration of the Negotiations Period applicable to such Dispute.  The costs of such mediation, including fees and expenses, shall be borne equally by such Parties.

**10.4**     **Arbitration**.  If there remains unresolved any Dispute thirty (30) days after the expiration of the Negotiations Period applicable to such Dispute, then the Parties shall submit such Dispute to a three (3) member disinterested third-party arbitration panel selected (a) by mutual agreement of such Parties or (b) in the event such Parties do not reach an agreement regarding the selection of such panel within sixty (60) days after the expiration of the Negotiations Period applicable to such Dispute, each Party shall select one arbitrator within ten (10) business days after the expiration of such period, and those two arbitrators shall then select within ten (10) business days a third arbitrator.  If two arbitrators have been selected by such Parties and those two arbitrators are unable to select a third arbitrator within such ten (10) business day-period, a third arbitrator shall be appointed by the AAA within fifteen (15) days after the expiration of such period.  The arbitrators thus selected or appointed shall conduct the arbitration pursuant to the then-current rules of the AAA.  The arbitrators shall be governed by the provisions of this Agreement.  In the event the applicable Parties mutually agree upon the selection of such three (3) member panel, the fees and expenses of the arbitrators shall be shared equally between the applicable Parties.  In the event the applicable Parties are not able to mutually agree upon the selection of such three (3) member panel, each of the Parties, respectively, shall bear the costs of its appointed arbitrator, and the fees and expenses of the third arbitrator shall be shared equally between the Parties involved in the Dispute.  Each Party shall bear its own, and its Affiliates', costs and attorneys' fees in any arbitration proceeding.  The arbitration shall be concluded within no later than one hundred eighty (180) days following the expiration of the Negotiations Period.  The award of the arbitrators shall be final and binding on the Parties and may be enforced in a court having competent jurisdiction.

**10.5**     **Injunctive or Similar Relief**.  Solely for the purpose of obtaining a temporary restraining order, preliminary injunction or other interim injunctive or equitable relief or remedy or recognition or enforcement of any judgment relating thereto, each Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for purposes of enforcing this Agreement, waives any and all rights under the laws of any other state to object to jurisdiction within the State of Illinois, and consents to the service of process in any such action or proceedings, in addition to any other manner permitted by applicable laws, by compliance with the notices provision of this Agreement.

**10.6**     **Survival**.  This Article X shall survive the expiration or earlier termination of this Agreement.

**ARTICLE XI**
**GENERAL PROVISIONS**

**11.1**     **Additional Assurances**.  The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein provided to the contrary; provided, however, at the request of a Party, the other Party or Parties shall execute such additional instruments and take such additional action as the requesting Party may deem necessary to effectuate this Agreement.  In addition, and from time to time after the Closing Date, Seller and

41

Buyer shall each execute and deliver such other instruments of conveyance and transfer, and take such other actions as any Party may reasonably request, to more effectively convey and transfer full right, title and interest to, vest in, and place Buyer in legal and actual possession of the Purchased Assets.

**11.2   Recitals**.  The recitals set forth at the beginning (starting on page one) of this Agreement  are incorporated into this Agreement and made part of this Agreement as substantive provisions and not as mere recitals.

**11.3   Consideration**.  The Parties acknowledge the mutual receipt and sufficiency of valuable consideration for the formation of the legally binding contract represented by this Agreement.  That consideration includes all of the representations, warranties, covenants, and obligations contained in this Agreement and the Real Property Purchase Agreement.

**11.4   Consents, Approvals and Discretion**.  Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by a Party or a Party must or may exercise discretion, such consent or approval shall not be unreasonably withheld, conditioned or delayed and such discretion shall be reasonably exercised.

**11.5   Legal Expenses**.  In the event a Party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial proceedings, each Party shall pay its own legal expenses.

**11.6   Choice of Law; Venue**.  This Agreement and all disputes or controversies arising out of or relating to this Agreement or the Transaction (in contract or tort) shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflicts of law principles and, subject to Article X, the venue of all disputes, claims, and lawsuits arising hereunder shall lie in Cook County, Illinois.

**11.7   Benefit, Assignment and Third Party Beneficiaries**.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns; provided, however, that no Party may assign this Agreement without the prior written consent of the other Party except that Buyer may assign this Agreement and/or any of its rights hereunder to a wholly owned subsidiary of Buyer ("***Buyer Subsidiary***").  Buyer's assignment of its rights under this Agreement to a Buyer Subsidiary shall not release Buyer from performing its obligations hereunder, but rather Buyer and Buyer's Subsidiary shall be jointly and severally liable for such obligations.  This Agreement is intended solely for the benefit of the Parties and is not intended to, and shall not, create any enforceable third party beneficiary rights, except with respect to the provisions of Article IX, which shall inure to the benefit of the Indemnified Parties, who are intended to be third-party beneficiaries thereof.

**11.8   No Brokerage**.  The Parties represent to each other that no broker or finder is entitled to any brokerage fees, commissions or finder's fees in connection with the Transaction by reason of any action taken by the Parties.  Each Party shall indemnify the other Party from and against all Losses arising out of claims for fees or commissions of any brokers or finders engaged or alleged to have been engaged by such Party.

DM3\8379252.24

**11.9**    **Cost of Transaction**.  Except as may be provided to the contrary elsewhere herein: (i) Buyer shall pay the fees, expenses and disbursements incurred by Buyer and its agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto; and (ii) Seller shall pay the fees, expenses and disbursements incurred by Seller and its agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto.

**11.10**    **Confidentiality**.  It is understood by the Parties that the information, documents and instruments delivered to each Party by the other Parties or agents thereof in connection with the negotiation of this Agreement or in compliance with the terms, conditions and covenants hereof are of a confidential and proprietary nature.  Both prior to and for a period of three (3) years following the Closing, the Parties shall maintain the confidentiality of all such confidential information, documents or instruments delivered to it by the other Parties or agents thereof and shall not disclose such confidential information, documents and instruments to any third parties other than its Representatives assisting in the Transaction or as may be required by applicable Laws.  If the Closing is not consummated, each Party shall return all such confidential information, documents and instruments and all copies thereof in its possession to the Party providing them.  The terms and conditions of this Agreement and all other agreements and instruments executed and delivered by the Parties in connection with this Agreement shall remain confidential and the Parties shall not disclose such agreements or instruments, or any part thereof, to any third party other than its Representatives assisting in the Transaction for a period of three (3) years following the Closing or as may be required by applicable Laws.  Any breach of this Section 11.10 by a Party would result in irreparable harm to the other Parties and therefore the Parties shall be entitled to seek an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond in addition to other legal and equitable remedies.

**11.11**    **Public Announcements**.  No Party shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the Transaction without the prior written consent of Buyer and Seller, except for information and filings (a) reasonably necessary to be directed to Governmental Authorities to fully and lawfully effect the Transaction or (b) required under Law or the rules of any stock exchange applicable to a Party or its Affiliates.

**11.12**    **Waiver of Breach**.  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**11.13**    **Notice**.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered with signed receipt, when delivered by facsimile or other electronic means with electronic confirmation of delivery (unless not delivered on a business day or delivered after 5:00 p.m. Central Time on a business day, in which case such delivery shall be deemed effective on the next succeeding business day), when delivered by overnight courier with signed receipt, or when delivered by registered United States mail, with postage prepaid and return receipt requested, addressed to the

43

DM3\8379252.24

addresses below or to such other address as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.


Buyer:                          AUM Global Healthcare Management, LLC
                                21 Forest Avenue
                                River Forest, Illinois 60305
                                Attn: President

With a Copy to:                 Benesch Friedlander Coplan and Aronoff
                                71 South Wacker Drive, Suite 1600
                                Chicago, IL 60606
                                Attn: Juan Morado, Jr.
                                Email: jmorado@beneschlaw.com


Seller:                         SRC Hospital Investments II, LLC
                                898 N. Sepulveda Blvd., Suite 500
                                El Segundo, CA 90245
                                Attn:  Chief Executive Officer


With a Copy to:                 Duane Morris LLP
                                190 South LaSalle Street, Suite 3700
                                Chicago, IL 60603-3433
                                Attn:  Paul Coyle, Esquire

                                Tel.:  (312) 499-0109
                                Fax: (312) 277-7590
                                Email: pcoyle@duanemorris.com

                                and

                                Kirkland & Ellis LLP
                                300 North LaSalle
                                Chicago, IL 60654
                                Attn: Jaimie Fedell
                                Tel.: (312) 862-3709
                                Fax: (312) 862-2200
                                Email: jaimie.fedell@kirkland.com


    **11.14   Severability**.  In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or

44

DM3\8379252.24

unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

**11.15 <u>Interpretation</u>**. In the interpretation of this Agreement, except where the context otherwise requires, (i) "including" or "include" does not denote or imply any limitation, (ii) "or" has the inclusive meaning "and/or," (iii) "and/or" means "or" and is used for emphasis only, (iv) "$" refers to United States dollars, (v) the singular includes the plural, and vice versa, and each gender includes each other gender, (vi) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (vii) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (viii) "Exhibit" refers to an exhibit to this Agreement (which is incorporated herein by reference), unless otherwise stated in this Agreement, (ix) "Schedule" refers to a schedule to this Agreement and incorporates any attachments thereto (which are incorporated herein by reference), unless otherwise stated in this Agreement, (x) all references to times are times in Chicago, Illinois, and (xi) "day" refers to a calendar day unless expressly identified as a "business day," which means any day that is not a Saturday, Sunday, or official federal holiday in the United States.

**11.16 <u>Entire Agreement, Amendments and Counterparts</u>**. This Agreement supersedes all previous contracts, agreements and understandings between the Parties regarding the subject matter hereof and constitutes the entire agreement existing between or among the Parties respecting the subject matter hereof and no Party shall be entitled to benefits other than those specified herein. As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and neither Party is relying on any such oral statements or prior written material. All prior representations or agreements, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties. This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Signatures received via facsimile or other electronic transmission shall be accepted as originals. Notwithstanding any oral agreement or course of conduct of the Parties or their Representatives to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each Party.

**11.17 <u>Personal Liability</u>**. This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect equity holder of either Party or any officer, director, employee, investor or other Representative of either Party.

**11.18 <u>Disclosure Generally</u>**. Notwithstanding anything to the contrary contained in the Schedules or in this Agreement, the information and disclosures contained in any Schedule shall be deemed to be disclosed and incorporated by reference in any other Schedule as though fully set forth in such Schedule for which applicability of such information and disclosure is reasonably apparent on its face. The fact that any item of information is disclosed in any Schedule shall not be construed to mean that such information is required to be disclosed by this Agreement. Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Change" or other similar terms in this Agreement.

45

**11.19** **Offset Rights**. Except as set forth below, each Party is entitled to set-off or recoup any amounts owed by the other Party (or any other Buyer or Seller Indemnified Party), including without limitation the outstanding obligations under the Ramco Note, and the amounts earned and billed or owed under the Transition Services Agreement either before or after the Closing Date (but in the case of the TSA, no such amounts that have not yet come due or have not been earned and billed), against any amounts due and payable by such Party to the other Party (or any Buyer or Seller Indemnified Party, respectively), including any indemnification payment due pursuant to Sections 9.1 or 9.2 of this Agreement or any amount owed by Seller to Buyer relating to the adjustment of the Estimated Employee Payroll Credit. However, Buyer shall not have any right to set off the amounts owed by Seller to Buyer, including for indemnification or other reasons under this Agreement, against any fees, costs and expenses earned and billed under the Transition Services Agreement, and Buyer shall have an absolute obligation to pay all such fees, costs and expenses earned and billed under the Transition Services Agreement. For the avoidance of doubt, any indemnification payment due and payable by Seller pursuant to Section 9.2 of this Agreement shall be effected through a corresponding reduction in the aggregate amount of outstanding obligations under the Ramco Note immediately prior to such payment or indemnification.

**11.21** **Time of Essence**. Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

**11.22** **Waiver of Conflicts Regarding Representation; Non-Assertion of Attorney-Client Privilege**.

(a) Buyer waives and agrees not to assert, and agrees to cause its Affiliates to waive and not to assert, any conflict of interest arising out of or relating to the representation, after the Closing (the "***Post-Closing Representation***"), of the Seller Parties or any member, officer, employee or director of the Seller Parties (any such Person, a "***Designated Person***") in any matter involving or relating to this Agreement or the Transaction, by any legal counsel currently representing the Seller Parties in connection with this Agreement or the Transaction (the "***Current Representation***").

(b) Buyer waives and agrees not to assert, and agrees to cause its Affiliates to waive and to not assert, any attorney-client privilege with respect to any communication between any legal counsel and any Designated Person occurring during the Current Representation in connection with any Post-Closing Representation, including in connection with a dispute with Buyer or any of its Affiliates, it being the intention of the parties hereto that all such rights to such attorney-client privilege and to control such attorney-client privilege shall be retained by Seller; provided that the foregoing waiver and acknowledgement of retention shall not extend to any communication not involving this Agreement or the Transaction, or to communications with any Person other than the Designated Persons and their advisers.

(c) Buyer, on behalf of itself and its Affiliates agrees that no communications (including email or other written communications) subject to attorney-client privilege in connection with the Current Representation shall be subject to disclosure, directly or indirectly, to Buyer or any Person acting on behalf of Buyer, and the same shall be controlled by Seller and shall not be claimed by Buyer or any of its Affiliates.

46

DM3\8379252.24

(d)      Nothing in this Section is intended to or shall be deemed to operate as a waiver of any applicable privilege or protection that could be asserted to prevent disclosure of any confidential communication by any legal counsel currently representing any Designated Person.

(e)      Seller and Buyer agree to take, and to cause their respective Affiliates to take, all steps reasonably necessary to implement the intent of this Section 11.19.

*[Signature Pages Follows]*

47

DocuSign Envelope ID: 0F9A28E0-73B2-4F4B-A131-61A1C402793F

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized officers as of the date set forth below.

**Seller:**

**SRC HOSPITAL INVESTMENTS II, LLC**

By:_____
Name: Nicholas Orzano
Title: Authorized Signatory
Date: November 22, 2022

**Buyer:**

**AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**

By:_____
Name:  Manoj Prasad
Title:   CEO
Date: November 22, 2022

Signature Page to Membership Interest Purchase Agreement

DM3\8379252.24

DocuSign Envelope ID: 358BD986-532A-4106-96CF-79FC99F85188

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized officers as of the date set forth below.

**Seller:**

**SRC HOSPITAL INVESTMENTS II, LLC**

By:_____
Name: Nicholas Orzano
Title: Authorized Signatory
Date: November 22, 2022

**Buyer:**

**AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**

By:_____
Name: Manoj Prasad
Title:   CEO
Date: November 22, 2022

## EXHIBIT A

**TRANSITION SERVICES AGREEMENT**

**[To be finalized prior to Closing]**

*Exhibit A to Membership Interest Purchase Agreement*

**EXHIBIT B**

**RESTRICTIVE COVENANT AGREEMENT**

**[Attached]**

*Exhibit B to Membership Interest Purchase Agreement*

**EXHIBIT C**

**DEA POWER OF ATTORNEY**

**[Attached]**

*Exhibit C to Membership Interest Purchase Agreement*

DM3\8379252.24

# EXHIBIT D

## EXCLUDED LIABILITY ASSUMPTION AGREEMENT

### [Attached]

DM3\8379252.24

# EXHIBIT E

## SALE ORDER

### [To be Attached]

# EXHIBIT F

## AMENDMENTS TO AMENDED AND RESTATED MASTER LEASES FOR CHICAGO REAL PROPERTY

**[To be Attached]**

*Exhibit F to Membership Interest Purchase Agreement*

DM3\8379252.24

## <u>SCHEDULES TO MEMBERSHIP INTEREST PURCHASE AGREEMENT</u>

**[To be Attached]**

DM3\8379252.24

DocuSign Envelope ID: 0286A25E-04F1-4F87-9821-6CBF6E876A92

**FIRST AMENDMENT TO MEMBERSHIP INTEREST PURCHASE AGREEMENT**

This **FIRST AMENDMENT TO MEMBERSHIP INTEREST PURCHASE AGREEMENT** (this "Amendment") is entered into as of December 29, 2022, by and between **AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**, a Michigan limited liability company ("*Buyer*"), and **SRC HOSPITAL INVESTMENTS II, LLC**, a Delaware limited liability company ("*SRC II*" or "*Seller*"). Buyer and Seller are collectively referred to as the "*Parties*" and each individually as a "*Party*."

RECITALS

WHEREAS, the Parties entered into that certain Membership Interest Purchase Agreement dated as of November 22, 2022 (the "MIPA"); and

WHEREAS, the Parties desire to amend the MIPA as described below.

NOW, THEREFORE, in consideration for the foregoing premises, the mutual promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Excluded Assets/State of Illinois Tax Credits.  The MIPA is hereby amended by deleting Section 2.2(e) thereof relating to Excluded Assets in its entirety and replacing it with the following new Section 2.2(e):

(e) State of Illinois Tax Credits for investor-owned hospitals relating to the Hospital Facilities for the portion of tax years 2020 and 2021 during which Seller owned the Subsidiaries, which tax credits shall accrue to or shall otherwise be available for use by Seller or Pipeline Health System;

2.      2022 State of Illinois Tax Credits; Joinder.  The State of Illinois Tax Credits for investor-owned hospitals relating to the Hospital Facilities for tax year 2022 (collectively the "**2022 Tax Credits**") shall accrue to or shall otherwise be available for use by Buyer or Buyer's designee, and neither Seller nor Pipeline Health System shall take any contrary position on any local, state or federal tax filing. The Parties agree that Ramco Healthcare Holdings, LLC will become a party to this Amendment solely relating to the 2022 Tax Credits, as further described in the Joinder attached hereto.

3.      Ratification of MIPA.  To the extent necessary to effect the agreements of the Parties herein to and make any other provision of the MIPA consistent with such agreements, the MIPA is hereby deemed amended accordingly.  Otherwise, the provisions of the MIPA not expressly modified pursuant to this Amendment shall remain unchanged and in full force and effect and are hereby ratified and confirmed.  This Amendment shall become a part of the MIPA and is binding upon the Parties and their respective successors and permitted assigns.  In the event of a conflict between the MIPA and this Amendment, this Amendment shall control.

4.      Counterparts.  This Amendment may be executed in multiple counterparts (including by means of electronically transmitted signature pages) all of which taken together shall constitute one and the same agreement.  In pleading or proving any provision of this Amendment, it shall not be necessary to produce more than one set of such counterparts.

*[Signature Pages Follow]*

20701923 v2

DocuSign Envelope ID: CFF0BEED-A34F-47EB-AA9C-3D4A55227D8C

**IN WITNESS WHEREOF,** the Parties have caused this Amendment to be duly executed as of the date and year first written above.

**Seller:**

**SRC HOSPITAL INVESTMENTS II, LLC**

By:_____
Name: Nicholas Orzano
Title: Authorized Signatory

**Buyer:**

**AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**

By:_____
Name:  Manoj Prasad
Title:   CEO

DocuSign Envelope ID: 0286A25E-04F1-4F87-9821-6CBF6E876A92

**IN WITNESS WHEREOF,** the Parties have caused this Amendment to be duly executed as of the date and year first written above.

**Seller:**

**SRC HOSPITAL INVESTMENTS II, LLC**

By:_____
Name: Nicholas Orzano
Title: Authorized Signatory

**Buyer:**

**AUM GLOBAL HEALTHCARE MANAGEMENT, LLC**

DocuSigned by:

By:_____*Manoj Prasad*_____
Name: Manoj Prasad
Title:   CEO

DocuSign Envelope ID: 0286A25E-04F1-4F87-9821-6CBF6E876A92

## JOINDER

RAMCO HEALTHCARE HOLDINGS, LLC, as buyer (the "**Ramco**") under that Real Estate Asset Purchase Agreement, dated as of July 19, 2022, as amended and reinstated by that Reinstatement and Amendment of Real Estate Purchase Agreement, dated as of November 22, 2022 (collectively, the "**REPA**") by and between Ramco and West Suburban Property Holdings, LLC, River Forest Property Holdings, LLC, Weiss Property Holdings, LLC, Weiss MOB Property Holdings, LLC (collectively, "**REPA Sellers**"), hereby joins and agrees to this Amendment for the purpose of acknowledging the right of Buyer, or its designees, to the 2022 Tax Credits as a result of the transactions contemplated by the MIPA.  Ramco further agrees that in consideration of Buyer's right to the 2022 Tax Credits, and the receipt by Ramco of the credit in the amount of $853,415.68 applicable to estimated 2022 taxes for the Real Property (as defined in the REPA) granted at closing under the REPA on December 29, 2022, REPA Sellers' obligations, if any, with respect to the proration of or adjustment for 2022 taxes applicable to the Real Property pursuant to Section 2.6(f)(i) of the REPA have been satisfied in full, and Ramco will have no claim for any further proration or adjustments pursuant thereto.  REPA Sellers shall be a beneficiary of and shall be entitled to rely on this Joinder.

**RAMCO HEALTHCARE HOLDINGS, LLC**


By: _Rathnaker Reddy Patlola_____
       <small>DocuSigned by:</small>
       <small>2B4AC89A128C4E7</small>
Name:  Rathnaker Reddy Patlola
Title:   Authorized Signatory